**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 24-CV-20631-BECERRA/SANCHEZ**

TRANSPARK, LLC,

Plaintiff,

v.

FTP INVESTMENT CORPORATION,

Defendant

______________________________/

**PLAINTIFF'S *AMENDED* MOTION TO VACATE JUDGMENT AND FOR NEW TRIAL**

Plaintiff, TRANSPARK, LLC ("Transpark" or "Plaintiff"), by and through undersigned counsel and pursuant to Rule 59, Fed. R. Civ. P., moves to vacate the Judgment [ECF No. 190] and for a new trial on the October 3, 2025 Jury Verdict returned in favor of Defendant FTP INVESTMENT CORPORATION ("FTP" or "Defendant") and states as follows:

## OVERVIEW

Transpark is entitled to a new trial based on errors that, both individually and cumulatively, deprived it of a fair trial. Despite undisputed evidence that the *Profit Participation Agreement* (Pl.'s Tr. Ex. 1) was valid and binding, that FTP sold the subject venture property for $18 Million, and that FTP never paid Transpark its contractual share of the net profits, the Jury's Verdict [ECF No. 179] found no breach of contract. The Verdict was against the clear weight of the evidence and resulted from two fundamental errors.

***First***, the Court admitted into evidence a *Collateral Assignment of Rights* (the "Collateral Assignment") dated August 27, 200 (Def.'s Tr. Exs. 78, 79) – a personal loan agreement between the parties' individual principals – that was legally irrelevant to Transpark's contractual rights under the Profit Participation Agreement. Defendant's counsel misrepresented on motion *in limine* that the evidence arising from the Collateral Assignment would be used only to show Mr. Seidler's

subjective state of mind. The Court relied on this misrepresentation when it denied Plaintiff's motion *in limine* and admitted the Collateral Assignment into evidence. Throughout trial, Defendant elicited evidence and argued to the jury in closing that the Collateral Assignment automatically extinguished Transpark's contractual rights—a legal impossibility under Florida law. No foreclosure ever occurred; and, the Collateral Assignment was time-barred; yet, the jury was allowed to consider is as though it had continuing legal force, without any limiting or curative instructions (the request for which was soundly rejected by the Court).

***Second***, Defendant's counsel engaged in pervasive misconduct during closing argument that gravely impaired the jury's consideration of the case. Counsel committed fundamental error by calling Plaintiff's attorney (Mr. Pardo) a liar, then launched into sustained character assassination of Plaintiff's principal, Greg Mirmelli, repeatedly calling him a "con man" and "liar" in arguments the Court itself acknowledged had "nothing to do with the evidence." Most critically, counsel explicitly instructed the jury to decide the case and render its verdict **not** based on the evidence and **not** based on whether FTP breached the Profit Participation Agreement but based on whether the jury believed Greg Mirmelli was "a con man" trying to "shake down" FTP's principal, Bart Seidler. The Court did not provide limiting or curative instructions, and the jury followed Defendant's improper instruction to decide this case based on character rather than evidence.

The cumulative effect of these errors—the admission of legally irrelevant and prejudicial evidence used contrary to counsel's representations, combined with counsel's improper instruction to the jury to decide based on character attacks rather than contractual obligations—deprived Transpark of a fair trial and resulted in a verdict that contradicts undisputed facts. As fully explained below, a new trial is required.

## RELEVANT FACTS

**The Profit Participation Agreement**

In 2006, Transpark secured a contract to purchase real property located at 130 Southeast First Street, Miami, Florida (the "Property"). (Pl. Tr. Ex. 1). Transpark procured Defendant FTP to join in the acquisition of the Property. On May 22, 2006, Transpark and FTP memorialized their agreement in writing—the *Profit Participation Agreement* (Pl. Tr. Ex. 1). Under the Profit Participation Agreement, Transpark invested $300,000 towards the purchase of the Property in exchange for (a) the right to lease ("Lease") the Property and (b) a 30% participation in the net profits, when the property was ultimately sold or developed. (Pl. Tr. Ex. 1). In the event that Transpark defaulted on the Lease, Transpark would only be entitled to receive 15% of the net profits, when the property was ultimately sold or developed. (Pl. Tr. Ex. 1). The agreement also included a right of first refusal. Notably, Mirmelli, in his individual capacity, executed the Profit Participation Agreement to personally guarantee Transpark's payment and performance under the agreement. (Pl. Tr. Ex. 1).

**Operation of the Parking Lot and Lease Arrangement**

On May 31, 2006, and in a separate writing than the Profit Participation Agreement, Transpark and FTP executed a Ground Lease Agreement for Transpark to lease the subject venture Property (the "Ground Lease"). (Pl. Tr. Ex. 6). The default provision under the Ground Lease expressly states that "no default shall occur **until** notice thereof is given to the defaulting party . . ." (Pl. Tr. Ex. 6). Transpark was current in rent under the Lease for the first two years. (2025.09.30 Tr.-2 at 86:15 – 18).[1] During that time, Transpark's employee, Nathan Heber ("Heber") physically operated the parking lot. (2025.0930 Tr.-2 at 3:25-4:7; 91:22-92:5. Without oversight from

[1] A true and correct copy of Day 2 of the Jury Trial Transcript, dated September 30, 2025, is attached hereto as **Exhibit B**.

