UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CV-20631-JB

TRANSPARK, LLC, Plaintiff,

vs.

FTP INVESTMENT CORPORATION, Defendant.

Miami, Florida
September 29, 2025
11:00 a.m. - 4:55 p.m.
Trial Day 1 EXCERPT
Pages 1 to 32

---

JURY TRIAL EXCERPT
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:
JOSEPH ISAIAH PARDO, ESQ
MELISSA LEA MACKIEWICZ, ESQ
SAVANNAH LEE DUFFY, ESQ
Pardo Law PLLC
1205 Lincoln Road
Suite 211
Miami Beach, Florida 33139

FOR THE DEFENDANT:
MARCUS ANTONIO NIELSEN, ESQ
MANUEL LAZARO CASABIELLE, ESQ
Boyd Richards Parker Colonnelli
100 SE 2nd Street
Suite 2600
Miami, Florida 33131

STENOGRAPHICALLY REPORTED BY:
VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR
Official Court Reporter to:
The Honorable Jacqueline Becerra
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
Vernita_Allen-Williams@flsd.uscourts.gov

INDEX OF WITNESSES

STEWART MIRMELLI:
Direct Examination............Page 61
Cross-Examination.............Page 81
Redirect Examination..........Page 114

BART SEIDLER:
Cross-Examination.............Page 118

EXHIBITS ADMITTED

Plaintiff's Exhibits en masse.................Page 60
Plaintiff's Exhibit 136.......................Page 60
Plaintiff's Exhibit 1.........................Page 71
Defendant's Exhibit 41........................Page 77
Defendant's Exhibit 87........................Page 84
Defendant's Exhibit 2.........................Page 96
Defendant's Exhibit 1.........................Page 100

10:49AM (Voir Dire reported and not transcribed.)

10:49AM (Back on the record at 11:00 a.m.)

11:00AM THE COURT: Let's bring the jury in.

11:01AM (Jury in at 11:01 a.m.)

11:01AM THE COURT: Everyone, be seated.

11:02AM Members of the jury, now that you've been sworn, I need to explain some basic principles about a civil trial and your duty as jurors. These are preliminary instructions. I will give you more instructions at the end of the trial.

11:02AM It is your duty to listen to the evidence, decide what happened, and apply the law to the facts. It is my job to provide you with the law you must apply. And you must follow the law even if you disagree with it.

11:02AM You must decide the case on only the evidence presented in this courtroom. Now, evidence comes in many forms. It can be testimony about what someone saw, heard, or smelled. It can be an exhibit or a photograph. It can be somebody's opinion.

11:02AM Some evidence may prove a fact indirectly, so let's say a witness saw wet grass outside and people walking into the courthouse carrying wet umbrellas. This may be indirect evidence that it rained even though the witness didn't personally see it rain. Indirect evidence is sometimes called circumstantial evidence. Simply a chain of circumstances that likely proves a fact.

11:03AM As far as the law is concerned, it makes no difference whether evidence is direct or indirect. You may choose to believe

or disbelieve either kind. Your job is to give each piece of evidence whatever weight you think it deserves.

During the trial, you will hear certain things that are not evidence, and those you must not consider. First, the lawyers' statements and arguments are not evidence. In their opening and closing arguments, the lawyers will discuss the case. Their remarks might help you follow the evidence, but the remarks themselves aren't evidence and shouldn't play a role in your deliberations.

Second, the lawyers' questions and objections aren't evidence. Only the witnesses' answers are evidence. Don't decide that something is true just because a lawyer's question suggested it. For example, a lawyer might ask a witness: You saw Mr. Jones hit his sister, didn't you? That question is not evidence of what the witness saw or what Mr. Jones did unless the witness agrees with it.

There are rules of evidence that control what the Court can receive into evidence. When a lawyer asks a witness a question or presents an exhibit, the opposing lawyer may object if he thinks or she thinks that the rules of evidence don't permit it. If I overrule the objection, then the witness may answer the question or the Court might receive it as an exhibit.

If I sustain an objection, the witness then cannot answer the question. And if I sustain the objection on an exhibit, that exhibit will not be entered into evidence. When I sustain an

objection to a question, you must ignore the question and not guess what the answer might have been.

Now, sometimes I might disallow evidence. This is also called striking it. And if I ask you to strike -- if I strike something, I will be asking you to disregard or ignore it. And that means you're not going to consider it in your deliberations. I may allow evidence, for example, only for a limited purpose. If I do so, I will instruct you that that piece of evidence is only entered for that purpose.

To reach a verdict, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or only part of it or none of it. When considering a witness's testimony, I'd like you to take into account the following: the witness's opportunity and ability to see, hear, or know the things that they're testifying about; the witness's memory; the witness's manner while testifying; any interest that the witness has in the outcome of the case; any bias or prejudice the witness may have; any other evidence that contradicts the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors affecting their believability. At the end of the trial, I'll give you additional guidelines for determining a witness's credibility.

Now, as I said to you during selection, this is a civil case. To help you follow the evidence, I'm going to summarize

again the parties' position. This case is a business dispute between two companies over a written contract called a Profit Participation Agreement entered into in May 2006 between the plaintiff, Transpark, LLC -- we'll refer to them as just "Transpark" -- and defendant FTP Investment Corporation -- and you will hear them referred to as just "FTP."

The agreement concerns commercial real estate in Downtown Miami, and we will be referring to that commercial real estate as just the property. You may hear it called by the address or others, but if you hear "the property," we're talking about the commercial real estate in downtown.

In May 2006, FTP purchased the property pursuant to the participation agreement. Under the agreement, Transpark would receive a percentage of the profits from the sale of the property given certain conditions -- if certain conditions, rather, were met.

In August 2021, FTP sold the property at issue. Transpark claims that FTP breached the agreement and breached the implied covenant of good faith and fair dealing. Transpark contends that there were profits from the sale of the property and that FTP failed to distribute Transpark its share of the profits at the time the property was sold and that FTP failed to honor Transpark 's right of first refusal under the agreement.

FTP denies it breached the agreement and claims that Transpark breached the agreement first. FTP contends that

Transpark failed to uphold its obligations under the agreement. It also contends that Transpark's claims are barred because they abandoned and repudiated the agreement, rendering that agreement unenforceable. FTP contends that even if the agreement is enforceable, Transpark is not entitled to any money from the sale of the property under the terms of that agreement.

The plaintiff has the burden of proof in a civil case, and that burden of proof is called a preponderance of the evidence. That means the plaintiff has to prove that in light of all the evidence, what it claims is more likely true than not. So if you put all the evidence, you know, favoring the plaintiff on one side of the scale and all the evidence on the other side, right, on the other side of the scales, if the scale tips in the favor of the plaintiff, it has met its burden, all right. If it doesn't, you must find in favor of the defendant.

To decide whether any fact has been proved by a preponderance of the evidence, you may, unless I instruct you otherwise, consider the testimony of all witnesses regardless of who called them and all the exhibits I allowed regardless of who produced the exhibit. After considering all the evidence, if you decide a claim or fact is more likely true than not, then the claim or fact has been proved by a preponderance of the evidence.

Now, on certain issues called affirmative defenses, there the defense would have the burden of proving those elements by a preponderance of the evidence. I will instruct you on the facts

11:10AM that the defendant must prove for any affirmative defense. After considering that evidence, if you decide that they have successfully proved an affirmative defense, again, you have to show it by a preponderance of the evidence, it's the same standard for the affirmative defenses.

11:10AM Now, during this trial, you're going to be allowed to submit witnesses -- I mean questions to the witnesses after the lawyers have finished their own questions. So here is how the procedure is going to work, all right. After each witness has testified and the lawyers have asked all their questions, I am going to ask you if you have a question. If you have a question, you're going to write it down, right. You're going to write down the question on one of the note pages on the pads that Donna gave you, and you will give those questions over to the marshal.

11:11AM You may submit a question for a witness only to clarify an answer or to help you understand the evidence. My experience with juror questions indicates that jurors really rarely have more than a few questions for any one witness, and there may be no questions at all for some witnesses.

11:11AM If you submit the question, the marshal will give it to me, and I will look through those questions with the lawyers. If the rules of evidence allow for the question, then I am going to read that question to a witness. Now, I might modify the question. I might modify the form, right, so that it comports with the rules of evidence. Sometimes I may not allow the

question at all, right.

So sometimes your question will be given to the witness, I'll read it to the witness, and the witness will answer it; sometimes you will see your question didn't get asked. That's either because the law maybe doesn't allow for that question to be asked or because that's not the witness -- the right witness, maybe another witness, right, is going to be coming up that will better answer that question. If I don't allow the question to be asked though, you are not to draw any conclusions from that or speculate as to why it wasn't called or what the answer might have been, all right.

So just a few important things to remember about jury questions. First, you don't say anything out loud, right. You're going to be writing them down. Two, I can't recall a witness if you have questions later. So if you have a question, ask it. Don't you think, "Oh, I'll ask this later or maybe it's coming later," right. Because if that doesn't happen, I can't recall a witness for you.

And finally, because it is important that you remain neutral and open-minded, please phrase those questions in a way that doesn't express an opinion that you might already be developing about the case or a witness, all right. You must keep an open mind until you've heard all the evidence, the closing arguments, and my final instructions on the law.

Remember that while serving on the jury, you may not talk

with anyone about anything related to the case. You may tell people you're a juror and give them information as to when you're going to be in court and not at home or not at the office, but you must not discuss anything about the case.

You shouldn't even talk -- or you can't talk about the case even with -- evening amongst each other, right, until deliberations. You want to make sure you've heard everything -- again, the evidence, the arguments, the law -- before you begin deliberations. You need to keep an open mind all the way to the end of the trial. And sometimes premature discussions about things can lead to premature decisions.

Now, in this age of technology, I want to emphasize in addition to not talking face-to-face with anybody about the case, you can't communicate by other means, right. No email, no texting, phones, messages, nothing with the Internet obviously, no social media, websites or apps, anything like that. Sometimes I give people the list, but I feel like every time I have a list of the new apps, there is another app I have never heard of, right. So if you're using a computer to talk to somebody, you're not talking to them about this case, okay.

You must not provide any information about this case to anyone by any means whatsoever. And of course, as I mentioned to you before, that includes not posting anything about the case, all right, on any kind of blog or chat room or social media websites or the like.

Again, don't use Google. I know there is more than Google now. Firefox, right, any kind of search engines that are out there, don't use anything to search anything online about the case, the parties, the law. Don't visit any place that you hear of, right. Don't read anything about this case. Don't research anything about it.

The law forbids you to talk with anyone else about the case and forbids anyone also to talk to you about it. It's very important that you understand why these rules exist and why they're so important. You have to base your decision only on the testimony and the evidence presented here. It's not fair to the parties if you base your decision in any way on information you acquired outside the courtroom. For example, the law often uses words and phrases in special ways. So it's important that any definitions you hear come from me, not from another source.

Only you, the jurors, can decide a verdict. The law only sees you as fair, and only you have promised to be fair, so no one else is qualified, all right.

Now, if you wish, you can also take notes. I see that some of you have already been taking notes. You have a pad. We will provide you with paper and pens. If you don't take notes, that's fine. If you do take notes to help you remember what a witness might say, don't share those notes with anyone else, right, until you go into the jury room to deliberate.

Don't let note-taking distract you from listening and

observing the witness. When you leave the courtroom, you should leave your notes in the jury room, but just hidden. So in other words, if you have been writing on that notebook, just close the notebook and put your pen on it when you leave the jury room.

Whether or not you take notes, you should rely on your own memory of the testimony. Your notes are only there to help you; they're not entitled to more weight than your memory or your impression of the testimony.

So in terms of -- I already told you for this morning what we're going to do. Each side is going to make an opening statement. Lawyers aren't required to make opening statements, but they will, and they usually always do, so you're going to be hearing from the lawyers on opening statements. It's not meant to be an argument, right. They're just going to be presenting what they believe the evidence will show.

After that, the plaintiff will begin to call witnesses, so the way that works is the plaintiff has to call their witnesses first. They're going to call a witness. They get to ask the questions first, then the defense asks questions, and then the plaintiff gets a chance to ask questions again, all right.

Then your questions will be considered. All right. After you ask your questions, I typically let the lawyers, again, if there is any follow-up, follow up only to those questions, all right.

The plaintiff will then rest, and the defense is going to

call a case, and it will be the same thing. If they call witnesses, they will get to ask the questions first. Then the defense -- I mean then the plaintiffs, then back to the defense, then back to you, same process, all right. The defense puts on a case. After they rest, because the plaintiffs have the burden of proof, they may call what we call a rebuttal case, or maybe not. They don't have to, okay.

Once they're done with the presentation of the evidence, then we go to closing arguments, all right. So you will hear the plaintiff give a closing argument, the defense will give a closing argument, plaintiff, again, gets a rebuttal, all right. And then I instruct you just like I have now. There will be a lengthier set of instructions because then I will address the law, right, that you have to consider in this case. All right.

Don't take any of the instructions that I have given you here because some of them you're going to hear again. Just because you've heard them twice doesn't mean they're more important, right. You're going to hear all my instructions at the end, like I said. Take them all and consider them all equally, all right. You don't, like, take one and say "Well, this one, we heard a lot. That one must be more important." No, you're going to consider all of my instructions as a whole.

Once that happens, then you will go into the jury room, and that's when you begin your deliberations. All right.

Are you ready, counsel?

11:19AM MR. PARDO: On behalf of the plaintiff, we're ready to begin opening statements; however, the parties have stipulated to the introduction of certain exhibits before opening trial, if the Court would indulge.

11:19AM THE COURT: All right. So you want the stipulations read before opening?

11:19AM MR. PARDO: Yes, Judge.

11:19AM THE COURT: All right. Hold on because I have the stipulations here. Were you going to read the stipulations, or would you like me to read the stipulations --

11:20AM MS. MACKIEWICZ: Your Honor, different issue. We're going to offer certain exhibits into evidence at this point that the parties have stipulated are admissible so that they can be used in opening statements.

11:20AM THE COURT: All right. So let's do this because I think it makes more sense. If you've already agreed that they're going to be in evidence, not a problem, use them in your opening statements. I assume you have let each other know what these exhibits are.

11:20AM MS. MACKIEWICZ: Yes.

11:20AM THE COURT: Okay. Not a problem. Then when you begin your case in chief, you can enter those exhibits in the normal course, all right.

11:20AM MS. MACKIEWICZ: Thank you, Your Honor.

11:20AM THE COURT: Let's proceed to opening statements.

MR. PARDO: Good morning. My name is Joseph Pardo.

THE COURT: I'm going to stop you right there. We can't hear you. Is your lapel on?

MR. PARDO: Test one, two. Test one, two. I'll use the lapel. That's fine. Test one, two.

THE COURT: No, we can't hear you.

MR. PARDO: Test one, two. Test one, two.

THE COURT: We can't hear you. Give me a minute.

(Brief pause to resolve technology issue.)

THE COURT: Do you want to take another lapel, Donna?

(Brief pause to resolve technology issue.)

MR. PARDO: Good morning. My name is Joseph Pardo. I represent the plaintiff, Transpark, LLC. My client is Gregory Mirmelli. It's his company.

FTP Investment Corporation is a California corporation owned by the defendant's principal, Bart Seidler.

I want to tell you up front, I am an advocate for my client. I am here to convince you to give Transpark a favorable verdict at the end of this trial, and at the end of this case, I will ask you to enter a verdict in favor of Transpark because FTP Investment Corporation breached the contract with Transpark when they sold real property in Downtown Miami for $18 million and did not give Transpark 30 percent of the profits from the sale and did not honor a right of first refusal that existed in the contract.

They kept a hundred percent of the sale proceeds for

11:22AM itself.

11:22AM Now, my opening statement to you is not evidence. It's just an overview of the evidence that I believe will be presented in this case. What you see and hear from the witness stand, that's what's in evidence. When you weigh the evidence, as long as the evidence tips in Transpark's favor, we've met our burden and you should enter a verdict in Transpark's favor. We believe that the evidence will far exceed that burden. That's the burden you should follow.

11:23AM We're going pull up the contract. It's Plaintiff's Exhibit 1. It is the Profit Participation Agreement.

11:23AM THE COURTROOM DEPUTY: It's coming.

11:23AM MR. PARDO: Thank you.

11:23AM This document will be introduced into evidence. It's the only contract that Transpark is suing under; not any other contract, not any other document. This is the contract that we're seeking to enforce. And under the contract, Section 1, Transpark is entitled to 30 percent of the net cash flow from the sale of the property.

11:23AM Now, the evidence will show that in 2006 Greg was under contract to buy this property. He had a contract. He owned the deal. He brought that contract to Mr. Seidler, who had seen Greg's success in the Miami real estate market, and he assigned that contract to FTP so that they could enter into this Profit Participation Agreement and assignment.

11:24AM The evidence will show that FTP's principal, Bart Seidler, was independently wealthy. He had the means to carry the project, and the assignment brought value to him because he got to own the property. He took title to the property subject to this Profit Participation Agreement.

11:24AM The evidence will show that Transpark put in $300,000 towards the purchase of the property. FTP put in money, too. And they took out a four-and-a-half -- excuse me -- FTP took out a four-and-a-half-million-dollar mortgage. That was a mortgage that was taken out by FTP and guaranteed by Mr. Seidler.

11:25AM Looking at Section 1, you see that there is a 30 percent: GM shall be entitled to receive 30 percent of the net cash flow and any profits from the sale or development of the property. And that's broken down in two buckets. 300,000 was his capital contribution, was equity to the purchase of the property, and then the next line says: GM -- that's Transpark -- gets a 15 percent promote. That's for bringing the deal and for being the initial operator, the initial tenant. And the evidence will show that this contract was valid until the closing.

11:25AM We're going to pull up Plaintiff's Exhibit 6. This is a ground lease. It's between FTP and Transpark. Transpark was the first tenant, the first operator of this property that was a parking lot. The evidence will show that Transpark leased the property and that the lease expired in 2011. There was no default under this lease. There was no default, no eviction, no

termination. The lease just expired. And FTP was okay with that.

And I want to be very clear about something. The lease is a separate contract from the Profit Participation Agreement. They are two contracts. They are not incorporated into one another, and the evidence will show that they were separate responsibilities.

And that's where I want to introduce my first theme of the case. Operations of this parking lot are different from profit participation. The responsibilities to run the lot, the responsibilities to be the operator are different than contract rights under a Profit Participation Agreement. Just like FTP did, you could own that property and not be the operator.

Transpark was the first operator. It had employees. One of them was a gentlemen named Nathan Heber. The evidence will show that Nathan Heber was the boots on the ground dealing with FTP on all matters related to the property while Transpark leased it. When the Transpark lease expired, the evidence will show that FTP hired Nathan Heber to continue operating the lot.

Operations are different than profit participation, and FTP was content, they were okay having a new operator come in, someone that Mr. Seidler thought was honest and managed the lot well. But just because Transpark stopped operating the lot, the evidence will show, does not mean that Transpark gave up its profit participation rights. We're going to go back to the Profit Participation Agreement, page 3, Section 2 d.

Section 2 d, as in David. Even if there was a default under the lease, FTP had to give 15 days written notice of default, and if that happened, then Transpark might lose its 15 percent promote. Remember, the 30 percent has a 15 and a 15; this is just the promote.

This is where I introduce my next theme of the case, notice matters. Notice matters.

We can take this down, Patrick. Thank you.

So what is notice? The evidence will show it's like a jury summons that tells you you had to show up here today at this courtroom at this time, so you could perform your civic duty. But if you got an email and it said there are a lot of trials going on, nothing more, nothing less, you might not know to show up on this day and time for this trial. Or if you got a parking ticket that says you owe this amount of money, and you have to send it to this address, and if you don't pay it by this time, the fine goes up, that's notice.

The Profit Participation Agreement talks about notice, and the evidence will show that the contract language about notice was clear. There are a few sections that deal with notice, and I'm going to call a few of them up now.

Let's go to page 5, Section 10, of the Profit Participation Agreement: Any notice or demand or document which either party is required or may desire to give or deliver -- not even if they had to give it; if they thought they might want to

11:29AM give it, if they desired to give it -- it shall be in writing, and then it lists both parties, the people who have to receive the notice, and an address for where they should receive notice.

11:29AM The evidence will show that Mr. Seidler at FTP Investment Corporation, that's his business address. And the evidence will show that Greg Mirmelli used his father Stewart's law firm address, the 130 Southeast 2nd Street, Suite 2650. That's his father's address, and his father is a lawyer. Greg's address may have changed from time to time, but Bart knew how to get ahold of Greg. Mr. Seidler, he knew how to get ahold of Greg.

11:30AM Let's go back to page -- Section 2 a on page 3.

11:30AM As happens in some businesses, you might need a capital contribution. You might need to put money into the deal, and the contract contemplated that. It said that if there's going to be money that has to go into the deal, you have to put it up 70/30, very similar to the 70/30 profit participation split. But look at Section 2 c. Section 2 c of the contract says that if there is going to be a capital contribution, it has to be noticed by FTP at least ten days prior to the date moneys are required in the normal course of business.

11:31AM FTP, not Transpark, was responsible for giving notice at least ten days before money was due into the venture in order for it to be a capital contribution under this agreement.

11:31AM Section 2 b of the contract says that if after ten days the notice is given, capital contribution is called and you don't

11:31AM put up your money, then the other side may loan money to the venture at a specified interest rate.

Now, I am going to make you a promise. You will not see any evidence at this trial where FTP gave Transpark notice of any capital call or capital contribution that was required pursuant to this Profit Participation Agreement. Without notice, how is Transpark supposed to know what money it has to put in? Without notice, how is Transpark supposed to enforce its right?

Now, in 2008, there was a financial crisis that hit Miami very hard. You will see evidence from Mr. Seidler to Nathan Heber, who was Greg's employee at the time, and you recall FTP later hired Nathan Heber to operate the lot, and FTP was asking Mr. Heber, Where is the rent money? You're behind on rent.

We're conceding that those emails were sent, but we will contend to you that that is not notice. You will not see an email, a text message, a WhatsApp, a FedEx letter that even uses the word "notice," "capital contribution," "profit participation," or "default" under the Profit Participation Agreement, which is the only contract that we are seeking to enforce.

Let's go to Section 3 of the Profit Participation Agreement. This is what I say where the rubber meets the road. When the property is sold, there has to be some reconciliation of moneys put in, interest that's earned, and this section, Section 3, where the rubber meets the road, says that before profits are distributed, 70/30, FTP does get a preferential

11:33AM return. That's what the contract says.

11:33AM And then I'm going to read this to you. The second paragraph says: Upon the sale of the property -- that's a when -- upon the sale of the property, mortgages, secured debt, and outstanding expenses shall be retired first, and all remaining profits shall be distributed simultaneously according to the 70/30 percentage,^ as mentioned above. All cash flow from the property shall be distributed according to the 70/30 ratios.

11:34AM GM, that's Transpark, has the right to see the closing statement and -- here's another when -- upon the sale of the property, the closing agent shall distribute the money to the properties -- excuse me -- to the parties.

11:34AM FTP, the evidence will show, sold the property without doing any calculation whatsoever. They didn't notify us that the property was being sold. They sold the property for $18 million. The evidence will show that there was 17 and a half million dollars of discretionary cash flow, and FTP took all of it for itself. The evidence will show that FTP never did a calculation of the profits that were made on this property until after they were sued.

11:34AM Even though Mr. Seidler will testify -- we'll read his deposition into the record -- that he was sitting there at the closing table with this agreement in his head, and he thought to himself -- the evidence will show he thought to himself: I knew there were sale proceeds, I just don't want Transpark to get any

of them. The evidence will show that not only did FTP take all the money, they sold the property without even telling us.

Let's turn to Section 7 of the contract. This is the right of first refusal. Mr. Seidler, FTP, they acknowledge this is a right of first refusal. Section 7 says that if FTP -- we'll call it ^up -- receives an offer to buy the property, they have to give us notice of that offer, and then Transpark has the right to match the economic terms of that offer within a certain period of time. And only if we choose not to exercise our right of first refusal, then FTP may sell the property. It's a right of first refusal, and everybody knows it. FTP did not honor this right of first refusal.

We'll show you Plaintiff's Exhibit 123. Let's go to the first page, please. This is the purchase and sale agreement that FTP signed. This is when it went under contract to sell the property to a buyer, Blutrich Acquisitions, Inc., and they agreed to sell the property for $18 million. They didn't tell us that they were signing this contract. They didn't even tell us they got an offer to buy the property.

Let's go to page 10. This is where -- in the agreement itself, Mr. Seidler made certain representations. He represented to the buyers certain things: that nobody's approval was required in order to enter into this contract, that this contract wouldn't conflict with any other contract to which FTP was a party. We contend, and the evidence will show that Mr. Seidler was not being

truthful when he made these representations to the buyer.

You will hear from both Mr. Seidler's lawyer, a gentleman named Moises Grayson, that he had never heard of the Profit Participation Agreement or, quite frankly, my client until we sued -- excuse me, we served him with a subpoena, and he sat for his deposition in this lawsuit.

And you will hear from the closing agent, the buyer's attorney who was responsible for receiving the sale proceeds, distributing the cash proceeds pursuant to Mr. Seidler's direction, that he never would have closed on this deal. He never would have allowed the transaction to close if he knew about the Profit Participation Agreement and the right of first refusal.

The evidence will show that Mr. Colletti relied on an affidavit, a sworn statement from Mr. Seidler, swearing under oath that there was no potential claim out there that could affect his ability to sell this property.

So the contract says we get 30 percent of the profits, the cash flow from the sale. How is the jury to determine that? The evidence will show there was cash at closing.

Let's pull up Plaintiff's Exhibit 136. This is a settlement statement. It is a HUD. It is what Mr. Colletti used to calculate money in, money out. There is a buyer side and a seller side, and I want to focus on some of these lines here. Line 401 is the contract sales price: $18 million.

I should tell you that they bought the property for

11:38AM $6 million. That's roughly 300,000 from Transpark, about a million dollars that FTP contributed, and the 4-and-a-half-million mortgage. That's your purchase price. They sold the property for $18 million.

11:38AM Line 501 shows a 1-and-a-half-million-dollar deposit that was already distributed to FTP before the closing even took place. Line 515 shows 13 and a half million dollars going into what's called a 1031 exchange. Now, that is a legal mechanism pursuant to which you can place money in a certain account and then use that money to buy replacement property.

11:39AM And the evidence will show that FTP did buy a $3 million warehouse in Miami using those $13 million, 1031 exchange funds; $10 million of it came back to him.

11:39AM And then line 803 shows the cash to seller. That's after you have taken all that and the other expenses out, it's what's called the seller's boot, the 2 and a half million dollars that gets given to FTP, actual sale cash at closing.

11:39AM So you have the 1-and-a-half-million-dollar deposit, the 13 and a half million-dollar 1031 exchange, and the 2 and a half million dollar seller's boot. That's how the plaintiff calculates a 17 and a half million dollars cash flow from the closing.

11:40AM Now, the evidence will also show that FTP told and swore to the government that they made money. Let's pull up Plaintiff's Exhibit 142.

11:40AM This is FTP's 2021 tax return. This document will be in

evidence, or it's going to be introduced into evidence, and it is from the year they sold the property. Let's turn to page 6. This is what's called a Form 4797, I believe. 4797, and it is when you calculate profits from the sale of a business.

And you can see there was a typo in the street address; there was a typo in the date that the property was acquired, but if you look at that Column G, he shows -- excuse me, FTP shows an $11.4 million capital gain on the property for 6 or 6.6, sold the property for 18, $11.4 million in capital gains.

We will ask you to use your common sense and to weigh the evidence and determine what was the profit from the sale of this property and how much of that, if any, should have gone to Transpark? We contend it's 30 percent. Here is the upshot.

The evidence is going to show that FTP believes it lost money on the deal. According to FTP, they believe -- FTP believes they should have made $21 million. Because they only made 17, there was no profit; therefore, Transpark should not get any of the cash flow from the sale.

The CPA, the expert witness that they have hired to testify about this case, he calls it -- the evidence will show -- fictitious losses. As the jury, you're going to have to decide if that testimony is credible.

The evidence will show that in 2012 after the lease expired and after Transpark was no longer responsible for operating the lot, FTP's bank where it took the 4 and a half

million-dollar loan, there was a successor in interest because of the financial crisis. The note came due, and FTP didn't pay off the note. So the bank sent a letter. They sent another letter. They sent another letter. They sent eight default letters that the loan was due, and it had to be repaid.

The evidence will show that FTP did not send a single one of those letters to Transpark. The evidence will show that FTP did not ask, did not request, and certainly did not give notice under the Profit Participation Agreement that there was any capital contribution due and owing under the Profit Participation Agreement.

Now, of course, the bank, having not been paid by FTP, the evidence will show the bank sued FTP and Bart Seidler individually because he and his wife's financials, they relied upon them for the loan. And the evidence will show the bank won that lawsuit.

Let's pull up Plaintiff's Exhibit 90. This will be in evidence. It's the final judgment entered in favor of Branch Banking and Trust Company against FTP and Bart Seidler individually. It is a final judgment entered in October of 2013. And if we go to page 3, FTP and Bart Seidler were liable to the bank for over 5 and a half million dollars.

So what did FTP do with that final judgment? Did they send a notice or a capital call to Transpark or Greg Mirmelli individually, who had guaranteed the performance under the Profit

11:44AM Participation Agreement? No. The evidence will show the exact opposite. Let's pull up Plaintiff's Exhibit 96.

11:44AM FTP entered into a confidential settlement agreement with another successor in interest, the folks who bought the mortgage and the note from BB&T. It is a confidential settlement agreement between FTP and Bart Seidler and the buyer of the note, the bank, Crimson Plaza, LLC.

11:44AM Did FTP tell Transpark that it was entering into this confidential settlement agreement? The evidence will show that they called a company meeting to approve the settlement; the meeting wasn't noticed to Transpark or Greg. Transpark didn't have an opportunity to negotiate this confidential settlement agreement. They weren't participating in the negotiations with Crimson Plaza. They were deprived of an opportunity to put up any money towards -- not paying the judgment -- it's a settlement payment. A settlement payment that relieves FTP and Bart Seidler individually from liability.

11:45AM FTP will argue that if this settlement payment, the $5.8 million that they paid pursuant to this confidential settlement agreement -- let's go to page 2 -- page 2.

11:45AM First paragraph ^ a ^ A, that's the $5.8 million settlement payment that has to get paid. We can take this exhibit down. Thank you.

11:45AM So FTP and Mr. Seidler's judgment goes away. And FTP argues that that $5.8 million accrued interest under the Profit

11:45AM Participation Agreement from 2013, '14, '15, '16, all the way to 2021, and that Mr. Seidler sitting at the closing table thinking in his head, I thought I was underwater under this agreement, I thought I had lost money.

Let's be clear. The evidence will show that FTP's own books and records did not record any of these fictitious losses, did not show any of these accruing interest payments under the Profit Participation Agreement, no. The evidence will show that nothing mattered as long as FTP got its money.

FTP may argue that Greg should have known about the judgment, the lawsuit. Maybe, you know, the payment was made right around the holidays, December 24th. Let's pull up Plaintiff's Exhibit 97. This will be in evidence.

This is the actual wires that Mr. Seidler contributes to FTP. FTP on the 24th, December 24th makes this $5.8 million payment to Crimson Plaza. This is another one of my themes. Mr. Seidler knew how to get ahold of Greg. You see the date, December 24th. Let's pull up Plaintiff's Exhibit 100, and let's do a side-by-side.

On December 24th, Mr. Seidler was emailing Greg about some other deal that Greg was working on because Greg and Bart were friends. They had an ongoing relationship for about ten years. They knew each other. They partied together. They talked about their trips together. They shared wine together. They knew one another. They were cordial with one another for many of these

years.

The evidence will show maybe it wasn't December 24th; maybe it was December 25th. Let's go to Plaintiff's Exhibit 108. On Christmas Day, Bart is texting Greg: Merry Hanukah, happy Christmas. And here is FTP 13 years later saying, why didn't Transpark put up its share of the $5.8 million settlement funds?

The evidence will show that FTP allowed Transpark to stop operating the lot. The evidence will show that FTP allowed Transpark to pay whatever rent they could, that they never defaulted them on the loan, that the loan -- excuse me, they never defaulted them on the lease, that the loan documents, FTP's own loan documents, prevented FTP from holding Transpark in default under the lease, that Nathan Heber, Transpark's ex-employee, continued operating the lot, that Nathan Heber found a new tenant who was paying over -- excuse me, FTP found another tenant to pay over half a million dollars a year in rent. And then in 2021 when the property was profitable, FTP sold the property for $18 million and took all the money for itself.

So did FTP comply with that Section 3 where the rubber meets the road, where you have to reconcile and do all your capital contributions? The evidence will show they did not. Did FTP send Transpark an accounting, a reconciliation showing its capital contributions over the years? The evidence will show it did not.

And did FTP even share a copy of the closing statement,

right? GM has a right to see the closing statement. Did they even do that? The answer is they did not. It wasn't until Transpark sued FTP for the first time that they for the first time ever claimed that they put money in the deal, that there was a prior material breach of the deal, that there was any other reason why they kept all the money for themselves.

At the end of this trial, we're going to ask you to award Transpark the damages based on their breach of contract and based on the breach of implied covenant of good faith and fair dealing, that FTP didn't do what was fair and reasonable with the discretion that they had.^

You get to decide what the damages are. And if that preponderance of the evidence just tips in Transpark's favor, the verdict is ours.

We anticipate calling the following witnesses: Stewart Mirmelli. That's Greg's father and lawyer whose address was the notice address. Mr. Seidler, FTP, the defendant's representative. Joseph Colletti, who is that closing agent that facilitated the sale. Moises Grayson, that's FTP's lawyer who represented him in the sale. And finally, Greg Mirmelli.

And when we finish our presentation of the evidence, I am going to come back on the podium, summarize all the evidence that you will have seen during the trial, including every document that I showed you here. Every single document that I showed you here will be in evidence.

11:51AM And after we finish our case, FTP may put on its witnesses, we may call our rebuttal witnesses, and then we're going to trust you. And we trust you to use your common sense and find that there was a breach of contract for failure to distribute the 30 percent of the sale proceeds, and to award whatever damage figure you feel is appropriate there, and that FTP breached the implied covenants, and award whatever damage figure you believe is appropriate there.

11:51AM This case is about FTP's promise to Transpark that they would honor the terms of the contract and share in the profits. This case is about FTP's lies and deceit and intent to keep all the money for itself. I thank you for your time.

11:52AM THE COURT: Thank you very much, counsel.

11:52AM Defense.

11:52AM MR. NIELSON: Your Honor, I have a demonstrative I would like to show to the jury that has already been shared with the plaintiff.

11:52AM THE COURT: Sure, if it's been shared and there's no objection.

11:52AM MR. PARDO: No objection, Your Honor.

11:52AM THE COURT: All right.

11:52AM MR. NIELSON: Good morning, ladies and gentlemen. My name is Marcus Nielson.

11:52AM THE COURT: No --

11:52AM THE COURTROOM DEPUTY: Counsel, is your lapel mic off?

11:52AM MR. NIELSON: My lapel mic is on.

11:52AM THE COURTROOM DEPUTY: Okay. Yep, I got it. All right.

11:52AM MR. NIELSON: Good morning, ladies and gentlemen. My 11:52AM name is Marcus Nielson, and I represent the defendant, FTP 11:52AM Investment Corporation, alongside my colleague Manny Casabielle.

11:52AM This case is about a contract and a company that died 11:52AM over ten years ago. The evidence is going to show you that 11:53AM Transpark broke its promises, went out of business, became -- and 11:53AM became dissolved and abandoned the agreement and that now 11:53AM Transpark has come back to life to try and shake down FTP for 11:53AM money that it does not deserve. This case is about a contract 11:53AM about property that the plaintiffs already talked to you about. 11:53AM It concerns a parking lot in Downtown that functions as a parking 11:53AM lot business.

11:53AM But first, let's talk about the main witnesses in this 11:53AM case, the people that you're going to hear from throughout this 11:53AM trial. The first one is plaintiff, the Trans- -- Transpark, a 11:53AM company owned by Gregory Mirmelli. You're going to hear testimony 11:53AM that Gregory Mirmelli created this company for the purposes of 11:53AM this agreement. And you're going to hear testimony that Greg 11:53AM Mirmelli is an individual who has experience in the parking lot 11:53AM business and that they're based out of Miami.

11:53AM The second important witness you're going to hear from is 11:54AM FTP Investment Corporation, the defendant, the company that I 11:54AM represent. It's a company operated by Bart Seidler, and you're

going to hear testimony that Bart Seidler is an individual in the real estate business who is a self-made man who put himself through college and started his real estate business with just $2,500 in the 1970s and built his company into what it is today.

And one key thing about Bart Seidler and FTP Investment Corporation is that they were based in California during the relevant time period of this case, while Transpark was based in Miami.

And the third important witness you're going to hear from is a witness named Nathan Heber. Nathan Heber is going to give you a very unique opportunity. He is going to give you both sides of the story. Why is that? That's because Nathan Heber initially worked for Transpark, the plaintiff, and Greg Mirmelli from around 2006 until approximately 2012. And then once Transpark went out of business, FTP hired Nathan Heber to work for FTP, the defendant.

Nathan Heber's involvement runs so deep in this case is that he even drafted the ground lease at issue for Transpark. And the plaintiff, Transpark, hired Nathan Heber to manage the parking lot on its behalf, so Nathan Heber is going to have intimate knowledge about what happened between these two parties.

Now, let's talk about the background of the deal, the purpose of why these parties entered into this agreement. You're going to hear testimony that Gregory Mirmelli had the piece of property under contract with a company that he owned, not

11:55AM Transpark, and that he couldn't afford to close on the deal and that he had $100,000 that he borrowed from his dad at the risk of being lost because if he couldn't close the deal in time, he was going to lose that $100,000 deposit, but he couldn't afford it.

11:55AM So what did Greg Mirmelli do? He comes to somebody with good credit, good financing, and good business sense, Bart Seidler at FTP Investment Corporation, and they come up with a plan. FTP is going to be the money, while Transpark is going to be the boots on the ground running the parking lot on behalf of FTP because Transpark is based in Miami, FTP is based in California. They can't be here involved in the day-to-day.

11:56AM So FTP financed the purchase of the property, over 90 percent of the sale price, and then if things went right, they would split the profits 70/30; 70 going to FTP, 30 going to Transpark. But, ladies and gentlemen, the evidence is going to show you that things did not go right.

11:56AM Now, let's talk about the actual purchase of the deal, the details of the purchase. The property is bought in May 2006, and initially Transpark contributed only $300,000 towards the purchase and defendant FTP contributed 5.75 million to ensure the deal closed on time. And then as part of the agreement, FTP was to obtain financing for the deal with Transpark's assistance, and FTP took out a mortgage on the property.

11:57AM And you're going to hear the testimony that that's because the deal's closing was imminent and FTP did not have

11:57AM sufficient time to get financing prior to the closing of the deal, so they got financing after the fact with Transpark's assistance. You're going to hear testimony from Nathan Heber that he was involved in assisting FTP to get this financing, which was a $4.5 million loan that created a mortgage on the property and reduced FTP's initial investment to only 1.2 million.

11:57AM And then the parties executed the agreement that was discussed by the plaintiff, and they executed the ground lead. And this agreement created certain obligations on Transpark, certain promises, the first one being that Transpark promised to take over the responsibility for supervising the daily operations of the property. And that was important because FTP and Bart Seidler, the defendants who I represent, were based in California. They couldn't be involved in the day-to-day. That was Transpark's job. That was Gregory Mirmelli's job.

11:58AM The second one is that Transpark would work with FTP on various decisions relating to the property, and that ^ third promise, a very important promise, was that Transpark would lease the property as a parking lot from FTP and promised to pay $30,000 a month. And that was an important promise because the purpose of the deal was that FTP would front the money and then afterwards would not need to put in money unless it was absolutely necessary.

11:58AM They came up with this number $30,000 so that that money would generate revenue to pay the bills associated ^ with the property, pay the mortgage payment that FTP took out on the

property. So that $30,000 a month is very important to FTP.

And then finally, should the need arise and the parties need to contribute money towards this property, outside of what they initially already invested, they would split those costs 70/30; 70 from FTP, 30 from Transpark, the plaintiff.

And there is also one very special promise that was in this contract. This promise is from Gregory Mirmelli, the owner of plaintiff Transpark. Gregory Mirmelli signed this contract in his individual capacity and promised that his company would perform its promises. He guaranteed that Transpark would meet its obligations, and you're going to hear testimony from Bart Seidler that this clause was important to him because Transpark was a new company that did not have any history so he needed Gregory Mirmelli to have skin in the game.

Now, let's talk about the timeline of events. The facts of this case, they run from 2006 to 2021, but we're going to start at the beginning.

In 2006, the agreement is signed, the lease is signed. Transpark has taken over the property and is running it as a parking lot with Nathan Heber as its manager. And 2006 is going well. The plaintiff is meeting its rent obligations. It's paying $30,000 a month, and you're going to hear testimony from Nathan Heber that it was paying that $30,000 a month because Gregory Mirmelli was honoring its promise. He was involved in the property. He was making sure that they could cover rent if there

was ever a shortfall, but slowly things started to change.

In 2007, Transpark is still paying its rent on time, but Gregory Mirmelli's finances start to get a little shaky. Gregory Mirmelli, the owner of plaintiff who signed that personal guaranty, comes to Bart Seidler, the owner of the defendant, FTP, and says he needs money, he is nervous about his finances, he needs a loan. And this concerns Bart Seidler because the person who just guaranteed that his company was going to perform its obligations under the contract is now needing money, needing a loan. But Bart does -- Bart Seidler does loan Gregory Mirmelli this $300,000 on August -- in August 2007. And they sign a promissory note where Gregory Mirmelli has to repay this amount of money by January 1st, 2008.

And so in 2007, Bart Seidler gives Greg Mirmelli a $300,000 loan, which is equal to the amount that Transpark was required to invest in the property to get it purchased. And because Bart Seidler is concerned about his interest because the person who just guaranteed a company's performance now needs money, he has Greg Mirmelli sign a collateral assignment of rights.

And what does this collateral assignment of rights do? Greg Mirmelli agreed to transfer his interest in the property to Bart Seidler should he fail to repay this loan, should he fail to repay this $300,000 loan.

Ladies and gentlemen, the evidence is going to show you

12:02PM that Gregory Mirmelli did not repay this loan, and that in January 2008, Gregory Mirmelli only paid $200,000, and to this day, he stills owes $100,000 plus interest. This was Gregory Mirmelli's first broken promise, and it was also defendant FPT's first indication that this agreement is dead because if he breaches the collateral assignment of rights, Gregory Mirmelli loses his interest in the profit.

Now we jump to 2008. Things start to go very poorly for Transpark. Transpark stops paying its rent in full or on time, stops paying the $30,000 a month, and FTP makes repeated demands to Transpark.

You're going to hear testimony from Nathan Heber and Bart Seidler that FTP sent emails to Nathan Heber demanding the payment of its rent because that's just how they did business, and in response to these emails, Nathan Heber, the manager of the property, the person designated by the plaintiff to manage the property, told FTP that it was not possible for them to meet their rent obligations, that Transpark was broke, that it could not keep its promise that it made in the contract.

And you're also going to hear testimony from Nathan Heber that starting around 2008 Gregory Mirmelli stops managing the property, stops being involved in Transpark, despite the fact that he guaranteed that his company was going to perform.

By 2010, Transpark owes FTP over $300,000 in rent, an amount equal to the amount that Transpark had to invest in 2006 to

help get the property purchased. And then you're going to hear from Nathan Heber, who drafted the ground lease at issue for Transpark, that there is a clause in that lease that says if Transpark fails to pay rent more than twice in one year, that it is in automatic default.

Ladies and gentlemen, the evidence will show you that in 2008, 2009, and 2010, Transpark failed to pay rent more than three times in each year and was in automatic default of that lease, and you're going to hear testimony from Nathan Heber that he considered his own boss, Transpark, to be in automatic default of that lease.

Now 2011 to 2012 comes around, and Transpark is giving up on the property. Despite Transpark's promise to manage and supervise the daily operations of the property, it doesn't renew the lease and shows no interest in managing the property, and by 2011, Transpark is broke, out of business, and becomes a dissolved entity. And this forces FTP and Bart Seidler, who are based in California, not living in Miami, to take over the complete operation, funding, and supervision of this property despite Transpark and Gregory Mirmelli's promises to the contrary.

And by 2012, defendant FTP has taken over everything and hires Nathan Heber because Bart Seidler lives in California, he can't be here on a daily basis to make sure a parking lot is running, and Bart Seidler had no experience in managing parking lots, so he hires Nathan Heber. And you're going to hear

testimony from Bart Seidler that from 2008 to 2012 as a result of Transpark's failure to meet its obligations, failure to pay rent, that it had to contribute $550,000 into the property to make sure the property was running properly and that mortgage payment was paid.

And you're going to hear testimony from Nathan Heber, Transpark's manager of the property, that he knew that each time that Transpark was short on rent that FTP was going to have to step in and cover the difference, despite the purpose of the agreement being Transpark pays the rent and the rent payment covers the mortgage payments.

And by 2012, FTP considers the agreement dead and abandoned, over with because Bart Seidler finds out that Transpark is dissolved, shut down, and out of business. You can't do business with a dead company.

And on top of Transpark's failures, Gregory Mirmelli breached that promissory note and gave his interest in the property to Bart Seidler, further solidifying FTP Investment's thinking that the agreement is abandoned and over with.

You've heard from plaintiff's counsel regarding notice, that you may hear testimony from Gregory Mirmelli that he believes his broken promises should be excused because he did not receive a physical letter in the mail at a very specific address. But you're going to hear testimony from Nathan Heber, Transpark's manager at the time, that Nathan Heber told Bart Seidler that they

12:07PM no longer maintain an office at that address, that they shut down their office at this very specific address in 2008 -- around 2008, 2009, and FTP did provide written notice to Transpark in writing via email demanding the payment of rent, but in response to these demands, Transpark told them that it was not possible for them to comply.

12:07PM Why would you continue sending demands to somebody who told you that they are broke and out of business? That should lead you to believe that notice was pointless. When someone tells you they have no money, you don't continue sending them letters asking them for money that you know they don't have. And by 2012, Transpark is dissolved, rendering notice pointless.

12:07PM 2013 comes around. Transpark is dissolved at this time, and FTP is fighting for its life because the promissory note on the property becomes due. And you're going to hear testimony from Bart Seidler that he believed that the bank was going to extend the life of the loan so that it wouldn't become due.

12:08PM But the note was sold to a different bank, and that bank had a different idea. They did not extend the loan, and the note became due, and they sued FTP and Bart Seidler. And you're going to hear testimony from Bart Seidler that he fought for his life to come up with the money to save this property from foreclosure.

12:08PM And the bank did get a final judgment against FTP that empowered the bank to foreclose on the property. So to prevent this foreclosure, FTP came up with $5.8 million to save it from

foreclosure. And during this time that FTP is fighting for its life, Transpark is dissolved and out of business, and Gregory Mirmelli is aware of this lawsuit.

Now we jump forward to August 2021. FTP does sell the property, but at this point, FTP considers the agreement dead and Transpark dead because the company was dissolved. So FTP doesn't tell anybody about the agreement because there is nobody to tell because the agreement was over with and dead.

Now, throughout the life of this property FTP had to contribute a substantial amount of money to save it and to make sure it continued running. FTP contributed a total of $7.6 million to this property, exclusive of interest owed to it, compounding annual interest.

And there is a very special clause in this agreement called a preferential return. What that essentially means is that FTP gets paid first. It says that before the distribution of any profits to Transpark, FTP gets the return of its investment and expenses plus interest. And when you do the math on the compounding interest, the amount owed to FTP is substantial. And in the contract, FTP gets a minimum of 10 percent compounding interest on that 7.6 million.

And you're going to hear from our expert witness Dana Kaufman who is a forensic accountant and a lawyer, and he is going to tell you that when you do the math on the compounding interest owed on that $7.6 million, there is no money left over for

Transpark, that there is no damages because the amount owed to FTP on the 7.6 million plus 10 percent compounding interest exceeds the sale price. So even if you determine that this contract is enforceable, Transpark is not entitled to any money under the terms of the agreement.

Ladies and gentlemen, all Transpark had to offer was broken promises. The evidence is going to show you that Transpark did not uphold its obligations, that Transpark went out of business, that Transpark became dissolved and abandoned the agreement and that now Transpark has come back to life trying to shake down FTP for money that it does not deserve.

And throughout this trial you should ask yourself one question: Why should Transpark be excused from all of its failures? And if you determine that it should not be excused from its failures, you should find in favor of the defendant, FTP Investment Corporation. Thank you.

THE COURT: Thank you very much, counsel.

We typically take this lunch break at 12:30. I'm not sure it really makes sense to start a witness for 15 minutes, so I think we'll go ahead, and we'll have our lunch break a little bit early. We'll take our break now.

I'm going to ask you all to come back at 1:30, so you're going to have an hour and 15 minutes, just a little longer. There is a legal issue I have to attend to with the lawyers anyway, so we won't take that long, but we will go ahead and give you that

extra time. It gives you a little time to settle in, make phone calls, and arrange whatever you need to arrange since you have been selected for the jury.

I will tell you this every time: Don't talk to each other about the case, don't talk to anybody else about the case, don't research anything else on the case. All right. Enjoy your lunch.

(Jury out at 12:12 p.m.)

THE COURT: I haven't heard the jury door. Is it closed?

THE COURT SECURITY OFFICER: Yes.

THE COURT: All right. Last night you all filed an objection to some of the exhibits coming in.

MR. NIELSON: Yes.

THE COURT: So I will take the lunch break now. But why don't you all be back around 1:15, and we can hear argument on that unless you've already resolved it.

MS. MACKIEWICZ: Your Honor, we advised defendant's counsel that we may not be offering those exhibits into evidence. And so what I advised them to do is if we offer them, make the objection about an individual exhibit at that time.

THE COURT: No, so we're not doing that. Because if I have to hear argument on it, then I need to excuse the jury. So by this point, you should know whether you're admitting the exhibit or not. If you're not going to admit it, it's not an issue. If you're going to admit it, let them know which ones

12:14PM you're going to admit, and be back at 1:15 for argument on that.

12:14PM MS. MACKIEWICZ: Yes, Your Honor.

12:14PM THE COURT: I will have to hear argument on whether or not it violated the discovery deadlines. It's difficult to do that sidebar, and I don't want to waste the jury's time.

12:14PM MS. MACKIEWICZ: Understood, Your Honor.

12:14PM THE COURT: If you have agreed or you're not going to use any of those exhibits, just let Donna know, and then we will start back up at 1:30. All right.

12:14PM MS. MACKIEWICZ: Okay.

12:14PM THE COURT: Thank you very much.

12:14PM MR. NIELSON: Thank you, Your Honor.

12:14PM (Lunch recess at 12:14 p.m.)

01:18PM (Back on the record at 1:21 p.m. )

01:21PM THE COURT: You can be seated. All right. Do you want --

01:21PM Now the microphones are on. Go ahead.

01:21PM MS. MACKIEWICZ: I'm sorry, Your Honor. You're asking for the exhibits that we're introducing into evidence by agreement?

01:21PM THE COURT: No. I'm asking you whether or not you intend to introduce any exhibits that are the subject of the defendant's objection that was filed last night.

01:21PM MS. MACKIEWICZ: The plaintiffs do not at this time.

01:21PM THE COURT: You do not --

MS. MACKIEWICZ: We do not intend to offer those exhibits into evidence.

THE COURT: Okay. So I will accept your representation. If that changes, then you will alert me that that's changing; not when you seek to admit the exhibit, but the day before or the morning of so that we're not interrupting the jury.

MS. MACKIEWICZ: Understood, Your Honor.

THE COURT: Okay.

MR. PARDO: Your Honor, at this time, there is another legal matter that we want to raise outside the presence of the jury.

THE COURT: Okay.

MR. PARDO: I was loath to object during Mr. Nielson's opening, but the defendants seek to argue to the jury, and I imagine they will intend to elicit testimony from the witnesses, that there was a foreclosure pursuant to a collateral assignment. And we believe Florida case law is clear, and they should not be allowed to argue there cannot be a foreclosure without a judicial proceeding.

And I will represent to you there was never a lawsuit where FTP sought to foreclose on that collateral assignment document. And therefore, we believe that it would be improper for them to argue or elicit evidence in any manner relating to that collateral assignment that wasn't raised on dismissal or summary judgment.

01:23PM THE COURT: So what is it that you want? You want a motion in limine?

01:23PM MR. PARDO: Motion in limine to prevent any evidence or argument arising from the collateral assignment which was not only never sued upon --

01:23PM THE COURT: First of all, everybody was speaking so fast in opening, maybe the jury followed you, maybe they didn't. You need to slow down. And second of all, if you're talking so fast I can't follow you, that's even worse.

01:23PM So was there a foreclosure or not?

01:23PM MR. PARDO: There was not.

01:23PM THE COURT: What was there? There was obviously some proceeding because -- excuse me, sir. There had to be some proceeding that he was referring to, right? So explain that.

01:23PM MR. PARDO: There is a foreclosure on the property from the bank. That proceeding, we acknowledge it happened. Separately, a year after the property was purchased, Gregory Mirmelli individually borrowed from Bart Seidler individually $300,000. And there was a collateral assignment of rights document that we contend will not be admissible.

01:24PM And then Mr. Nielson argued to the jury or suggested to the jury that the evidence would show that there was an assignment, right, there was a foreclosure of that collateral assignment. That never happened. Collateral assignment of rights was a document, and you cannot foreclose on Transpark's intangible

01:24PM contract rights without judicial process. That foreclosure never took place.

01:24PM THE COURT: I'm not sure it would be a foreclosure, right? It would just be a default, no?

01:24PM MR. PARDO: Excuse me. The statute we would cite is 679.601(1)(a),^ and it says that: After default, a secured party has the rights provided in this part to reduce a claim to judgment, foreclosure, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial resource. There has to be judicial resource. You can't do it extrajudicially.

01:25PM THE COURT: I understand that. If you have a default, if it is a default on a property, you can go to foreclosure. If it is a default on a loan, you don't foreclose anything. That's what I'm trying to ask you so that I can understand what you're talking about because I'm still not understanding what it is that you're talking about.

01:25PM MR. PARDO: One, there was no default notice on the loan, but more importantly, there was no default or foreclosure of the collateral assignment. Their argument is that Transpark assigned all of its rights pursuant to some memorandum of understanding that wasn't attached to the collateral assignment document, and those rights were foreclosed. They were ^ signed ^ assigned over to FTP as collateral for the loan -- excuse me, assigned to Bart Seidler as collateral for some other loan.

01:25PM THE COURT: All right. What's the response?

01:26PM MR. NIELSON: Your Honor, we're not bringing a claim on the collateral assignment of rights. We have these affirmative defenses of abandonment of the contract, and it goes to the state of mind of the parties. Within this collateral assignment of rights --

01:26PM THE COURT: No, stop. He says that you argued to the jury that there was a foreclosure of those collateral rights. Is that true or not?

01:26PM MR. NIELSON: That's not true, Your Honor.

01:26PM THE COURT: What's not true?

01:26PM MR. NIELSON: I said that he did not repay the loan, and so he forfeited his rights to the property, in Bart Seidler's mind, to Bart Seidler.

01:26PM THE COURT: There is nothing -- what's the issue with that, sir?

01:26PM MR. PARDO: As long as they're not going to elicit evidence that there was actually an assignment. I'm fine with Mr. Seidler thinking in his mind that there was an assignment but not that there actually was a foreclosure or an assignment of those contracts.

01:26PM THE COURT: So let me just give this as a general understanding of how this trial is going to be conducted, right.

01:26PM I'm going to let everybody try their case. There is going to be a lot of things they're going to say that you don't

01:27PM like, that your client doesn't like. I'm not stopping them from saying those things. If there is a basis, based on the rules of evidence, not to allow particular testimony, I will hear your objection. If there is not, then it's going to come in.

01:27PM You're free to cross-examine. You're free to present other evidence. You're free to note for the jury what was and was not in evidence at closing.

01:27PM MR. PARDO: Understood, Your Honor.

01:27PM THE COURT: Let me just say this now before we start.

01:27PM (Cell phone.)

01:27PM THE COURT: When there is an objection, I expect counsel to rise and say: Objection. There are no speaking objections. If I ask you for the basis of your objection, I expect you to tell me what the basis is in one word or a number. But when you get up and object, I don't want to hear anything else other than: Objection. Sometimes I can tell what the objection is, and I'll sustain it. Sometimes I can tell what the objection is, and I'll overrule it. There are no speaking objections in front of the jury, okay.

01:28PM MR. PARDO: Understood. Thank you, Your Honor.

01:28PM THE COURT: All right. Are they ready?

01:28PM MR. NIELSON: Your Honor, I have one issue I would like to raise with the Court.

01:28PM THE COURT: Give me a minute.

01:28PM (Brief pause.)

01:28PM THE COURT: One other thing that Donna brought to my attention just to make sure that, again, because there are multiple lawyers, when we go to sidebar, one lawyer on each -- for each party speaks. You're obviously free to consult with your cocounsel before you finish your argument or your response, but only one lawyer speaks at sidebar and one lawyer at a time. Don't speak over each other either.

01:28PM Yes, sir.

01:28PM MR. NIELSON: Your Honor, during the plaintiff's opening, he discussed the personal relationship between Bart Seidler and Gregory Mirmelli, and we believe that they have opened the door for Bart Seidler to discuss Gregory Mirmelli's use of alcohol and gambling, which may be subject to the motion in limine, that fractured their personal relationship.

01:28PM THE COURT: Really? How do you gather? Because they said they knew each other, you're going to open the door to that?

01:29PM MR. NIELSON: They were close friends for a very long time until Bart Seidler stole money from him, and part of the reason why they stopped doing business was because of Gregory Mirmelli's -- ^

01:29PM THE COURT: Right. What rule of evidence or law can you cite to me that would make that relevant? If you can cite one to me, then we can talk about it, but I know of none; that doesn't mean that one doesn't exist, so...

01:29PM MR. NIELSON: Okay, Your Honor.

THE COURT: I mean, if you want to elicit that, be prepared to cite me some case law as to why that would be appropriate under the rules of evidence.

MR. NIELSON: Of course, Your Honor.

THE COURT: Okay. Are they ready?

THE COURTROOM DEPUTY: Yes.

MS. MACKIEWICZ: Your Honor, if I may just -- I'm sorry. If I may just have one minute to run to the ladies' room? I'm next up, and I don't want to have to interrupt my direct. I promise I will be very, very quick.

THE COURT: Be quick --

MS. MACKIEWICZ: Thank you.

THE COURT: -- because it's 1:30.

Something is happening on this defense side with those microphones. Mr. Casabielle, I can hear almost everything you're saying at all times, so I don't know if it's your microphone, your voice. It's not bothering me, but I can't imagine you want the other side to hear everything you're saying.

MR. CASABIELLE: I understand that, Your Honor, and I want to address an issue.

May I, Mr. Pardo, or do you want to wait for cocounsel?

MR. PARDO: What?

MR. CASABIELLE: The issue is what we want to bring up or what we're objecting to that you plan on bringing up.

Let me make the argument, if I may. May I proceed?

01:30PM THE COURT: You may. She has run out for 30 seconds.

01:30PM MR. CASABIELLE: Okay. Your Honor, they have alluded to what happened between the parties and what Mr. Seidler did after he sold the property. It is our contention that after he sold that property, nothing else is relevant. How he disbursed the funds, none of that is relevant.

01:30PM Now, I want to raise that now because we're going to be raising objections in the future. I just wanted to give the Court a heads-up. I understand something comes up, we object, you rule. That's clear. So I just want to bring that up. That's an issue for us.

01:30PM THE COURT: How could everything after the sale be irrelevant?

01:31PM MR. CASABIELLE: Be irrelevant --

01:31PM THE COURT: Right.

01:31PM MR. CASABIELLE: -- or relevant?

01:31PM THE COURT: You're saying it's irrelevant.

01:31PM MR. CASABIELLE: It is irrelevant, Your Honor, because what's at issue here is there was a contract for sale, they bought the property, there was a contract between the parties, the plaintiff breached that contract, basically abandoned that agreement. That was done and over with.

01:31PM THE COURT: What is it that you expect them to elicit that's after the sale that is irrelevant?

01:31PM MR. CASABIELLE: Honestly, Your Honor, I lost track after

01:31PM he started getting into all the tax forms and how the money was reported and who it went to and all that stuff during his opening statement, but I anticipate that he's going to try to bring that up during trial. Maybe we could just nip it in the bud now.

01:31PM THE COURT: I'm not even sure what you're talking about because what he mentioned in opening, I thought that all of that had to do with the damages calculation, which clearly had to have been after the sale.

01:32PM But do you have any response?

01:32PM MR. PARDO: That's correct, Your Honor. At a minimum, the 2021 tax return reflects what FTP proffered to the U.S. government, they earned the capital gains on the property, which would be probative of the fact that he thought there was profits, at a minimum.

01:32PM THE COURT: I mean, it goes to damages because one of your defenses is even if we lose, we win because there were no profits, and in order to rebut that, they're saying: Of course, there were profits. That has to do with how your client treated the money.

01:32PM MR. CASABIELLE: That's fine, Your Honor. The testimony would be the property was sold for $18 million. What other explanation do we need as to what the profits were?

01:32PM THE COURT: Sir, if your argument, which I believe is your argument based on everything I know in this case, is that they -- even if there was not abandonment, even if you owed them a

01:32PM percentage of the sale, there in fact was no profit, right?

01:32PM MR. CASABIELLE: There is no --

01:33PM THE COURT: There is no profit; isn't that your argument?

01:33PM MR. CASABIELLE: Well, no. Our argument is that there was -- the property was sold for $18 million, which appears to be a profit. Under the agreement between the parties, Mr. Seidler was entitled to preferred interest, preferred payments, in other words. That was explained. The way it is going to come out, the expert will testify that the $7 million that Mr. Seidler put in, multiply that by the minimum interest that is due and owing under the agreement, reaches an amount higher than the $17,000 [sic].

01:33PM THE COURT: I understand. Their argument --

01:33PM MR. CASABIELLE: That's it.

01:33PM THE COURT: Their argument is that the way your client treated that profit and treated those funds suggests that another calculation is viable. I'm going to let them do that. Why would I not? Everybody gets to try their case.

01:33PM Let's get the jury.

01:33PM MR. CASABIELLE: Thank you, Your Honor.

01:34PM THE COURTROOM DEPUTY: All rise for the jury.

01:34PM THE COURT: I'm hearing you talk to your client, sir. What's going on with that microphone?

01:34PM MR. CASABIELLE: Can you hear me, test one, two?

01:34PM THE COURT: I can hear you.

01:34PM MR. CASABIELLE: Just my voice or this?

THE COURTROOM DEPUTY: Yeah, I think -- your voice carries loudly, but --

MR. CASABIELLE: I can't help it.

THE COURT: Well, then that's fine. Then everybody will hear what your tell your client or I'll sit your client -- I mean, you can't help it. Mr. Casabielle, you've been doing this longer than -- come on.

MR. CASABIELLE: Most of us.

THE COURT: Yeah. So, please, let's not make that happen again.

(Jury in 1:34 p.m.)

THE COURT: All right. Welcome back. We'll hear from your first witness now, counsel.

MS. MACKIEWICZ: Your Honor, at this time plaintiff seeks to introduce a series of exhibits into evidence to which the parties have stipulated as to their admissibility.

THE COURT: All right. Give me one moment to get your exhibit list. All right. You may proceed.

MS. MACKIEWICZ: The plaintiffs offer Plaintiff's Exhibit 2, Plaintiff's Exhibit 4, Plaintiff's Exhibit 5, Plaintiff's Exhibit 6, Plaintiff's Exhibit 7, Plaintiff's Exhibit 9, Plaintiff's Exhibit 11, Plaintiff's Exhibit 12, Plaintiff's Exhibit 13, Plaintiff's Exhibit 14, Plaintiff's Exhibit 15, Plaintiff's Exhibit 16, Plaintiff's Exhibit 17, Plaintiff's Exhibit 22, Plaintiff's Exhibit 24, Plaintiff's Exhibit 25,

Plaintiff's Exhibit 26, Plaintiff's Exhibit 28, Plaintiff's Exhibit 30, Plaintiff's Exhibit 32, Plaintiff's Exhibit 33, Plaintiff's Exhibit 34, Plaintiff's Exhibit 35, Plaintiff's Exhibit 36, Plaintiff's Exhibit 37, Plaintiff's Exhibit 38, Plaintiff's Exhibit 39, Plaintiff's Exhibit 40, Plaintiff's Exhibit 41, Plaintiff's Exhibit 45, Plaintiff's Exhibit 47, Plaintiff's Exhibit 51, Plaintiff's Exhibit 54, Plaintiff's Exhibit 55, Plaintiff's Exhibit 56, Plaintiff's Exhibit 58, Plaintiff's Exhibit 59, Plaintiff's Exhibit 60, Plaintiff's Exhibit 61, Plaintiff's Exhibit 62, Plaintiff's Exhibit 64, Plaintiff's Exhibit 65, Plaintiff's Exhibit 66, Plaintiff's Exhibit 67, Plaintiff's Exhibit 69, Plaintiff's Exhibit 70, Plaintiff's Exhibit 71, Plaintiff's Exhibit 72, Plaintiff's Exhibit 73, Plaintiff's Exhibit 74, Plaintiff's Exhibit 75, Plaintiff's Exhibit 76, Plaintiff's Exhibit 77, Plaintiff's Exhibit 83, Plaintiff's Exhibit 84, Plaintiff's Exhibit 85, Plaintiff's Exhibit 86, Plaintiff's Exhibit 88, Plaintiff's Exhibit 90, Plaintiff's Exhibit 93, Plaintiff's Exhibit 95, Plaintiff's Exhibit 96, Plaintiff's Exhibit 97, Plaintiff's Exhibit 98, Plaintiff's Exhibit 100, Plaintiff's Exhibit 102, Plaintiff's Exhibit 104, Plaintiff's Exhibit 105, Plaintiff's Exhibit 107, Plaintiff's Exhibit 108, Plaintiff's Exhibit 109, Plaintiff's Exhibit 111, Plaintiff's Exhibit 112, Plaintiff's Exhibit 117, Plaintiff's Exhibit 118, Plaintiff's Exhibit 120, Plaintiff's Exhibit 121, Plaintiff's Exhibit 122, Plaintiff's

Exhibit 123, Plaintiff's Exhibit 124, Plaintiff's Exhibit 125, Plaintiff's Exhibit 128, Plaintiff's Exhibit 129, Plaintiff's Exhibit 130, Plaintiff's Exhibit 131, Plaintiff's Exhibit 133, Plaintiff's Exhibit 135, Plaintiff's Exhibit 140, Plaintiff's Exhibit 142, Plaintiff's Exhibit 143, Plaintiff's Exhibit 158 --

MR. CASABIELLE: Is that 58 or 68?

MS. MACKIEWICZ: -- Plaintiff's Exhibit 159 --

THE COURT: Excuse me, ma'am. You were asked for a correction. 158, is that right?

MS. MACKIEWICZ: 158, yes.

THE COURT: All right. 158.

MS. MACKIEWICZ: -- Plaintiff's 159, Plaintiff's Exhibit 165, Plaintiff's Exhibit 166, Plaintiff's Exhibit 167, Plaintiff's Exhibit 168, Plaintiff's Exhibit 169, Plaintiff's Exhibit 170, Plaintiff's Exhibit 171, Plaintiff's Exhibit 173, Plaintiff's Exhibit 175, Plaintiff's Exhibit 176, Plaintiff's Exhibit 177, and Plaintiff's Exhibit 179.

THE COURT: Counsel, is that correct? That's without objection.

MR. NIELSON: Did you say 135?

MS. MACKIEWICZ: I did.

MR. NIELSON: I note an objection here on my list.

MS. MACKIEWICZ: Okay. Then we can remove Exhibit 135, as there was no agreement.

THE COURT: No objection as to the remainder?

01:40PM MR. NIELSON: No, Your Honor.

01:40PM THE COURT: All right. Those exhibits are all now admitted into evidence.

01:40PM Please proceed, counsel.

01:40PM (Plaintiff's Exhibits listed were received.)

01:40PM MS. MACKIEWICZ: Your Honor, at this time the plaintiffs call Stewart Mirmelli.

01:41PM My apologies, Your Honor, if I may, the exhibit to which there was no objection is Plaintiff's Exhibit 136, and we would offer that into evidence at this time.

01:41PM THE COURT: Any objection?

01:41PM MR. NIELSON: No objection, Your Honor.

01:41PM THE COURT: All right. 136 is admitted.

01:41PM (Plaintiff Exhibit 136 was received.)

01:41PM THE COURTROOM DEPUTY: Please remain standing, sir. Raise your right hand.

01:41PM (The witness is sworn.)

01:41PM THE WITNESS: I promise.

01:41PM THE COURTROOM DEPUTY: Okay. Thank you. Please have a seat.

01:41PM THE WITNESS: Thank you.

01:41PM THE COURTROOM DEPUTY: And please state your first and last name for the record.

01:41PM THE WITNESS: Stewart Mirmelli.

01:41PM THE COURTROOM DEPUTY: Thank you.

THE COURT: You may proceed, counsel.

DIRECT EXAMINATION

BY MS. MACKIEWICZ:

Q. Good afternoon, Mr. Mirmelli. What is your business address?

A. At the present time, it's 1750 James Avenue. I work out of my apartment, Apartment 11F, and it's a Miami Beach.

Q. And what is your profession?

A. I'm an attorney.

Q. When were you admitted to the Florida Bar?

A. I believe 1972.

Q. And have you ever owned your own business?

A. Yes.

Q. And during what time period?

A. I would say starting around 1975, I always had my own business.

Q. And was that your law practice?

A. Yes.

Q. What type of law do you practice?

A. Mostly real estate.

Q. And since 1993, have you primarily focused on real estate?

A. I would say yes.

Q. Have you represented both buyers and sellers in real estate transactions over the past several decades?

A. Yes, I have.

Q. Who is Mr. Gregory Mirmelli to you?

A. He's my son.
Q. Over the years, have you been the attorney for Mr. Gregory Mirmelli and his businesses?
A. Yes, I have.
Q. And can you provide the jury with a brief history of Mr. Gregory Mirmelli's business and real estate transactions between 1999 and 2006.
A. What I remember, his first transaction I believe was purchasing a property on 11th Street in Miami City. He had that for a short period of time. He had flipped it and made it -- a good profit on it. He had invested in a property on 10th Street in Downtown Miami. He had a parking lot on, I think, between 7th and 8th Street on Biscayne Boulevard.
He had -- I worked in the Bank of America Tower downtown, which is 100 Southeast 2nd Street. He had a lot that was just west of that property. He had property that he owned in Wynwood, some commercial property that he owned on South Beach. He had a parking garage downtown. It was about -- I think it was on Southeast 1st Street. That used to be the garage for the Greater Miami Federal Bank building. He had that.
He had a number of luxury homes. He lived on Sunset Island for -- on the water in a beautiful home on the water, and he owned some private homes that he rented out as part of his investments. There are probably others, but I can't remember everything.
Q. How has Mr. Gregory Mirmelli handled his businesses over the

01:45PM past 25 years to your knowledge?
01:45PM A. Well, Greg was always good at finding deals and making deals. To my surprise too^ sometimes -- you know, I was practicing law since 1972, and I remember one day he said: You know, you're going to receive a wire to your account for a million dollars. And I said --
01:45PM THE COURT: All right. So hold on, sir.
01:45PM THE WITNESS: I'm sorry.
01:45PM THE COURT: The question is how he handled his business. You can answer -- hold on a second.
01:45PM THE WITNESS: I'm sorry.
01:45PM THE COURT: So when you testify, unless there is a specific question, I'm going to ask that you not testify or give information about what other people told you. That might violate the hearsay rule. And so if she asks for it, we'll see. That way I have a minute to consider it.
01:45PM THE WITNESS: Thank you, Your Honor.
01:45PM BY MS. MACKIEWICZ:
01:46PM Q. Let me ask you a different question. In your earlier answer, you mentioned a series of properties that Mr. Gregory Mirmelli or his businesses owned. Did he have a separate limited liability company for each property?
01:46PM A. Yes.
01:46PM Q. And as part of your representation of Mr. Gregory Mirmelli and his businesses, did you set up those limited liability companies

with the State of Florida?
A. I would say most of the time I did, yes.
Q. And I believe you just testified that Mr. Gregory Mirmelli's practice was to negotiate the business deals himself on behalf of these various companies?
A. Yes.
Q. How would you describe Mr. Gregory Mirmelli's knowledge, if at all, of the terms of each of his business deals?
MR. CASABIELLE: Objection, Your Honor.
THE COURT: Sustained.
BY MS. MACKIEWICZ:
Q. Other than to which you've testified, is there something else that you would include in a description of how Mr. Gregory Mirmelli handled his businesses over the past 25 years?
A. Greg was very good at finding deals and making deals and putting them together. He had people that worked for him. I wouldn't describe him as a hands-on operator. He would oversee the operation of the properties, but he concentrated more on finding the deals, putting the deals together.
Q. As the attorney for Mr. Gregory Mirmelli's businesses, did you, if at all, receive mail addressed to those businesses?
A. Yes, frequently I did.
MS. MACKIEWICZ: Your Honor, may I approach the witness?
THE COURT: You may.

BY MS. MACKIEWICZ:
Q. Mr. Mirmelli, I'm showing you what was previously marked as Plaintiff's Exhibit No. 8. Do you recognize this document?
A. Yes, I've seen this.
Q. And what is it?
A. It's a contract for the purchase and sale of property.
Q. What is the date of the contract?
A. It's April 4th, 2006.
Q. And who is the buyer?
A. The buyer is 130 S.E. 1st Street, LLC.
Q. And do you recognize the signature under the buyer's name?
A. Yes. That's my son's signature.
Q. That's Gregory Mirmelli's signature?
A. Gregory Mirmelli as the manager of the LLC.
Q. And this is a purchase and sale agreement for the property located at 130 Southeast 1st Street?
A. Yes.
Q. If you turn to page 10 --
THE COURT: This exhibit is not in evidence, ma'am.
MS. MACKIEWICZ: It is not. Let me offer it into evidence. Just give me one second.
BY MS. MACKIEWICZ:
Q. Is a purchase and sales agreement of this type a document that you prepare in your ordinary course of business as a real estate attorney?

A. Yes. I prepare many documents, purchase and sale agreements. I don't believe I prepared this one, but I do prepare many documents like this.

Q. And as Gregory Mirmelli's attorney, do you maintain documents such as this, purchase and sale agreements, in your real estate files in the ordinary course of your business?

A. Yes, I would.

MS. MACKIEWICZ: Plaintiff offers Exhibit No. 8 into evidence, Your Honor.

MR. CASABIELLE: Your Honor, objection. He said he did not prepare it. Objection.

THE COURT: It's sustained.

BY MS. MACKIEWICZ:

Q. Did you maintain this purchase and sale agreement in your records as an attorney for Gregory Mirmelli and 130 S.E. 1st Street, LLC?

A. Yes, I did.

MS. MACKIEWICZ: Your Honor, I would offer Plaintiff's Exhibit 8 into evidence.

MR. CASABIELLE: Same objection, Your Honor.

THE COURT: Sustained.

BY MS. MACKIEWICZ:

Q. What was your business address in 2006?

A. I think it was 100 Southeast 2nd Street. It was the Bank of America Tower or previously it was the CenTrust Tower.

01:51PM Q. And was there a suite that you occupied?
01:51PM A. I was in Suite 2600 and 2650 across the hall from each other. At certain times, I was on one side or other. I don't remember exactly what year I switched, but it was either 2600 or 2650.
01:52PM Q. Over the years, did you, if at all, keep an accurate address on file with the Florida Bar?
01:52PM A. Yes.
01:52PM Q. And to your knowledge, are addresses of Florida attorneys available, if at all, to the public through the Florida bar?
01:52PM A. Yes, absolutely.
01:52PM Q. Turning back to Mr. Gregory Mirmelli's businesses --
01:52PM MS. MACKIEWICZ: Your Honor, may I approach the witness?
01:52PM THE COURT: You may. With what exhibit?
01:52PM MS. MACKIEWICZ: Exhibit No. 9, which was previously admitted into evidence.
01:52PM THE COURT: Okay.
01:52PM BY MS. MACKIEWICZ:
01:52PM Q. Mr. Mirmelli, this is the April 24, 2006, articles of organization for Transpark, LLC. If you turn to page 2 of the document.
01:53PM A. Okay.
01:53PM Q. And you look at the bottom right-hand corner.
01:53PM A. Where the signature is, you're saying?
01:53PM Q. Excuse me?
01:53PM A. Where the signature is?

01:53PM Q. On page 2 of the document -- oh, I'm sorry, the bottom left-hand corner. It's page 2 of this document, so the first page of the articles.
01:53PM A. So on page 1 --
01:53PM Q. Yes. I'm sorry for the confusion there.
01:53PM A. That's all right.
01:53PM MS. MACKIEWICZ: Donna, can you present this.
01:53PM THE COURTROOM DEPUTY: Yes.
01:53PM MS. MACKIEWICZ: Thank you.
01:53PM THE COURTROOM DEPUTY: You're welcome.
01:53PM BY MS. MACKIEWICZ:
01:54PM Q. Although it's very blurry, does that show that you prepared these articles of organization?
01:54PM A. Yes.
01:54PM Q. And if we look at Article III of the articles of organization for Transpark, LLC, what is the location of the principal address of the company?
01:54PM A. 100 Southeast 2nd Street, Suite 2650, Miami, Florida 33131.
01:54PM Q. And that was the location of your law office, correct?
01:54PM A. Yes, it was.
01:54PM Q. And if we look down to Article IV, the name and address of the resident agent of Transpark, LLC, is what?
01:54PM A. The resident agent is Gregory Mirmelli, and the address is 100 Southeast 2nd Street, Suite 2650, Miami, Florida 33131.
01:54PM Q. And then if we turn to the next page, which contains

01:54PM Article V, who does it identify as the managing member of the company Transpark, LLC?
01:55PM A. Gregory Mirmelli.
01:55PM Q. And, again, at the bottom of this page, do you recognize Gregory Mirmelli's signature?
01:55PM A. I do.
01:55PM Q. And one more question back on the left-hand corner -- bottom corner of page 1 of the document, does it identify your Florida Bar number?
01:55PM A. Yes, it does.
01:55PM Q. As well as your law firm address?
01:55PM A. Yes. It has my law firm address, my bar number, and my telephone number.
01:55PM Q. And as shown on the first page of the exhibit, Plaintiff's Exhibit 9, this was filed with the Florida Department of State, Division of Corporations?
01:55PM A. Yes, it was.
01:55PM Q. And so that's available to the public?
01:56PM A. Yes, this is public information.
01:56PM MS. MACKIEWICZ: Your Honor, may I approach the witness?
01:56PM THE COURT: You may.
01:56PM BY MS. MACKIEWICZ:
01:56PM Q. Mr. Mirmelli, I'm showing you what was previously marked as Plaintiff's Exhibit No. 1. What is this document?
01:56PM A. Well, the first page is a fax cover sheet. It is addressed to

me from Nathan Heber, and it indicates that: Attached is a Profit Participation Agreement.

Q. And what is the date of that facsimile?

A. It looks like May 25th, 2006.

Q. Did you receive this facsimile and its attachment and maintain it in the ordinary course of business as Transpark's attorney?

A. Yes.

Q. And the fax number under your name, it was your fax number on May 25th, 2006?

A. Yes, it was.

MS. MACKIEWICZ: Your Honor, plaintiffs move Exhibit No. 1 into evidence.

THE COURT: Is there an objection to Plaintiff's Exhibit 1?

MR. CASABIELLE: No, Your Honor. I thought we did this already.

MR. NIELSON: No, Your Honor, we do have an objection.

MR. CASABIELLE: We do.

THE COURT: What is your objection to 1?

MR. CASABIELLE: If we may, Your Honor, the fax cover sheet is not part of the agreement. We agreed to the actual contract.

THE COURT: Counsel.

MS. MACKIEWICZ: This is the business record as it was maintained by this witness in his files.

01:58PM THE COURT: Right. That's not how the business record exception works. So are you admitting it without the fax cover sheet, or do you insist on doing it with the fax cover sheet?

01:58PM MS. MACKIEWICZ: With the fax cover sheet is how it provided this witness ^notice, so that's why I asked for it to be admitted with the fax cover sheet.

01:58PM THE COURT: It won't be. Would you like to admit it without?

01:58PM MS. MACKIEWICZ: I will admit it without.

01:58PM THE COURT: So without the fax cover sheet, Exhibit 1 is admitted.

01:58PM (Plaintiff Exhibit 1 was received.)

01:58PM MS. MACKIEWICZ: Your Honor, may I publish Exhibit 1 to the jury without the first page of the fax cover sheet?

01:58PM THE COURT: You may.

01:58PM MS. MACKIEWICZ: And, Your Honor, may I have the CSO have one delivered to each of the jurors in paper form?

01:59PM THE COURT: Will you be doing that with all the exhibits?

01:59PM MS. MACKIEWICZ: No.

01:59PM THE COURT: Okay.

01:59PM MR. CASABIELLE: Counsel, may we see that before it's shown, please.

01:59PM MS. MACKIEWICZ: I'm taking off page 1.

01:59PM MR. CASABIELLE: Okay. Thank you.

02:00PM BY MS. MACKIEWICZ:

Q. Mr. Mirmelli, let's look first at the first paragraph of the -- this agreement, this Profit Participation Agreement. In the first paragraph, Transpark, LLC, is identified as having an address of 100 Southeast 2nd Street, Suite 2650, Miami, Florida, and then in the agreement, it says it will hereinafter be referred to as "GM." Do you see that?
A. Yes.
Q. And, again, 100 Southeast 2nd Street, Suite 2650, was your law office address at this time?
A. Yes, it was.
Q. And now if we scroll down and look at the recital B, does it identify you as being the escrow agent for this transaction?
A. Yes.
Q. And then in Section 1 of this Profit Participation Agreement, do you see where it says: GM shall be entitled to receive 30 percent of the net cash flow and any profits from the sale or development of this property?
A. Yes, I do.
Q. And over the years, to your knowledge, did Mr. Gregory Mirmelli maintain his entitlement to receive this 30 percent?
MR. CASABIELLE: Objection.
THE COURT: Sustained.
MS. MACKIEWICZ: Your Honor, may I approach the witness?
THE COURT: You may.
What exhibit are you approaching with, ma'am?

MS. MACKIEWICZ: 5, which is in evidence.

BY MS. MACKIEWICZ:

Q. Mr. Mirmelli, do you recognize this as the closing statement for the purchase of 130 Southeast 1st Street in Miami, Florida?

A. Yes.

Q. And if we look at Section 8 in the top right corner, it identifies you as the settlement agent?

A. Yes, Section H, did you say?

Q. H, yes.

A. Yes, yes, it does.

Q. And then under that, in Section I, it shows a settlement date of May 31st, 2006?

A. Yes.

Q. And the location, place of settlement is 100 Southeast 2nd Street, Suite 2650?

A. That's correct.

Q. And as of May 31st, 2006, 100 Southeast 2nd Street, Suite 2650, was your law office location?

A. Yes, it was.

Q. And then if we look down to line 205 on the settlement statement --

A. Yes, I see it.

Q. -- what does that show?

A. It shows that funds were received from Gregory Mirmelli in the amount of $300,000.

MS. MACKIEWICZ: Your Honor, may I approach the witness?

THE COURT: You may. You can just announce what exhibit you're using.

MS. MACKIEWICZ: Sure. Exhibit No. 6 of plaintiff's. This document has previously been admitted into evidence.

BY MS. MACKIEWICZ:

Q. Do you recognize this, Mr. Mirmelli, to be the ground lease for the property located at 130 Southeast 1st Street?

A. Yes.

Q. And it's dated May 31st, 2006?

A. Yes, it is.

Q. And that's the same date as the closing of the purchase of the property; is that correct?

A. That's right, yes.

Q. And looking at the opening paragraphs, what address is listed for Transpark?

A. 100 Southeast 2nd Street, Suite 2650, Miami, Florida 33131.

Q. And then if we go to page 3 of this document, under Section 11, notices, what is the address? What's listed for the tenant Transpark, LLC?

A. 100 Southeast 2nd Street, Suite 2650, Miami, Florida 33131.

Q. And this is the same address as your law office at this time?

A. Yes, it is.

Q. Mr. Mirmelli, did you, if at all, receive mail at your law office for Mr. Gregory Mirmelli's various businesses over the

02:05PM years?
02:05PM A. Yes.
02:06PM MS. MACKIEWICZ: Your Honor, may I approach the witness with Plaintiff's Exhibit No. 23?
02:06PM THE COURT: Sure.
02:06PM BY MS. MACKIEWICZ:
02:06PM Q. Mr. Mirmelli, do you recognize this document?
02:06PM A. Yes, I do.
02:06PM Q. And did you receive this at your law office in the regular course of your business?
02:06PM A. Yes.
02:06PM Q. Is this a typical type of notice and mail that you would receive on your son Gregory Mirmelli's behalf in connection with his businesses at your law office?
02:06PM MR. CASABIELLE: Objection.
02:06PM THE COURT: Sustained.
02:06PM BY MS. MACKIEWICZ:
02:06PM Q. Did you maintain this document in the ordinary course of your business on behalf of your son and his business as of November 4th, 2008?
02:07PM A. Yes, I did.
02:07PM MS. MACKIEWICZ: Plaintiff offers Plaintiff's Exhibit 23 into evidence.
02:07PM MR. CASABIELLE: Objection, Your Honor.
02:07PM THE COURT: It's sustained.

02:07PM BY MS. MACKIEWICZ:
02:07PM Q. Mr. Mirmelli, when, if at all, did you move your law office to a new address?
02:07PM A. I moved from that building, I think to 340 West Flagler Street, it would have been around 2012 or 2013. I don't remember the exact date.
02:07PM Q. And what, if anything, happened to the mail that may have been sent to your prior law office address after you relocated to 340 West Flagler Street?
02:08PM MR. CASABIELLE: Objection.
02:08PM THE COURT: Sustained.
02:08PM BY MS. MACKIEWICZ:
02:08PM Q. The law office at 100 Southeast 2nd Street, Suite 2650, after you relocated, who took possession of that office?
02:08PM MR. CASABIELLE: Objection.
02:08PM THE COURT: If you know, sir.
02:08PM He can answer. Overruled.
02:08PM THE WITNESS: Yeah, I think we had subleased it to another -- another company. I don't think it was a law firm, but I think there was a company that took over the lease.
02:08PM BY MS. MACKIEWICZ:
02:08PM Q. And did you have a connection with those individuals who subleased the Suite 2650 at 100 Southeast 2nd Street after you relocated your law firm?
02:09PM MR. CASABIELLE: Objection, Your Honor.

THE COURT: Sustained.

BY MS. MACKIEWICZ:

Q. Mr. Mirmelli, do you recall, if at all, a time over the past several years -- I'm sorry -- the past several decades that you in your capacity as an attorney did not receive a notice under a contract?

MR. CASABIELLE: Objection.

THE COURT: Sustained.

MS. MACKIEWICZ: Your Honor, may I approach the witness?

THE COURT: With what?

MS. MACKIEWICZ: Defendant's Exhibit 41.

THE COURT: Defense 41?

MS. MACKIEWICZ: Yes.

THE COURT: Okay.

MR. CASABIELLE: Sorry, counsel, what exhibit was that?

MS. MACKIEWICZ: 41.

(Brief pause conferring with defense counsel.)

MS. MACKIEWICZ: Your Honor, at this time, plaintiffs move Defendant's Exhibit 41 into evidence.

MR. CASABIELLE: No objection.

THE COURT: Defendant's 41 is admitted.

(Defense Exhibit 41 was received.)

MS. MACKIEWICZ: And may I ask that it be published to the jury.

Are you putting it up?

THE COURTROOM DEPUTY: No. Do you have it up? Oh, okay. There it is.

BY MS. MACKIEWICZ:

Q. Mr. Mirmelli, do you recall a time when Transpark, LLC, was administratively dissolved?

A. Yes.

Q. And does the first page of Defendant's Exhibit 41 show that the -- that Transpark, LLC, was reinstated in the state of Florida?

A. Yes, it does.

Q. And what is the date of that reinstatement?

A. November 28th, 2017.

Q. And then if we go to page 7 of this document, if you look at the mailing address, what does it indicate?

A. 100 Southeast 2nd Street, Suite 2650, Miami, Florida 33131.

Q. And who is the resident agent?

A. Gregory Mirmelli.

Q. And, again, in 2008, your law office was located at 100 Southeast 2nd Street, Suite 2650?

A. Yes, it was.

Q. And then if we move to page 10 of this exhibit, what address is indicated for Mr. Gregory Mirmelli as the current resident agent?

A. 340 West Flagler Street, 209, it says, Miami, Florida 33130.

Q. And looking above it, it shows the current principal place of

business to be the same address?
A. Yes, it does.
Q. And that was the new location of your law office as of November 28th, 2017, correct?
A. That's where I was located at that time, yes.
Q. And if we turn to page 11, the principal place of business remains 340 West Flagler Street for January 16th, 2018, is that correct?
A. Yes, that's correct.
Q. And if we turn to page 12, the principal place of business for Transpark, LLC, as of February 5th, 2019, again, for the resident agent, shows Greg Mirmelli, 340 West Flagler Street, 209, Miami, Florida 33130, is that correct?
A. Yes, that's correct.
Q. Again, that's the location of your law office?
A. Yes.
Q. And if we turn to the next page, as of January 16th, 2020, it also shows that the name and address of the current registered agent is Gregory Mirmelli, 340 West Flagler Street, 209, Miami, Florida 33130?
A. Yes, it does.
Q. And that remained the location of your law office as of January 2020?
A. I believe so, yes.
Q. And then if we go to the next page, and, again, we see that

the name and address of the resident agent for Transpark, LLC, was Gregory Mirmelli, 340 West Flagler Street, 209, Miami, Florida 33130?
A. Yes.
Q. And that was the location of your law office on March 14th, 2021?
A. Yes.
Q. And these records that I've showed to you related to the Florida limited liability annual company report are public records, is that correct?
A. Yes, they are.
Q. Let's go back to Plaintiff's Exhibit No. 6. This is the ground lease agreement between Transpark and FTP?
A. Yes.
Q. And on page 3 of this document, it identifies that for notices to the tenant, they should go to 100 Southeast 2nd Street, Suite 2650, Miami, Florida 33131. Do you see that?
A. Yes, I do.
Q. Do you recall ever receiving a notice under this ground lease agreement at your law office?
A. I don't recall receiving that, no.
Q. And then if we go to Plaintiff's Exhibit 1, which is the Profit Participation Agreement --
A. Okay.
Q. -- and we look at the section on notices, which is Section 10,

do you see that it says to GM, which is Transpark, Mr. Gregory Mirmelli, 100 Southeast 2nd Street, Suite 2650, Miami, Florida 33131?
A. Yes, I do.
Q. And do you recall ever receiving a notice under the Profit Participation Agreement to your law office?
A. No.
MS. MACKIEWICZ: No further questions, Your Honor.
THE COURT: Cross-examination.
MR. CASABIELLE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. CASABIELLE:
Q. Good afternoon, sir.
A. Good afternoon.
Q. You're Gregory's father, right?
A. Yes, I am.
Q. You love him?
A. Absolutely.
Q. And you would do whatever you can to help him, correct?
A. I always have.
Q. And if you could say something positive in this courtroom relating to him, you would do so, yes?
A. I'm sorry, could you repeat that.
Q. If you could say something positive about him in this courtroom, you would do so, yes?

A. If it was the truth, yes.
Q. Okay. You would not lie for him?
A. No.
Q. All right. Let's talk about some of the exhibits. Where do we start? Let's start with Exhibit No. 1.
MR. CASABIELLE: Your Honor, permission to publish? It's already been agreed to.
THE COURT: You may.
MR. CASABIELLE: Can we please put up No. 1, Donna?
MR. PARDO: Plaintiff's 1?
MR. CASABIELLE: It's a trial exhibit. It's already been admitted. Plaintiff's 1, yes. Is it up? There we go.
Will you scroll down, please. Keep going. Keep going. Keep going. Keep going, please. The section that talks about notices, please go there. There, stop. There we go. Good.
BY MR. CASABIELLE:
Q. All right. Now, Mr. Mirmelli, can you please read that to the jury, Section 10.
A. It says: Notices. Any notice, demand, or document which any party is required or may desire or give or deliver to or make upon any party hereto shall, in the case of notice or demand, be in writing to: And if to FTP, Mr. Bart Seidler, FTP Investment Corporation, 1940 Fillmore Street, San Francisco, California 94115.
I think that's 115. It is partially blocked out. It might

be 105. And then if to Gregory Mirmelli, if to GM, Mr. Greg Mirmelli, 100 Southeast 2nd Street, Suite 2650, Miami, Florida 33131.

Q. Now, Mr. Mirmelli's -- Transpark's address during this period of time was not 2650, was it? It was 2610, yes?

A. I don't know. Where would I see that?

Q. Pardon?

A. Where would I find that, Transpark?

MR. CASABIELLE: May I have a moment, Your Honor?

THE COURT: You may.

(Brief pause to confer with cocounsel.)

MR. CASABIELLE: Can you please put up DX, Defense Exhibit 87. That's already been admitted, Your Honor. Permission to publish?

THE COURT: Defense 87 hasn't been admitted.

MR. CASABIELLE: Defense 87?

THE COURT: -- defense exhibit other than the one that has been admitted. ^

MR. CASABIELLE: If I may, Your Honor, that was one of the stipulated exhibits.

THE COURT: I'm hearing it is not.

Defense 87, is there an objection to Defense 87?

MS. MACKIEWICZ: There is not, Your Honor, but it has not been offered into evidence yet.

THE COURT: My question is: Is there an objection to 87?

MS. MACKIEWICZ: No. If it's offered, there will be no objection.
THE COURT: 87 is being offered. There is no objection. Defense 87 is admitted.
(Defense Exhibit 87 was received.)
MR. CASABIELLE: Permission to publish?
THE COURT: You may publish.
MR. CASABIELLE: Thank you, Your Honor.
BY MR. CASABIELLE:
Q. Now, can you tell us -- what you understand Defense Exhibit 87 to be.
A. It looks like a printout from the division of corporations regarding The Mirmelli Law Firm, P.A.
MR. CASABIELLE: I need a moment, Your Honor.
(Brief pause to confer with cocounsel. )
MR. CASABIELLE: We're on Exhibit 87 -- no.
MR. NIELSON: Yes, 87.
MR. CASABIELLE: 87. Can we scroll down, please.
BY MR. CASABIELLE:
Q. Now, before we continue scrolling down, let me ask you this question directly.
Did there come a time when you changed -- the Mirmelli Law Firm address changed?
A. Yes.
Q. Did it ever change to 2610?

02:23PM A. You know, I don't remember. I know that when I was originally at 100 Southeast 2nd Street, I was sharing space with an attorney, Jeff Harman. He left. Other people came in, and the building changed the suite numbers on us at different times, but we were in the same physical location.

02:24PM Q. But your suite numbers changed to 2610, did it not?

02:24PM A. I don't remember 2610. I remember 2600, I remember 2650, but it's possible.

02:24PM Q. All right. Let's go ahead and check.

02:24PM MR. CASABIELLE: Please, if we could scroll down. Keep going, please. Keep going. Keep going. Keep going. Stop there. Go back, please. Go forward. All right. We're at Exhibit Bates-stamped 87- -- scroll up, please -- -5.

02:25PM BY MR. CASABIELLE:

02:25PM Q. Can you tell us what your address is according to this annual report.

02:25PM A. It says Suite 2610 at 100 Southeast 2nd Street, Miami, Florida 33131.

02:25PM Q. Well, let me ask you something. If something is addressed to 2650, would you expect it to go to 2610?

02:25PM A. Normally, no, you wouldn't expect that.

02:25PM Q. Exactly.

02:25PM A. No.

02:25PM Q. Exactly.

02:25PM A. That's not to say it couldn't. I mean --

02:25PM Q. Now we're speculating, aren't we?
02:25PM A. No, but I did say that the building changed the suite numbers and -- you know.
02:25PM Q. No, no. That's not what I'm asking you, sir.
02:25PM Your son's address was 2650, right?
02:25PM A. Yes.
02:25PM Q. Your address was 2610, correct?
02:25PM A. In 2009, yeah.
02:25PM Q. Could you tell us perhaps why mail that's being sent to your son at 2650 would go to 2610?
02:26PM A. 2650 and 2610 were right across the hall from each other.
02:26PM Q. Are you suggesting to this jury that a mailman would go to that floor, the 26th floor, with mail for 2650, and he would deliver it -- he or she would deliver it to 2610?
02:26PM A. I'm telling you that it's happened. I don't know about mailmen, but the mailman in that building was the regular mailman, and he knew the parties. I did get, you know, mail that was misdelivered from one suite to the other.
02:26PM Q. Okay.
02:26PM A. If it would happen in every case, I don't know.
02:26PM Q. But you can't testify with specificity when that happened, can you?
02:26PM A. No. Just that it did happen. That's all I can tell you.
02:26PM Q. It's very possible that mail -- that the notices were being sent to 2650 that were not being delivered to 2650 because they

were addressed to 2610, yes?
A. I -- I can speculate and say, you know, it's possible, yeah.
Q. It's very possible, yes?
A. Yeah.
Q. You can't rule it out that mail that was addressed to 2650 was not delivered to 2610, can you?
A. That mail that was addressed to 2650?
Q. That was addressed to 2650 was not delivered to 2610?
A. Yeah, I can't say.
Q. Okay.
A. I can't say.
Q. Now, your address changed? The Mirmelli Law Firm address changed after you moved from 2610, did it not?
A. To where?
Q. I am going to ask you where. Well, let me ask you in this way. First question: Did it move? Yes?
A. Yes.
Q. Second question: Where did it move to?
A. Well, you're asking from 2610, and I see that I was listed at Suite 2610. My recollection is my office was 2600 and then moved across the hall to 2650. There were only two offices on that floor, but it did change at one point. It did change, I guess, to 2650. I think 2650 was the last office that I had in that building.
Q. Okay. And then you had an address of 2610, right, at that

building, yes?
A. That's what it says.
Q. Those are the records?
A. Yes. According to the records, that's what it says.
Q. Okay. And you moved from the 2610 address to another address. I think it's on Miami Beach?
A. 340 West Flagler Street.
Q. Okay. Sorry. You moved to Miami Beach after that?
A. After that, yes.
Q. And when did you move to the Flagler Street address?
A. I think it was around 2013.
Q. Now, would you expect to receive mail addressed to the 2650 address at your Flagler address?
A. Well, let me answer the way it happened if that's all right.
Q. No. What I am asking you --
A. -- what I expect?
THE COURT: No, hold on. So you can't speak over each other. You have to let him finish the question.
You have to let him finish the answer.
BY MR. CASABIELLE:
Q. Can you please answer my question.
A. Okay. Could you repeat it because --
MR. CASABIELLE: Madam Court Reporter, can we repeat the question, please.
(Question read.)

THE WITNESS: I did receive mail addressed to 2650 at Flagler, and I was also called from the office at 2650 to pick up mail that was delivered there that was not forwarded to Flagler Street. So would I expect it? I don't know what -- how to answer that, but it did happen, yes.

BY MR. CASABIELLE:

Q. Can you tell us what it is that you did receive at the Flagler address that was addressed to the 2650 address, what documents, what they pertained to?

A. I -- I can't tell you specifically. You're going back a lot of years. I can just tell you that I did receive mail that went to 2650.

Q. Okay.

A. And either it was forwarded or we got phone calls and I picked it up.

Q. Now, obviously, it's been a long time ago, so we have to rely on the records, right? Yes?

A. I -- I don't know how to answer that.

Q. Well, you don't have an independent recollection of what occurred, do you?

A. Only that I did receive mail, but specifically what pieces of mail, I couldn't tell you.

Q. Okay. Let's move on then to the next address you moved to. What was that? That was in Miami Beach?

A. That was 1750 James Avenue.

02:31PM Q. Okay. Did you expect to receive mail at the Miami Beach address that was addressed to the 2650 address?
02:31PM A. No. At that point, I had been out of that office for close to ten years.
02:31PM Q. Okay.
02:31PM A. So no, I wouldn't even expect that mail would be going there, but.
02:31PM Q. What year did you move to Miami Beach?
02:31PM A. I'm sorry?
02:31PM Q. What year did you move to Miami Beach?
02:31PM A. Well, that's my apartment where I lived, and I was transitioning from working out of the office downtown to working out of my apartment, so I was in -- at that address, 1750 James Avenue, since the late '90s, I believe.
02:32PM Q. That was a terrible question. My apologies.
02:32PM When did you move your office address to the Miami Beach address?
02:32PM A. I don't remember the date that I actually did that, but I would say somewhere probably around 2019, 2018, I might have changed it to that. That's when I started to transition there.
02:32PM MR. CASABIELLE: Can we put up 87 again, please.
02:32PM Permission to publish, Your Honor?
02:32PM THE COURT: Go ahead.
02:32PM BY MR. CASABIELLE:
02:32PM Q. And we scroll down, and specifically, I want to find -- so we

02:32PM can hopefully focus in on it, what year is this?
02:32PM Now, this is a report -- what's on the screen right now is a report filed April of 2008, yes?
02:33PM A. Yes.
02:33PM Q. The mailing address for your business is Miami Beach, yes?
02:33PM A. That's what it says, yes.
02:33PM Q. Is that -- had you transitioned -- let me phrase this correctly.
02:33PM Had you changed your business address by 2008 to the Miami Beach address?
02:33PM A. No.
02:33PM Q. This is what this report says.
02:33PM A. It does. Could you go back to the top and let me see what this is for?
02:33PM Q. Yes, of course.
02:33PM MR. CASABIELLE: Scroll up, please.
02:33PM THE WITNESS: Yeah, because at one point, I was advised by my accountant to form the PA. I don't remember what year, but, yeah, it does say 1750 James in 2008, but I was -- I was working at 100 Southeast 2nd Street then.
02:33PM BY MR. CASABIELLE:
02:33PM Q. Yeah, but this is your official business address, yes?
02:33PM A. It's where I'm registered with the bar.
02:33PM Q. Okay.
02:33PM MR. CASABIELLE: Let's move on to the next year, please.

2009. Scroll down. Can we focus up a little bit. There we go.
BY MR. CASABIELLE:
Q. This is a report for 2009, and here your office is the 2610 address, right?
A. Yes.
Q. So you went from Miami Beach to 2610?
A. No, I was downtown all the time.
Q. Well --
A. I didn't move my office, and I wasn't working out of my home in 2008. It says that address is where I was registered with the bar, but I wasn't working out of my house then.
Q. You just reminded me how sometimes I don't ask the proper question. Let me rephrase it, please.
Was your business address in 2009 the suite -- the 2610 address?
A. I believe so, 2610 or 2600.
Q. You don't know?
A. Well, I know that at one time the building changed the suite number, so -- but this says 2610, so the suite was probably called 2610 at that point.
Q. Okay. I'm asking about what you know about your own business address, your own law firm. In 2009, your office address was Suite 2610, right?
A. Yes, that's what it says.
Q. Next year, please. We're in 2010 now. What is your office

02:35PM address in the year 2010?
02:35PM A. Suite 2610, 100 Southeast 2nd Street --
02:35PM Q. Next year --
02:36PM A. -- Miami, Florida 33131.
02:36PM Q. Sorry. Next year, please. 2011, what is your address, business address?
02:36PM A. Same thing, Suite 2610, 100 Southeast 2nd Street, Miami, Florida 33131.
02:36PM Q. Okay. Next year. Here we are, 2012. What is your business address?
02:36PM A. Suite 2610, 100 Southeast 2nd Street, Miami, Florida 33131.
02:36PM Q. Next year, please. What is your address in the year 2013?
02:36PM A. Suite 2610, 100 Southeast 2nd Street, Miami, Florida 33131.
02:36PM Q. Next, please. The year 2014, what is the business address then?
02:36PM A. The same thing, Suite 2610, 100 Southeast 2nd Street Miami, Florida 33131.
02:37PM Q. Next year, please. All right. This is the year 2015. What is your official business address in the year 2015?
02:37PM A. Suite 209, 340 West Flagler Street, Miami, Florida 33130.
02:37PM Q. All right. Let's continue to the next year. Still the Flagler address in 2016?
02:37PM A. Still the Flagler address, yes.
02:37PM Q. 2017. Still the Flagler address in 2017?
02:37PM A. Yes, yes.

02:37PM Q. 2018, please. Same address?
02:37PM A. Still the Flagler address.
02:37PM Q. All right. Let's go to 2019. Now we have a Miami Beach address, right?
02:37PM A. Yes.
02:37PM Q. And that is the James Avenue address?
02:37PM A. Yes, 1750 James Avenue.
02:37PM Q. Okay. 2020, please. Same address, Miami Beach?
02:37PM A. Yes.
02:37PM Q. 2021, same address, Miami Beach?
02:38PM A. Same address.
02:38PM Q. 2022, same address?
02:38PM A. Same address, yes.
02:38PM Q. Okay. Finally, 2023, same address, right?
02:38PM A. Yes.
02:38PM Q. Okay. Now, during the years that all -- that you had these business addresses, again, is it your testimony that whatever went to 2050 [sic] would arrive at these different addresses? If you don't understand my question, I can rephrase it.
02:38PM A. I mean, I'm confused by 2050 is --
02:38PM Q. Okay. My bad. 2650 is Gregory -- Gregory, your son's, address?
02:38PM A. Yes.
02:38PM Q. Is it your testimony that during all these years where you have different addresses that you were receiving notices that were

addressed to the 2650 address; is that your testimony?
A. That I received mail addressed to 2650 during all of these years?
Q. Yeah -- yes.
A. I doubt that I would have received it during all of those years. I did receive some --
Q. Some?
A. -- some mail addressed to 2650, but, you know, remember, I changed my address, everything is on the computer I notify, so at some point, there were so many years passed, I wasn't really receiving. I don't receive now anything to 2650.
Q. We all understand that, sir.
A. Yes.
Q. It's just we're addressing whether or not you were receiving notices for -- addressed to your son at 2650, and that's what -- where we were headed. You've already addressed that issue.
A. Okay.
Q. So let's move on.
MR. CASABIELLE: That was a participation agreement, which was Defense Exhibit 1 and also, I think, a plaintiff's exhibit. Excuse me. Can we go to Defense Exhibit 2, which is a ground lease, which was also admitted as a plaintiff's exhibit. And I would ask permission to publish if there is no objection.
MS. MACKIEWICZ: I'm sorry. What exhibit number?
MR. CASABIELLE: DX No. 2.

THE COURT: Is there any objection to 2?

MS. MACKIEWICZ: It's already in evidence as a plaintiff's exhibit, so no.

MR. CASABIELLE: That is correct, Your Honor.

THE COURT: All right. But what's the plaintiff's exhibit number, then, for the record, please?

MR. CASABIELLE: No. 2.

MS. MACKIEWICZ: It's 6, Your Honor.

THE COURT: It's Plaintiff's 6.

MR. CASABIELLE: I'm sorry?

THE COURT: Plaintiff's 6 is the ground lease agreement, and it's already in evidence.

MR. CASABIELLE: Yes.

MS. MACKIEWICZ: Correct, correct.

THE COURT: So you're just going to use Plaintiff's 6?

MR. CASABIELLE: Or -- yeah. It was just -- it's labeled as Defendant 2, but we'll use Plaintiff 6. Yes, Your Honor.

THE COURT: All right. I'm happy to also admit Defendant's 2.

MR. CASABIELLE: Please do.

THE COURT: Okay. Defendant's 2 is admitted.

(Defendant's Exhibit 2 was received.)

MR. CASABIELLE: Permission to publish?

THE COURT: Yes.

MR. CASABIELLE: All right. Can we put it up, please.

BY MR. CASABIELLE:
Q. There is a notice somewhere here about notices.
MR. CASABIELLE: Can we go down to that. Here we go.
BY MR. CASABIELLE:
Q. This requires that notices be sent to 2650, correct? This is a lease?
A. Yes, that's what it says.
Q. This would not have been addressed to either the 2610 address or the Flagler address or the Miami Beach address, correct?
A. It says 2650, 100 Southeast 2nd Street.
Q. Right. I mean, it's kind of obvious, but I want to make sure we have a good record here.
A. Yes, that's what it says.
Q. All right. Let's talk a little bit about the contract for purchase of a property. You talked a little bit about that, that you were aware that your son had a contract to purchase the subject property here which is a parking lot on -- in Downtown, right?
A. Yes.
Q. Okay. And he came to you with that deal, did he not?
A. Yes, he did.
Q. Did you have to borrow or lend him money to be able to secure that deal?
A. I don't think I lent him any money for that.
Q. You didn't lend him $100,000 to secure the deal?

02:42PM A. I don't remember, honestly. I don't think I did. It's possible, but I don't -- I don't remember.

02:42PM MR. CASABIELLE: Permission -- if I could have a moment, Your Honor.

02:42PM THE COURT: Sure.

02:42PM (Brief pause to confer with cocounsel.)

02:43PM MR. CASABIELLE: Your Honor, we'd like to put up Plaintiff's 5, which has already been admitted into evidence.

02:43PM THE COURT: All right. Plaintiff's 5.

02:43PM BY MR. CASABIELLE:

02:43PM Q. Okay. Now this is going to be difficult. I'm going to try to find --

02:43PM MR. CASABIELLE: Can we scroll down, please.

02:43PM BY MR. CASABIELLE:

02:43PM Q. Okay. Item No. 2001 on the agreement, what does that say?

02:43PM A. It says: Deposits or earnest money -- Stewart Mirmelli, $100,000.

02:43PM Q. What does that mean?

02:43PM A. That means I was holding $100,000 in my trust account.

02:44PM Q. That was money that you were lending your son, wasn't it, so he could secure the deal?

02:44PM A. No, it's not money that I lent my son. You know, like I told you, it's possible at times I lent him money. I don't recall here, but $100,000 was being held in my trust account for the benefit of this transaction.

02:44PM Q. Okay. How does that work?

02:44PM A. How does it work? When any client purchases a piece of property and they put up a deposit, that deposit is usually held in trust by one of the attorneys. In this case, I had $100,000 in my trust account.

02:44PM Q. Okay. Where did the money come from for the deposit in your trust account? Whose money was that?

02:44PM A. You know, I don't remember as we're sitting here exactly the details, but from this document, it would indicate that it came from Greg and that I was holding $100,000 in trust as the deposit on this contract.

02:45PM Q. Mr. Mirmelli, are you sure about that, sir?

02:45PM A. I'm not.

02:45PM Q. Okay.

02:45PM A. I told you from the beginning, I don't remember whether I loaned him money or not, but I -- one thing I am sure about is that the $100,000 was being held as a deposit on this transaction.

02:45PM Q. All right.

02:45PM MR. CASABIELLE: Can we put up Defense Exhibit No. 1, Your Honor, which is --

02:45PM THE COURT: Defense 1 is also Plaintiff's 1, is it not?

02:45PM MS. MACKIEWICZ: Correct, Your Honor.

02:45PM MR. CASABIELLE: Yes.

02:45PM THE COURT: All right. Do you want me to also admit it as Defendant's 1?

MR. CASABIELLE: Well, admit if it if hasn't been admitted. I'm asking permission to publish.

THE COURT: You can publish it. This is the confusion. Defendant's 1 is not in evidence. If you want to publish Plaintiff's 1, which is in evidence, you can. If you want to publish Defendant's 1, I'll admit Defendant's 1 as well. It's the same document, but I will admit it twice.

MR. CASABIELLE: May I explain, Your Honor?

THE COURT: No. Which one do you want?

MR. CASABIELLE: Defendant 1.

THE COURT: Perfect. Is there any objection to Defendant's 1?

MS. MACKIEWICZ: No, Your Honor.

THE COURT: Okay. Admitted.

(Defense Exhibit 1 was received.)

MR. CASABIELLE: Can we please put it up. Let's go to Section B of that. Focus on that, please. Under recitals, highlight it.

BY MR. CASABIELLE:

Q. Do you see that, what's been highlighted, sir?

A. Yes, I do.

Q. Can you read it to the jury.

A. Sure. It says: Simultaneously with the execution of this agreement, FTP will tender the sum of $100,000 to Stewart Mirmelli, Esquire, the escrow agent under the contract for

purchase, in replacement of the deposit previously placed by GM under the contract for purchase and, upon receipt of said sum by the escrow agent, the escrow agent shall return the sum of $100,000 to GM.

Q. Okay. What does that mean to you?

A. I believe that the contract was being assigned and the assignee was replacing the deposit. He was putting up the 100,000, taking over the contract, and returning the original deposit to the person who put it up.

Q. The assignee being Greg, your son?

A. The assignor, I'm sorry. No, Greg would be the assignor.

Q. Assignee, assignor; I get confused.

A. The assignor is the one who's assigning the contract, so Greg is the assignor. He had the money up. The assignee who is taking the contract now replaced his $100,000 deposit, so he got his money back. And I'm still holding $100,000, but now it's from the assignee.

Q. Let's start from the beginning.

Why would FTP owe Stewart Mirmelli $100,000?

A. Stewart Mirmelli, Esquire?

Q. Yes.

A. They don't owe it to me. They're replacing a deposit that I'm holding in escrow. It says the escrow agent, so they would give me the $100,000.

Q. Who would give you $100,000?

A. FTP. They're taking the contract.
Q. Right.
A. And it says then the 100,000 that I was holding from Greg would be returned to him. So under the contract which requires the $100,000 deposit, it's still there, it's just from the assignee, not the assignor.
Q. Now, when we're talking about the contract where Greg got the rights to purchase that property, right --
A. Correct.
Q. -- he would be the assignor then, yes?
A. When the contract was assigned, he would be the assignor.
Q. Hence the confusion, so let's try to clarify that.
A. What confusion? I'm sorry.
Q. I'm confused. Let me try to clarify it.
A. Okay.
Q. The original contract where Greg gets the right to purchase the lot downtown?
A. Yes.
Q. He agrees to put up $100,000 as earnest money or subject to secure the loan -- secure the deal, yes?
A. As a deposit on the purchase of the property.
Q. Okay. That money, that $100,000 that Greg is using to secure the loan would go to the seller of the property, right?
A. Not at that time. The seller doesn't get the money until there is a closing. That's when the money -- up until the time of

closing, the money is held by the escrow agent in trust. When the property actually closes, which is the date the deed is issued, the property transfers.

Then the settlement agent, which was me, and, you know, if you look at the settlement statement that we went over, I would distribute the funds, I would record documents, I would pay expenses that are listed on the settlement statement. That would be my responsibility as the settlement agent, and that's when the seller gets his money.

Q. Were you the escrow agent in the deal where Greg buys the property or gets the right to buy the property? Were you the escrow agent?

A. Yes.

Q. You were?

A. Yes.

Q. And you were doing -- holding money pursuant to the instructions of the seller of the property at that time, right?

A. No. I hold it pursuant to the terms of the contract.

Q. Okay. Terms of the contract, which would be the instructions from the seller and the buyer?

A. The buyer and seller --

THE COURT: Tell you what. We're going to take our afternoon break. How much longer do think you have on cross-examination?

MR. CASABIELLE: Maybe another half hour to an hour,

somewhere in between.

THE COURT: All right. So we're going to take about 15 minutes.

MR. CASABIELLE: 15 minutes. Thank you, Your Honor.

(Jury out at 2:51 p.m.)

THE COURT: Hold on. I'm not sure why anybody is leaving, so this is how it works. Until the jury closes the door, everybody has got to stay. I need to know if there is any issue on the plaintiff or any issues that the defendant needs to raise before our break.

Anything on behalf of the plaintiff?

MR. PARDO: Nothing on behalf of the plaintiff. Thank you, Your Honor.

THE COURT: Anything on behalf of the defense?

MR. NIELSON: Nothing, Your Honor.

THE COURT: All right. I'll see you in 15 minutes.

(Recess at 2:52 p.m.)

(Back on the record at 3:09 p.m.)

THE COURT: Before we bring the jury back in, where is the witness?

MR. PARDO: Outside, Your Honor.

MS. MACKIEWICZ: Outside in the hallway.

THE COURT: Can you bring him in.

All right. It is very important that you not interrupt his answer.

It is very important you don't interrupt his question. The court reporter can't take down the record that way, so you need to stop --

THE WITNESS: I will be very careful.

THE COURT: -- take a minute, stop, take a minute. Please. It's -- I'm trying to look at the record here as it's coming up --

MR. CASABIELLE: My apologies, Judge.

THE COURT: -- we're not getting a record that way.

MR. CASABIELLE: I should know better.

THE COURT: Yes.

Can you bring the jury in.

(Jury in at 3:11 p.m. )

THE COURT: You may all be seated. And then let's proceed.

MR. CASABIELLE: May I proceed, Your Honor?

THE COURT: Yes.

MR. CASABIELLE: Thank you very much.

BY MR. CASABIELLE:

Q. Mr. Mirmelli, do you know the expression "hard money"?

A. Yes.

Q. How do you understand that? What do you understand that to mean?

A. Hard money is when money is put down on a contract and you can't get your deposit back. Usually there is an inspection

period, and you have the right to inspect property. And if you want to cancel the deal, you can do it during an inspection period. After that expires, with other possible exceptions, but generally after that expires, the money becomes hard, which means it's nonrefundable.

Q. Do you know when the $100,000 that we have been discussing became hard money in this deal?

A. I have to look at the agreement --

Q. My apologies. Let me rephrase.

Do you know when the $100,000 became hard money in the deal that Greg had to purchase the lot in downtown?

A. I'd have to look at the contract to be able to tell you.

Q. Now let me ask you this question. Did Greg ever complain to you that this deadline, this hard money deadline was coming up and the deal needed to be closed soon?

A. You know, it's possible because, you know, Greg's done a lot of deals, and that does happen frequently in deals where you've got a deadline coming up, so I can't say specifically I remember one way or the other. But it's possible that it happened in this deal.

Q. Did you ever complain or express concern that the hard money deadline was coming due on that original deal to your son?

A. I wouldn't phrase it that way. As an attorney -- sorry.

Q. Go ahead.

A. As an attorney, if I see that a deadline is coming up for my

client, I'm going to alert them to that.
Q. Did you?
A. But it's not my money, so.
Q. Did you do that in this case, alert your son that the hard money deadline was coming up on that deal, the initial deal?
A. I mean, you're going back almost 20 years, so it's, you know, very difficult for me to say I did it in that deal. I don't know.
Q. If by chance there was some evidence provided that you did do that, do you have any evidence to refute that fact?
MS. MACKIEWICZ: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: If there is evidence to show that I advised him of that, do I have any evidence to refute that?
BY MR. CASABIELLE:
Q. Yes.
A. No.
Q. Okay. Did Greg ever sign over a check to you in the amount of $100,000 dated May 22nd, 2006?
A. You know, very few transactions were done with checks. We're not even allowed to do them pretty much anymore, especially with cashier's checks. In 2006 probably the money was wired or transferred. I don't know if he wrote a check. I don't remember.
Q. Okay. This would be money coming from Greg, your son, to you?
A. Right.
Q. Do you recollect back in 2006 whether or not he wrote a

03:15PM check -- actually, endorsed a check over to you for $100,000 and that check was written by Bart Seidler? Do you have a recollection of that?

03:15PM A. I'd have to see the document, but I don't recall the specifics.

03:15PM Q. If I showed you a document, would that help refresh your recollection?

03:15PM A. It might.

03:15PM Q. If I showed you that check, would that help you refresh your recollection?

03:15PM A. It might.

03:15PM MR. CASABIELLE: Your Honor, may I approach the witness in an effort to refresh his recollection?

03:15PM THE COURT: You may. Make sure you show counsel what you're going to show him.

03:16PM MR. CASABIELLE: Yes, ma'am.

03:16PM (Brief pause while counsel confer.)

03:16PM MR. CASABIELLE: Your Honor, may I proceed?

03:16PM THE COURT: You may.

03:16PM MR. CASABIELLE: May I approach?

03:16PM THE COURT: Yes.

03:16PM MR. CASABIELLE: Thank you.

03:16PM THE WITNESS: Careful on that step.

03:16PM BY MR. CASABIELLE:

03:16PM Q. Let me show you this. I don't want you to talk about what it

is. I'm just showing it to you to see if it refreshes your recollection. Here you go. Tell me when you're done reviewing that document.
A. Okay.
Q. I will take that back. Now, sir, do you have a recollection of Gregory Mirmelli, your son, endorsing a check over to you that was written out by Stewart Mirmelli -- I'm sorry, Stewart [sic] Seidler in the amount of $100,000?
A. Well --
Q. The question is: Do you have a recollection?
A. Do I have a recollection, I -- I don't without looking at it. After you showed me that, I could explain what that is, but I don't have recollection.
Q. Go ahead and explain that, please.
A. That check was dated May 22nd, I believe, 2006.
Q. Right.
A. Which is the date that the contract was assigned from Greg to Bart Seidler. And that was the $100,000 that was replacing the money that I received from Greg as a deposit on the contract.
Q. Greg is giving you money, and then he's giving you more money?
A. No, he didn't. The check that Bart Seidler wrote out was addressed to Greg.
Q. Yes.
A. So Greg endorsed it to me because I was supposed to hold that 100,000 in trust. That's why it was endorsed to me. The $100,000

03:18PM that I was already holding was Greg's money, and that's money that
03:18PM would be returned to Greg, so this was replacing the $100,000 that
03:18PM I was holding.
03:18PM Q. All right. Let me try to understand this. Greg gave you
03:18PM $100,000 to hold in trust when the original deal was consummated,
03:18PM right?
03:18PM A. When the contract was signed.
03:18PM Q. Right. And that would have been the original contract to
03:18PM purchase the property, right?
03:18PM A. Correct.
03:19PM Q. He gave you $100,000 to hold in trust?
03:19PM A. To hold in trust, that's correct.
03:19PM Q. Why would you need another $100,000, then?
03:19PM A. Well, the contract was being assigned from Greg to Bart
03:19PM Seidler. So now it's up to Bart Seidler to put up the money, the
03:19PM $100,000 deposit on the contract, and Greg gets his $100,000 back.
03:19PM That's very typical in -- in assignments of contracts. Usually
03:19PM they're assigned for a profit.
03:19PM But that was a check from Bart Seidler to Greg, so he was
03:19PM refunding Greg's money, and it had to be held in trust because,
03:19PM according to the contract, I'm the escrow agent, I'm holding the
03:19PM deposit in trust. So when Greg received that check, he endorsed
03:19PM it to my trust account. I deposited it in my trust account, and
03:19PM then I'm sure I returned Greg's $100,000 to him. So I'm still
03:20PM holding 100,000.

Q. All right. Now, when we started out this testimony, I asked you if you would try to help your son during this trial, and you kind of addressed it. I want to make sure we're clear about that.

If there was an issue that came up before the Court where -- or before the jury where it could go either way, would you tend to choose an explanation that would favor your son?

A. No, I mean, I would tell you the truth.

MS. MACKIEWICZ: Objection.

THE COURT: Overruled.

BY MR. CASABIELLE:

Q. Go ahead.

A. I would tell you the truth. I wouldn't lie to protect my son.

Q. I'm not talking about facts that can be proven or disproven. I'm talking about memory lapses where you could have remembered, he could have done that, he could not have done that. Would you tend to -- would you tend to favor the recollection in your mind that would favor your son?

A. No, if I recollected, I'd recollect. If I didn't, I wouldn't.

Q. Okay. One final question. You say you had to refund money to Greg, the $100,000, right?

A. It was an assignment of the contract, so Bart Seidler was replacing the $100,000 deposit that Greg had put up. So when I got the funds from Bart Seidler that Greg endorsed to me, that freeze up his 100,000 and the seller is in the same position.

Q. According to the HUD statement, Greg had to come up with

$300,000?

A. For the purchase, yes.

Q. Why would you give him back $100,000 if he had to come up with a hundred -- $300,000?

MS. MACKIEWICZ: Objection.

THE WITNESS: Well, you're talking about two --

THE COURT: Overruled.

THE WITNESS: Oh, I'm sorry.

THE COURT: All right. So you have to also give a minute because if there's an objection, I have to be --

THE WITNESS: I didn't realize, Your Honor. I didn't hear. Sorry.

THE COURT: Your objection is overruled. Ask your next question.

MR. CASABIELLE: Can you repeat the question, Madam Court Reporter.

(Question read.)

THE WITNESS: The $100,000 that I received was received on May 22nd. That was to replace the $100,000 that Greg had put up. The closing of this transaction took place on May 31st. On May 31st -- that's called the closing date. On the closing date is when the buyer has to come up with all of their money, not on May 22nd.

It's conceivable that I did hold Greg's $100,000. I don't remember, as we're sitting here, that I can say I gave him

back the $100,000 on May 22nd. But these are two different dates. The date of the closing was almost ten days later. That's when Greg would have had to come up with the additional $300,000.

BY MR. CASABIELLE:

Q. Okay. Now, as closing escrow agent, your duty was to disburse funds according to the parties' intentions and instructions, yes?

A. According to the contract.

Q. Yes. The contract called for Greg to pay the seller $300,000, yes?

A. No, I don't believe so. I think that Greg's obligation came under the assignment agreement with Bart Seidler.

Q. Okay. The obligation was that $300,000 was to go to the seller, yes?

A. Well, it would. Greg had an obligation to come up with 300,000 toward the purchase price, and that would eventually go to the seller.

Q. Again, I ask the question: If the $300,000 was supposed to go to the seller and you were holding Greg's $100,000, why would you give it back to Greg as opposed to giving it to the seller?

MS. MACKIEWICZ: Objection.

THE COURT: Overruled.

THE WITNESS: You keep confusing it. I'm not holding Greg's $100,000; I'm holding Bart Seidler's $100,000. When the contract was assigned, Greg is giving Bart Seidler his rights under the contract. Bart Seidler is giving Greg back his

$100,000. He's replacing the deposit. So at that date, May 22nd, I received a $100,000 deposit from Bart Seidler that replaced Greg's 100,000. Greg was entitled to get back his $100,000 at that time. When the closing took place, at that time Bart Seidler and Greg had to come up with the money for closing, and that's when the buyers would have come up with their money.

BY MR. CASABIELLE:

Q. I'm sorry. Did you just say you never held on to Greg's money?

A. I didn't say that.

Q. What did you say? I thought I heard you --

A. I said I might have held on to it or not. I don't know at this time, but, you know, in answering your question, the $100,000 that Greg had put up initially was no longer the deposit under the contract. When the contract was assigned and Bart Seidler replaced it, the $100,000 was still there; only it wasn't coming from Greg at that point. It was coming from Bart Seidler, or his entity.

MR. CASABIELLE: Thank you, sir.

No further questions, Your Honor.

THE COURT: All right. Redirect?

MS. MACKIEWICZ: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. MACKIEWICZ:

Q. Mr. Mirmelli, can you describe the layout of the offices in

the suite where your law office was located at 100 Southeast 2nd Street?
A. Yes. I was on the 26th floor of the building, and when I originally had my office there, my office was facing -- I was on the side facing east and north. It was about 60 percent of the entire floor. And on the other side of the -- of that floor, there was either one or two other offices that were facing west.
Q. When the postal carrier delivered mail to the suite on the 26th floor at 100 Southeast 2nd Street, who was the mail delivered to?
MR. CASABIELLE: Objection, Your Honor.
THE WITNESS: Usually to the receptionist.
THE COURT: Overruled.
THE WITNESS: I'm sorry.
BY MS. MACKIEWICZ:
Q. You can answer.
A. To the receptionist usually.
Q. And how many receptionists were there for the suite on the 26th floor at 100 Southeast 2nd Street?
A. One.
Q. And did this receptionist then deliver the mail she received to the various individuals holding offices within that suite?
MR. CASABIELLE: Objection.
THE COURT: Sustained. Ma'am, it's your witness. You can't lead your witness.

03:27PM BY MS. MACKIEWICZ:
03:27PM Q. What did the receptionist do with the mail she received from the postal carrier after -- I'm sorry. Let me restate that.
03:27PM After the receptionist received mail from the postal carrier, what did she do with it?
03:27PM MR. CASABIELLE: Objection.
03:27PM THE COURT: Ma'am, so you have to lay a foundation. Does he know what the receptionist did? I mean, you can't ask these questions this way.
03:27PM BY MS. MACKIEWICZ:
03:27PM Q. Do you know what the receptionist did with the mail after she received it from the postal carrier?
03:28PM A. Yes.
03:28PM Q. And what did she do?
03:28PM A. She would separate it for the various attorneys that it was supposed to go to and deliver it to the attorneys.
03:28PM MS. MACKIEWICZ: Thank you. No further questions.
03:28PM THE COURT: All right. Call your next witness.
03:28PM Thank you very much -- oh, sorry. No. We have juror questions. So if anyone has any questions, just let me know. It looks like some of you are writing. Is there a question? All right. I see no's on behalf of the jurors.
03:28PM Sir, there are no more questions for you. You're excused. Thank you very much.
03:28PM THE WITNESS: Your Honor, these documents --

THE COURT: Just go ahead and leave them there. The lawyers will figure out what to do with them. Don't worry about it.

THE WITNESS: Thank you.

THE COURT: Thank you, sir.

(The witness is excused.)

THE COURT: Call your next witness.

MR. PARDO: The plaintiff calls Bart Seidler to the stand.

MR. CASABIELLE: One procedural question.

THE COURT: Okay. What is it?

MR. CASABIELLE: Your Honor, normally when one attorney --

THE COURT: We're in front of the jury. Let me take you sidebar.

MR. CASABIELLE: Sidebar, thank you.

(Sidebar conference.)

MR. CASABIELLE: Your Honor, when normally that attorney's tasked with raising objections and then the courts still allow other attorneys to jump in, is that your rule?

THE COURT: Yes, I don't think anybody violated that.

MR. CASABIELLE: No, but I may violate that.

THE COURT: Well, then don't.

MR. CASABIELLE: Well, this is the point. He is going to do -- he is going to call Bart, he is going to do the cross on

03:29PM Bart, and I wanted to jump in on objections when he was --

03:29PM THE COURT: You have your direction.

03:30PM MR. CASABIELLE: Yes, ma'am.

03:30PM THE COURT: All right. Thank you.

03:30PM (End of sidebar.)

03:30PM THE COURT: All right. Mr. Seidler, if you could take
03:30PM the stand, please.

03:30PM THE COURTROOM DEPUTY: Please raise your right hand.

03:30PM (The witness is sworn.)

03:30PM THE WITNESS: Yes.

03:30PM THE COURTROOM DEPUTY: Okay. Thank you. Please have a
03:30PM seat. Please state your first and last name for the record.

03:30PM THE WITNESS: Bart Seidler.

03:30PM THE COURTROOM DEPUTY: Thank you.

03:31PM MR. PARDO: Your Honor, permission to treat Mr. Seidler
03:31PM as an adverse witness.

03:31PM THE COURT: What's the defense's position on that?

03:31PM MR. NIELSON: No objection, Your Honor.

03:31PM THE COURT: All right. There's no objection. You may
03:31PM proceed.

03:31PM MR. PARDO: Thank you.

03:31PM CROSS-EXAMINATION

03:31PM BY MR. PARDO:

03:31PM Q. Mr. Seidler, would you introduce yourself to the jury, please.

03:31PM A. My name is Bart Seidler, and I'm the president of FTP

Investment Corporation.
Q. FTP Investment Corporation is the defendant in this lawsuit, correct?
A. Correct.
Q. Mr. Seidler, before we get into the substance here, you can agree with me that if there is anything unclear about the question I ask you, you will let me know to clarify the question?
A. Yeah, and I've got some hearing issues, so if you could speak loudly, I would appreciate it.
Q. I will do my best, and if I'm not speaking up enough, just let me know.
Mr. Seidler, you're a lawyer by training, correct?
A. I went to law school, yes.
Q. You passed the California bar exam?
A. Correct.
Q. You're the president of FTP Investment Corporation, the defendant in this lawsuit?
A. I'm what?
Q. You're the president of FTP?
A. Yes, yes.
Q. And when you speak on behalf of FTP in this case, is there anyone else on behalf of FTP that can speak about the company other than you?
A. Yes.
Q. Who is that?

03:32PM A. I'm sorry, you asked if I speak on behalf of the company.
03:32PM Q. That's right.
03:32PM A. Yes.
03:32PM Q. And anyone else?
03:32PM A. No.
03:32PM Q. In 2006 FTP took title to the subject property, correct?
03:32PM A. Yes.
03:32PM Q. Bought the property for $6 million?
03:32PM A. Yes.
03:32PM Q. 2021, FTP sold the property?
03:32PM A. Yes.
03:32PM Q. Sold the property for $18 million?
03:32PM A. Yes.
03:32PM Q. Your contention and your testimony here today is that you lost money on the deal?
03:32PM A. Yes. If you read the agreement, yes.
03:32PM Q. Let's pull up Plaintiff's Exhibit 1. Is this the Profit Participation Agreement you were referring to?
03:33PM A. Yes.
03:33PM Q. I want to understand and go back in time to May of 2006, when FTP took title to the property, what its understanding was of its obligations and responsibilities under this contract. Is that fair?
03:33PM A. Exactly what it says in the agreement.
03:33PM Q. Very well. Section 1 says that when the property sells,

FTP -- excuse me. Transpark, fourth line down, shall be entitled to receive 30 percent of the net cash flow and any profits from the sale or development of the property. Do you see that there?
A. Yes, I see it.
Q. FTP understood the terms of this section in May of 2006, correct?
A. Yes.
Q. It intended to abide by the terms of this contract?
A. Well, it's not just this term, it's all the terms, yes.
Q. But certainly in May of 2006, assuming all the terms were complied with, FTP intended to comply with this section, correct?
A. Yes.
Q. Now, the 30 percent of profit participation was broken into two buckets: 15 percent was the 300,000 that Transpark put into the deal, and 15 percent was the "promote," as it describes in this contract, right?
A. Yes.
Q. FTP understood that in May of 2006?
A. I'm sorry?
Q. FTP understood that -- structure in May 2006?
A. Yes.
Q. Top of PDF page 3, the first -- the top of the first section, it says that GM, that's Transpark, agrees to lease the property as a parking lot from FTP for as long as FTP desires, right, for as long as FTP desires? Did I highlight that correctly?

03:35PM A. Where does it say that?
03:35PM Q. End of the first line, beginning of the second. GM, that's Transpark, agrees to lease the property as a parking lot from FTP for as long as FTP desires, right? It's highlighted on your screen?
03:35PM A. Yeah, that's what it says.
03:35PM Q. Transpark -- excuse me, FTP understood that term too in May of 2006, right?
03:35PM A. I'm sorry?
03:35PM Q. May of 2006, just what the document says, right?
03:35PM A. Yes.
03:35PM Q. Section 2, this is where it talks about capital contributions, right? Right, Mr. Seidler?
03:35PM A. Yes.
03:35PM Q. Okay. Very good. And it says that if there has to be a capital contribution that they have to be put up 70 percent FTP, 30 percent Transpark, right?
03:36PM A. That's what that part says, yes.
03:36PM Q. FTP understood that in 2006?
03:36PM A. Yes.
03:36PM Q. FTP was going to abide by that from 2006 all the way through its ownership of the property, right?
03:36PM A. Yes.
03:36PM Q. Section C, Section 2 C, as in Charlie: All other capital contributions in excess of the initial capital -- let's pause.

03:36PM Initial capital, that's the money that FTP put in to buy the deal and the money that Transpark put in to buy the deal, right?
03:36PM A. Correct.
03:36PM Q. Okay. All other capital contributions in excess of the initial capital contribution to close the purchase -- now we're on to the next line -- shall be noticed by FTP to each party at least ten days prior to the date moneys are required in the normal course of business for the operation and development of the property.
03:37PM Did I read that right?
03:37PM A. That's what it says.
03:37PM Q. Very well. FTP understood this provision of the contract in May of 2006, correct?
03:37PM A. Yes.
03:37PM Q. You would agree with me that FTP was the one who had to give the notice of the capital contribution, right?
03:37PM A. That's what it says.
03:37PM Q. Transpark doesn't have to ask FTP: Hey, do I need to give a capital contribution, correct?
03:37PM A. No, this section doesn't say that.
03:37PM Q. And then we'll go up to Section B, as in boy: In the event that Transpark or FTP cannot meet their capital contribution, then the other side may advance the capital required and receive interest on the money so advanced at a rate of 14 percent per annum.

Did I read that right?
A. Yes.
Q. Okay. So that's -- if there is a notice capital contribution and then if somebody doesn't put up their capital contribution, the other side may loan the money to the business, fair?
A. It says if the other side cannot meet the required capital.
Q. That's right. If there is a capital contribution called for by, let's say, FTP, and if Transpark upon receipt of the capital contribution call notice cannot make that required capital contribution, then FTP may advance the capital and loan it to the business at 14 percent, right?
A. It's referring to the interest you would receive on the capital contribution and also additional points you would get --
Q. Very well.
A. -- for that capital contribution.
Q. A capital contribution that under Section C has to be noticed by FTP within ten days of the money being due, correct?
A. Yes. The document speaks for itself.
Q. Very well. Let's go to Section D, as in David, of this Section 2.
In the event Transpark defaults on the lease, which default is not cured by Transpark within 15 days of receipt of written notice of default from FTP, Transpark will lose the 15 percent promote and will only be entitled to receive the 15 percent share of profits unless further diluted.

03:39PM Did I read that correctly?
03:39PM A. That's what it says, yes.
03:39PM Q. Very well. So I want you to assume, as you contend, that there was an automatic default under the lease. You would agree with me that under this Section 2 D of the Profit Participation Agreement, FTP still has to give 15 days' notice before Transpark loses its 15 percent promote, right?
03:40PM A. No. It says if he doesn't cure it within 15 days.
03:40PM Q. That's right.
03:40PM A. It doesn't say anything about notice in this section.
03:40PM Q. So let's highlight the parenthetical which says: If GM defaults on the lease (which default is not cured by GM within 15 days of receipt of written notice of default from FTP).
03:40PM So let's back up. Let's assume that you contend there was an automatic default under a lease. FTP has to now give 15 days' notice of that default and give Transpark 15 days to cure before the 15 percent promote is lost, correct?
03:40PM A. No. An automatic default is an automatic default.
03:40PM Q. Under which document?
03:40PM A. I believe there is another document.
03:40PM Q. The lease?
03:40PM A. The lease.
03:40PM Q. The lease, okay.
03:40PM MR. PARDO: Let's pull up Plaintiff's Exhibit 6. And pull up the default provision. Let's scroll down. Next page. It

is going to be the bottom of Section 14. Let's do a split screen. There you go.

BY MR. PARDO:

Q. This is the default provision you're referring to that says there has to be notice -- there has to be a nonpayment of rent; if there is more than two, then they're in automatic default of the lease, correct?

A. Yeah, if he fails to pay rent --

Q. More than twice in one year?

A. Yeah, there is an automatic default.

Q. Under the lease, right?

A. Correct.

MR. PARDO: Let's go to the top -- let's go to the title of this document. This is the lease, right. Under the ground lease agreement. Okay.

So assume, as you contend, that there was an automatic default under the ground lease.

Let's go to Section 2 D, as in David, of the Profit Participation Agreement. 2 D, as in David, let's call that up.

BY MR. PARDO:

Q. In the event that Transpark defaults on the lease -- now here is the parenthetical -- (which default is not cured by Transpark within 15 days of receipt of written notice of default from FTP), then Transpark loses its 15 percent promote.

You would agree with me there, right?

A. That's what it says, yes.
Q. Very well. Now, Section 3. I say this is where the rubber meets the road. This is Section 3 of the Profit Participation Agreement that I imagine you were referring to, your capital contributions accruing interest of 14 percent?
A. Well, interest, yeah, what it says.
Q. Now, this is the provision that you were enforcing, right? Correct?
A. There is a number of provisions in here that are applicable.
Q. Very well. I want to take you now to August of 2021, okay. FTP was under contract to sell the property for $18 million?
A. Correct.
Q. Didn't tell Transpark that it was selling the property for $18 million, correct?
A. No, I did not.
Q. And FTP did not either, correct?
A. Pardon?
Q. FTP did not?
A. No, FTP did not.
Q. Okay. There is a closing agent out there, Joe Colletti, right? Do you understand that Joe Colletti was the closing agent who was facilitating the escrows just like Mr. Stewart Mirmelli was?
A. I never dealt with Joe Colletti. Never met him. Never talked to him. Never dealt with him.

03:43PM Q. You understand there was a closing agent for the property?
03:43PM A. Yes.
03:43PM Q. It wasn't your attorney; it happened to have been the buyer's attorney, correct?
03:43PM A. That was the closing agent, yes.
03:43PM Q. That closing agent receives the cash to close from the buyer, correct?
03:44PM A. Yes.
03:44PM Q. There was a closing statement that says how the money is supposed to get disbursed, correct?
03:44PM A. Yes.
03:44PM Q. There are sale proceeds from the transaction, correct?
03:44PM A. Is that a question?
03:44PM Q. Yes.
03:44PM A. Yes.
03:44PM Q. At the closing you knew there were sale proceeds, correct?
03:44PM A. Yes.
03:44PM Q. You wanted FTP to receive all of the sale proceeds, correct?
03:44PM A. Yes.
03:44PM Q. You knew that Transpark wasn't receiving any of the sale proceeds, correct?
03:44PM A. Yes.
03:44PM Q. And in your mind, you thought you had lost money on the deal, correct?
03:44PM A. Yeah, with all the -- with everything I had paid, plus all the

03:44PM defaults and everything else.
03:44PM Q. That's the Section 3?
03:44PM A. I felt the Transpark wasn't entitled to --
03:44PM THE COURT: Everyone, stop. You cannot speak over each other. Same problem.
03:45PM You have to wait till he's done.
03:45PM You have to wait till he's done.
03:45PM THE WITNESS: Okay.
03:45PM THE COURT: You cannot speak over each other, all right. Try that again.
03:45PM BY MR. PARDO:
03:45PM Q. Very well. It was at the closing table that FTP was seeking, among other provisions that you contend, to enforce this Section 3, right?
03:45PM A. I'm sorry?
03:45PM Q. You thought you had lost money on the deal based on all the capital contributions that you believe had accrued interest over the period of time that FTP had owned the property, right?
03:45PM A. I thought there was no money entitled to Transpark.
03:45PM Q. Right, because you were looking and thinking about this Section 3 that said that you get a preferred return, right?
03:45PM A. That's one of the reasons, yes.
03:45PM Q. Okay. So at the closing, right, when the property closed, you're sitting there saying to yourself in your head: Under Section 3 of the Profit Participation Agreement, I get my

preferred return, right?
A. That's part of it. That's not the --
Q. But it's at least one part of it?
A. It's one part of it.
Q. You understand that Transpark believes it was entitled to some portion of the $18 million of the sale price, right?
A. No.
Q. You understand that's Transpark's belief, that's Transpark's contention?
A. Yes, I understand that.
Q. And you believe they should get zero dollars from the sale, right?
A. I believe that when the evidence is in, the jury will decide the right way, and that's what I believe.
Q. You understand that --
MR. PARDO: We can take down this Section 3. Thank you, Patrick.
BY MR. PARDO:
Q. You understand that Transpark is not suing on any other contract except for the Profit Participation Agreement, right?
A. I assume that's what you're saying, yes.
Q. Now, the term, the length of the contract, the term of the contract was until the property was sold, right?
A. I think so, yes.
Q. Let's go back to the section that deals with notice. That's

03:47PM going to be Section 10.
03:47PM Let's just look at the introductory paragraph for a moment. Call it up. Any notice, demand, or document which any party is required or may desire to give or deliver to or make upon any party hereto shall, in the case of notice or demand, be in writing to.
03:48PM Did I read that right?
03:48PM A. Yes.
03:48PM Q. Okay. Let's go back to 2006. What was FTP's understanding of what sorts of things under the contract required notice?
03:48PM A. Whatever it says is the required notice.
03:48PM Q. Anything that was required, right? It says that, right?
03:48PM A. Yes.
03:48PM Q. And anything you may desire to give?
03:48PM A. That's what it says.
03:48PM Q. Okay. At any point from 2006 to 2021, did FTP ever desire to give notice?
03:48PM A. Yes, I gave notices.
03:48PM Q. Okay. Very well.
03:48PM In what form did those notices take?
03:48PM A. Orally with phone calls and emails.
03:48PM Q. Anything else?
03:48PM A. Well, discussing to his manager and to Mr. Mirmelli.
03:48PM Q. I'll put that in the oral category. Oral conversations and emails. Anything else?

03:49PM A. I think that's what I remember, yes.
03:49PM Q. Okay. So you would agree with me not once between 2006 and 2021 did you ever send or even desire to send a notice to Transpark by U.S. mail, correct?
03:49PM A. Neither one of us did, yes.
03:49PM Q. I'm only asking about you, sir.
03:49PM A. The answer is yes.
03:49PM Q. Neither Bart Seidler, nor FTP ever desired to give notice by U.S. mail to Transpark or Gregory Mirmelli at any time between 2006 and 2021, correct?
03:49PM A. I don't know about the word "desire," but I didn't -- I don't recall sending any U.S. mail notices.
03:49PM Q. What was FTP's understanding of how the contract could be terminated?
03:49PM A. What do you mean, how it could be terminated?
03:49PM Q. Well, a contract is either in force and effect or it's not. In what circumstances and how does it get terminated? How does it get effectuated?
03:50PM A. I don't think there is a termination clause in here.
03:50PM Q. Okay. So how is one to know that the contract is no longer -- that FTP no longer desires to enforce the contract?
03:50PM A. There's no termination clause.
03:50PM Q. Granted there's no termination clause, but it behooves you if you desire to tell Transpark that you no longer consider the document in force and effect, wouldn't you have to give notice?

A. No. I'd say we'd discuss it, send him an email. I'd send him -- discuss it with him.
Q. Okay, "discuss." Did you ever orally discuss with Greg Mirmelli that the contract was terminated?
A. I -- I sent numerous emails of his defaults and he gave up, but.
Q. Emails of defaults, emails of defaults. Defaults under the lease, right?
MR. NIELSON: Your Honor, objection.
THE COURT: Overruled. Overruled.
THE WITNESS: I'm sorry. What was the question?
BY MR. PARDO:
Q. You said you gave emails of defaults. Under the lease, right?
A. Correct.
Q. Not of the Profit Participation Agreement, correct?
A. I'm not sure.
Q. How about a capital contribution? Did you ever say in writing of any kind from FTP to Transpark there's a capital call?
A. I said there was money due that had to be paid, yes.
Q. Okay. Under the lease, right?
A. Under the lease and the fact that we had to provide capital contributions.
Q. You used the word "capital contributions" in some written writing to Transpark?
A. I'm -- I don't -- I don't think so, no.

03:52PM Q. In 2006 how did FTP understand that capital calls would be made?
03:52PM A. My understanding?
03:52PM Q. FTP's understanding, yes.
03:52PM A. Was that we were working together and we'd know that money was needed and we'd put it up.
03:52PM Q. Okay. But what would that notice look like? Didn't it require an amount?
03:52PM A. Pardon?
03:52PM Q. It would require a specific amount, right?
03:52PM A. Yes.
03:52PM Q. Like: Dear Transpark, you owe your percentage of a $5.8 million settlement payment to Crimson Plaza due within ten days, correct? Something like that?
03:53PM A. No, I didn't send those notices.
03:53PM Q. Who on behalf of FTP would be responsible for sending notices under the Profit Participation Agreement?
03:53PM A. It would be me.
03:53PM Q. You. You never did?
03:53PM A. No.
03:53PM MR. PARDO: Let's pull up the Plaintiff's Exhibit 6, the lease, and go down to the notice provision, please.
03:53PM MR. JUSTESEN: What?
03:53PM MR. PARDO: Plaintiff's Exhibit 6, to the notice provision. Just a moment. There you go.

BY MR. PARDO:
Q. Now, you would agree with me, once again, the lease is a separate document from the Profit Participation Agreement, two contracts, right, separate contracts?
A. They were together.
Q. Well, excuse me, sir. When was the lease signed?
A. Pardon?
Q. When was the lease signed?
A. Whatever the date on it is.
Q. Let's go up to the top, first page. May 31st, 2006, Profit Participation Agreement?
A. Right around the date of the closing, right.
Q. Well, let's go to PDF page 5 of the Profit Participation Agreement. They were signed on different dates, right? Right?
A. 5/25, right.
Q. And 5/31?
A. Yeah. But the day of the closing was 5/31; it wasn't 5/25.
Q. But they were separate contracts signed at separate times, right?
A. They were meant to work together.
Q. That wasn't my question. They were signed separately, they were separate documents, one wasn't expressly incorporated into the other, right?
A. They are different documents.
Q. Very well. So under the lease -- back to Section 11,

03:55PM page 3 -- any notice, approval, or other communication required hereunder shall be given in writing and shall be deemed to have been given if sent by facsimile with confirmation of transmittal, delivered by hand, sent by recognized overnight courier (such as Federal Express), or mailed by certified mail or registered mail, return receipt requested in a postage-prepaid envelope and addressed to the other party as set forth below.

03:56PM Did I read that right?

03:56PM A. Yes, you did.

03:56PM Q. Now, I thought I heard you say just a moment ago you thought the documents were supposed to work together, right?

03:56PM A. The lease -- the reason for the profit participation and the lease was they were working together, yes.

03:56PM Q. So if there was anything unclear about how notice should be given under the Profit Participation Agreement, and as you contend the documents worked together, fair to look at how notice should be given under the lease?

03:56PM A. What I meant when I said "worked together" was the lease was part of the entire project just like this was. They're separate documents, but they are -- the intention of the parties is that they were working together with both items.

03:56PM Q. Right. But if there's any ambiguity or if anything that's not clear in the Profit Participation Agreement, for example, how notice should be given, wouldn't it be fair to look at how the parties were dealing with one another in, as you call it, a

document that's supposed to collaborate and work together with the other?
A. No.
Q. No. So you're telling the jury that they should disregard Section 11 in the lease for notices?
A. No, I'm not saying that.
Q. Very well. Did you ever give Transpark any notice under the lease in accordance with this Section 11?
A. Yes, Transpark was given plenty of notice, but it wasn't by mail, it was other means which I testified to earlier.
Q. Very well. Transpark never received notice under the lease in accordance with this Section 11, right?
A. Not by fax -- well, they may have received facsimile, but not by overnight courier or by certified or registered mail.
Q. What would they have received facsimile?
A. I don't know. We faxed stuff back and forth sometimes.
Q. Not a default notice though?
A. I can't tell you right now. Show me the documents.
Q. I'm going to trust that if there is a default notice sent by fax, we'll see it in this trial.
I want you to assume now that, as you contend, FTP made capital contributions. Can you do that for me?
A. To assume I made capital contributions?
Q. Yes.
A. Yes.

03:58PM Q. In 2006 what was FTP's understanding of how it had to keep records of those capital contributions?
03:58PM A. Keep records in your accounting.
03:58PM Q. Okay. Anything else?
03:58PM A. That's how you keep records, accounting.
03:58PM Q. So if you want the jury to understand what capital contributions FTP believed it made, we would look to your accounting records, no further, correct?
03:59PM A. I don't know. I have other documents also, but.
03:59PM Q. Well, what other documents? Now I'm hearing there's accounting records and there's some other documents?
03:59PM A. I made some spreadsheets.
03:59PM Q. Okay. And those would show the full extent of what -- the capital contributions and interest and expenses under the profit participation that FTP believed, correct?
03:59PM A. They show what they show. I can't tell you that one showed the full extent.
03:59PM Q. For example, on an annual basis, if FTP believed that there were capital contributions being made, it didn't keep records of accruing interest on those capital contributions, right?
03:59PM A. I don't think so, no.
03:59PM Q. When you made the $5.8 million settlement payment to Crimson Plaza between 2013 and 2021, you never calculated accrued capital interest -- excuse me, accruing interest on that amount, did you?
03:59PM A. I don't believe so, no.

04:00PM Q. In fact, there will not be a single financial record of FTP that ever shows accruing capital contributions?
04:00PM A. No, it shows the capital contributions.
04:00PM Q. Not accruing interest though?
04:00PM A. Pardon?
04:00PM Q. Not accruing interest on those capital contributions?
04:00PM A. It may not.
04:00PM Q. Is FTP required to keep full and complete accounting records?
04:00PM A. Not of that.
04:00PM Q. Not of the capital contributions and the accruing interest that you believed you're earning on them?
04:00PM A. We kept full and complete accounting records of all the capital distributions.
04:00PM Q. Just not the interest that you contend now was accruing on them?
04:00PM A. That was not in our accounting records.
04:00PM Q. Mr. Seidler, you had this Profit Participation Agreement in your head at the time of closing, right?
04:01PM A. In my head when?
04:01PM Q. You were thinking about it at the time of closing?
04:01PM A. Which closing?
04:01PM Q. 2021, when you sold the property for $18 million?
04:01PM A. No.
04:01PM Q. No?
04:01PM A. No.

Case 1:24-cv-20631-JB Document 199-1 Entered on FLSD Docket 12/03/2025 Page 140 of 205


Q. You didn't think that you were underwater based on this agreement?
A. No, it was over.
Q. Let's pull up -- excuse me, Mr. Seidler. Before I do this, do you remember having your deposition taken in this case?
A. Go ahead --
Q. Do you remember having your deposition taken in this case?
A. Not right now, no.
Q. You had two depositions, one in 2024?
A. Oh, yeah. You took two depositions.
Q. That's right. A second deposition in 2025, right?
A. Yes.
Q. Where you swore to tell the truth during that deposition?
A. Yes.
Q. And in fact you told the truth during that deposition, right?
A. I told the truth, yes.
Q. Okay. Let's go to the first page of the 2025 Bart Seidler deposition. This is the deposition of Bart Seidler taken in this case on January 21st, 2025, at 1:51 p.m. Let's turn to page 27, lines 5 through 10. We'll call that up.
Would you read that out loud to the jury, please. Mr. Seidler, would you read it out loud to the jury.
A. My answer or the question?
Q. Question and answer, please.
A. When the property was sold in August of 2021, FTP didn't refer

04:02PM to the agreement to determine what moneys should or shouldn't be paid.

04:02PM THE COURT: You're going to have to slow down. The court reporter still has to write that.

04:02PM THE WITNESS: Pardon?

04:02PM THE COURT: When you read, you need to slow down.

04:02PM THE WITNESS: Okay.

04:02PM Should or shouldn't be paid to FTP pursuant to the agreement, correct?

04:02PM Answer: In my head, I knew I hadn't made money based on the agreement.

04:03PM MR. PARDO: We can take that down. Thank you.

04:03PM THE WITNESS: Which is exactly what I just said.

04:03PM BY MR. PARDO:

04:03PM Q. Yeah, that's right. You were trying to enforce Section 3 of the Profit Participation Agreement, right?

04:03PM A. All the sections.

04:03PM Q. You were trying to enforce all the sections of the contract?

04:03PM A. All the ones that refer to this.

04:03PM Q. But you were trying to enforce the contract at closing?

04:03PM A. Pardon?

04:03PM Q. You're the trustee of the Bart Seidler Irrevocable Trust?

04:03PM A. Yes.

04:03PM MR. NIELSON: Objection.

04:03PM THE COURT: Basis?

04:03PM MR. NIELSON: Relevance.
04:03PM THE COURT: Overruled.
04:03PM BY MR. PARDO:
04:03PM Q. Your trust owns all of the actual shares of FTP Investment Corporation?
04:03PM A. Yes.
04:03PM Q. FTP, like many companies, holds regular company meetings?
04:03PM A. Yes.
04:03PM Q. FTP maintains corporate records in a corporate record book?
04:03PM A. Yes.
04:03PM Q. FTP has a bookkeeper who maintains its financial records?
04:03PM A. We have a bookkeeper, yes.
04:04PM Q. You're not the bookkeeper though, right?
04:04PM A. Yes.
04:04PM Q. You're the bookkeeper?
04:04PM A. No, I'm not the bookkeeper.
04:04PM Q. It has another bookkeeper who maintains the records, correct?
04:04PM A. Yes.
04:04PM Q. That's the person who would know whether they're full, complete, and accurate at the time they're actually entered into the system, right?
04:04PM A. Yes.
04:04PM Q. You're the ultimate decision-maker for FTP?
04:04PM A. I'm sorry?
04:04PM Q. You're the ultimate decision-maker for FTP?

A. Yes.
Q. Now, FTP owns real estate all over the country, correct?
A. I don't know about all over the country, but in a few places, yes.
Q. It owns property in San Francisco, California?
A. Yes.
MR. NIELSON: Objection.
THE COURT: Overruled.
BY MR. PARDO:
Q. It owns property in Las Vegas?
A. Yes.
Q. What's commonly referred to as the Mojave property?
A. Yes.
Q. It owns a penthouse at the Portofino Yacht Club in Miami Beach?
A. Yes.
Q. It owns a warehouse in Miami, Florida?
A. Yes.
Q. The warehouse that you bought using $3 million of the sale proceeds from the sale of the property in 2021?
A. Yes.
Q. And you also own the Ingraham Building in Downtown Miami?
A. That's not owned by FTP.
Q. Oh. Who owns that one?
A. That's owned by my children.

04:05PM Q. Now, each of FTP's properties has its own bank account, correct?
04:05PM A. Correct.
04:05PM Q. Now, Mr. Seidler, you've done dozens of real estate deals in your career?
04:05PM A. Yes.
04:05PM Q. And for this property here, you were the one who decided whether FTP required a capital contribution?
04:05PM A. I was the one who would what?
04:05PM Q. Decide whether or not FTP needed a capital contribution.
04:06PM A. Well, if it was needed, it was needed.
04:06PM Q. You were the one who would decide that, right?
04:06PM A. If there needed money in the account, yes. Yes.
04:06PM Q. You would be the one who decided that, correct?
04:06PM A. Yes.
04:06PM Q. Now, for FTP Corporation, you would decide, for example -- let me rephrase.
04:06PM For this venture you were the one who decided whether or not there would be distributions, correct?
04:06PM A. There were no distributions.
04:06PM Q. You would be the one to decide whether or not there would be distributions though, that would be your decision?
04:06PM A. No. I think the agreement called for the parties to work together.
04:06PM Q. But if they couldn't resolve their differences, then you would

be the ultimate decider?
A. There was no provision for distributions.
Q. I'm not asking about whether there was a provision.
I'm saying if there were going to be distributions, you would be the one to decide?
A. Probably.
Q. And a distribution is when you're sending profits out of the company, right?
A. You're talking about this particular property?
Q. That's right.
A. Yes.
Q. Let's pull up Plaintiff's Exhibit 120. This is in evidence.
And it's just, quite frankly, Mr. Seidler, for the benefit the jury, do you recognize the property at 130 Southeast 1st Street, generally, the layout?
A. Yes. It's a survey.
Q. Yes. It shows it is a double-row parking lot with ingress/egress each side, right?
A. I'm sorry, I didn't --
Q. Do you see in the top left corner, for example, it says: Shed?
A. Shed?
Q. Yeah.
A. Yes.
Q. Do you know what that is?

04:07PM A. I don't know.
04:07PM Q. It's a physical structure, right? It's like a little shed on the property?
04:08PM A. Right.
04:08PM Q. Do you know if there is any other buildings on the property?
04:08PM A. No, not that -- no. It's just a parking lot.
04:08PM Q. Very well. Now, you would agree with me that Gregory Mirmelli brought you the deal to buy 130 Southeast 1st Street?
04:08PM A. Yes.
04:08PM MR. PARDO: Patrick, we can put this down. Thank you.
04:08PM BY MR. PARDO:
04:08PM Q. And you would agree with me that Transpark put in $300,000 towards the purchase of the property, correct?
04:08PM A. Yeah, at the closing, yes.
04:08PM Q. Now, ultimately FTP took out a four-and-a-half-million-dollar loan on the property?
04:08PM A. Yes.
04:08PM Q. Where did the loan proceeds go?
04:08PM A. They were returned to FTP as part of the money that it put up.
04:08PM Q. Did it go into this property's account?
04:09PM A. Yeah, it went back to FTP.
04:09PM Q. Well, no, not just FTP. Every property has its own bank account.
04:09PM Did it go back into this account?
04:09PM A. No, because it went back to FTP's account.

04:09PM Q. Not the bank account associated with this property at 130 Southeast 1st Street, correct?
04:09PM A. The money didn't come from the bank account associated with this property.
04:09PM Q. I understand.
04:09PM A. It went back to the account where the money came from.
04:09PM Q. I hear you a hundred percent. I just want to make sure we're clear.
04:09PM The mortgage proceeds did not go into the bank account for the 130 Southeast 1st Street property, correct?
04:09PM A. I don't think so, no.
04:09PM Q. You would agree with me, correct?
04:09PM A. Yes.
04:09PM Q. Now, you and Greg were friends for many years, right?
04:09PM A. Yes.
04:09PM Q. You would have regular communication with him over the years?
04:10PM A. Meaning friendly, as a friend?
04:10PM Q. Friendly communications, yes.
04:10PM A. Yes.
04:10PM Q. He would try and rent the properties that you owned for you?
04:10PM A. I'm sorry?
04:10PM Q. Greg would try and rent the properties out that you owned?
04:10PM A. He tried to rent --
04:10PM THE COURT: You can't speak over each other.
04:10PM THE WITNESS: He tried to rent a property that I owned

with another partner.

BY MR. PARDO:

Q. Right. You would talk about your trips together, right?

A. Yes.

Q. You would have trips to Park City, Utah, and Ibiza; you would share that with him in a friendly way?

A. Yes.

Q. And Greg would help you get Art Basel passes and Miami Heat tickets, right?

A. Sometimes.

Q. You would ask him to get VIP passes and tickets to EuroCave?

A. Tickets to what?

Q. EuroCave.

A. I don't know if he helped me buy a EuroCave, but.

Q. You used to share jokes with one another; you were friends?

A. Yes, we were friends.

Q. And you shared mutual friends too, right?

A. Yes.

Q. Kamal, the founder of Haute Living?

A. I'm not that friendly with Kamal.

Q. But you would go to parties with him together?

A. Pardon?

Q. You would go to parties together?

A. Sometimes. Not that often.

Q. And you would agree with me you were in regular course of

communication with Greg all the way through 2015, right?
A. No.
Q. Mr. Seidler, do you remember when you had your deposition taken in 2024?
A. Yes, please.
Q. You swore to tell the truth?
A. Yes.
Q. And, in fact, everything that you said in that deposition was truthful?
A. Yes. Let me see the deposition.
Q. Let's pull up the 2024 deposition. Let's read it for -- the first page. October 23rd, 2024, in this case.
THE COURTROOM DEPUTY: Is this admitted or not?
THE COURT: No, no, no. You can't show it to the jury. If you're refreshing his recollection, refresh his recollection. He asked to see it.
MR. PARDO: If I may, Judge, I'm impeaching the witness. Do you want me to not publish it to the jury?
THE COURT: No, I understand what you're doing. What he asked was to see his deposition, so you cannot impeach him. What he asked is to see his deposition.
MR. PARDO: So may I show it to him without publishing it to the jury?
THE COURT: Yes, that you may do.
MR. PARDO: Thank you, Your Honor.

04:12PM Let's put it up on the screen and not publish it to the jury, please. Page 201, lines 23 to 25.

04:12PM THE WITNESS: Yeah. It says through '14. That's what I testified to.

04:12PM BY MR. PARDO:

04:12PM Q. Okay. In fact, you and Greg lived in the same building between 2011 and 2014, right?

04:12PM A. The same building?

04:13PM Q. The same building.

04:13PM A. Which building was that?

04:13PM Q. Well, where did you live in 2011?

04:13PM A. Pardon?

04:13PM Q. Where did you live? Did you own real property in 2011 in Miami Beach?

04:13PM A. Yeah. I lived in the same place I live now.

04:13PM Q. Which is?

04:13PM A. One Century Lane.

04:13PM Q. And you lived there between 2011 and 2014?

04:13PM A. I don't think he was in that building. He had a house somewhere.

04:13PM Q. How do you know that?

04:13PM A. Huh?

04:13PM Q. How did you know that?

04:13PM A. He told me --

04:13PM Q. You knew where Greg lived?

A. -- he bought a house and he was living in it.
Q. So you knew where Greg lived?
A. I don't know. I knew he was living in a house.
Q. But he told you he was living in a house in Miami Beach, right? Sunset Island IV.
A. What's your question, sir?
Q. You knew that, right? You knew around that time where Greg was living? You knew he had a home?
A. Yeah. Also, my partner, Mark Roberts, told me he was living there.
Q. Very well. Now, prior to 2006 you knew that Greg had experience in the real estate industry, right?
A. Yes, in parking lots.
Q. You saw him make a lot of money in the 2000s?
A. I don't know what he made or didn't make.
Q. Well, isn't it a fact that you went to him and asked him to bring you a deal?
A. I -- in general, I probably discussed it: If he saw any deals, let me know.
Q. And the 130 Southeast 1st Street was one of those deals, right?
A. That's what he brought, yes.
Q. And Greg assigned that contract to FTP, right?
A. Yes.
Q. Let's pull back up the Profit Participation Agreement.

You would agree with me this only relates to the 130 Southeast 1st Street property, right?
A. That's what it refers to.
Q. It doesn't relate, for example, to that Mojave property out in Las Vegas?
A. No.
Q. They have nothing to do with one another, right?
A. No.
Q. You're not trying to add terms to this agreement that don't exist, right?
A. No. The agreement speaks for itself.
Q. You're not trying to ask the jury to take out terms that do exist, right?
A. No.
Q. This isn't a partnership agreement between FTP and Transpark, right?
A. No.
Q. Not a partnership between FTP and Greg Mirmelli, right?
A. It's not.
Q. It's not FTP's shareholder agreement?
A. No, it's not.
Q. It's not a --
THE COURTROOM DEPUTY: Sorry to interrupt. Is this something that the jury should be seeing that you're discussing now?

MR. PARDO: No.

THE COURTROOM DEPUTY: Thank you.

MR. PARDO: But, Patrick -- no, it's okay. You can take it down. Thank you, though. I appreciate it.

BY MR. PARDO:

Q. So you were saying it's not a partnership agreement; it's not a development agreement?

A. It's not a what agreement?

Q. Not a development agreement? It's not like a, you know, a GCAIA; it's not like an agreement you would sign to build a property?

A. No.

Q. It's not a memorandum of understanding?

A. No.

Q. Your belief is that Transpark could, quote, "only enjoy the upside," right?

A. Yes. Well, they'd have to -- I mean if there was an upside.

Q. Now, the parties to the Profit Participation Agreement are FTP and Transpark, right?

A. That --

Q. The parties to the agreement; FTP and Transpark, right?

A. We're not partners.

Q. The parties. The parties to the contract. The parties to the contract, the two entities --

A. The two parties?

04:16PM Q. -- to the contract?
04:16PM A. Yes.
04:16PM Q. Let's pull up the Profit Participation Agreement, and we'll go
04:17PM to Section 3 where the rubber meets the road.
04:17PM Last line: GM has the right to see the closing statement
04:17PM and upon a sale the closing agent shall distribute the money to
04:17PM the parties. Did I read that right?
04:17PM A. That's what it says.
04:17PM Q. You would agree with me Transpark didn't get to see the
04:17PM closing statement at the sale of the property?
04:17PM A. Yes, I agree with you.
04:17PM Q. And the closing agent did not distribute any money to
04:17PM Transpark at the closing, right?
04:17PM A. I don't think so, no.
04:17PM Q. Let's pull up Plaintiff's Exhibit 5. This is in evidence. Go
04:18PM to line 204 on the left-hand column, estimated funds from API.
04:18PM Do you see that here, Line 204 on the left-hand side,
04:18PM estimated funds from API, $4,977,588.27? Do you see that there?
04:18PM A. Yes.
04:18PM Q. What's API?
04:18PM A. It's a company called Asset Preservation. It's a intermediary
04:18PM for an exchange.
04:18PM Q. They're a qualified intermediary for a 1031 exchange?
04:19PM A. Yes.
04:19PM Q. So the money that FTP was bringing to the table, about 4.9

towards the $6 million purchase price, came from a sale that FTP had of other property?

You were using the capital gains from that sale, rolling them over into this property, correct?

A. Yeah, it was using the gain from another property to roll-over into this property.

Q. Just like in 2021 when FTP sold the property, it sent 13 and a half million dollars to API as a 1031 intermediary, right?

A. Yeah, whatever we sent them; similar type of transaction.

Q. Let's pull up Plaintiff's Exhibit 136 already in evidence. And let's go through some of these lines. You see Box H, the settlement agent, Joseph R. Colletti?

A. I see that.

Q. That was the buyer's attorney?

A. That was the buyer's agent.

Q. And also the closing agent, correct?

A. Correct.

Q. He was the one who brought all the money in, distributed the money out?

A. Yes.

Q. Sales price, Line 401, $18,000,000?

A. Yes, sales price.

Q. A little -- lines down -- sorry. Give me a moment. I apologize. Just a moment.

Let's go to Plaintiff's Exhibit 1 the right of first

refusal PDF. Call up Section 7.
Mr. Seidler, you understood in 2006 that this section is what's called a right of first refusal?
This is Section 7 -- I apologize -- is a right of first refusal.
A. What about it?
Q. That's what FTP understood it to be in 2006, right?
A. Whatever it says, that's it.
Q. In your own words could you explain to the jury what a right of first refusal is?
A. Can you pull up the section for me.
Q. Patrick, let's call up a little bit bigger Section 7, please.
A. It's a right to have the first right to purchase the property.
Q. Who held that right?
A. Either party.
Q. If, for example, FTP got an offer to buy the property or an LOI to buy the property, you had to give Transpark an opportunity to match those terms, right?
A. That's what it says.
Q. Now, this section was there for Transpark's benefit because Transpark didn't own the property, right?
A. Correct.
Q. The only one who would be getting an offer to buy the property is FTP because FTP owned the property, right?
A. Yes.

Q. If FTP got an offer to buy the property it would have to give notice of that offer to Transpark, right?
A. Yes, according to this section.
Q. According to this section. Now, that deals with ownership. You would agree with me that ownership of the property is different than the operations of the property, correct?
A. In what sense?
Q. In the sense that the money that comes in from the purchase and sale is different from the parking lot money coming in from the operations.
A. Yes.
Q. Ownership is different than operations, correct?
A. Ownership is different, yes.
Q. Now, when FTP bought the property, the seller had a right of first refusal for the operations, right?
A. I think -- yeah, I think it did.
Q. Let's pull up Plaintiff's Exhibit 7 in evidence. I can scroll through it if up want, but what do you understand this document to be?
A. Sorry?
Q. What do you understand this document to be? Is this that right of first refusal that we were talking about relating to the operation?
A. It was a document from the previous owner, that they would have a right to -- it says to operate or to lease the property.

04:24PM Q. Right. And what did you have to do if somebody wanted to lease the property?
04:25PM A. I don't know. What does it say?
04:25PM Q. Well, let's scroll down until you tell me where the document says what you have to do when somebody wants to lease the property for this right of first refusal.
04:25PM A. Well, what does it say?
04:25PM Q. That's right. Tell us where to go. Let's scroll to the next page?
04:25PM A. I don't know. Where is it?
04:25PM Q. Let's go to Section 3 of the previous page. Section 3, let's look it up. No, Section 3, please. Two and three, two and three, thank you. Two and three, please. Thank you. If the owner receives the terms of a lease management agreement, consulting services or any other offer they have to give notice, right?
04:25PM A. Who's manager? That's when they were running the parking lot.
04:26PM Q. They were the previous manager, FTP came in, it had a new manager come in, and the seller held on to that right of first refusal, right?
04:26PM A. Yeah, they had it, but they didn't want anything to do with the lot; they just sold it.
04:26PM Q. Right but my point is FTP knew what a right of first refusal was, right?
04:26PM A. I mean, the document speaks for itself.
04:26PM Q. Very well. This right of first refusal was publicly recorded

04:26PM in what's called the memorandum of right of first refusal, right?
04:26PM A. Was it publicly recorded?
04:26PM Q. Do you know whether it was publicly recorded?
04:26PM A. I don't know. I don't think so.
04:26PM Q. Let's pull up Plaintiff's Exhibit 10 in evidence.
04:26PM A. There it is; yes, it was publicly recorded.
04:26PM Q. Now, once the right of first refusal was publicly recorded, it
04:26PM affected title to the property, right?
04:26PM A. Yes.
04:26PM Q. Why?
04:26PM A. It's recorded.
04:26PM Q. Because now the world knows if somebody wants to buy it, they
04:27PM have to contend with this right of first refusal, right?
04:27PM A. Yes.
04:27PM Q. We can take this down. Thank you, Patrick. FTP took title to
04:27PM the property, not Transpark, right?
04:27PM A. FTP what.
04:27PM Q. Took title to the property, they owned it?
04:27PM A. Yes.
04:27PM Q. FTP took out the mortgage, not Transpark?
04:27PM A. Yes.
04:27PM Q. You, Bart Seidler, in your individual capacity, you guaranteed
04:27PM the loan?
04:27PM A. Yeah. The bank made me guarantee it.
04:27PM Q. And that's because you and your significant other, you had the

04:27PM wherewithal, the means, the balance sheet to guarantee the loan?
04:27PM A. You'd have to ask the bank, but I assume that's why.
04:27PM Q. Didn't you provide your financials in order for the bank to
04:28PM qualify you for the loan?
04:28PM A. Yes.
04:28PM Q. The bank didn't rely on Transpark's financials?
04:28PM A. Correct.
04:28PM Q. The bank didn't rely on Gregory Mirmelli's financials?
04:28PM A. I don't think so, no.
04:28PM Q. FTP, when it was negotiating the Profit Participation
04:28PM Agreement, it could have required Transpark to cosign the loan,
04:28PM correct?
04:28PM A. I suppose it could have; but Transpark was a new company, had
04:28PM no assets.
04:28PM Q. But if, for example, FTP wanted Transpark there to ensure the
04:28PM loan, it could have asked Gregory Mirmelli to cosign the loan? It
04:28PM could have done that, correct?
04:28PM A. It had no assets.
04:28PM Q. Gregory Mirmelli could have been another guarantor of the
04:28PM loan, correct?
04:28PM A. He wasn't an owner of the property.
04:28PM Q. I didn't ask whether he was an owner of the property.
04:28PM He could have been a guarantor on the loan if you wanted him
04:29PM to?
04:29PM A. I suppose the bank could ask him to be a guarantor if they

wanted to.
Q. Not only the bank, you could have asked him to be a guarantor on the loan if you wanted him to?
A. If you put it as a hypothetical, yes.
Q. It's a hypothetical because you didn't want him to be a guarantor on the loan, right?
A. No.
Q. You didn't want him to be a guarantor?
A. He wasn't an owner of the property.
Q. Mr. Seidler, did you want Mr. Mirmelli to be a guarantor on the loan or not?
A. Did I want him to be?
Q. Yes.
A. No.
Q. No, you didn't want Gregory Mirmelli to be a guarantor on the loan?
A. And he didn't want to be either, so.
Q. Now let's pull up Plaintiff's Exhibit 13. This is in evidence. This is that promissory note, right, for four-and-a-half million dollars. The mortgage that was taken out on the property was based on this note?
A. Yes.
Q. Transpark didn't sign the note?
A. No.
Q. Transpark assumed no responsibilities under the note?

A. Correct.
Q. Transpark had no obligation to repay the note?
A. Correct.
Q. Now, Plaintiff's Exhibit 14, this is in evidence, this is the mortgage.
Do you recognize the mortgage, the four-and-a-half-million dollar mortgage with Colonial Bank?
A. Yes.
Q. Let's turn to page 4, Section 1.03. It's a long section, but let me see where I want to start here. I printed it out.
MR. PARDO: Just a moment.
(Brief pause to collect documents.)
BY MR. PARDO:
Q. I'm going to look at the seventh line down, right after the semicolon on the right-hand side. One line up. Sorry. One line up, right after the semicolon. You -- excuse me: FTP as the mortgagor shall not suffer or permit any breach or default to occur with respect to any of the foregoing.
So if I can back up, you would agree with me that when FTP took out the mortgage with Colonial Bank, it promised the bank that it would not allow its tenant to be in default or breach of a lease, correct?
A. Let me read it. No, that's referring to the -- the covenants in the loan agreement.
Q. Let's start at the top. The mortgagor, right, that's FTP?

Right?
A. Right.
Q. Shall, that's on the second line, fifth word: cause to be performed all of the covenants, terms, conditions, provisions under any ground lease, right?
That says that you have to make sure that all the lease conditions are met, right?
A. No, it's not talking about lease. It's talking about the covenants in the loan agreement; like, you won't, I don't know, damage the property, you won't keep hazardous waste on the property, things like that. And it's saying that the mortgagor, which is FTP, shall make sure its tenants any lessees, or anyone else that's using the property will not violate those covenants. It would be like keeping hazardous waste or things like that, that's what that refers to.
Q. Mortgagor and mortgagor's sole cost and expense, shall maintain and cause to be performed all of the covenants, agreements, terms, conditions and provisions, all of them on its part to be kept, observed and performed under any ground lease?
A. You would have to look at the covenants.
Q. Right?
A. And it's saying the tenants, you know, anybody. If it was an office building, the tenants. They're just trying to make sure that the owner of the property doesn't let anybody violate the bank's specific covenants.

Q. Does it say the bank's covenants? It says: all terms and conditions of any lease, all conditions.
A. You have to look through the whole document and see what the covenants are.
Q. But you would agree with me, at least as a general rule, FTP had to make sure that all the covenants were met: and you shall not permit any breach or default to occur with respect to that?
A. That's what it says.
Q. Very well. Now let's look at Plaintiff's Exhibit 16. This is in evidence.
MR. JUSTESEN: 15?
MR. PARDO: 16 in evidence.
BY MR. PARDO:
Q. Let's scroll to the last page. This is the personal guarantee that you provided to the bank, I guess the previous page. Thank you.
A. Yes.
Q. So here now we have to acknowledge that Bart Seidler signing in his individual capacity is different than FTP signing the note itself; separate documents, right?
A. That's what it says.
Q. So, for example, profit participation and the lease were separate documents; the note and the mortgage are separate documents; and the note and guaranty, they're all separate documents, right?

04:35PM A. The guaranty is part of the entire loan package, it's a separate piece of paper but it's part of the entire loan.
04:35PM Q. Okay. You would agree with me you can operate a parking lot without owning it?
04:35PM A. You could, yes, of course.
04:35PM Q. And you can be the owner of a parking lot without operating it?
04:35PM A. Yes.
04:35PM Q. In 2006 you weren't a parking lot operator?
04:36PM A. Correct.
04:36PM Q. But you did want to own the property?
04:36PM A. Correct.
04:36PM Q. And you wanted to make money from owning the property?
04:36PM A. Correct.
04:36PM Q. Isn't it true that you have no idea when Transpark stopped operating the property?
04:36PM A. I'm sorry?
04:36PM Q. Isn't it true you have no idea when Transpark actually stopped operating the property?
04:36PM A. I believe -- I'm trying to remember the date. Yeah, Transpark stopped operating it, and because I was living in California, I had hired Nathan Heber to operate the property.
04:36PM Q. Do you recall when that was?
04:36PM A. I'm trying to think. I think it was around 2012.
04:36PM Q. That's because the lease --

04:36PM A. '11 and '12, it was pretty confusing, the Transpark there.
04:37PM Q. The lease in 2000 --
04:37PM A. '11.
04:37PM Q. 2011 is when the lease expired?
04:37PM A. Correct.
04:37PM Q. Now, I know you said that FTP hired Nathan Heber. But you would agree with me that Mr. Heber was the one who actually operated the lot from day one, right?
04:37PM A. He worked for Transpark in the beginning.
04:37PM Q. I understand he worked for Transpark but he was the boots on the ground, he was the actual guy operating the lot from day one, right?
04:37PM A. Yeah, he was there.
04:37PM Q. He was the actual person on the ground, he was the one --
04:37PM A. I think he and Greg did together.
04:37PM Q. We want to know what you know.
04:37PM He was the one that was operating it from day one, right?
04:38PM A. I said he and Greg were operating it together.
04:38PM Q. Okay. Now, you would agree with me generally, though, going back to the lease, Plaintiff's Exhibit 6, there is no mention in the lease of the Profit Participation Agreement, right?
04:38PM A. Correct.
04:38PM Q. The lease deals strictly with operations, right?
04:38PM A. It deals with the lease.
04:38PM Q. Just the operations on the property, right?

04:38PM A. The lease on the property.
04:38PM Q. Not ownership or profit participation?
04:38PM A. Yeah, whatever it says.
04:38PM Q. The lease does not deal with profit participation, correct?
04:38PM A. Correct.
04:38PM Q. Now, between May of 2006 and August of 2021, FTP never told its lender that Transpark was in default of the lease, correct?
04:38PM A. I don't -- I don't think so. There were three different loans on the property.
04:39PM Q. Well, at any time between 2006 and 2021 did FTP tell any of its lenders that Transpark was ever in default on its lease?
04:39PM A. I don't think -- I'm not sure. I don't think so.
04:39PM Q. And, in fact, there was a certificate of landlord and tenant, right, between the two that FTP promised the lender that it wouldn't hold them in default, right?
04:39PM A. I don't know. Do you have that? I don't know.
04:39PM Q. Let's pull up Plaintiff's Exhibit 12, Section 9.
04:39PM June 1st, 2006, certificate of landlord and tenant for Colonial. The landlord is FTP. The tenant is Transpark. The premises is 130 Southeast 1st Street. Let's go to Section 9.
04:39PM A. Okay. That was signed at the closing.
04:40PM Q. Yeah, let's look at what it says on Section 9. Let's call it up.
04:40PM Anything in the lease to the contrary notwithstanding: Landlord -- that's FTP -- agrees that it will not terminate the

lease for any default on the part of the tenant without first having given written notice to the lender, specifying the nature of any default and permitting the lender 30-days notice to cure or cause the such default to be cured?
A. Yeah. It says the word "terminate."
Q. The lease was never terminated?
A. The lease expired.
Q. And, in fact, they were never held in default?
A. There were defaults in the lease, yes; but it was never terminated.
Q. But you never told the lender they were in default?
A. Pardon?
Q. You never told the lender they were in default?
A. Probably not.
Q. We can put this down. Thank you.
A. But this was just that particular loan, correct? That's the first Colonial Bank loan?
Q. Well, you understand that Colonial Bank sold the note and all of the rights and obligations with that note to BB&T?
A. That was in the second loan.
Q. And then BB&T sold all the rights and obligations of the loan to Crimson Plaza?
A. Yeah, but that was a different loan than that loan.
Q. They bought a different note?
A. Different loan.

Q. Different loan. They bought on the renewal promissory note?
A. No. There was a brand-new loan in --
Q. 2011?
A. I think it was '9.
Q. Okay. So let's pivot to that. In 2009 Colonial Bank initiated foreclosure proceedings?
A. Correct.
Q. And did FTP give Transpark notice of those foreclosure proceedings?
A. I think they served Transpark on it. I don't know.
Q. Well, I'm asking not whether Transpark may have been served -- and I'll suggest to you that's a different document you're thinking of.
But in 2009 when Colonial Bank sued to foreclose FTP, did FTP give Transpark or Greg notice of that lawsuit?
A. Did -- I think they were served in it so they had notice. I don't -- I don't recall giving them specific notice. What I might have said, yes, they knew because we were in foreclosure and Nathan Heber, we were scrambling to get another loan; I'm pretty sure they knew.
Q. I'm not asking whether they knew; I'm asking whether FTP gave notice under the Profit Participation Agreement of the lawsuit?
A. I -- I don't know.
Q. Now, I understand that Transpark wasn't making a hundred percent rent payments during some period of time of the lease,

04:42PM right?
04:42PM A. Yes.
04:42PM Q. You accepted every rent payment that they made?
04:43PM A. Yes.
04:43PM Q. You never rejected any rent payment as insufficient?
04:43PM A. No.
04:43PM Q. You kept and there was no problem keeping the money that they gave you?
04:43PM A. Yes, no problem.
04:43PM Q. You never sued Transpark for unpaid rent?
04:43PM A. Did I sue them?
04:43PM Q. Yes.
04:43PM A. No.
04:43PM Q. You never sued them for being in default on the lease?
04:43PM A. No.
04:43PM Q. You never sued Greg to guaranty Transpark's performance?
04:43PM A. No.
04:43PM Q. Let's pull up Plaintiff's Exhibit 27 already in evidence. This is the complaint in the -- excuse me. Let's not publish it to the jury. Hold on one moment. Let me confer with my colleague.
04:43PM (Brief pause to confer with cocounsel.)
04:44PM MR. PARDO: My apologies. Let's pull up Plaintiff's Exhibit 25. Is that in evidence?
04:44PM MS. MACKIEWICZ: Yes.

MR. PARDO: Thank you. 25 is in evidence.
BY MR. PARDO:
Q. So when the Colonial lawsuit was filed, it was ultimately resolved, correct?
A. I'm sorry.
Q. The Colonial lawsuit that was filed in 2009, the first foreclosure lawsuit, that ultimately resolved itself, right?
A. Yes.
Q. And that's because FTP signed a renewal promissory note?
A. Signed a new -- we did a new loan.
Q. This is the new loan you were talking about, right?
A. I think so, yeah.
Q. Now, did FTP discuss the material terms of this new loan with Transpark?
A. They were aware of the new loan.
Q. I understand that but did you discuss the material terms of the new loan with Transpark?
A. I don't recall.
Q. Did you give them notice of the new loan?
A. Yeah, they -- they knew about it.
Q. Not did they know about it. Did FTP give notice of the new loan to Transpark?
A. I discussed it with their manager, that we were getting a new loan. I -- I don't remember exactly, but they knew that we were getting a new loan.

04:45PM Q. The Profit Participation Agreement requires notice. Did you give notice of the new loan to Transpark under the Profit Participation Agreement?
04:45PM A. I don't recall.
04:45PM Q. Now, the bank relied on your personal financials to issue this loan as well, correct?
04:46PM A. Yes.
04:46PM Q. Now, at this time you could have asked Transpark to cosign the loan, correct?
04:46PM A. The bank wasn't interested in anybody signing the loan but the owner and me.
04:46PM Q. But if you wanted to, you could have gone back to Greg and said, for example, you need to put up additional collateral for this loan if you wanted to?
04:46PM A. Hypothetically, yes.
04:46PM Q. But you didn't?
04:46PM A. No.
04:46PM Q. Now, BB&T is the first successor in interest to Colonial?
04:46PM A. Yes in.
04:46PM Q. They filed a lawsuit for foreclosure?
04:46PM A. Yes.
04:46PM Q. That's because when the note matured, FTP didn't pay off the note in full, correct?
04:46PM A. Yeah, they wouldn't renew the -- they promised to renew it and then they didn't renew it.

Q. Well?
A. And it wasn't paid off so they filed a foreclosure.
Q. They sent you notice -- the bank sent you notice before they filed foreclosure, right?
A. Yeah, they served me.
Q. Well, before they served you with a lawsuit they sent you notice that FTP was in default of the loan, right?
A. Yes.
Q. Let's pull up Plaintiff's Exhibit 58.
THE COURT: Counsel, before you go to the next exhibit, how much longer do you have with this witness?
MR. PARDO: I would have no problem stopping at Your Honor's leisure. It's going to go a decent amount more. I am happy to stop whenever you want. I'm ambivalent. I will defer to the jury.
THE COURT: Okay. Well, it's 4:47.
MR. PARDO: Happy to stop.
THE COURT: If this exhibit is going to take, you know, within 15 minutes, we'll go till 5:00.
MR. PARDO: No. It's a series of exhibits, so I'm okay stopping now.
THE COURT: Okay. All right. Then I think we're going to break for the day.
This is going to be the issue with our schedule tomorrow. I have a commitment that I have to attend to because I'm the

04:48PM speaker at a lunch so I have to go to the lunch, I can't cancel. So we're going to have -- you all are going to have a longer lunch period tomorrow. So we're going to break from 11:30 till 1:30 tomorrow, so I am going to ask that tomorrow you be here by 8:30 so we can start as soon as you get here, no later than 8:45. My hope would be that you were hearing testimony by 8:45. We'll take still one break in the morning, we'll go till 11:30, you will have a longer lunch. We'll come back at 1:30. And my inclination tomorrow is to also go till 5:00 because we're going to have that big break. Otherwise, I think we'll be ending a little shy of 5:00 for the rest of the trial, but tomorrow I don't want to lose too much time. My apologies, like I said, I don't have a choice. The fliers were already printed and people have already signed up, so it is what it is.

04:48PM So again, don't talk about the case with each other, don't talk about it with anybody else, don't look anything up, and we will see you bright and early tomorrow morning at 8:30.

04:49PM (Jury out at 4:49 p.m.)

04:49PM THE COURT: Be here at 8:30. Hold on. I have to wait for the door to close because the jury can still hear us.

04:49PM I asked the jury to be here at 8:30. That's an early start for them. I suspect we will probably start closer to 8:45. But I'll be here; and so if the jury is here I'd like to start at early as we can tomorrow so we don't lose too much time because of the larger lunch break that I have to take.

04:50PM MR. PARDO: Your Honor, the plaintiff is invoking the rule of sequestration, so I think that raises two issues.

04:50PM One, we're obviously invoking the rule when, two, Mr. Seidler is still on the stand overnight.

04:50PM THE COURT: I know. So what will happen is you've invoked the rule, I don't see anybody else, at least sitting behind the defense.

04:50PM Sir, you're in the middle of testimony, so you can't talk about your testimony to anyone, including your lawyers.

04:50PM You can talk about the case, you can talk about other things, but not about your testimony because you're right in the middle of it.

04:50PM THE WITNESS: Okay.

04:50PM THE COURT: Okay. All right. Anything further on behalf of the plaintiff?

04:50PM MR. PARDO: Nothing on behalf of the plaintiff. Thank you.

04:50PM THE COURT: On behalf of the defense?

04:50PM MR. CASABIELLE: Yes, Your Honor, if I may.

04:50PM I didn't realize or I didn't know what the procedure was for the admission of certain exhibits. Now I do. I have a list of the exhibits -- plaintiff's exhibits -- I'm sorry, defendant's exhibits that have been agreed to.

04:50PM Does Your Honor want me to read those into the record today, tomorrow? That way we don't have to go through the

exchange whether or not it's been admitted or not.

THE COURT: Right. So you can do that. I think since the plaintiffs did it in front of the jury -- I didn't realize it was going to be so many, otherwise I would not have let you do that -- but since they did it in front of the jury, you can do the same. You can either do it on your next cross or you can do it when you begin your case in chief. Whenever you want to do it, you can do that.

MR. CASABIELLE: We'll do it right before he begins -- Mr. Nielson begins his cross then.

THE COURT: And then in terms of scheduling, you heard what the schedule is for tomorrow. We will sit on Friday. I was able -- the one sentencing I couldn't move, I have moved it to an earlier time frame, so we will probably -- we will start later in the morning; probably around 11:00. I don't know exactly the time, but we will be sitting on Friday.

MR. PARDO: Thank you, Your Honor.

THE COURT: All right. Yes, sir.

MR. CASABIELLE: Yes, Your Honor. Regarding scheduling, Your Honor may recall I mentioned that I had other sentencing hearings in this building or at least in this court. I don't want to be presumptuous but I believe Rehan, Judge Gayles' deputy clerk, led me to believe that he had contacted chambers to let you know that the sentencing that I had in Key West for Monday has now been transferred to Miami at 1:00 o'clock. And therefore --

THE COURT: Hold on. What you had told me is that you had a sentencing in Key West on Tuesday of next week, and I went ahead -- I had not heard back from you, so we will not be sitting next Tuesday, and I have already set a number of criminal hearings for Tuesday that I cannot move.

MR. CASABIELLE: Okay.

THE COURT: So it was a Judge Martinez case that you had on Tuesday. So is there another case?

MR. CASABIELLE: I need to clarify, yes. There are two cases; one in front of Gayles and one in front of Moore, not Martinez. I get them confused; it's easy to do that. It was in front of Moore. The one in front of Moore was scheduled for the 7th. I filed a motion to continue that because I wanted to go on vacation. That was mooted out by this Court's opinion that we were going to trial on that day, so I took it upon myself filing a motion for a continuance in the Moore case, which he granted. So that is no longer on for -- it is no longer a conflict for me on the 7th.

The second case I have, and that means -- we can be here on the 7th.

The second conflict that I had was for Monday, and that's in front of Judge Gayles; different defendant, different case. He -- to deal with the conflict, he agreed to move it to Miami as opposed to a sentencing in Key West; that way it would only take about half an hour of my time on that day to finish that and

continue with this.

I just wanted to let the Court know that's my understanding of what they have done based upon what I have asked them to do so that this Court can schedule accordingly.

THE COURT: All right. So since I never heard back from you, on the 7th, which is Tuesday, we will not be sitting in this trial on the 7th because I have scheduled a number of criminal hearings on a significant criminal matter with five codefendants for the 7th; so we will not sit the 7th.

If you have a different sentencing on the 6th, which is the first I hear of it, and Judge Gayles has moved it to Miami on the 6th, I need to know at what time that is.

MR. CASABIELLE: 1:00 o'clock.

THE COURT: 1:00 o'clock on the 6th. So we will take our lunch break at 1:00 o'clock on the 6th. That shouldn't be an issue. But we won't be sitting the 7th because, like I said, I hadn't heard from you and I went ahead and already scheduled other things on the 7th.

MR. CASABIELLE: Thank you, Your Honor.

THE COURT: So next week we're only sitting three days, not five.

This should be moving along. This cannot possibly be seven trial days, gentlemen and ma'am; it just can't be. So hopefully that will be sufficient to take this case to the jury, all right.

04:55PM All right. Thank you very much. We'll see you tomorrow bright and early, everyone.

04:55PM MR. PARDO: Thank you, Your Honor.

04:55PM MR. CASABIELLE: Thank you, Your Honor.

04:55PM THE COURT: Thank you for accommodating that lunch I have.

04:55PM (Recess at 4:55 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate EXCERPT transcription of the proceedings in the above-entitled matter.

DATE: 9/29/25

/s/Vernita Allen-Williams
VERNITA ALLEN-WILLIAMS, RMR, FCRR
Official Court Reporter
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
(305) 523-5938

**$**

**$10** [1] - 25:13
**$100,000** [49] - 35:2, 35:4, 39:3, 97:25, 98:17, 98:19, 98:24, 99:4, 99:10, 99:17, 100:24, 101:4, 101:15, 101:16, 101:19, 101:24, 101:25, 102:5, 102:19, 102:22, 106:6, 106:10, 107:18, 108:1, 109:8, 109:18, 109:25, 110:2, 110:5, 110:11, 110:13, 110:16, 110:24, 111:20, 111:22, 112:3, 112:18, 112:19, 112:24, 113:1, 113:18, 113:23, 114:1, 114:2, 114:3, 114:13, 114:16
**$13** [1] - 25:12
**$17,000** [1] - 56:11
**$18** [13] - 15:22, 22:15, 23:17, 24:24, 25:4, 30:17, 55:21, 56:5, 120:12, 127:11, 127:14, 130:6, 139:22
**$18,000,000** [1] - 155:21
**$2,500** [1] - 34:4
**$200,000** [1] - 39:2
**$21** [1] - 26:16
**$30,000** [6] - 36:19, 36:23, 37:1, 37:22, 37:23, 39:10
**$300,000** [15] - 17:6, 35:19, 38:11, 38:15, 38:24, 39:24, 48:19, 73:25, 112:1, 112:4, 113:3, 113:8, 113:12, 113:17, 146:12
**$4,977,588.27** [1] - 154:18
**$550,000** [1] - 41:3

**'**

**'11** [2] - 166:1, 166:3
**'12** [1] - 166:1
**'14** [2] - 29:1, 150:3
**'15** [1] - 29:1
**'16** [1] - 29:1
**'9** [1] - 169:4
**'90s** [1] - 90:14

**/**

**/s/Vernita** [1] - 179:14

**1**

**1** [36] - 1:6, 1:7, 16:11, 16:17, 17:11, 68:4, 69:8, 69:24, 70:12, 70:14, 70:19, 71:10, 71:12, 71:13, 71:23, 72:14, 80:22, 82:5, 82:9, 82:10, 82:12, 95:20, 99:19, 99:21, 99:25, 100:4, 100:5, 100:6, 100:10, 100:12, 100:15, 120:17, 120:25, 155:25
**1-and-a-half-million-dollar** [2] - 25:5, 25:18
**1......................... Page** [2] - 2:7, 2:9
**1.03** [1] - 162:9
**1.2** [1] - 36:6
**10** [11] - 19:22, 23:20, 43:20, 44:2, 65:18, 78:21, 80:25, 82:18, 131:1, 140:20, 159:5
**100** [33] - 1:18, 2:9, 29:18, 58:20, 62:15, 66:24, 68:18, 68:23, 72:4, 72:8, 73:14, 73:17, 74:17, 74:21, 76:13, 76:23, 78:15, 78:18, 80:16, 81:2, 83:2, 85:2, 85:17, 91:20, 93:2, 93:7, 93:11, 93:13, 93:16, 97:10, 115:1, 115:9, 115:19
**100,000** [6] - 101:8, 102:3, 109:25, 110:25, 111:24, 114:3
**102** [1] - 58:20
**1031** [5] - 25:8, 25:12, 25:19, 154:23, 155:8
**104** [1] - 58:21
**105** [2] - 58:21, 83:1
**107** [1] - 58:22
**108** [2] - 30:3, 58:22
**109** [1] - 58:22
**10th** [1] - 62:11
**11** [7] - 57:22, 74:19, 79:6, 135:25, 137:5, 137:8, 137:12
**11.4** [2] - 26:8, 26:9
**111** [1] - 58:23
**112** [1] - 58:23
**114** [1] - 2:3
**115** [1] - 82:25
**117** [1] - 58:24
**118** [2] - 2:4, 58:24
**11:00** [3] - 1:5, 3:1, 176:15
**11:01** [1] - 3:3
**11:30** [2] - 174:3, 174:7
**11F** [1] - 61:6
**11th** [1] - 62:9
**12** [3] - 57:22, 79:10, 167:17
**120** [2] - 58:24, 145:12
**1205** [1] - 1:15
**121** [1] - 58:25
**122** [1] - 58:25
**123** [2] - 23:13, 59:1
**124** [1] - 59:1
**125** [1] - 59:1
**128** [1] - 59:2
**129** [1] - 59:2
**12:12** [1] - 45:8
**12:14** [1] - 46:13
**12:30** [1] - 44:18
**13** [6] - 25:7, 25:19, 30:5, 57:23, 155:7, 161:18
**130** [14] - 20:7, 59:3, 65:10, 65:16, 66:15, 73:4, 74:8, 145:15, 146:8, 147:2, 147:10, 151:20, 152:2, 167:20
**131** [1] - 59:3
**133** [1] - 59:3
**135** [3] - 59:4, 59:20, 59:23
**136** [5] - 24:20, 60:9, 60:13, 60:14, 155:10
**136....................... Page** [1] - 2:7
**14** [6] - 57:23, 123:24, 124:11, 126:1, 127:5, 162:4
**140** [1] - 59:4
**142** [2] - 25:24, 59:5
**143** [1] - 59:5
**14th** [1] - 80:5
**15** [27] - 17:16, 19:2, 19:4, 44:19, 44:23, 57:23, 104:3, 104:4, 104:16, 121:14, 121:15, 124:22, 124:23, 124:24, 125:6, 125:7, 125:8, 125:13, 125:15, 125:16, 125:17, 126:23, 126:24, 164:11, 173:19
**158** [4] - 59:5, 59:9, 59:10, 59:11
**159** [2] - 59:7, 59:12
**16** [3] - 57:24, 164:9, 164:12
**165** [1] - 59:13
**166** [1] - 59:13
**167** [1] - 59:13
**168** [1] - 59:14
**169** [1] - 59:14
**16th** [2] - 79:7, 79:17
**17** [4] - 22:16, 25:21, 26:16, 57:24
**170** [1] - 59:14
**171** [1] - 59:15
**173** [1] - 59:15
**175** [1] - 59:16
**1750** [5] - 61:5, 89:25, 90:13, 91:19, 94:7
**176** [1] - 59:16
**177** [1] - 59:16
**179** [1] - 59:17
**18** [1] - 26:9
**1940** [1] - 82:23
**1970s** [1] - 34:4
**1972** [2] - 61:10, 63:4
**1975** [1] - 61:14
**1993** [1] - 61:20
**1999** [1] - 62:7
**1:00** [4] - 176:25, 178:13, 178:14, 178:15
**1:15** [2] - 45:15, 46:1
**1:21** [1] - 46:14
**1:30** [5] - 44:22, 46:9, 53:13, 174:3, 174:8
**1:34** [1] - 57:11
**1:51** [1] - 140:19
**1st** [15] - 38:13, 62:19, 65:10, 65:16, 66:15, 73:4, 74:8, 145:15, 146:8, 147:2, 147:10, 151:20, 152:2, 167:18, 167:20

**2**

**2** [28] - 18:25, 19:1, 20:11, 20:17, 20:24, 25:16, 25:19, 28:20, 57:20, 67:19, 68:1, 68:2, 95:21, 95:25, 96:1, 96:7, 96:17, 96:19, 96:21, 96:22, 122:12, 122:24, 124:20, 125:5, 126:18, 126:19
**2......................... Page** [1] - 2:9
**20** [1] - 107:6
**2000** [1] - 166:2
**2000s** [1] - 151:14
**2001** [1] - 98:15
**2006** [47] - 6:3, 6:12, 16:20, 34:14, 35:18, 37:16, 37:18, 37:20, 39:25, 62:7, 65:8, 66:23, 67:18, 70:4, 70:9, 73:12, 73:17, 74:10, 107:18, 107:21, 107:25, 109:15, 120:6, 120:20, 121:5, 121:10, 121:18, 121:20, 122:8, 122:10, 122:19, 122:21, 123:13, 131:9, 131:16, 132:2, 132:10, 134:1, 135:10, 138:1, 151:11, 156:2, 156:7, 165:9, 167:6, 167:10, 167:18
**2007** [3] - 38:2, 38:11, 38:14
**2008** [15] - 21:9, 38:13, 39:2, 39:8, 39:21, 40:7, 41:1, 42:2, 75:20, 78:18, 91:3, 91:9, 91:19, 92:10
**2009** [10] - 40:7, 42:3, 86:8, 92:1, 92:3, 92:14, 92:22, 169:5, 169:14, 171:6
**201** [1] - 150:2
**2010** [4] - 39:24, 40:7, 92:25, 93:1
**2011** [10] - 17:24, 40:12, 40:16, 93:5, 150:7, 150:11, 150:13, 150:18, 166:4, 169:3
**2012** [10] - 26:23, 34:14, 40:12, 40:21, 41:1, 41:12, 42:11, 76:5, 93:9, 165:24
**2013** [7] - 27:20, 29:1, 42:13, 76:5, 88:11, 93:12, 138:23
**2014** [3] - 93:14, 150:7, 150:18
**2015** [3] - 93:18, 93:19, 149:1
**2016** [1] - 93:22
**2017** [4] - 78:12, 79:4,

93:24
**2018** [3] - 79:7, 90:19, 94:1
**2019** [3] - 79:11, 90:19, 94:3
**2020** [3] - 79:17, 79:23, 94:8
**2021** [21] - 6:17, 25:25, 29:2, 30:16, 37:16, 43:4, 55:11, 80:6, 94:10, 120:10, 127:10, 131:16, 132:3, 132:10, 138:23, 139:22, 140:25, 143:20, 155:7, 167:6, 167:10
**2022** [1] - 94:12
**2023** [1] - 94:14
**2024** [4] - 140:9, 149:4, 149:11, 149:12
**2025** [4] - 1:4, 140:11, 140:17, 140:19
**204** [2] - 154:16, 154:17
**205** [1] - 73:20
**2050** [2] - 94:18, 94:20
**209** [5] - 78:24, 79:12, 79:19, 80:2, 93:20
**211** [1] - 1:15
**21st** [1] - 140:19
**22** [1] - 57:25
**22nd** [6] - 107:18, 109:15, 112:19, 112:23, 113:1, 114:1
**23** [3] - 75:4, 75:22, 150:2
**23rd** [1] - 149:12
**24** [2] - 57:25, 67:18
**24-CV-20631-JB** [1] - 1:2
**24th** [6] - 29:12, 29:15, 29:18, 29:20, 30:2
**25** [6] - 57:25, 63:1, 64:14, 150:2, 170:24, 171:1
**25th** [3] - 30:3, 70:4, 70:9
**26** [1] - 58:1
**2600** [6] - 1:19, 67:2, 67:4, 85:7, 87:20, 92:16
**2610** [31] - 83:5, 84:25, 85:6, 85:7, 85:17, 85:20, 86:7, 86:10, 86:11, 86:14, 87:1, 87:6, 87:8, 87:13, 87:19, 87:20, 87:25, 88:5, 92:3, 92:6, 92:14, 92:16, 92:19, 92:20, 92:23, 93:2, 93:7, 93:11, 93:13, 93:16, 97:8
**2650** [47] - 20:7, 67:2, 67:4, 68:18, 68:24, 72:4, 72:8, 73:15, 73:18, 74:17, 74:21, 76:13, 76:23, 78:15, 78:19, 80:17, 81:2, 83:2, 83:5, 85:7, 85:20, 86:5, 86:10, 86:11, 86:13, 86:25, 87:5, 87:7, 87:8, 87:21, 87:23, 88:12, 89:1, 89:2, 89:8, 89:12, 90:2, 94:21, 95:1, 95:2, 95:8, 95:11, 95:15, 97:5, 97:10
**26th** [4] - 86:13, 115:3, 115:9, 115:19
**27** [2] - 140:19, 170:18
**28** [1] - 58:1
**28th** [2] - 78:12, 79:4
**29** [1] - 1:4
**2:51** [1] - 104:5
**2:52** [1] - 104:17
**2nd** [31] - 1:18, 20:7, 62:15, 66:24, 68:18, 68:24, 72:4, 72:8, 73:14, 73:17, 74:17, 74:21, 76:13, 76:23, 78:15, 78:19, 80:16, 81:2, 83:2, 85:2, 85:17, 91:20, 93:2, 93:7, 93:11, 93:13, 93:16, 97:10, 115:1, 115:9, 115:19

## 3

**3** [24] - 18:25, 20:11, 21:20, 21:24, 25:11, 27:21, 30:19, 74:18, 80:15, 121:22, 127:2, 127:3, 129:2, 129:14, 129:21, 129:25, 130:16, 136:1, 141:15, 143:19, 154:4, 158:11, 158:12
**30** [17] - 15:23, 16:18, 17:11, 17:12, 19:4, 24:17, 26:13, 32:5, 35:14, 37:5, 54:1, 58:2, 72:16, 72:20, 121:2, 121:13, 122:17
**30-days** [1] - 168:3
**300,000** [4] - 17:14, 25:1, 113:15, 121:14
**305** [1] - 179:17
**31st** [6] - 73:12, 73:17, 74:10, 112:20, 112:21, 135:10
**32** [2] - 1:7, 58:2
**33** [1] - 58:2
**33128** [2] - 1:24, 179:17
**33130** [5] - 78:24, 79:13, 79:20, 80:3, 93:20
**33131** [15] - 1:19, 68:18, 68:24, 74:17, 74:21, 78:15, 80:17, 81:3, 83:3, 85:18, 93:4, 93:8, 93:11, 93:13, 93:17
**33139** [1] - 1:16
**34** [1] - 58:3
**340** [9] - 76:4, 76:8, 78:24, 79:7, 79:12, 79:19, 80:2, 88:7, 93:20
**35** [1] - 58:3
**36** [1] - 58:4
**37** [1] - 58:4
**38** [1] - 58:4
**39** [1] - 58:5
**3:09** [1] - 104:18
**3:11** [1] - 105:13

## 4

**4** [3] - 26:25, 57:20, 162:9
**4-and-a-half-million** [1] - 25:2
**4.5** [1] - 36:5
**4.9** [1] - 154:25
**40** [1] - 58:5
**400** [2] - 1:24, 179:16
**401** [2] - 24:24, 155:21
**41** [8] - 58:6, 77:11, 77:12, 77:16, 77:19, 77:21, 77:22, 78:7
**41........................ Page** [1] - 2:8
**45** [1] - 58:6
**47** [1] - 58:6
**4797** [2] - 26:3
**4:47** [1] - 173:16
**4:49** [1] - 174:18
**4:55** [2] - 1:5, 179:7
**4th** [2] - 65:8, 75:20

## 5

**5** [10] - 19:22, 27:22, 57:20, 73:1, 85:13, 98:8, 98:9, 135:13, 140:20, 154:15
**5.75** [1] - 35:20
**5.8** [8] - 28:19, 28:21, 28:25, 29:15, 30:6, 42:25, 134:13, 138:22
**5/25** [2] - 135:15, 135:17
**5/31** [2] - 135:16, 135:17
**501** [1] - 25:5
**51** [1] - 58:7
**515** [1] - 25:7
**523-5938** [1] - 179:17
**54** [1] - 58:7
**55** [1] - 58:8
**56** [1] - 58:8
**58** [3] - 58:8, 59:6, 173:9
**59** [1] - 58:9
**5:00** [3] - 173:19, 174:9, 174:11
**5th** [1] - 79:11

## 6

**6** [18] - 17:20, 25:1, 26:2, 26:8, 57:21, 74:4, 80:12, 96:8, 96:9, 96:11, 96:15, 96:17, 120:8, 125:24, 134:21, 134:24, 155:1, 166:20
**6.6** [1] - 26:8
**60** [4] - 2:6, 2:7, 58:9, 115:5
**61** [2] - 2:2, 58:10
**62** [1] - 58:10
**64** [1] - 58:10
**65** [1] - 58:11
**66** [1] - 58:11
**67** [1] - 58:12
**679.601(1)(a** [1] - 49:6
**68** [1] - 59:6
**69** [1] - 58:12
**6th** [4] - 178:10, 178:12, 178:14, 178:15

## 7

**7** [9] - 23:3, 23:5, 56:9, 57:21, 78:13, 156:1, 156:4, 156:12, 157:17
**7.6** [4] - 43:12, 43:21, 43:25, 44:2
**70** [4] - 35:14, 37:5, 58:12, 122:16
**70/30** [7] - 20:15, 20:16, 21:25, 22:6, 22:8, 35:14, 37:5
**71** [2] - 2:7, 58:13
**72** [1] - 58:13
**73** [1] - 58:14
**74** [1] - 58:14
**75** [1] - 58:14
**76** [1] - 58:15
**77** [2] - 2:8, 58:15
**7th** [10] - 62:12, 177:13, 177:18, 177:20, 178:6, 178:7, 178:9, 178:16, 178:18

## 8

**8** [4] - 65:3, 66:8, 66:19, 73:6
**803** [1] - 25:14
**81** [1] - 2:2
**83** [1] - 58:16
**84** [2] - 2:8, 58:16
**85** [1] - 58:16
**86** [1] - 58:17
**87** [15] - 83:13, 83:15, 83:16, 83:22, 83:25, 84:3, 84:4, 84:5, 84:10, 84:16, 84:17, 84:18, 85:13, 90:21
**87........................ Page** [1] - 2:8
**88** [1] - 58:17
**8:30** [4] - 174:4, 174:17, 174:19, 174:21
**8:45** [3] - 174:5, 174:6, 174:22
**8th** [1] - 62:13

## 9

**9** [6] - 57:22, 67:14, 69:15, 167:17, 167:20, 167:22
**9/29/25** [1] - 179:14
**90** [3] - 27:17, 35:13, 58:18
**93** [1] - 58:18
**94115** [1] - 82:24
**95** [1] - 58:18
**96** [3] - 2:9, 28:2, 58:19
**97** [2] - 29:13, 58:19
**98** [1] - 58:20

# A


**a.m** [3] - 1:5, 3:1, 3:3
**abandoned** [6] - 7:3, 33:9, 41:13, 41:19, 44:9, 54:21
**abandonment** [2] - 50:4, 55:25
**abide** [2] - 121:8, 122:21
**ability** [2] - 5:14, 24:16
**able** [3] - 97:22, 106:12, 176:13
**above-entitled** [1] - 179:10
**absolutely** [3] - 36:22, 67:10, 81:18
**accept** [1] - 47:3
**accepted** [1] - 170:3
**accommodating** [1] - 179:5
**accordance** [2] - 137:8, 137:12
**according** [11] - 22:6, 22:8, 26:15, 85:15, 88:4, 110:21, 111:25, 113:6, 113:7, 157:3, 157:4
**accordingly** [1] - 178:4
**account** [19] - 5:14, 25:9, 63:5, 98:19, 98:24, 99:5, 99:7, 110:23, 144:1, 144:13, 146:20, 146:23, 146:24, 146:25, 147:1, 147:3, 147:6, 147:9
**accountant** [2] - 43:23, 91:18
**accounting** [8] - 30:22, 138:3, 138:5, 138:8, 138:11, 139:8, 139:12, 139:16
**accrued** [3] - 28:25, 129:17, 138:23
**accruing** [9] - 29:7, 127:5, 138:20, 138:24, 139:2, 139:4, 139:6, 139:10, 139:14
**accurate** [3] - 67:5, 142:20, 179:9
**acknowledge** [3] - 23:4, 48:16, 164:18
**acquired** [2] - 11:13, 26:6
**Acquisitions** [1] - 23:16
**actual** [7] - 25:17, 29:14, 35:17, 70:21, 142:4, 166:11, 166:14
**add** [1] - 152:9
**addition** [1] - 10:13
**additional** [4] - 5:22, 113:3, 124:13, 172:13
**address** [92] - 6:9, 13:13, 19:16, 20:3, 20:5, 20:7, 20:8, 26:5, 31:16, 31:17, 41:23, 42:1, 42:2, 53:20, 61:4, 66:23, 67:5, 68:16, 68:21, 68:23, 69:11, 69:12, 72:4, 72:9, 74:15, 74:19, 74:22, 76:3, 76:8, 78:14, 78:21, 79:1, 79:18, 80:1, 83:4, 84:23, 85:15, 86:5, 86:7, 87:12, 87:25, 88:5, 88:10, 88:13, 89:8, 89:23, 90:2, 90:13, 90:16, 90:17, 91:5, 91:9, 91:10, 91:22, 92:4, 92:10, 92:14, 92:15, 92:22, 93:1, 93:5, 93:6, 93:10, 93:12, 93:14, 93:19, 93:22, 93:23, 93:24, 94:1, 94:2, 94:4, 94:6, 94:8, 94:10, 94:11, 94:12, 94:13, 94:14, 94:22, 95:1, 95:9, 97:8, 97:9
**addressed** [20] - 64:21, 69:25, 85:19, 87:1, 87:5, 87:7, 87:8, 88:12, 89:1, 89:8, 90:2, 95:1, 95:2, 95:8, 95:15, 95:16, 97:8, 109:22, 111:3, 136:7
**addresses** [4] - 67:8, 94:17, 94:18, 94:25
**addressing** [1] - 95:14
**administratively** [1] - 78:5
**admissibility** [1] - 57:16
**admissible** [2] - 14:13, 48:20
**admission** [1] - 175:21
**admit** [11] - 45:24, 45:25, 46:1, 47:5, 71:7, 71:9, 96:18, 99:24, 100:1, 100:6, 100:7
**admitted** [20] - 60:3, 60:13, 61:9, 67:15, 71:6, 71:11, 74:5, 77:21, 82:12, 83:13, 83:15, 83:18, 84:4, 95:22, 96:21, 98:8, 100:2, 100:14, 149:13, 176:1
**ADMITTED** [1] - 2:5
**admitting** [2] - 45:23, 71:2
**advance** [2] - 123:23, 124:10
**advanced** [1] - 123:24
**adverse** [1] - 118:16
**advised** [4] - 45:17, 45:19, 91:17, 107:12
**advocate** [1] - 15:17
**affect** [1] - 24:15
**affected** [1] - 159:8
**affecting** [1] - 5:21
**affidavit** [1] - 24:14
**afford** [2] - 35:1, 35:4
**afternoon** [4] - 61:4, 81:13, 81:14, 103:23
**afterwards** [1] - 36:21
**age** [1] - 10:12
**agent** [33] - 22:11, 24:7, 31:18, 68:22, 68:23, 72:12, 73:7, 78:16, 78:23, 79:12, 79:19, 80:1, 100:25, 101:3, 101:23, 103:1, 103:4, 103:8, 103:10, 103:12, 110:21, 113:5, 127:20, 127:21, 128:1, 128:5, 128:6, 154:6, 154:12, 155:12, 155:15, 155:16
**ago** [3] - 33:7, 89:16, 136:10
**agree** [19] - 119:6, 123:15, 125:4, 126:25, 132:2, 135:2, 146:7, 146:12, 147:12, 148:25, 152:1, 154:9, 154:11, 157:5, 162:19, 164:5, 165:3, 166:7, 166:19
**agreed** [8] - 14:16, 23:16, 38:22, 46:7, 70:21, 82:7, 175:23, 177:23
**Agreement** [47] - 6:3, 16:11, 16:25, 17:5, 18:3, 18:11, 18:25, 19:18, 19:23, 21:6, 21:18, 21:21, 24:4, 24:12, 27:9, 27:11, 28:1, 29:1, 29:8, 70:2, 72:2, 72:14, 80:23, 81:6, 120:18, 125:6, 126:19, 127:4, 129:25, 130:20, 133:15, 134:17, 135:3, 135:11, 135:14, 136:15, 136:23, 139:17, 141:16, 151:25, 153:18, 154:3, 160:11, 166:21, 169:22, 172:1, 172:3
**agreement** [79] - 6:7, 6:13, 6:18, 6:23, 6:24, 6:25, 7:1, 7:3, 7:4, 7:6, 20:23, 22:23, 23:14, 23:20, 28:3, 28:5, 28:9, 28:13, 28:20, 29:3, 33:9, 33:20, 34:23, 35:21, 36:7, 36:9, 37:18, 39:5, 41:10, 41:12, 41:19, 43:5, 43:7, 43:8, 43:14, 44:5, 44:10, 46:20, 54:22, 56:6, 56:11, 59:24, 65:15, 65:23, 66:14, 70:21, 72:2, 72:5, 80:13, 80:20, 95:19, 96:11, 98:15, 100:24, 106:8, 113:11, 120:16, 120:24, 126:15, 140:2, 141:1, 141:9, 141:11, 144:23, 152:9, 152:11, 152:15, 152:20, 153:6, 153:7, 153:8, 153:9, 153:10, 153:21, 158:14, 162:24, 163:9
**agreements** [3] - 66:1, 66:5, 163:18
**agrees** [5] - 4:15, 102:19, 121:23, 122:3, 167:25
**agricultural** [1] - 49:9
**ahead** [12] - 44:20, 44:25, 46:17, 85:9, 90:23, 106:24, 109:14, 111:11, 117:1, 140:6, 177:3, 178:17
**ahold** [3] - 20:9, 20:10, 29:17
**alcohol** [1] - 52:12
**alert** [3] - 47:4, 107:1, 107:4
**ALLEN** [2] - 1:21, 179:14
**Allen** [1] - 179:14
**ALLEN-WILLIAMS** [2] - 1:21, 179:14
**Allen-Williams** [1] - 179:14
**allow** [8] - 5:7, 8:22, 8:25, 9:5, 9:8, 51:3, 117:20, 162:21
**allowed** [7] - 7:19, 8:6, 24:11, 30:7, 30:8, 47:18, 107:20
**alluded** [1] - 54:2
**almost** [3] - 53:15, 107:6, 113:2
**alongside** [1] - 33:5
**ambiguity** [1] - 136:22
**ambivalent** [1] - 173:14
**America** [2] - 62:14, 66:25
**amount** [16] - 19:15, 38:12, 38:15, 39:25, 43:10, 43:19, 44:1, 56:11, 73:25, 107:17, 109:8, 134:8, 134:10, 138:24, 173:13
**announce** [1] - 74:2
**annual** [4] - 43:13, 80:9, 85:15, 138:18
**annum** [1] - 123:25
**answer** [22] - 4:21, 4:23, 5:2, 8:16, 9:3, 9:8, 9:10, 31:2, 63:10, 63:19, 76:17, 88:14, 88:19, 88:21, 89:4, 89:18, 104:25, 115:16, 132:7, 140:23, 140:24, 141:10
**answering** [1] - 114:13
**answers** [1] - 4:11
**anticipate** [2] - 31:15, 55:3
**ANTONIO** [1] - 1:17
**anyway** [1] - 44:24
**apartment** [3] - 61:6, 90:11, 90:13
**Apartment** [1] - 61:6
**API** [4] - 154:16, 154:18, 154:20, 155:8

**apologies** [6] - 60:8, 90:15, 105:8, 106:9, 170:23, 174:12
**apologize** [2] - 155:24, 156:4
**app** [1] - 10:18
**APPEARANCES** [1] - 1:11
**applicable** [1] - 127:9
**apply** [2] - 3:10, 3:11
**appreciate** [2] - 119:9, 153:4
**approach** [9] - 64:23, 67:12, 69:20, 72:23, 74:1, 75:3, 77:9, 108:12, 108:20
**approaching** [1] - 72:25
**appropriate** [3] - 32:6, 32:8, 53:3
**approval** [2] - 23:22, 136:1
**approve** [1] - 28:10
**apps** [2] - 10:16, 10:18
**April** [3] - 65:8, 67:18, 91:3
**argue** [5] - 28:18, 29:10, 47:14, 47:18, 47:23
**argued** [2] - 48:21, 50:7
**argues** [1] - 28:25
**argument** [17] - 12:14, 13:10, 13:11, 45:15, 45:22, 46:1, 46:3, 48:4, 49:20, 52:5, 53:25, 55:23, 55:24, 56:3, 56:4, 56:12, 56:14
**arguments** [5] - 4:5, 4:6, 9:24, 10:8, 13:9
**arise** [1] - 37:2
**arising** [1] - 48:4
**arrange** [2] - 45:2
**arrive** [1] - 94:18
**Art** [1] - 148:8
**Article** [3] - 68:15, 68:21, 69:1
**articles** [4] - 67:18, 68:3, 68:13, 68:15
**Asset** [1] - 154:21
**assets** [2] - 160:14, 160:18
**assigned** [12] - 16:23, 49:20, 49:23, 49:24, 101:6, 102:11, 109:17, 110:14, 110:18, 113:24, 114:15, 151:23
**assignee** [6] - 101:7, 101:10, 101:12, 101:14, 101:17, 102:6
**assigning** [1] - 101:13
**assignment** [22] - 16:25, 17:3, 38:19, 38:21, 39:6, 47:16, 47:21, 47:24, 48:4, 48:19, 48:23, 48:24, 49:20, 49:22, 50:3, 50:5, 50:18, 50:19, 50:20, 111:21, 113:11
**assignments** [1] - 110:17
**assignor** [8] - 101:11, 101:12, 101:13, 101:14, 102:6, 102:10, 102:11
**assistance** [2] - 35:22, 36:2
**assisting** [1] - 36:4
**associated** [3] - 36:24, 147:1, 147:3
**assume** [8] - 14:18, 125:3, 125:14, 126:16, 130:21, 137:21, 137:23, 160:2
**assumed** [1] - 161:25
**assuming** [1] - 121:10
**attached** [2] - 49:22, 70:1
**attachment** [1] - 70:5
**attend** [2] - 44:24, 173:25
**attention** [1] - 52:2
**attorney** [16] - 24:8, 61:8, 62:2, 64:20, 65:25, 66:4, 66:15, 70:6, 77:5, 85:2, 106:23, 106:25, 117:13, 128:3, 128:4, 155:14
**attorney's** [1] - 117:19
**attorneys** [5] - 67:8, 99:4, 116:15, 116:16, 117:20
**August** [7] - 6:17, 38:11, 43:4, 127:10, 140:25, 167:6
**automatic** [10] - 40:5, 40:8, 40:10, 125:4, 125:15, 125:18, 126:6, 126:10, 126:16
**available** [3] - 49:9, 67:9, 69:18
**Avenue** [7] - 1:24, 61:5, 89:25, 90:14, 94:6, 94:7, 179:16
**award** [3] - 31:7, 32:5, 32:7
**aware** [3] - 43:3, 97:16, 171:15

**B**

**background** [1] - 34:22
**bad** [1] - 94:21
**balance** [1] - 160:1
**bank** [30] - 26:25, 27:3, 27:12, 27:13, 27:15, 27:22, 28:6, 42:16, 42:18, 42:23, 42:24, 48:16, 144:1, 146:22, 147:1, 147:3, 147:9, 159:24, 160:2, 160:3, 160:6, 160:8, 160:25, 161:2, 162:20, 164:15, 172:5, 172:10, 173:3
**Bank** [9] - 62:14, 62:20, 66:24, 162:7, 162:20, 168:17, 168:18, 169:5, 169:14
**bank's** [2] - 163:25, 164:1
**Banking** [1] - 27:19
**Bar** [3] - 61:9, 67:6, 69:9
**bar** [5] - 67:9, 69:12, 91:23, 92:11, 119:14
**barred** [1] - 7:2
**BART** [1] - 2:4
**Bart** [69] - 15:16, 17:1, 20:9, 27:13, 27:19, 27:21, 28:6, 28:16, 29:21, 30:4, 33:25, 34:1, 34:5, 35:6, 36:12, 37:11, 38:5, 38:7, 38:10, 38:14, 38:17, 38:23, 39:12, 40:17, 40:22, 40:24, 41:1, 41:13, 41:18, 41:25, 42:16, 42:20, 42:21, 48:18, 49:24, 50:13, 50:14, 52:10, 52:12, 52:18, 82:22, 108:2, 109:18, 109:21, 110:14, 110:15, 110:19, 111:21, 111:23, 113:11, 113:23, 113:24, 113:25, 114:2, 114:4, 114:15, 114:17, 117:8, 117:25, 118:1, 118:13, 118:25, 132:8, 140:17, 140:18, 141:22, 159:22, 164:18
**base** [2] - 11:10, 11:12
**based** [16] - 31:8, 33:22, 34:6, 34:7, 35:10, 36:13, 40:17, 51:2, 55:24, 129:16, 140:1, 141:10, 161:21, 178:3
**Basel** [1] - 148:8
**basic** [1] - 3:6
**basis** [6] - 40:23, 51:2, 51:13, 51:14, 138:18, 141:25
**Bates** [1] - 85:13
**Bates-stamped** [1] - 85:13
**BB&T** [4] - 28:5, 168:19, 168:21, 172:18
**Beach** [20] - 1:16, 61:6, 62:17, 88:6, 88:8, 89:24, 90:1, 90:8, 90:10, 90:16, 91:5, 91:10, 92:6, 94:3, 94:8, 94:10, 97:9, 143:15, 150:14, 151:4
**beautiful** [1] - 62:22
**became** [6] - 33:8, 33:9, 42:20, 44:9, 106:7, 106:10
**BECERRA** [1] - 1:9
**Becerra** [1] - 1:22
**become** [1] - 42:17
**becomes** [3] - 40:16, 42:15, 106:4
**BEFORE** [1] - 1:9
**begin** [6] - 10:8, 12:16, 13:24, 14:2, 14:21, 176:7
**beginning** [5] - 37:17, 99:15, 101:18, 122:2, 166:9
**begins** [2] - 176:9, 176:10
**behalf** [17] - 14:1, 34:20, 35:9, 64:4, 75:13, 75:19, 104:11, 104:12, 104:14, 116:22, 119:21, 119:22, 120:1, 134:16, 175:14, 175:16, 175:18
**behind** [2] - 21:13, 175:7
**behooves** [1] - 132:23
**belief** [2] - 130:8, 153:15
**believability** [1] - 5:21
**believes** [4] - 26:14, 26:15, 41:21, 130:5
**below** [1] - 136:7
**benefit** [3] - 98:25, 145:13, 156:20
**best** [1] - 119:10
**better** [2] - 9:8, 105:10
**between** [23] - 6:2, 6:3, 17:21, 28:6, 34:21, 52:10, 54:3, 54:20, 56:6, 62:7, 62:12, 80:13, 104:1, 132:2, 132:9, 138:23, 150:7, 150:18, 152:15, 152:18, 167:6, 167:10, 167:14
**bias** [1] - 5:17
**big** [1] - 174:10
**bigger** [1] - 156:12
**bills** [1] - 36:24
**Biscayne** [1] - 62:13
**bit** [5] - 44:20, 92:1, 97:14, 97:15, 156:12
**blocked** [1] - 82:25
**blog** [1] - 10:24
**blurry** [1] - 68:12
**Blutrich** [1] - 23:16
**book** [1] - 142:9
**bookkeeper** [6] - 142:11, 142:12, 142:13, 142:15, 142:16, 142:17
**books** [1] - 29:6
**boot** [2] - 25:16, 25:20
**boots** [3] - 18:15, 35:8, 166:10
**borrow** [1] - 97:22
**borrowed** [2] - 35:2, 48:18
**boss** [1] - 40:10
**bothering** [1] - 53:17
**bottom** [5] - 67:22, 68:1, 69:4, 69:7, 126:1
**bought** [10] - 24:25, 28:4, 35:18, 54:19, 120:8, 143:19, 151:1, 157:14, 168:24, 169:1
**Boulevard** [1] - 62:13
**Box** [1] - 155:11
**boy** [1] - 123:21
**Boyd** [1] - 1:18
**Branch** [1] - 27:18

**brand** [1] - 169:2
**brand-new** [1] - 169:2
**breach** [7] - 31:5, 31:8, 31:9, 32:4, 162:17, 162:21, 164:7
**breached** [8] - 6:18, 6:24, 6:25, 15:21, 32:6, 41:17, 54:21
**breaches** [1] - 39:6
**break** [12] - 44:18, 44:20, 44:21, 45:14, 103:23, 104:10, 173:23, 174:3, 174:7, 174:10, 174:25, 178:15
**brief** [11] - 15:9, 15:11, 51:25, 62:5, 77:17, 83:11, 84:15, 98:6, 108:17, 162:12, 170:22
**bright** [2] - 174:17, 179:2
**bring** [8] - 3:2, 53:23, 54:10, 55:3, 104:19, 104:23, 105:12, 151:17
**bringing** [4] - 17:17, 50:2, 53:24, 154:25
**broke** [4] - 33:8, 39:18, 40:16, 42:8
**broken** [5] - 17:14, 39:4, 41:22, 44:7, 121:13
**brought** [6] - 16:22, 17:3, 52:1, 146:8, 151:22, 155:18
**buckets** [2] - 17:14, 121:14
**bud** [1] - 55:4
**build** [1] - 153:10
**Building** [1] - 143:22
**building** [16] - 62:20, 76:4, 85:3, 86:2, 86:16, 87:24, 88:1, 92:18, 115:3, 150:6, 150:8, 150:9, 150:10, 150:19, 163:23, 176:21
**buildings** [1] - 146:5
**built** [1] - 34:4
**burden** [8] - 7:7, 7:8, 7:14, 7:24, 13:5, 16:6, 16:8
**business** [51] - 6:1, 20:5, 20:20, 26:4, 33:8, 33:14, 33:22, 34:2, 34:3, 34:15, 35:6, 39:14, 40:16, 41:14, 41:15, 42:8, 43:2, 44:9, 52:19, 61:4, 61:11, 61:15, 62:6, 63:9, 64:4, 64:8, 65:24, 66:6, 66:23, 70:6, 70:24, 71:1, 75:10, 75:19, 79:1, 79:6, 79:10, 91:5, 91:9, 91:22, 92:14, 92:21, 93:6, 93:9, 93:14, 93:19, 94:17, 123:8, 124:5, 124:11
**businesses** [11] - 20:12, 62:3, 62:25, 63:21, 63:25, 64:14, 64:20, 64:21, 67:11, 74:25, 75:14
**buy** [15] - 16:21, 23:6, 23:19, 25:10, 25:11, 103:11, 123:1, 123:2, 146:8, 148:14, 156:16, 156:17, 156:23, 157:1, 159:12
**buyer** [10] - 23:16, 24:1, 24:22, 28:6, 65:9, 65:10, 103:20, 103:21, 112:22, 128:6
**buyer's** [5] - 24:7, 65:11, 128:3, 155:14, 155:15
**buyers** [3] - 23:22, 61:22, 114:6
**buys** [1] - 103:10
**BY** [63] - 1:21, 61:3, 63:18, 64:11, 65:1, 65:22, 66:13, 66:22, 67:17, 68:11, 69:22, 71:25, 73:2, 74:6, 75:6, 75:17, 76:1, 76:12, 76:21, 77:2, 78:3, 81:12, 82:16, 84:9, 84:19, 85:14, 88:20, 89:6, 90:24, 91:21, 92:2, 97:1, 97:4, 98:10, 98:14, 100:19, 105:19, 107:14, 108:24, 111:10, 113:4, 114:7, 114:24, 115:15, 116:1, 116:10, 118:23, 126:3, 126:20, 129:11, 130:18, 133:12, 135:1, 141:14, 142:3, 143:9, 146:11, 148:2, 150:5, 153:5, 162:13, 164:13, 171:2

## C

**calculate** [2] - 24:22, 26:4
**calculated** [1] - 138:23
**calculates** [1] - 25:20
**calculation** [4] - 22:14, 22:18, 55:7, 56:16
**California** [10] - 15:15, 34:6, 35:10, 36:13, 40:18, 40:22, 82:23, 119:14, 143:5, 165:21
**cancel** [2] - 106:2, 174:1
**cannot** [11] - 4:23, 47:18, 48:25, 123:22, 124:6, 124:9, 129:4, 129:9, 149:20, 177:5, 178:22
**capacity** [4] - 37:9, 77:5, 159:22, 164:19
**capital** [59] - 17:14, 20:12, 20:18, 20:23, 20:25, 21:5, 21:17, 26:8, 26:9, 27:10, 27:24, 30:21, 30:23, 55:12, 122:12, 122:16, 122:24, 122:25, 123:1, 123:4, 123:5, 123:16, 123:19, 123:22, 123:23, 124:3, 124:4, 124:6, 124:7, 124:8, 124:9, 124:10, 124:13, 124:15, 124:16, 127:4, 129:17, 133:17, 133:18, 133:21, 133:23, 134:1, 137:22, 137:23, 138:2, 138:6, 138:14, 138:19, 138:20, 138:23, 139:2, 139:3, 139:6, 139:10, 139:13, 144:8, 144:10, 155:3
**career** [1] - 144:5
**careful** [2] - 105:4, 108:23
**carrier** [4] - 115:8, 116:3, 116:5, 116:12
**carries** [1] - 57:2
**carry** [1] - 17:2
**carrying** [1] - 3:19
**CASABIELLE** [125] - 1:17, 53:19, 53:23, 54:2, 54:14, 54:16, 54:18, 54:25, 55:20, 56:2, 56:4, 56:13, 56:19, 56:23, 56:25, 57:3, 57:8, 59:6, 64:9, 66:10, 66:20, 70:15, 70:18, 70:20, 71:21, 71:24, 72:21, 75:15, 75:24, 76:10, 76:15, 76:25, 77:7, 77:15, 77:20, 81:10, 81:12, 82:6, 82:9, 82:11, 82:16, 83:9, 83:12, 83:16, 83:19, 84:6, 84:8, 84:9, 84:14, 84:16, 84:18, 84:19, 85:10, 85:14, 88:20, 88:23, 89:6, 90:21, 90:24, 91:16, 91:21, 91:25, 92:2, 95:19, 95:25, 96:4, 96:7, 96:10, 96:13, 96:16, 96:20, 96:23, 96:25, 97:1, 97:3, 97:4, 98:3, 98:7, 98:10, 98:13, 98:14, 99:19, 99:23, 100:1, 100:8, 100:10, 100:16, 100:19, 103:25, 104:4, 105:8, 105:10, 105:16, 105:18, 105:19, 107:14, 108:12, 108:16, 108:18, 108:20, 108:22, 108:24, 111:10, 112:15, 113:4, 114:7, 114:19, 115:11, 115:23, 116:6, 117:10, 117:12, 117:16, 117:18, 117:22, 117:24, 118:3, 175:19, 176:9, 176:19, 177:6, 177:9, 178:13, 178:19, 179:4
**Casabielle** [3] - 33:5, 53:15, 57:6
**CASE** [1] - 1:2
**case** [63] - 3:13, 4:6, 5:17, 5:25, 6:1, 7:7, 9:22, 10:1, 10:4, 10:6, 10:13, 10:20, 10:21, 10:23, 11:4, 11:5, 11:8, 13:1, 13:5, 13:6, 13:14, 14:22, 15:19, 16:4, 18:8, 19:6, 26:20, 32:1, 32:9, 32:11, 33:6, 33:11, 33:16, 34:7, 34:17, 37:16, 45:5, 45:6, 47:17, 50:24, 53:2, 55:24, 56:17, 82:21, 86:20, 99:4, 107:4, 119:21, 131:5, 140:5, 140:7, 140:19, 149:12, 174:15, 175:10, 176:7, 177:7, 177:8, 177:16, 177:19, 177:22, 178:24
**cases** [1] - 177:10
**cash** [14] - 16:18, 17:12, 22:7, 22:17, 24:9, 24:18, 24:19, 25:14, 25:17, 25:21, 26:18, 72:16, 121:2, 128:6
**cashier's** [1] - 107:21
**category** [1] - 131:24
**cell** [1] - 51:10
**CenTrust** [1] - 66:25
**Century** [1] - 150:17
**certain** [14] - 4:3, 6:15, 7:23, 14:3, 14:12, 23:8, 23:21, 23:22, 25:9, 36:9, 36:10, 67:3, 175:21
**certainly** [2] - 27:8, 121:10
**certificate** [2] - 167:13, 167:18
**certified** [2] - 136:5, 137:14
**certify** [1] - 179:9
**chain** [1] - 3:22
**chambers** [1] - 176:23
**chance** [2] - 12:20, 107:8
**change** [4] - 38:1, 84:25, 87:22
**changed** [12] - 20:9, 84:22, 84:23, 85:4, 85:6, 86:2, 87:12, 87:13, 90:20, 91:9, 92:18, 95:9
**changes** [1] - 47:4
**changing** [1] - 47:4
**Charlie** [1] - 122:24
**chat** [1] - 10:24
**check** [12] - 85:9, 107:17, 107:22, 108:1, 108:2, 108:9, 109:6, 109:15, 109:21, 110:19,

110:22
**checks** [2] - 107:19, 107:21
**chief** [2] - 14:22, 176:7
**children** [1] - 143:25
**choice** [1] - 174:12
**choose** [3] - 3:25, 23:9, 111:6
**Christmas** [2] - 30:4, 30:5
**circumstances** [2] - 3:22, 132:17
**circumstantial** [1] - 3:21
**cite** [4] - 49:5, 52:22, 53:2
**City** [2] - 62:9, 148:5
**civic** [1] - 19:11
**civil** [3] - 3:6, 5:24, 7:7
**claim** [6] - 7:21, 7:22, 24:15, 49:7, 49:8, 50:2
**claimed** [1] - 31:4
**claims** [4] - 6:18, 6:24, 7:2, 7:10
**clarify** [5] - 8:15, 102:12, 102:14, 119:7, 177:9
**clause** [6] - 37:12, 40:3, 43:14, 132:19, 132:22, 132:23
**clear** [8] - 18:2, 19:20, 29:5, 47:17, 54:10, 111:3, 136:23, 147:8
**clearly** [1] - 55:7
**clerk** [1] - 176:23
**client** [11] - 15:13, 15:18, 24:4, 51:1, 55:18, 56:14, 56:21, 57:5, 99:2, 107:1
**close** [9] - 12:3, 24:11, 35:1, 35:3, 52:17, 90:3, 123:5, 128:6, 174:20
**closed** [5] - 24:10, 35:21, 45:9, 106:15, 129:23
**closer** [1] - 174:22
**closes** [2] - 103:2, 104:7
**closing** [55] - 4:6, 9:23, 13:9, 13:10, 17:19, 22:9, 22:11, 22:23, 24:7, 24:19, 25:6, 25:17, 25:21, 29:2, 30:25, 31:1, 31:18, 35:25, 36:1, 51:7, 73:3, 74:12, 102:25, 103:1, 112:20, 112:21, 113:2, 113:5, 114:4, 114:5, 127:20, 127:21, 128:1, 128:5, 128:6, 128:9, 128:16, 129:12, 129:23, 135:12, 135:17, 139:18, 139:20, 139:21, 141:20, 146:14, 154:5, 154:6, 154:10, 154:12, 154:13, 155:16, 167:21
**Club** [1] - 143:14
**cocounsel** [6] - 52:5, 53:21, 83:11, 84:15, 98:6, 170:22
**codefendants** [1] - 178:8
**collaborate** [1] - 137:1
**collateral** [18] - 38:19, 38:21, 39:6, 47:16, 47:21, 47:24, 48:4, 48:19, 48:23, 48:24, 49:20, 49:22, 49:24, 49:25, 50:3, 50:5, 50:8, 172:13
**colleague** [2] - 33:5, 170:21
**collect** [1] - 162:12
**college** [1] - 34:3
**Colletti** [7] - 24:13, 24:21, 31:18, 127:20, 127:21, 127:24, 155:12
**Colonial** [10] - 162:7, 162:20, 167:19, 168:17, 168:18, 169:5, 169:14, 171:3, 171:6, 172:18
**Colonnelli** [1] - 1:18
**Column** [1] - 26:7
**column** [1] - 154:16
**coming** [14] - 9:7, 9:16, 16:12, 45:12, 105:7, 106:14, 106:18, 106:22, 106:25, 107:5, 107:23, 114:16, 114:17, 157:9
**commercial** [4] - 6:7, 6:8, 6:11, 62:17
**commitment** [1] - 173:25
**common** [2] - 26:10, 32:3
**commonly** [1] - 143:12
**communicate** [1] - 10:14
**communication** [3] - 136:1, 147:16, 149:1
**communications** [1] - 147:18
**companies** [4] - 6:2, 63:25, 64:5, 142:7
**Company** [1] - 27:19
**company** [27] - 15:14, 28:10, 33:6, 33:18, 33:19, 33:24, 33:25, 34:4, 34:25, 37:9, 37:13, 38:8, 39:23, 41:15, 43:6, 63:22, 68:17, 69:2, 76:19, 76:20, 80:9, 119:22, 120:1, 142:7, 145:8, 154:21, 160:13
**company's** [1] - 38:18
**complain** [2] - 106:13, 106:21
**complaint** [1] - 170:19
**complete** [4] - 40:18, 139:8, 139:12, 142:20
**complied** [1] - 121:11
**comply** [3] - 30:19, 42:6, 121:11
**comports** [1] - 8:24
**compounding** [5] - 43:13, 43:19, 43:20, 43:24, 44:2
**computer** [2] - 10:19, 95:9
**conceding** [1] - 21:14
**conceivable** [1] - 112:24
**concentrated** [1] - 64:18
**concern** [1] - 106:21
**concerned** [2] - 3:24, 38:17
**concerns** [3] - 6:7, 33:13, 38:7
**conclusions** [1] - 9:9
**conditions** [7] - 6:15, 163:4, 163:7, 163:18, 164:2
**conducted** [1] - 50:23
**confer** [6] - 83:11, 84:15, 98:6, 108:17, 170:20, 170:22
**conference** [1] - 117:17
**conferring** [1] - 77:17
**confidential** [5] - 28:3, 28:5, 28:9, 28:12, 28:19
**confirmation** [1] - 136:3
**conflict** [4] - 23:24, 177:17, 177:21, 177:23
**confused** [4] - 94:20, 101:12, 102:14, 177:11
**confusing** [2] - 113:22, 166:1
**confusion** [4] - 68:5, 100:3, 102:12, 102:13
**connection** [2] - 75:13, 76:22
**consider** [8] - 4:4, 5:6, 7:18, 13:14, 13:19, 13:22, 63:16, 132:24
**considered** [2] - 12:21, 40:10
**considering** [3] - 5:13, 7:20, 8:2
**considers** [2] - 41:12, 43:5
**consult** [1] - 52:4
**consulting** [1] - 158:14
**consummated** [1] - 110:5
**contacted** [1] - 176:23
**contains** [1] - 68:25
**contemplated** [1] - 20:14
**contend** [12] - 21:15, 23:25, 26:13, 48:20, 125:3, 125:14, 126:16, 129:13, 136:15, 137:21, 139:14, 159:13
**contends** [4] - 6:20, 6:25, 7:2, 7:4
**content** [1] - 18:20
**contention** [3] - 54:4, 120:14, 130:9
**continuance** [1] - 177:16
**continue** [7] - 18:18, 42:7, 42:10, 84:20, 93:21, 177:13, 178:1
**continued** [2] - 30:14, 43:11
**contract** [102] - 6:2, 15:21, 15:24, 16:10, 16:15, 16:16, 16:17, 16:21, 16:22, 16:24, 17:19, 18:3, 18:10, 19:19, 20:14, 20:17, 20:24, 21:19, 22:1, 23:3, 23:15, 23:18, 23:23, 23:24, 24:17, 24:24, 31:8, 32:4, 32:10, 33:6, 33:11, 34:25, 37:7, 37:8, 38:9, 39:19, 43:20, 44:3, 49:1, 50:4, 54:19, 54:20, 54:21, 65:6, 65:7, 70:22, 77:6, 97:14, 97:16, 99:11, 100:25, 101:2, 101:6, 101:8, 101:13, 101:15, 102:1, 102:4, 102:7, 102:11, 102:16, 103:18, 103:19, 105:24, 106:12, 109:17, 109:19, 110:7, 110:8, 110:14, 110:16, 110:21, 111:21, 113:7, 113:8, 113:24, 113:25, 114:15, 120:22, 121:8, 121:16, 123:12, 127:11, 130:20, 130:22, 130:23, 131:10, 132:13, 132:16, 132:20, 132:21, 133:4, 141:18, 141:20, 151:23, 153:23, 153:24, 154:1
**contracts** [6] - 18:4, 50:21, 110:17, 135:4, 135:18
**contradicts** [1] - 5:19
**contrary** [2] - 40:20, 167:24
**contribute** [3] - 37:3, 41:3, 43:10
**contributed** [4] - 25:2, 35:19, 35:20, 43:11
**contributes** [1] - 29:14
**contribution** [24] - 17:15, 20:13, 20:18, 20:23, 20:25, 21:5, 21:17, 27:10, 122:16, 123:5, 123:16, 123:19, 123:22, 124:3, 124:4, 124:7, 124:9, 124:10, 124:13, 124:15, 124:16, 133:17, 144:8, 144:10
**contributions** [20] - 30:21, 30:23, 122:12, 122:25, 123:4, 127:5, 129:17, 133:22, 133:23, 137:22, 137:23, 138:2,

Bart Seidler - Cross (Pardo) 186


138:7, 138:14, 138:19, 138:20, 139:2, 139:3, 139:6, 139:10
**control** [1] - 4:17
**conversations** [1] - 131:24
**convince** [1] - 15:18
**copy** [1] - 30:25
**cordial** [1] - 29:25
**corner** [6] - 67:22, 68:2, 69:7, 69:8, 73:6, 145:20
**corporate** [2] - 142:9
**Corporation** [15] - 6:5, 15:15, 15:21, 20:5, 33:5, 33:24, 34:6, 35:7, 44:16, 82:23, 119:1, 119:2, 119:16, 142:5, 144:16
**CORPORATION** [1] - 1:6
**corporation** [1] - 15:15
**corporations** [1] - 84:12
**Corporations** [1] - 69:16
**correct** [93] - 55:10, 59:18, 68:19, 73:16, 74:13, 79:4, 79:8, 79:9, 79:13, 79:14, 80:10, 81:19, 86:7, 96:4, 96:14, 97:5, 97:9, 99:22, 102:9, 110:10, 110:12, 119:3, 119:4, 119:12, 119:15, 120:6, 121:6, 121:11, 123:3, 123:13, 123:19, 124:17, 125:17, 126:7, 126:12, 127:8, 127:12, 127:14, 127:16, 128:4, 128:7, 128:10, 128:12, 128:16, 128:18, 128:21, 128:24, 132:4, 132:10, 133:14, 133:15, 134:14, 138:8, 138:15, 141:9, 142:17, 143:2, 144:2, 144:3, 144:14, 144:19, 146:13, 147:2, 147:10, 147:12, 155:4, 155:16, 155:17, 156:22, 157:6, 157:12, 160:7, 160:12, 160:17, 160:20, 162:1, 162:3, 162:22, 165:10, 165:12, 165:14, 166:5, 166:22, 167:4, 167:5, 167:7, 168:16, 169:7, 171:4, 172:6, 172:9, 172:23
**correction** [1] - 59:9
**correctly** [3] - 91:8, 121:25, 125:1
**cosign** [3] - 160:11, 160:16, 172:8
**cost** [1] - 163:16
**costs** [1] - 37:4
**counsel** [18] - 13:25, 32:13, 32:25, 41:20, 44:17, 45:18, 51:11, 57:13, 59:18, 60:4, 61:1, 70:23, 71:21, 77:15, 77:17, 108:14, 108:17, 173:10
**country** [2] - 143:2, 143:3
**courier** [2] - 136:4, 137:14
**course** [15] - 10:22, 14:23, 20:20, 27:12, 53:4, 55:17, 65:24, 66:6, 70:6, 75:10, 75:18, 91:15, 123:8, 148:25, 165:5
**COURT** [205] - 1:1, 3:2, 3:4, 14:5, 14:8, 14:15, 14:21, 14:25, 15:2, 15:6, 15:8, 15:10, 32:13, 32:18, 32:21, 32:24, 44:17, 45:9, 45:10, 45:11, 45:14, 45:21, 46:3, 46:7, 46:11, 46:15, 46:21, 46:25, 47:3, 47:8, 47:12, 48:1, 48:6, 48:12, 49:3, 49:12, 50:1, 50:7, 50:11, 50:15, 50:22, 51:9, 51:11, 51:21, 51:24, 52:1, 52:15, 52:21, 53:1, 53:5, 53:11, 53:13, 54:1, 54:12, 54:15, 54:17, 54:23, 55:5, 55:15, 55:23, 56:3, 56:12, 56:14, 56:21, 56:24, 57:4, 57:9, 57:12, 57:17, 59:8, 59:11, 59:18, 59:25, 60:2, 60:11, 60:13, 61:1, 63:7, 63:9, 63:12, 64:10, 64:24, 65:19, 66:12, 66:21, 67:13, 67:16, 69:21, 70:13, 70:19, 70:23, 71:1, 71:7, 71:10, 71:15, 71:18, 71:20, 72:22, 72:24, 74:2, 75:5, 75:16, 75:25, 76:11, 76:16, 77:1, 77:8, 77:10, 77:12, 77:14, 77:21, 81:9, 82:8, 83:10, 83:15, 83:17, 83:21, 83:25, 84:3, 84:7, 88:17, 90:23, 96:1, 96:5, 96:9, 96:11, 96:15, 96:18, 96:21, 96:24, 98:5, 98:9, 99:21, 99:24, 100:3, 100:9, 100:11, 100:14, 103:22, 104:2, 104:6, 104:14, 104:16, 104:19, 104:23, 105:5, 105:9, 105:11, 105:14, 105:17, 107:11, 108:14, 108:19, 108:21, 111:9, 112:7, 112:9, 112:13, 113:21, 114:21, 115:13, 115:24, 116:7, 116:18, 117:1, 117:5, 117:7, 117:11, 117:14, 117:21, 117:23, 118:2, 118:4, 118:6, 118:17, 118:19, 129:4, 129:9, 133:10, 141:3, 141:6, 141:25, 142:2, 143:8, 147:24, 149:14, 149:19, 149:24, 173:10, 173:16, 173:18, 173:22, 174:19, 175:5, 175:14, 175:18, 176:2, 176:11, 176:18, 177:1, 177:7, 178:5, 178:14, 178:20, 179:5
**Court** [14] - 1:22, 1:23, 4:17, 4:22, 14:4, 51:23, 54:8, 88:23, 111:4, 112:15, 178:2, 178:4, 179:15, 179:15
**court** [4] - 10:3, 105:2, 141:3, 176:21
**Court's** [1] - 177:14
**courthouse** [1] - 3:19
**COURTROOM** [19] - 16:12, 32:25, 33:2, 53:6, 56:20, 57:1, 60:15, 60:19, 60:22, 60:25, 68:8, 68:10, 78:1, 118:8, 118:11, 118:14, 149:13, 152:23, 153:2
**courtroom** [6] - 3:14, 11:13, 12:1, 19:11, 81:21, 81:25
**courts** [1] - 117:19
**covenant** [2] - 6:19, 31:9
**covenants** [11] - 32:7, 162:23, 163:4, 163:9, 163:13, 163:17, 163:20, 163:25, 164:1, 164:4, 164:6
**cover** [10] - 37:25, 41:9, 69:25, 70:20, 71:2, 71:3, 71:4, 71:6, 71:10, 71:14
**covers** [1] - 41:11
**CPA** [1] - 26:19
**created** [3] - 33:19, 36:5, 36:9
**credibility** [1] - 5:23
**credible** [1] - 26:22
**credit** [1] - 35:6
**criminal** [3] - 177:4, 178:7, 178:8
**Crimson** [6] - 28:7, 28:14, 29:16, 134:13, 138:22, 168:22
**crisis** [2] - 21:9, 27:2
**CROSS** [2] - 81:11, 118:22
**Cross** [1] - 2:2
**cross** [7] - 2:4, 51:5, 81:9, 103:24, 117:25, 176:6, 176:10
**cross-examination** [2] - 81:9, 103:24
**CROSS-EXAMINATION** [2] - 81:11, 118:22
**Cross-Examination............Page** [1] - 2:2
**cross-Examination.............Page** [1] - 2:4
**cross-examine** [1] - 51:5
**CSO** [1] - 71:16
**cure** [3] - 125:8, 125:16, 168:3
**cured** [4] - 124:22, 125:12, 126:22, 168:4
**current** [3] - 78:22, 78:25, 79:18

## D

**dad** [1] - 35:2
**daily** [3] - 36:11, 40:14, 40:23
**damage** [3] - 32:5, 32:7, 163:10
**damages** [5] - 31:8, 31:12, 44:1, 55:7, 55:15
**Dana** [1] - 43:22
**DATE** [1] - 179:14
**date** [20] - 20:19, 26:6, 29:17, 65:7, 70:3, 73:11, 74:12, 76:6, 78:11, 90:18, 103:2, 109:17, 112:21, 113:2, 114:1, 123:7, 135:9, 135:12, 165:20
**dated** [3] - 74:10, 107:18, 109:15
**dates** [2] - 113:1, 135:14
**David** [4] - 19:1, 124:19, 126:18, 126:19
**day-to-day** [2] - 35:11, 36:14
**days** [15] - 19:2, 20:19, 20:22, 20:24, 113:2, 123:7, 124:17, 124:22, 125:8, 125:13, 125:16, 126:23, 134:14, 178:20, 178:23
**days'** [2] - 125:6, 125:15
**dead** [6] - 39:5, 41:12, 41:15, 43:5, 43:6, 43:8
**deadline** [6] - 106:14, 106:18, 106:22, 106:25, 107:5
**deadlines** [1] - 46:4
**deal** [44] - 16:22, 17:17, 19:20, 20:13, 20:15, 24:10, 26:15,

29:21, 31:4, 31:5, 34:22, 35:1, 35:3, 35:17, 35:21, 35:22, 36:1, 36:21, 97:20, 97:23, 97:25, 98:21, 102:20, 103:10, 106:2, 106:7, 106:10, 106:15, 106:20, 106:22, 107:5, 107:7, 110:5, 120:15, 121:15, 123:1, 123:2, 128:23, 129:16, 146:8, 151:17, 167:4, 177:23
**deal's** [1] - 35:25
**dealing** [4] - 6:19, 18:15, 31:9, 136:25
**deals** [17] - 63:2, 64:4, 64:8, 64:15, 64:19, 106:17, 130:25, 144:4, 151:19, 151:20, 157:4, 166:23, 166:24
**dealt** [2] - 127:24, 127:25
**dear** [1] - 134:12
**debt** [1] - 22:4
**decades** [2] - 61:23, 77:4
**deceit** [1] - 32:11
**December** [6] - 29:12, 29:15, 29:18, 29:20, 30:2, 30:3
**decent** [1] - 173:13
**decide** [16] - 3:9, 3:13, 4:11, 5:10, 7:16, 7:21, 8:2, 11:16, 26:21, 31:12, 130:13, 144:10, 144:12, 144:16, 144:21, 145:5
**decided** [3] - 144:7, 144:14, 144:18
**decider** [1] - 145:1
**decision** [5] - 11:10, 11:12, 142:23, 142:25, 144:22
**decision-maker** [2] - 142:23, 142:25
**decisions** [2] - 10:11, 36:17
**deed** [1] - 103:2
**deemed** [1] - 136:2
**deep** [1] - 34:17
**default** [49] - 17:24, 17:25, 19:1, 19:3, 21:18, 27:4, 30:12, 40:5, 40:8, 40:10, 49:4, 49:6, 49:12, 49:13, 49:14, 49:18, 49:19, 124:21, 124:23, 125:4, 125:12, 125:13, 125:15, 125:16, 125:18, 125:25, 126:4, 126:6, 126:10, 126:17, 126:22, 126:23, 137:17, 137:19, 162:17, 162:21, 164:7, 167:7, 167:11, 167:15, 168:1, 168:3, 168:4, 168:8, 168:11, 168:13, 170:14, 173:7
**defaulted** [2] - 30:10, 30:11
**defaults** [10] - 124:21, 125:12, 126:21, 129:1, 133:5, 133:7, 133:13, 168:9
**Defendant** [2] - 1:7, 96:17
**defendant** [16] - 6:5, 7:15, 8:1, 33:4, 33:24, 34:16, 35:20, 38:5, 39:4, 40:21, 44:15, 100:10, 104:9, 119:2, 119:17, 177:22
**DEFENDANT** [1] - 1:17
**defendant's** [8] - 15:16, 31:17, 45:17, 46:22, 77:21, 96:21, 100:4, 175:22
**Defendant's** [13] - 2:8, 2:8, 2:9, 2:9, 77:11, 77:19, 78:7, 96:19, 96:22, 99:25, 100:6, 100:12
**defendants** [2] - 36:13, 47:14
**defense** [21] - 7:24, 8:1, 8:3, 12:19, 12:25, 13:3, 13:4, 13:10, 32:14, 53:14, 77:12, 77:17, 83:15, 83:17, 83:22, 84:4, 99:21, 104:14, 175:7, 175:18
**Defense** [10] - 77:22, 83:12, 83:16, 83:22, 84:5, 84:10, 95:20, 95:21, 99:19, 100:15
**defense's** [1] - 118:17
**defenses** [4] - 7:23, 8:5, 50:4, 55:16
**defer** [1] - 173:14
**definitions** [1] - 11:15
**deliberate** [1] - 11:24
**deliberations** [5] - 4:9, 5:6, 10:7, 10:9, 13:24
**deliver** [7] - 19:24, 82:20, 86:14, 115:21, 116:16, 131:4
**delivered** [8] - 71:17, 86:25, 87:6, 87:8, 89:3, 115:8, 115:9, 136:4
**demand** [5] - 19:23, 82:19, 82:21, 131:3, 131:5
**demanding** [2] - 39:13, 42:4
**demands** [3] - 39:10, 42:5, 42:7
**demonstrative** [1] - 32:15
**denies** [1] - 6:24
**Department** [1] - 69:15
**deposit** [23] - 25:5, 25:18, 35:4, 99:3, 99:6, 99:10, 99:17, 101:1, 101:7, 101:9, 101:15, 101:22, 102:5, 102:21, 105:25, 109:19, 110:16, 110:22, 111:22, 114:1, 114:2, 114:14
**deposited** [1] - 110:23
**deposition** [15] - 22:22, 24:6, 140:5, 140:7, 140:11, 140:13, 140:15, 140:18, 149:3, 149:8, 149:10, 149:11, 149:20, 149:21
**depositions** [2] - 140:9, 140:10
**deposits** [1] - 98:16
**deprived** [1] - 28:14
**deputy** [1] - 176:22
**DEPUTY** [19] - 16:12, 32:25, 33:2, 53:6, 56:20, 57:1, 60:15, 60:19, 60:22, 60:25, 68:8, 68:10, 78:1, 118:8, 118:11, 118:14, 149:13, 152:23, 153:2
**describe** [3] - 64:7, 64:17, 114:25
**describes** [1] - 121:15
**description** [1] - 64:13
**deserve** [2] - 33:11, 44:11
**deserves** [1] - 4:2
**designated** [1] - 39:16
**desire** [8] - 19:24, 82:20, 131:4, 131:14, 131:16, 132:3, 132:11, 132:24
**desired** [2] - 20:1, 132:8
**desires** [4] - 121:24, 121:25, 122:4, 132:21
**despite** [4] - 39:22, 40:13, 40:19, 41:9
**details** [2] - 35:18, 99:9
**determine** [5] - 24:18, 26:11, 44:3, 44:14, 141:1
**determining** [1] - 5:22
**developing** [1] - 9:22
**development** [6] - 17:13, 72:17, 121:3, 123:8, 153:7, 153:9
**died** [1] - 33:6
**difference** [2] - 3:24, 41:9
**differences** [1] - 144:25
**different** [27] - 14:11, 18:8, 18:10, 18:19, 42:18, 42:19, 63:19, 85:4, 94:18, 94:25, 113:1, 135:14, 135:24, 157:6, 157:9, 157:12, 157:13, 164:19, 167:8, 168:23, 168:24, 168:25, 169:1, 169:12, 177:22, 178:10
**difficult** [3] - 46:4, 98:11, 107:7
**diluted** [1] - 124:25
**Dire** [1] - 2:25
**DIRECT** [1] - 61:2
**direct** [3] - 2:2, 3:25, 53:9
**direction** [2] - 24:10, 118:2
**directly** [1] - 84:21
**disagree** [1] - 3:12
**disallow** [1] - 5:3
**disbelieve** [1] - 4:1
**disburse** [1] - 113:5
**disbursed** [2] - 54:5, 128:10
**discovery** [1] - 46:4
**discretion** [1] - 31:11
**discretionary** [1] - 22:17
**discuss** [9] - 4:6, 10:4, 52:12, 133:1, 133:2, 133:3, 171:13, 171:16
**discussed** [4] - 36:8, 52:10, 151:18, 171:23
**discussing** [3] - 106:6, 131:23, 152:24
**discussions** [1] - 10:10
**dismissal** [1] - 47:24
**disproven** [1] - 111:13
**dispute** [1] - 6:1
**disregard** [2] - 5:5, 137:4
**dissolved** [9] - 33:9, 40:16, 41:14, 42:12, 42:13, 43:2, 43:6, 44:9, 78:5
**distract** [1] - 11:25
**distribute** [6] - 6:21, 22:11, 32:4, 103:6, 154:6, 154:12
**distributed** [5] - 21:25, 22:6, 22:8, 25:6, 155:18
**distributing** [1] - 24:9
**distribution** [2] - 43:16, 145:7
**distributions** [6] - 139:13, 144:19, 144:20, 144:22, 145:2, 145:4
**District** [4] - 1:23, 1:23, 179:15, 179:16
**DISTRICT** [3] - 1:1, 1:1, 1:10
**division** [1] - 84:12
**Division** [1] - 69:16
**document** [45] - 16:14, 16:16, 19:23, 25:25, 31:23, 31:24, 47:22, 48:20, 48:25, 49:22, 65:3, 65:23, 67:20, 68:1, 68:2, 69:8, 69:24, 74:5, 74:18, 75:7, 75:18, 78:13, 80:15, 82:19, 99:9, 100:7, 108:4, 108:6, 109:3, 122:10, 124:18, 125:19, 125:20, 126:14, 131:3,

132:25, 135:3, 137:1, 157:18, 157:21, 157:24, 158:4, 158:24, 164:3, 169:12
**documents** [22] - 30:11, 30:12, 66:1, 66:3, 66:4, 89:8, 103:6, 116:25, 135:22, 135:24, 136:11, 136:16, 136:20, 137:18, 138:9, 138:10, 138:11, 162:12, 164:20, 164:23, 164:24, 164:25
**dollar** [6] - 17:9, 25:19, 25:20, 27:1, 146:15, 162:7
**dollars** [11] - 22:17, 25:2, 25:7, 25:16, 25:21, 27:22, 30:16, 63:5, 130:11, 155:8, 161:20
**done** [12] - 13:8, 54:22, 106:16, 107:19, 109:2, 111:15, 129:6, 129:7, 144:4, 160:17, 178:3
**Donna** [6] - 8:13, 15:10, 46:8, 52:1, 68:7, 82:9
**door** [5] - 45:9, 52:11, 52:16, 104:7, 174:20
**double** [1] - 145:17
**double-row** [1] - 145:17
**doubt** [1] - 95:5
**down** [38] - 8:12, 9:14, 17:14, 19:8, 28:23, 33:10, 41:14, 42:1, 44:11, 48:8, 68:21, 72:11, 73:20, 82:13, 84:18, 84:20, 85:10, 90:25, 92:1, 97:3, 98:13, 105:2, 105:24, 121:1, 125:25, 130:16, 134:22, 141:3, 141:6, 141:12, 146:10, 153:4, 155:23, 158:4, 159:15, 162:14, 168:15
**Downtown** [6] - 6:7, 15:22, 33:13, 62:12, 97:17, 143:22
**downtown** [7] - 6:11, 62:14, 62:18, 90:12, 92:7, 102:17, 106:11
**dozens** [1] - 144:4
**drafted** [2] - 34:18, 40:2
**draw** [1] - 9:9
**due** [12] - 20:22, 27:2, 27:5, 27:10, 42:15, 42:17, 42:20, 56:10, 106:22, 124:17, 133:19, 134:13
**DUFFY** [1] - 1:14
**during** [21] - 4:3, 5:24, 8:6, 31:23, 34:6, 43:1, 47:13, 52:9, 55:2, 55:4, 61:13, 83:4, 94:16, 94:24, 95:2, 95:5, 106:2, 111:2, 140:13, 140:15, 169:25
**duty** [4] - 3:6, 3:9, 19:11, 113:5
**DX** [1] - 83:12
**dX** [1] - 95:25

**E**

**early** [5] - 44:21, 174:17, 174:21, 174:24, 179:2
**earned** [2] - 21:23, 55:12
**earnest** [2] - 98:16, 102:19
**earning** [1] - 139:11
**east** [1] - 115:5
**easy** [1] - 177:11
**economic** [1] - 23:8
**effect** [2] - 132:16, 132:25
**effectuated** [1] - 132:18
**effort** [1] - 108:13
**eight** [1] - 27:4
**either** [14] - 4:1, 9:5, 19:24, 52:7, 67:4, 89:14, 97:8, 111:5, 115:7, 127:16, 132:16, 156:15, 161:17, 176:6
**elements** [1] - 7:24
**elicit** [5] - 47:15, 47:23, 50:17, 53:1, 54:23
**email** [5] - 10:14, 19:12, 21:16, 42:4, 133:1
**emailing** [1] - 29:20
**emails** [9] - 21:14, 39:13, 39:15, 131:21, 131:25, 133:5, 133:7, 133:13
**emphasize** [1] - 10:12
**employee** [2] - 21:11, 30:13
**employees** [1] - 18:13
**empowered** [1] - 42:24
**en** [1] - 2:6
**end** [9] - 3:8, 5:21, 10:10, 13:19, 15:19, 31:7, 118:5, 122:2
**ending** [1] - 174:10
**endorsed** [5] - 108:1, 109:24, 109:25, 110:22, 111:23
**endorsing** [1] - 109:6
**enforce** [9] - 16:17, 21:8, 21:19, 49:8, 129:13, 132:21, 141:15, 141:18, 141:20
**enforceable** [2] - 7:5, 44:4
**enforcing** [1] - 127:7
**engines** [1] - 11:2
**enjoy** [2] - 45:6, 153:15
**ensure** [2] - 35:20, 160:15
**enter** [5] - 14:22, 15:20, 16:7, 16:24, 23:23
**entered** [8] - 4:25, 5:9, 6:3, 27:18, 27:20, 28:3, 34:23, 142:20
**entering** [1] - 28:8
**entire** [4] - 115:6, 136:19, 165:1, 165:2
**entities** [1] - 153:24
**entitled** [14] - 7:5, 12:7, 16:18, 17:12, 44:4, 56:7, 72:15, 114:3, 121:1, 124:24, 129:3, 129:19, 130:5, 179:10
**entitlement** [1] - 72:20
**entity** [2] - 40:17, 114:18
**envelope** [1] - 136:6
**equal** [2] - 38:15, 39:25
**equally** [1] - 13:19
**equity** [1] - 17:15
**escrow** [11] - 72:12, 100:25, 101:3, 101:23, 103:1, 103:10, 103:12, 110:21, 113:5
**escrows** [1] - 127:22
**especially** [1] - 107:20
**ESQ** [5] - 1:13, 1:13, 1:14, 1:17, 1:17
**Esquire** [2] - 100:25, 101:20
**essentially** [1] - 43:15
**estate** [15] - 6:7, 6:8, 6:11, 16:23, 34:2, 34:3, 61:19, 61:20, 61:22, 62:6, 65:24, 66:5, 143:2, 144:4, 151:12
**estimated** [2] - 154:16, 154:18
**EuroCave** [3] - 148:11, 148:13, 148:14
**evening** [1] - 10:6
**event** [3] - 123:21, 124:21, 126:21
**events** [1] - 37:15
**eventually** [1] - 113:15
**eviction** [1] - 17:25
**evidence** [156] - 3:9, 3:13, 3:14, 3:17, 3:19, 3:21, 3:22, 3:25, 4:2, 4:4, 4:5, 4:7, 4:8, 4:11, 4:14, 4:17, 4:18, 4:20, 4:25, 5:3, 5:7, 5:8, 5:18, 5:20, 5:25, 7:9, 7:10, 7:11, 7:12, 7:17, 7:20, 7:22, 7:25, 8:2, 8:4, 8:16, 8:22, 8:25, 9:23, 10:8, 11:11, 12:15, 13:8, 14:12, 14:17, 16:2, 16:3, 16:5, 16:6, 16:8, 16:14, 16:20, 17:1, 17:6, 17:18, 17:23, 18:5, 18:14, 18:17, 18:23, 19:9, 19:19, 20:4, 20:5, 21:4, 21:10, 22:13, 22:16, 22:18, 22:24, 23:1, 23:25, 24:13, 24:19, 25:11, 25:22, 26:1, 26:11, 26:14, 26:20, 26:23, 27:6, 27:7, 27:13, 27:15, 27:18, 28:1, 28:9, 29:5, 29:8, 29:13, 30:2, 30:7, 30:8, 30:21, 30:23, 31:13, 31:21, 31:22, 31:25, 33:7, 35:15, 38:25, 40:6, 44:7, 45:18, 46:19, 47:2, 47:23, 48:3, 48:22, 50:18, 51:3, 51:6, 51:7, 52:21, 53:3, 57:15, 60:3, 60:10, 65:19, 65:21, 66:9, 66:19, 67:15, 70:12, 73:1, 74:5, 75:23, 77:19, 83:24, 96:2, 96:12, 98:8, 100:4, 100:5, 107:8, 107:9, 107:12, 107:13, 130:13, 145:12, 154:15, 155:10, 157:17, 159:5, 161:19, 162:4, 164:10, 164:12, 170:18, 170:24, 171:1
**ex** [1] - 30:13
**ex-employee** [1] - 30:13
**exact** [2] - 28:1, 76:6
**exactly** [8] - 67:4, 85:22, 85:24, 99:8, 120:24, 141:13, 171:24, 176:15
**exam** [1] - 119:14
**examination** [2] - 81:9, 103:24
**EXAMINATION** [4] - 61:2, 81:11, 114:23, 118:22
**Examination............ Page** [2] - 2:2, 2:4
**Examination........... Page** [1] - 2:2
**Examination.......... Page** [1] - 2:3
**examine** [1] - 51:5
**example** [12] - 4:13, 5:7, 11:13, 136:23, 138:18, 144:16, 145:20, 152:4, 156:16, 160:15, 164:22, 172:13
**exceed** [1] - 16:8
**exceeds** [1] - 44:2
**except** [1] - 130:20
**exception** [1] - 71:2
**exceptions** [1] - 106:3
**EXCERPT** [3] - 1:6, 1:9, 179:10
**excess** [2] - 122:25, 123:4
**exchange** [6] - 25:8, 25:12, 25:19, 154:22, 154:23, 176:1
**exclusive** [1] - 43:12
**excuse** [20] - 17:8, 22:12, 24:5, 26:7, 30:10, 30:15, 45:22,

48:13, 49:5, 49:24, 59:8, 67:24, 95:21, 121:1, 122:7, 135:6, 138:24, 140:4, 162:16, 170:19
**excused** [5] - 41:22, 44:13, 44:14, 116:24, 117:6
**executed** [2] - 36:7, 36:8
**execution** [1] - 100:23
**exercise** [1] - 23:9
**Exhibit** [172] - 2:7, 2:7, 2:8, 2:8, 2:9, 2:9, 16:11, 17:20, 23:13, 24:20, 25:24, 27:17, 28:2, 29:13, 29:18, 30:3, 57:20, 57:21, 57:22, 57:23, 57:24, 57:25, 58:1, 58:2, 58:3, 58:4, 58:5, 58:6, 58:7, 58:8, 58:9, 58:10, 58:11, 58:12, 58:13, 58:14, 58:15, 58:16, 58:17, 58:18, 58:19, 58:20, 58:21, 58:22, 58:23, 58:24, 58:25, 59:1, 59:2, 59:3, 59:4, 59:5, 59:7, 59:12, 59:13, 59:14, 59:15, 59:16, 59:17, 59:23, 60:9, 60:14, 65:3, 66:8, 66:19, 67:14, 69:15, 69:24, 70:11, 70:14, 71:10, 71:12, 71:13, 74:4, 75:4, 75:22, 77:11, 77:19, 77:22, 78:7, 80:12, 80:22, 82:5, 83:13, 84:5, 84:10, 84:16, 85:12, 95:20, 95:21, 96:22, 99:19, 100:15, 120:17, 125:24, 134:21, 134:24, 145:12, 154:15, 155:10, 155:25, 157:17, 159:5, 161:18, 162:4, 164:9, 166:20, 167:17, 170:18, 170:24, 173:9
**exhibit** [28] - 3:16, 4:19, 4:22, 4:24, 4:25, 7:20, 28:22, 45:20, 45:24, 47:5, 57:18, 60:8, 65:19, 67:13, 69:14, 72:25, 74:2, 77:15, 78:21, 82:11, 83:17, 95:21, 95:22, 95:24, 96:3, 96:6, 173:10, 173:18
**EXHIBITS** [1] - 2:5
**Exhibits** [2] - 2:6, 60:5
**exhibits** [21] - 7:19, 14:3, 14:12, 14:19, 14:22, 45:12, 45:18, 46:8, 46:19, 46:22, 47:1, 57:15, 60:2, 71:18, 82:4, 83:20, 173:20, 175:21, 175:22, 175:23
**exist** [4] - 11:9, 52:24, 152:10, 152:13
**existed** [1] - 15:24
**expect** [10] - 51:11, 51:13, 54:23, 85:20, 85:21, 88:12, 88:16, 89:4, 90:1, 90:6
**expense** [1] - 163:16
**expenses** [5] - 22:5, 25:15, 43:18, 103:7, 138:14
**experience** [4] - 8:16, 33:21, 40:24, 151:12
**expert** [3] - 26:19, 43:22, 56:9
**expired** [6] - 17:24, 18:1, 18:17, 26:24, 166:4, 168:7
**expires** [2] - 106:3, 106:4
**explain** [6] - 3:6, 48:14, 100:8, 109:12, 109:14, 156:9
**explained** [1] - 56:8
**explanation** [2] - 55:22, 111:6
**express** [2] - 9:21, 106:21
**Express** [1] - 136:5
**expression** [1] - 105:20
**expressly** [1] - 135:22
**extend** [2] - 42:16, 42:19
**extent** [2] - 138:13, 138:17
**extra** [1] - 45:1
**extrajudicially** [1] - 49:11

**F**

**face** [2] - 10:13
**face-to-face** [1] - 10:13
**facilitated** [1] - 31:18
**facilitating** [1] - 127:22
**facing** [3] - 115:4, 115:5, 115:7
**facsimile** [5] - 70:3, 70:5, 136:3, 137:13, 137:15
**fact** [18] - 3:17, 3:23, 7:16, 7:21, 7:22, 36:2, 39:22, 55:13, 56:1, 107:9, 133:21, 139:1, 140:15, 149:8, 150:6, 151:16, 167:13, 168:8
**factors** [1] - 5:21
**facts** [4] - 3:10, 7:25, 37:15, 111:13
**fail** [2] - 38:23
**failed** [4] - 6:21, 6:22, 7:1, 40:7
**fails** [2] - 40:4, 126:8
**failure** [3] - 32:4, 41:2
**failures** [3] - 41:16, 44:14, 44:15
**fair** [10] - 6:19, 11:11, 11:17, 31:9, 31:10, 120:23, 124:5, 136:16, 136:24
**faith** [2] - 6:19, 31:9
**far** [2] - 3:24, 16:8
**fast** [2] - 48:6, 48:8
**father** [4] - 20:6, 20:8, 31:16, 81:15
**father's** [1] - 20:8
**favor** [11] - 7:14, 7:15, 15:20, 16:6, 16:7, 27:18, 31:13, 44:15, 111:6, 111:16, 111:17
**favorable** [1] - 15:18
**favoring** [1] - 7:11
**fax** [12] - 69:25, 70:8, 70:20, 71:2, 71:3, 71:4, 71:6, 71:10, 71:14, 137:13, 137:20
**faxed** [1] - 137:16
**FCRR** [2] - 1:21, 179:14
**February** [1] - 79:11
**Federal** [2] - 62:20, 136:5
**FedEx** [1] - 21:16
**felt** [1] - 129:3
**few** [6] - 8:18, 9:12, 19:20, 19:21, 107:19, 143:3
**fictitious** [2] - 26:21, 29:6
**fifth** [1] - 163:3
**fighting** [2] - 42:14, 43:1
**figure** [3] - 32:6, 32:7, 117:2
**file** [1] - 67:6
**filed** [10] - 45:11, 46:23, 69:15, 91:3, 171:3, 171:6, 172:20, 173:2, 173:4, 177:13
**files** [2] - 66:6, 70:25
**filing** [1] - 177:15
**Fillmore** [1] - 82:23
**final** [6] - 9:24, 27:18, 27:20, 27:23, 42:23, 111:19
**finally** [4] - 9:19, 31:20, 37:2, 94:14
**financed** [1] - 35:12
**finances** [2] - 38:3, 38:6
**financial** [4] - 21:9, 27:2, 139:1, 142:11
**financials** [5] - 27:14, 160:3, 160:6, 160:8, 172:5
**financing** [5] - 35:6, 35:22, 36:1, 36:2, 36:4
**fine** [6] - 11:22, 15:5, 19:16, 50:18, 55:20, 57:4
**finish** [6] - 31:21, 32:1, 52:5, 88:18, 88:19, 177:25
**finished** [1] - 8:8
**Firefox** [1] - 11:2
**firm** [6] - 20:6, 69:11, 69:12, 76:19, 76:24, 92:22
**Firm** [3] - 84:13, 84:23, 87:12
**first** [68] - 4:4, 6:23, 6:25, 9:13, 12:18, 12:19, 13:2, 15:24, 17:22, 18:7, 18:13, 22:5, 23:4, 23:5, 23:9, 23:10, 23:12, 23:14, 24:12, 28:21, 31:3, 33:15, 33:17, 36:10, 39:4, 39:5, 43:16, 48:6, 57:13, 60:22, 62:8, 68:2, 69:14, 69:25, 71:14, 72:1, 72:3, 78:7, 87:16, 118:12, 121:22, 122:2, 135:10, 140:17, 149:12, 155:25, 156:3, 156:4, 156:10, 156:13, 157:15, 157:22, 158:6, 158:18, 158:22, 158:25, 159:1, 159:7, 159:13, 168:1, 168:17, 171:6, 172:18, 178:11
**five** [2] - 178:8, 178:21
**Flagler** [19] - 76:4, 76:9, 78:24, 79:7, 79:12, 79:19, 80:2, 88:7, 88:10, 88:13, 89:2, 89:3, 89:7, 93:20, 93:22, 93:23, 93:24, 94:2, 97:9
**fliers** [1] - 174:13
**flipped** [1] - 62:10
**floor** [8] - 86:13, 87:22, 115:3, 115:6, 115:9, 115:19
**FLORIDA** [1] - 1:1
**Florida** [39] - 1:3, 1:16, 1:19, 1:23, 1:24, 47:17, 61:9, 64:1, 67:6, 67:8, 67:9, 68:18, 68:24, 69:8, 69:15, 72:4, 73:4, 74:17, 74:21, 78:9, 78:15, 78:24, 79:13, 79:20, 80:2, 80:9, 80:17, 81:2, 83:2, 85:17, 93:4, 93:8, 93:11, 93:13, 93:17, 93:20, 143:17, 179:16, 179:17
**flow** [9] - 16:18, 17:12, 22:7, 22:17, 24:18, 25:21, 26:18, 72:16, 121:2
**focus** [4] - 24:23, 91:1, 92:1, 100:17
**focused** [1] - 61:20
**folks** [1] - 28:4
**follow** [7] - 3:11, 4:7, 5:25, 12:23, 16:9, 48:9
**follow-up** [1] - 12:23
**followed** [1] - 48:7
**following** [2] - 5:14, 31:15
**FOR** [2] - 1:13, 1:17
**forbids** [2] - 11:7, 11:8
**force** [2] - 132:16, 132:25
**forces** [1] - 40:17
**foreclose** [5] - 42:24, 47:21, 48:25, 49:14,

169:14
**foreclosed** [1] - 49:23
**foreclosure** [22] - 42:22, 42:25, 43:1, 47:16, 47:18, 48:10, 48:15, 48:23, 49:1, 49:3, 49:8, 49:13, 49:19, 50:8, 50:20, 169:6, 169:8, 169:18, 171:7, 172:20, 173:2, 173:4
**foregoing** [2] - 162:18, 179:9
**forensic** [1] - 43:23
**forfeited** [1] - 50:13
**Form** [1] - 26:3
**form** [4] - 8:24, 71:17, 91:18, 131:20
**forms** [2] - 3:14, 55:1
**forth** [2] - 136:7, 137:16
**forward** [2] - 43:4, 85:12
**forwarded** [2] - 89:3, 89:14
**fought** [1] - 42:21
**foundation** [1] - 116:7
**founder** [1] - 148:19
**four** [5] - 17:8, 17:9, 146:15, 161:20, 162:6
**four-and-a-half** [2] - 17:8, 161:20
**four-and-a-half-million** [1] - 162:6
**four-and-a-half-million-dollar** [2] - 17:9, 146:15
**fourth** [1] - 121:1
**FPT's** [1] - 39:4
**fractured** [1] - 52:14
**frame** [1] - 176:14
**Francisco** [2] - 82:23, 143:5
**frankly** [2] - 24:4, 145:13
**free** [4] - 51:5, 51:6, 52:4
**freeze** [1] - 111:24
**frequently** [2] - 64:22, 106:17
**Friday** [2] - 176:12, 176:16
**friend** [1] - 147:17
**friendly** [3] - 147:17, 148:6, 148:20
**Friendly** [1] - 147:18
**friends** [6] - 29:22, 52:17, 147:14, 148:15, 148:16, 148:17
**front** [11] - 15:17, 36:21, 51:18, 117:14, 176:3, 176:5, 177:10, 177:12, 177:22
**FTP** [258] - 1:6, 6:5, 6:6, 6:12, 6:17, 6:18, 6:21, 6:22, 6:24, 6:25, 7:4, 15:15, 15:20, 16:24, 17:7, 17:8, 17:10, 17:21, 18:1, 18:11, 18:16, 18:18, 18:20, 19:2, 20:4, 20:18, 20:21, 21:4, 21:11, 21:12, 21:25, 22:13, 22:17, 22:18, 23:1, 23:4, 23:5, 23:10, 23:11, 23:15, 23:24, 25:2, 25:6, 25:11, 25:17, 25:22, 26:7, 26:14, 26:15, 27:2, 27:6, 27:7, 27:12, 27:13, 27:19, 27:21, 27:23, 28:3, 28:6, 28:8, 28:16, 28:18, 28:24, 29:9, 29:10, 29:15, 30:5, 30:7, 30:8, 30:12, 30:15, 30:17, 30:19, 30:22, 30:25, 31:3, 31:10, 31:17, 32:1, 32:6, 33:4, 33:10, 33:24, 34:5, 34:15, 35:7, 35:9, 35:10, 35:12, 35:14, 35:20, 35:21, 35:23, 35:25, 36:4, 36:12, 36:16, 36:19, 36:21, 36:25, 37:1, 37:5, 38:5, 39:10, 39:13, 39:17, 39:24, 40:17, 40:21, 41:8, 41:12, 41:18, 42:3, 42:14, 42:20, 42:23, 42:25, 43:1, 43:4, 43:5, 43:6, 43:9, 43:11, 43:16, 43:17, 43:19, 43:20, 44:1, 44:11, 44:15, 47:21, 49:24, 55:11, 80:13, 82:22, 100:24, 101:19, 102:1, 118:25, 119:2, 119:16, 119:19, 119:21, 119:22, 120:6, 120:10, 120:21, 121:1, 121:5, 121:11, 121:18, 121:20, 121:24, 121:25, 122:3, 122:4, 122:7, 122:16, 122:19, 122:21, 123:1, 123:6, 123:12, 123:15, 123:18, 123:22, 124:8, 124:10, 124:17, 124:23, 125:6, 125:15, 126:23, 127:11, 127:16, 127:18, 127:19, 128:18, 129:12, 129:18, 131:16, 132:8, 132:21, 133:18, 134:1, 134:16, 137:21, 138:7, 138:15, 138:18, 139:1, 139:8, 140:25, 141:8, 142:4, 142:7, 142:9, 142:11, 142:23, 142:25, 143:2, 143:23, 144:8, 144:10, 144:16, 146:15, 146:19, 146:21, 146:22, 151:23, 152:15, 152:18, 153:18, 153:21, 154:25, 155:1, 155:7, 156:7, 156:16, 156:24, 157:1, 157:14, 158:17, 158:22, 159:15, 159:17, 159:20, 160:10, 160:15, 162:16, 162:19, 162:25, 163:12, 164:5, 164:19, 166:6, 167:6, 167:10, 167:14, 167:19, 167:25, 169:8, 169:14, 169:15, 169:21, 171:9, 171:13, 171:21, 172:22, 173:7
**FTP's** [16] - 17:1, 25:25, 26:25, 29:5, 30:11, 31:19, 32:9, 32:11, 36:6, 131:9, 132:13, 134:4, 138:1, 144:1, 146:25, 152:20
**FTP)** [1] - 125:13
**full** [7] - 39:9, 138:13, 138:17, 139:8, 139:12, 142:19, 172:23
**functions** [1] - 33:13
**funding** [1] - 40:19
**funds** [10] - 25:12, 30:6, 54:6, 56:15, 73:24, 103:6, 111:23, 113:6, 154:16, 154:18
**future** [1] - 54:8

**G**

**gain** [2] - 26:8, 155:5
**gains** [3] - 26:9, 55:12, 155:3
**gambling** [1] - 52:13
**game** [1] - 37:14
**garage** [2] - 62:18, 62:19
**gather** [1] - 52:15
**Gayles** [3] - 177:10, 177:22, 178:11
**Gayles'** [1] - 176:22
**GCAIA** [1] - 153:10
**general** [3] - 50:22, 151:18, 164:5
**generally** [3] - 106:4, 145:15, 166:19
**generate** [1] - 36:24
**gentleman** [1] - 24:2
**gentlemen** [8] - 18:14, 32:22, 33:3, 35:15, 38:25, 40:6, 44:6, 178:23
**given** [12] - 6:15, 9:2, 13:15, 20:25, 25:17, 136:2, 136:3, 136:15, 136:17, 136:24, 137:9, 168:2
**GM** [15] - 17:12, 17:16, 22:9, 31:1, 72:6, 72:15, 81:1, 83:1, 101:1, 101:4, 121:23, 122:2, 125:11, 125:12, 154:5
**Google** [2] - 11:1, 11:2
**government** [2] - 25:23, 55:12
**granted** [2] - 132:23, 177:16
**grass** [1] - 3:18
**Grayson** [2] - 24:3, 31:19
**Greater** [1] - 62:19
**Greg** [79] - 16:20, 20:6, 20:10, 27:24, 28:11, 29:10, 29:17, 29:20, 29:21, 30:4, 31:20, 33:20, 34:13, 35:5, 38:14, 38:19, 38:22, 63:2, 64:15, 79:12, 83:1, 99:10, 101:10, 101:11, 101:13, 102:3, 102:7, 102:16, 102:22, 103:10, 106:11, 106:13, 107:17, 107:23, 109:17, 109:19, 109:20, 109:22, 109:24, 110:2, 110:4, 110:14, 110:16, 110:19, 110:22, 111:20, 111:22, 111:23, 111:25, 112:19, 113:3, 113:8, 113:14, 113:19, 113:24, 113:25, 114:3, 114:5, 114:14, 114:17, 133:3, 147:14, 147:22, 148:8, 149:1, 150:6, 150:25, 151:2, 151:7, 151:11, 151:23, 152:18, 166:15, 166:18, 169:15, 170:16, 172:12
**Greg's** [14] - 16:23, 20:8, 21:11, 31:16, 106:16, 110:1, 110:20, 110:24, 112:24, 113:10, 113:18, 113:23, 114:3, 114:8
**Gregory** [63] - 15:13, 33:18, 33:19, 34:24, 36:15, 37:7, 37:8, 37:13, 37:23, 38:3, 38:10, 38:12, 39:1, 39:2, 39:3, 39:6, 39:21, 40:20, 41:16, 41:21, 43:2, 48:17, 52:11, 52:12, 52:19, 61:25, 62:2, 62:6, 62:25, 63:20, 63:24, 64:3, 64:7, 64:13, 64:20, 65:13, 65:14, 66:4, 66:15, 67:11, 68:23, 69:3, 69:5, 72:19, 73:24, 74:25, 75:13, 78:17, 78:22, 79:19, 80:2, 81:1, 83:1, 94:21, 109:6, 132:9, 146:7, 160:8, 160:16, 160:19, 161:15
**Gregory's** [1] - 81:15
**ground** [17] - 17:21, 18:15, 34:18, 35:9,

36:8, 40:2, 74:7, 80:13, 80:19, 95:22, 96:11, 126:14, 126:17, 163:5, 163:19, 166:11, 166:14
**guarantee** [3] - 159:24, 160:1, 164:14
**guaranteed** [7] - 17:10, 27:25, 37:10, 38:8, 38:18, 39:23, 159:22
**guarantor** [8] - 160:19, 160:23, 160:25, 161:2, 161:6, 161:8, 161:10, 161:15
**guaranty** [4] - 38:5, 164:24, 165:1, 170:16
**guess** [3] - 5:2, 87:22, 164:15
**guidelines** [1] - 5:22
**guy** [1] - 166:11

## H

**half** [17] - 17:8, 17:9, 22:16, 25:7, 25:16, 25:19, 25:21, 26:25, 27:22, 30:16, 103:25, 146:15, 155:8, 161:20, 162:6, 177:25
**hall** [3] - 67:2, 86:11, 87:21
**hallway** [1] - 104:22
**hand** [9] - 60:16, 67:22, 68:2, 69:7, 118:8, 136:4, 154:16, 154:17, 162:15
**handled** [3] - 62:25, 63:9, 64:14
**hands** [1] - 64:17
**hands-on** [1] - 64:17
**Hanukah** [1] - 30:4
**happy** [4] - 30:4, 96:18, 173:14, 173:17
**hard** [9] - 21:10, 105:20, 105:24, 106:4, 106:7, 106:10, 106:14, 106:21, 107:4
**Harman** [1] - 85:3
**Haute** [1] - 148:19
**hazardous** [2] - 163:10, 163:14
**head** [6] - 22:23, 29:3, 129:24, 139:18, 139:19, 141:10
**headed** [1] - 95:16
**heads** [1] - 54:9
**heads-up** [1] - 54:9
**hear** [53] - 4:3, 5:15, 6:6, 6:9, 6:10, 11:4, 11:15, 13:9, 13:16, 13:18, 15:3, 15:6, 15:8, 16:4, 24:2, 24:7, 33:16, 33:18, 33:20, 33:23, 34:1, 34:9, 34:24, 35:24, 36:3, 37:11, 37:22, 39:12, 39:20, 40:1, 40:9, 40:25, 41:6, 41:21, 41:24, 42:15, 42:21, 43:22, 45:15, 45:22, 46:3, 51:3, 51:15, 53:15, 53:18, 56:23, 56:24, 57:5, 57:12, 112:12, 147:7, 174:20, 178:11
**heard** [15] - 3:15, 9:23, 10:7, 10:18, 13:17, 13:21, 24:3, 41:20, 45:9, 114:11, 136:10, 176:11, 177:3, 178:5, 178:17
**hearing** [6] - 12:13, 56:21, 83:21, 119:8, 138:10, 174:6
**hearings** [3] - 176:21, 177:4, 178:8
**hearsay** [1] - 63:15
**Heat** [1] - 148:8
**Heber** [33] - 18:14, 18:15, 18:18, 21:11, 21:12, 21:13, 30:13, 30:14, 34:10, 34:12, 34:15, 34:19, 34:20, 36:3, 37:20, 37:23, 39:12, 39:13, 39:15, 39:20, 40:2, 40:9, 40:22, 40:25, 41:6, 41:24, 41:25, 70:1, 165:22, 166:6, 166:7, 169:19
**Heber's** [1] - 34:17
**held** [10] - 98:24, 99:3, 99:17, 103:1, 110:20, 114:8, 114:12, 156:14, 158:18, 168:8
**help** [13] - 4:7, 5:25, 8:16, 11:22, 12:6, 40:1, 57:3, 57:6, 81:19, 108:6, 108:9, 111:2, 148:8
**helped** [1] - 148:14
**hence** [1] - 102:12
**hereby** [1] - 179:9
**hereinafter** [1] - 72:5
**hereto** [2] - 82:21, 131:5
**hereunder** [1] - 136:2
**hidden** [1] - 12:2
**higher** [1] - 56:11
**highlight** [3] - 100:18, 121:25, 125:11
**highlighted** [2] - 100:20, 122:4
**himself** [4] - 22:24, 34:2, 64:4
**hired** [7] - 18:18, 21:12, 26:19, 34:15, 34:19, 165:22, 166:6
**hires** [2] - 40:22, 40:25
**history** [2] - 37:13, 62:5
**hit** [2] - 4:14, 21:9
**hold** [15] - 14:8, 63:7, 63:10, 88:17, 103:18, 104:6, 109:24, 110:5, 110:11, 110:12, 112:24, 167:15, 170:20, 174:19, 177:1
**holding** [15] - 30:12, 98:19, 99:10, 101:16, 101:23, 102:3, 103:16, 110:1, 110:3, 110:21, 110:25, 113:18, 113:22, 113:23, 115:22
**holds** [1] - 142:7
**holidays** [1] - 29:12
**home** [4] - 10:3, 62:22, 92:9, 151:8
**homes** [2] - 62:21, 62:23
**honest** [1] - 18:21
**honestly** [2] - 54:25, 98:1
**honor** [4] - 6:22, 15:24, 23:11, 32:10
**Honor** [101] - 14:11, 14:24, 32:15, 32:20, 45:17, 46:2, 46:6, 46:12, 46:18, 47:7, 47:9, 50:2, 50:10, 51:8, 51:20, 51:22, 52:9, 52:25, 53:4, 53:7, 53:19, 54:2, 54:18, 54:25, 55:10, 55:20, 56:19, 57:14, 60:1, 60:6, 60:8, 60:12, 63:17, 64:9, 64:23, 66:9, 66:10, 66:18, 66:20, 67:12, 69:20, 70:11, 70:15, 70:17, 70:20, 71:13, 71:16, 72:23, 74:1, 75:3, 75:24, 76:25, 77:9, 77:18, 81:8, 81:10, 82:6, 83:9, 83:13, 83:19, 83:23, 84:8, 84:14, 90:22, 96:4, 96:8, 96:17, 98:4, 98:7, 99:20, 99:22, 100:8, 100:13, 104:4, 104:13, 104:15, 104:21, 105:16, 107:10, 108:12, 108:18, 112:11, 114:20, 114:22, 115:11, 116:25, 117:12, 117:18, 118:15, 118:18, 133:9, 149:25, 175:1, 175:19, 175:24, 176:17, 176:19, 176:20, 178:19, 179:3, 179:4
**Honor's** [1] - 173:13
**HONORABLE** [1] - 1:9
**Honorable** [1] - 1:22
**honoring** [1] - 37:24
**hope** [1] - 174:6
**hopefully** [2] - 91:1, 178:24
**hour** [4] - 44:23, 103:25, 177:25
**house** [5] - 92:11, 150:19, 151:1, 151:3, 151:4
**HUD** [2] - 24:21, 111:25
**hundred** [4] - 15:25, 112:4, 147:7, 169:24
**hypothetical** [2] - 161:4, 161:5
**hypothetically** [1] - 172:15

## I

**Ibiza** [1] - 148:5
**idea** [3] - 42:19, 165:15, 165:18
**identified** [1] - 72:3
**identifies** [2] - 73:7, 80:15
**identify** [3] - 69:1, 69:8, 72:12
**ignore** [2] - 5:1, 5:5
**Ill** [1] - 68:15
**imagine** [3] - 47:15, 53:17, 127:4
**imminent** [1] - 35:25
**impeach** [1] - 149:20
**impeaching** [1] - 149:17
**implied** [3] - 6:19, 31:9, 32:7
**important** [16] - 9:12, 9:19, 11:9, 11:10, 11:14, 13:18, 13:21, 33:23, 34:9, 36:12, 36:18, 36:20, 37:1, 37:12, 104:24, 105:1
**importantly** [1] - 49:19
**impression** [1] - 12:8
**improper** [1] - 47:22
**Inc** [1] - 23:16
**inclination** [1] - 174:8
**include** [1] - 64:13
**includes** [1] - 10:23
**including** [2] - 31:23, 175:9
**incorporated** [2] - 18:4, 135:22
**independent** [1] - 89:19
**independently** [1] - 17:2
**INDEX** [1] - 1:25
**indicate** [2] - 78:14, 99:9
**indicated** [1] - 78:22
**indicates** [2] - 8:17, 70:1
**indication** [1] - 39:5
**indirect** [3] - 3:19, 3:21, 3:25
**indirectly** [1] - 3:17
**individual** [6] - 33:21, 34:1, 37:9, 45:20, 159:22, 164:19
**individually** [6] - 27:14, 27:20, 27:25, 28:17, 48:18
**individuals** [2] - 76:22, 115:22
**indulge** [1] - 14:4
**industry** [1] - 151:12
**information** [5] - 10:2, 10:21, 11:12, 63:14, 69:19
**Ingraham** [1] - 143:22
**ingress/egress** [1] - 145:18
**initial** [7] - 17:17, 17:18, 36:6, 107:5,

122:25, 123:1, 123:5
**initiated** [1] - 169:6
**insist** [1] - 71:3
**inspect** [1] - 106:1
**inspection** [2] - 105:25, 106:2
**instruct** [4] - 5:8, 7:17, 7:25, 13:12
**instructions** [10] - 3:7, 3:8, 9:24, 13:13, 13:15, 13:18, 13:22, 103:17, 103:19, 113:6
**insufficient** [1] - 170:5
**intangible** [1] - 48:25
**intend** [3] - 46:21, 47:1, 47:15
**intended** [2] - 121:8, 121:11
**intent** [1] - 32:11
**intention** [1] - 136:20
**intentions** [1] - 113:6
**interest** [37] - 5:17, 21:2, 21:23, 27:1, 28:4, 28:25, 29:7, 38:17, 38:22, 39:3, 39:7, 40:15, 41:17, 43:12, 43:13, 43:18, 43:19, 43:21, 43:24, 44:2, 49:9, 56:7, 56:10, 123:24, 124:12, 127:5, 127:6, 129:17, 138:14, 138:20, 138:24, 139:4, 139:6, 139:10, 139:14, 172:18
**interested** [1] - 172:10
**intermediary** [3] - 154:21, 154:23, 155:8
**Internet** [1] - 10:15
**interrupt** [4] - 53:9, 104:24, 105:1, 152:23
**interrupting** [1] - 47:6
**intimate** [1] - 34:20
**introduce** [5] - 18:7, 19:6, 46:22, 57:15, 118:24
**introduced** [2] - 16:14, 26:1
**introducing** [1] - 46:19
**introduction** [1] - 14:3
**introductory** [1] - 131:2
**invest** [2] - 38:16, 39:25
**invested** [2] - 37:4, 62:11
**Investment** [14] - 6:5, 15:15, 15:21, 20:4, 33:5, 33:24, 34:5, 35:7, 44:16, 82:22, 119:1, 119:2, 119:16, 142:4
**INVESTMENT** [1] - 1:6
**investment** [2] - 36:6, 43:17
**Investment's** [1] - 41:18
**investments** [1] - 62:23
**invoked** [1] - 175:6
**invoking** [2] - 175:1, 175:3
**involved** [5] - 35:11, 36:4, 36:14, 37:24, 39:22
**involvement** [1] - 34:17
**irrelevant** [5] - 54:13, 54:14, 54:17, 54:18, 54:24
**Irrevocable** [1] - 141:22
**ISAIAH** [1] - 1:13
**Island** [2] - 62:21, 151:5
**issue** [20] - 6:17, 14:11, 15:9, 15:11, 34:18, 40:2, 44:24, 45:25, 50:15, 51:22, 53:20, 53:23, 54:10, 54:19, 95:16, 104:8, 111:4, 172:5, 173:24, 178:16
**issued** [1] - 103:2
**issues** [4] - 7:23, 104:9, 119:8, 175:2
**Item** [1] - 98:15
**items** [1] - 136:21
**itself** [10] - 16:1, 22:18, 23:21, 30:18, 32:12, 124:18, 152:11, 158:24, 164:20, 171:7
**IV** [2] - 68:21, 151:5

**J**

**Jacqueline** [1] - 1:22
**JACQUELINE** [1] - 1:9
**James** [6] - 61:5, 89:25, 90:13, 91:19, 94:6, 94:7
**January** [6] - 38:13, 39:2, 79:7, 79:17, 79:23, 140:19
**Jeff** [1] - 85:3
**job** [4] - 3:10, 4:1, 36:15
**Joe** [3] - 127:20, 127:21, 127:24
**jokes** [1] - 148:15
**Jones** [2] - 4:13, 4:15
**Joseph** [4] - 15:1, 15:12, 31:18, 155:12
**JOSEPH** [1] - 1:13
**Judge** [7] - 14:7, 105:8, 149:17, 176:22, 177:7, 177:22, 178:11
**JUDGE** [1] - 1:10
**judgment** [9] - 27:18, 27:20, 27:23, 28:15, 28:24, 29:11, 42:23, 47:25, 49:8
**judicial** [4] - 47:18, 49:1, 49:9, 49:10
**jump** [4] - 39:8, 43:4, 117:20, 118:1
**June** [1] - 167:18
**juror** [3] - 8:17, 10:2, 116:19
**jurors** [5] - 3:7, 8:17, 11:16, 71:17, 116:22
**JURY** [1] - 1:9
**jury** [65] - 3:2, 3:3, 3:5, 9:12, 9:25, 11:24, 12:2, 12:4, 13:23, 19:10, 24:18, 26:21, 32:16, 45:3, 45:8, 45:9, 45:22, 47:6, 47:11, 47:14, 48:7, 48:21, 48:22, 50:8, 51:6, 51:19, 56:18, 56:20, 57:11, 62:5, 71:14, 77:24, 82:18, 86:12, 100:22, 104:5, 104:7, 104:19, 105:12, 105:13, 111:5, 117:14, 118:24, 130:13, 137:4, 138:6, 140:21, 140:22, 145:14, 149:14, 149:18, 149:23, 150:2, 152:12, 152:24, 156:9, 170:20, 173:15, 174:18, 174:20, 174:21, 174:23, 176:3, 176:5, 178:24
**jury's** [1] - 46:5
**JUSTESEN** [2] - 134:23, 164:11

**K**

**Kamal** [2] - 148:19, 148:20
**Kaufman** [1] - 43:23
**keep** [20] - 9:22, 10:9, 32:11, 39:18, 67:5, 82:13, 82:14, 85:10, 85:11, 113:22, 138:1, 138:3, 138:5, 138:19, 139:8, 163:10
**keeping** [2] - 163:14, 170:7
**kept** [5] - 15:25, 31:6, 139:12, 163:19, 170:7
**Key** [3] - 176:24, 177:2, 177:24
**key** [1] - 34:5
**kind** [6] - 4:1, 10:24, 11:2, 97:11, 111:3, 133:18
**knowledge** [5] - 34:21, 63:1, 64:7, 67:8, 72:19
**known** [1] - 29:10
**knows** [2] - 23:11, 159:12

**L**

**labeled** [1] - 96:16
**ladies** [6] - 32:22, 33:3, 35:15, 38:25, 40:6, 44:6
**ladies'** [1] - 53:8
**landlord** [4] - 167:13, 167:18, 167:19, 167:25
**Lane** [1] - 150:17
**language** [1] - 19:19
**lapel** [5] - 15:3, 15:5, 15:10, 32:25, 33:1
**lapses** [1] - 111:14
**larger** [1] - 174:25
**Las** [2] - 143:10, 152:5
**last** [7] - 45:11, 46:23, 60:23, 87:23, 118:12, 154:5, 164:14
**late** [1] - 90:14
**law** [43] - 3:10, 3:11, 3:24, 9:5, 9:24, 10:8, 11:4, 11:7, 11:13, 11:16, 13:13, 20:6, 47:17, 52:21, 53:2, 61:16, 61:18, 63:3, 68:19, 69:11, 69:12, 72:8, 73:18, 74:22, 74:24, 75:9, 75:14, 76:2, 76:8, 76:13, 76:19, 76:24, 78:18, 79:3, 79:15, 79:22, 80:5, 80:20, 81:6, 92:22, 115:1, 119:13
**Law** [4] - 1:14, 84:13, 84:22, 87:12
**lawsuit** [14] - 24:6, 27:16, 29:11, 43:3, 47:20, 119:2, 119:17, 169:15, 169:22, 171:3, 171:6, 171:7, 172:20, 173:6
**lawyer** [12] - 4:13, 4:18, 4:19, 20:8, 24:2, 31:16, 31:19, 43:23, 52:3, 52:6, 119:12
**lawyer's** [1] - 4:12
**lawyers** [11] - 4:6, 8:8, 8:10, 8:21, 12:11, 12:13, 12:22, 44:24, 52:3, 117:2, 175:9
**lawyers'** [2] - 4:5, 4:10
**lay** [1] - 116:7
**layout** [2] - 114:25, 145:15
**LAZARO** [1] - 1:17
**LEA** [1] - 1:13
**lead** [4] - 10:11, 36:8, 42:9, 115:25
**lease** [85] - 17:21, 17:24, 17:25, 18:1, 18:2, 18:17, 19:2, 26:23, 30:11, 30:13, 34:18, 36:18, 37:18, 40:2, 40:3, 40:8, 40:11, 40:15, 74:7, 76:20, 80:13, 80:19, 95:22, 96:11, 97:6, 121:23, 122:3, 124:21, 125:4, 125:12, 125:15, 125:21, 125:22, 125:23, 126:7, 126:11, 126:14, 126:15, 126:17, 126:21, 133:8, 133:13, 133:20, 133:21, 134:22, 135:2, 135:6, 135:8, 135:25, 136:12, 136:13, 136:17, 136:18, 137:5, 137:8, 137:11, 157:25, 158:2, 158:5, 158:14, 162:22, 163:5,

163:6, 163:8, 163:19, 164:2, 164:22, 165:25, 166:2, 166:4, 166:20, 166:21, 166:23, 166:24, 167:1, 167:4, 167:7, 167:11, 167:24, 168:1, 168:6, 168:7, 168:9, 169:25, 170:14
**leased** [2] - 17:23, 18:16
**least** [7] - 20:19, 20:22, 123:6, 130:3, 164:5, 175:6, 176:21
**leave** [4] - 12:1, 12:2, 12:4, 117:1
**leaving** [1] - 104:7
**led** [1] - 176:23
**LEE** [1] - 1:14
**left** [7] - 43:25, 68:2, 69:7, 85:3, 145:20, 154:16, 154:17
**left-hand** [4] - 68:2, 69:7, 154:16, 154:17
**legal** [3] - 25:8, 44:24, 47:10
**leisure** [1] - 173:13
**lend** [2] - 97:22, 97:25
**lender** [6] - 167:7, 167:14, 168:2, 168:3, 168:11, 168:13
**lenders** [1] - 167:11
**lending** [1] - 98:20
**length** [1] - 130:22
**lengthier** [1] - 13:12
**lent** [3] - 97:24, 98:22, 98:23
**less** [1] - 19:13
**lessees** [1] - 163:12
**letter** [5] - 21:16, 27:3, 27:4, 41:23
**letters** [3] - 27:4, 27:7, 42:10
**liability** [4] - 28:17, 63:21, 63:25, 80:9
**liable** [1] - 27:21
**lie** [2] - 82:2, 111:12
**lien** [1] - 49:9
**lies** [1] - 32:11
**life** [7] - 33:10, 42:14, 42:17, 42:21, 43:2, 43:9, 44:10
**light** [2] - 5:20, 7:9
**likely** [3] - 3:22, 7:10, 7:21
**limine** [3] - 48:2, 48:3, 52:13
**limited** [4] - 5:7, 63:21, 63:25, 80:9
**Lincoln** [1] - 1:15
**Line** [2] - 154:17, 155:21
**line** [15] - 17:16, 24:24, 25:5, 25:7, 25:14, 73:20, 121:1, 122:2, 123:6, 154:5, 154:16, 162:14, 162:15, 163:3
**lines** [5] - 24:23, 140:20, 150:2, 155:11, 155:23
**list** [5] - 10:17, 57:18, 59:22, 175:21
**listed** [5] - 60:5, 74:15, 74:19, 87:19, 103:7
**listen** [1] - 3:9
**listening** [1] - 11:25
**lists** [1] - 20:2
**live** [3] - 150:11, 150:13, 150:15
**lived** [7] - 62:21, 90:11, 150:6, 150:15, 150:18, 150:25, 151:2
**lives** [1] - 40:22
**Living** [1] - 148:19
**living** [7] - 40:18, 151:1, 151:3, 151:4, 151:8, 151:9, 165:21
**LLC** [17] - 1:3, 6:4, 15:13, 28:7, 65:10, 65:14, 66:16, 67:19, 68:16, 68:22, 69:2, 72:3, 74:20, 78:4, 78:8, 79:11, 80:1
**loan** [70] - 21:1, 27:1, 27:5, 27:15, 30:10, 30:11, 30:12, 36:5, 38:7, 38:10, 38:15, 38:23, 38:24, 39:1, 42:17, 42:19, 49:14, 49:18, 49:24, 49:25, 50:12, 102:20, 102:23, 124:5, 124:10, 146:16, 146:18, 159:23, 160:1, 160:4, 160:11, 160:16, 160:20, 160:23, 161:3, 161:6, 161:11, 161:16, 162:24, 163:9, 165:1, 165:2, 168:16, 168:17, 168:20, 168:21, 168:23, 168:25, 169:1, 169:2, 169:19, 171:10, 171:11, 171:13, 171:15, 171:17, 171:19, 171:22, 171:24, 171:25, 172:2, 172:6, 172:9, 172:10, 172:14, 173:7
**loaned** [1] - 99:16
**loans** [1] - 167:8
**loath** [1] - 47:13
**located** [5] - 65:16, 74:8, 78:18, 79:5, 115:1
**location** [9] - 68:16, 68:19, 73:14, 73:18, 79:3, 79:15, 79:22, 80:5, 85:5
**LOI** [1] - 156:17
**look** [28] - 8:21, 20:16, 26:7, 67:22, 68:15, 68:21, 72:1, 72:11, 73:6, 73:20, 78:13, 80:25, 103:5, 105:6, 106:8, 106:12, 131:2, 134:7, 136:16, 136:24, 138:7, 158:12, 162:14, 163:20, 164:3, 164:9, 167:22, 174:16
**looking** [5] - 17:11, 74:15, 78:25, 109:11, 129:20
**looks** [3] - 70:4, 84:12, 116:21
**lose** [6] - 19:3, 35:4, 55:16, 124:23, 174:11, 174:24
**loses** [3] - 39:7, 125:7, 126:24
**losses** [2] - 26:21, 29:6
**lost** [8] - 26:14, 29:4, 35:3, 54:25, 120:14, 125:17, 128:23, 129:16
**loud** [3] - 9:13, 140:21, 140:22
**loudly** [2] - 57:2, 119:9
**love** [1] - 81:17
**lunch** [11] - 44:18, 44:20, 45:7, 45:14, 174:1, 174:2, 174:8, 174:25, 178:15, 179:5
**Lunch** [1] - 46:13
**luxury** [1] - 62:21

## M

**ma'am** [8] - 59:8, 65:19, 72:25, 108:16, 115:24, 116:7, 118:3, 178:23
**MACKIEWICZ** [92] - 1:13, 14:11, 14:20, 14:24, 45:17, 46:2, 46:6, 46:10, 46:18, 46:24, 47:1, 47:7, 53:7, 53:12, 57:14, 57:19, 59:7, 59:10, 59:12, 59:21, 59:23, 60:6, 61:3, 63:18, 64:11, 64:23, 65:1, 65:20, 65:22, 66:8, 66:13, 66:18, 66:22, 67:12, 67:14, 67:17, 68:7, 68:9, 68:11, 69:20, 69:22, 70:11, 70:24, 71:4, 71:9, 71:13, 71:16, 71:19, 71:23, 71:25, 72:23, 73:1, 73:2, 74:1, 74:4, 74:6, 75:3, 75:6, 75:17, 75:22, 76:1, 76:12, 76:21, 77:2, 77:9, 77:11, 77:13, 77:16, 77:18, 77:23, 78:3, 81:8, 83:23, 84:1, 95:24, 96:2, 96:8, 96:14, 99:22, 100:13, 104:22, 107:10, 111:8, 112:5, 113:20, 114:22, 114:24, 115:15, 116:1, 116:10, 116:17, 170:25
**madam** [1] - 88:23
**Madam** [1] - 112:15
**mail** [34] - 41:23, 64:21, 74:24, 75:12, 76:7, 86:9, 86:13, 86:17, 86:24, 87:5, 87:7, 88:12, 89:1, 89:3, 89:11, 89:21, 89:22, 90:1, 90:6, 95:2, 95:8, 115:8, 115:9, 115:21, 116:2, 116:4, 116:11, 132:4, 132:9, 132:12, 136:5, 137:10, 137:14
**mailed** [1] - 136:5
**mailing** [2] - 78:14, 91:5
**mailman** [3] - 86:12, 86:16
**mailmen** [1] - 86:16
**main** [1] - 33:15
**maintain** [7] - 42:1, 66:4, 66:14, 70:5, 72:20, 75:18, 163:17
**maintained** [1] - 70:25
**maintains** [3] - 142:9, 142:11, 142:17
**maker** [2] - 142:23, 142:25
**man** [1] - 34:2
**manage** [3] - 34:19, 39:16, 40:13
**managed** [1] - 18:21
**management** [1] - 158:14
**manager** [10] - 37:20, 39:15, 41:7, 41:25, 65:14, 131:23, 158:16, 158:17, 158:18, 171:23
**managing** [4] - 39:21, 40:15, 40:24, 69:1
**manner** [2] - 5:16, 47:23
**Manny** [1] - 33:5
**MANUEL** [1] - 1:17
**March** [1] - 80:5
**Marcus** [2] - 32:23, 33:4
**MARCUS** [1] - 1:17
**Mark** [1] - 151:9
**marked** [2] - 65:2, 69:23
**market** [1] - 16:23
**marshal** [2] - 8:14, 8:20
**Martinez** [2] - 177:7, 177:11
**masse.................. Page** [1] - 2:6
**match** [2] - 23:8, 156:18
**material** [3] - 31:5, 171:13, 171:16
**math** [2] - 43:18, 43:24
**matter** [3] - 47:10, 178:8, 179:11
**mattered** [1] - 29:9
**matters** [3] - 18:16, 19:7
**matured** [1] - 172:22
**mean** [20] - 8:7, 13:3, 13:17, 18:23, 52:24, 53:1, 55:15, 57:5, 85:25, 94:20, 97:11, 98:18, 101:5, 105:23, 107:6,

111:7, 116:8, 132:15, 153:17, 158:24
**Meaning** [1] - 147:17
**means** [11] - 5:6, 7:9, 10:14, 10:22, 17:2, 43:15, 98:19, 106:4, 137:10, 160:1, 177:19
**meant** [3] - 12:13, 135:20, 136:18
**mechanism** [1] - 25:8
**media** [2] - 10:16, 10:24
**meet** [5] - 37:10, 39:17, 41:2, 123:22, 124:6
**meeting** [3] - 28:10, 28:11, 37:21
**meetings** [1] - 142:7
**meets** [5] - 21:21, 21:24, 30:20, 127:3, 154:4
**MELISSA** [1] - 1:13
**member** [1] - 69:1
**members** [1] - 3:5
**memorandum** [3] - 49:21, 153:13, 159:1
**memory** [4] - 5:16, 12:6, 12:7, 111:14
**mention** [1] - 166:20
**mentioned** [5] - 10:22, 22:7, 55:6, 63:20, 176:20
**Merry** [1] - 30:4
**message** [1] - 21:16
**messages** [1] - 10:15
**met** [6] - 6:16, 7:14, 16:6, 127:24, 163:7, 164:6
**Miami** [64] - 1:3, 1:16, 1:19, 1:24, 1:24, 6:8, 15:22, 16:23, 21:9, 25:12, 33:22, 34:8, 35:10, 40:18, 61:6, 62:9, 62:12, 62:20, 68:18, 68:24, 72:4, 73:4, 74:17, 74:21, 78:15, 78:24, 79:12, 79:19, 80:2, 80:17, 81:2, 83:2, 85:17, 88:6, 88:8, 89:24, 90:1, 90:8, 90:10, 90:16, 91:5, 91:9, 92:6, 93:4, 93:7, 93:11, 93:13, 93:16, 93:20, 94:3, 94:8, 94:10, 97:9, 143:14, 143:17, 143:22, 148:8, 150:14, 151:4, 176:25, 177:23, 178:11, 179:16, 179:17
**mic** [2] - 32:25, 33:1
**microphone** [2] - 53:16, 56:22
**microphones** [2] - 46:17, 53:15
**middle** [2] - 175:8, 175:12
**might** [22] - 4:7, 4:13, 4:22, 5:2, 5:3, 8:23, 8:24, 9:10, 9:21, 11:23, 19:3, 19:13, 19:25, 20:12, 20:13, 63:14, 82:25, 90:19, 108:8, 108:11, 114:12, 169:17
**million** [55] - 15:22, 17:9, 22:15, 22:16, 23:17, 24:24, 25:1, 25:2, 25:4, 25:7, 25:11, 25:12, 25:13, 25:16, 25:19, 25:20, 25:21, 26:8, 26:9, 26:16, 27:1, 27:22, 28:19, 28:21, 28:25, 29:15, 30:6, 30:16, 30:17, 35:20, 36:5, 36:6, 42:25, 43:12, 43:21, 43:25, 44:2, 55:21, 56:5, 56:9, 63:5, 120:8, 120:12, 127:11, 127:14, 130:6, 134:13, 138:22, 139:22, 143:19, 146:15, 155:1, 155:8, 161:20, 162:6
**million-dollar** [2] - 25:19, 27:1
**mind** [7] - 9:23, 10:9, 50:5, 50:14, 50:19, 111:16, 128:23
**minded** [1] - 9:20
**minimum** [4] - 43:20, 55:10, 55:14, 56:10
**minute** [7] - 15:8, 51:24, 53:8, 63:16, 105:5, 112:9
**minutes** [6] - 44:19, 44:23, 104:3, 104:4, 104:16, 173:19
**Mirmelli** [87] - 15:14, 20:6, 27:24, 31:16, 31:20, 33:18, 33:19, 33:21, 34:13, 34:24, 35:5, 37:7, 37:8, 37:14, 37:24, 38:4, 38:10, 38:12, 38:14, 38:19, 38:22, 39:1, 39:2, 39:6, 39:21, 41:16, 41:21, 43:3, 48:18, 52:11, 60:7, 60:24, 61:4, 61:25, 62:3, 62:25, 63:20, 63:24, 64:14, 65:2, 65:14, 66:15, 67:18, 68:23, 69:3, 69:23, 72:1, 72:20, 73:3, 73:24, 74:7, 74:24, 75:7, 76:2, 77:3, 78:4, 78:17, 78:22, 79:12, 79:19, 80:2, 81:2, 82:17, 83:1, 83:2, 84:13, 84:22, 87:12, 98:16, 99:12, 100:25, 101:19, 101:20, 105:20, 109:6, 109:7, 114:25, 127:22, 131:23, 132:9, 133:4, 146:7, 152:18, 160:16, 160:19, 161:10, 161:15
**MIRMELLI** [1] - 2:1
**Mirmelli's** [18] - 36:15, 38:3, 39:4, 40:20, 52:12, 52:20, 62:6, 64:3, 64:7, 64:20, 65:13, 66:4, 67:11, 69:5, 74:25, 75:13, 83:4, 160:8
**misdelivered** [1] - 86:18
**modify** [2] - 8:23, 8:24
**Moises** [2] - 24:3, 31:19
**Mojave** [2] - 143:12, 152:4
**moment** [11] - 57:17, 83:9, 84:14, 98:3, 131:2, 134:25, 136:10, 155:23, 155:24, 162:11, 170:20
**Monday** [2] - 176:24, 177:21
**money** [114] - 7:5, 17:7, 19:15, 20:13, 20:15, 20:22, 21:1, 21:7, 21:13, 22:11, 23:2, 24:22, 25:9, 25:10, 25:23, 26:15, 28:15, 29:4, 29:9, 30:18, 31:4, 31:6, 32:12, 33:11, 35:8, 36:21, 36:22, 36:23, 37:3, 38:6, 38:9, 38:13, 38:19, 42:10, 42:11, 42:22, 43:10, 43:25, 44:4, 44:11, 52:18, 55:1, 55:19, 97:22, 97:24, 98:16, 98:20, 98:22, 98:23, 99:6, 99:7, 99:16, 101:14, 101:16, 102:19, 102:22, 102:24, 102:25, 103:1, 103:9, 103:16, 105:20, 105:24, 106:4, 106:7, 106:10, 106:14, 106:21, 107:3, 107:5, 107:21, 107:23, 109:19, 109:20, 110:1, 110:15, 110:20, 111:19, 112:22, 114:5, 114:6, 114:9, 120:15, 123:1, 123:2, 123:24, 124:5, 124:17, 128:9, 128:23, 129:16, 129:19, 133:19, 134:5, 141:10, 144:13, 146:19, 147:3, 147:6, 151:14, 154:6, 154:12, 154:25, 155:18, 155:19, 157:8, 157:9, 165:13, 170:7
**moneys** [4] - 20:19, 21:23, 123:7, 141:1
**month** [5] - 36:20, 37:1, 37:22, 37:23, 39:10
**Moore** [4] - 177:10, 177:12, 177:16
**mooted** [1] - 177:14
**morning** [9] - 12:9, 15:1, 15:12, 32:22, 33:3, 47:6, 174:7, 174:17, 176:15
**mortgage** [17] - 17:9, 25:3, 28:4, 35:23, 36:5, 36:25, 41:4, 41:11, 147:9, 159:20, 161:20, 162:5, 162:6, 162:7, 162:20, 164:23
**mortgages** [1] - 22:4
**mortgagor** [4] - 162:17, 162:25, 163:11, 163:16
**mortgagor's** [1] - 163:16
**most** [2] - 57:8, 64:2
**mostly** [1] - 61:19
**motion** [5] - 48:2, 48:3, 52:13, 177:13, 177:16
**move** [17] - 70:11, 76:2, 77:19, 78:21, 87:16, 87:18, 88:10, 89:23, 90:8, 90:10, 90:16, 91:25, 92:9, 95:18, 176:13, 177:5, 177:23
**moved** [8] - 76:4, 87:13, 87:20, 88:5, 88:8, 89:23, 176:13, 178:11
**moving** [1] - 178:22
**MR** [218] - 14:1, 14:7, 15:1, 15:4, 15:7, 15:12, 16:13, 32:15, 32:20, 32:22, 33:1, 33:3, 45:13, 46:12, 47:9, 47:13, 48:3, 48:11, 48:15, 49:5, 49:18, 50:2, 50:10, 50:12, 50:17, 51:8, 51:20, 51:22, 52:9, 52:17, 52:25, 53:4, 53:19, 53:22, 53:23, 54:2, 54:14, 54:16, 54:18, 54:25, 55:10, 55:20, 56:2, 56:4, 56:13, 56:19, 56:23, 56:25, 57:3, 57:8, 59:6, 59:20, 59:22, 60:1, 60:12, 64:9, 66:10, 66:20, 70:15, 70:17, 70:18, 70:20, 71:21, 71:24, 72:21, 75:15, 75:24, 76:10, 76:15, 76:25, 77:7, 77:15, 77:20, 81:10, 81:12, 82:6, 82:9, 82:10, 82:11, 82:16, 83:9, 83:12, 83:16, 83:19, 84:6, 84:8, 84:9, 84:14, 84:16, 84:17, 84:18, 84:19, 85:10, 85:14, 88:20, 88:23, 89:6, 90:21, 90:24, 91:16, 91:21, 91:25, 92:2, 95:19, 95:25, 96:4, 96:7, 96:10, 96:13, 96:16, 96:20, 96:23, 96:25, 97:1, 97:3, 97:4, 98:3, 98:7, 98:10, 98:13, 98:14, 99:19, 99:23, 100:1, 100:8, 100:10, 100:16,

100:19, 103:25, 104:4, 104:12, 104:15, 104:21, 105:8, 105:10, 105:16, 105:18, 105:19, 107:14, 108:12, 108:16, 108:18, 108:20, 108:22, 108:24, 111:10, 112:15, 113:4, 114:7, 114:19, 115:11, 115:23, 116:6, 117:8, 117:10, 117:12, 117:16, 117:18, 117:22, 117:24, 118:3, 118:15, 118:18, 118:21, 118:23, 125:24, 126:3, 126:13, 126:20, 129:11, 130:16, 130:18, 133:9, 133:12, 134:21, 134:23, 134:24, 135:1, 141:12, 141:14, 141:24, 142:1, 142:3, 143:7, 143:9, 146:10, 146:11, 148:2, 149:17, 149:22, 149:25, 150:5, 153:1, 153:3, 153:5, 162:11, 162:13, 164:11, 164:12, 164:13, 170:23, 171:1, 171:2, 173:12, 173:17, 173:20, 175:1, 175:16, 175:19, 176:9, 176:17, 176:19, 177:6, 177:9, 178:13, 178:19, 179:3, 179:4

**MS** [91] - 14:11, 14:20, 14:24, 45:17, 46:2, 46:6, 46:10, 46:18, 46:24, 47:1, 47:7, 53:7, 53:12, 57:14, 57:19, 59:7, 59:10, 59:12, 59:21, 59:23, 60:6, 61:3, 63:18, 64:11, 64:23, 65:1, 65:20, 65:22, 66:8, 66:13, 66:18, 66:22, 67:12, 67:14, 67:17, 68:7, 68:9, 68:11, 69:20, 69:22, 70:11, 70:24, 71:4, 71:9, 71:13, 71:16, 71:19, 71:23, 71:25, 72:23, 73:1, 73:2, 74:1, 74:4, 74:6, 75:3, 75:6, 75:17, 75:22, 76:1, 76:12, 76:21, 77:2, 77:9, 77:11, 77:13, 77:16, 77:18, 77:23, 78:3, 81:8, 83:23, 84:1, 95:24, 96:2, 96:8, 96:14, 99:22, 100:13, 104:22, 107:10, 111:8, 112:5, 113:20, 114:22, 114:24, 115:15, 116:1, 116:10, 116:17, 170:25

**multiple** [1] - 52:3

**multiply** [1] - 56:10

**must** [11] - 3:11, 3:13, 4:4, 5:1, 7:15, 8:1, 9:22, 10:4, 10:21, 13:21

**mutual** [1] - 148:17

## N

**name** [12] - 15:1, 15:12, 32:23, 33:4, 60:23, 65:11, 68:21, 70:8, 79:18, 80:1, 118:12, 118:25

**named** [3] - 18:14, 24:3, 34:10

**Nathan** [32] - 18:14, 18:15, 18:18, 21:10, 21:12, 30:13, 30:14, 34:10, 34:12, 34:15, 34:17, 34:19, 34:20, 36:3, 37:20, 37:22, 39:12, 39:13, 39:15, 39:20, 40:2, 40:9, 40:22, 40:25, 41:6, 41:24, 41:25, 70:1, 165:22, 166:6, 169:19

**nature** [1] - 168:2

**necessary** [1] - 36:22

**need** [20] - 3:5, 10:9, 20:12, 20:13, 36:22, 37:2, 37:3, 45:2, 45:22, 48:8, 55:22, 84:14, 104:8, 105:3, 110:13, 123:18, 141:6, 172:13, 177:9, 178:12

**needed** [7] - 37:13, 106:15, 134:6, 144:10, 144:11, 144:13

**needing** [2] - 38:9

**needs** [4] - 38:6, 38:7, 38:18, 104:9

**negotiate** [2] - 28:12, 64:4

**negotiating** [1] - 160:10

**negotiations** [1] - 28:13

**nervous** [1] - 38:6

**net** [4] - 16:18, 17:12, 72:16, 121:2

**neutral** [1] - 9:20

**never** [30] - 10:18, 22:18, 24:3, 24:10, 30:9, 30:10, 47:20, 48:5, 48:24, 49:1, 114:8, 127:24, 127:25, 134:19, 137:11, 138:23, 167:6, 168:6, 168:8, 168:9, 168:11, 168:13, 170:5, 170:10, 170:14, 170:16, 178:5

**new** [20] - 10:18, 18:20, 30:14, 37:12, 76:3, 79:3, 158:17, 160:13, 169:2, 171:10, 171:11, 171:13, 171:15, 171:17, 171:19, 171:21, 171:23, 171:25, 172:2

**next** [27] - 17:16, 19:6, 53:9, 68:25, 79:17, 79:25, 89:23, 91:25, 92:25, 93:3, 93:5, 93:9, 93:12, 93:14, 93:18, 93:21, 112:13, 116:18, 117:7, 123:6, 125:25, 158:8, 173:10, 176:6, 177:2, 177:4, 178:20

**NIELSEN** [1] - 1:17

**NIELSON** [26] - 32:15, 32:22, 33:1, 33:3, 45:13, 46:12, 50:2, 50:10, 50:12, 51:22, 52:9, 52:17, 52:25, 53:4, 59:20, 59:22, 60:1, 60:12, 70:17, 84:17, 104:15, 118:18, 133:9, 141:24, 142:1, 143:7

**Nielson** [4] - 32:23, 33:4, 48:21, 176:10

**Nielson's** [1] - 47:13

**night** [2] - 45:11, 46:23

**nip** [1] - 55:4

**NO** [1] - 1:2

**no's** [1] - 116:22

**nobody** [1] - 43:7

**nobody's** [1] - 23:22

**none** [3] - 5:12, 52:23, 54:6

**nonpayment** [1] - 126:5

**nonrefundable** [1] - 106:5

**normal** [3] - 14:22, 20:19, 123:7

**normally** [3] - 85:21, 117:12, 117:18

**North** [2] - 1:24, 179:16

**north** [1] - 115:5

**note** [28] - 8:13, 11:25, 27:2, 27:3, 28:5, 28:6, 38:12, 41:17, 42:14, 42:18, 42:19, 51:6, 59:22, 161:19, 161:21, 161:23, 161:25, 162:2, 164:19, 164:23, 164:24, 168:18, 168:19, 168:24, 169:1, 171:9, 172:22, 172:23

**note-taking** [1] - 11:25

**notebook** [2] - 12:3, 12:4

**notes** [8] - 11:19, 11:20, 11:21, 11:22, 11:23, 12:2, 12:5, 12:6

**nothing** [10] - 10:15, 19:13, 29:9, 50:15, 54:5, 104:12, 104:15, 152:7, 175:16

**notice** [82] - 19:2, 19:7, 19:9, 19:17, 19:18, 19:19, 19:20, 19:23, 20:3, 20:21, 20:25, 21:4, 21:6, 21:8, 21:15, 21:17, 23:7, 27:8, 27:24, 31:17, 41:20, 42:3, 42:9, 42:12, 49:18, 71:5, 75:12, 77:5, 80:19, 81:5, 82:19, 82:21, 97:2, 123:16, 124:3, 124:9, 124:23, 125:6, 125:10, 125:13, 125:16, 126:5, 126:23, 130:25, 131:3, 131:5, 131:10, 131:11, 131:17, 132:3, 132:8, 132:25, 134:7, 134:22, 134:24, 136:1, 136:14, 136:16, 136:24, 137:7, 137:9, 137:11, 137:17, 137:19, 157:2, 158:15, 168:2, 168:3, 169:8, 169:15, 169:16, 169:17, 169:22, 171:19, 171:21, 172:1, 172:2, 173:3, 173:7

**noticed** [4] - 20:18, 28:11, 123:6, 124:16

**notices** [16] - 74:19, 80:15, 80:25, 82:15, 82:19, 86:24, 94:25, 95:15, 97:2, 97:5, 131:18, 131:20, 132:12, 134:15, 134:16, 137:5

**notify** [2] - 22:14, 95:9

**notwithstanding** [1] - 167:24

**November** [3] - 75:20, 78:12, 79:4

**number** [14] - 36:23, 51:14, 62:21, 69:9, 69:12, 69:13, 70:8, 92:19, 95:24, 96:6, 127:9, 177:4, 178:7

**numbers** [3] - 85:4, 85:6, 86:2

**numerous** [1] - 133:5

## O

**o'clock** [4] - 176:25, 178:13, 178:14, 178:15

**oath** [1] - 24:14

**object** [4] - 4:19, 47:13, 51:15, 54:9

**objecting** [1] - 53:24

**objection** [58] - 4:21, 4:23, 4:24, 5:1, 32:19, 32:20, 45:12, 45:20, 46:23, 51:4, 51:11, 51:12, 51:13, 51:16, 51:17, 59:19, 59:22, 59:25, 60:9, 60:11, 60:12, 64:9, 66:10, 66:11, 66:20, 70:13, 70:17, 70:19, 72:21, 75:15, 75:24, 76:10, 76:15, 76:25,

77:7, 77:20, 83:22, 83:25, 84:2, 84:3, 95:23, 96:1, 100:11, 107:10, 111:8, 112:5, 112:10, 112:13, 113:20, 115:11, 115:23, 116:6, 118:18, 118:19, 133:9, 141:24, 143:7
**objections** [6] - 4:10, 51:12, 51:18, 54:8, 117:19, 118:1
**obligation** [4] - 113:10, 113:12, 113:14, 162:2
**obligations** [11] - 7:1, 36:9, 37:11, 37:21, 38:9, 39:18, 41:2, 44:8, 120:22, 168:19, 168:21
**observed** [1] - 163:19
**observing** [1] - 12:1
**obtain** [1] - 35:22
**obvious** [1] - 97:11
**obviously** [5] - 10:15, 48:12, 52:4, 89:16, 175:3
**occupied** [1] - 67:1
**occur** [2] - 162:18, 164:7
**occurred** [1] - 89:20
**October** [2] - 27:20, 149:12
**OF** [2] - 1:1, 1:25
**offer** [17] - 14:12, 23:6, 23:7, 23:8, 23:19, 44:6, 45:19, 47:1, 57:19, 60:10, 65:20, 66:18, 156:16, 156:23, 157:1, 157:2, 158:15
**offered** [3] - 83:24, 84:1, 84:3
**offering** [1] - 45:18
**offers** [2] - 66:8, 75:22
**office** [35] - 10:3, 42:1, 42:2, 68:19, 72:9, 73:18, 74:22, 74:25, 75:9, 75:14, 76:2, 76:8, 76:13, 76:14, 78:18, 79:3, 79:15, 79:22, 80:5, 80:20, 81:6, 87:20, 87:23, 89:2, 90:3, 90:12, 90:16, 92:3, 92:9, 92:22, 92:25, 115:1, 115:4, 163:23
**OFFICER** [1] - 45:10
**offices** [4] - 87:21, 114:25, 115:7, 115:22
**Official** [2] - 1:22, 179:15
**official** [2] - 91:22, 93:19
**often** [2] - 11:13, 148:24
**once** [6] - 13:8, 13:23, 34:14, 132:2, 135:2, 159:7
**one** [99] - 7:12, 8:13, 8:18, 11:17, 13:20, 13:21, 15:4, 15:5, 15:7, 18:4, 18:13, 27:6, 29:16, 29:25, 33:17, 34:5, 36:10, 36:16, 37:6, 40:4, 44:12, 49:18, 51:14, 51:22, 52:1, 52:3, 52:6, 52:22, 52:24, 53:8, 55:15, 56:23, 57:17, 63:4, 65:21, 66:2, 67:3, 69:7, 71:17, 83:17, 83:19, 86:18, 87:22, 91:17, 92:18, 99:4, 99:16, 100:9, 101:13, 106:19, 111:19, 115:7, 115:20, 117:10, 117:12, 123:15, 126:9, 129:22, 130:3, 130:4, 132:5, 132:20, 135:22, 136:25, 138:16, 140:9, 143:24, 144:7, 144:9, 144:12, 144:14, 144:18, 144:21, 145:5, 148:15, 151:20, 152:7, 155:18, 156:23, 162:15, 166:7, 166:8, 166:11, 166:14, 166:17, 170:20, 174:7, 175:3, 176:13, 177:10, 177:12
**One** [1] - 150:17
**ones** [2] - 45:25, 141:19
**ongoing** [1] - 29:22
**online** [1] - 11:3
**open** [4] - 9:20, 9:23, 10:9, 52:16
**open-minded** [1] - 9:20
**opened** [1] - 52:11
**opening** [17] - 4:6, 12:10, 12:11, 12:13, 14:2, 14:3, 14:6, 14:14, 14:17, 14:25, 16:2, 47:14, 48:7, 52:9, 55:2, 55:6, 74:15
**operate** [4] - 21:12, 157:25, 165:3, 165:22
**operated** [2] - 33:25, 166:8
**operating** [12] - 18:18, 18:22, 26:25, 30:8, 30:14, 165:6, 165:16, 165:19, 165:21, 166:11, 166:17, 166:18
**operation** [4] - 40:19, 64:18, 123:8, 157:23
**operations** [10] - 18:8, 18:19, 36:11, 40:14, 157:6, 157:10, 157:12, 157:15, 166:23, 166:25
**operator** [8] - 17:18, 17:22, 18:10, 18:12, 18:13, 18:20, 64:17, 165:9
**opinion** [3] - 3:16, 9:21, 177:14
**opportunity** [5] - 5:14, 28:12, 28:14, 34:11, 156:17
**opposed** [2] - 113:19, 177:24
**opposing** [1] - 4:19
**opposite** [1] - 28:2
**oral** [2] - 131:24
**orally** [2] - 131:21, 133:3
**order** [4] - 20:22, 23:23, 55:17, 160:3
**ordinary** [4] - 65:24, 66:6, 70:6, 75:18
**organization** [3] - 67:19, 68:13, 68:15
**original** [5] - 101:8, 102:16, 106:22, 110:5, 110:8
**originally** [2] - 85:1, 115:4
**otherwise** [4] - 7:18, 49:8, 174:10, 176:4
**outcome** [1] - 5:17
**outside** [6] - 3:18, 11:13, 37:3, 47:10, 104:21, 104:22
**outstanding** [1] - 22:5
**overnight** [3] - 136:4, 137:14, 175:4
**overrule** [2] - 4:21, 51:18
**overruled** [11] - 76:17, 107:11, 111:9, 112:7, 112:13, 113:21, 115:13, 133:10, 142:2, 143:8
**oversee** [1] - 64:17
**overview** [1] - 16:3
**owe** [4] - 19:15, 101:19, 101:22, 134:12
**owed** [5] - 43:12, 43:19, 43:25, 44:1, 55:25
**owes** [2] - 39:3, 39:24
**owing** [2] - 27:10, 56:10
**own** [18] - 8:8, 12:6, 17:4, 18:12, 29:5, 30:11, 40:10, 61:11, 61:14, 92:21, 92:22, 143:22, 144:1, 146:22, 150:13, 156:9, 156:21, 165:11
**owned** [17] - 15:16, 16:21, 33:18, 34:25, 61:11, 62:16, 62:17, 62:22, 63:21, 129:18, 143:23, 143:25, 147:20, 147:22, 147:25, 156:24, 159:18
**owner** [11] - 37:7, 38:4, 38:5, 157:24, 158:13, 160:21, 160:22, 161:9, 163:24, 165:6, 172:11
**ownership** [6] - 122:22, 157:4, 157:5, 157:12, 157:13, 167:2
**owning** [2] - 165:4, 165:13
**owns** [7] - 142:4, 143:2, 143:5, 143:10, 143:14, 143:17, 143:24

**P**

**P.A** [1] - 84:13
**p.m** [12] - 1:5, 45:8, 46:13, 46:14, 57:11, 104:5, 104:17, 104:18, 105:13, 140:19, 174:18, 179:7
**PA** [1] - 91:18
**package** [1] - 165:1
**pad** [1] - 11:20
**pads** [1] - 8:13
**page** [46] - 18:25, 19:22, 20:11, 23:14, 23:20, 26:2, 27:21, 28:20, 65:18, 67:19, 68:1, 68:2, 68:4, 68:25, 69:4, 69:8, 69:14, 69:25, 71:14, 71:23, 74:18, 78:7, 78:13, 78:21, 79:6, 79:10, 79:17, 79:25, 80:15, 121:22, 125:25, 135:10, 135:13, 136:1, 140:17, 140:19, 149:12, 150:2, 158:9, 158:11, 162:9, 164:14, 164:15
**pages** [1] - 8:13
**Pages** [1] - 1:7
**paid** [11] - 27:12, 28:19, 28:22, 39:2, 41:5, 43:16, 128:25, 133:19, 141:2, 141:8, 173:2
**paper** [3] - 11:21, 71:17, 165:2
**paragraph** [5] - 22:3, 28:21, 72:1, 72:3, 131:2
**paragraphs** [1] - 74:15
**PARDO** [67] - 1:13, 14:1, 14:7, 15:1, 15:4, 15:7, 15:12, 16:13, 32:20, 47:9, 47:13, 48:3, 48:11, 48:15, 49:5, 49:18, 50:17, 51:8, 51:20, 53:22, 55:10, 82:10, 104:12, 104:21, 117:8, 118:15, 118:21, 118:23, 125:24, 126:3, 126:13, 126:20, 129:11, 130:16, 130:18, 133:12, 134:21, 134:24, 135:1, 141:12, 141:14, 142:3, 143:9, 146:10, 146:11, 148:2, 149:17, 149:22, 149:25, 150:5, 153:1, 153:3, 153:5, 162:11, 162:13, 164:12, 164:13,

170:23, 171:1, 171:2, 173:12, 173:17, 173:20, 175:1, 175:16, 176:17, 179:3
**Pardo** [4] - 1:14, 15:1, 15:12, 53:21
**pardon** [10] - 83:7, 127:17, 134:9, 135:7, 139:5, 141:5, 141:21, 148:22, 150:12, 168:12
**parenthetical** [2] - 125:11, 126:22
**Park** [1] - 148:5
**Parker** [1] - 1:18
**parking** [25] - 17:23, 18:8, 19:14, 33:13, 33:21, 34:19, 35:9, 36:19, 37:20, 40:23, 40:24, 62:12, 62:18, 97:17, 121:24, 122:3, 145:17, 146:6, 151:13, 157:9, 158:16, 165:3, 165:6, 165:9
**part** [17] - 5:12, 35:21, 49:7, 52:18, 62:23, 63:24, 70:21, 122:18, 130:2, 130:3, 130:4, 136:19, 146:19, 163:19, 165:1, 165:2, 168:1
**partially** [1] - 82:25
**participating** [1] - 28:13
**Participation** [47] - 6:3, 16:11, 16:25, 17:5, 18:3, 18:11, 18:25, 19:18, 19:23, 21:6, 21:18, 21:20, 24:4, 24:12, 27:9, 27:10, 28:1, 29:1, 29:8, 70:2, 72:2, 72:14, 80:23, 81:6, 120:18, 125:5, 126:19, 127:3, 129:25, 130:20, 133:15, 134:17, 135:3, 135:11, 135:13, 136:15, 136:23, 139:17, 141:16, 151:25, 153:18, 154:3, 160:10, 166:21, 169:22, 172:1, 172:3
**participation** [13] - 6:13, 18:9, 18:19, 18:24, 20:16, 21:17, 95:19, 121:13, 136:12, 138:15, 164:22, 167:2, 167:4
**particular** [3] - 51:3, 145:9, 168:16
**partied** [1] - 29:23
**parties** [28] - 11:4, 11:12, 14:2, 14:13, 20:2, 22:12, 34:21, 34:23, 36:7, 37:2, 50:5, 54:3, 54:20, 56:6, 57:16, 86:17, 136:20, 136:25, 144:23, 148:21, 148:23, 153:18, 153:21, 153:23, 153:25, 154:7
**parties'** [2] - 6:1, 113:6
**partner** [2] - 148:1, 151:9
**partners** [1] - 153:22
**partnership** [3] - 152:15, 152:18, 153:6
**party** [11] - 19:24, 23:24, 49:6, 52:4, 82:20, 82:21, 123:6, 131:3, 131:5, 136:7, 156:15
**passed** [2] - 95:10, 119:14
**passes** [2] - 148:8, 148:11
**past** [5] - 61:23, 63:1, 64:14, 77:3, 77:4
**Patrick** [6] - 19:8, 130:17, 146:10, 153:3, 156:12, 159:15
**pause** [11] - 15:9, 15:11, 51:25, 77:17, 83:11, 84:15, 98:6, 108:17, 122:25, 162:12, 170:22
**pay** [14] - 19:16, 27:2, 30:9, 30:15, 36:19, 36:24, 36:25, 40:4, 40:7, 41:2, 103:6, 113:8, 126:8, 172:22
**paying** [7] - 28:15, 30:15, 37:21, 37:23, 38:2, 39:9, 39:10
**payment** [15] - 28:16, 28:18, 28:22, 29:11, 29:16, 36:25, 39:13, 41:4, 41:10, 42:4, 134:13, 138:22, 170:3, 170:5
**payments** [4] - 29:7, 41:11, 56:7, 169:25
**pays** [1] - 41:10
**PDF** [3] - 121:22, 135:13, 156:1
**pen** [1] - 12:4
**pens** [1] - 11:21
**penthouse** [1] - 143:14
**people** [9] - 3:18, 10:2, 10:17, 20:2, 33:16, 63:14, 64:16, 85:3, 174:13
**per** [1] - 123:24
**percent** [33] - 15:23, 15:25, 16:18, 17:11, 17:12, 17:16, 19:4, 24:17, 26:13, 32:5, 35:13, 43:20, 44:2, 72:16, 72:20, 115:5, 121:2, 121:13, 121:14, 121:15, 122:16, 122:17, 123:24, 124:11, 124:23, 124:24, 125:7, 125:17, 126:24, 127:5, 147:7, 169:25
**percentage** [4] - 6:14, 22:7, 56:1, 134:12
**perfect** [1] - 100:11
**perform** [4] - 19:11, 37:10, 38:8, 39:23
**performance** [3] - 27:25, 38:18, 170:16
**performed** [3] - 163:4, 163:17, 163:19
**perhaps** [1] - 86:9
**period** [10] - 23:8, 34:7, 61:13, 62:10, 83:4, 106:1, 106:3, 129:18, 169:25, 174:3
**permission** [8] - 82:6, 84:6, 90:22, 95:23, 96:23, 98:3, 100:2, 118:15
**Permission** [1] - 83:13
**permit** [3] - 4:20, 162:17, 164:7
**permitting** [1] - 168:3
**person** [6] - 38:7, 38:18, 39:16, 101:9, 142:19, 166:14
**personal** [5] - 38:4, 52:10, 52:14, 164:14, 172:5
**personally** [1] - 3:20
**pertained** [1] - 89:9
**phone** [4] - 45:1, 51:10, 89:14, 131:21
**phones** [1] - 10:15
**photograph** [1] - 3:16
**phrase** [3] - 9:20, 91:7, 106:23
**phrases** [1] - 11:14
**physical** [3] - 41:23, 85:5, 146:2
**pick** [1] - 89:2
**picked** [1] - 89:14
**piece** [5] - 4:1, 5:8, 34:24, 99:2, 165:2
**pieces** [1] - 89:21
**pivot** [1] - 169:5
**place** [11] - 11:4, 25:6, 25:9, 49:2, 73:14, 78:25, 79:6, 79:10, 112:20, 114:4, 150:15
**placed** [1] - 101:1
**places** [1] - 143:3
**Plaintiff** [4] - 1:4, 60:14, 71:12, 96:17
**plaintiff** [35] - 6:4, 7:7, 7:9, 7:11, 7:14, 12:16, 12:17, 12:20, 12:25, 13:10, 13:11, 14:1, 15:13, 25:20, 32:17, 33:17, 34:13, 34:19, 36:8, 37:5, 37:8, 37:21, 38:4, 39:16, 54:21, 57:14, 66:8, 75:22, 104:9, 104:11, 104:12, 117:8, 175:1, 175:15, 175:16
**PLAINTIFF** [1] - 1:13
**plaintiff's** [8] - 41:20, 52:9, 74:4, 95:20, 95:22, 96:3, 96:5, 175:22
**Plaintiff's** [156] - 2:6, 2:7, 2:7, 16:10, 17:20, 23:13, 24:20, 25:23, 27:17, 28:2, 29:13, 29:18, 30:3, 57:19, 57:20, 57:21, 57:22, 57:23, 57:24, 57:25, 58:1, 58:2, 58:3, 58:4, 58:5, 58:6, 58:7, 58:8, 58:9, 58:10, 58:11, 58:12, 58:13, 58:14, 58:15, 58:16, 58:17, 58:18, 58:19, 58:20, 58:21, 58:22, 58:23, 58:24, 58:25, 59:1, 59:2, 59:3, 59:4, 59:5, 59:7, 59:12, 59:13, 59:14, 59:15, 59:16, 59:17, 60:5, 60:9, 65:3, 66:18, 69:14, 69:24, 70:13, 75:4, 75:22, 80:12, 80:22, 82:10, 82:12, 96:9, 96:11, 96:15, 98:8, 98:9, 99:21, 100:5, 120:17, 125:24, 134:21, 134:24, 145:12, 154:15, 155:10, 155:25, 157:17, 159:5, 161:18, 162:4, 164:9, 166:20, 167:17, 170:18, 170:23, 173:9
**plaintiffs** [9] - 13:3, 13:5, 33:12, 46:24, 57:19, 60:6, 70:11, 77:18, 176:3
**plan** [2] - 35:7, 53:24
**play** [1] - 4:8
**Plaza** [6] - 28:7, 28:14, 29:16, 134:13, 138:23, 168:22
**plenty** [1] - 137:9
**PLLC** [1] - 1:14
**plus** [4] - 39:3, 43:18, 44:2, 128:25
**podium** [1] - 31:22
**point** [12] - 14:12, 43:5, 45:23, 87:22, 90:3, 91:17, 92:20, 95:10, 114:17, 117:24, 131:16, 158:22
**pointless** [2] - 42:9, 42:12
**points** [1] - 124:13
**poorly** [1] - 39:8
**portion** [1] - 130:6
**Portofino** [1] - 143:14
**position** [3] - 6:1, 111:24, 118:17
**positive** [2] - 81:21, 81:24
**possession** [1] - 76:14
**possible** [11] - 39:17, 42:5, 85:8, 86:24, 87:2, 87:3, 98:2, 98:23, 106:3, 106:16, 106:19
**possibly** [1] - 178:22
**postage** [1] - 136:6
**postage-prepaid** [1] - 136:6
**postal** [4] - 115:8, 116:3, 116:4, 116:12
**posting** [1] - 10:23

**potential** [1] - 24:15
**practice** [3] - 61:16, 61:18, 64:4
**practicing** [1] - 63:3
**preferential** [2] - 21:25, 43:15
**preferred** [4] - 56:7, 129:21, 130:1
**prejudice** [1] - 5:18
**preliminary** [1] - 3:7
**premature** [2] - 10:10, 10:11
**premises** [1] - 167:20
**prepaid** [1] - 136:6
**prepare** [4] - 65:24, 66:1, 66:2, 66:11
**prepared** [3] - 53:2, 66:2, 68:12
**preponderance** [6] - 7:8, 7:17, 7:22, 7:25, 8:4, 31:13
**presence** [1] - 47:10
**present** [3] - 51:5, 61:5, 68:7
**presentation** [2] - 13:8, 31:21
**presented** [3] - 3:13, 11:11, 16:3
**presenting** [1] - 12:14
**presents** [1] - 4:19
**Preservation** [1] - 154:21
**president** [3] - 118:25, 119:16, 119:19
**presumptuous** [1] - 176:22
**pretty** [3] - 107:20, 166:1, 169:19
**prevent** [2] - 42:24, 48:3
**prevented** [1] - 30:12
**previous** [4] - 157:24, 158:11, 158:17, 164:15
**previously** [6] - 65:2, 66:25, 67:14, 69:23, 74:5, 101:1
**price** [9] - 24:24, 25:3, 35:13, 44:3, 113:15, 130:6, 155:1, 155:21, 155:22
**primarily** [1] - 61:20
**principal** [6] - 15:16, 17:1, 68:16, 78:25, 79:6, 79:10
**principles** [1] - 3:6
**printed** [2] - 162:10, 174:13
**printout** [1] - 84:12
**private** [1] - 62:23
**probative** [1] - 55:13
**problem** [6] - 14:17, 14:21, 129:5, 170:7, 170:9, 173:12
**procedural** [1] - 117:10
**procedure** [2] - 8:9, 175:20
**proceed** [9] - 14:25, 53:25, 57:18, 60:4, 61:1, 105:15, 105:16, 108:18, 118:20
**proceeding** [4] - 47:19, 48:13, 48:14, 48:16
**proceedings** [3] - 169:6, 169:9, 179:10
**proceeds** [12] - 15:25, 22:25, 24:8, 24:9, 32:5, 128:12, 128:16, 128:18, 128:21, 143:20, 146:18, 147:9
**process** [2] - 13:4, 49:1
**produced** [1] - 7:20
**profession** [1] - 61:7
**proffered** [1] - 55:11
**profit** [20] - 18:9, 18:19, 18:24, 20:16, 21:17, 26:11, 26:17, 39:7, 56:1, 56:3, 56:6, 56:15, 62:11, 110:18, 121:13, 136:12, 138:14, 164:22, 167:2, 167:4
**Profit** [47] - 6:2, 16:11, 16:24, 17:5, 18:3, 18:11, 18:24, 19:18, 19:22, 21:6, 21:18, 21:20, 24:3, 24:12, 27:9, 27:10, 27:25, 28:25, 29:8, 70:1, 72:2, 72:14, 80:23, 81:5, 120:17, 125:5, 126:18, 127:3, 129:25, 130:20, 133:15, 134:17, 135:3, 135:10, 135:13, 136:15, 136:23, 139:17, 141:16, 151:25, 153:18, 154:3, 160:10, 166:21, 169:22, 172:1, 172:2
**profitable** [1] - 30:17
**profits** [21] - 6:14, 6:20, 6:21, 15:23, 17:13, 21:25, 22:6, 22:19, 24:17, 26:4, 32:10, 35:14, 43:17, 55:13, 55:17, 55:18, 55:22, 72:16, 121:2, 124:25, 145:7
**project** [2] - 17:3, 136:19
**promise** [13] - 21:3, 32:9, 36:18, 36:20, 37:6, 37:7, 37:24, 39:4, 39:19, 40:13, 53:10, 60:18
**promised** [7] - 11:17, 36:10, 36:19, 37:9, 162:20, 167:14, 172:24
**promises** [6] - 33:8, 36:10, 37:10, 40:20, 41:22, 44:7
**promissory** [6] - 38:12, 41:17, 42:14, 161:19, 169:1, 171:9
**promote** [8] - 17:17, 19:4, 19:5, 121:15, 124:24, 125:7, 125:17, 126:24
**proof** [3] - 7:7, 7:8, 13:6
**proper** [1] - 92:12
**properly** [1] - 41:4
**properties** [6] - 22:12, 63:20, 64:18, 144:1, 147:20, 147:22
**property** [191] - 6:9, 6:10, 6:12, 6:14, 6:17, 6:20, 6:22, 7:6, 15:22, 16:19, 16:21, 17:4, 17:7, 17:13, 17:15, 17:22, 17:24, 18:12, 18:16, 21:22, 22:3, 22:4, 22:7, 22:11, 22:13, 22:15, 22:19, 23:2, 23:6, 23:10, 23:16, 23:17, 23:19, 24:16, 24:25, 25:3, 25:10, 26:2, 26:6, 26:8, 26:9, 26:12, 30:17, 33:12, 34:25, 35:12, 35:18, 35:23, 36:5, 36:12, 36:17, 36:19, 36:25, 37:1, 37:3, 37:19, 37:25, 38:16, 38:22, 39:16, 39:17, 39:22, 40:1, 40:13, 40:14, 40:15, 40:19, 41:3, 41:4, 41:7, 41:18, 42:15, 42:22, 42:24, 43:5, 43:9, 43:12, 48:15, 48:17, 49:13, 50:13, 54:4, 54:5, 54:20, 55:12, 55:21, 56:5, 62:9, 62:11, 62:16, 62:17, 63:22, 65:6, 65:15, 72:17, 74:8, 74:13, 97:15, 97:17, 99:3, 102:8, 102:21, 102:23, 103:2, 103:3, 103:11, 103:17, 106:1, 110:9, 120:6, 120:8, 120:10, 120:12, 120:21, 120:25, 121:3, 121:23, 122:3, 122:22, 123:9, 127:11, 127:13, 128:1, 129:18, 129:23, 130:23, 139:22, 140:25, 143:5, 143:10, 143:12, 143:20, 144:7, 145:9, 145:14, 146:3, 146:5, 146:13, 146:16, 146:22, 147:1, 147:4, 147:10, 147:25, 150:13, 152:2, 152:4, 153:11, 154:10, 155:2, 155:4, 155:5, 155:6, 155:7, 156:13, 156:16, 156:17, 156:21, 156:23, 156:24, 157:1, 157:5, 157:6, 157:14, 157:25, 158:2, 158:5, 159:8, 159:16, 159:18, 160:21, 160:22, 161:9, 161:21, 163:10, 163:11, 163:13, 163:24, 165:11, 165:13, 165:16, 165:19, 165:22, 166:25, 167:1, 167:9
**property's** [1] - 146:20
**protect** [1] - 111:12
**prove** [3] - 3:17, 7:9, 8:1
**proved** [3] - 7:16, 7:22, 8:3
**proven** [1] - 111:13
**proves** [1] - 3:22
**provide** [7] - 3:10, 10:21, 11:21, 42:3, 62:5, 133:21, 160:3
**provided** [4] - 49:7, 71:5, 107:8, 164:15
**proving** [1] - 7:24
**provision** [8] - 123:12, 125:25, 126:4, 127:7, 134:22, 134:25, 145:2, 145:3
**provisions** [4] - 127:9, 129:13, 163:4, 163:18
**public** [4] - 67:9, 69:18, 69:19, 80:9
**publicly** [5] - 158:25, 159:2, 159:3, 159:6, 159:7
**publish** [15] - 71:13, 82:6, 83:14, 84:6, 84:7, 90:22, 95:23, 96:23, 100:2, 100:3, 100:4, 100:6, 149:18, 150:1, 170:19
**published** [1] - 77:23
**publishing** [1] - 149:22
**pull** [27] - 16:10, 17:20, 24:20, 25:23, 27:17, 28:2, 29:12, 29:18, 120:17, 125:24, 125:25, 134:21, 140:4, 145:12, 149:11, 151:25, 154:3, 154:15, 155:10, 156:11, 157:17, 159:5, 161:18, 167:17, 170:18, 170:23, 173:9
**purchase** [32] - 17:7, 17:15, 23:14, 25:3, 35:12, 35:17, 35:18, 35:20, 65:6, 65:15, 65:23, 66:1, 66:5, 66:14, 73:4, 74:12, 97:15, 97:16, 101:1, 101:2, 102:8, 102:16, 102:21, 106:11, 110:9, 112:2, 113:15, 123:5, 146:13, 155:1, 156:13, 157:8
**purchased** [4] - 6:12, 38:16, 40:1, 48:17
**purchases** [1] - 99:2
**purchasing** [1] - 62:9
**purpose** [5] - 5:7, 5:9, 34:23, 36:20, 41:9
**purposes** [1] - 33:19
**pursuant** [10] - 6:12, 21:5, 24:9, 25:8, 28:19, 47:16, 49:21,

103:16, 103:18, 141:8
**put** [45] - 7:11, 12:4, 17:6, 17:7, 20:13, 20:15, 21:1, 21:7, 21:23, 28:14, 30:6, 31:4, 32:1, 34:2, 36:22, 56:9, 82:9, 83:12, 90:21, 96:25, 98:7, 99:3, 99:19, 100:16, 101:9, 102:19, 105:24, 110:15, 111:22, 112:19, 114:14, 121:14, 122:16, 123:1, 123:2, 124:4, 131:24, 134:6, 146:10, 146:12, 146:19, 150:1, 161:4, 168:15, 172:13
**puts** [1] - 13:4
**putting** [4] - 64:16, 64:19, 77:25, 101:7

## Q

**qualified** [2] - 11:18, 154:23
**qualify** [1] - 160:4
**questions** [26] - 4:10, 8:7, 8:8, 8:10, 8:14, 8:17, 8:18, 8:19, 8:21, 9:13, 9:15, 9:20, 12:19, 12:20, 12:21, 12:22, 12:23, 13:2, 81:8, 114:20, 116:9, 116:17, 116:20, 116:23
**quick** [2] - 53:10, 53:11
**quite** [2] - 24:4, 145:13
**quote** [1] - 153:15

## R

**rain** [1] - 3:21
**rained** [1] - 3:20
**raise** [6] - 47:10, 51:23, 54:7, 60:16, 104:9, 118:8
**raised** [1] - 47:24
**raises** [1] - 175:2
**raising** [2] - 54:8, 117:19
**rarely** [1] - 8:17
**rate** [2] - 21:2, 123:24
**rather** [1] - 6:15
**ratios** [1] - 22:8
**reach** [1] - 5:10
**reaches** [1] - 56:11
**read** [25] - 8:23, 9:3, 11:5, 14:5, 14:9, 14:10, 22:2, 22:21, 82:17, 88:25, 100:22, 112:17, 120:16, 123:10, 124:1, 125:1, 131:7, 136:8, 140:21, 140:22, 141:6, 149:11, 154:7, 162:23, 175:24
**ready** [4] - 13:25, 14:1, 51:21, 53:5
**real** [17] - 6:7, 6:8, 6:11, 15:22, 16:23, 34:2, 34:3, 61:19, 61:20, 61:22, 62:6, 65:24, 66:5, 143:2, 144:4, 150:13, 151:12
**realize** [3] - 112:11, 175:20, 176:3
**really** [4] - 8:17, 44:19, 52:15, 95:10
**reason** [3] - 31:5, 52:19, 136:12
**reasonable** [1] - 31:10
**reasonableness** [1] - 5:19
**reasons** [1] - 129:22
**rebut** [1] - 55:17
**rebuttal** [3] - 13:6, 13:11, 32:2
**receipt** [6] - 101:2, 124:8, 124:22, 125:13, 126:23, 136:6
**receive** [29] - 4:18, 4:22, 6:14, 17:12, 20:2, 20:3, 41:22, 63:5, 64:21, 70:5, 72:15, 72:20, 74:24, 75:9, 75:13, 77:5, 88:12, 89:1, 89:7, 89:11, 89:21, 90:1, 95:6, 95:11, 121:2, 123:23, 124:12, 124:24, 128:18
**received** [22] - 60:5, 60:14, 71:12, 73:24, 77:22, 84:5, 95:2, 95:5, 96:22, 100:15, 109:19, 110:22, 112:18, 114:2, 115:21, 116:2, 116:4, 116:12, 137:11, 137:13, 137:15
**receives** [3] - 23:6, 128:6, 158:14
**receiving** [8] - 24:8, 80:19, 80:21, 81:5, 94:25, 95:11, 95:14, 128:20
**receptionist** [7] - 115:12, 115:17, 115:21, 116:2, 116:4, 116:8, 116:11
**receptionists** [1] - 115:18
**recess** [3] - 46:13, 104:17, 179:7
**recital** [1] - 72:11
**recitals** [1] - 100:17
**recognize** [8] - 65:3, 65:11, 69:4, 73:3, 74:7, 75:7, 145:14, 162:6
**recognized** [1] - 136:4
**recollect** [2] - 107:25, 111:18
**recollected** [1] - 111:18
**recollection** [14] - 87:20, 89:19, 108:3, 108:7, 108:10, 108:13, 109:2, 109:5, 109:10, 109:11, 109:13, 111:16, 149:15
**reconcile** [1] - 30:20
**reconciliation** [2] - 21:22, 30:22
**record** [18] - 3:1, 22:22, 29:6, 46:14, 60:23, 70:24, 71:1, 96:6, 97:12, 103:6, 104:18, 105:2, 105:6, 105:9, 118:12, 139:1, 142:9, 175:24
**recorded** [6] - 158:25, 159:2, 159:3, 159:6, 159:7, 159:11
**records** [19] - 29:6, 66:15, 80:8, 80:10, 88:3, 88:4, 89:17, 138:2, 138:3, 138:5, 138:8, 138:11, 138:19, 139:8, 139:12, 139:16, 142:9, 142:11, 142:17
**redirect** [1] - 114:21
**Redirect** [1] - 2:3
**REDIRECT** [1] - 114:23
**reduce** [1] - 49:7
**reduced** [1] - 36:6
**refer** [3] - 6:4, 140:25, 141:19
**referred** [3] - 6:6, 72:5, 143:12
**referring** [7] - 6:8, 48:14, 120:18, 124:12, 126:4, 127:4, 162:23
**refers** [2] - 152:3, 163:15
**reflects** [1] - 55:11
**refresh** [4] - 108:6, 108:9, 108:13, 149:15
**refreshes** [1] - 109:1
**refreshing** [1] - 149:15
**refund** [1] - 111:19
**refunding** [1] - 110:20
**refusal** [21] - 6:23, 15:24, 23:4, 23:5, 23:10, 23:11, 23:12, 24:12, 156:1, 156:3, 156:5, 156:10, 157:15, 157:22, 158:6, 158:19, 158:22, 158:25, 159:1, 159:7, 159:13
**refute** [2] - 107:9, 107:13
**regarding** [3] - 41:20, 84:13, 176:19
**regardless** [2] - 7:18, 7:19
**registered** [5] - 79:18, 91:23, 92:10, 136:5, 137:14
**regular** [5] - 75:9, 86:16, 142:7, 147:16, 148:25
**Rehan** [1] - 176:22
**reinstated** [1] - 78:8
**reinstatement** [1] - 78:11
**rejected** [1] - 170:5
**relate** [1] - 152:4
**related** [3] - 10:1, 18:16, 80:8
**relates** [1] - 152:1
**relating** [4] - 36:17, 47:23, 81:22, 157:22
**relationship** [3] - 29:22, 52:10, 52:14
**relevance** [1] - 142:1
**relevant** [5] - 34:7, 52:22, 54:5, 54:6, 54:16
**relied** [3] - 24:13, 27:14, 172:5
**relieves** [1] - 28:16
**relocated** [3] - 76:8, 76:14, 76:24
**rely** [4] - 12:5, 89:16, 160:6, 160:8
**remain** [2] - 9:19, 60:15
**remainder** [1] - 59:25
**remained** [1] - 79:22
**remaining** [1] - 22:5
**remains** [1] - 79:7
**remarks** [2] - 4:7
**remember** [29] - 9:12, 9:25, 11:22, 19:4, 62:8, 62:24, 63:4, 67:3, 76:5, 85:1, 85:7, 90:18, 91:18, 95:8, 98:1, 98:2, 99:8, 99:15, 106:18, 107:22, 112:25, 132:1, 140:5, 140:7, 149:3, 165:20, 171:24
**remembered** [1] - 111:14
**reminded** [1] - 92:12
**remove** [1] - 59:23
**rendering** [2] - 7:3, 42:12
**renew** [4] - 40:14, 172:24, 172:25
**renewal** [2] - 169:1, 171:9
**rent** [28] - 21:13, 30:9, 30:16, 37:21, 37:25, 38:2, 39:9, 39:14, 39:18, 39:24, 40:4, 40:7, 41:2, 41:8, 41:10, 42:4, 126:5, 126:8, 147:20, 147:22, 147:23, 147:25, 169:25, 170:3, 170:5, 170:10
**rented** [1] - 62:23
**repaid** [1] - 27:5
**repay** [6] - 38:12, 38:23, 38:24, 39:1, 50:12, 162:2
**repeat** [4] - 81:23, 88:22, 88:23, 112:15
**repeated** [1] - 39:10
**rephrase** [4] - 92:13, 94:19, 106:9, 144:17
**replace** [1] - 112:19
**replaced** [3] - 101:15, 114:2, 114:16
**replacement** [2] - 25:10, 101:1
**replacing** [6] - 101:7, 101:22, 109:18, 110:2, 111:22, 114:1

**report** [6] - 80:9, 85:16, 91:2, 91:3, 91:12, 92:3
**reported** [2] - 2:25, 55:2
**REPORTED** [1] - 1:21
**reporter** [2] - 105:2, 141:4
**Reporter** [4] - 1:22, 88:23, 112:16, 179:15
**represent** [5] - 15:13, 33:4, 33:25, 36:13, 47:20
**representation** [2] - 47:3, 63:24
**representations** [2] - 23:21, 24:1
**representative** [1] - 31:17
**represented** [3] - 23:21, 31:19, 61:22
**repudiated** [1] - 7:3
**request** [1] - 27:8
**requested** [1] - 136:6
**require** [2] - 134:8, 134:10
**required** [19] - 12:11, 19:24, 20:19, 21:5, 23:22, 38:16, 82:20, 123:7, 123:23, 124:6, 124:9, 131:4, 131:10, 131:11, 131:12, 136:1, 139:8, 144:8, 160:11
**requires** [3] - 97:5, 102:4, 172:1
**research** [2] - 11:5, 45:6
**resident** [6] - 68:22, 68:23, 78:16, 78:22, 79:11, 80:1
**resolve** [3] - 15:9, 15:11, 144:25
**resolved** [3] - 45:16, 171:4, 171:7
**resource** [2] - 49:9, 49:10
**respect** [2] - 162:18, 164:7
**response** [5] - 39:15, 42:4, 50:1, 52:5, 55:9
**responsibilities** [5] - 18:6, 18:9, 18:10, 120:22, 161:25
**responsibility** [2] - 36:11, 103:8
**responsible** [4] - 20:21, 24:8, 26:24, 134:16
**rest** [3] - 12:25, 13:5, 174:11
**restate** [1] - 116:3
**result** [1] - 41:1
**retired** [1] - 22:5
**return** [9] - 22:1, 25:25, 43:15, 43:17, 55:11, 101:3, 129:21, 130:1, 136:6
**returned** [4] - 102:4, 110:2, 110:24, 146:19
**returning** [1] - 101:8
**revenue** [1] - 36:24
**reviewing** [1] - 109:2
**Richards** [1] - 1:18
**right-hand** [2] - 67:22, 162:15
**rights** [19] - 18:11, 18:24, 38:20, 38:21, 39:6, 48:19, 48:24, 49:1, 49:7, 49:21, 49:23, 50:3, 50:6, 50:8, 50:13, 102:8, 113:24, 168:19, 168:21
**rise** [2] - 51:12, 56:20
**risk** [1] - 35:2
**RMR** [2] - 1:21, 179:14
**road** [5] - 21:21, 21:24, 30:20, 127:3, 154:4
**Road** [1] - 1:15
**Roberts** [1] - 151:9
**role** [1] - 4:8
**roll** [1] - 155:5
**roll-over** [1] - 155:5
**rolling** [1] - 155:3
**room** [6] - 10:24, 11:24, 12:2, 12:4, 13:23, 53:8
**roughly** [1] - 25:1
**row** [1] - 145:17
**RPR** [1] - 1:21
**rubber** [5] - 21:21, 21:24, 30:19, 127:2, 154:4
**rule** [9] - 52:21, 54:9, 63:15, 87:5, 117:20, 164:5, 175:2, 175:3, 175:6
**rules** [7] - 4:17, 4:20, 8:22, 8:25, 11:9, 51:2, 53:3
**run** [4] - 18:9, 37:16, 53:8, 54:1
**running** [6] - 35:9, 37:19, 40:24, 41:4, 43:11, 158:16
**runs** [1] - 34:17

## S

**S.E** [2] - 65:10, 66:15
**sale** [48] - 6:14, 6:20, 7:5, 15:23, 15:25, 16:18, 17:13, 22:3, 22:4, 22:10, 22:25, 23:14, 24:8, 24:18, 25:17, 26:4, 26:11, 26:18, 31:19, 31:20, 32:5, 35:13, 44:3, 54:12, 54:19, 54:24, 55:8, 56:1, 65:6, 65:15, 66:1, 66:5, 66:14, 72:16, 121:3, 128:12, 128:16, 128:18, 128:20, 130:6, 130:11, 143:19, 143:20, 154:6, 154:10, 155:1, 155:3, 157:9
**sales** [4] - 24:24, 65:23, 155:21, 155:22
**San** [2] - 82:23, 143:5
**sat** [1] - 24:5
**SAVANNAH** [1] - 1:14
**save** [3] - 42:22, 42:25, 43:10
**saw** [6] - 3:15, 3:18, 4:13, 4:15, 151:14, 151:18
**scale** [2] - 7:12, 7:13
**scales** [1] - 7:13
**schedule** [3] - 173:24, 176:12, 178:4
**scheduled** [3] - 177:12, 178:7, 178:17
**scheduling** [2] - 176:11, 176:19
**school** [1] - 119:13
**scrambling** [1] - 169:19
**screen** [4] - 91:2, 122:5, 126:1, 150:1
**scroll** [14] - 72:11, 82:13, 84:18, 85:10, 85:13, 90:25, 91:16, 92:1, 98:13, 125:25, 157:17, 158:4, 158:8, 164:14
**scrolling** [1] - 84:20
**SE** [1] - 1:18
**search** [2] - 11:2, 11:3
**seat** [2] - 60:20, 118:12
**seated** [3] - 3:4, 46:15, 105:14
**second** [14] - 4:10, 22:2, 33:23, 36:16, 48:8, 63:10, 65:21, 87:18, 122:2, 140:11, 163:3, 168:20, 177:19, 177:21
**seconds** [1] - 54:1
**section** [16] - 21:23, 80:25, 82:14, 121:5, 121:11, 121:22, 122:24, 123:20, 125:10, 130:25, 156:2, 156:11, 156:20, 157:3, 157:4, 162:9
**Section** [56] - 16:17, 17:11, 18:25, 19:1, 19:22, 20:11, 20:17, 20:24, 21:20, 21:24, 23:3, 23:5, 30:19, 72:14, 73:6, 73:8, 73:11, 74:19, 80:25, 82:18, 100:17, 120:25, 122:12, 122:24, 123:21, 124:16, 124:19, 124:20, 125:5, 126:1, 126:18, 127:2, 127:3, 129:2, 129:14, 129:21, 129:25, 130:16, 131:1, 135:25, 137:5, 137:8, 137:12, 141:15, 154:4, 156:1, 156:4, 156:12, 158:11, 158:12, 162:9, 167:17, 167:20, 167:22
**sections** [3] - 19:20, 141:17, 141:18
**secure** [6] - 97:22, 97:25, 98:21, 102:20, 102:22
**secured** [2] - 22:4, 49:6
**security** [1] - 49:8
**SECURITY** [1] - 45:10
**see** [49] - 3:20, 5:15, 9:4, 11:19, 16:4, 17:11, 21:3, 21:10, 21:15, 22:9, 26:5, 29:17, 31:1, 63:15, 71:21, 72:6, 72:15, 73:22, 79:25, 80:17, 81:1, 83:6, 87:19, 91:13, 100:20, 104:16, 106:25, 108:4, 109:1, 116:22, 121:3, 121:4, 137:20, 145:20, 149:10, 149:16, 149:20, 149:21, 154:5, 154:9, 154:17, 154:18, 155:11, 155:13, 162:10, 164:3, 174:17, 175:6, 179:1
**seeing** [1] - 152:24
**seek** [2] - 47:5, 47:14
**seeking** [3] - 16:17, 21:19, 129:12
**seeks** [1] - 57:14
**sees** [1] - 11:17
**Seidler** [97] - 15:16, 16:22, 17:2, 17:10, 18:21, 20:4, 20:10, 21:10, 22:21, 23:4, 23:21, 23:25, 24:14, 27:13, 27:19, 27:21, 28:6, 28:16, 29:2, 29:14, 29:17, 29:20, 31:17, 33:25, 34:1, 34:5, 35:6, 36:13, 37:11, 38:5, 38:7, 38:10, 38:14, 38:17, 38:23, 39:13, 40:17, 40:22, 40:24, 41:1, 41:13, 41:18, 41:25, 42:16, 42:20, 42:21, 48:18, 49:25, 50:14, 50:19, 52:10, 52:12, 52:18, 54:3, 56:6, 56:9, 82:22, 108:2, 109:8, 109:18, 109:21, 110:15, 110:19, 111:21, 111:23, 113:11, 113:24, 113:25, 114:2, 114:4, 114:15, 114:17, 117:8, 118:6, 118:13, 118:15, 118:24, 118:25, 119:5, 119:12, 122:13, 132:8, 139:17, 140:4, 140:17, 140:18, 140:22, 141:22, 144:4, 145:13, 149:3, 156:2, 159:22, 161:10, 164:18, 175:4
**SEIDLER** [1] - 2:4
**Seidler's** [5] - 24:2, 24:9, 28:24, 50:13, 113:23

**selected** [1] - 45:3
**selection** [1] - 5:24
**self** [1] - 34:2
**self-made** [1] - 34:2
**sell** [6] - 23:10, 23:15, 23:17, 24:16, 43:4, 127:11
**seller** [16] - 24:23, 25:14, 102:23, 102:24, 103:9, 103:17, 103:20, 103:21, 111:24, 113:8, 113:13, 113:16, 113:18, 113:19, 157:14, 158:18
**seller's** [2] - 25:16, 25:20
**sellers** [1] - 61:22
**selling** [1] - 127:13
**sells** [1] - 120:25
**semicolon** [2] - 162:15, 162:16
**send** [9] - 19:15, 27:6, 27:24, 30:22, 132:3, 133:1, 134:15
**sending** [5] - 42:7, 42:10, 132:12, 134:16, 145:7
**sense** [7] - 14:16, 26:10, 32:3, 35:6, 44:19, 157:7, 157:8
**sent** [19] - 21:14, 27:3, 27:4, 39:13, 76:8, 86:9, 86:25, 97:5, 133:5, 136:3, 136:4, 137:19, 155:7, 155:9, 173:3, 173:6
**sentencing** [6] - 176:13, 176:20, 176:24, 177:2, 177:24, 178:10
**separate** [15] - 18:3, 18:5, 63:21, 116:15, 135:3, 135:4, 135:18, 135:22, 136:19, 164:20, 164:23, 164:24, 165:2
**separately** [2] - 48:17, 135:21
**September** [1] - 1:4
**sequestration** [1] - 175:2
**series** [3] - 57:15, 63:20, 173:20
**served** [6] - 24:5, 169:10, 169:11, 169:16, 173:5, 173:6
**services** [1] - 158:15
**serving** [1] - 9:25
**set** [4] - 13:13, 63:25, 136:7, 177:4
**settle** [1] - 45:1
**settlement** [23] - 24:21, 28:3, 28:5, 28:9, 28:10, 28:12, 28:15, 28:16, 28:18, 28:20, 28:22, 30:6, 73:7, 73:11, 73:14, 73:20, 103:4, 103:5, 103:7, 103:8, 134:13, 138:22, 155:12
**seven** [1] - 178:23
**seventh** [1] - 162:14
**several** [3] - 61:23, 77:4
**shake** [2] - 33:10, 44:11
**shaky** [1] - 38:3
**shall** [20] - 17:12, 20:1, 22:5, 22:6, 22:8, 22:11, 72:15, 82:21, 101:3, 121:1, 123:6, 131:5, 136:2, 154:6, 162:17, 163:3, 163:12, 163:16, 164:6
**share** [8] - 6:21, 11:23, 30:6, 30:25, 32:10, 124:24, 148:6, 148:15
**shared** [4] - 29:24, 32:16, 32:18, 148:17
**shareholder** [1] - 152:20
**shares** [1] - 142:4
**sharing** [1] - 85:2
**shed** [3] - 145:21, 145:22, 146:2
**sheet** [9] - 69:25, 70:21, 71:3, 71:4, 71:6, 71:10, 71:14, 160:1
**short** [2] - 41:8, 62:10
**shortfall** [1] - 38:1
**show** [65] - 8:4, 12:15, 16:20, 17:1, 17:6, 17:18, 17:23, 18:5, 18:15, 18:17, 18:23, 19:9, 19:10, 19:13, 19:19, 20:4, 20:6, 22:13, 22:16, 22:18, 22:24, 23:1, 23:13, 23:25, 24:13, 24:19, 25:11, 25:22, 26:14, 26:20, 26:23, 27:6, 27:7, 27:13, 27:15, 28:1, 28:9, 29:5, 29:7, 29:8, 30:2, 30:7, 30:8, 30:21, 30:23, 32:16, 33:7, 35:16, 38:25, 40:6, 44:7, 48:22, 68:12, 73:23, 78:7, 107:12, 108:14, 108:15, 108:25, 137:18, 138:13, 138:16, 149:14, 149:22
**showed** [7] - 31:24, 80:8, 108:6, 108:9, 109:12, 138:16
**showing** [4] - 30:22, 65:2, 69:23, 109:1
**shown** [2] - 69:14, 71:22
**shows** [14] - 25:5, 25:7, 25:14, 26:7, 40:15, 73:11, 73:24, 78:25, 79:12, 79:18, 139:2, 139:3, 145:17
**shut** [2] - 41:14, 42:1
**shy** [1] - 174:10
**sic** [2] - 94:18, 109:7
**sic]** [1] - 56:11
**side** [20] - 7:12, 7:13, 12:10, 21:1, 24:22, 24:23, 29:19, 53:14, 53:18, 67:3, 115:5, 115:6, 123:23, 124:5, 124:6, 145:18, 154:17, 162:15
**side-by-side** [1] - 29:19
**sidebar** [7] - 46:5, 52:3, 52:6, 117:15, 117:16, 117:17, 118:5
**sides** [1] - 34:11
**sign** [5] - 38:11, 38:19, 107:17, 153:10, 161:23
**signature** [6] - 65:11, 65:12, 65:13, 67:23, 67:25, 69:5
**signed** [16] - 23:15, 37:8, 37:18, 38:4, 49:23, 110:7, 135:6, 135:8, 135:14, 135:18, 135:21, 167:21, 171:9, 171:10, 174:13
**significant** [2] - 159:25, 178:8
**signing** [4] - 23:18, 164:18, 164:19, 172:10
**similar** [2] - 20:16, 155:9
**simply** [1] - 3:22
**simultaneously** [2] - 22:6, 100:23
**single** [3] - 27:6, 31:24, 139:1
**sister** [1] - 4:14
**sit** [3] - 57:5, 176:12, 178:9
**sitting** [11] - 22:22, 29:2, 99:8, 112:25, 129:24, 175:6, 176:16, 177:3, 178:6, 178:16, 178:20
**skin** [1] - 37:14
**slow** [3] - 48:8, 141:3, 141:6
**slowly** [1] - 38:1
**smelled** [1] - 3:15
**so..** [1] - 52:24
**social** [2] - 10:16, 10:24
**sold** [26] - 6:17, 6:22, 15:22, 21:22, 22:13, 22:15, 23:2, 25:3, 26:2, 26:8, 30:17, 42:18, 54:4, 55:21, 56:5, 120:10, 120:12, 130:23, 139:22, 140:25, 155:7, 158:21, 168:18, 168:21
**sole** [1] - 163:16
**solidifying** [1] - 41:18
**someone** [3] - 3:15, 18:21, 42:9
**sometimes** [14] - 3:21, 5:3, 8:25, 9:2, 9:4, 10:10, 10:16, 51:16, 51:17, 63:3, 92:12, 137:16, 148:10, 148:24
**somewhere** [4] - 90:19, 97:2, 104:1, 150:20
**son** [17] - 62:1, 75:13, 75:19, 86:10, 95:15, 97:16, 98:20, 98:22, 101:10, 106:22, 107:4, 107:23, 109:6, 111:2, 111:6, 111:12, 111:17
**son's** [3] - 65:12, 86:5, 94:21
**soon** [2] - 106:15, 174:5
**Sorry** [1] - 152:23
**sorry** [38] - 46:18, 53:7, 63:8, 63:11, 68:1, 68:5, 77:4, 77:15, 81:23, 88:8, 90:9, 93:5, 95:24, 96:10, 101:11, 102:13, 106:23, 109:7, 112:8, 112:12, 114:8, 115:14, 116:3, 116:19, 120:1, 121:19, 122:9, 129:15, 133:11, 142:24, 145:19, 147:21, 155:23, 157:20, 162:15, 165:17, 171:5, 175:22
**sorts** [1] - 131:10
**sought** [1] - 47:21
**source** [1] - 11:15
**South** [1] - 62:17
**Southeast** [41] - 20:7, 62:15, 62:19, 65:16, 66:24, 68:18, 68:24, 72:4, 72:8, 73:4, 73:14, 73:17, 74:8, 74:17, 74:21, 76:13, 76:23, 78:15, 78:19, 80:16, 81:2, 83:2, 85:2, 85:17, 91:20, 93:2, 93:7, 93:11, 93:13, 93:16, 97:10, 115:1, 115:9, 115:19, 145:15, 146:8, 147:2, 147:10, 151:20, 152:2, 167:20
**SOUTHERN** [1] - 1:1
**Southern** [2] - 1:23, 179:16
**space** [1] - 85:2
**speaker** [1] - 174:1
**speaking** [4] - 48:6, 51:12, 51:18, 119:10
**speaks** [5] - 52:4, 52:6, 124:18, 152:11, 158:24
**special** [3] - 11:14, 37:6, 43:14
**specific** [6] - 41:23, 42:2, 63:13, 134:10, 163:25, 169:17
**specifically** [4] - 89:10, 89:21, 90:25, 106:18
**specificity** [1] - 86:21
**specifics** [1] - 108:5
**specified** [1] - 21:2
**specifying** [1] - 168:2
**speculate** [2] - 9:10, 87:2

**speculating** [1] - 86:1
**split** [4] - 20:16, 35:14, 37:4, 126:1
**spreadsheets** [1] - 138:12
**stamped** [1] - 85:13
**stand** [4] - 16:4, 117:9, 118:7, 175:4
**standard** [1] - 8:4
**standing** [1] - 60:15
**start** [16] - 37:16, 38:3, 39:8, 44:19, 46:8, 51:9, 82:5, 101:18, 162:10, 162:25, 174:5, 174:22, 174:23, 176:14
**started** [5] - 34:3, 38:1, 55:1, 90:20, 111:1
**starting** [2] - 39:21, 61:14
**state** [4] - 50:4, 60:22, 78:8, 118:12
**State** [2] - 64:1, 69:15
**statement** [16] - 12:11, 16:2, 22:10, 24:14, 24:21, 30:25, 31:1, 55:3, 73:3, 73:21, 103:5, 103:7, 111:25, 128:9, 154:5, 154:10
**statements** [7] - 4:5, 12:11, 12:13, 14:2, 14:14, 14:18, 14:25
**STATES** [2] - 1:1, 1:10
**States** [2] - 1:23, 179:15
**statute** [1] - 49:5
**stay** [1] - 104:8
**STENOGRAPHICALLY** [1] - 1:21
**step** [2] - 41:9, 108:23
**Stewart** [10] - 31:15, 60:7, 60:24, 98:16, 100:24, 101:19, 101:20, 109:7, 127:22
**STEWART** [1] - 2:1
**Stewart's** [1] - 20:6
**still** [16] - 38:2, 49:16, 93:21, 93:23, 93:24, 94:2, 101:16, 102:5, 110:24, 114:16, 117:20, 125:6, 141:4, 174:7, 174:20, 175:4
**stills** [1] - 39:3
**stipulated** [4] - 14:2, 14:13, 57:16, 83:20
**stipulations** [4] - 14:5, 14:9, 14:10
**stole** [1] - 52:18
**stop** [10] - 15:2, 30:7, 50:7, 82:15, 85:11, 105:3, 105:5, 129:4, 173:14, 173:17
**stopped** [5] - 18:22, 52:19, 165:15, 165:18, 165:21
**stopping** [3] - 51:1, 173:12, 173:21
**stops** [4] - 39:9, 39:10, 39:21, 39:22
**story** [1] - 34:12
**Street** [59] - 1:18, 20:7, 62:9, 62:11, 62:13, 62:15, 62:19, 65:10, 65:16, 66:16, 66:24, 68:18, 68:24, 72:4, 72:8, 73:4, 73:15, 73:17, 74:8, 74:17, 74:21, 76:5, 76:9, 76:13, 76:23, 78:15, 78:19, 78:24, 79:7, 79:12, 79:19, 80:2, 80:16, 81:2, 82:23, 83:2, 85:2, 85:17, 88:7, 88:10, 89:4, 91:20, 93:2, 93:7, 93:11, 93:13, 93:16, 93:20, 97:10, 115:2, 115:9, 115:19, 145:15, 146:8, 147:2, 147:10, 151:20, 152:2, 167:20
**street** [1] - 26:5
**strictly** [1] - 166:23
**strike** [2] - 5:4
**striking** [1] - 5:4
**structure** [2] - 121:20, 146:2
**stuff** [2] - 55:2, 137:16
**subject** [6] - 17:4, 46:22, 52:13, 97:17, 102:19, 120:6
**subleased** [2] - 76:18, 76:23
**submit** [3] - 8:7, 8:15, 8:20
**subpoena** [1] - 24:5
**substance** [1] - 119:5
**substantial** [2] - 43:10, 43:19
**success** [1] - 16:23
**successfully** [1] - 8:3
**successor** [3] - 27:1, 28:4, 172:18
**sue** [1] - 170:11
**sued** [10] - 22:20, 24:5, 27:13, 31:3, 42:20, 48:5, 169:14, 170:10, 170:14, 170:16
**suffer** [1] - 162:17
**sufficient** [2] - 36:1, 178:24
**suggest** [1] - 169:12
**suggested** [2] - 4:12, 48:21
**suggesting** [1] - 86:12
**suggests** [1] - 56:15
**suing** [2] - 16:15, 130:19
**suite** [12] - 67:1, 85:4, 85:6, 86:2, 86:18, 92:14, 92:18, 92:19, 115:1, 115:8, 115:18, 115:22
**Suite** [28] - 1:15, 1:19, 20:7, 67:2, 68:18, 68:24, 72:4, 72:8, 73:15, 73:18, 74:17, 74:21, 76:13, 76:23, 78:15, 78:19, 80:17, 81:2, 83:2, 85:17, 87:20, 92:23, 93:2, 93:7, 93:11, 93:13, 93:16, 93:20
**sum** [3] - 100:24, 101:2, 101:3
**summarize** [2] - 5:25, 31:22
**summary** [1] - 47:24
**summons** [1] - 19:10
**sunset** [1] - 151:5
**Sunset** [1] - 62:21
**supervise** [1] - 40:14
**supervising** [1] - 36:11
**supervision** [1] - 40:19
**suppose** [2] - 160:13, 160:25
**supposed** [8] - 21:7, 21:8, 109:24, 113:17, 116:16, 128:10, 136:11, 137:1
**surprise** [1] - 63:3
**survey** [1] - 145:16
**suspect** [1] - 174:22
**sustain** [4] - 4:23, 4:24, 4:25, 51:17
**sustained** [10] - 64:10, 66:12, 66:21, 72:22, 75:16, 75:25, 76:11, 77:1, 77:8, 115:24
**swearing** [1] - 24:14
**switched** [1] - 67:4
**swore** [3] - 25:22, 140:13, 149:6
**sworn** [4] - 3:5, 24:14, 60:17, 118:9
**system** [1] - 142:21

## T

**table** [4] - 22:23, 29:2, 129:12, 154:25
**talks** [3] - 19:18, 82:14, 122:12
**tasked** [1] - 117:19
**tax** [3] - 25:25, 55:1, 55:11
**technology** [3] - 10:12, 15:9, 15:11
**telephone** [1] - 69:13
**ten** [10] - 20:19, 20:22, 20:24, 29:22, 33:7, 90:4, 113:2, 123:7, 124:17, 134:13
**tenant** [11] - 17:18, 17:22, 30:14, 30:15, 74:20, 80:16, 162:21, 167:13, 167:18, 167:19, 168:1
**tenants** [3] - 163:12, 163:22, 163:23
**tend** [3] - 111:5, 111:16
**tender** [1] - 100:24
**term** [4] - 121:9, 122:7, 130:22
**terminate** [2] - 167:25, 168:5
**terminated** [6] - 132:14, 132:15, 132:17, 133:4, 168:6, 168:10
**termination** [4] - 18:1, 132:19, 132:22, 132:23
**terms** [22] - 7:6, 12:9, 23:8, 32:10, 44:5, 64:8, 103:18, 103:19, 121:5, 121:8, 121:9, 121:10, 152:9, 152:12, 156:18, 158:14, 163:4, 163:18, 164:1, 171:13, 171:16, 176:11
**terrible** [1] - 90:15
**test** [6] - 15:4, 15:5, 15:7, 56:23
**testified** [5] - 8:10, 64:3, 64:12, 137:10, 150:4
**testify** [6] - 22:21, 26:20, 56:9, 63:12, 63:13, 86:21
**testifying** [2] - 5:15, 5:16
**testimony** [40] - 3:15, 5:11, 5:13, 5:19, 5:20, 7:18, 11:11, 12:6, 12:8, 26:22, 33:18, 33:20, 34:1, 34:24, 35:24, 36:3, 37:11, 37:22, 39:12, 39:20, 40:9, 41:1, 41:6, 41:21, 41:24, 42:15, 42:21, 47:15, 51:3, 55:20, 94:17, 94:24, 95:1, 111:1, 120:14, 174:6, 175:8, 175:9, 175:11
**text** [1] - 21:16
**texting** [2] - 10:15, 30:4
**THE** [257] - 1:9, 1:13, 1:17, 3:2, 3:4, 14:5, 14:8, 14:15, 14:21, 14:25, 15:2, 15:6, 15:8, 15:10, 16:12, 32:13, 32:18, 32:21, 32:24, 32:25, 33:2, 44:17, 45:9, 45:10, 45:11, 45:14, 45:21, 46:3, 46:7, 46:11, 46:15, 46:21, 46:25, 47:3, 47:8, 47:12, 48:1, 48:6, 48:12, 49:3, 49:12, 50:1, 50:7, 50:11, 50:15, 50:22, 51:9, 51:11, 51:21, 51:24, 52:1, 52:15, 52:21, 53:1, 53:5, 53:6, 53:11, 53:13, 54:1, 54:12, 54:15, 54:17, 54:23, 55:5, 55:15, 55:23, 56:3, 56:12, 56:14, 56:20, 56:21, 56:24, 57:1, 57:4, 57:9, 57:12, 57:17, 59:8, 59:11, 59:18, 59:25, 60:2, 60:11, 60:13, 60:15, 60:18, 60:19, 60:21, 60:22, 60:24, 60:25, 61:1, 63:7, 63:8, 63:9, 63:11, 63:12, 63:17, 64:10, 64:24, 65:19, 66:12, 66:21, 67:13, 67:16, 68:8, 68:10, 69:21, 70:13, 70:19, 70:23,

71:1, 71:7, 71:10, 71:15, 71:18, 71:20, 72:22, 72:24, 74:2, 75:5, 75:16, 75:25, 76:11, 76:16, 76:18, 77:1, 77:8, 77:10, 77:12, 77:14, 77:21, 78:1, 81:9, 82:8, 83:10, 83:15, 83:17, 83:21, 83:25, 84:3, 84:7, 88:17, 89:1, 90:23, 91:17, 96:1, 96:5, 96:9, 96:11, 96:15, 96:18, 96:21, 96:24, 98:5, 98:9, 99:21, 99:24, 100:3, 100:9, 100:11, 100:14, 103:22, 104:2, 104:6, 104:14, 104:16, 104:19, 104:23, 105:4, 105:5, 105:9, 105:11, 105:14, 105:17, 107:11, 107:12, 108:14, 108:19, 108:21, 108:23, 111:9, 112:6, 112:7, 112:8, 112:9, 112:11, 112:13, 112:18, 113:21, 113:22, 114:21, 115:12, 115:13, 115:14, 115:24, 116:7, 116:18, 116:25, 117:1, 117:4, 117:5, 117:7, 117:11, 117:14, 117:21, 117:23, 118:2, 118:4, 118:6, 118:8, 118:10, 118:11, 118:13, 118:14, 118:17, 118:19, 129:4, 129:8, 129:9, 133:10, 133:11, 141:3, 141:5, 141:6, 141:7, 141:13, 141:25, 142:2, 143:8, 147:24, 147:25, 149:13, 149:14, 149:19, 149:24, 150:3, 152:23, 153:2, 173:10, 173:16, 173:18, 173:22, 174:19, 175:5, 175:13, 175:14, 175:18, 176:2, 176:11, 176:18, 177:1, 177:7, 178:5, 178:14, 178:20, 179:5

**theme** [2] - 18:7, 19:6
**themes** [1] - 29:16
**themselves** [2] - 4:8, 31:6
**therefore** [3] - 26:17, 47:22, 176:25
**thinking** [6] - 29:2, 41:19, 50:19, 129:20, 139:20, 169:13
**thinks** [2] - 4:20
**third** [2] - 34:9, 36:17
**three** [6] - 40:7, 158:12, 158:13, 167:8, 178:20
**throughout** [3] - 33:16, 43:9, 44:12
**ticket** [1] - 19:14
**tickets** [3] - 148:9, 148:11, 148:12
**timeline** [1] - 37:15
**tips** [3] - 7:13, 16:6, 31:13
**title** [7] - 17:4, 120:6, 120:21, 126:13, 159:8, 159:15, 159:18
**today** [4] - 19:10, 34:4, 120:14, 175:25
**together** [20] - 29:23, 29:24, 64:16, 64:19, 134:5, 135:5, 135:20, 136:11, 136:13, 136:16, 136:18, 136:21, 137:1, 144:24, 148:3, 148:21, 148:23, 166:15, 166:18
**tomorrow** [11] - 173:24, 174:3, 174:4, 174:9, 174:11, 174:17, 174:24, 175:25, 176:12, 179:1
**took** [23] - 17:4, 17:8, 22:17, 25:6, 26:25, 30:18, 35:23, 36:25, 49:2, 76:14, 76:20, 112:20, 114:4, 120:6, 120:21, 140:10, 146:15, 159:15, 159:18, 159:20, 162:20, 177:15
**top** [9] - 41:16, 73:6, 91:13, 121:22, 126:13, 135:10, 145:20, 162:25
**total** [1] - 43:11
**toward** [1] - 113:15
**towards** [6] - 17:7, 28:15, 35:19, 37:3, 146:13, 155:1
**Tower** [3] - 62:14, 66:25
**track** [1] - 54:25
**training** [1] - 119:12
**Trans** [1] - 33:17
**transaction** [8] - 24:11, 62:8, 72:12, 98:25, 99:17, 112:20, 128:12, 155:9
**transactions** [3] - 61:23, 62:6, 107:19
**transcribed** [1] - 2:25
**transcription** [1] - 179:10
**transfer** [1] - 38:22
**transferred** [2] - 107:22, 176:25
**transfers** [1] - 103:3
**transition** [1] - 90:20
**transitioned** [1] - 91:7
**transitioning** [1] - 90:12
**transmittal** [1] - 136:3
**TRANSPARK** [1] - 1:3
**Transpark** [194] - 6:4, 6:5, 6:13, 6:18, 6:19, 6:21, 6:23, 6:25, 7:1, 7:5, 15:13, 15:18, 15:20, 15:21, 15:23, 16:15, 16:17, 17:6, 17:16, 17:21, 17:23, 18:13, 18:16, 18:17, 18:22, 18:23, 19:3, 20:21, 21:4, 21:7, 21:8, 22:9, 22:25, 23:7, 25:1, 26:13, 26:17, 26:24, 27:7, 27:24, 28:8, 28:11, 30:6, 30:7, 30:9, 30:12, 30:22, 31:3, 31:8, 32:9, 33:8, 33:10, 33:17, 34:7, 34:13, 34:14, 34:18, 34:19, 35:1, 35:8, 35:10, 35:15, 35:19, 36:9, 36:10, 36:16, 36:18, 37:5, 37:8, 37:10, 37:12, 37:19, 38:2, 38:15, 39:9, 39:11, 39:18, 39:22, 39:24, 39:25, 40:3, 40:4, 40:7, 40:10, 40:12, 40:16, 40:20, 41:8, 41:10, 41:13, 42:3, 42:5, 42:12, 42:13, 43:2, 43:6, 43:17, 44:1, 44:4, 44:6, 44:7, 44:8, 44:9, 44:10, 44:13, 49:20, 67:19, 68:16, 68:22, 69:2, 72:3, 74:16, 74:20, 78:4, 78:8, 79:11, 80:1, 80:13, 81:1, 83:8, 121:1, 121:14, 121:23, 122:3, 122:7, 122:17, 123:2, 123:18, 123:22, 124:8, 124:21, 124:22, 124:23, 125:6, 125:16, 126:21, 126:22, 126:24, 127:13, 128:20, 129:3, 129:19, 130:5, 130:19, 132:4, 132:9, 132:24, 133:18, 133:24, 134:12, 137:7, 137:9, 137:11, 146:12, 152:15, 153:15, 153:19, 153:21, 154:9, 154:13, 156:17, 156:21, 157:2, 159:16, 159:20, 160:11, 160:13, 160:15, 161:23, 161:25, 162:2, 165:15, 165:18, 165:20, 166:1, 166:9, 166:10, 167:7, 167:11, 167:19, 169:8, 169:10, 169:11, 169:15, 169:24, 170:10, 171:14, 171:17, 171:22, 172:2, 172:8
**Transpark's** [21] - 7:2, 16:6, 16:7, 30:13, 31:13, 35:22, 36:2, 36:14, 40:13, 41:2, 41:7, 41:16, 41:24, 48:25, 70:6, 83:4, 130:8, 156:20, 160:6, 170:16
**treat** [1] - 118:15
**treated** [3] - 55:18, 56:15
**trial** [23] - 3:6, 3:8, 4:3, 5:21, 8:6, 10:10, 14:3, 15:19, 19:14, 21:4, 31:7, 31:23, 33:17, 44:12, 50:23, 55:4, 82:11, 111:2, 137:20, 174:11, 177:15, 178:7, 178:23
**Trial** [1] - 1:6
**TRIAL** [1] - 1:9
**trials** [1] - 19:12
**tried** [2] - 147:23, 147:25
**trips** [3] - 29:24, 148:3, 148:5
**true** [8] - 4:12, 7:10, 7:21, 50:9, 50:10, 50:11, 165:15, 165:18
**trust** [19] - 32:3, 98:19, 98:24, 99:4, 99:5, 99:7, 99:10, 103:1, 109:25, 110:5, 110:11, 110:12, 110:20, 110:22, 110:23, 137:19, 142:4
**Trust** [2] - 27:19, 141:22
**trustee** [1] - 141:22
**truth** [7] - 82:1, 111:7, 111:12, 140:13, 140:15, 140:16, 149:6
**truthful** [2] - 24:1, 149:9
**try** [12] - 33:10, 50:24, 55:3, 56:17, 98:11, 102:12, 102:14, 110:4, 111:2, 129:10, 147:20, 147:22
**trying** [11] - 44:10, 49:15, 105:6, 141:15, 141:18, 141:20, 152:9, 152:12, 163:23, 165:20, 165:24
**Tuesday** [5] - 177:2, 177:4, 177:5, 177:8, 178:6
**turn** [10] - 23:3, 26:2, 65:18, 67:19, 68:25, 79:6, 79:10, 79:17, 140:19, 162:9
**turning** [1] - 67:11
**twice** [4] - 13:17, 40:4, 100:7, 126:9
**two** [29] - 6:2, 9:14, 15:4, 15:5, 15:7, 17:14, 18:4, 34:21, 56:23, 87:21, 112:6, 113:1, 115:7, 121:14, 126:6,

135:3, 140:9, 140:10, 153:24, 153:25, 158:12, 158:13, 167:14, 175:2, 175:3, 177:9
**type** [4] - 61:18, 65:23, 75:12, 155:9
**typical** [2] - 75:12, 110:17
**typically** [2] - 12:22, 44:18
**typo** [2] - 26:5, 26:6

## U

**U.S** [4] - 55:11, 132:4, 132:9, 132:12
**ultimate** [3] - 142:23, 142:25, 145:1
**ultimately** [3] - 146:15, 171:3, 171:7
**umbrellas** [1] - 3:19
**unclear** [2] - 119:6, 136:14
**under** [69] - 6:13, 6:23, 7:1, 7:6, 16:15, 16:17, 16:20, 17:25, 18:11, 19:2, 20:23, 21:18, 23:15, 24:14, 27:9, 27:10, 27:25, 28:25, 29:3, 29:7, 30:13, 34:25, 38:9, 44:4, 53:3, 56:6, 56:10, 65:11, 70:8, 73:11, 74:18, 77:5, 80:19, 81:5, 100:17, 100:25, 101:2, 102:4, 113:11, 113:25, 114:14, 120:22, 124:16, 125:4, 125:5, 125:15, 125:19, 126:11, 126:14, 126:17, 127:11, 129:24, 131:10, 133:7, 133:13, 133:20, 133:21, 134:17, 135:25, 136:15, 136:17, 137:7, 137:11, 138:14, 161:25, 163:5, 163:19, 169:22, 172:2
**understood** [12] - 46:6, 47:7, 51:8, 51:20, 121:5, 121:18, 121:20, 122:7, 122:19, 123:12, 156:2, 156:7
**underwater** [2] - 29:3, 140:1
**unenforceable** [1] - 7:4
**unique** [1] - 34:11
**United** [2] - 1:23, 179:15
**UNITED** [2] - 1:1, 1:10
**unless** [6] - 4:15, 7:17, 36:22, 45:16, 63:12, 124:25
**unpaid** [1] - 170:10
**up** [120] - 9:7, 12:23, 15:17, 16:10, 17:20, 18:23, 19:10, 19:13, 19:17, 19:21, 20:15, 21:1, 23:6, 24:20, 25:23, 27:17, 28:2, 28:14, 29:12, 29:18, 30:6, 35:7, 36:23, 40:12, 42:22, 42:25, 46:9, 51:14, 53:9, 53:23, 53:24, 54:9, 54:10, 55:4, 63:25, 77:25, 78:1, 82:9, 82:12, 83:12, 85:13, 89:2, 89:15, 90:21, 91:16, 92:1, 96:25, 98:7, 99:3, 99:19, 100:16, 101:7, 101:9, 101:14, 102:19, 102:25, 105:7, 106:14, 106:18, 106:25, 107:5, 110:15, 111:4, 111:22, 111:24, 111:25, 112:3, 112:20, 112:22, 113:3, 113:14, 114:5, 114:6, 114:14, 119:10, 120:17, 122:16, 123:21, 124:4, 125:14, 125:24, 125:25, 126:19, 131:3, 133:5, 134:6, 134:21, 135:10, 140:4, 140:20, 145:12, 146:19, 149:11, 150:1, 151:25, 154:3, 154:15, 155:10, 156:1, 156:11, 156:12, 157:17, 157:18, 158:12, 159:5, 161:18, 162:15, 162:16, 162:19, 167:17, 167:23, 170:18, 170:23, 172:13, 173:9, 174:13, 174:16
**uphold** [2] - 7:1, 44:8
**upshot** [1] - 26:13
**upside** [2] - 153:16, 153:17
**uses** [2] - 11:13, 21:16
**Utah** [1] - 148:5

## V

**vacation** [1] - 177:14
**valid** [1] - 17:19
**value** [1] - 17:3
**various** [5] - 36:17, 64:5, 74:25, 115:22, 116:15
**Vegas** [2] - 143:10, 152:5
**venture** [3] - 20:22, 21:2, 144:18
**verdict** [6] - 5:10, 11:16, 15:19, 15:20, 16:7, 31:14
**VERNITA** [2] - 1:21, 179:14
**Vernita_Allen** [1] - 1:25
**Vernita_Allen-Williams@flsd.uscourts.gov** [1] - 1:25
**via** [1] - 42:4
**viable** [1] - 56:16
**violate** [4] - 63:14, 117:22, 163:13, 163:24
**violated** [2] - 46:4, 117:21
**VIP** [1] - 148:11
**visit** [1] - 11:4
**voice** [3] - 53:17, 56:25, 57:1
**Voir** [1] - 2:25
**vs** [1] - 1:5

## W

**wait** [4] - 53:21, 129:6, 129:7, 174:19
**walking** [1] - 3:18
**wants** [2] - 158:5, 159:12
**warehouse** [3] - 25:12, 143:17, 143:19
**waste** [3] - 46:5, 163:10, 163:14
**water** [2] - 62:22
**ways** [1] - 11:14
**wealthy** [1] - 17:2
**websites** [2] - 10:16, 10:24
**week** [2] - 177:2, 178:20
**weigh** [2] - 16:5, 26:10
**weight** [2] - 4:2, 12:7
**welcome** [2] - 57:12, 68:10
**west** [2] - 62:16, 115:7
**West** [12] - 76:4, 76:9, 78:24, 79:7, 79:12, 79:19, 80:2, 88:7, 93:20, 176:24, 177:2, 177:24
**wet** [2] - 3:18, 3:19
**WhatsApp** [1] - 21:16
**whatsoever** [2] - 10:22, 22:14
**wherewithal** [1] - 160:1
**whole** [2] - 13:22, 164:3
**wife's** [1] - 27:14
**Williams** [1] - 179:14
**WILLIAMS** [2] - 1:21, 179:14
**Williams@flsd.uscourts.gov** [1] - 1:25
**win** [1] - 55:16
**wine** [1] - 29:24
**wire** [1] - 63:5
**wired** [1] - 107:21
**wires** [1] - 29:14
**wish** [1] - 11:19
**witness** [56] - 3:18, 3:20, 4:13, 4:15, 4:18, 4:21, 4:23, 5:12, 5:17, 5:18, 8:9, 8:15, 8:18, 8:23, 9:2, 9:3, 9:6, 9:7, 9:14, 9:18, 9:22, 11:23, 12:1, 12:18, 16:4, 26:19, 33:23, 34:9, 34:10, 43:22, 44:19, 57:13, 60:17, 64:23, 67:12, 69:20, 70:25, 71:5, 72:23, 74:1, 75:3, 77:9, 104:20, 108:12, 115:24, 115:25, 116:18, 117:6, 117:7, 118:9, 118:16, 149:17, 173:11
**WITNESS** [31] - 60:18, 60:21, 60:24, 63:8, 63:11, 63:17, 76:18, 89:1, 91:17, 105:4, 107:12, 108:23, 112:6, 112:8, 112:11, 112:18, 113:22, 115:12, 115:14, 116:25, 117:4, 118:10, 118:13, 129:8, 133:11, 141:5, 141:7, 141:13, 147:25, 150:3, 175:13
**witness's** [7] - 5:13, 5:14, 5:16, 5:19, 5:20, 5:22
**WITNESSES** [1] - 1:25
**witnesses** [12] - 7:18, 8:7, 8:19, 12:16, 12:17, 13:2, 31:15, 32:2, 33:15, 47:15
**witnesses'** [1] - 4:11
**won** [1] - 27:15
**word** [6] - 21:17, 51:14, 132:11, 133:23, 163:3, 168:5
**words** [4] - 11:14, 12:3, 56:8, 156:9
**works** [3] - 12:17, 71:2, 104:7
**world** [1] - 159:12
**worry** [1] - 117:2
**worse** [1] - 48:9
**write** [3] - 8:12, 141:4
**writing** [10] - 9:14, 12:3, 20:1, 42:3, 82:22, 116:21, 131:5, 133:17, 133:24, 136:2
**written** [10] - 6:2, 19:2, 42:3, 108:2, 109:7, 124:22, 125:13, 126:23, 133:23, 168:2
**wrote** [3] - 107:22, 107:25, 109:21
**Wynwood** [1] - 62:16

## Y

**Yacht** [1] - 143:14
**year** [24] - 26:2, 30:16, 40:4, 40:8, 48:17, 67:4, 90:8, 90:10, 91:1, 91:18, 91:25, 92:25, 93:1, 93:3, 93:5, 93:9, 93:12, 93:14, 93:18, 93:19, 93:21, 126:9
**years** [22] - 29:23, 30:1, 30:5, 30:23, 33:7, 62:2, 63:1, 64:14, 67:5, 72:19,

75:1, 77:4, 89:11, 90:4, 94:16, 94:24, 95:3, 95:6, 95:10, 107:6, 147:14, 147:16
**yourself** [3] - 44:12, 118:24, 129:24

**Z**

**zero** [1] - 130:11