Mirmelli, the cash proceeds from the parking lot's operations fell dramatically. (2025.09.30 Tr.-2 at p. 86, lines 19 – 25). Mirmelli believed that Heber was skimming the cash from the business. (2025.09.30 Tr.-2 at 90:2 – 15). From the middle of to late 2007, Seidler and Heber stopped communicating with Mirmelli. (2025.09.30 Tr.-2, 84:6–16; 88:24–89:4; 92:3–12). Even though the rent under the Lease was not being paid, FTP never gave Transpark notice of breach of the Profit Participation Agreement. 2025.09.30 Tr.-2 at 90:16–18). Frustrated by the situation, Transpark stopped managing the parking lot operation. (2025.09.30 Tr.-2, 91:9–10; 91:16–21). In 2011, Seidler leased the parking lot directly to Heber. (2025.09.30 Tr.-2, 3:25–4:12; 9–13; 84:14–16; 91:6–13). Mirmelli believes that Seidler and Heber conspired to deprive him of the benefits of the Lease operations. (2025.09.30 Tr.-2, 86:8–87:21).

**The Personal Loan and Collateral Assignment**

On or around August 2007, Mirmelli was in the process of buying a new home for $5.7 million. (2025.09.30 Tr.-2, 175:13–16). The transaction was completely unrelated to the parties' business with the Property. (2025.09.30 Tr.-2, 174:21–24). Mirmelli personally borrowed $300,000 from Seidler. (2025.09.30 Tr.-2, 174:21–24). That loan was memorialized by a promissory note (the "Promissory Note") and secured by the Collateral Assignment. (Def.'s Tr. Ex's. 78, 79); (2025.09.30 Tr.-2 at 203:19–204:7). The Collateral Assignment was executed and delivered by Gregory Mirmelli, individually (not Transpark), to Bart Seidler, individually (not FTP), to secure any outstanding balance on the Promissory Note. (Def.'s Tr. Ex. 78). The Collateral Assignment had absolutely nothing to do with or connected in any way to the Profit Participation Agreement. Under the Collateral Assignment, Mirmelli agreed to transfer his rights to the Property to Seilder, as set forth in a "Memorandum of Understanding" purported to be attached to the Collateral Assignment as Exhibit A. At trial, however, FTP did not introduce such attachment,

(2025.09.30 Tr.-2, 209:24–210:1), and Mr. Seidler testified that the Profit Participation Agreement was not the Memorandum of Understanding. The Collateral Assignment purportedly created a security interest in *Mirmelli's* interests (not Transpark) in such memorandum. (Def.'s Tr. Ex. 79). At the time the Collateral Assignment was executed, Mirmelli had no personal interest in the Property. (Def.'s Tr. Ex. 79).

At trial, Mirmelli testified that he had repaid Seidler the entire $300,000 loan; however, by the time this lawsuit was filed, he could find documentation of repayment of only $200,000. (2025.09.30 Tr.-2, 205:19–206:1–14). No evidence to the contrary was produced at trial; Seidler never gave Mirmelli notice of breach of the Promissory Note, nor did Seidler file a legal claim for breach of the Promissory Note. Importantly, there was no evidence at trial that Seidler ever gave Mirmelli notice of breach of the Collateral Assignment, nor was any evidence elicited at trial that Seidler filed a legal claim to foreclose the Collateral Assignment. Nor did Seidler give Mirmelli the required statutory notice of any non-judicial enforcement of the Collateral Assignment.

**The 2012 Foreclosure and Lack of a Capital Call**

In 2012, BB&T, the holder by assignment of FTP's mortgage in the Property, called for repayment of the loan. (2025.09.29 Tr.-1, 172:18-173:2) [ECF No. 160].[2] FTP never issued a capital call to Transpark under the Profit Participation Agreement. (2025.09.29 Tr.-1, 134:12-20). FTP never gave Transpark notice of a capital call. (2025.09.29 Tr.-1, 134:12–20; 2025.09.30 Tr.-2, 6:5–12; 7:12–16). Rather, when Crimson Plaza LLC obtained a final judgment against Seidler (he was personally obligated on the loan), Seidler came up with the funds himself to satisfy the judgment. (2025.09.30 Tr.-2, 23:2-8).

[2] A true and correct copy of Day 1 of the Jury Trial Transcript, dated September 29, 2025, is attached hereto as **Exhibit A**.

**The Sale of the Property**

In August 2021, FTP entered into a contract to sell the property for $18 million. (Pl.'s Tr. Ex. 123. Despite Transpark's right of first refusal expressly provided in the Profit Participation Agreement, FTP never gave Transpark notice of the contract for sale or honored the right of first refusal. (2025.09.30 Tr.-2, 29:21–30:5). FTP closed on the contract and sold the Property for $18 million. (Pl. Tr. Ex. 136). The net cash proceeds from the sale were approximately $17.5 million. (Pl. Tr. Ex. 136). On its corporate tax return, FTP reported capital gains on the sale of the property of $11.4 million. (Pl. Tr. Ex. 142). At no time prior to closing on the sale of the Property did Seidler or FTP inform the closing agent, Mr. Joseph Colletti, of the existence of the Profit Participation Agreement or Transpark's right of first refusal. (2025.09.30 Tr.-2, 108:7–16). Had Mr. Colletti known, then (as closing agent) he never would have closed without Transpark's waiver and consent. (2025.09.30 Tr.-2, 109:7–23). FTP took the entire net proceeds of sale for its own account and did not pay Transpark any monies pursuant to the Profit Participation Agreement. (2025.09.20 Tr.-1, 128:9–21).

**Procedural History**

On February 18, 2024, Transpark sued FTP for breach of the Profit Participation Agreement. (ECF No. 1) and a jury trial was held on September 29, 2025 through October 3, 2025. On October 24, 2025, Final Judgment was entered in FTP's favor. [ECF No. 190].

**Opening Statement and Motion in Limine**

In his opening statement at trial, Defendant's counsel, Marcus Nielsen ("Nielsen"), told the jury that the evidence would show that Plaintiff had lost his right to share in the profits pursuant to a collateral assignment. (2025.09.29 Tr.-1, 41:16–18). Immediately thereafter, and prior to introducing any evidence in the case, Plaintiff moved *in limine* to exclude the Collateral

Assignment and any reference and argument relating thereto. (2025.09.29 Tr.-1, 47:13–49:2).[3] In response, Defendant argued that it intended only to suggest that Seidler ***believed*** that Plaintiff no longer had any contract rights and therefore did not believe it was obligated to give notice to Plaintiff of its capital call. (2025.09.29 Tr.-1, 50:2–21). Based upon that representation, the Court declined to grant Plaintiff's motion in limine. (2025.09.29 Tr.-1, 50:12-51:7).

**Introduction of the Collateral Assignment**

At trial, and over Plaintiff's objection, Defendant offered the Collateral Assignment into evidence. (2025.09.29 Tr.-1, 210:25–211:1). Plaintiff objected on grounds of completeness, relevance, and the legal issues raised *in limine*. (2025.09.29 Tr.-1, 211:4–5). The Court initially deferred ruling on the objection. (2025.09.29 Tr.-1, 211:7–9). Defendant then proceeded to elicit evidence that Transpark's profit participation rights had been foreclosed and lost pursuant to the Collateral Assignment; and at each successive questioning by Defendant's counsel as to the effect of the un-foreclosed Collateral Assignment, the Court overruled Plaintiff's objection. (2025.09.30 Tr.-2, p. 212, line 22 – p. 213, line 23) (2025.09.30 Tr.-2, p. 212, line 22 – p. 213, line 23). At the next break, the Court overruled Plaintiff's objection to the introduction of the Collateral Assignment. (2025.09.30 Tr.-2, 216:2-8). Plaintiff orally requested the Court reconsider its ruling and renewed its request to have the Collateral Assignment excluded from evidence, which was

[3] Plaintiff argued that the Collateral Assignment had been executed and delivered by Gregory Mirmelli, individually (not Transpark), to Bart Seidler, individually (not FTP), to secure any outstanding balance on the Promissory Note; that the Collateral Assignment created a security interest in Mirmelli's interests alone (not Transpark); that the enforcement of such interest was subject to the requirements of Chapter 679, Florida Statutes (UCC – Secured Transactions); that neither Seidler nor Defendant ever properly foreclosed their security interest pursuant to Florida law; that the statute of limitations on both the Promissory Note and the Collateral Assignment expired prior to the filing of this action; and that Plaintiff feared that Defendant might seek to introduce the Collateral Assignment and argue that Mirmelli's execution and delivery of the Collateral Assignment to Seidler meant that Transpark had somehow automatically lost its participation interest, and that no contract existed for Defendant to breach. (2025.09.29 Tr.-1, p. 47, line 13 – p. 49, line 2; *id.* at p. 49, line 18 - 25).

denied by the Court (2025.10.01 Tr.-3, 8:10–9:9) [ECF No. 164].[4] Thereafter and throughout the trial, Plaintiff objected to Defendant's references to the Collateral Assignment. (2025.09.30 Tr.-2, 240:25–241:9, 212:9-15, 212:23–213:2).

**Closing Arguments**

In closing argument, Defendant argued exactly as Plaintiff feared it would, and exactly *contrary* to Defendant counsel's representation to the Court at the motion *in limine*: Defendant's counsel argued to the jury that Plaintiff had no contract participation rights because such rights had been extinguished automatically by the delivery of the Collateral Assignment. (2025.10.03 Tr.-4, 47:3-20, 55:12-23) [ECF No. 176].[5] Defendant's counsel specifically urged the jury to find no breach of contract based on the Collateral Assignment. During Defendant's closing argument, Plaintiff objected to Defendant's argument relating to the Collateral Assignment. (2025.10.03 Tr.-4, 55:24). The Court again overruled Plaintiff's objection. (2025.10.03 Tr.-4, 55:25).

Mr. Casabielle also told the jury that Plaintiff's counsel, Joseph Pardo, had lied to them. (2025.10.03 Tr.-4, 35:7–13) (**It's called** respectfully **lying** or deflecting. And **I made a few notes of what Mr. Pardo said** during his closing argument, **which are examples of this**."). During closing argument, Casabielle also repeatedly expressed his personal opinion that Mirmelli is both a liar and a con man: (2025.10.03 Tr.-4, 38:22–23) ("Now, I want to suggest to you that Mr. Mirmelli is a **con man**") (2025.10.03 Tr.-4, 45:20–24) ("**He is a liar.** I will be so bold as to accuse him of being that kind of a person.") (2025.10.03 Tr.-4, 50:3–12) (**He is a con man. . . If you believe Mirmelli is a liar,** well, we're wasting our time here. Go back to the jury room and say: Leave us alone, you get nothing."). Casabielle then entreated the jury to render its decision in the

[4] A true and correct copy of Day 3 of the Jury Trial Transcript, dated October 1, 2025, is attached hereto as **Exhibit C**.
[5] A true and correct copy of Day 4 of the Jury Trial Transcript, dated October 3, 2025, is attached hereto as **Exhibit D**.

case not on the evidence, but rather on Mirmelli's nature as a liar and as a con man. (2025.10.03 Tr.-4, 57:13–21) (Say no to Mr. Mirmelli, we're not going to allow you to shake down Bart. **We know you're a con man, Mr. Mirmelli**, no, you cannot continue doing it."

**Request for Curative Instructions**

Immediately upon completion of Defendant's closing argument and prior to charging the jury, Plaintiff's counsel objected to Casabielle's improper comments and sought corrective instructions to the jury. (2025.10.03 Tr.-4, 62:17–64:18). The Court overruled Plaintiff's objections and declined to instruct the jury as to both Casabielle's improper arguments relating to the Promissory Note and Collateral Assignment and his improper comments. (2025.10.03 Tr.-4, 62:17–64:18). The Court ultimately denied the request for curative instructions, stating: "No, I don't need to hear anything else. There is no reason for me to give a curative instruction that, even if I were to accept your description of Mr. Casabielle's closing, would not be an appropriate curative instruction because **it's got nothing to do with the evidence before them**." (2025.10.03 Tr.-4, 62:17–64:18) (emphasis added).

It is undisputed that (i) the Profit Participation Agreement was valid and binding, and that (ii) Defendant failed to remit to Plaintiff any money pursuant to the Profit Participation Agreement. Nevertheless, on October 3, 2025, the jury returned its verdict in Defendant's favor, finding specifically that Defendant did not breach the Profit Participation Agreement. [ECF No. 179]. As fully explained below, the jury's special finding was against the clear weight of the evidence.

## MEMORANDUM OF LAW

## I. LEGAL STANDARD

Transpark is entitled to a new trial. *See* Fed. R. Civ. P. 59(a)(1)(A). "[T]he Supreme Court has held that a motion for a new trial may rest on the fact 'the verdict is against the weight of the

evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" *Goodloe v. Royal Caribbean Cruises, Ltd.*, 418 F. Supp. 3d 1112, 1120 (S.D. Fla. 2019), *aff'd*, 1 F.4th 1289 (11th Cir. 2021) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). It is proper to grant the motion when "the verdict is against the clear weight of the evidence." *Id.* (quoting *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 520 (11th Cir. 1988)). A new trial is warranted "where the error has caused substantial prejudice to the affected party." *Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 815 (11th Cir. 2017). Such errors include the presentation of prejudicial information, misconduct or pernicious behavior, erroneous jury instructions, or some combination of the foregoing. *See Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994); *FIGA v. R.V.M.P. Corp.,* 874 F.2d 1528, 1532 (11th Cir. 1989) (reversing judgment and ordering new trial where evidentiary error could have affected the outcome of the case).

## II. ARGUMENT

### A. The Court's Decision to Admit the Collateral Assignment Caused Substantial Prejudice to Transpark.

The Eleventh Circuit has identified the following factors to consider in determining whether to grant a new trial when a party's substantial rights were affected: (1) "the number of errors;" (2) "the closeness of the factual disputes;" (3) "the prejudicial effect of the evidence;" (4) "the instructions given;" and (5) "whether counsel intentionally elicited the evidence and focused on it during the trial." *Ad-Vantage*, 37 F.3d at 1465. Applying the *Ad-Vantage* factors demonstrates that Transpark is entitled to a new trial.

In *Ad-Vantage*, the Eleventh Circuit granted a new trial after inadmissible evidence was presented to the jury pursuant to Rule 403's balancing test. *See id.* at 1466. Importantly, even

though the *Ad-Vantage* court found that "the errors were few, the disputed facts were close, the evidence was highly prejudicial, no correcting instructions were given, and the inadmissible evidence was not only intentionally elicited but also emphasized in closing argument." *Id.* Here, all five of the *Ad-Vantage* court's factors strongly support granting Transpark a new trial. The number of errors was substantial, the factual disputes were close (with the verdict contradicting undisputed facts), the prejudicial effect was severe, no curative instructions were given, and counsel intentionally elicited and focused on the inadmissible evidence through misrepresentation. The cumulative effect deprived Transpark of a fair trial and resulted in a verdict against the clear weight of the evidence.

**(i) The number of errors flowing from the admission of the Promissory Note and Collateral Assignment was substantial.**

As a preliminary matter, it was an error for the Court to admit the Promissory Note and Collateral Assignment because their probative value—if any—was substantially outweighed by the danger of confusing the issues and misleading the jury. *See* Fed. R. Evid. 403. It is undisputed that the Promissory Note and Collateral Assignment involved: (a) a personal loan from Seidler (individually) to Mirmelli (individually); (b) a security interest in Mirmelli's individual interests (not Transpark's); and (c) parties different from those to the Profit Participation Agreement. During the trial, there was no evidence elicited that that the corporate formalities of both Transpark and FTP were disregarded such that the entities were the alter egos of Mirmelli and Seidler, respectively. The admission of this evidence certainly confused the jury about the distinct corporate entities and contractual relationships at issue.

The introduction of the Collateral Assignment allowed FTP's counsel to mislead the jury by questioning Mirmelli about his personal interest to the Property and failure to repay the loan and incorrectly argue to the jury that the personal loan agreement between the parties' principals

in their individual capacity divested *Transpark* from any share of the profits from the sale of the Property pursuant to the Profit Participation Agreement. Casabielle used the Collateral Assignment to incorrectly argue that the execution and delivery of the Collateral Assignment automatically cancelled the Profit Participation Agreement and divested Transpark from any share of the profits from the sale of the property; Casabielle repeatedly elicited testimony about the legal effect of the Collateral Assignment, including questioning Mr. Mirmelli about whether he understood he "lost his interest" if he failed to repay the loan; and, at closing, Defendant's counsel argued that the Collateral Assignment automatically extinguished Transpark's rights under the Profit Participation Agreement.

Moreover, the Collateral Assignment was introduced into evidence despite the fact it was incomplete (missing Exhibit A) and therefore violative of the Doctrine of Completeness. *See* Fed. R. Evid. 106; *see also Samedi v. Miami-Dade Cty.*, 134 F. Supp. 2d 1320, 1330 n. 9 (S.D. Fla. Jan 26, 2001) (referring to exhibits with incomplete attachments as "incompetent evidence.") The Collateral Assignment expressly stated that all of Mirmelli's rights to the Property were set forth in a 'Memorandum of Understanding'—a document that FTP failed to introduce at trial. As such, it was an error to allow the Promissory Note and Collateral Assignment into evidence. In sum: the multiple errors flowing from admission of the Collateral Assignment warrant a new trial.

**(ii) The closeness of the factual disputes supports a new trial.**

Defendant's only evidence that FTP did not breach the Profit Participation Agreement was that there was no contract to breach, because Transpark's profit participation rights had either been (i) foreclosed and lost pursuant to the Collateral Assignment or (ii) (as an affirmative defense) that Transpark's abandoned the agreement. On the other hand, Transpark presented evidence, which was undisputed, that (a) the Profit Participation Agreement was valid and binding; (b) FTP sold the property for $18 million with net proceeds of approximately $17.5 million and reported capital

gains of $11.4 million; and (c) FTP never paid Transpark any monies pursuant to the Profit Participation Agreement. The conflicting evidence, including the confusing effect of the Collateral Assignment on the Profit Participation Agreement, allowed for the jury to find that FTP did not breach the Profit Participation Agreement ***because*** Transpark's profit participation rights had been foreclosed. The jury's finding is evident, as it did not find that Transpark abandoned the agreement. This verdict was against the clear weight of the evidence because had Transpark's participation rights actually been foreclosed pursuant to its breach of the Collateral Assignment, then the Profit Participation Agreement would have been terminated, thereby there would have been no valid and enforceable agreement for FTP to breach.

**(iii) The prejudicial effect of the Promissory Note and Collateral Assignment was substantial and manifested in multiple ways throughout the trial; and, no curative instructions were given.**

Defendant's counsel represented to the Court during Plaintiff's motion *in limine* that Defendant would use the Collateral Assignment only to show Seidler's subjective state of mind (to explain why FTP failed to give required notices). The Court relied on this representation in denying the motion *in limine*. However, Defendant then used it to argue actual legal extinguishment of Transpark's rights—exactly what Plaintiff feared and what counsel represented he would not do. By allowing the Promissory Note and Collateral Assignment into evidence, Defendant was able to make legally incorrect representations to the jury.

Under Florida law, there is no "automatic enforcement" of a security interest. The Collateral Assignment could only be enforced through: (a) judicial foreclosure, or (b) non-judicial disposition with proper statutory notice under Fla. Stat. §§ 679.611, 679.613. Neither occurred. Yet Defendant argued to the jury that Mirmelli's failure to repay his ***personal*** loan ***automatically*** caused Transpark to "lose" its contractual rights—a legal impossibility that was presented as established fact.

Assuming *arguendo* that that Seidler intended the instant case to include or effect a foreclosure of the Collateral Assignment, such just claims were time-barred. The statute of limitations on both the Promissory Note (as well as the Collateral Assignment) had expired pursuant to Fla. Stat. § 95.11(2). As a matter of law, these were legal nullities with "no legitimate legal effect." Yet the jury was allowed to consider them as though they had continuing legal force. The absence of curative instructions compounded the prejudicial effect of the Promissory Note and Collateral Assignment. When the Court admitted the Promissory Note and Collateral Assignment over objection, it gave no limiting instruction to the jury explaining: (a) the limited purpose for which it could be considered (for Seidler's state of mind); (b) that it could not be used to establish automatic foreclosure; or (c) that enforcement would have required compliance with Florida UCC requirements that never occurred. The absence of any curative or limiting instructions left the jury free to rely on legal impossibilities and time-barred documents. This failure to instruct was particularly prejudicial given that the jury returned a verdict contradicting undisputed facts.

**(iv) Defendant's counsel intentionally elicited and focused on the inadmissible evidence through misrepresentation.**

The evidence demonstrates that Defendant's counsel not only intentionally elicited the evidence but did so through misrepresentation and then focused on it extensively in violation of his representations. Defendant's counsel, Marcus Nielsen, intentionally told the jury in opening statement that "Gregory Mirmelli breached that promissory note and gave his interest in the property to Bart Seidler, further solidifying FTP Investment's thinking that the agreement is abandoned and over with." This was a deliberate strategic decision to plant the Collateral Assignment theory before any evidence was introduced. Then, when Plaintiff moved *in limine* to exclude the Collateral Assignment, Nielsen represented to the Court: "I said that he did not repay the loan, and so he forfeited his rights to the property, *in Bart Seidler's mind*, to Bart Seidler."

Based on this representation of limited use, the Court denied the motion *in limine*. Despite this clear representation, Defendant's co-counsel, Casabielle, then moved to introduce the Collateral Assignment and, over repeated objections, elicited testimony about whether Mirmelli understood he would "lose his interest" if he didn't repay the loan—going far beyond Seidler's subjective belief. Critically, the record shows repeated questioning on this topic with repeated objections being overruled, demonstrating that counsel intentionally focused on and emphasized this evidence despite representation of its limited use.

Defendant's counsel made the Collateral Assignment a centerpiece of his closing and argued that Mirmelli's failure to repay the personal loan meant that Transpark lost its contractual rights. This was the exact argument Plaintiff feared, the exact argument counsel represented he would not make, and the exact legal theory that is impossible under Florida law. The progression: from opening statement, to misrepresentation at the motion *in limine*, to introduction of the exhibit, to repeated examination on the topic, to making it a centerpiece of closing argument demonstrates a premeditated strategy to use inadmissible and irrelevant evidence despite representations to the contrary. This factor weighs heavily in favor of a new trial. Defendant's counsel did not accidentally elicit inadmissible evidence—he deliberately sought it out, misrepresented his intentions to overcome Plaintiff's motion *in limine*, and then made it central to his case despite its legal irrelevance. This intentional conduct demonstrates exactly the type of prejudicial advocacy that warrants a new trial. Accordingly, the cumulative effect of the Promissory Note and Collateral Assignment warrant granting Transpark a new trial under the *Ad-Vantage Factors*.

**B. Defendant Counsel's Misconduct in Closing Argument Mandates a New Trial.**

The misconduct of counsel warrants a new trial when such misconduct "impair[s] gravely the calm and dispassionate consideration of the case by the jury." *Vineyard v. Cty. of Murray, Ga.*,

990 F.2d 1207, 1213 (11th Cir. 1993) (quoting *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir. 1988) (internal quotations omitted)). In determining whether to set aside a jury verdict based on an attorney statement made during closing argument, the Eleventh Circuit "look[s] to the entire closing argument, the context of the remarks, the objection raised, and the curative instruction." *Gonzalez v. Batmasian*, 734 F. App'x 677, 682 (11th Cir. 2018) (quoting *Allstate Ins. Co*., 845 F.2d at 318); *Hilger v. Velazquez*, 613 Fed. App'x 775, 776 (11th Cir. 2015) (per curiam). It is improper for counsel to make irrelevant references designed to inflame the passions and prejudices of the jury or use arguments that would lead the jury to decide the case on considerations other than the evidence. *See, e.g., Alvarado-Santos v. Dep't of Health*, 619 F.3d 126, 136 (1st Cir. 2010) ("[I]nflammatory arguments to the jury based on the Dominican nationality of some individual defendants . . . are 'clearly prohibited conduct' and have no place in a court of law."). Defendant counsel's pernicious conduct violated the established standard by (i) committing fundamental error by calling Plaintiff counsel a liar; and (ii) arguing to the jury that they should base their verdict on their opinion of Mirmelli's character as a liar and a con man rather than on the evidence. As fully explained below, such conduct caused substantial prejudice such that the jury rendered a finding that was against the clear weight of the evidence, warranting a new trial.

**(i) Defendant counsel's misconduct calling opposing counsel a liar was fundamental error.**

An *ad hominem* attack occurs when counsel attacks a party's or opposing counsel's character or morals. *R.J. Reynolds Tobacco Co. v. Gafney*, 188 So. 3d 53, 59 (Fla. 4th DCA 2016); *Whittenburg v. Werner Enterprises Inc*, 561 F.3d 1122, 1130 (10th Cir. 2009) ("[I]t is not the function of closing argument to debase, degrade or impugn the veracity of a litigant or opposing counsel."). It is well-settled law in Florida such *ad hominem* attacks during closing arguments constitutes fundamental error. *Stevenson v. Israeli*, WL 2326834, at *2 (Fla. 3d DCA, No. 3D24-

0618, 2025, Aug. 13, 2025) ("A party's closing argument that impugns the credibility or integrity of opposing counsel before the jury constitutes fundamental error as it deprives the party whose counsel was impugned from receiving a fair trial."); *Fla. Peninsula Ins. Co. v. Nolasco*, 318 So. 3d 584, 586 (Fla. 3d DCA 2021); *Sun Supermarkets, Inc. v. Fields,* 568 So.2d 480, 481–82 (Fla. 3d DCA 1990), *rev. denied*, 581 So.2d 164 (Fla.1991) ("[t]he conduct of the plaintiff's counsel in this case devastated any chance the defendant might have had to secure a fair trial in front of a jury who had been told not to trust the defendant's counsel. These derogatory remarks about opposing counsel will not be condoned.").

Here, Defendants' counsel called Plaintiff's counsel a liar, claiming that he was "respectfully lying or deflecting" during his closing argument. Defendants' counsel then proceeded to purport to provide the jury examples of Plaintiff's counsels' lies. Indeed, such statements constitute the exact type of *ad hominem* attacks the Third District has deemed highly improper and prejudicial. In sum, Casabielle's comment calling Pardo a liar constitutes fundamental error. As such, the Court should grant Plaintiff's motion for new trial.

**(ii) Defendant counsel's repeated characterization of Mirmelli as a liar and con man, coupled with arguments to decide the case based on character rather than evidence, constitutes prejudicial misconduct**

Closing arguments must "confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence," and must not be used to "inflame the minds and passions of the jurors so that their verdict reflects an emotional response[.]" *Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1028 (Fla. 2000). Rules of Professionalism prohibits counsel from asserting "a personal opinion as to ... the credibility of a witness[.]" R. Regulating Fla. Bar 4-3.4(e). This ethical rule serves vital purposes: "it not only prevents lawyers from placing their own credibility at issue in a case, it also limits the possibility that the jury may decide a case

based on non-record evidence." *Murphy*, 766 So. 2d at 1028. In short, the rule helps "ensure that juries render verdicts based on record evidence and applicable law, not based on impermissible matters interjected by counsel during closing argument." *Id.* While counsel enjoys latitude in closing argument to draw inferences from the evidence and comment on witness credibility, Florida law establishes clear boundaries that Defendant's counsel repeatedly transgressed.

The distinction between permissible and impermissible argument is clear. Counsel may identify specific evidence and argue that the jury should infer from that evidence that a witness's testimony is not credible. *See United States v. Henderson*, 320 F.3d 92, 105 (1st Cir. 2003) (holding that while it is permissible to identify "for the jury a specific item of evidence and [argue] that the jury should infer from that piece of evidence that the defendant's theory was not worthy of belief" it is impermissible for counsel to interject his personal opinion by characterizing defendant's assertions as "absurd"). What counsel may not do is launch into wholesale character assassination divorced from the evidentiary record and explicitly urge the jury to decide the case based on the witness's purported nature as a "con man" rather than the evidence. Yet that is precisely what occurred here. Here: Mr. Casabielle made sweeping character attacks wholly untethered to the evidentiary record; and, when Plaintiff sought curative instructions, the Court itself acknowledged that Casabielle's comments had "nothing to do with the evidence before them." (2025.10.03 Tr.-4, 62:17–64:18). Casabielle's repeated characterizations of Mirmelli as a "con man" and "liar" went far beyond commenting on specific testimony. (2025.10.03 Tr.-4, 50:3-12). Rather, they constituted a sustained attack on Mirmelli's character—assertions about who he is as a person, untethered from any particular piece of record evidence. Most critically: Casabielle urged the jury to decide based on character rather than evidence:

> Now, this is really important, folks, because the plaintiff's case is pretty much dependent on whether or not you believe Mirmelli. **<u>If you believe Mirmelli is a</u>**

> **liar, well, we're wasting our time here. Go back to the jury room and say: Leave us alone, you get nothing.**

(2025.10.03 Tr.-4, 50:8–12) (emphasis added). This was not argument about specific evidence—it was an instruction to decide the entire case based solely on whether the jury believed Mirmelli was "a liar" as a person. Casabielle doubled down on this approach:

> And you can do that -- **you can say no by checking off no in the verdict form. That's the very first question. Say no to Mr. Mirmelli, we're not going to allow you to shake down Bart. We know you're a con man, Mr. Mirmelli, no, you cannot continue doing it.**

(2025.10.03 Tr.-4, 57:18–21) (emphasis added).This argument was fundamentally improper. The validity of the Profit Participation Agreement was undisputed. FTP never raised extinguishment of the agreement as an affirmative defense. The jury's role was to determine whether FTP breached the agreement—a question of fact to be decided based on the evidence presented. Instead, Casabielle urged the jury to check "NO" on the verdict form not based on any evidence regarding breach, but because they should believe Mirmelli is "a con man" attempting to "shake down" Defendant. *See Stevenson v. Israeli*, WL 2326834, at *2 (reversing for new trial where counsel made multiple derogatory comments including that plaintiffs were trying to "shake down" defendants).

Plaintiff's counsel objected to Casabielle's improper comments and sought corrective instructions to the jury. (2025.10.03 Tr.-4, 62:17–64:18). The Court denied the request. (2025.10.03 Tr.-4, 62:17–64:18). The Court's observation—that Casabielle's argument had "nothing to do with the evidence"—actually demonstrates precisely why the misconduct was so prejudicial and why curative instructions were necessary. When counsel makes arguments untethered to the evidence and explicitly urges the jury to decide based on a party's purported character, curative instructions become essential to refocus the jury on their proper role. The

absence of any instruction left the jury free to follow Casabielle's improper exhortation to decide the case based on Mirmelli's supposed nature as a "con man" rather than the evidence of whether FTP breached the agreement. The prejudicial impact is evident in the verdict itself. Despite undisputed evidence that: (1) the Profit Participation Agreement was valid and binding; (2) FTP sold the Property for $18 million; (3) FTP never paid Transpark any share of the profits as required by the agreement; and (4) FTP never properly foreclosed any security interest that might have affected Transpark's rights, the jury nevertheless found that FTP did not breach the agreement. This verdict against the clear weight of the evidence suggests that the jury followed Casabielle's improper instruction to decide based on character judgments rather than contractual obligations.

Defendant counsel's misconduct pervaded the entire closing argument and deprived Transpark of a fair trial. Casabielle committed fundamental error by calling opposing counsel a liar—conduct that Florida courts have repeatedly held constitutes grounds for a new trial without need for curative instructions. Beyond that, he engaged in sustained character assassination of Mirmelli, repeatedly labeling him a "con man" and "liar" in arguments the Court itself acknowledged had "nothing to do with the evidence." Most critically, he explicitly urged the jury to decide the case not based on whether FTP breached the Profit Participation Agreement, but based on whether they believed Mirmelli was "a con man" trying to "shake down" Defendant. The cumulative effect of these improper arguments—compounded by the Court's denial of curative instructions—gravely impaired the jury's calm and dispassionate consideration of the case. The resulting verdict, which found no breach despite undisputed evidence that FTP sold the Property for $18 million and paid Transpark nothing, demonstrates that the jury followed Casabielle's improper instruction to decide based on character rather than evidence. Under the standards established by the Eleventh Circuit and Florida courts, this misconduct mandates a new trial.

**WHEREFORE,** Plaintiff respectfully requests that the Court order a new trial, together with such further and additional relief the Court deems just, equitable, and proper.

**CERTIFICATE OF CONFERRAL**

**I HEREBY CERTIFY** that, on November 26, 2025, Plaintiff's counsel, Joseph I. Pardo, Esq., and Defendant's counsel, Marcus Nielsen, Esq., further conferred in good faith to resolve the issues raised in this motion, but were unable to do so.

By: *Joseph I. Pardo, Esq.*
Joseph I. Pardo

Date: December 2, 2025

Respectfully submitted.

**ZARCO EINHORN SALKOWSKI, P.A.**
One Biscayne Tower
2 S. Biscayne Blvd., Suite 3400
Miami, Florida 33131
Telephone: (305) 374-5418
Telecopier: (305) 374-5428

**ROBERT ZARCO (FBN 502138)**
E-mail: rzarco@zarcolaw.com
Secondary Email: eservice@zarcolaw.com
**F. ALAINA RODRIGUEZ (FBN 1070046)**
E-mail: farodriguez@zarcolaw.com
Secondary Email: bryan@zarcolaw.com

and

**PARDO LAW, PLLC**
1205 Lincoln Road, Suite 211
Miami Beach, Florida 33139
Phone: (305) 308-7388
Email: joe@pardolawmiami.com

By: */s/ Joseph I. Pardo*
Joseph I. Pardo, Esquire
Fla. Bar No. 1003339

*Counsel for Plaintiff Transpark*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that, on December 2, 2025, a copy of the foregoing was filed electronically by using the CM/ECF system, and that notification of this filing is to be provided to all counsel of record who have registered to receive notices from the court under the CM/ECF system.

*/s/ Joseph I Pardo*
**Joseph Pardo**