UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CV-20631-JB

TRANSPARK, LLC, Miami, Florida

Plaintiff, September 30, 2025

vs. 8:41 a.m. - 4:53 p.m.

FTP Investment CORPORATION, Trial Day 2

Defendant. Pages 1 to 247

---

JURY TRIAL
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: JOSEPH ISAIAH PARDO, ESQ
MELISSA LEA MACKIEWICZ, ESQ
SAVANNAH LEE DUFFY, ESQ
Pardo Law PLLC
1205 Lincoln Road
Suite 211
Miami Beach, Florida 33139

FOR THE DEFENDANT: MARCUS ANTONIO NIELSEN, ESQ
MANUEL LAZARO CASABIELLE, ESQ
Boyd Richards Parker Colonnelli
100 SE 2nd Street
Suite 2600
Miami, Florida 33131

STENOGRAPHICALLY REPORTED BY:

VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR
Official Court Reporter to:
The Honorable Jacqueline Becerra
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
Vernita_Allen-Williams@flsd.uscourts.gov

INDEX OF WITNESSES

BART SEIDLER:
Cross-Examination.............Page 3
Examination...................Page 47

GREGORY MIRMELLI:
Direct Examination............Page 49
Cross-Examination.............Page 119

JOSEPH COLLETTI:
Direct Examination............Page 102
Cross-Examination.............Page 111
Redirect Examination..........Page 114

EXHIBITS ADMITTED

Defendant's Exhibit 111.......................Page 42
Defendant's Exhibit 122.......................Page 42
Defendant's Exhibits 3 through 6..............Page 45
Defendant's Exhibits 10, 13, 14...............Page 46
Defendant's Exhibits 16 through 18............Page 46
Defendant's Exhibits 21, 22, 28...............Page 46
Defendant's Exhibit 29........................Page 47
Defendant's Exhibit 43........................Page 143
Defendant's Exhibit 78........................Page 204
Defendant's Exhibit 79........................Page 216

08:41AM (Call to order of the Court at 8:41 a.m.)

08:41AM THE COURTROOM DEPUTY: Case No. 24-CV-20631-Becerra, Transpark, LLC vs. FTP Investment Corporation.

08:42AM THE COURT: Counsel, please state your appearances for the record starting with the plaintiff.

08:42AM MR. PARDO: Good morning, Your Honor. Joseph Pardo, Pardo Law, PLLC. With me are my cocounsel Melissa Mackiewicz and Savannah Duffy. Also with me are my paralegals, Elidja Clinton and Liz Osoria, my client representative Gregory Mirmelli, and our technician Patrick Justesen.

08:42AM MR. NIELSEN: Marcus Nielsen on behalf of the defendant with Manny Casabielle, Bart Seidler the client, Nanette Bauza, and Dan Smith.

08:42AM THE COURT: All right. Good morning. Let's have the witness on the stand, and let's bring the jury when they're ready.

08:42AM (Jury in at 8:42 a.m.)

08:43AM THE COURT: Good morning. Thank you so much for being here early. We're starting even earlier than I planned. Everyone can be seated. Let's continue.

08:44AM BART SEIDLER, THE DEFENDANT, PREVIOUSLY SWORN

08:44AM CONTINUED CROSS-EXAMINATION

08:44AM BY MR. PARDO:

08:44AM Q. Good morning, Mr. Seidler.

08:44AM A. Good morning.

08:44AM Q. I want to take a moment and talk about Nathan Heber. You know

who he is?
A. Yes.
Q. He is the gentleman that FTP hired to operate the parking lot after FTP?
A. After FTP?
Q. Excuse me, after Transpark?
A. Yes.
Q. And he had a company called Concept Park?
A. I believe so.
Q. And Concept Park was paid a management fee by FTP during the time that it operated the lot?
A. Yes.
MR. PARDO: Let's pull up Plaintiff's Exhibit 83. This is in evidence. And publish it to the jury, please.
BY MR. PARDO:
Q. Do you see on the screen an invoice from Concept Park to FTP Investment Corp for a management fee of the parking lot dated May of 2013?
A. Yes.
Q. You thought that Nathan Heber was a good operator of the lot?
A. Yes.
Q. You thought he was honest?
A. Yes.
Q. FTP was happy to have him managing the lot?
A. Yes.

Q. You desired to have him manage the lot?
A. Pardon?
Q. You desired -- FTP wanted to have him manage the lot?
A. Well, I was in California. I needed someone to run the lot.
Q. So FTP wanted to have Nathan Heber operate the lot instead?
A. I had no one else, yes.
Q. Yes. Why didn't Transpark, when it was operating the lot, get a management fee like Concept Park?
A. Well, there was no management fee contemplated.
Q. Because Transpark's rights were contemplated by the Profit Participation Agreement, right?
A. I would say yes.
Q. We left off yesterday at the BB&T lawsuit. This was the successor in interest bank that sued to foreclose on the renewal note. Do you recall that?
A. I'm sorry, are we talking -- yeah, we talked about it, yes.
MR. PARDO: So let's pull up Plaintiff's Exhibit 58 in evidence. This is the first default notice from the lawyers for the bank. Let's zoom out, Patrick, and look at the whole document.
BY MR. PARDO:
Q. Do you recognize this?
A. Yes.
Q. What do you understand it to be?
A. It is a notice from the bank's attorneys when the bank called

08:46AM the loan. I'd have to read it, but.
08:46AM Q. Take a moment.
08:46AM A. Yeah, they elected to accelerate the loan, and they demanded that they get paid by the date on the letter.
08:47AM Q. So this was April 11th of 2012 that the bank was demanding payment on the loan, correct?
08:47AM A. Yes.
08:47AM Q. Now, at this point in time, April 11th, 2012, did FTP notice a capital call from Transpark?
08:47AM A. Did we notice a capital call?
08:47AM Q. Correct.
08:47AM A. No.
08:47AM Q. Did you tell Transpark pursuant to the Profit Participation Agreement that there was a capital call to pay off the loan?
08:47AM A. No.
08:47AM Q. Did you even tell them that the bank had sent a default notice?
08:47AM A. I believe the bank had served them with other papers. I don't remember exactly when, but this was just a notice to pay the loan.
08:47AM Q. Sir, this was before suit was filed, right?
08:47AM A. Probably.
08:47AM Q. So before the lawsuit was filed, did you tell Transpark that you had been served with a default notice from the bank?
08:48AM A. I don't -- I don't recall, no.
08:48AM Q. Okay. Plaintiff's Exhibit 59. Another default notice 12 days

08:48AM later, correct? In evidence, excuse me.
08:48AM A. Yes, yes.
08:48AM Q. Same thing; you didn't tell Transpark that you got a second default notice and the bank was again rejecting payment and saying: Pay the loan in full?
08:48AM A. I'm sorry, what was the question?
08:48AM Q. Just like the first default notice, you didn't tell Transpark this is the second default notice, correct?
08:48AM A. Yes.
08:48AM Q. You didn't tell Transpark about this default notice, correct?
08:48AM A. Yeah, it's the same as the first one.
08:48AM Q. You didn't tell Transpark there was a capital call necessary after receiving this default notice, right?
08:48AM A. No.
08:48AM Q. You would agree with me, correct?
08:48AM A. Yes.
08:48AM Q. Exhibit 60 in evidence, Plaintiff's Exhibit 60 in evidence. Now we're in May of 2012. Another default notice from the bank, same thing?
08:49AM A. Yes, they -- they knew it was in default, but I don't recall if I specifically told -- well, I discussed it with Nathan Heber.
08:49AM Q. Not Greg Mirmelli?
08:49AM A. I -- I can't remember specifically, but he knew about it.
08:49AM Q. He knew about this notice specifically?
08:49AM A. He knew that the loan was in default.

08:49AM Q. Did he know about this notice that --
08:49AM A. I -- I don't know if he knew about this specific notice.
08:49AM Q. Certainly FTP didn't tell him about this notice, correct?
08:49AM A. I don't recall.
08:49AM Q. Plaintiff's Exhibit 61 in evidence. Another default notice, dated June 22nd, where the bank is once again rejecting payment and demanding payment in full of the loan, correct?
08:49AM A. Yes.
08:49AM Q. Just like before, you didn't tell Transpark about this notice?
08:49AM A. I don't recall.
08:49AM Q. You didn't make a capital call under the Profit Participation Agreement after receiving this notice, correct?
08:50AM A. I discussed it with Nathan Heber.
08:50AM Q. But not Greg Mirmelli?
08:50AM A. I don't remember.
08:50AM Q. Certainly Transpark didn't -- excuse me, certainly FTP didn't send a notice to Greg Mirmelli after receiving this default notice from the bank, right?
08:50AM A. I don't remember.
08:50AM Q. Plaintiff's Exhibit 62, also in evidence. August 7th, 2012. Same thing? The bank rejected payment?
08:50AM A. Yes, they were rejecting the payments that I was making.
08:50AM Q. And demanding full payment on the loan. This is before the lawsuit was filed, right?
08:50AM A. Yes, right.

08:50AM Q. There were more notices. Plaintiff's Exhibit 64, also in evidence. September 2012, once again, the same thing, right?
08:50AM A. Same thing.
08:50AM Q. Plaintiff's Exhibit 65, also in evidence. Same thing, right?
08:51AM A. Well, every time I tried to pay the bank, they wouldn't accept the payment.
08:51AM Q. Because they demanded payment in full of the loan, correct?
08:51AM A. Right.
08:51AM Q. And you didn't make a capital call to Transpark telling them that they had to pay a 30 percent pro rata share of the loan, correct?
08:51AM A. I don't -- I don't recall.
08:51AM Q. Okay. Now, how were all of these notices sent to FTP, by what method?
08:51AM A. It says electronic mail and via courier.
08:51AM Q. Well, let's go back to the previous one starting at 58, the first time they sent notice. Plaintiff's Exhibit 58, and let's just scroll through them, please. FedEx?
08:51AM A. Yes.
08:51AM Q. Uses the word "notice and default" in the default notice?
08:51AM A. I'm sorry, is that a question?
08:51AM Q. Yeah. The notice itself uses the words "default and notice" within the document?
08:52AM A. Where does it say that?
08:52AM Q. "As a result of the default." Third line up or fourth line up

08:52AM from the bottom of the first paragraph, halfway through the line "as a result of the default." Scroll down. Scroll down. My apologies. Let's call up the first paragraph.

08:52AM As a result of the default, BB&T has elected to accelerate the loan?

08:52AM A. Yeah, but where does it say "notice"?

08:52AM Q. I'm sorry. You think this wasn't a notice now?

08:52AM A. That's what it says.

08:52AM Q. Okay. Very well.

08:52AM A. As a result of the default.

08:52AM Q. Plaintiff's Exhibit 59, same thing?

08:52AM MR. PARDO: Patrick, if you would, thank you.

08:52AM BY MR. PARDO:

08:52AM Q. Same thing? "You are in default," second line?

08:53AM A. Yes, it says "you are in default."

08:53AM Q. That's how FTP knew that the bank was holding it in default, right?

08:53AM A. Well, this is addressed to me because I had guaranteed the loan.

08:53AM Q. Correct. But --

08:53AM A. It said I was in default.

08:53AM Q. Correct. But this is emblematic of how a default notice should be sent, right?

08:53AM A. I wouldn't say that.

08:53AM Q. How else should a default notice be sent under a document that

says you have to give notice of a default in a specific way?
A. You'd have to ask their lawyer how they sent it.
Q. Okay. So you're now saying it's typical to consult with a lawyer to determine how a default notice should be sent?
A. Sometimes.
Q. Well, how about in this case? Was it appropriate for you to consult with a lawyer in order to determine how these default notices should have been sent?
A. I don't know.
Q. Certainly at no point between May 2006 and August 2021 did you ever consult your lawyer, Moises Grayson, to determine whether a default notice should be sent to Transpark under the Profit Participation Agreement, right?
A. Moises Grayson wasn't involved in this. Except for the closing.
Q. Okay. So between the time that you entered into the contract without telling Transpark and selling the property without telling Transpark, did you consult with Moises Grayson whether or not you should send any sort of notice to Transpark under the Profit Participation Agreement?
A. Prior to his involvement in the closing?
MR. NIELSEN: Objection, Your Honor.
BY MR. PARDO:
Q. Yes.
THE COURT: Sir, if you're going to object, I can't even

hear you, so you have to stand up and loudly tell me you're objecting.

MR. NIELSEN: Objection, Your Honor.

THE COURT: He has already answered, so let's try again for the next question.

You are speaking so quickly, sir, I am not following you.

MR. PARDO: Thank you.

THE COURT: The jury might be doing a better job than me.

MR. PARDO: Thank you, Your Honor.

THE COURT: You need to slow down, and you need to stop interrupting the witness.

MR. PARDO: Thank you, Your Honor.

BY MR. PARDO:

Q. You would agree with me that you did not consult with Moises Grayson at any time between when you went under contract to sell the property without telling Transpark and when you sold the property without telling Transpark, correct?

MR. NIELSEN: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: I only dealt with Moises Grayson for the closing.

BY MR. PARDO:

Q. That's right. But in between the points in time when you went under contract to sell the property without telling Transpark and sold the property without telling Transpark, you didn't consult

Moises Grayson to determine whether you should give notice to Transpark under the Profit Participation Agreement, correct?
A. You mean notice in the past?
Q. No, no. Notice during that time from when you went under contract to when you sold the property, you didn't consult with him?
A. No, no.
Q. Why, again, was the loan in foreclosure with BB&T in 2012, 2011?
A. The Colonial Bank had made the original loan, and Colonial Bank was sold to BB&T, and both -- Colonial Bank didn't want to renew the loan. It was -- for whatever reason, they had promised me they would renew it and we were negotiating, and then they said they wouldn't renew it. And then they sold the loan to BB&T who, you know, who wouldn't renew it also.
Q. Because it was the same loan officer, Orlando Gelpi, that was dealing with --
A. In the beginning, yes.
Q. BB&T's loan officer was the same loan officer as was with Colonial Bank, correct?
A. Yeah, when Colonial was sold to BB&T.
Q. Now, when the loan foreclosure lawsuit was filed, FTP raised certain defenses, correct?
A. Yes.
MR. PARDO: Can we pull up Plaintiff's Exhibit 69 in

08:57AM evidence.
08:57AM BY MR. PARDO:
08:57AM Q. Do you recognize FTP's affirmative defenses in that BB&T foreclosure lawsuit?
08:57AM A. That's what it says.
08:57AM Q. Now, in your defenses you didn't allege that Transpark was required to defend or contribute towards the foreclosure, correct?
08:57AM A. Correct.
08:57AM Q. You didn't cross-claim or sue Transpark for its contribution to defend the BB&T lawsuit, correct?
08:57AM A. Correct. Transpark isn't part of this lawsuit.
08:57AM Q. You didn't allege in the lawsuit that Transpark wasn't paying its rent and that's why the property went into foreclosure, correct?
08:57AM A. Correct.
08:57AM Q. You didn't even consult with Transpark or Greg Mirmelli during the lawsuit, correct?
08:57AM A. No, I spoke with Nathan Heber about it.
08:58AM Q. Nathan Heber was cooperating with you at that time, correct?
08:58AM A. Correct.
08:58AM Q. Now, also around this time you were looking at selling the property, correct?
08:58AM A. No.
08:58AM MR. PARDO: Let's pull up Plaintiff's Exhibit 78. But before we do, can we get a check that it's in evidence, 78,

08:58AM please.

08:58AM THE COURT: It is not.

08:58AM MR. PARDO: We're not going to publish this to the jury,
08:58AM but we'll show it to the witness. Let's go to the next page,
08:58AM please.

08:58AM BY MR. PARDO:

08:58AM Q. Do you see the bottom email, the bottom third, without
08:59AM disclosing the contents of it? Do you see that there?

08:59AM A. Yes.

08:59AM Q. Was your email in and around March of 2012 the email address
08:59AM that's indicated there?

08:59AM A. That's my email.

08:59AM Q. You received this email from Nathan Heber?

08:59AM A. I'm sure I did.

08:59AM Q. You received it in the normal course?

08:59AM A. Yes.

08:59AM Q. You maintained it in the normal course?

08:59AM A. In --

08:59AM Q. You maintained this email? You didn't alter it in one way or
08:59AM the other?

08:59AM A. Yes, it's still my email.

08:59AM Q. And you would have been the person to retain emails on behalf
08:59AM of FTP in and around this time?

08:59AM A. Yes.

08:59AM Q. And you maintained it through the date of this lawsuit,

08:59AM correct?
08:59AM A. Did what?
08:59AM Q. You maintained this email through the date of this lawsuit, correct?
08:59AM A. Yes, it's my email.
08:59AM MR. PARDO: Your Honor, we'd like to offer Plaintiff's Exhibit 78 into evidence.
08:59AM MR. NIELSEN: Objection, Your Honor.
09:00AM THE COURT: The basis of the objection?
09:00AM MR. NIELSEN: Hearsay.
09:00AM THE COURT: It is hearsay. Move on, counsel.
09:00AM MR. PARDO: You can bring the document down. We can drop the document, Patrick. Thank you.
09:00AM BY MR. PARDO:
09:00AM Q. You would agree with me that under the Profit Participation Agreement before 2013 you had the ability to sell the property, correct?
09:00AM A. Before the foreclosure was filed, you mean?
09:00AM Q. Yeah. Before the final judgment of foreclosure was filed, you had the ability to sell the property, right?
09:00AM A. Yes.
09:00AM Q. Now, this would have been before the $5.8 million settlement payment that you made to Crimson Plaza, right?
09:00AM A. Yes.
09:00AM Q. The $5.8 million payment that you contend was accruing

09:01AM 14 percent compound interest through 2021, right?

09:01AM A. It was a capital contribution.

09:01AM Q. So before then there would not have been a capital contribution accruing all this interest, right?

09:01AM A. I'm sorry, what?

09:01AM Q. I want to zone in in the period of time before you believe you made this capital contribution that started accruing all the interest. I want to go prior to that, all right?

09:01AM A. Yes.

09:01AM Q. In and around, let's say, October of 2013, did you receive any offers to buy the property?

09:01AM A. I believe Greg Mirmelli, who was a real estate broker at the time, sent an offer, I think it was the day the foreclosure was filed.

09:01AM MR. PARDO: Let's pull up Plaintiff's Exhibit 89 in evidence.

09:01AM IT STAFF: 89?

09:01AM MR. PARDO: 89, yes, in evidence.

09:01AM THE COURT: Not in evidence.

09:01AM MR. PARDO: It's not in evidence. Okay, we'll move on.

09:01AM BY MR. PARDO:

09:02AM Q. But you do agree that Greg Mirmelli was bringing you offers to sell the property prior to putting the capital contribution in in 2013, correct?

09:02AM A. I agree that --

THE COURT: Sir. Sir.

THE WITNESS: Sorry.

THE COURT: You have to absolutely wait for him to say his last word, and then you can start talking.

THE WITNESS: Okay.

THE COURT: Okay.

THE WITNESS: I'm sorry. He sent one offer, yes, that I remember.

BY MR. PARDO:

Q. The offer was from a gentleman named Harvey Hernandez?

A. I don't recall. If you have a copy of it.

Q. Well, would it help to see the document to refresh your recollection?

A. He -- he brought an offer.

Q. But it would help --

A. On the day of the foreclosure judgment, yes.

MR. PARDO: So let's pull up Plaintiff's Exhibit 90. This is in evidence.

BY MR. PARDO:

Q. This is the foreclosure judgment entered against FTP and Bart Seidler on October 4th, 2013, correct?

A. Right.

Q. Now, under this final judgment, FTP and Bart Seidler were liable to the successor in interest of BB&T, right, Crimson Plaza?

A. Correct.

09:03AM Q. And they owed the bank over $5 million?
09:03AM A. Yes.
09:03AM MR. PARDO: Let's go to that part of the judgment.
09:03AM BY MR. PARDO:
09:03AM Q. We're looking at page 3 of the judgment. Your personal liability was $5.6 million plus interest?
09:03AM A. Correct.
09:03AM Q. At this point in time, did FTP make a capital call under the Profit Participation Agreement?
09:03AM A. I had to pay the -- either pay that judgment or lose the property.
09:03AM Q. That wasn't my question. Did FTP make a capital call to Greg or to Transpark under the Profit Participation Agreement when this judgment was entered?
09:04AM A. No.
09:04AM Q. Transpark wasn't liable under this final judgment, correct?
09:04AM A. Correct.
09:04AM Q. Now, in and around this time, wasn't it your practice to send documents via U.S. mail?
09:04AM A. No. U.S. mail? No.
09:04AM Q. U.S. mail, that was your course of conduct around this time?
09:04AM A. It was emails or phone calls.
09:04AM Q. Do you recall having your deposition taken in 2013?
09:04AM A. Yes.
09:04AM Q. In this foreclosure lawsuit?

A. Yes.
Q. You swore to tell the truth?
A. Yes.
Q. And, in fact, your 2013 deposition testimony was truthful?
A. Yes.
MR. PARDO: Let's show the witness and not publish to the jury the 2013 depo, page 77, lines 1 through 14.
Your Honor, permission to allow the witness to recite his deposition testimony.
THE COURT: No. He can read it.
BY MR. PARDO:
Q. You can read it, Mr. Seidler.
THE COURT: To himself.
BY MR. PARDO:
Q. Please.
A. What's the context here? I think this is referring to notices to the bank. It says: How did you send it?
What are they referring to?
Q. Well, your course of conduct around this time was to send stuff by U.S. mail usually, right?
A. No. With Transpark it was email and phone calls. I don't know what this is referring to. Kindly show me, please, what -- what -- how did you send it? Send what?
Q. Well, look at the bottom. Your course of conduct wasn't to send stuff U.S. mail? Look at the bottom line, line 13 and 14.

Your course of conduct wasn't to send stuff U.S. mail? Isn't --
A. I think it's referring to the bank. I don't know. You won't show me what was before that, so I can't answer your question properly, sir.
Q. Now, around this time you knew how to get ahold of Greg Mirmelli, right?
A. Which time?
Q. 2013. October, November, December of 2013, you knew how to get ahold of Greg Mirmelli?
MR. PARDO: You can take it down, Patrick, thank you.
THE WITNESS: Yes.
MR. PARDO: Let's pull up Plaintiff's Exhibit 95. In evidence, correct?
MS. MACKIEWICZ: Yes.
MR. PARDO: Thank you.
BY MR. PARDO:
Q. You would agree with me --
MR. PARDO: We can publish this to the jury.
BY MR. PARDO:
Q. -- that in December of '13, you and Greg were still in regular communication? You were telling him when you were coming back into town?
A. Okay. That's regarding an apartment Greg wanted to lease.
Q. Right. But my point is, you were in regular communication with Greg around this time?

09:07AM A. There is an email there, yes.
09:07AM Q. You knew how to get ahold of him?
09:07AM A. Yes.
09:07AM Q. Very well. Now, the $5.8 million settlement payment was paid pursuant to what contract? What agreement?
09:07AM A. A settlement agreement.
09:07AM Q. Let's pull up Plaintiff's Exhibit 96 in evidence. Publish it to the jury. Is this the confidential settlement agreement that you and the FTP entered into with Crimson Plaza, LLC?
09:07AM A. Correct.
09:07AM Q. This is the agreement that you held a company meeting to approve?
09:07AM A. That what?
09:07AM Q. You held a company meeting to approve this settlement agreement?
09:07AM A. Yes.
09:07AM Q. Transpark is not a party to this confidential settlement agreement?
09:07AM A. Correct.
09:07AM Q. Transpark didn't negotiate this confidential settlement agreement?
09:08AM A. No.
09:08AM Q. Transpark wasn't given an opportunity to negotiate this confidential settlement agreement?
09:08AM A. They weren't -- they weren't named in the lawsuit, they

09:08AM weren't part of the lawsuit or this agreement.
09:08AM Q. And, therefore, they weren't required to make the payment that arose under this agreement, correct?
09:08AM A. No.
09:08AM Q. No, you disagree with me?
09:08AM A. No, I said they -- FTP and myself had to make the payment.
09:08AM Q. Not Greg?
09:08AM A. Correct.
09:08AM Q. Now, let's go to the next page, which says what that payment was. This is the $5.8 million settlement payment on Section 2A, right? Let's call up Section 2A at the top, right. That's the $5.8 million payment, correct?
09:08AM A. Okay. What's the question?
09:09AM Q. You recognize that it was this provision in this confidential settlement agreement --
09:09AM A. You're showing it to me. I didn't specifically recognize it.
09:09AM Q. That's why I'm showing it to you.
09:09AM This Section 2A reflects the $5.8 million confidential settlement payment that FTP was making to Crimson Plaza, correct?
09:09AM A. Correct.
09:09AM Q. And, in fact, there was a confidentiality provision in this agreement, correct?
09:09AM A. Correct.
09:09AM Q. FTP and you individually were precluded from telling anybody about this payment, correct?

09:09AM A. I'd have to read the confidentiality agreement, but probably, yes.
09:09AM Q. Now, you, Bart Seidler, acted on behalf of FTP when deciding to enter into this confidential settlement agreement, right?
09:09AM A. Yes.
09:09AM Q. Let's pull up Plaintiff's Exhibit 97 in evidence. Let's talk about the source of the funds that made the confidential settlement payment.
09:10AM On December 23rd, there was a $5.8 million deposit, do you see that line highlighted in front of you?
09:10AM A. Yes.
09:10AM Q. The source of those funds was you, correct?
09:10AM A. Was FTP Investment Corporation. The money was -- was this the wire to -- yeah, the source was from FTP Investment.
09:10AM Q. Well, some of that money was your money, right?
09:10AM A. Different moneys that I put together, I scrambled to get the money.
09:10AM Q. Well, didn't you have the means to pay this judgment?
09:10AM A. Myself?
09:10AM Q. Yourself, yes, sir.
09:10AM A. No, I had to borrow money, I had to take money from some of my companies, I had to scramble to pay that kind of money.
09:11AM Q. You didn't tell the bank that you had the funds to pay off the loan?
09:11AM A. I signed -- it wasn't the bank, it was Crimson.

09:11AM Q. No, but during the BB&T lawsuit, didn't you tell the bank that you had the money to pay off the loan?
09:11AM A. I don't recall saying that.
09:11AM Q. Okay. Let's talk about where you deposited these moneys. Let's look at the Account No. 7634. Do you see that there?
09:11AM A. Yes.
09:11AM Q. That is not the bank account associated with the property at 130 Southeast 1st Street, correct?
09:11AM A. That is an account of FTP Investment Corporation.
09:11AM Q. I hear you, that's an account specifically for the Mojave property, correct?
09:11AM A. It might be, I'm not sure.
09:11AM Q. Well, it's certainly not a designated account for the parking lot at issue in this case, right?
09:11AM A. I'm not sure, sir. It's an FTP investment account of money that I scrambled to put together to pay the money so I didn't lose the property or have a judgment against me for $5.8 million.
09:12AM Q. But certainly, there is only one parking lot account with Wells Fargo, right?
09:12AM A. I think there are several, actually.
09:12AM Q. This wasn't one of them?
09:12AM A. I don't know. I don't memorize my account numbers.
09:12AM Q. Okay. Well, this -- around this --
09:12AM A. It says from savings. I don't know. I put the money together in one account, I had to wire it to them, and it came out of this

account, but it was FTP Investment, it was personal funds and FTP Investment funds, and all the money I could scramble to get to pay off a foreclosure judgment.
Q. Now, on December 24th, you would agree with me you knew how to get ahold of Greg Mirmelli, right?
A. About what?
Q. Making a capital call to the venture if he needed to contribute?
A. On which date?
Q. December 24th, the date of the confidential settlement payment was made to Crimson Plaza?
A. I think the settlement was made before that. You mean when the money was wired?
Q. Yeah, the wire was made on December 24th, do you see that on the left-hand column?
A. Right. It was coming from FTP to pay a settlement agreement.
Q. Right. But on that date, the date that the money was actually being paid, you knew how to get ahold of Greg Mirmelli, correct?
A. I -- I knew what?
Q. How to get ahold of Greg Mirmelli, correct?
A. I assume so, yes.
Q. Well, let's show you Plaintiff's Exhibit 100 in evidence and do a side by side between 97 and 100. Same date on the top of this email, December 24, 2013, from you to Greg Mirmelli?
A. Yes.

Q. So on the same day that you're wiring a confidential settlement payment to Crimson, you were also emailing Greg Mirmelli about other matters that you had going on together, correct?
A. I was responding to him trying to rent a three-bedroom apartment.
Q. Some other business that you had together, right?
A. Pardon?
Q. Some other business that you had together at the time?
A. No, he was trying to rent an apartment.
Q. Yes, he was trying to serve as your broker for an apartment, right?
A. He was trying to make a commission renting an apartment.
Q. That's right, you had other business with him around this time, right?
A. Not really, but...
Q. Well, when somebody is trying to earn a commission, isn't that business? Aren't they trying to earn money?
A. Yeah, he is trying to make money on the rental.
Q. Now Section 2C of Plaintiff's Exhibit 1, top of PDF page 3, Section 2C, all right. This is that 10-day notice provision that we looked at, FTP is responsible for noticing capital contribution at least ten days prior to the date moneys are required?
A. That's what it says.
Q. Okay. We can take this down and go back to Plaintiff's

Exhibit 97, which is that outgoing wire to Crimson Plaza. Did you send any notice to Greg at least ten days prior to December 24, 2013, that you were making this settlement agreement?
A. I don't think so, no.
Q. Now, as a result of this payment, the judgments against FTP and you individually were vacated, right?
A. Correct.
Q. Let's pull up Plaintiff's Exhibit 105 in evidence. This is the order that vacated the default judgment, correct? Not the default judgment, excuse me, the final --
A. Yes, it looks like it.
Q. This is the order that vacated the final judgment and dismissed the case against you, correct?
A. That's what it says.
Q. Now, afterwards, you ultimately released the property to a new tenant, correct?
A. About -- many years later, yes.
Q. Let's pull up Plaintiff's Exhibit 112 in evidence. This is the lease that was entered into with City Parking, correct?
A. Yes.
Q. They were paying over half a million dollars a year in rent?
Let's look at the bottom of page 1 and the top of page 2 regarding rent.
A. Starting in 2017, yes, 500,000 per year.
Q. That made the parking lot profitable?

09:17AM A. I -- I believe, yes, because there was no mortgage.
09:17AM Q. Profitable, right?
09:17AM A. It was just expenses, property taxes.
09:17AM Q. That's right, between 2017 and 2021, the business was making money, right.
09:17AM A. Yes.
09:17AM Q. 2018, it made over $300,000 a year?
09:17AM A. I don't have the exact number, but...
09:17AM Q. Several hundred thousand dollars a year every year between 2017 and 2021, correct?
09:17AM A. I'd have to see the statements, but if you say so.
09:17AM Q. Any reason to doubt that?
09:17AM A. Pardon?
09:18AM Q. Any reason to doubt that?
09:18AM A. I'm not looking at the financial statement so I can't tell you exactly what it made, but it was profitable.
09:18AM Q. You seem to be pretty good at knowing, in your head, when you're losing money. So in and around this time, did you know in your head that you were making money or losing money?
09:18AM A. I said it was profitable.
09:18AM Q. Very well. In 2021, you entered into a purchase and sale agreement with the Alright (phonetic) Corporation or Blutrich Corporation, correct?
09:18AM A. Yeah, there was a purchase and sale agreement.
09:18AM Q. Let's pull up Plaintiff's Exhibit 123, this is the purchase

agreement that you signed with Blutrich Acquisition, Inc.?
A. Yes.
Q. And you didn't tell Transpark or Greg that you were signing this contract?
A. No.
Q. Did you check to see whether Transpark had been reinstated on Sunbiz around this time?
A. No.
Q. Did you receive -- did you send any written correspondence to Greg telling him that the property was about to be sold?
A. No.
Q. Let's go to Sections K and L of this purchase and sale agreement. These are representations and warranties that you made. Keep on going, if you don't mind.
This is what happens when you go out of order, your technician needs to catch up. I apologize.
Representations and warranties, Section 5, 5.01, and let's go to the next page. The next page, K and L. No consents and no conflicts. You made these representations to the buyer, correct?
A. Correct.
Q. We'll just leave it up on the screen for everyone's benefit for a few seconds.
FTP called a company meeting to approve this purchase contract, correct?
A. Yes.

Q. It passed a resolution saying it was in the best interest of the company to sell this property, right?
A. Yes, passed a resolution to sell it, yes.
Q. Because it was in the best interest of the company to sell the property, right?
A. I don't know if they used those words, but it's a resolution to sell, yes.
Q. Let's look at the resolution, Plaintiff's Exhibit 128.
A. That's what it says, yes.
Q. Okay. Very good.
MR. PARDO: We can take it down. Now let's pull up Plaintiff's Exhibit 136.
BY MR. PARDO:
Q. This is the -- in evidence -- the closing statement from the sale of the property in 2021, correct?
A. Correct.
Q. You would agree with me that the purpose of the closing statement is to show the accounting for the closing?
A. Yes.
Q. You would agree with me that nowhere on this settlement statement would the jury see a reconciliation of capital contributions, correct?
A. Correct.
Q. Nowhere on this closing statement will the jury see a preferred return distribution to FTP, correct?

A. Correct.
Q. There is no mention of moneys due to FTP pursuant to a Profit Participation Agreement in this closing statement, correct?
A. Correct.
Q. And neither Greg nor Transpark was provided a copy of the closing statement?
A. No.
Q. Now, around this time FTP's understanding of profit is whatever the plain, ordinary meaning of the word "profit" is, correct?
A. I'm sorry?
Q. The meaning of the word "profit," you would prescribe it a plain and ordinary meaning?
A. What is it -- what plain and ordinary meaning are you using?
Q. Around August of 2021, what did FTP understand the word "profit" to mean as it was used in a real estate transaction context?
A. I would say money left over after paying all expenses, deducting capital contributions, interest owed, all the expenses including interest -- what's left over.
Q. Including the preferred return that you believed was owed to you in August of 2021?
A. It would include that, yes.
Q. Okay. So let's go to line 401 of the closing statement. And we agree that the sale price was $18 million, right?

A. Yes.
Q. Line 601 shows a 1-and-a-half-million-dollar deposit that had been previously made and released to FTP, correct?
A. Yes. I think it's the money that the buyers put up as a deposit.
Q. Right, that hard money deposit that Mr. Stewart Mirmelli was talking about, right?
A. Yes, probably.
Q. Line 515 shows 13-and-a-half-million dollars going to -- that's API, the 1031 exchange that is similar to the capital gains that you brought in when you bought the property, right?
A. Yes.
Q. So you brought in about $4 million of capital gains and you left with about 13-and-a-half-million dollars of capital gains?
A. No, that doesn't say what the gain is; it just shows the money going in and out.
Q. Well, what money are you allowed to put into a 1031 exchange?
A. Pardon?
Q. What money is allowed to go into a 1031 exchange? The capital gains, right?
A. The sale price.
Q. The entire sale price can go into the 1031 exchange?
A. No, the entire -- that's money that went into asset preservation, but the capital gain is going to be done on your tax return.

09:25AM Q. Right, but my point is: What sorts of moneys are you allowed to put into a 1031 exchange, if you know?
09:25AM A. Moneys from sale of a property.
09:25AM Q. Capital gains that you're allowed to defer to a future date, correct?
09:25AM A. The capital gain is not determined, but it's money from the sale of the property.
09:25AM Q. Correct.
09:25AM A. So you don't pay a capital gain.
09:25AM Q. That's right, you roll over the capital gains to a future transaction?
09:25AM A. Right.
09:25AM Q. And in this case from that 13-and-a-half-million dollars that you sent to Asset Preservation, Inc., $3 million was used to buy the warehouse in Miami, correct?
09:25AM A. Correct.
09:25AM Q. And 10-and-a-half-million dollars came back to FTP in around December of 2021, correct?
09:25AM A. I think, yes.
09:26AM Q. And then that money got distributed to you and your trust, correct?
09:26AM A. Yes.
09:26AM Q. Now, let's look at line 803 of the closing statement. This is after you deduct the -- from the $18 million sale price, less the closing expenses, brokerage fees, what have you, less the

1-and-a-half-million-dollar deposit, less the 10-and-a-half-million dollars that went to Asset Preservation, Inc., for a 1031 exchange, there is still 2-and-a-half-million dollars that's cash to the seller, right?

A. Yes.

Q. That's what's called a seller's boot?

A. Yes.

Q. If we add those three numbers up, one-and-a-half, two-and-a-half, 13-and-a-half, you got 17-and-a-half-million dollars of cash flow?

A. Yeah, I -- whatever. The document speaks for itself.

Q. Very well. A-million-and-a-half, that deposit, went straight to you, Bart Seidler, right?

A. I -- I don't remember exactly where it went, but.

Q. Well, the million-and-a-half --

MR. PARDO: Let's pull up Plaintiff's Exhibit 137, in evidence.

THE WITNESS: It probably went into FTP's account.

MR. PARDO: Not in evidence. I apologize. Let me take a break on that. No, not in evidence. Don't show it, please.

IT STAFF: Just to the witness.

MR. PARDO: Thank you. Let's pull it down for a moment.

BY MR. PARDO:

Q. Would it help refresh your recollection if you saw the check for 1-and-a-half-million dollars to see to whom it was written?

A. Yes, but the money didn't go straight to me, it went to FTP.

MR. PARDO: Let's now pull up that exhibit without publishing it to the jury.

BY MR. PARDO:

Q. Take a good hard look at it. Take note of the final four digits of the account number on this check. There you go. And which account it was in the top left-hand corner.

A. Yes.

MR. PARDO: Okay. We can take this down now.

BY MR. PARDO:

Q. A million-and-a-half dollars went directly to Bart Seidler, correct?

A. It went from the closing to FTP Investment, and then it went from FTP Investment to me.

Q. Not just FTP Investment, the specific bank account from FTP Investment dealing with this property, correct?

A. FTP Investment has several accounts. They're all company accounts, and that's one of the company accounts.

Q. Didn't you testify yesterday that each property has its own account?

A. Yes, for operations, yes.

Q. And this was the operations account for the -- if I may --

A. It's still an FTP account. If it's -- for some reason it was paid out of that account. This is not confusing. It's FTP Investment, always company accounts.

09:29AM Q. I understand that, sir, but there is the FTP Investment parent company with all of its properties across the country, and then there is the FTP account for this property, a specific account just for this property. It's still an FTP account, but it's for this property?
09:29AM A. Yeah, but it's not consider --
09:29AM MR. NIELSEN: Objection, Your Honor.
09:29AM THE WITNESS: It was for operations when it was operating.
09:29AM THE COURT: Excuse me, sir. There was an objection.
09:29AM If you're not louder, your client can't hear it.
09:29AM So the objection is overruled. Please finish answering the question.
09:29AM THE WITNESS: I'm sorry, could you repeat the question.
09:29AM BY MR. PARDO:
09:29AM Q. I was differentiating, sir, between FTP's many accounts for all of its various properties across the country and the specific operations account for this property for which the closing funds, the sale proceeds, went into. Do you understand that distinction?
09:30AM A. Yeah. I don't remember where the closing funds went into. I know they went into FTP Investment.
09:30AM Q. Right.
09:30AM A. Specifically which account --
09:30AM MR. PARDO: Let's show the witness -- it's not in evidence -- Plaintiff's Exhibit 138. Take a look at the account

09:30AM number in the middle right-hand side where it says "account
09:30AM number," bottom third on the right-hand side. Let's call that up.
09:30AM BY MR. PARDO:
09:30AM Q. You would agree with me, sir, that this is a bank statement
09:30AM from the parking lot account for this property, right?
09:30AM A. One of the parking lot accounts, yes.
09:31AM Q. Oh, so now there's more than one parking lot account?
09:31AM A. Yes.
09:31AM Q. Yesterday there was just one for each account; now there's
09:31AM multiple?
09:31AM A. No, I didn't say there was just one. You asked me about if
09:31AM there was an account for the parking lot, and there is, but I
09:31AM think there are several accounts for the parking lot.
09:31AM Q. Okay. Let's go back to the master document. This is the
09:31AM account where the sale proceeds went though, right?
09:31AM A. You'd have to show me where it went.
09:31AM Q. Let's look at the next page. On August 24th, this is where
09:31AM the sale proceeds, the seller's boot and all that money got sent
09:31AM back to FTP from the sale, correct?
09:31AM A. Into -- into which account?
09:31AM Q. The FTP account for this property, sir.
09:32AM A. Where is the account number on this?
09:32AM Q. Let's go back to the first page. Look at how it's described.
09:32AM A. Yeah, that's -- that's where that money went.
09:32AM Q. Now, FTP maintained this bank account in the normal course of

its business?
A. Does FTP maintain bank accounts?
Q. Yes.
A. Yes.
Q. And the statements, you would have maintained in the normal course of business?
A. Yes.
Q. You, sir, would have been the one responsible for maintaining bank statements such as this?
A. Pardon?
Q. You would have been the person responsible for maintaining bank statements such as this one?
A. My -- my bookkeeper does.
Q. On behalf of FTP Investments though, right?
A. My bookkeeper does, yes.
Q. Okay.
MR. PARDO: Your Honor, we'd like to introduce Plaintiff's Exhibit 138 into evidence.
MR. NIELSEN: Objection, Your Honor.
THE COURT: Sustained. It's not a business record.
BY MR. PARDO:
Q. But you would agree with me --
MR. PARDO: We can take this document down.
BY MR. PARDO:
Q. -- that the sale proceeds did go into the parking lot account

09:33AM and Transpark didn't get any of them, right?
09:33AM A. Yes.
09:33AM Q. And then when the money came back from the 1031 exchange, Transpark didn't get any of that money as well, correct?
09:33AM A. Yes.
09:33AM MR. PARDO: Let's pull up Plaintiff's Exhibit 142, in evidence. This is the tax return for FTP in 2021.
09:33AM BY MR. PARDO:
09:33AM Q. Do you recognize the document?
09:33AM A. Yes, I recognize it.
09:33AM Q. FTP reported $11.4 million in capital gains.
09:33AM MR. PARDO: Let's go to page 6, I believe. Let's call up Part 1 there.
09:34AM THE WITNESS: Yes, that's what it says.
09:34AM BY MR. PARDO:
09:34AM Q. FTP swore to the government that it made $11.4 million in capital gains on this property?
09:34AM A. I'm sorry, what? Sir, could you speak into the mic a little.
09:34AM Q. FTP swore to the government in this tax return that it made $11.4 million in capital gains, correct?
09:34AM A. FTP filed a tax return showing that, yes. It has the wrong address on it, but that wasn't me, that was my accountant.
09:34AM Q. It also has the wrong purchase date on it, right?
09:34AM A. Yeah, that wasn't -- that was my accountant.
09:34AM Q. But we agree that you had $11.4 million capital gains, that's

for sure?
A. That's what it says.
Q. And that's right? That's correct?
A. I assume so, yes.
Q. Well, you would have reviewed this tax return before you signed it and sent it to the government, right?
A. I review it briefly. My accountant -- my CPA does the returns. I don't study them, but if that's what he put, that's what it was.
Q. And those $11.4 million in capital gains were eventually taxable, correct?
A. Yes.
Q. And taxes were paid on that income, correct?
A. Yes, of course.
Q. Let's pull up Plaintiff's Exhibit -- excuse me, Defendant's Exhibit 111, it's not in evidence so we will just publish -- excuse me, show it to the witness.
MR. PARDO: And at this time, Your Honor, if there is no objection to the document, we'd like to move it into evidence.
MR. NIELSEN: Let me see it.
MR. PARDO: This is --
THE COURT: Is it defense?
MR. PARDO: It's a Defense Exhibit 111, there is no objection to the exhibit.
THE COURT: Counsel.

09:36AM MR. NIELSEN: No objection, Your Honor.

09:36AM THE COURT: All right. Defense 111 is admitted.

09:36AM (Defense Exhibit 111 was received.)

09:36AM MR. PARDO: And I'd like to do a side by side with Defendant's Exhibit 122, not in evidence yet, at this time if there is no objection, we would like to move Defendant's Exhibit 122 in evidence.

09:36AM THE COURT: Is there an objection to 122 coming into evidence?

09:36AM MR. NIELSEN: Can I see it?

09:36AM THE COURT: It's your exhibit, it's Defense 122.

09:36AM MR. NIELSEN: No objection, Your Honor.

09:36AM THE COURT: All right. 122 is admitted.

09:36AM (Defense Exhibit 122 was received.)

09:36AM MR. PARDO: All right. Let's do a side by side of page 10 from Defendant's Exhibit 111, and page 1 from Defendant's Exhibit 122. And let's pull up each of the accounts 2800 capital contributions. On the left, it will be in the top third, thank you, and on the right it will be in the bottom right there. Perfect.

09:37AM BY MR. PARDO:

09:37AM Q. So, sir, on the left, I will represent to you, is FTP, the entire company's general ledger, and on the right is just the general ledger for the parking lot account, okay.

09:37AM Are you with me so far?

A. Okay.
Q. Why is it that the capital contributions for the parking lot account in 2021 show a return of 1-and-a-half million dollars? Do you see on the right-hand side the check that we saw for 1-and-a-half million dollars?
A. I don't -- I don't know why it shows that. I guess that's the million and a half dollars I got.
Q. For what?
A. I -- I don't know what this is.
Q. How come it doesn't show a reconciliation of capital contributions that you contend were made when the property was sold?
A. This -- this is FTP's accounting.
Q. On the left side is FTP's accounting for its entire company in 2021, in December -- excuse me, for 2021, the entire year. That's the whole company's general ledger.
What's a general ledger, sir?
A. What's a general ledger?
Q. Yes.
A. It's a general ledger of the company.
Q. It shows all the banking entries for that company?
A. It shows the financial activity, yes.
Q. Financial activity of a company in 2021, you've got the entire company's financial activity with respect to capital contributions in 2021, and on the right side you have all the parking lot

09:39AM accounts, financial activity for 2021, capital contributions.
09:39AM A. So what's your question, sir?
09:39AM Q. Why doesn't this show a reconciliation of capital contributions that you contend were made to the property?
09:39AM A. Why doesn't it show what?
09:39AM Q. A reconciliation, an advanced distribution, a preferred return, why doesn't your own general ledger show the moneys that you believe had to be repaid back to you at closing?
09:39AM A. It doesn't show that.
09:39AM Q. Because there were profits at closing, right, sir?
09:40AM A. Because what?
09:40AM Q. There were profits at closing. You didn't get a preferred return.
09:40AM A. The preferred return is not in this financial statement.
09:40AM Q. Because you got profits at the closing, right, sir?
09:40AM A. I don't understand your question, but I got -- there was a profit at the -- well, there was money that was received at the closing.
09:40AM Q. It was profit --
09:40AM A. When you calculate everything based on the agreement, it was not profitable.
09:40AM Q. You just didn't record that in your own general ledger, right?
09:40AM A. We did not put that in the general ledger.
09:40AM Q. It was just in your head?
09:40AM A. It -- it doesn't have to be in the general ledger.

09:40AM MR. PARDO: No further questions.

09:40AM THE COURT: Counsel?

09:41AM MR. NIELSEN: Your Honor, we would like to read some -- admit some exhibits into evidence.

09:41AM THE COURT: All right.

09:41AM MR. NIELSEN: Defendant's Exhibit 1 through 6.

09:41AM THE COURT: All right, 1 and 2 had already been admitted. So we'll admit 2, 3, 4, 5, and 6.

09:41AM (Defense Exhibits 3 through 6 were received.)

09:41AM MR. NIELSEN: Defendant Exhibit 9 and 10.

09:41AM THE COURT: 9 and 10 are admitted.

09:41AM MS. MACKIEWICZ: Your Honor, we objected to Exhibit 9.

09:41AM MR. NIELSEN: I don't see one on the filed document.

09:41AM THE COURT: There is no objection listed on the sheet, ma'am. Is there an objection now?

09:41AM MS. MACKIEWICZ: We provided you a sheet that had no objection to them, to my knowledge, so the answer to the question is yes, there was an objection, both hearsay and relevance.

09:42AM THE COURT: I don't see an objection to 9, ma'am, so if there is an objection to 9, you can't admit it this way.

09:42AM MS. MACKIEWICZ: Right.

09:42AM THE COURT: You can try to admit it through the witness and then we will cross that bridge when we get to it.

09:42AM So 10 is without objection.

09:42AM (Defense Exhibit 10 was received.)

09:42AM MR. NIELSEN: Defendant's Exhibit 13 and 14.
09:42AM THE COURT: Without objection?
09:42AM MS. MACKIEWICZ: No objection.
09:42AM THE COURT: Admitted.
09:42AM (Defense Exhibits 13 and 14 were received.)
09:42AM MR. NIELSEN: Defendant Exhibit 16 through 18.
09:42AM MS. MACKIEWICZ: No objection.
09:42AM THE COURT: Admitted 16 through 18.
09:42AM (Defense Exhibits 16 through 18 were received.)
09:42AM MR. NIELSEN: Defendant's Exhibit 21 and 22.
09:42AM MS. MACKIEWICZ: No objection.
09:42AM THE COURT: Admitted.
09:42AM (Defense Exhibits 21 and 22 were received.)
09:42AM MR. NIELSEN: Defendant's Exhibit 24.
09:42AM MS. MACKIEWICZ: No objection.
09:42AM MR. NIELSEN: Defendant Exhibit 26.
09:42AM MS. MACKIEWICZ: No objection.
09:42AM THE COURT: 24 and 26 are admitted without objection.
09:42AM (Defense Exhibits 24 and 26 were received.)
09:42AM MR. NIELSEN: Defendant's Exhibit 28.
09:42AM MS. MACKIEWICZ: No objection.
09:42AM THE COURT: Admitted without objection.
09:42AM (Defense Exhibit 28 was received.)
09:42AM MR. NIELSEN: Defendant's Exhibit 29.
09:42AM MS. MACKIEWICZ: No objection.

09:42AM THE COURT: Admitted without objection.
09:42AM (Defense Exhibit 29 was received.)
09:42AM MR. NIELSEN: Wait a second.
09:42AM (Brief pause to confer with cocounsel.)
09:43AM MR. NIELSEN: Excuse me, Your Honor. One second, please.
09:43AM THE COURT: Why don't you get started with this witness and then during a break we can sort that out. We will take a break at 10:00 o'clock, so why don't you start with your witness.

EXAMINATION

09:43AM BY MR. NIELSEN:
09:43AM Q. Mr. Seidler --
09:43AM A. Speak into the mic.
09:43AM Q. Mr. Seidler, by 2013 what did you consider Transpark's status of business to be?
09:44AM A. They were out of business.
09:44AM Q. By 2013, was Transpark dissolved?
09:44AM A. Yes.
09:44AM Q. By 2013, how much rent did Transpark owe you?
09:44AM A. By 2013, I think it was over $300,000 in rents that hadn't been paid.
09:44AM Q. By 2012, did -- what did you consider Transpark's status to be as a business?
09:44AM A. They were dissolved. Their bank accounts were closed and the State of Florida dissolved the company, it didn't exist.
09:44AM Q. By 2021, had Transpark ever sent you a notice stating that

they were back in business?
A. Never.
Q. By 2021, had Transpark ever sent you a notice that they were un -- reinstated as a business?
A. I'm sorry, what?
Q. By 2021, had Transpark sent you a notice stating that they were reinstated as a business?
A. No, they did not.
Q. So, by 2021, did you consider Transpark to still be dissolved?
A. They were gone, it was gone.

MR. NIELSEN: No further questions, Your Honor, and I reserve the right to recall him for my case in chief.

THE COURT: Any redirect?

MR. PARDO: No redirect, Your Honor.

THE COURT: Thank you, sir, you can go back to defense table.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Call your next witness.

MR. PARDO: Plaintiff calls Greg Mirmelli.

Your Honor, can we take a five-minute comfort break?

THE COURT: We're going to take a break at 10:00 o'clock because I have my calendar call at 10:00.

MR. PARDO: Okay. Very well.

THE COURT: Thank you.

09:45AM MR. PARDO: Mr. Nielsen has offered to read some additional exhibits, if that's okay with Your Honor.

09:45AM THE COURT: No. It's your case in chief, he doesn't have a witness on, let's go.

09:46AM (The witness is sworn.)

09:46AM THE WITNESS: Yes.

09:46AM THE COURTROOM DEPUTY: Thank you. Please have a seat.

09:46AM THE WITNESS: Thank you.

09:46AM THE COURTROOM DEPUTY: Please state your first and last name for the record.

09:46AM THE WITNESS: Gregory Mirmelli.

09:46AM THE COURTROOM DEPUTY: Thank you.

09:46AM THE COURT: You may proceed, Counsel.

09:46AM MR. PARDO: Thank you, Your Honor.

09:46AM GREGORY MIRMELLI, THE PLAINTIFF, SWORN

09:46AM DIRECT EXAMINATION

09:46AM BY MR. PARDO:

09:46AM Q. Greg, could you introduce yourself to the jury, please.

09:46AM A. Good morning, my name is Greg Mirmelli, nice to meet you.

09:46AM Q. Greg, what's your relationship with Transpark, LLC?

09:46AM A. I am the hundred percent shareholder.

09:47AM Q. When, to the best of your knowledge, was Transpark formed?

09:47AM A. Approximately, the time of the acquisition of the property, 2006.

09:47AM Q. And what was the purpose of forming Transpark?

A. To hold my ownership interest in accordance with the Profit Participation Agreement.
Q. Now, was the transaction, this property at 130 Southeast 1st Street your first real estate venture?
A. No.
Q. Could you tell the jury, when was your first real estate venture in Miami, Florida?
A. I believe it was in 1998.
Q. Could you give a sense of how many transactions in real estate you had done between, let's say, 1998 and 2006?
A. 25.
Q. Would you give the jury a sense of the kinds of transactions you did?
A. I was -- I was very active as an acquisition specialist. I would tie up properties with my own money and, in some cases, take on a partner and buy the properties with the partner in the sense of putting up the money equally, and in other cases where the deals were larger than I could do by myself, I would take control of them by putting a contract together with a due diligence period, which meant money that was not hard, soft money, and during that soft money period, I would show them to potential investors and I would explain to them how coming from South Beach and seeing how great it is, downtown is the next thing, it's going to explode, and convince them this is the place to invest.
And that's how I successfully closed on approximately, like

I said, 25 transactions in Downtown Miami with numerous, numerous, numerous very big, intelligent, sophisticated real estate investors.
Q. How old were you in 1998?
A. In 1998, I was 25 years old.
Q. Could you give the jury a sense of how you learned the real estate market.
A. It was -- I was blessed to have just been born in Miami Beach, at which time Miami Beach was a complete slum, as you will, in 1973 through 1983 when movies like Scarface were coming out and it was infamous for just being a big, like, murderous cartel, such cities, and Miami Vice was the thing that sort of put Miami on the map, and it was a dangerous place.
I mean, it was nothing like it is today. And my parents had owned a hotel that literally didn't go up in value from 1950 till 1990, like it was just stagnant because of all that.
So having seen the things that happened between 1990 and 1998 when I made my first acquisition, like the Delano Hotel opened up --
MR. CASABIELLE: Objection, Your Honor. Nonresponsive.
THE COURT: Sustained. Sir, this is not a narrative about Miami Beach.
Why don't you ask questions.
MR. PARDO: Very well.
THE COURT: Excuse me.

THE WITNESS: I can answer it better.

THE COURT: All right. So nobody can talk over me. Nobody can talk over each other --

THE WITNESS: I apologize.

THE COURT: -- either, because we don't get a record, so I am trying to provide instruction to make sure that we have a record and that we can all follow along.

Ask him specific questions.

Wait till he is finished with his question. Don't speak over him.

Don't speak over your client. You can proceed.

MR. PARDO: Thank you, Your Honor.

BY MR. PARDO:

Q. Greg, what is a promote interest in the real estate industry?

A. Promote interest is when a person takes control of a property, brings it to an investor, and gets the investor to agree that they will give them a percentage of the profits, a percentage of the ownership of the property in exchange for bringing them the deal.

Q. How did you learn what a promote interest was?

A. Just figured it out from observing others and quickly picked up on how it works.

Q. Did you -- how did you meet Bart Seidler?

A. We met socially in the late 1990s when I moved back to Miami.

Q. Prior -- sorry. Prior to 2006, had you ever done any business with Bart Seidler?

09:52AM A. No.
09:52AM Q. So why was it that Transpark brought this deal to FTP?
09:52AM A. So even though I hadn't done business with Bart Seidler, I had shown him other deals which he declined to work -- to invest in, such as 700 Biscayne Boulevard downtown across the street from the American Airlines Arena, which I still run the parking till today.
09:53AM And when he saw how well I was doing on these other deals that he declined on, by the time 2006 came along, finally -- Bart's a tough guy to get to invest. I mean he really needs to believe in it. So after he saw me be successful with Dan Kodsi, Marc Roberts, Harvey Silverman, et cetera, many, many, other investors --
09:53AM MR. CASABIELLE: Objection, Your Honor. Nonresponsive.
09:53AM THE COURT: Excuse me. All right, sir. The objection is overruled. If a lawyer gets up and objects, you need to stop answering the question and wait for my ruling. All right?
09:53AM THE WITNESS: Yes. I'm sorry.
09:53AM As I was completing, when this -- at this point Bart had recognized that I was good at what I did, and the stars had aligned because this property was across the street from a building that he owned, a quarter-million-square-foot office building that had no parking.
09:54AM BY MR. PARDO:
09:54AM Q. Let me break that down. In and around 2006, who did you understand owned the Ingraham Building?

09:54AM A. Bart Seidler.
09:54AM Q. And where in relation to the Ingraham Building is this parking lot?
09:54AM A. Diagonally across the street.
09:54AM Q. Now, if you know, how many square feet is the Ingraham Building in office space?
09:54AM A. Approximately a quarter-million.
09:54AM Q. Was there any reason why in particular you thought this property would be of interest to Mr. Seidler?
09:54AM A. Yes.
09:54AM Q. Could you elaborate, please.
09:54AM A. I had recently acquired a parking garage called the Ingraham Garage, the same name as his building, for $27 million. And Bart, again, had his opportunity to invest in that deal but did not. So when this parking lot came along, I was sure in my head he would want to do this deal; and as it turned out, he did.
09:55AM Q. In May of 2006 when you entered into the -- when Transpark entered into the Profit Participation Agreement, why did you individually sign the Profit Participation Agreement?
09:55AM A. I guess to -- because I was so confident of the deal being so great and I had so many other assets to back it that I didn't feel --
09:55AM Q. Well, let's pull up the Profit Participation Agreement Plaintiff's Exhibit 1, Section 9.
09:55AM A. Okay.

09:55AM MR. PARDO: This is going to be PDF page 5, Patrick.
09:56AM BY MR. PARDO:
09:56AM Q. For each of your properties that you did business, was there any rhyme or reason to the way you structured each company?
09:56AM A. Yes.
09:56AM Q. So what is a special purpose entity?
09:56AM A. A special purpose entity?
09:56AM Q. Or an SPE?
09:56AM A. I always considered it more of an LLC.
09:56AM Q. LLC.
09:56AM A. It's a limited liability corporation, so that limits your liability from each -- so, for example, if I owned a parking lot on 9th Street, if I owned a parking lot on 8th Street, which I did, and 10th Street and 11th Street, if somebody got hit by a car on 11th Street, they can't sue me on 9th Street as well.
09:56AM Q. Was it typical of your practice in the early 2000s to have separate companies for separate ventures?
09:57AM A. Definitely.
09:57AM Q. So explain why, notwithstanding that, you agreed to sign the Profit Participation Agreement in your individual capacity?
09:57AM A. Again, it was a very long time ago. It was not my general practice. In most of my other partnerships I did not do this, but I would have to say that it was, you know, it was drafted by FTP, it was drafted by Bart. And I liked him and wanted to work with him, so I guess this was something he demanded and I complied with

because I felt confident that there was no harm in it.
Q. And if, for example, Transpark was administratively dissolved with the State of Florida for a number of years, what did you understand your personal obligation to be?
A. Obviously that was an accident. It was -- it was never supposed to be administratively dissolved. Obviously even when corporations get administratively dissolved, you still are allowed to --
MR. CASABIELLE: Objection, Your Honor. Nonresponsive.
THE WITNESS: -- reopen them.
THE COURT: So your objection is overruled.
Sir, when you hear the other lawyer object, I need you just to stop talking immediately. All right.
THE WITNESS: I will try to be faster. I'm sorry.
THE COURT: No, it's not being faster; it's being slower, so when you hear him object, you have to stop.
THE WITNESS: Right, I mean to stop.
THE COURT: You need to stop.
THE WITNESS: Yeah.
THE COURT: One more question before the break, sir. Go ahead.
BY MR. PARDO:
Q. Did you believe that the venture would be profitable?
A. Yes.
MR. PARDO: Good time for a break, Your Honor?

09:58AM THE COURT: Sure.

09:58AM Ladies and gentlemen of the jury, we're going to take a break. I have my calendar call as well at 10:00 o'clock, so we're going to take at least a 15-minute break. We won't be back before 10:15. 10:15 is the earliest I can get you back.

09:58AM (Jury out at 9:58 a.m.)

09:59AM THE COURT: All right. We'll take our break.

09:59AM Sir, you're under oath now. You're in the middle of your testimony, so you can't talk to anybody about your testimony, all right. You can talk to your lawyers about other things, but not about the substance of your testimony.

09:59AM All right. We're in recess.

09:59AM MR. CASABIELLE: 10:15?

09:59AM THE COURT: Yes, sir.

09:59AM (Recess at 9:59 a.m.)

10:00AM (Back on the record at 10:27 a.m.)

10:28AM THE COURT: As I mentioned, before the cases keep coming and Tuesday is my calendar call -- you can be seated, sir, so I was able to resolve my calendar call, give everybody a break, and get back to you.

10:28AM So, Counsel, proceed.

10:28AM MR. PARDO: Thank you, Your Honor.

10:28AM BY MR. PARDO:

10:28AM Q. Greg, in 2006, when you signed the Profit Participation Agreement individually and on behalf of Transpark, were there any

10:28AM terms of the contract that were unclear to you?
10:28AM A. Could we put it up in front of me?
10:28AM MR. PARDO: Sure, and may I approach, Your Honor, and hand the witness a copy of Plaintiff's Exhibit No. 1 for reference?
10:29AM THE COURT: You may.
10:29AM MR. PARDO: Patrick, let's bring up Plaintiff's Exhibit 1, please.
10:29AM BY MR. PARDO:
10:29AM Q. Let's start with your capital contribution, your initial $300,000 capital contribution.
10:29AM A. Okay.
10:29AM Q. What was your understanding of why that was being put up?
10:29AM A. Negotiated deal term, I met with Bart, discussed the opportunity, and we agreed that I would put up $300,000, and he would put up a 1031 exchange amount which would quickly be refi'd and we were going to end up in that ratio, whatever it came out to.
10:30AM Q. And, in fact, do you know whether or not Transpark assisted in getting the financing for the property?
10:30AM A. We -- yes, we did.
10:30AM Q. Could you elaborate on what that financing was?
10:30AM A. Well, in the Profit Participation Agreement, if you give me a moment --
10:30AM Q. Could I direct your attention to Section A of the recitals?

10:30AM A. "GM will use best efforts to provide all necessary" --
10:30AM THE COURT: So, if you're reading it out loud the court reporter has to take it, so if you're going to read --
10:30AM THE WITNESS: Should I read it to myself?
10:30AM THE COURT: Well, either read it to yourself or if you're asked to read out loud, you may do, but you have to do so loud and clear.
10:30AM THE WITNESS: Section A requires that I use best efforts to assist in obtaining the financing.
10:31AM BY MR. PARDO:
10:31AM Q. And what financing, if any, did Transpark help facilitate?
10:31AM A. The loan of $4.5 million from Colonial Bank.
10:31AM Q. Let's focus on Section 1 of the contract, was this clear to Transpark when it signed the contract?
10:31AM A. Yes.
10:31AM Q. What did Transpark expect to receive upon the sale of the closing, if anything?
10:31AM A. 30 percent.
10:31AM Q. Of?
10:31AM A. Of whatever it says in the contract.
10:31AM Q. Well, let's highlight where it says: "GM shall receive -- shall be entitled to receive 30 percent of the net cash flow and any profits from the sale or development of the property."
10:31AM A. Correct, so that's where it's -- you've got net cash flow and you've got profits, so this is what will need to be determined by

10:31AM the jury.
10:31AM Q. Do you know why the word "development" was used in this
10:32AM contract?
10:32AM A. From the first day we bought this property, I had always
10:32AM advocated that we should develop a rental building here because
10:32AM traffic from the north was getting so busy into downtown that
10:32AM people would rather live and work here which, obviously, it became
10:32AM more than we ever imagined, so, yes, that was the reason.
10:32AM Q. Now, that was at the time you entered into the contract.
10:32AM Sitting here today, do you know whether or not the ultimate
10:32AM buyer of this property has plans for development of the property?
10:32AM A. Yes, it has come to my attention that they do plan to develop
10:32AM just that.
10:32AM Q. What do you understand the buyer of the property to be
10:32AM developing on this parking lot?
10:32AM MR. CASABIELLE: Objection, Your Honor. Hearsay.
10:32AM THE COURT: Overruled.
10:32AM THE WITNESS: There is an approved project for a 80- or
10:32AM 90-floor building that's going through an approval process at the
10:33AM moment.
10:33AM BY MR. PARDO:
10:33AM Q. In your experience --
10:33AM A. Residential.
10:33AM Q. In your experience in Miami real estate, between 1999 and
10:33AM 2006, did you observe firsthand similar projects being built and

approved?
A. Yes.
Q. Do you have personal firsthand knowledge of whether any of those projects were profitable?
A. Yes.
Q. Did that information influence one way or the other why you negotiated the Profit Participation Agreement the way you did?
A. Definitely.
Q. Could you elaborate that to the jury, please.
THE COURT: No, no, no. You have to ask him a question; not just tell him to elaborate things to the jury.
MR. PARDO: Very well, Judge. Thank you.
BY MR. PARDO:
Q. How much profit did you see these other projects making between 1999 and 2006?
MR. CASABIELLE: Objection, Your Honor. Your Honor, other projects.
THE COURT: So, can you just ask him what motivated him to enter into the profit sharing agreement in the manner in which he did. Try something like that.
MR. PARDO: Very well.
THE COURT: Sustained.
BY MR. PARDO:
Q. What motivated you, if anything, to enter into the Profit Participation Agreement the way you did?

10:34AM A. Under the context of the development or?
10:34AM Q. (Nodding.)
10:34AM A. I saw that very quickly the entire South Beach, which was the only area zoned for high-rises, had been eaten up by the Affiliated Related Group, and there was really nothing left to be done. So the obvious move was to jump into Downtown where an explosion would happen, which would cause more and more and more of these incredibly profitable deals to take place.
10:34AM Q. Did you have business relationships with any developers in and around this time that you were entering into the Profit Participation Agreement?
10:34AM A. I would say I don't want to use the word every because that would be impossible, but with the majority of the developers in Downtown Miami I had direct communication with.
10:35AM Q. And between the time of 2006 and 2021, did you maintain those relationships with those developers?
10:35AM A. Yes.
10:35AM Q. And in that time period between 2006 and 2021, did you have equity interest in other ventures which were profitable?
10:35AM A. Yes.
10:35AM Q. Could you give an example of specific properties in and around this subject property which you had an interest in which were profitable?
10:35AM MR. CASABIELLE: Objection.
10:35AM THE COURT: Sustained.

BY MR. PARDO:
Q. Did you have an interest in the 700 Biscayne property which was profitable?
A. I had a profitable parking operation.
Q. Did you have a promote interest?
A. During the years of 2003 till 2010, I did.
Q. And was that interest profitable to you individually?
A. Very.
Q. To what magnitude was it profitable to you around that time?
MR. CASABIELLE: Objection. Relevance.
THE COURT: Sustained.
MR. PARDO: Your Honor, may I request sidebar on this issue?
THE COURT: You may.
(Sidebar conference.)
THE COURT: All right.
MR. PARDO: Your Honor, my understanding is that the defendants are arguing futility; that Greg was broke, that because the business was closed down and because Greg was broke, he would have no ability to put up money for a capital contribution.
I believe that it is not only probative to the defense, but I should be allowed to preempt that by presenting evidence to the jury in my case.
THE COURT: So first of all, the question you just asked had no time frame and doesn't deal with futility because you can

10:37AM make money on a deal, but it doesn't mean that you have any money
10:37AM left, depending on your debt, so.
10:37AM You know, this is why you probably estimated this trial
10:37AM taking seven or nine days. You need to hone in on what the
10:37AM relevant time frame is. You can ask him questions as to if you're
10:37AM trying to negate the futility defense as to the time frame; but,
10:37AM you know, continuing to put him on the stand so that he can
10:37AM pontificate on everything from the crime rate to Miami Beach to
10:37AM the parking lot crisis in Downtown Miami is a bit much.
10:38AM So you have to narrowly ask him questions and, like I
10:38AM said, if you want to show that he was wealth and it wasn't futile,
10:38AM that's fine. You're not even at that gate is the problem, right.
10:38AM MR. PARDO: Thank you, Your Honor.
10:38AM (End of sidebar conference.)
10:38AM THE COURT: All right. Let's continue.
10:38AM BY MR. PARDO:
10:38AM Q. Let's go to the Profit Participation Agreement in Section 2.
10:38AM Actually, before we do that let's look at the top paragraph here,
10:38AM g m agrees to lease -- I apologize, Patrick. The top paragraph.
10:39AM What was your and Transpark's understanding in and around
10:39AM 2006 of how long Transpark was supposed to lease the property?
10:39AM A. Two years.
10:39AM Q. And why was that?
10:39AM A. That's what we negotiated, and that's -- that's why we wrote
10:39AM it.

Q. And now, what was the significance, if any, to you of the language Transpark agrees to lease the property for as long as FTP desires?
A. Well, FTP had the entire property in their name, had full -- essentially full power and control, and that gave FTP full power and control to lease it to whoever they may like.
Q. And how, if at all, did Transpark understand it would know whether or not FTP desired for Transpark to continue leasing the property?
A. Obviously by giving me written notice.
Q. Let's look at Section 2. Did Transpark understand in 2006 that it might have to put up capital contributions during FTP's ownership of the property?
A. Yes.
Q. And specifically what percentage of the capital contribution notice did Transpark understand it would have to put up?
A. 30 percent.
Q. Did Transpark understand any conditions to be required before it had to put up 30 percent of the capital contribution?
A. Yes.
Q. What conditions were those?
A. FTP had to give me or I should say Transpark written notice that a capital contribution was due.
Q. Was there a particular section that you relied upon to form that understanding?

10:41AM A. There was.
10:41AM Q. Could you tell us?
10:41AM A. In No. 2, letter C, all -- on the second line, FTP each party at least ten days prior notice to the moneys required for formal course of business for the operation and development of the property.
10:41AM Q. Between 2006 and 2021 was there ever a time that FTP or Bart Seidler didn't know how to get ahold of you?
10:41AM A. No chance.
10:41AM Q. Are you sure about that answer?
10:41AM A. Positive.
10:41AM Q. Why are you so sure?
10:41AM A. Between the amount of times we ran into each other, the texts, the mutual friends, the knowing where I lived, the fact that he had come to occasions at my home, the fact that I have gone to occasions at his home.
10:42AM Q. And let's break that down. Between 2011 and 2014, did you know where Bart Seidler maintained a local residence here?
10:42AM A. Yes. He had two places where he generally resided.
10:42AM Q. Where was that?
10:42AM A. One of them was the Penthouse 02 at the Murano Portofino, I believe. It might have been 01, but I am pretty sure PH02, had a partnership with Marc Roberts for where for all the money in the world I couldn't count how many times I was up there. If it wasn't a hundred, it was close to it.

10:42AM And he also had a place on Century Lane where I also lived
10:43AM for a couple years where we saw each other all the time.
10:43AM Q. Between 2011 and 2014 when you both lived at the Century Lane,
10:43AM had you gone to his apartment?
10:43AM A. Yes.
10:43AM Q. Approximately how many times?
10:43AM A. I couldn't count exactly but probably between five and ten
10:43AM times.
10:43AM Q. Just for edification purposes, you know the general layout,
10:43AM you were there enough times to know what the apartment looked
10:43AM like?
10:43AM A. Yes.
10:43AM Q. Could you explain to the jury, for example, the general layout
10:43AM of the apartment?
10:43AM A. Sure. It's a corner unit facing west and it has a nice
10:43AM downtown view and it also oversees the Venetian Causeway road.
10:43AM The living room is the part that's facing the water and Downtown
10:43AM Miami and has a really beautiful view, again including the
10:43AM Venetian Causeway. When you walk in through the front door, to
10:43AM your left there is a bedroom, after that there is a kitchen. And
10:44AM to the right is the master bedroom.
10:44AM Q. Thank you. We can bring this section down and go to Section 3
10:44AM where I say the rubber meets the road. Did Transpark have an
10:44AM understanding of when profits from the venture would be
10:44AM distributed, if at all?

10:44AM A. Yes.
10:44AM Q. When was that?
10:44AM A. Upon the sale of the property or upon the profits from the parking operation.
10:44AM Q. Let's elaborate on that. Why did you believe that Transpark would be entitled to profits from the parking lot operations?
10:44AM A. That's what the agreement said.
10:44AM Q. Did Transpark receive any of the profits from the profits -- excuse me. Did Transpark receive any of the profits from the parking lot operation between 2017 and 2021?
10:44AM A. No.
10:44AM Q. Did FTP tell you or Transpark that there were profits from the parking lot operations between 2017 and 2021?
10:45AM A. No.
10:45AM Q. If there were a capital contribution that was noticed that Transpark didn't put up that was accruing interest, would Transpark agree that FTP should get a preferred return?
10:45AM A. Only if I didn't -- only if Transpark didn't put up their share and they were given notice.
10:45AM Q. For how long was the term of this contract to the best of your knowledge?
10:45AM A. The term is, to the best of my knowledge, I could read it again, is till the property is sold.
10:45AM Q. Let's pull up Section 4, PDF page 4.
10:45AM A. Term.

10:45AM Q. Would you read it slowly, please?
10:46AM A. This agreement shall constitute to be in full force and effect until a sale of the property is consummated to a third party or until terminated by the parties or by operation of law.
10:46AM Q. Did Transpark ever receive a notice from FTP that FTP had terminated the contract?
10:46AM A. No.
10:46AM Q. Did FTP ever give notice to Transpark that FTP had terminated the contract pursuant to operation of law?
10:46AM A. No.
10:46AM Q. Did you, Greg, ever receive a notice from FTP that they believed Transpark had abandoned the deal?
10:46AM A. No.
10:46AM Q. Did Transpark ever receive a notice of the capital call from FTP?
10:46AM A. No.
10:46AM Q. We can take this exhibit down. Thank you.
10:46AM Who was Nathan Heber to -- let me ask another question. Which is are you familiar with a company named Park West Parking?
10:47AM A. Yes.
10:47AM Q. What was your relationship, if any, to Park West Parking between 2000 and 2006?
10:47AM A. When I obtained my first parking lot, I opened up that company to be a parent company. Originally to be the company for the first parking lot, but it ultimately became the parent company for

10:47AM many, many parking lots.
10:47AM Q. Approximately how many parking lots was Park West Parking
10:47AM responsible for managing between 2000 and 2006?
10:47AM A. Between 15 and 20.
10:47AM Q. And in and around that time did Park West Parking employ
10:47AM Nathan Heber?
10:47AM A. Yes.
10:47AM Q. Would you tell the jury what specifically was Nathan Heber's
10:48AM responsibilities for Park West Parking?
10:48AM A. His responsibilities were to act as a manager and initially it
10:48AM was more of a internship and it grew into more and more
10:48AM responsibilities as we acquired more and more deals.
10:48AM Q. How did you meet Nathan Heber?
10:48AM A. Nathan Heber's father tragically passed away when I was at
10:48AM Hebrew Academy as a child, so the entire community knew the Heber
10:48AM family back since he was a kid; so I've known him since he was a
10:48AM small child.
10:48AM Q. Are you older or younger or approximately the same?
10:48AM A. Older.
10:48AM Q. Older than Nathan?
10:48AM A. Yes.
10:48AM Q. Did you have any idea about the opportunities you were giving
10:48AM Nathan, specifically with respect to Park West Parking around this
10:48AM time?
10:48AM A. Obligation such as --

10:48AM Q. Did you believe you were giving Nathan Heber an opportunity to work for Park West Parking or was he preeminently qualified?
10:49AM A. I was giving him an opportunity to learn from me and eventually take, you know, more -- become a manager.
10:49AM Q. When the Profit Participation Agreement was signed until the time that the lease expired, what was Nathan Heber's responsibility for this lot?
10:49AM A. At that point, he had helped me, I would ask him to take maps of Miami and highlight in different colors who owned them, and so we could seek out acquiring them and bringing in either our current investors or potentially new investors, investors in general, helping, depending on which parking lot it was, he had more or less responsibilities on going down personally and picking up cash, taking it to the bank, and depositing it. He would draft leases and eventually he even -- he signed paperwork.
10:50AM Q. Now, did Nathan Heber ever own Park West Parking?
10:50AM A. Never.
10:50AM Q. Did he ever own Transpark?
10:50AM A. No.
10:50AM Q. Was he ever the registered agent or manager of Transpark on Sunbiz?
10:50AM A. No.
10:50AM Q. Did he ever have authority to bind Transpark under the Profit Participation Agreement?
10:50AM A. No.

10:50AM Q. Let's look at Section 7 of the Profit Participation Agreement, the right of first refusal.
10:51AM MR. PARDO: And, Patrick, if you'd put it up on the screen, please. PDF page 4 of Plaintiff's Exhibit 1. Excuse me.
10:51AM BY MR. PARDO:
10:51AM Q. Greg, around 2006, did you have an understanding of what a right of first refusal is?
10:51AM A. Yes.
10:51AM Q. In layman's terms, could you explain to the jury what your understanding of a right of first refusal is?
10:51AM A. Sure, let's say Jack and Jill owned a property and either Jack or Jill receives an offer from a third party, if the offer was given to Jack, and Jack wants to accept the offer and Jill doesn't, then Jill has the right to match the offer.
10:51AM Q. In 2006, was it important to Transpark that it have a right of first refusal under the Profit Participation Agreement?
10:51AM A. Yes.
10:51AM Q. Why?
10:51AM A. Just so that if there was ever a situation where an offer was acceptable to FTP, which I felt was too low, I could just come in and give them their money and take them out.
10:52AM Q. Was Nathan Heber responsible for filings with the Florida Secretary of State for the various companies that you managed?
10:52AM A. There were so many at the time, as I've expressed in how many deals I did, that I had multiple other potential people, so the

10:52AM only thing I can truly say is I don't know.
10:52AM Q. Would it have been typical of you to delegate the responsibility of filing an annual report to anybody in specific?
10:52AM A. So the filing of annual reports, sometimes it went through my father's office, sometimes it was done in conjunction -- by -- it could have been Daniel Bortunk or a woman named Danuska (phonetic) who was the office manager who managed the bank accounts up until a certain point. When she quit, there was a point where Nathan had to take some of her responsibilities. There was also at that same time Danny had to take some --
10:53AM Q. Let me ask it this way: Was it your practice to be responsible yourself for filing the annual reports, or was it your practice to delegate that responsibility?
10:53AM A. Delegate.
10:53AM MR. PARDO: Could you pull up, Patrick, Plaintiff's Exhibit 56, which is in evidence.
10:53AM Oops. Let's take this down. Hold on. Let's not publish it to the jury. And let me see page 2 and see if this is the exhibit that I'm looking for.
10:54AM IT STAFF: It's still presenting.
10:54AM MR. PARDO: Could we get it shown to the witness, please.
10:54AM THE COURTROOM DEPUTY: Only?
10:54AM MR. PARDO: Only to the witness for now. I just want to make sure this is the right exhibit. Thank you.
10:54AM THE COURTROOM DEPUTY: You're welcome.

10:54AM MR. PARDO: Very well. We can go back to page 1 and publish to the jury, please.

10:54AM Let's pull up Plaintiff's Exhibit 56.

10:54AM BY MR. PARDO:

10:54AM Q. And I'll ask you, Greg, whether you recognize the email.

10:54AM MR. PARDO: Permission to publish to the jury, Your Honor, it's in evidence.

10:54AM THE COURT: Yes, if it's in evidence, you may.

10:54AM MR. PARDO: Thank you.

10:55AM THE WITNESS: It just jumped off.

10:55AM BY MR. PARDO:

10:55AM Q. There we go. Take a look at the email and let me know if you recognize it.

10:55AM A. I do.

10:55AM Q. Could you tell the jury why you sent an email to parkwestmh@gmail.com and aroth@accountant.com on April 28, 2009?

10:55AM A. So A. Roth was working as my CPA, as it says in his title. And it says Nathan is asking Avrohom N. Roth, who is my schoolmate from three years old who ended up working with me, became an accountant, "Are you taking care of this, the annual" -- meaning, the subject is, "I got a list of annual reports."

10:55AM Q. Was this typical of your practice of delegation around this time?

10:55AM A. Yes.

10:55AM Q. Let's look at page 2 and see the annual reports that you were

10:56AM delegating for Nathan and Avrohom Roth to file with the Secretary of State.

10:56AM MR. PARDO: Page 2, please. Thank you.

10:56AM THE WITNESS: Okay.

10:56AM BY MR. PARDO:

10:56AM Q. Is this consistent with the various LLCs that you would set up?

10:56AM A. Yes.

10:56AM MR. PARDO: And let's scroll down a little bit.

10:56AM THE WITNESS: LLCs, it is.

10:56AM BY MR. PARDO:

10:56AM Q. Do you see a few up from the bottom, Transit Parking, LLC, Transpark, LLC?

10:56AM A. Yes.

10:56AM Q. Could you tell the jury what Transpark, LLC, stood for?

10:56AM A. Transpark, LLC, what it stood for is --

10:56AM Q. How did you come up with the name Transpark?

10:56AM MR. CASABIELLE: Your Honor, objection.

10:56AM THE COURT: Overruled.

10:56AM THE WITNESS: In the parking business, you either have monthly customers or transient customers. So "trans" was an abbreviation for transient because this lot had a lot of transient business versus monthly customers.

10:57AM BY MR. PARDO:

10:57AM Q. Now, did you create this spreadsheet?

A. No.
Q. Did you fill out this spreadsheet in the column that says "keep alive"?
A. I was the ultimate decision-maker on those questions.
Q. And, in fact, if we go back to page 1, do you see your email in the middle where you told Nathan and Avrohom, "See my comments attached"?
A. Correct.
Q. Now if we go back to page 2 in the column that says "keep alive," was that your work?
A. Yes.
Q. And what did you indicate next to Transpark, LLC?
A. "Keep alive."
Q. Why?
A. Because I had an active Profit Participation Agreement in that property and it was an alive property, it was an alive deal.
Q. For how long did Transpark believe it had a profit participation interest in the subject property?
A. Until it was sold.
MR. PARDO: Let's pull up Plaintiff's Exhibit 5, the closing statement which is in evidence. Let's call up lines 204 through 206 on the left-hand column.
BY MR. PARDO:
Q. Transpark contributed $300,000 toward the closing, correct?
A. Yes.

10:58AM Q. Did you have an understanding around this time of whether or not FTP utilized 1031 exchanges?
10:58AM A. I did.
10:58AM Q. What was your understanding?
10:58AM A. My understanding was that Mr. Seidler was selling a property on Pine Tree and 41st Street and he was taking his profits from that property and 1031 exchanging it into this property.
10:59AM Q. Did you and Mr. Seidler have any conversations about whether or not FTP's 1031 exchange would be a reason to enter into the Profit Participation Agreement?
10:59AM A. We did.
10:59AM Q. Now, do you know whether -- do you know why Transpark was not given an ownership interest in the property?
10:59AM A. I do now.
10:59AM Q. So back in 2006, what did you understand was the reason why Transpark didn't get an ownership interest in the property?
10:59AM A. Mr. Seidler told me that because it's a 1031 exchange, it has to go into his name, which I later found out not to be the case but that was later.
10:59AM Q. How did you find out -- when did you find out that it wasn't the case?
11:00AM A. When it came time that I was doing my own 1031 exchanges with partners.
11:00AM Q. How many 1031 exchanges have you done in your career?
11:00AM A. Now, ten.

11:00AM Q. And in any of those ten 1031 exchanges, has it ever been the case that you could take title in more than one owner's name?
11:00AM A. Yes.
11:00AM Q. Do you have an opinion whether or not that's typical in the real estate industry?
11:00AM MR. CASABIELLE: Objection.
11:00AM THE COURT: Overruled.
11:00AM THE WITNESS: Now that I have become older and more experienced, I learned that there is a thing called a TIC, a tenancy in common, and in this case I should have formed a tenancy in common and owned my 30 percent. I would own a hundred percent of 30 percent, and FTP would own a hundred percent of 70 percent.
11:00AM THE COURT: So, counsel, the question you asked your client is whether or not this was typical in the real estate industry. He gave an answer about tenancy in common and what he should have done, which is not responsive. So I am going to ask the jury to disregard that answer.
11:01AM Sir, you need to listen to the question and you have to answer the question that's posed, because the objection goes to the question. So if I overrule the objection, it is because I am assuming that the answer is to that question.
11:01AM THE WITNESS: Understood. Sorry.
11:01AM BY MR. PARDO:
11:01AM Q. I will ask a different question, which is: Do you have -- over the course of your career, have you come to understand what

is a tenancy in common?
A. Yes.
THE COURT: No, counsel, go back and ask your question --
MR. PARDO: Very well.
THE COURT: -- and have him answer that.
MR. PARDO: Thank you, Your Honor.
BY MR. PARDO:
Q. Did you come to understand whether or not it was typical in the real estate industry to use a 1031 exchange and own it with more than one entity?
A. Yes.
Q. And through what mechanism, if you know, would that be accomplished?
A. A tenancy in common.
Q. Do you have a personal firsthand knowledge of what a tenancy in common is?
A. Yes.
Q. Could you tell the jury what your understanding of a tenancy in common is?
A. Can I use specific examples that I currently own or should I just give a general answer?
Q. If you believe it would be helpful for the jury to understand, please do.
A. I just want to make sure it's okay with the judge.
Q. Go ahead.

A. Anyway, to answer the question, in this case we're in agreement it had been established where I would receive 30 percent and I -- Transpark would receive 30 percent, and FTP would receive 70 percent. It's contemplated that upon the sale they might want to go their different ways. They might want to stick together or they might want to go their different ways if there is a future 1031 exchange.

So therefore, the tenancy in common was established in order to allow my entity to own a hundred percent of 30 percent, at which time a sale takes place I could take that 30 percent and go do whatever I want with it and FTP could take their 70 percent and go do whatever they want with it.

Q. Do you have a belief, sitting here today, whether or not FTP's decision to take title to the property in its own name was to your benefit?

A. To my benefit?

Q. Yes.

A. No, it was to my detriment.

Q. Why do you believe it was to your detriment?

A. Because the property never would have been able to be sold and all these notices that mysteriously were never given would have been given.

Q. Let's turn to Section 8 of the Profit Participation Agreement, PDF page 4. Section 8, the first paragraph. It says: All notices under this agreement shall be in writing and shall be

effective only upon delivery. This agreement shall inure to the benefit of and be binding upon all parties, their estates, heirs, personal representatives, and assigns.

Do you see that in front of you, Greg?

A. I do.

Q. Who was Transpark's personal representative and beneficiary?

A. Greg Mirmelli.

Q. You said that Transpark was administratively dissolved for a certain period of time?

A. It was.

Q. Was it ultimately reinstated?

A. Yes.

Q. During that period of time between 2011 when it was temporarily administratively dissolved and 2017 when it was reinstated, who did you understand to be the beneficiary of the rights under this Profit Participation Agreement?

A. Greg Mirmelli.

Q. And then when Transpark was reinstated in 2017 through 2021 when the property was sold, who did you understand to be the beneficiary of the rights and obligations under this agreement?

A. Greg Mirmelli.

Q. And was there also an entity that you believed?

A. Transpark.

Q. Let's pull up Plaintiff's Exhibit 6. This is the ground lease. Do you know why -- excuse me.

Do you know whether or not FTP asked Transpark to be its tenant under the lease?
A. Do I know why they did?
Q. Yes.
A. Well, because when we made the deal, I was the largest parking operator in Downtown Miami, and they -- it was both intent and agreement that I would enter into this lease.
Q. And did you ever receive or did Transpark ever receive any notice pursuant to this lease that the lease had been terminated, defaulted, or anything else?
A. No.
MR. PARDO: You can pull this exhibit down. And pull up Plaintiff's Exhibit 12, the certificate of landlord and tenant, which is in evidence, and pull up Section 9 of that exhibit, please.
BY MR. PARDO:
Q. Do you recall when you signed the certificate of landlord and tenant? It says: Anything in the lease to the contrary notwithstanding -- excuse me -- landlord agrees that it will not terminate the lease for any default on the part of tenant without first having given written notice to the lender, specifying the nature of any such default and permitting the lender 30 days after the date of such notice to cure or cause such default to be cured.
A. Yes, I'm familiar with this.
Q. Did this certificate of landlord influence one way or the

11:07AM other Transpark's understanding of how it could be held in default of the lease?
11:07AM A. It did.
11:07AM Q. How?
11:07AM A. It meant I was in good standing.
11:07AM Q. Did Transpark consider in any way this certificate of landlord when it -- when it never received any notices at any point during its tenancy?
11:07AM A. Never received any notices, never had any reason whatsoever to believe I was in anything but good standing.
11:07AM MR. PARDO: Thank you, Patrick. We can bring this exhibit down.
11:07AM BY MR. PARDO:
11:07AM Q. I showed Mr. Seidler the final judgment that was entered against FTP and Bart Seidler. You saw that?
11:08AM A. Yes.
11:08AM Q. Around that time did Transpark present any offers to purchase the property to Bart Seidler and FTP?
11:08AM A. Yes.
11:08AM Q. From whom?
11:08AM A. Like I mentioned, it was Harvey Hernandez and Affiliated Related Group.
11:08AM Q. Did you have personal knowledge of what the terms of that offer was?
11:08AM A. Initially they had offered $8 million, but we had verbally

11:08AM discussed that they were willing to go up to closer to nine.
11:08AM Q. Now, why, if at all, were you facilitating an offer to FTP for the sale of the property around the time that the final judgment was being entered?
11:08AM A. In order to recoup my investment and to make a profit.
11:08AM Q. Did you even know that a final judgment was about to be entered against FTP?
11:08AM A. No. Unfortunately, he completely abandoned me and left me in the dark, never gave me any notice.
11:09AM Q. How about of the confidential settlement agreement; did FTP give you a heads-up that they were about to enter into the confidential settlement agreement with Crimson Plaza after the final judgment was entered?
11:09AM A. No. During that time FTP wasn't giving me anything. They were only talking to Nathan Heber, and I guess they obviously ended up hiring him.
11:09AM Q. Did you try to reach out to Bart Seidler at any time between 2013 onward?
11:09AM A. I, you know, can't remember each and every specific instance, but I do believe I reached out to him here and there.
11:09AM Q. Well, how would you reach out to Bart Seidler between 2013 and 2021, let's say?
11:10AM A. Well, there was -- under social contacts I would just call him or text him.
11:10AM Q. And you would also email him?

11:10AM A. Or email him.

11:10AM MR. PARDO: Let's pull up Plaintiff's Exhibit 100, in evidence.

11:10AM BY MR. PARDO:

11:10AM Q. In and around December of 2013, could you explain the context of why you were having this email exchange with Bart Seidler?

11:10AM A. Bart and his good friend and business partner and my former business partner owned a -- I guess Mark owns it now, but then they owned together a penthouse at the Murano Portofino and for both of them it was sort of like a second home. They didn't use it all the time, so it was made clear to me that if I ever had the opportunity to bring them in revenue and they weren't using it, I could bring them an offer. I was in that business, and I made them an offer. That was the context. I brought them an offer to rent out the unit.

11:11AM THE COURT: Sir, you're really going to have to speak more clearly. You're kind of mumbling. I'm trying to look at the transcript here as it's coming up, and it's a little difficult.

11:11AM THE WITNESS: Bart was a partner in this condominium, and I brought him an offer for a client to rent it so he could make money and I could make a commission.

11:11AM BY MR. PARDO:

11:11AM Q. Was this the only time that you were doing business with Bart Seidler between 2006 and 2013?

11:11AM A. No. I mean, well, other than Transpark.

11:11AM Q. What other business did you have going on with him? What other brokerage opportunities were you doing with him around this time?
11:12AM A. He had a lot of space available in the Ingraham Building, and he would give me walk-throughs and show me spaces that he wanted to rent. And I would show them to clients and attempt to rent out those office spaces.
11:12AM Q. Let's go back to Nathan Heber. Did there come a time where your relationship with Nathan Heber changed from when it started?
11:12AM A. Yes.
11:12AM Q. Did it change for the better or for the worse?
11:12AM A. For the worse.
11:12AM Q. Could you be a little bit more specific about the time when that relationship changed?
11:12AM A. Around the time that the rent payments of $30,000 per month were going smoothly from the beginning. I don't have it in front of me, but it was for a period of 18 to 20 to 24 months, something like that, everything was going fine.
11:13AM But as soon as the rent payments started getting lower and they weren't being made in full, I started suspecting that he was stealing, that he was skimming cash. It's a cash business; it's a parking lot business. And simultaneously with that, he had become jealous of the fact that he saw me doing a lot of real estate deals, so I guess he felt entitled that he could skim cash and sort of hurt me so he could try to fill -- come into my shoes.

11:13AM Q. Around this time that you held that belief, did you observe a change in the relationship between Nathan Heber, your employee, and Mr. Seidler?
11:13AM A. Definitely.
11:13AM Q. Could you explain, first, when you saw that change. First, when you saw that change specifically.
11:14AM A. It -- it was during -- what happened was Nathan --
11:14AM Q. Sorry. I apologize. If you can just think for a moment about when, maybe a year or so, you saw the change in relationship between Nathan, your employee, and Mr. Seidler. Just think about it for a moment and then tell the jury when.
11:14AM A. I would say in the middle to late of 2007.
11:14AM Q. Okay. And what was the change that you saw in the relationship between Nathan Heber and Bart Seidler around that time?
11:14AM A. Oh, it was clear as day. He went from coming to my home office every day and sitting next to me and working with me like a right-hand man to moving into Bart's office building, hiring his own assistant, and operating in a manner where I couldn't watch him anymore, where I couldn't see him on a daily basis, where he could do what he wants.
11:14AM Q. You said Bart's office building. Which office building specifically were you referring to?
11:15AM A. The Ingraham Building.
11:15AM Q. Now -- did the relationship between Mr. Heber and Mr. Seidler

11:15AM get better or worse over the years?

11:15AM MR. CASABIELLE: Objection, Your Honor. Speculation. Relevance.

11:15AM THE COURT: Overruled.

11:15AM MR. CASABIELLE: One other thing, Your Honor. If Mr. Mirmelli could speak into the microphone. My client is having some difficulty hearing him.

11:15AM THE COURT: Okay. Speak as clearly and loudly as you can into that microphone, sir.

11:15AM THE WITNESS: I moved the mic closer to me. Mr. Seidler mentioned he had some hearing problems, so I did it.

11:15AM BY MR. PARDO:

11:15AM Q. So around this time did you observe the relationship between Mr. Heber and Mr. Seidler getting better or worse?

11:15AM A. Their relationship was getting better and better.

11:15AM Q. Could you say specifically what sorts of things were happening

11:16AM which confirms your belief that they were getting better.

11:16AM A. Because Bart had went from always calling me first to -- whether it was socially or business-wise, to only dealing with Nathan, only working with Nathan, writing emails back and forth with Nathan, which we later saw -- which I didn't know about at the time but -- I definitely was left in the dark because he had moved into Bart's building.

11:16AM Q. Now, you said this started as early as 2007?

11:16AM A. Late 2007. It's a long time ago. The dates will all speak

for themselves, but he went from working for years right next to me in my home office to moving on his own downtown into Bart's building and hiring an assistant that I had -- I didn't even have her phone number or anything, so.

Q. Who was responsible for maintaining the financial records from 2007 onward?

MR. CASABIELLE: Objection, Your Honor. I'm not sure what he's asking.

THE COURT: Overruled.

THE WITNESS: I mean by -- according to me or according to the agreement?

BY MR. PARDO:

Q. In and around 2007 were there Transpark, LLC, accounting records that were being maintained?

A. Yes.

Q. And to the best of your knowledge, from 2007 onward, who individually was responsible for creating those financial records?

A. Nathan.

Q. Did you depend on him to make those records?

A. Yes.

Q. Did you -- were you -- were you given an opportunity to confirm they were accurate before he created them?

A. No.

Q. Do you know, sitting here today, whether or not Nathan provided those financial records to FTP?

11:18AM A. Only after seeing all the discovery.
11:18AM Q. Now, to the best of your knowledge, what did the financial records that Nathan Heber was presenting to FTP show?
11:18AM A. When our relationship started to deteriorate, the amounts of money that was coming into the parking lot also deteriorated.
11:18AM Q. Now, sitting here today, have you seen in evidence, in fact, emails between Nathan Heber and Bart Seidler where Mr. Seidler was asking Nathan Heber, "Where is the rent money? You owe me money"?
11:18AM A. Yes.
11:19AM Q. Sitting here today, do you have an understanding of why those emails were being exchanged?
11:19AM A. Bart was asking Nathan where the money was, Nathan was most likely skimming, so he didn't want to come to me with it and discuss it with me, so he would just make excuses to Bart but making it look like it was my fault.
11:19AM Q. Did any of the emails that you saw between Bart and Nathan Heber mention the Profit Participation Agreement?
11:19AM A. No.
11:19AM Q. Did any of the emails that you saw between Bart and Nathan Heber mention the capital contribution?
11:19AM A. No.
11:19AM Q. Did any communication between Bart and Nathan Heber that you saw mention a potential loss of your promote interest?
11:19AM A. No.
11:19AM Q. Did any communication between Bart and Nathan that you saw

11:20AM mention a dilution of profits?
11:20AM A. No.
11:20AM Q. Did any communication between Nathan and Bart that you saw mention the profit participation in any context?
11:20AM A. No.
11:20AM Q. Sitting here today, which contract did you understand FTP was communicating with Nathan Heber about?
11:20AM A. If anything, the parking lot.
11:20AM Q. The ground lease that expired in 2011?
11:20AM A. Correct.
11:20AM Q. The ground lease that, after it expired, FTP hired Nathan Heber to operate?
11:20AM A. Yes.
11:20AM Q. Did you have any ownership in Concept Park?
11:20AM A. No.
11:20AM Q. Did you have the opportunity to manage the lot after you stopped operating the lot?
11:20AM A. No.
11:20AM Q. Did FTP reach out to you and say, "We desire for you to come back in and continue operating the lot"?
11:20AM A. No.
11:20AM Q. When the rent payments being made -- were made from Transpark to FTP, who was actually responsible for sending the rent payments?
11:21AM A. So I -- I guess the parent company, Park West Parking, was

11:21AM always sending whatever payments were being sent, and a lot of those payments were handled by Nathan Heber.

11:21AM Q. Now, to the best of your knowledge, did FTP accept or reject the rent payments that were made?

11:21AM A. They accepted them.

11:21AM Q. Did you receive any communication directly, indirectly through a third party, did you receive any indicia at all that the rent payments you were making were unacceptable to FTP?

11:21AM A. No.

11:21AM Q. What did Bart and FTP say to you about the rent payments you were making?

11:21AM A. Nothing.

11:22AM MR. PARDO: Let's pull up Plaintiff's Exhibit 123, this is the purchase and sale agreement. It's in evidence.

11:22AM BY MR. PARDO:

11:22AM Q. When this purchase and sale agreement was signed in May of 2021, was Transpark registered with the State of Florida, Department of Business?

11:22AM A. Yes.

11:22AM Q. When this purchase and sale agreement was signed in May of 2021, did Greg Mirmelli -- did you live in Miami?

11:22AM A. Yes.

11:22AM Q. Did you have a domicile that was registered in the public records?

11:22AM A. Yes, the public records showed my address.

11:22AM Q. Where were you living around that time?
11:22AM A. It was -- I had an address specifically for business mail to be received, and that's what was on the Transpark as my place of business.
11:23AM MR. PARDO: Your Honor, can you give me just a moment so I can call up a specific exhibit number?
11:23AM THE COURT: Sure.
11:23AM (Brief pause.)
11:23AM MR. PARDO: Your Honor, we're going to pull up Defendant's Exhibit 41. This is in evidence.
11:23AM THE COURT: All right.
11:23AM BY MR. PARDO:
11:23AM Q. So, Greg, I'll just give you a moment to look at this document and become reoriented with it.
11:23AM What do you understand it to be?
11:23AM A. It is a Division of Sunbiz -- Sunbiz.org, Division of Corporations, it refers to Transpark, LLC, my company.
11:23AM Q. First, what's your understanding of the purpose of having the Division of Corporations mailing and registered agent address?
11:24AM A. So that if somebody needed to give me notice or find me, they knew where to go.
11:24AM Q. What significance, if any, was the address 1521 Alton Road, 894, Miami Beach, Florida 33139?
11:24AM A. That is where all of my mail goes, gets received, that has importance that needs to be addressed having anything to do with

my business.
Q. And was this emailing address registered with Greg Mirmelli in the public records as of May 2021 when FTP signed the purchase and sale agreement?
A. Yes.
Q. Now, did FTP tell you that they were -- that they had received an offer to buy the property?
A. No.
Q. Did FTP tell you that they had accepted that offer?
A. They didn't tell me anything, so I couldn't know that they accepted it because they didn't tell me there was one.
MR. PARDO: Let's pull up Plaintiff's Exhibit 136.
BY MR. PARDO:
Q. This is the closing statement in evidence from the sale of the property.
Sitting here today, do you have an understanding of whether or not FTP made money from this deal?
A. Yes.
Q. How much money do you understand they made from the deal?
A. At a minimum, 11.4 million, and at a maximum, 17-and-a-half million.
Q. Could you first go with the 11.4 million, from where do you derive that understanding?
A. Mr. Seidler's tax returns. Capital gain.
Q. And the -- sorry. And the 17-and-a-half million, from where

11:25AM do you derive that understanding?
11:25AM A. So where the profit participation earlier, here --
11:26AM Q. Let's go to Section 1 of the Profit Participation Agreement, PDF page 2.
11:26AM A. Okay. So it says 30 percent of any net cash flow. His net cash flow was $17.5 million, approximately, give or take, you know, less the $15,000.
11:27AM MR. PARDO: All right. We can pull this down. Thank you.
11:27AM BY MR. PARDO:
11:27AM Q. Greg, I want to separate FTP's ownership of the property in two segments; one, between 2006 and 2013, line in the sand, then I will go from 2014 through 2021.
11:27AM Do you understand the two segments of time that I'm looking at?
11:27AM A. Okay, yes.
11:27AM Q. In the first segment of time, between 2006 and 2013, did you receive -- did you or Transpark receive a capital call from FTP?
11:27AM A. No.
11:27AM Q. In each of those years, did you have access to liquidity above half a million dollars?
11:27AM A. Yes.
11:27AM Q. Turning to -- what was the maximum amount of liquidity during that time period that you had access to?
11:27AM A. I couldn't count but it was sometimes a couple million,

11:28AM sometimes a million, sometimes -- it just depended on when and where, there was a lot of different times.
11:28AM Q. Well, in that period of time between 2006 and 2013, what was the process, if any, that you determined -- what process, if any, did you use to determine when to tap into liquidity cash flow that you would have needed?
11:28AM A. Well, if somebody -- if I was required to make a payment, it could be a mortgage payment, it could be a credit card payment, it could be acquisition of a property, or participation in acquisition of a property, all types of things.
11:28AM Q. So, would it depend on the needs of the moment?
11:28AM A. Yes.
11:28AM Q. And how would you know whether or not money was needed?
11:28AM A. By receiving a notice or a document or a bill or something that told me I needed to pay.
11:29AM Q. And same set of questions between 2014 and 2021, did you have access to liquidity during that time period?
11:29AM A. I did.
11:29AM Q. Up to what amount of liquidity did you have access to?
11:29AM A. At any given moment, millions of dollars.
11:29AM MR. PARDO: Your Honor, I think this is 11:30, good time to stop.
11:29AM THE COURT: Yes, I was going to ask if you were done with that.
11:29AM So it's 11:30, like I have said, we have to take a longer

break today. I will be back by 1:30, if not beforehand, but we will start at 1:30.

Enjoy your longer break. Don't talk to each other about the case, don't talk to anybody else about it and don't research anything about the case. We'll see you at 1:30.

(Jury out at 11:29 a.m.)

THE COURT: All right, Counsel, we are in recess.

MR. PARDO: Thank you, Your Honor.

MS. MACKIEWICZ: Your Honor, before you leave the bench, may I ask you one quick question? I have been called to an emergency hearing at the bankruptcy court.

THE COURT: You need to wait for the jury --

MS. MACKIEWICZ: I apologize.

I've been called to an emergency hearing at the bankruptcy court in another case at 1:30, I'm not handling a witness this afternoon, I just want to make sure with Your Honor it is okay that I being be excused for probably a half hour, 45 minutes.

THE COURT: It's fine by me.

MS. MACKIEWICZ: Thank you, Your Honor.

(Lunch recess at 11:30 a.m.)

(Back on the record at 1:37 p.m.)

THE COURT: All right. Let's bring the jury.

MR. PARDO: Your Honor, before we do, with Your Honor's permission and by the agreement of the parties, the two lawyer

witnesses, that's Moises Grayson and Joseph Colletti have made themselves available this afternoon. The parties have agreed they both shouldn't take a whole lot of time to have them go time certain now before Mr. Mirmelli goes back on the stand.

THE COURT: You're going to interrupt your client's testimony for that?

MR. PARDO: Yes, Your Honor, by agreement of the parties.

MR. CASABIELLE: That's his desire, we're fine with that, but I would like to raise one issue, Moises Grayson represented our client in a closing. It is our contention that whatever communications they had during that event is privileged. So I want to bring that up so when I say "objection," should I say privilege?

THE COURT: No. You're not going to ask him any communications he had with the client, are you?

MR. PARDO: No, Your Honor. In fact, we will proffer it's communications he didn't have.

MR. CASABIELLE: Well, that kind of goes to the communications, he did have.

THE COURT: No, no, no, no, no. That's not the way that works. So you can ask him, "Did you and your client discuss X," and just because he says no, it's not privileged. That's a privilege communication, whether the communication even existed could be privileged, no?

MR. PARDO: Understood, Your Honor.

THE COURT: I mean, do you think I'm wrong?

MR. PARDO: I don't think you're wrong, but I would -- Mr. Grayson previously testified that, I am pretty sure Mr. Seidler waived the privilege when he testified, he didn't tell his own lawyer about the issues that we're going to raise.

THE COURT: That doesn't waive the privilege. First of all, we are not -- this jury is already waiting. I don't care who has made themselves available, you're not interrupting the plaintiff's testimony by calling a lawyer where there is a privilege issue that apparently needs to be litigated.

MR. PARDO: Then, Your Honor, we have no need for the witness.

We also have Mr. Colletti we would like to get on the stand as well.

THE COURT: Is he going to have a privilege issue?

MR. PARDO: No privilege issue.

MR. CASABIELLE: No, because he represented the buyer of the property -- the last buyer of the property.

THE COURT: Like I said, I mean, if you're going to call a lawyer that's going to have a privilege issue, then at the very least, I should have been given some time to assess what the privilege is or not, to not inconvenience the jury.

You're welcome to call him, but you're going to have to discuss with me what it is that you think you're going to put him on the stand for, so that I have an understanding of is there a

privilege, has it been waived. And I am not going to do that with the jury waiting.

MR. PARDO: Your Honor, we have no need for the witness --

THE COURT: So now you just don't have a need for the witness?

MR. PARDO: That's right, Judge, and we're going to move on to Mr. Colletti.

THE COURT: Do you have an objection with Mr. Colletti being called?

MR. CASABIELLE: No, Your Honor, not right now. It depends what questions are asked; but obviously there isn't a privilege issue. That's why I'm not raising it.

THE COURT: If there is not a privilege issue and you want to interrupt your client's testimony, then --

MR. NIELSEN: Your Honor, may I raise one issue?

THE COURT: Yes.

MR. NIELSEN: During Bart Seidler's examination by the plaintiff, he elicited questions from Bart Seidler regarding Moises Grayson, and I raised an objection that was overruled that it was for privilege. Could we have that stricken from the record?

THE COURT: No, no. I have to tell you, this case has been pending a long time. You have litigated all sorts of things in this case. There is, like, a privilege issue running around

and nobody bothered to put that in a motion in limine, right? Or you could have asked for a sidebar if you thought it was a privilege issue. No.

Bring the jury in.

(Jury in at 1:41 p.m.)

THE COURT: Ladies and gentlemen of the jury, thank you very much for accommodating me. I still haven't had lunch because I spent the entire time yapping to a bunch of lawyers, so that's where we're at. We're ready to begin.

The plaintiff, with no objection from the defense, has asked to take a witness out of turn, so we will be interrupting this witness's testimony just for a minute to call a different witness that is apparently not a lengthy witness but does have a scheduling conflict.

Counsel.

MR. PARDO: Thank you, Your Honor.

The plaintiffs call Joseph Colletti to the stand.

THE COURT: All right.

THE COURTROOM DEPUTY: Watch your step. There is an exhibit up here.

THE WITNESS: There is some paperwork.

MR. PARDO: May I approach, Your Honor? May I approach, Your Honor?

THE COURT: Sure.

THE COURTROOM DEPUTY: Please raise your right hand.

01:42PM (The witness is sworn.)
01:42PM THE WITNESS: I do.
01:42PM THE COURTROOM DEPUTY: Okay, thank you. Please have a
01:42PM seat. Please state your first and last name for the record.
01:43PM THE WITNESS: Joseph Colletti.
01:43PM THE COURTROOM DEPUTY: Thank you.
01:43PM JOSEPH COLLETTI, PLAINTIFF'S WITNESS, SWORN
01:43PM DIRECT EXAMINATION
01:43PM BY MR. PARDO:
01:43PM Q. Good afternoon, Mr. Colletti. What's your profession?
01:43PM A. I am an attorney.
01:43PM Q. And what area of practice, if any, do you have, what
01:43PM specialty?
01:43PM A. Real estate.
01:43PM Q. Sir, do you know what --
01:43PM THE COURT: I'm sorry. Because you were talking over
01:43PM each other, I did not hear what his specialty was.
01:43PM THE WITNESS: Oh. It's real estate.
01:43PM THE COURT: Real estate, all right. Thank you.
01:43PM BY MR. PARDO:
01:43PM Q. Did you have any involvement in the sale of the property at
01:43PM 130 Southeast 1st Street, Miami, Florida, in August of 2021?
01:43PM A. I did.
01:43PM Q. What was your involvement, if any, with that transaction?
01:43PM A. I represented the purchaser of the property. I was also the

01:43PM closing agent and the title agent.
01:43PM Q. What's the role, if any, of a closing and title agent for a real estate transaction?
01:43PM A. Well, as a closing agent, you're responsible to prepare the closing statement, to gather all the documents necessary for the closing. As the title agent, you're responsible for issuance of a title commitment and to follow the requirements in the title commitment in order to close the transaction. I also acted as the attorney for the buyer.
01:44PM Q. Do you know what a right of first refusal is?
01:44PM A. I do.
01:44PM Q. Does a right of first refusal have any connection to a title commitment?
01:44PM A. Yes, it would.
01:44PM Q. What connection is that?
01:44PM A. If there is a right of first refusal and it's noted in the title commitment or someone has a right of first refusal and it is determined that one exists, it must be dealt with before you close in order to resolve any issues concerning the right of first refusal and whether or not that party, in fact, has the right and is exercising it.
01:44PM Q. Can you close a real estate transaction without resolving a right of first refusal?
01:44PM A. I would not, no.
01:44PM Q. Why not?

01:44PM A. Because you could have post-closing repercussions from the party if you're made -- if the closing agent or the attorney or the title agent is made aware of a right of first refusal and closes with that knowledge, you could have repercussions after the closing where the party who held the right would seek redress against either the agent or the buyer by not resolving the issue before the closing.
01:45PM Q. Are you familiar with a closing document called a company resolution?
01:45PM A. Yes.
01:45PM Q. What purpose, if any, does a company resolution have in connection with a real estate transaction?
01:45PM A. A company resolution is a resolution that indicates the authority of the party to sign the documentation, depending on the entity. If there is a manager or a stockholder or a president, it lists the managers; if there is an LLC, it makes representations concerning the authority of the party to execute the documents that are required to close.
01:45PM Q. I am going to show you what's been previously identified as Plaintiff's Exhibit 128. It's in evidence.
01:45PM MR. PARDO: And we'll publish it to the jury, please.
01:45PM BY MR. PARDO:
01:46PM Q. Do you see the document in front of you, sir?
01:46PM A. I do.
01:46PM Q. What do you understand it to be?

01:46PM A. That is a resolution of FTP, which was the seller in the transaction, which indicates who the director and the shareholder was and was naming Bart Seidler as the president of the company authorized to execute the documents on behalf of FTP for the closing.
01:46PM Q. Did you rely on this resolution in any way in connection with the sale of the property in August of 2021?
01:46PM A. Yes, I did.
01:46PM Q. And what way was that?
01:46PM A. Well, I had the -- I knew the authority of the party selling because it was an entity, not an individual. And that entity, FTP, was disclosing in the resolution that Bart Seidler, as president of the corporation, had the authority to execute the documents on behalf of the company that were required to close the transaction.
01:46PM Q. Sir, are you familiar with a document in real estate transactions called a company affidavit?
01:47PM A. Yes.
01:47PM Q. I'm going to show you what's been previously marked as Plaintiff's Exhibit 129.
01:47PM MR. PARDO: It's in evidence, and we'll publish it to the jury.
01:47PM BY MR. PARDO:
01:47PM Q. Do you recognize the document, sir?
01:47PM A. Yes, I do.

Q. What do you understand it to be?
A. This is a typical document in a real estate transaction. It's an affidavit from the seller making certain representations as to the status of the property and also the status of the affiant giving the affidavit and the company, such as any encumbrances on the property, any liens, any taxes that may be due, if the entity is bankrupt or insolvent. It's a typical document required by the title company from the seller as to the representations that are in the document.
Q. Did you rely on this closing affidavit as part of this real estate transaction in August of 2021?
A. Yes. I always get an affidavit like that in a real estate transaction.
Q. Would an affidavit like this have any -- would it protect against the nondisclosure of certain documents?
A. Yes. The reason the title companies require the affidavit is in the event there is any false statements made, such as we find out afterwards there was a hidden mortgage or taxes that were due or a lien on the property, they would have recourse to go back to the party who executed the affidavit.
Q. Now, you also represented the buyer in this transaction?
A. I did.
Q. I am going to show you what's been marked as Plaintiff's Exhibit 123 in evidence.
Do you recognize the document?

01:48PM A. Yes. That was the negotiated purchase and sale agreement between the buyer and seller for the acquisition of the property.
01:48PM Q. And who is the counterpart with whom you were negotiating this contract?
01:48PM A. Well, I was dealing with or speaking with and -- throughout the transaction, the attorney for the company.
01:48PM Q. Which was who?
01:48PM A. Moises Grayson.
01:49PM Q. At any time during the period of the contract execution through the closing, did you become aware of any contracts that had not been disclosed to you during -- prior to the execution of the contract?
01:49PM A. No.
01:49PM Q. I'd like to show you Plaintiff -- excuse me. Let's go to page 10. And highlight Sections K and L for you.
01:49PM Were these provisions of the contract specifically negotiated by your client and FTP?
01:49PM A. Yes.
01:49PM Q. In your own words, could you summarize what these provisions meant to your client.
01:49PM A. Well, the no consents provision indicates that there were no requirements from any third party to be obtained in connection with the delivery and performance by the seller or the buyer -- I'm sorry, by the seller as to the closing of the transaction and the delivery of the title.

01:50PM And the no contracts -- I'm sorry, the no conflicts provision indicates that the execution of the agreement and the consummation of the transaction won't conflict with or result in any violation of the documents of the selling entity or conflict with any violation or any mortgages or any other agreement for which the seller was a party.

01:50PM Q. Now, prior to the sale of the property in August of 2021, did you become aware of any document which conflicted with these seller representations?

01:50PM A. No.

01:50PM Q. After the sale of the property in August of 2021, did you become aware of a contract which violated the seller representations in this contract?

01:50PM A. I did.

01:50PM Q. What document was that?

01:50PM A. There was a participation agreement. I became aware of that in, I believe it was, June of 2024 in conjunction with my deposition. There was a participation agreement whereby a third party had executed an agreement with seller as to participation in the management and sale of the property.

01:51PM Q. Did you have any understanding of that contract with respect to a right of first refusal?

01:51PM A. Not at the time of closing, but at the time that it was disclosed to me in 2024.

01:51PM MR. PARDO: Let's do a side-by-side of this page 10 and

01:51PM Plaintiff's Exhibit 1.

01:51PM IT STAFF: What?

01:51PM MR. PARDO: Plaintiff's Exhibit 1.

01:51PM BY MR. PARDO:

01:51PM Q. Do you see the document on the right side of your screen?

01:51PM A. Yes.

01:51PM Q. What document do you understand that to be?

01:51PM A. That is the Profit Participation Agreement and assignment that
01:51PM I first saw in '24.

01:51PM Q. Sitting here today, would you have closed on the sale of the
01:52PM transaction if you had known about this Profit Participation
01:52PM Agreement?

01:52PM A. No.

01:52PM Q. Why not?

01:52PM A. Similar to a right of first refusal, if a third party is
01:52PM claiming an interest in the property based on a document recorded
01:52PM or not, if it's made -- disclosed to me before the closing, I
01:52PM would never close the transaction to avoid issues with the buyer
01:52PM having issues after the clothing, and the title company having
01:52PM issues after the closing of a third party making a claim that I,
01:52PM as a closing agent, improperly disbursed proceeds or closed a
01:52PM transaction without first advising them based on the language in
01:52PM the participation agreement.

01:52PM Q. I would like to show a final document here, Plaintiff's
01:52PM Exhibit 136 already in evidence.

01:52PM MR. PARDO: We can take these down, Patrick, thank you. 136, please.
01:52PM BY MR. PARDO:
01:52PM Q. Do you recognize the document?
01:53PM A. I do.
01:53PM Q. What do you understand it to be?
01:53PM A. That is the settlement statement, which is customarily used in the closing of a transaction, which indicates the prorations and the amounts due from the buyer and the seller in order to close the transaction.
01:53PM MR. PARDO: Let's go to the signature page, the last page of the settlement agreement. -- settlement statement, excuse me.
01:53PM BY MR. PARDO:
01:53PM Q. Do you see the signatures for the buyer and the seller?
01:53PM A. I do.
01:53PM Q. Do you have an understanding of whether or not FTP authorized the distributions pursuant to this closing statement?
01:53PM A. Yes, they did by execution of this document.
01:53PM Q. Would you have disbursed moneys pursuant to this closing statement without FTP's approval and direction?
01:53PM A. No, unless as all parties, including myself as the settlement agent, execute the settlement statement, there is no disbursements made because this is the document that authorizes the closing agent to disburse in accordance with the numbers and the prorations on the statement.

Q. And sitting here today, do you have an opinion whether or not the parties under the Profit Participation Agreement had profits to distribute?
A. I'm sorry, can you repeat that?
Q. Do you believe there were profits to distribute upon the closing?
A. Well, yes, based upon this, a chunk of the money, I believe it was 12 or 13 million, went to a 1031 company on behalf of the seller, and I believe the seller also received some proceeds from the sale.
MR. PARDO: No further questions.
THE COURT: Cross-examination.
MR. CASABIELLE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. CASABIELLE:
Q. Good afternoon, Mr. Colletti.
A. Good afternoon.
Q. Mr. Colletti, have you had any repercussions after this closing that occurred on the sale of this property from anybody?
A. Repercussions, no.
Q. Nobody has called you, sued you, or said anything about not doing the closing in the proper manner, right?
A. Only until I heard from plaintiff with regard to this -- plaintiff's counsel with regard to this suit.
Q. And that was during your deposition in 2024?

01:55PM A. Yes.
01:55PM Q. Did Mr. Mirmelli ever sue you?
01:55PM A. Did what?
01:55PM Q. Mr. Mirmelli, has he ever sued you --
01:55PM A. Oh, no.
01:55PM Q. -- for not doing a proper closing?
01:55PM A. No, no, not at all.
01:55PM Q. Did he ever sue you for not enforcing the right of first refusal?
01:55PM A. No.
01:55PM Q. So you have had no repercussions?
01:55PM A. I said -- I testified that there were no repercussions since the closing, that I am aware of.
01:55PM Q. So when you're talking about you would not have closed because you would feared repercussions, the truth of the matter is you haven't had any repercussions?
01:55PM A. What I stated was if I was aware of a right of first refusal or, in this case, a participation agreement, I wouldn't have closed it without resolving it, but because I wasn't aware of those, I closed, and I was not aware of any repercussions since then until my deposition.
01:56PM Q. Okay. Now would you agree that there is a right of first refusal to the management of the parking lot and a right of first refusal to buy the parking lot? Those are two different things, yes?

A. Yes, but there was a right of first refusal for the management of the parking lot not to purchase the parking lot.
Q. For the management of the parking lot?
A. Yes.
Q. Your concern was whether or not that right of first refusal would affect the title to the parking lot, correct?
A. That's correct.
Q. But this right of first refusal had nothing to do with the title, did it?
A. No, my client accepted the parking operator on the property, so it didn't have anything to do with title.
Q. Exactly. So there's no need to enforce a right of first refusal to the management of the property if it doesn't deal with the title of the property, correct?
A. Right, it would -- it would only be if the right of first refusal was to the acquisition of the property.
Q. Of the title?
A. Yes, of the title.
Q. And the right of first refusal here was not to the title, was it?
A. No, it was to the right of the parking operator to continue to manage and operate the parking facility.
Q. Did the operator of the parking lot complain to you about this at all during the closing, the sale, anything?
A. No, the buyer accepted the operator, they continued on the

property, I believe, for a short period of time after the closing.
Q. So, sir, if I may say, you did nothing wrong during the closing of this property, did you?
A. I certainly hope not.
Q. You certainly did not --
A. I have practiced long enough to be careful.
Q. Yeah, but you have not been sued for doing something wrong, right?
A. Neither myself nor my client has been sued as a result of the transaction, no.

MR. CASABIELLE: No further questions, Your Honor.

THE COURT: Any redirect?

MR. PARDO: Can we pull up Section 7 of the Profit Participation Agreement, Plaintiff's Exhibit 1, and let's call that out.

REDIRECT EXAMINATION

BY MR. PARDO:
Q. Mr. Colletti, this is Section 7 of the Profit Participation Agreement that you weren't aware of prior to your deposition in 2024. Take a moment and read that, please.
A. Yes, I read it.
Q. Is this the sort of right of first refusal that you would have needed to see and resolve before clearing title?

MR. CASABIELLE: Objection. "Sort of."

THE COURT: Rephrase.

BY MR. PARDO:

Q. As you read this right of first refusal, sitting here today, do you believe now that it should have been resolved prior to closing?

MR. CASABIELLE: Objection. Asked and answered. Relevance.

THE COURT: Overruled.

THE WITNESS: Yes.

MR. PARDO: No further questions.

THE COURT: All right. Thank you very much, sir.

THE WITNESS: Thank you, Your Honor. Have a nice day.

THE COURT: You, too.

MR. PARDO: If I may, Judge, does the jury have any questions?

THE COURT: Thank you for reminding me. Does the jury have any questions?

(The jurors nodded.)

THE COURT: All right. Thank you very much, sir.

(The witness is excused.)

MR. PARDO: Your Honor, the plaintiff calls back to the stand Greg Mirmelli.

THE COURT: Yes, please.

GREGORY MIRMELLI, THE PLAINTIFF, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

BY MR. PARDO:

02:00PM Q. Greg, in 2012, were you aware of any world event which affected the Miami real estate market?

02:00PM A. Yes.

02:00PM Q. And in 2008, were you aware of any world events that affected the Miami real estate?

02:00PM A. Yes, right at the end of 2008.

02:00PM Q. What was that?

02:00PM A. There was a financial collapse compared with the 1929 biggest collapse in U.S. history.

02:00PM Q. Did you have an opportunity to observe the impact of that financial collapse on the Miami real estate market?

02:00PM A. I had the unfortunate education of a lifetime of it.

02:01PM Q. What impact, if any, did it have on the real estate assets that you were involved with in and around that time?

02:01PM A. I typically use the phrase of collateral damage as I was in many partnerships with investors who had control of deals and, you know, it was -- there were vultures out there who were waiting for that day where they can take from us what was ours, what we had owned, there were banks that were collapsing, there were numerous stories of people jumping out of windows on Wall Street. It was just a horror show.

02:01PM Q. Did you take any precautionary -- were there any precautionary

02:01PM measures that you took proactively in and around this time for your assets in real estate in Miami?

02:01PM A. Well, I will never forget, I believe it was the middle of October of 2008 when, you know, the stock market collapsed, followed by a thousand dollars down, a thousand dollars down, two thousand dollars down.

02:02PM Q. If I may, specifically, the precautionary measures you took in and around this time to protect your real estate assets.

02:02PM A. Shortly after it took a moment to digest, as a young guy and the first time going through anything like this, not to mention something so large, I -- I took measures as soon as I can after I digested the situation.

02:02PM Q. Did you have to prioritize certain interests in real estate to save?

02:02PM A. Yes.

02:02PM Q. Which assets did you identify, if any, that you wanted to save?

02:02PM A. My home on Sunset Island, this property, 130 Southeast 1st Street, Transpark, a townhouse at Sunset Harbor, any and all parking operations that I had been running that were profitable to me so I would have cash flow to get through this crazy period of time and, hopefully, save enough money to save as many deals as possible, and I had to concede certain deals and say, this one doesn't make the top list and deed in lieu is a famous term that I would return it to the bank for release --

02:03PM Q. Now, in and around this time of the financial crisis, was -- were you and Transpark expecting to receive a notice of capital contribution from FTP?

02:03PM A. I was certainly aware of the fact that the potential of it was quite possible and --

02:03PM Q. And what, if anything, were you doing to prepare for that possibility?

02:03PM A. I had formed relationships with a couple private lenders, and I had lines of credit set up for millions of dollars on my Sunset Island home, which had a debt to value ratio of well below 50 percent, meaning the home was worth over $10 million and the debt was 4 million, so I was able to at least pull, if necessary, two or $3 million out of that.

02:04PM I had the parking operation at 700 Biscayne, which I still have today, which is averaged profits from three-quarters of a million to a million dollars a year where I was prepared to allocate funds from that.

02:04PM I had other parking lots just to the west of this, which was also a property that I was fighting really hard to save, but I ended up -- it ended up in a confidential settlement, so I can't get further into that.

02:04PM But, you know, from the properties that I chose were on the priorities, these are my gems that I have to fight my hardest to protect, as I continued to try to also make new deals and so on and so forth.

02:05PM And then in addition to that, I maintained relationships with some very wealthy people who I can always rely on to, if necessary, borrow money because this was a good deal, and this was a deal worth saving.

02:05PM Q. Specifically who?

02:05PM A. It could have been my father, it could have been my uncle it could have been my brother, it could have been Dan Kodsi, who has gone on to do many further deals with me after that period of time.

02:05PM Q. And, specifically, with respect to the Transpark property here, what were you waiting for?

02:05PM A. Obviously, notice.

02:05PM MR. PARDO: No further questions, Your Honor.

02:06PM THE COURT: Cross-examination.

02:06PM MR. CASABIELLE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. CASABIELLE:

02:06PM Q. Mr. Mirmelli, you've been in the parking lot business for some while, yes?

02:06PM A. Correct.

02:06PM Q. Yes?

02:06PM A. Yes.

02:06PM Q. You've been successful?

02:06PM A. Yes.

02:07PM Q. You have money?

A. Yes.
Q. Why didn't you pay your rent?
A. Excuse me?
Q. Why did you not pay your rent if you had money?
A. I lived with the rules of the lease.
Q. I'm sorry, say that again.
A. I was -- I was never given notice.
Q. Okay. The reason you did not pay rent was because you were not given notice of what?
A. That I needed to make a capital contribution according to the Profit and Participation Agreement, which we're suing you on today.
Q. Right. You entered into an agreement, yes?
A. Yes.
Q. A lease agreement, yes?
A. Secondarily, yes.
Q. And you agreed to pay $30,000 a month, yes?
A. Yes.
Q. Did that obligation ever cease?
A. In accordance with the lease?
Q. Did it ever cease?
A. It never ceased.
Q. But you just decided not to pay it until somebody said you had to pay it?
A. As we discussed earlier, Nathan Heber and as, you know,

established a relationship with Bart. Every month he sent him money; Bart accepted it. And yes, I was waiting for a letter because as far as I knew, Bart was okay with that.

Q. Yeah. But many times Bart Seidler sent you emails saying you needed to pay money; didn't he?

A. Nathan responded to those emails. You will never see a response from me.

Q. So you're saying you didn't read your email now?

A. That's right. Nathan read all those emails.

Q. Explain that to the jury because that's a little confusing.

Nathan wrote those emails making believe that he was you so that he could read them as part of some Machiavellian plot to fool you or something?

MR. PARDO: Objection, Your Honor.

THE COURT: Overruled.

BY MR. CASABIELLE:

Q. Is that your testimony?

A. My testimony is, yes, that Nathan and Bart had a relationship, as Bart himself said, since the very beginning of 2006. And all correspondence was between them, and Nathan had always told me that he has Bart happy and that I don't have anything to worry about and that I have no reason whatsoever to respond to Bart about anything.

Q. Again, is it still your testimony that Nathan Heber wrote emails addressed to you so that he could open that email and read

it, but you would never see those emails; is that your testimony?
A. It is my testimony that I saw correspondence between them, but I never got in the middle of it knowing that he was -- "he" being FTP and Bart Seidler, were required by law, by the only thing that governs this deal to give Greg Mirmelli notice, Transpark and of course Greg Mirmelli guaranteed Transpark and it even specifically discussed in regards to the lease.
Q. Let me ask you something. You just said you did read some of the emails between Bart and Nathan, yes?
A. I -- I knew they existed.
Q. How did you know they existed if you didn't read them, sir?
A. Because as I testified earlier, Nathan used to sit next to me in a room, and he would say to me: Oh, Bart's asking for this or Bart's asking for that, so I told him this and I told him that; I told him we're doing the best we could.
Later on, as I mentioned, they -- it became obvious to me that Nathan was skimming, but if I could prove that, he would be in jail.
Q. All right. You've mentioned that a couple of times, that Nathan was stealing, Nathan was skimming. Do you have any proof at all that that happened, or is this just something you're testifying about to today?
A. Well, I'll tell you what I have, and you will tell me if this is proof or not. He hired his brother Steve Heber, and Steve Heber contacted me and said: Greg, I was robbing you; I was doing

02:11PM the wrong thing, and I feel horrible about it, and I want to pay
02:11PM you back; I don't have all the money to pay you back.
02:11PM But he wired me $30,000.
02:11PM Q. That's -- Steve, that's Nathan's brother?
02:11PM A. Right. Who he hired, yes.
02:11PM Q. The question is: Do you have any proof at all that Nathan was
02:11PM stealing or skimming from you, sir?
02:11PM A. I do not have proof. I can only tell you that the numbers
02:11PM went in half.
02:11PM Q. Okay. The numbers went in half. Now, wasn't this around the
02:12PM time that this collapse happened?
02:12PM A. And then they doubled.
02:12PM Q. Yes. But when the numbers went in half, that's when you
02:12PM abandoned ship, wasn't it, sir?
02:12PM A. I never abandoned anything. They abandoned me.
02:12PM MR. PARDO: Objection, Your Honor, to the prior question.
02:12PM I know it's after the fact, but.
02:12PM THE COURT: Overruled. It's cross-examination.
02:12PM BY MR. CASABIELLE:
02:12PM Q. Okay. Let's kind of backtrack a little bit, and we'll address
02:12PM this area again shortly. As Yogi Berra might say: Let's begin
02:12PM from the beginning.
02:12PM Let's start about the background of the deal, this deal
02:12PM where you had acquired an interest in purchasing the lot that
02:12PM we're talking about here, right? That's what I want to focus on

right now.
A. Correct.
Q. Who did you acquire an -- that right from?
A. The seller. I believe it was Central Parking.
Q. Okay. And you borrowed $100,000 from your father to secure that loan -- that deal, did you not?
A. Again, that's what you guys said yesterday. He testified he doesn't remember. I'm testifying I don't believe I would have needed to. So my -- I mean -- I don't know the relevance of it, but.
Q. Sorry?
A. I was certainly doing very well in 2006. I don't see any reason why I would have needed to have borrowed it, but I could have called him up and said: Hey, Dad, put it up for me; you know I'm good for it.
Q. You were doing very well in 2006, yet you weren't paying your rent?
A. Yes, I was. Have you reviewed the documents?
Q. Yes, sir, I have.
A. In 2006.
Q. You were paying your rent; I stand corrected.
How about 2007?
A. Yes.
Q. How about 2008? Maybe not?
A. But I was doing very well.

Q. But you did not pay your rent, did you?
A. Nathan at that point had opened an office in Bart -- we went through this before, but we can go through it again. He opened an office in Bart's office. He told me all along Bart was okay with what was going on. And I understood the document, the Profit Participation Agreement, specifically said he had to give me 15 days' notice on the lease.
Q. Okay. Let's --
A. That's what we're suing on. You guys haven't read it, I guess; but if you read it --
Q. Sir, I'm asking the questions here.
A. I'm answering them.
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
BY MR. CASABIELLE:
Q. Please answer my questions. You're not entitled to ask me questions. Do you understand the rules?
A. You just said I didn't pay rent in '06.
MR. CASABIELLE: Your Honor.
THE WITNESS: He just made an invalid statement to me, so how am I supposed to react?
THE COURT: First of all, I need you to slow down. I need you to stop talking over each other. The lawyer gets to ask questions. You have to answer the question. If you don't answer the question or you answer it with a question, he's not going to

02:15PM answer your questions. Your lawyer will have an opportunity to redirect after you're done with the cross-examination.

02:15PM THE WITNESS: Okay.

02:15PM THE COURT: It would be helpful, Mr. Casabielle, you know, you're very close to that microphone, and it is starting to feel like you're yelling, which I am not going to allow you to do, so I need you to stop.

02:15PM MR. CASABIELLE: I'm sorry, Your Honor. I don't know if I'm talking too loud or too soft. I'm trying to moderate my voice.

02:15PM Can we put up Defense Exhibit 1, which is also, I believe, Plaintiff's Exhibit 1, which is the Profit Participation Agreement and Assignment, which has already been agreed to or admitted into evidence. Can we focus, please, on Section B of the recitals. Yes, there.

02:15PM BY MR. CASABIELLE:

02:15PM Q. Can you read Section B of the recitals? Highlight it, please.

02:15PM A. Simultaneously with the execution of this agreement, FTP will tender the sum of $100,000 to Stewart Mirmelli, Esquire, the escrow agent under the contract, for purchase in replacement of the deposit previously placed by GM under the contract.

02:16PM Q. Okay. Why would FTP have to pay your dad $100,000?

02:16PM A. Replace.

02:16PM Q. Replace $100,000?

02:16PM A. That was the agreement I made with FTP.

Q. What was the agreement you made with FTP with regard to the $100,000?
A. Again, you're asking me not to answer a question with a question --
THE COURT: Just answer the question, sir. You're being asked a question; answer it.
THE WITNESS: I answered it. It was a replacement.
BY MR. CASABIELLE:
Q. What was it a replacement for?
A. Escrow.
Q. Who deposited the money in the escrow?
A. Who deposited the money in the escrow? It's too long ago to remember.
Q. So you're telling us you don't know if your dad put in $100,000 or not?
A. I'm telling you that I don't remember the sequence of events from 2006 in 2025, but it was either him or me.
Q. Okay. So --
A. But I had it.
Q. Pardon?
A. Meaning if I -- if I had called him to say: Dad, put this up for me; he knew I had the money, or I had wired him, and he had the money. But either way, I mean the seller obviously got an escrow letter and was comforted --
Q. Let me ask you a question. If you had the money, why is your

02:17PM father even involved in this deal from the get-go?
02:17PM A. All real estate contracts have an escrow agent.
02:17PM Q. That's an escrow agent. I'm talking about the deposit of money into escrows. Why is your dad involved in this deal at the beginning of it if you had all of the money needed to solidify the deal?
02:17PM A. Because that's the way we did business.
02:17PM Q. Okay. Let's talk about your business model. Your business model was to use other people's money, wasn't it? Isn't that correct?
02:18PM A. Not always.
02:18PM Q. Well, you want to eliminate risk, don't you?
02:18PM A. Depends on the deal.
02:18PM Q. Exactly, but your goal is to eliminate as much risk in a deal as possible?
02:18PM A. You could put words in my mouth, but I don't -- I don't agree with them.
02:18PM Q. Okay. I'm asking you.
02:18PM A. That wasn't a question.
02:18PM Q. I'm sorry. Say again? You're mumbling, sir.
02:18PM A. That was not a question.
02:18PM Q. Okay. Let me ask you a question.
02:18PM If you had the money, is there any reason why your dad would be involved with a contribution to the escrow account or a loan to you of $100,000?

02:18PM A. There is no evidence of any loan whatsoever. You keep bringing this up, but again, there is no reason for us to believe there was ever any loan made here, so unless you have evidence of it, please stop referring to it.
02:19PM Q. Well, sir --
02:19PM THE COURT: Sir, sir, sir. So he is going to ask questions, and you answer them, right.
02:19PM THE WITNESS: Yes.
02:19PM THE COURT: This is not an opportunity for you to argue with him.
02:19PM THE WITNESS: He's alleging --
02:19PM THE COURT: Excuse me, sir. Excuse me. Your lawyer made an opening statement; your lawyer will make a closing statement. You're going to answer the questions, and that's all you're going to do. Do you understand?
02:19PM THE WITNESS: Sure. Yes.
02:19PM MR. CASABIELLE: Thank you, Your Honor.
02:19PM BY MR. CASABIELLE:
02:19PM Q. You say if I have proof that your dad was involved. I'm showing it to you on the screen. Section B of the recitals, why is your dad involved at all if you had the money?
02:19PM A. Because he was the contract escrow agent.
02:19PM Q. He is the escrow agent. I'm not talking about him being the escrow agent or not. I'm talking about the deposit of money into the escrow.

MR. PARDO: Objection, Your Honor.
MR. CASABIELLE: What is the objection?
THE COURT: What's the basis of your objection?
MR. PARDO: Asked and answered and cumulative.
THE COURT: Overruled.
BY MR. CASABIELLE:
Q. I'm asking about the deposits into the escrow, sir.
You know the difference between being an escrow agent and depositing money into an escrow, yes?
A. Right.
Q. That's what I'm talking about; depositing money into the escrow.
Why would your dad be involved in depositing any money into the escrow if you had all the money necessary to secure the deal?
That's my question. Just please answer it, if you can. If you can't, just say so.
A. I just don't remember.
Q. Okay. Let's move on then. Let's talk about your business model again if I may. If you could eliminate risk in any deal, that would be your goal, yes?
A. No.
Q. Say again?
A. Absolutely not.
Q. No?
A. I've been known to take many risks, and I have.

Q. Okay. Well, let's talk about this particular deal. Your goal was to eliminate as much risk as possible, was it not?
A. My goal was to make a mutually beneficial deal for two parties.
Q. But you were responsible for depositing $300,000 as part of the purchase price, yes?
A. Yes.
Q. And then you went back to Mr. Seidler in 2007 and asked for a $300,000 loan, did you not? You did, yes?
A. Yes.
Q. That meant you had no skin in this game, did you?
A. For a brief period of time.
Q. Why did you do that? Why did you ask for $300,000 if you were so wealthy making so much money? What did you need the money for?
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: I was purchasing another property, and I had to come up with $5.7 million in cash, in which I had the other 5.4 million, and this 300,000 was the final 300,000.
BY MR. CASABIELLE:
Q. Okay. Now, did your dad ever express a concern that he was going to lose his $100,000 loan or deposit in the escrow because the deal had not been secured yet?
A. There was no chance of that.
Q. Okay. You don't remember an email from your dad saying "Hey,

you have to close on this soon or we're going to lose the -- the deposit?"
A. I had backup -- I had backup investors, not to mention I had every right on earth to just cancel the deal.
Q. That's right. And lose a 100,000, yes?
A. Excuse me?
Q. And lose $100,000?
A. No, I didn't lose 100,000. It was still in due diligence.
Q. Okay. It's under due diligence.
But didn't your dad say to you "Son, the due diligence period is ending, get this done," something to that effect? I'm paraphrasing.
A. He reminded me, but I was aware of it anyway.
Q. So he was concerned, wasn't he?
A. Concerned about what?
Q. About your not reaching the -- finalizing the deal within the due diligence period.
MR. PARDO: Objection, Your Honor.
THE COURT: What's the basis for your objection?
MR. PARDO: Speculation.
THE COURT: Overruled.
BY MR. CASABIELLE:
Q. Please answer.
A. I had signed contracts to purchase 20 different properties during that period of time. They all had inspection periods, they

all closed.
Q. That's not the question I asked.
A. Sounds like it was.
MR. CASABIELLE: Madam Court Reporter, can you please read back the question right before he gave that answer.
(From the record above, the reporter read the following:
Q. About your not reaching the -- finalizing the deal within the due diligence period.)
BY MR. CASABIELLE:
Q. Can you answer that question?
A. Yes, he would say wasn't concerned, he was doing his job as a lawyer to remind me that there was a certain amount of time left to close, and by that time, I had already reached a deal with Mr. Seidler, and I wasn't concerned whatsoever and, as you all know, the deal closed.
Q. Now, this case, sir, is about, let's say, four agreements that you entered into with Mr. Seidler; is that a fair assessment?
A. No.
Q. All right. Let's talk about the agreements you did enter into with him. First, there is the participation agreement and assignment, yes?
A. That's the only agreement we're suing on.
Q. Okay. How about the ground lease agreement, don't you think that's associated with this case?

02:25PM A. I -- I can't answer that question. I'm not a lawyer.
02:25PM Q. Okay. There is a promissory note you signed when you borrowed
02:25PM $300,000, correct?
02:25PM A. Yes.
02:25PM Q. That would be an agreement to repay that, yes?
02:25PM A. By Greg Mirmelli.
02:25PM Q. Yes, by Greg Mirmelli personally, sure. Are you telling us
02:26PM that Greg Mirmelli and Transpark are two different entities now?
02:26PM A. Of course, like all my companies.
02:26PM Q. Right, legally, yes?
02:26PM A. Yes.
02:26PM Q. Yes?
02:26PM A. Yes.
02:26PM Q. Okay. Now, in addition to those three agreements, you also
02:26PM signed an assignment of your interest in the property when you
02:26PM borrowed the money?
02:26PM MR. PARDO: Objection, Your Honor.
02:26PM BY MR. CASABIELLE:
02:26PM Q. The $300,000?
02:26PM MR. PARDO: Objection, Your Honor, and request for a
02:26PM sidebar.
02:26PM THE COURT: All right.
02:26PM THE WITNESS: Judge, am I allowed to get a mint from the
02:26PM table?
02:26PM THE COURT: Sure.

02:26PM (Sidebar conference.)

02:26PM MR. PARDO: Your Honor, Mr. Casabielle is now broaching a subject that I raised a motion in limine for the assignment document that he is referring to is an incomplete document, it doesn't have the memorandum of understanding that it references, Mr. Seidler's testimony is that the Profit Participation Agreement was not a memorandum.

02:27PM THE COURT: Please slow down, I lose you like after 30 seconds. I am not sure what kind of record you and I are getting from Vernita, but go ahead, slow down.

02:27PM MR. PARDO: The collateral assignment document that Mr. Casabielle is referring to is an incomplete document because it does not have the attachment exhibit, what's called a memorandum of understanding, a document that Mr. Seidler has testified was not the Profit Participation Agreement; and the parties to the assignment document, Greg Mirmelli individually and Bart Seidler individually, not Transpark or FTP.

02:28PM So we would contend that the motion -- excuse me, the document would be inadmissible and that any testimony arising from that document, unless the document is in evidence, should be precluded.

02:28PM THE COURT: Why is it inadmissible? Even if the document is inadmissible, why is testimony about what your client was doing with whatever interest he thought he had from the transaction; how is that irrelevant?

02:28PM MR. PARDO: Because Greg Mirmelli did not have any individual Profit Participation Agreement rights under the contract.

02:28PM THE COURT: He can answer that.

02:28PM MR. CASABIELLE: Well, he can. It's a nonsensical response; but yes, he could say that.

02:28PM And if I just may respond. The collateral assignment is key to our case because there's three reasons why that Mr. Mirmelli's interest in any of this property was done away with; one, he didn't pay rent; two, was he didn't pay the $300,000 back.

02:28PM What was the third reason? Oh, and he ran out of -- the company went out of business. I forgot that one; pretty important. So we have to talk about this particular subject that we're addressing now.

02:29PM With regard to the completeness of the document itself, it's their assignment, it is an assignment that the plaintiff signed, so if he doesn't have the copies, that's on him, not on us. We produced whatever we had.

02:29PM THE COURT: You're not answering the objection.

02:29PM MR. CASABIELLE: Which is?

02:29PM THE COURT: His objection is, as best I understand it, that the document at issue is incomplete.

02:29PM MR. CASABIELLE: And that's what I am addressing, the incompleteness that he is referring to are certain documents

referenced in the collateral assignment, correct, and what are those documents.

MR. PARDO: So it refers to a memorandum of understanding attached hereto as Exhibit A, and there is no Exhibit A to the document. The document they would want to introduce is incomplete, and Mr. Seidler testified the Profit Participation Agreement was not a memorandum of understanding.

THE COURT: I just lost as to why your client can't answer that question. Why -- why should I sustain it? He gets to bring up the knowledge your client had about the deal, what your client believed his interests were or were not, why he's probing that -- why can't he probe that?

MR. PARDO: The probative value of my client's truthfulness would be outweighed by the prejudice that would be caused to the jury is the belief that that interest was somehow foreclosed or assigned. He hasn't established the foundation that this document was an assignment of his rights under the Profit Participation Agreement.

THE COURT: I understand your argument. The prejudice here is not outweighed at all by the probative value. I don't know what your client is going to say. I assume your client is going to say --

Why isn't he allowed to probe that?

MR. PARDO: Because he is relying on the document that we contend would be inadmissible.

THE COURT: It doesn't matter if the document is inadmissible. The document might be inadmissible for a host of reasons; but he's probing the relevancy, he's probing the relationship that your client had or belief he had with respect to this agreement and what rights he had. He is entitled to do that.

MR. PARDO: Understood.

THE COURT: By the way, I have had it with the people speaking over each other, people speaking quickly, this guy mumbling into the microphone, this guy arguing with Mr. Casabielle. All the lawyers are doing it. Maybe not you, sir, but Mr. Casabielle is doing it. You're doing it.

I mean, really, we have a jury that we have asked them to take time out of the day to listen to this evidence. If all you all want to do is just scream at each other about it, I will dismiss the jury. I mean, come on. He is, like, mumbling all over, being argumentative. He is your client. You should have prepped him. I assume he's been deposed.

If he does it again, I'll ask the jury to be excused and I will admonish him outside the presence of the jury; and this time I won't be as nice as I was the first time. I mean, he is your client; and you were doing it even on his direct.

And, Mr. Casabielle, you are all over him.

MR. CASABIELLE: Your Honor, I can't help myself. He is arguing with me.

THE COURT: You are a member of the Bar. Help yourself.

Take a breath. Do not talk over him. I can't get a record this way. You're not even letting him finish his answers.

MR. CASABIELLE: I will do better. I will do better. Thank you.

(End of sidebar conference.)

THE COURT: All right. Let's continue.

MR. CASABIELLE: Madam Court Reporter, could you read back the last question I asked, please.

(From the record above, the reporter read the following:

Q. Okay. Now, in addition to those three agreements, you also signed an assignment of your interest in the property when you borrowed the money?

MR. PARDO: Objection, Your Honor.

BY MR. CASABIELLE:

Q. The $300,000?)

BY MR. CASABIELLE:

Q. Can you answer that question, please?

A. Again, it was not signed by Transpark; my Profit Participation Agreement was with Transpark and purely with Transpark.

Q. I'm sorry, you kind of mumbled there at the end. Can you speak up?

A. My Profit Participation Agreement was to the benefit of Transpark. Transpark did not ever cosign that -- that agreement.

Q. But didn't you act on behalf of Transpark?
A. Not in this case.
Q. Are you being selective as to when you acted on behalf of Transpark?
A. I mean, all loans that have additional guarantors list them; so if it wasn't listed, it wasn't listed. That's on your client who drafted the agreements.
Q. We're not talking about my client drafting the agreements.
A. Well, that's my opinion. That's my -- that was my belief.
Q. All right. Let's try to do something. I will ask a question; you answer it, please. Yes?
A. Sure.
Q. Okay. Did you sign an assignment as collateral for the $300,000 promissory note?
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: For the $300,000, yes.
BY MR. CASABIELLE:
Q. And what did you assign over?
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: I was guaranteeing the $300,000.
BY MR. CASABIELLE:
Q. And what did you use as collateral for that guaranty?
MR. PARDO: Objection, Your Honor.

02:35PM THE COURT: Overruled.
02:35PM THE WITNESS: In my opinion, my personal name.
02:35PM BY MR. CASABIELLE:
02:35PM Q. Say again?
02:35PM THE COURT: He said in his opinion, his personal name.
02:35PM BY MR. CASABIELLE:
02:35PM Q. All right. Well, let's start with the promise -- I'm sorry, the first agreement, which is the Profit Participation Agreement. If we could put that up, we'll discuss it. We'll get to the assignment in a little while.
02:35PM A. Okay.
02:35PM Q. Now, this is the agreement that you entered into on behalf of Transpark and with FTP, correct?
02:36PM A. Yes.
02:36PM Q. And in this agreement, you agreed to pay $30,000 a month as rent, yes?
02:36PM A. Yes.
02:36PM Q. Did you pay $30,000 a month throughout the duration of this lease?
02:36PM A. This is a Profit Participation Agreement. It specifically says in it for a period of two years. And we would have to pull the numbers up. It looks like for the first two years they did receive their $30,000 a month.
02:36PM Q. Okay.
02:36PM A. Possibly up until like the last two months, which was minimum.

02:36PM However, there was always a -- I'll just stop there.
02:36PM Q. Please do. So the last two months of the second year, you stopped paying the $30,000 a month?
02:36PM A. I believe Nathan, who had from day one been handling these matters with Bart, sent him what he -- a certain amount of money in different increments. It might have totaled 30,000 with 20,000 in one wire and 10,000 in another wire and so on and so forth. But they were in regards with each other, and I had always felt protected by my -- his obligation to give me capital contribution calls when it came to this agreement.
02:37PM Q. Okay. Very simple question. Please answer my question.
02:37PM Did Transpark pay $30,000 a month throughout the duration of the lease that Transpark had with FTP?
02:37PM MR. PARDO: Objection, Your Honor.
02:37PM BY MR. CASABIELLE:
02:37PM Q. Yes or no?
02:37PM THE COURT: What's the basis of your objection?
02:37PM MR. PARDO: Asked and answered.
02:37PM THE COURT: Overruled.
02:37PM BY MR. CASABIELLE:
02:37PM Q. Yes or no?
02:37PM A. I would need to see the paperwork.
02:37PM Q. What paper would you like to look at, sir?
02:38PM A. The transactions.
02:38PM Q. Which transaction?

A. The ledger, the ledger of payment.
Q. All right. We'll try to assist you, but if you could just identify what you want to look at, we'll try to produce it for you.
A. The moneys that you're asking me about.
Q. This seems to be going around in circles. What ledgers would you like to use to refresh your recollection as to whether or not Transpark paid $30,000 a month to FTP during the duration of the lease? It's a simple question.
A. I would like to see a spreadsheet of what was sent and each month starting from the first day till whenever you're asking me because it's 20 years ago, and I have 20 parking lots, and I don't remember.
MR. CASABIELLE: Your Honor, we would like to show the witness -- Defense Exhibit 43, which has been admitted through stipulation. I would like the Court to accept our stipulation -- I would ask the Court to accept our stipulation.
THE COURT: All right. So Defendant's 43? You're asking for it to be admitted?
There is no objection; is that correct?
MR. PARDO: No objection, Your Honor.
THE COURT: All right. It's admitted. D 43 is admitted.
MR. CASABIELLE: There we go. Thank you.
(Defense Exhibit 43 was received.)

BY MR. CASABIELLE:
Q. Is this the ledger you wanted to see?
A. Yes.
Q. Let's talk about 2006.
A. Okay.
Q. Are you ready?
A. Ready to go.
Q. Did Transpark pay $30,000 a month to FTP during the year of 2006 under the terms of the lease?
A. Yes.
Q. Next year, please?
A. Yes.
Q. Next year, please, 2007?
A. The Profit Participation Agreement said for the first two years. Those were the first two years.
Q. Let me finish my -- let me ask you a question, please.
A. Okay.
Q. In the year 2007, did Transpark pay $30,000 a month to FTP pursuant to its obligations under the lease?
A. Yes, it paid 30,000 per month for the year 2007.
Q. Let's move to 2008. Highlight it, please. Did Transpark pay $30,000 a month to FTP as required under the lease?
A. Well, here it gets confusing. It says 30, 30, 30, 30, then there is a 20 and a 10, which makes 30. Then there is a 10, 10, 10, which makes 30.

02:40PM And it's -- there're not 30 days in between these payments, so it appears as if payments were being made in different times. And, again, nobody was held in default, and nobody was allowed to be held in default according to prior testimony, so. And certainly no notice was given.

But, yes, this is the ledger, and nobody is arguing that this is how the payments took place.

02:41PM Q. So under this ledger, Transpark was not paying FTP $30,000 a month pursuant to its obligation under the lease? Yes or no?

02:41PM A. Yes.

02:41PM Q. It was?

02:41PM A. Yes -- yes or no? No, it was not paying the full 30,000 in every month.

02:41PM MR. CASABIELLE: Give me one moment.

02:41PM (Brief pause to retrieve calculator.)

02:41PM BY MR. CASABIELLE:

02:41PM Q. I want to do some math.

02:41PM A. Okay.

02:42PM Q. I'm going to use a calculator. All right. January 23rd, paid $30,000. Right?

02:42PM A. January --

02:42PM Q. 23rd, 2008; 30,000, yes?

02:42PM A. Yes.

02:42PM Q. February 15th, paid 30,000?

02:42PM A. Yes.

Q. The 14th, 30,000?
A. Yes.
Q. The 15th, 30,000?
A. Yes.
Q. 20th, 20,000?
A. 20,000 on the 20th and 10,000 more on the 31st, but yes.
Q. We're taking one entry at a time.
A. -- 20,000, yes.
Q. On the 30 -- I'm sorry, May 20th it was 20,000, yes?
A. Yes.
Q. May 20th, sorry, 20,000.
On May 31st, 10,000?
A. Yes.
Q. On June 18th, 10,000?
A. Yes.
Q. July 10th, 10,000?
A. Yes.
Q. July 18th, 10,000?
A. Yes.
Q. August 15th, 10,000?
A. Yes.
Q. August 26th, 10,000?
A. Yes.
Q. September 16th, 10,000?
A. Yes.

Q. October 7, 10,000?
A. Yes.
Q. October 21st, 10,000?
A. Yes.
Q. November 7th, 10,000?
A. Yes.
Q. November 20th, 10,000?
A. Yes.
Q. December 2nd, 10,000?
A. Yes.
Q. December 16th, 10,000?
A. Yes.
Q. According to my calculations, that's $270,000 for the month -- I'm sorry, for the year of 2008, correct?
A. How much?
Q. 270,000.
A. Well, when I look at the right line, it says: 20, 30, 40, 60, 70, 80, 90. It adds up -- it shows the deficit of 90, so I think your math is way off unless somebody's math is way off.
Q. But can we agree on the fact that in the year 2008 Transpark did not pay $300,000 to FTP as rent? Yes or no?
A. You mean 360, sir. You said 300.
Q. My bad.
A. 30 times 12 is --
Q. You're right. 360. Then -- well, they didn't pay 300, did

they?
A. It was actually within 20,000 of that if you do the real math.
Q. Okay, but they were supposed to pay 360, and they didn't pay it, right?
A. Like I said, they did their best, and it was accepted, and that's what was paid. I agree to everything you asked.
Q. But they did not live up to the agreement under the lease, which is to pay $30,000 a month, yes or no?
A. You've already asked me, and I've answered yes.
Q. And that's -- okay.
Next year. 2009. According to this ledger, in 2009 -- can we scroll down to the total for 2009. It says that Transpark paid $261,000 to FTP as rent, right?
A. That's right.
Q. You don't dispute that number, do you?
A. I see a lot of money missing.
Q. You do not dispute the number that is $261,000 as being the amount of rent that Transpark paid to FTP as rent for the year 2009?
A. That's right.
Q. Let's go to 2010. Okay. 2010, it says here you only paid or at least Transpark only paid $19,500. Do you dispute that number?
A. No.
Q. So needless to say, that's really, really a lot less than $360,000, correct?

A. It says that for January.
Q. That's for January. Okay, my bad.
A. You're talking about a year versus a month.
Q. What's so funny, sir?
A. That you keep making mathematical mistakes.
Q. That's true, I do, but we're not here testing my math ability. We're here testing your testimony, okay?
A. I know, but you're asking me mathematical questions.
MR. CASABIELLE: All right. Can we scroll down to the year-end totals for 2010. Do we have that? No? That's it.
All right. I guess we'll do some math again. All right. Let's go to 2010.
THE WITNESS: Okay.
MR. CASABIELLE: Highlight that, please.
BY MR. CASABIELLE:
Q. Transpark paid 19,500 to FTP, yes?
A. Yes, in January.
Q. In January, yes. In February, Transpark paid 20,000 to FTP, yes?
A. Yes.
Q. In March, Transpark paid 17,500 to FTP as rent, yes?
A. Yes.
Q. And in March -- April, rather, Transpark paid 2,800, correct?
A. Incorrect.
Q. No, that's not -- that's what this says?

A. You said 2,800, it's 21,800.
Q. My bad, it's late in the day my apologies, I stand corrected, $21,800?
A. Just a $19,000 difference, sure.
Q. Okay, that's fine. Let's add that. 19,500 --
A. Twenty-one eight minus 2,200 which is what you said.
Q. Let me finish my math, please. 19,500, plus 20,000, plus 17,500, plus 21,800, I get a total of $78,000 -- $800 for the year 2010. Do you dispute that figure?
A. Once again, you have made a drastic mistake.
Q. Go ahead, tell me what the mistake is.
A. You're calling four months a year, there's only -- there's 12 months in a year, you have forgotten May, June, July, August, September, October, November, and December, if you look at the spreadsheet.
Q. Well, I'm talking about -- you asked us to look at this.
A. You said for the year of 2010.
Q. Yes.
A. This is four months of 2010.
Q. Well, did you make any -- did Transpark make any other payments after April 2010?
A. There is no ledger. How would I know?
Q. Do you have any proof that Transpark made any payments after April -- sorry, after April 2010 through the end of the year of 2010, do you have any proof, yes or no?

A. I don't have proof either way.
Q. Okay.
A. Do you?
Q. Let's move on to 2011. That's it.
Did Transpark make any rent payments after 2010?
A. I cannot remember.
Q. Okay. Can you dispute our contention that Transpark did not pay any rent at all after 2010 through the term of the lease as obligated by the lease?
A. I -- I have no idea because, again, this was all being dealt with between Mr. Seidler and Heber. All these payments were mailed through Heber. I didn't sign these checks. I was not doing it. Mr. Seidler, who it clearly gave that -- you know the rule -- he was God in this deal. He made -- he got the desire. It said what he desires in our agreement, so he desired Mr. Heber to do this; Mr. Heber did this. He never wrote a default notice to Mr. Heber, and if he did, he certainly didn't show it to me, but he was obligated to send a notice to me and he didn't so --
Q. All right.
A. -- where is the problem?
Q. There are a lot of problems, sir.
First, we'll start off with the problem that you're being nonresponsive to my question.
MR. PARDO: Objection, Your Honor.
THE COURT: Sit down. Stop arguing with him. Ask him a

02:52PM question.
02:52PM MR. CASABIELLE: Oh, yes.
02:52PM Madam Court Reporter, can you read my last question?
02:52PM (From the record above, the reporter read the following:
02:51PM Q. Okay. Can you dispute our contention that Transpark did not pay any rent at all after 2010 through the term of the lease as obligated by the lease.)
02:51PM BY MR. CASABIELLE:
02:52PM Q. Answer that question, please.
02:52PM A. I just do not know.
02:52PM Q. I'm sorry, say that again.
02:53PM A. I don't know.
02:53PM Q. Okay. So you cannot dispute it?
02:53PM A. No.
02:53PM Q. That would have put Transpark in violation of the lease, would it not?
02:53PM A. In my opinion, it would not.
02:53PM Q. Because?
02:53PM A. Because the Profit Participation Agreement said that if there was any -- there are various reasons, I'm going to start with the Profit Participation Agreement requiring FTP to give a 15-day notice of any capital contributions, which were necessary for the property, which obviously would include the lease.

02:53PM I'm also going to refer back to Mr. Seidler's personal guaranty to the bank that he would never allow the lease to go into default, which is obviously why I was never held in default.
02:54PM Q. Okay. I guess your contention is it's because Mr. Seidler or FTP did not tell you you were not paying the rent, you did not have to pay the rent, is that your contention?
02:54PM A. That was his obligation.
02:54PM Q. But is that your contention, yes?
02:54PM A. Yes.
02:54PM Q. Okay. Now, you're also telling the jury that you did not have notice that he wanted his money, right?
02:54PM A. I did not have proper notice of any defaults, capital contributions ever, ever, ever, ever.
02:54PM Q. And you're talking about proper notice being a handwritten letter to you?
02:54PM A. Yeah, like you are in default of this, you are required to pay that, if you don't pay it by this date, as in accordance with this agreement, you will be held in default, you will be diluted. All the things it contemplated.
02:54PM That's the way it was written.
02:54PM Q. Right, so it is written, it is written in the participation agreement Transpark would pay $30,000 a month for rent?
02:55PM A. Yeah, it said for two years. If you look at the first two years, it even went into the third year that it was paying $30,000.

02:55PM Q. Isn't the agreement itself telling you you have to pay, you don't need notice, you know you have to pay it?
02:55PM A. You do need notice because it says it in the agreement.
02:55PM Q. So you're falling back on this technicality that it wasn't in the letter?
02:55PM A. Technicality? It's an agreement that says you have to give notice. That's not a technicality, that's a contractual obligation.
02:55PM Q. You had a contractual -- I'm sorry, Transpark had a contractual obligation to pay $30,000 a month pursuant to the Profit Participation Agreement, yes or no?
02:55PM A. It did.
02:55PM Q. So that's a contractual obligation, yes?
02:55PM A. With contingencies and remedies.
02:55PM Q. Okay. Isn't it a fact, sir, that Mr. Seidler sent you emails or communicated to Bart that -- not Bart -- Nathan that you needed to pay -- you knew you needed to pay?
02:56PM A. I told you many, many times, he had many communications with Nathan; Nathan had always told me everything was okay. I looked at my Profit Participation Agreement; it clearly said he had to give me 15 days' notice, so I had to believe Nathan, who turned out to be a snake, but that's a different story.
02:56PM Q. But again, you keep calling him a snake, a thief, a skimmer, but you have no proof of that. Why do you keep doing that, sir?
02:56PM A. Well, you just brought up these numbers, and isn't it funny

how they went from 30, 30, 30, 30, 30, 30, 30, 30, 30, 30 all the way down to 10, 10, 10, and then you're contending zero; all of a sudden, there were cars parking in that lot, where was the money going? He was picking it up every day.
Q. Sir, wasn't this your parking -- this deal that you had, that was for you to make a profit, for you to make money, yes?
A. The what?
Q. This deal that you had with FTP, Transpark?
A. The deal that I made was --
Q. Was to make money?
A. That was the goal, of course.
Q. Right. That was your money, yes?
A. What was my money?
Q. What you were supposed to be making from this deal?
A. Yes. It was our money.
Q. And yet, you're relying on -- I'm sorry, I didn't mean to interrupt. Go ahead?
A. It was the part -- it was a partnership; there was an agreement. I, like Mr. Seidler, had many different like, as he mentioned, I was in San Francisco, I couldn't watch it even though I was here in Miami, I had 20 parking lots, I had to build a company, and I had to have a staff and, unfortunately, in this world, you have to trust people that they're not going to steal from you, and when they do, and you don't catch onto it quick enough, bad things can happen.

02:57PM Q. Okay. But it's your property, your deal, your profits, yes?
02:58PM A. I was -- I was -- I had a Profit Participation Agreement.
02:58PM Q. Yes.
02:58PM A. It wasn't my deal; it was a deal that had a Profit
02:58PM Participation amongst two parties.
02:58PM Q. The parties being you and FTP or --
02:58PM A. Transpark and FTP.
02:58PM (Crosstalk.)
02:58PM THE COURT REPORTER: I'm sorry?
02:58PM THE WITNESS: Transpark and FTP.
02:58PM BY MR. CASABIELLE:
02:58PM Q. Right. Nathan had no ownership interest in this deal, did he?
02:58PM A. He picked up the cash every day so, no, he did not have any
02:58PM ownership, the answer is no, he did not have any ownership
02:58PM whatsoever in the profit sharing agreement.
02:58PM Q. So just answer -- if that's the answer, please just limit
02:58PM yourself to the answer.
02:58PM A. No, he did not.
02:58PM Q. So why do you think, why would Nathan -- I'm sorry, why would
02:58PM you abandon and not supervise this deal if you're -- if you're
02:58PM going to be making money on it? That's your responsibility, isn't
02:58PM it?
02:58PM A. No.
02:58PM Q. No?
02:58PM A. The agreement says FTP has to send notice.

Q. But you didn't supervise the functioning of the parking lot after 2007, 2008, right?
A. I supervised -- I attempted as hard as I can to supervise all my parking lots, but, unfortunately, when people get their hands in the cookie jar and you can't be 20 places at one time, cars are pulling in on 8th Street, 9th Street, 10th Street, 11th Street, 1st Street, 2nd Street, 5th Street, all at the same time, technology has changed now. Now there is all this new equipment and stuff, and it's a different world, but back then, people were able to just steal cash and, unfortunately, I was a victim of that.
Q. Again, the person stealing --
A. The numbers show it. I mean, how could that have happened?
Q. Again, the person stealing from you --
A. I never touched one dollar.
Q. May I ask a question, please?
A. Yeah.
Q. So again, your contention is that Nathan was stealing?
A. That's the only thing that makes any sense whatsoever.
Q. And yet, you have no proof?
A. I have -- I think the story is the proof.
Q. The story that his brother was stealing from you?
A. No, that was -- that's a "by the way," that was just -- that was an admission.
Do you want to hear the story?

Q. I want to hear what proof you have that Nathan was stealing from you. Tell us about that.
A. Before he had the power to go there and steal, and after he had the power to go there and steal, the numbers were 360,000 a year and then 500,000 a year, but while he was there, with the power to steal, they were 120,000 a year, 200,000 a year, 160,000 a year.
Does it take a genius to figure out it's the same parking lot in the same place with the same big office towers next to it? It looks -- I mean, being, you know, in this business long enough and seeing and hearing the horror stories that I have seen, that's what sure -- that's what it looks like to me, and I would hope that the jury would look at those numbers and see the same thing I'm seeing.
Q. I want to put this issue to rest.
Have you now -- have you now told us all the evidence you have to prove that Nathan was stealing from you so we don't have to repeat it again; yes or no?
A. Yes.
Q. Thank you. Let's move on.
THE COURT: All right. Why don't we take a little bit of a break this afternoon. We'll take about a 15-minute break.
(Jury out at 3:01 p.m.)
THE COURT: We're in recess for 15.
MR. CASABIELLE: Thank you, Your Honor.

(Recess at 3:02 p.m.)

(Back on the record at 3:19 p.m.)

THE COURT: Everyone ready? Let's bring the jury in.

THE COURTROOM DEPUTY: Bring the jury in.

(Jury in at 3:20 p.m.)

THE COURT: Everybody is here. Everybody be seated, let's continue.

MR. CASABIELLE: Thank you, Your Honor. Can we put back Exhibit DX-1, Defense Exhibit 1.

BY MR. CASABIELLE:

Q. Once again, this is the Profit Participation Agreement. And back to the recitals section. Apart from -- well, no, let's just take it a step at a time.

Recital A, "GM will use best efforts to provide all necessary expertise in securing the financing of the property, which is 283,800 square feet."

Did you comply with this obligation under the participation agreement?

A. To the best of my knowledge, yes.

Q. What did you do to comply with Recital A of the Profit Participation Agreement?

A. Helped close the loan.

Q. How did you do that?

A. Too long back to remember.

Q. You don't remember how -- I'm sorry, I didn't mean to

interrupt.
A. I was just saying I've been involved with so many loan closings that you can't remember the details of each one. I just remember there were no hiccoughs, it went smooth, and it closed.
Q. Okay. Do you know why Transpark needed to get a loan to finance the property?
A. Oh, they didn't need to. They just chose to.
Q. Okay. Do you know why?
A. Because Bart wanted the 4-and-a-half million to do what he wanted with, I guess. I can only assume.
Q. Right, so let's clarify that.
Bart put in 7 -- close to 6 million to purchase the property?
A. 5.75, I believe.
Q. Yeah, about 6 million. And he got a loan for approximately 4 million, right?
A. 4.5?
Q. No, I'm asking you.
A. I believe it was 4-and-a-half.
Q. Give or take. So --
A. Not give or take. It was 4.5.
Q. So it was approximately a $2 million difference, yes?
A. No. About 1.5 million difference.
Q. 1.5 million. I am terrible at math. Thank you for helping.
A. Okay.

03:23PM Q. All right. 1.5 million difference.
03:23PM So basically what Bart was doing was taking a loan for $4 million to repay that mortgage to reduce the obligation to the bank, right -- I'm sorry. Strike that. That's a bad question.
03:23PM So by taking out this loan of 4 million --
03:23PM A. 4.5 million.
03:23PM Q. -- 4.5 million, by taking this loan out for 4.5 million, Bart only had approximately 1.5 million of his own personal money in this --
03:23PM A. I put 300- in.
03:23PM Q. I'm not asking that, sir.
03:23PM A. So it wasn't 1.5; it was that minus the 300-.
03:23PM Q. Let me finish asking the question, please.
03:24PM So after --
03:24PM You seem perplexed. You want to explain to us why --
03:24PM A. I mean, every question you ask, the math is off. I would appreciate it if you would take an extra second, do the math accurately, and at least not, you know -- I don't want to sound rude or anything, but it's just happening dozens of times already.
03:24PM Q. All right.
03:24PM A. I don't think it's fair to ask me questions that are inaccurate.
03:24PM Q. Do you remember what the Judge told you a little while ago? That --
03:24PM THE COURT: That's enough. Let's move on to a question.

03:24PM He gets to ask the question. If you think it's wrong, you answer him as best you can. Your lawyer in redirect, if there is anything that he thinks he can cover, he can. All right.

03:24PM This is a question-and-answer session. He asks questions, and you answer them.

03:24PM MR. CASABIELLE: Thank you, Your Honor.

03:24PM THE COURT: Ask questions.

03:24PM MR. CASABIELLE: Yes, ma'am.

03:24PM BY MR. CASABIELLE:

03:24PM Q. So when Bart took out -- when Bart took out the approximate -- and we're not talking about exact numbers, so you don't have to correct me on my math -- the approximate $4.5 million loan, that was to take -- just -- that was to make sure he only had approximately 1.2 million of his personal assets tied up in this deal, right?

03:25PM A. Right.

03:25PM Q. In addition to that, you had already contributed $300,000 to the purchase of the property?

03:25PM A. Correct.

03:25PM Q. Okay. We've already discussed the Recital C.

03:25PM MR. CASABIELLE: Let's look at -- okay, let's move on to -- let's see what we want to talk about here. Okay. Section 1, please. Highlight that.

03:26PM (Technical difficulties.)

03:26PM THE COURT: Do you have a hard copy of that he can see?

MR. PARDO: That was for him if you want to hand him a hard copy.
MS. MACKIEWICZ: The witness's screen isn't working.
THE COURT: The witness's screen is not on.
MR. CASABIELLE: Oh, the screen is still not on?
THE COURT: The witness's screen is broken, yes.
MR. CASABIELLE: May I approach then, Your Honor?
THE COURT: Yes.
BY MR. CASABIELLE:
Q. All right. I'm going to hand you a hard copy of the agreement so we can refer to it together.
A. Okay.
Q. We're talking about Section 1, formation and purpose. This says this limits the amount of contribution to the purchase of the property to $300,000, correct?
A. Yes.
Q. And you reached that limit, correct?
A. Yes.
Q. And as a result of that $30,000 participation, you were entitled to 30 percent of the net cash flow and any profits from the sale or development of the property, right?
A. Yes. Just correcting, you said 30,000; it was 300,000.
Q. Thank you for keeping me straight here, correcting me on the numbers.
A. Okay.

03:28PM Q. Now, the 30 percent that you were supposed to receive was of the net cash flow, yes?
03:28PM A. I will leave that for my lawyer to argue.
03:28PM Q. No, I'm asking you, sir, what your understanding of the agreement was, not your lawyer.
03:28PM A. This is a lawsuit.
03:28PM Q. Sir, answer my question. Your understanding of this agreement was that you were supposed to receive 30 percent of the net cash flow and any profits from the sale or development of the property, right?
03:29PM A. You started the question by saying "your understanding was," so you're telling me what my understanding was.
03:29PM Q. I'm asking what your understanding was, sir.
03:29PM A. My understanding was that I was to receive 30 percent of the net cash flow and any profits from the sale or development of the property.
03:29PM Q. Okay. If there were no profits from the sale or development, you weren't entitled to anything, were you?
03:29PM A. No.
03:29PM Q. Okay. And if there was no profit from the cash flow, you weren't entitled to anything, correct? That's what the agreement says?
03:29PM A. I'm not sure that -- I believe there would be different ways to interpret that, and I'm not the one to make that decision.
03:29PM Q. Well, I'm asking what you understood. That is your decision?

A. So you're asking me, I guess --

MR. CASABIELLE: Madam Court Reporter, can you please repeat the last question I asked, please.

(From the record above, the reporter read the following:

Q. Well, I'm asking what you understood. That is your decision.)

BY MR. CASABIELLE:

Q. What did you understand -- well, let's go back to the beginning. Maybe we can clarify it a little bit.

You were entitled to receive 30 percent of the net cash flow if there was a profit, correct?

A. Well, it doesn't say if there was a profit. It says "and the profits," so you're rewriting the agreement with your question, the way you're saying it, so I can't agree with that.

Q. I am not rewriting it, sir. I'm asking you a question.

What was your understanding of this agreement where it says that you were entitled to receive 50 percent -- I'm sorry, 30 percent of the net cash flow; what was your understanding of that?

A. That means if there was $100,000,000, I should get 30.

Q. Okay. If there was a profit, yes?

A. It says "and the profits." It doesn't say -- the agreement, it's just the way it's written. I'm just reading it -- you put it in front of me. I'm reading what I'm seeing.

03:31PM Q. What does "net cash flow" mean to you? Net, focus on the word "net."

03:31PM A. 30 percent of the net cash flow, that means the amount of money that is distributed at the closing.

03:31PM Q. After costs, correct?

03:31PM A. Well, you're saying that, but it doesn't say that in this paragraph.

03:32PM Q. I'll read it again. We're going to do this until we get this question answered, please.

03:32PM GM shall not be obligated to expend more than $300,000 for the acquisition of the property, and GM shall be entitled to receive 30 percent of the net cash flow.

03:32PM What does "net cash flow" mean to you, and what did it mean to you when you signed this agreement?

03:32PM MR. PARDO: Objection, Your Honor. Compound.

03:32PM THE COURT: Overruled.

03:32PM THE WITNESS: I guess the net cash flow meant whatever the closing agent distributed. If there was expenses, which of course net would take out, he would take them out and then he would distribute the net cash flow.

03:32PM BY MR. CASABIELLE:

03:33PM Q. And of course, it would also -- before you got to net, net cash flow, you would have to deduct accrued interest, would you not? That's a cost?

03:33PM A. That was the closing agent's obligation, of course.

03:33PM Q. Of course.
03:33PM A. If he had done that, then that would have taken effect.
03:33PM Q. Right, so accrued interest as you understood it under this agreement, had to be taken off of the gross profits to reach the number net profits, right?
03:33PM A. I guess that would be the closing agent's to decide.
03:33PM Q. No, I'm asking what you understood, sir. Let's not blame the closing agent. I'm asking what you understood, please.
03:33PM A. I can't tell you what I understood 20 years ago when this was written.
03:33PM Q. All right. Let me ask you what you understand it to mean now.
03:34PM A. Having read it now, I, to be honest, I'm torn between whether it means the 17.5, which was the cash proceeds Mr. Seidler received; or the 11.4 that he reported on his tax returns. I am not a hundred percent sure myself. But I believe it's one of those two figures.
03:34PM Q. But you don't know which one?
03:34PM A. I -- I mean, yes, so in fact, I am not going to sit here and say, oh, it was the 17.5 because that would be better for me. I'm saying I honestly don't know which one, and I think it's the attorney's job to convince the jury to make that decision.
03:34PM Q. Maybe we can agree on one thing. The terms that Transpark had to live by are defined in this particular agreement, yes?
03:34PM A. Yes.
03:34PM Q. This is where the so-called rubber meets the road?

A. Yes.
Q. Okay. The obligations of Transpark, they're also defined by the lease agreement, yes?
A. No.
Q. The lease agreement does not define the obligations of Transpark with relation to paying rent, is that what you're saying?
A. Absolutely.
Q. Yes, absolutely, that's what you're saying?
A. I'm saying -- I don't know if I can elaborate to explain my --
THE COURT: If he's asking you a yes or no, it's only a yes or no.
THE WITNESS: So then no. The lease did not dictate anything to do with the profit-sharing agreement. If it did, it would be attached.
BY MR. CASABIELLE:
Q. I'm sorry, say again, I didn't -- what?
A. When an agreement is referring -- is in conjunction with another agreement, it would be like, for example, you'd write Exhibit A and it would say Exhibit A, and then you would attach them, and everyone would know that this agreement is connected with that agreement. That's how the whole world does business. You, as an attorney, I'm sure know that.
Q. Sir, let's focus on my questions and answer them, please.
A. I did. I answered your question.

Q. Are you saying that the lease agreement did not define the obligation of Transpark with regard to the payment of monthly rent; is that your testimony? It does not define the obligations?
A. I'm saying the profit participation and only the Profit Participation Agreement and assignment agreement dictated anything to do with paying rent.
Q. All right. Can we put up Defense Exhibit No. 2, it's already been introduced, which is the actual ground lease agreement. Do you have that in front of you? Is your screen on?
THE COURT: No, it's not.
MR. CASABIELLE: Oh, okay. May I approach?
THE COURT: You may.
MR. CASABIELLE: Thank you, Your Honor.
BY MR. CASABIELLE:
Q. I'm going to hand you the physical copy of it with some highlighting, those are my highlights. You can disregard those but at least you will have something to follow when we discuss it.
MR. CASABIELLE: The jury can see this, correct, Your Honor?
THE COURT: The jury can see it; it's just the witness's TV that's off.
MR. CASABIELLE: Keep scrolling down, please.
BY MR. CASABIELLE:
Q. All right. Let's look at No. 3, the rent. This says "tenant." That's Man Port (phonetic), yes?

03:37PM A. Huh?
03:37PM Q. Tenant.
03:37PM A. Yes.
03:37PM Q. Can you read three?
03:37PM A. "Tenant agrees to pay landlord a base rent ("Base rent"), in the amount of 360,000 and no dollars annually ($360,000), to be paid monthly in installments of $30,000 and no cents ($30,000) --
03:38PM THE COURT REPORTER: I'm sorry. No.
03:38PM THE COURT: You need to slow down, sir. She can't type that. You're reading it out loud, and you have to slow down.
03:38PM THE WITNESS: I'll go half speed -- "which amount includes all applicable sales taxes," commencing on the commencement date, as defined herein, and the first day of each and every subsequent month, (plus the first partial month of the term in this lease, the commencement date is not the first day of a calendar month). Base rent shall increase by 4 percent annually."
03:38PM BY MR. CASABIELLE:
03:38PM Q. Are you saying that that does not define the obligations of Transpark to pay rent?
03:39PM A. It does --
03:39PM Q. Thank you.
03:39PM A. -- require Transpark to pay rent.
03:39PM Q. Okay. Let's go to Section 1 of this agreement, which talks about term. Can you read that that you're looking at so we're all

03:39PM on the same page?
03:39PM A. "Landlord and tenant agree the term of this lease shall be five years and shall commence on June 1, 2006, quote, the commencement date, end parentheses, end quote, and expire on May 31, 2011, parentheses, quote, termination date, end parentheses, end quote. At the end of the initial term, tenant shall have the right to renew for additional one year terms until the property is sold or developed. At any time, in the event the property is sold, the landlord can terminate the lease within three months notice to tenant.
03:40PM Q. Does that particular clause not define the obligations of Transpark to pay rent?
03:40PM A. It's in conflict with the Profit Participation Agreement.
03:40PM Q. How so, sir?
03:40PM A. Because the Profit Participation Agreement clearly expresses two years, and this became a five-year plus additional terms, making it a completely separate document.
03:40PM Q. Okay. But you're still bound by this -- I'm sorry, Transpark was still bound by this document, yes?
03:40PM A. Yes, by both documents.
03:40PM Q. Okay. So any other inconsistencies that you can point out?
03:40PM A. None that haven't been pointed out already.
03:41PM MR. CASABIELLE: Okay. We can take that down for now. Go back to the Profit Participation Agreement, please. All right. Let's if to Section 2, next page. Now go to

the top of it please; I want to make sure we cover it all. The top of page 2. We can move on to --
BY MR. CASABIELLE:
Q. Let's talk about Section 2. This basically is an agreement where Transpark is coming up with up to $6 million but will get a $4 million loan; it was actually $4.5 million loan, right?
A. I think so, yes.
Q. Yes. And that's to reduce the amount of money -- personal funds that Mr. Seidler had in the deal, right? Yes?
A. Yes.
Q. And then that continues that it talks about capital contributions moving on after the initial contributions, yes?
A. Yes.
Q. If something broke in the parking lot and it needed to be fixed and it cost a hundred thousand dollars, hypothetical, under this particular clause, Transpark would have to pay 70,000, you would have to pay 30,000, yes?
A. Yeah, as long as, according to Section 2C, they wrote me a 10-day prior notice, then yes.
Q. We're back to the notice defense here, right? You didn't get notice?
A. Of course.
Q. So did you ever pay a contribution after the initial purchase of the property, any contribution?
A. I was never asked to.

Q. Okay. If you had been asked, would you have been able to pay?
A. Absolutely.
Q. And now we're talking about -- let's talk about specifically two thousand -- I think it was ten when you stopped paying the rent.
Would you have been able to pay Transpark for any contribution they had asked you for in 2010?
A. I would have been able to loan Transpark money to make capital contributions from other profitable assets that I had.
Q. And we're going back to your ability to make payments, right?
A. Correct.
Q. When you made this deal with Bart, okay, where you would come up with at least -- what was it -- 4 million, 4.5 million?
A. I don't recall the amount.
Q. Six million. Let's say 6 million.
A. The agreed amount.
Q. Right, the agreed amount. He was coming up with that amount, you were coming up with $300,000, yes?
A. The agreed amount, yes.
Q. Yes, $300,000, and then in 2007, you asked for $300,000 loan, yes?
A. Yes.
Q. At that point, you had no skin in this deal, did you?
MR. PARDO: Objection, Your Honor. Asked and answered.
THE COURT: Overruled.

THE WITNESS: There were two separate transactions so I had skin in this deal, and I had a loan on another deal that had plenty of, you know, the deal itself was --

BY MR. CASABIELLE:

Q. I'm talking about this deal. Let's be focused on this deal. This is what we're here about.

A. Right. So if FTP loaned me the money, then you could say I had no skin in this deal, but FTP didn't loan me the money, Bart Seidler loaned me the money, so I clearly had money in this deal.

Q. Right. So at the end of the day when you had made this deal with Bart, you basically bought property without having any money to do so, right?

A. Like I said, it was -- first of all, it was a six-month loan, it wasn't a forever loan. And second of all, it was -- it had nothing to do -- it was not borrowed from this loan, so I had my full 300,000, was still in this deal, and it still is to this minute.

Q. Right. And you got 300,000 of that back when you asked for a loan; did you not?

A. Not from that entity.

Q. From Bart?

A. That was a separate -- that was a friendship thing, as I thought, that's what it was to me, I was calling a friend to close on my dream house. It had nothing to do with this parking lot.

Q. At the end of the day, you had no skin in that particular

03:47PM deal?

03:47PM MR. PARDO: Objection, Your Honor. Asked and answered.

03:47PM THE WITNESS: I brought up --

03:47PM THE COURT: Hold on a second, that's overruled, and no speaking objections unless I ask you for the basis, Counsel.

03:47PM MR. PARDO: Understood.

03:47PM BY MR. CASABIELLE:

03:47PM Q. Please answer.

03:47PM A. I -- have I not answered?

03:47PM THE COURT: No, I overruled the objection. Answer the question again, sir.

03:47PM THE WITNESS: I will answer again.

03:47PM Bart personally loaned me money to help me complete the $5.7 million acquisition of a home of which I had 5.4 million. FTP, which required me to put $300,000 into a deal, still had that $300,000 in that deal. One had nothing to do --

03:47PM BY MR. CASABIELLE:

03:47PM Q. These actions, sir, are consistent with your business model, which is to buy property and limit your risk in the deal, right, that's your business model?

03:48PM A. It's not a business model, it's -- it's life, it's trying -- it's trying to make it through life, however you can.

03:48PM Q. Sir, do you remember giving a deposition on November 14th of 2024?

03:48PM A. I remember giving a deposition. I don't recall the date.

03:48PM Q. Okay. You gave two depositions, right?
03:48PM A. Right.
03:48PM Q. One was in November and the other one was a different date?
03:48PM A. If you say so, I'll take your word for it.
03:49PM Q. At page 158, do you remember being asked this series of questions and you giving this series of responses:
03:49PM "Question: So Transpark wasn't financially capable of purchasing the lot on its own?
03:49PM "Answer: That is not a fact. I was very, very well eased, almost for sure could have bought that without him."
03:49PM MR. PARDO: Objection, Your Honor.
03:49PM THE COURT: Sustained. So I don't know, Mr. Casabielle, you can't be reading the deposition in the record. This is not proper impeachment, unless you've asked him that exact question and he's given a different answer and if he does, then you have to show him the deposition, refresh his recollection.
03:49PM MR. CASABIELLE: I will do that, Your Honor.
03:49PM May I approach, Your Honor?
03:49PM THE COURT: You may.
03:49PM BY MR. CASABIELLE:
03:50PM Q. Here, sir. That's a transcript of your deposition, yes?
03:50PM A. Yes.
03:50PM Q. Do you remember talking to Mr. Nielsen about your model, your business model?
03:50PM A. I was referring to a very specific situation in a very

03:50PM specific deal. It doesn't make that my life career business model. As we speak, I own properties 100 fully by myself with my own money, too, as I did then.

03:51PM Q. But in this deal --

03:51PM A. In this deal, that is true, I used other people's money but, however, I brought great value to the table, and that's the reason this person chose to let me use his money, so it's a give and take.

03:51PM Q. What is an OPM?

03:51PM A. Other people's money.

03:51PM Q. That's your business model, isn't it?

03:51PM A. That's -- that's 90 percent of -- that's Blackstone's business model.

03:51PM Q. I'm asking you your business model, OPM, use other people's money, right?

03:51PM A. OPM was invented before I was born, by far.

03:51PM Q. But that's what you made reference to as being your business model?

03:51PM A. Yeah, of course, yeah. It's a very commonly used term.

03:51PM Q. Okay.

03:51PM A. Nothing wrong with it.

03:51PM Q. When you entered into the deal with Mr. Seidler with regard to the purchase of this property, you were following your OPM business model for this particular deal, yes?

03:51PM A. Yes.

MR. CASABIELLE: If I could have a moment, Your Honor, I'm trying to find a specific part.

THE COURT: Sure.

MR. CASABIELLE: Thank you.

(Brief pause while Mr. Casabielle reviews his notes.)

MR. CASABIELLE: All right. Can we go back to the Profit Participation Agreement one more time, please. Section 9. Will you bring that up.

BY MR. CASABIELLE:

Q. Read this to the jury, please.

A. Greg Mirmelli, in his individual capacity, joins into this agreement for the purpose of personally guaranteeing the timely and complete payment and performance by GM of the duties and obligations of GM specified in this agreement.

Q. What did you understand this clause to mean to you when you signed this agreement?

A. That along with all other clauses in the agreement, I was guaranteeing this agreement.

Q. Okay. You personally were guaranteeing it, yes?

A. Yes.

Q. So if a debt became due that Transpark owed to Bart Seidler or FTP and Transpark wasn't paying that debt, you were responsible for it personally, were you not?

A. Yes, but didn't I deserve notice? You expect me to -- crystal ball? That's not fair. It's just the way you're asking it, it's

not fair.

MR. CASABIELLE: Your Honor, move to strike.

THE COURT: No. You asked him a question. That's his answer.

MR. CASABIELLE: All right.

BY MR. CASABIELLE:

Q. So I mean during your testimony you've kind of differentiated between Transpark and you personally. You say that notices were sent to Transpark but not you personally?

A. Notices were sent nowhere.

Q. We're going to get to that, but --

A. That was already testified to this entire room many times.

Q. All right. You've talked about the assignment of interest, right? I think you mentioned that --

A. You did. I'd like to see it.

Q. Right. I'm talking about your testimony. Rely on your recollection if you could, please.

Now, do you have any issues with your recollections?

A. Yes.

Q. Okay.

MR. CASABIELLE: I need a moment, Your Honor.

BY MR. CASABIELLE:

Q. Do you remember telling Mr. Nielsen in his deposition that you had --

MR. PARDO: Objection, Your Honor.

THE COURT: Sustained.
BY MR. CASABIELLE:
Q. Did you ever represent that you had a photographic memory to anyone?
A. Maybe in a joking manner, but I don't have a photographic memory by any means.
Q. But you did make that representation, yes?
A. It's -- it was certainly a joke. I -- I have -- I don't even have a -- sometimes my memory is great and sometimes it's horrible. There is no question it's not photographic, and I -- I'd put everything I've got on it, the fact that my memory is not photographic, so that was a joke. If I ever said that, it was --
Q. A joke?
A. -- a complete joke.
Q. And if it wasn't a joke, it was a lie?
A. No, it wasn't a lie. It was --
Q. So do you have a photographic memory or not?
A. No.
Q. But if you said that seriously, that would be inconsistent with what you just testified to right now, making it a lie, would it not?
A. You know, if -- perhaps it was -- I was in a -- in a long, long deposition and said something out of turn. You could interpret it as a lie, but it was not my intention, and I am here with my right hand up swearing to I never intended to claim I have

a photographic memory. If I did, I'd be in the Elon Musk world. I'm not that guy.
Q. Let me try to wrap this area of inquiry up. Bottom line is if Transpark had an obligation to make a payment under either the lease agreement, the participation agreement, and they did not meet that obligation, you personally guaranteed that you would comply with that obligation, yes?
A. Subject to the cure period, yes.
Q. That kind of goes to whether or not you were made aware that Transpark owed money, right?
A. Yeah, it's a simple matter of -- you're referring to Section 9 -- refers to all sections, especially sections where a guy who doesn't own any part of the company has to have serious ramifications. I mean, you have to at least tell me "Hey, you owe me money."
MR. CASABIELLE: All right. Can we put up D 16, which if it has not been introduced yet, we would introduce it into evidence pursuant to stipulation.
THE COURT: Is there any objection to D 16?
MR. CASABIELLE: Defense Exhibit 16.
THE COURT: D 16 is already in evidence.
MR. CASABIELLE: It is already in evidence.
THE COURT: D 16 is in evidence.
MR. CASABIELLE: Can we put it up, please, and publish to the jury.

04:00PM BY MR. CASABIELLE:
04:00PM Q. This is Bart speaking to Nathan: Need parking money. Right?
04:00PM A. To Nathan?
04:00PM Q. And the date on this is 2008, yes?
04:00PM A. I can't see anything.
04:00PM Q. Oh, my bad. I don't know how we're going to do this then. Let me --
04:00PM MR. CASABIELLE: I have it here in paper, Your Honor.
04:00PM THE WITNESS: I mean, I'll take your word for it if they all see it --
04:00PM MR. CASABIELLE: No, I'll show it to you. I don't want you to take my word for anything, sir.
04:00PM THE WITNESS: If everyone else in the room sees it.
04:00PM THE COURT: You need to see the document, sir. He has a copy of it.
04:00PM MR. CASABIELLE: We're talking about 16, yes? Yes.
04:00PM May I approach?
04:00PM THE COURT: You may.
04:00PM BY MR. CASABIELLE:
04:01PM Q. Here is a hard copy.
04:01PM A. "Need parking dollars $$$."
04:01PM Interesting how I don't -- not to say I would have even looked at it anyway, but I'm not even copied on this --
04:01PM Q. Oh, you're not even copied?
04:01PM A. -- proving that he deals with Nathan.

Q. But wasn't Nathan your agent, sir, around this period of time?
A. No, he was a double agent. I have made that very clear.
Why would have Bart ended up hiring him for years afterwards and have all these emails with him that we have discovered where he called me a junkyard dog and this and that?
I mean, let's be honest, we're here to tell the truth. You asked for the truth. This is the truth. The truth is he saw me as the real estate guy; his only way to make money was to skim.
So, I mean, like this is the only thing that makes sense to me.
Q. Okay. So he was your agent though, wasn't he?
A. He was -- at this point, it seems as if he was everybody's agent.
Q. Okay --
A. He was his own agent.
Q. But he was still your agent, was he not?
MR. PARDO: Objection, Your Honor.
THE WITNESS: He was an agent of Transpark.
THE COURT: So I'm really going to try not to have to say this anymore. You can't talk over each other.
You have to wait for him to finish his answer.
You have to wait for the question, and you have to answer the question. All right?
THE WITNESS: Uh-huh.
THE COURT: Let's try again.

04:02PM BY MR. CASABIELLE:
04:02PM Q. Was Nathan Heber your agent in 2008?
04:02PM A. For which entity?
04:02PM Q. I'm sorry?
04:02PM A. For what company?
04:02PM Q. For this deal, the one we're here litigating, that we've been litigating for a few days now.
04:02PM A. No.
04:02PM Q. He was not your agent?
04:02PM A. He was not Transpark's agent. That's what we're litigating.
04:02PM Q. Was he your agent?
04:02PM A. "Your" as in Greg Mirmelli?
04:02PM Q. Yes.
04:02PM A. No.
04:02PM Q. What did Nathan's -- what was Nathan's participation --
04:03PM A. He worked for a company called Park West Parking.
04:03PM THE COURT: Sir, he was answering, and you were talking over him. I don't know how to explain this anymore. Please don't do that.
04:03PM MR. CASABIELLE: I thought he'd finished answering, Your Honor. I'm sorry.
04:03PM THE COURT: He had not. Just give him a second; and you need to give him a second.
04:03PM BY MR. CASABIELLE:
04:03PM Q. Go ahead, sir. Finish.

04:03PM THE COURT: I'll at least try to get another half-hour out of all of you before we all -- at least I completely lose my patience.

04:03PM MR. CASABIELLE: Yes, ma'am.

04:03PM BY MR. CASABIELLE:

04:03PM Q. Go ahead, answer. Finish answering.

04:03PM A. I already did. I will do it again. He worked for Park West Parking, that's it.

04:03PM Q. Who represented you personally in the running of the lot from the years 2006 through 2008?

04:03PM A. Nathan Heber worked for both myself and Bart during that period of time.

04:03PM Q. So during that period of time, he was your agent also, yes?

04:04PM A. I don't know if the word "agent" or "manager" is more appropriate, but he -- he oversaw the day-to-day operations at that lot, and he reported to Bart directly; and in many cases such as this, not even copying me.

04:04PM It became a Bart-and-Nathan, and it went on and on and on with Bart and Nathan. When Nathan is here to testify, we'll see how he speaks, and you'll -- you'll get the point.

04:04PM Q. There was a period of time when Nathan had a desk next to yours, yes?

04:04PM A. Yes.

04:04PM Q. What period of time was that?

04:04PM A. I guess 2005, 2004.

Q. To when?
A. Maybe till 2006, but right around 2006.
Q. During that period of time, he shared with you whatever messages Bart gave him regarding this particular property, yes?
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: There was nothing to share. During that period of time everything was hunky-dory. We already established it wasn't until well into 2008 until payments were even an issue. And he was gone long before that from being next to me.
BY MR. CASABIELLE:
Q. So are you testifying that subsequent to 2006 you had no knowledge that Bart was asking, demanding that he be paid?
A. I've already testified that Bart had been asking him about money. He had been sending money, and Bart had been accepting it. And he had been keeping me abreast of the situation and letting me know Bart's accepting it, we're doing our best. You've all heard my theory as to where the other moneys went that should have gone to Bart. Maybe he was paying him in cash. I don't know. Maybe he was giving Bart cash.
Q. Can we put --
A. The money -- it makes no sense that it just disappeared.
Q. Are you done? Yes?
A. You don't hear me speaking.
MR. CASABIELLE: Okay. Let's put up D 18.

Your Honor, again, this is an exhibit that's been introduced through stipulation. Permission to publish?

THE COURT: What's the number of the exhibit, sir?

MR. CASABIELLE: D 18. DX 18.

THE COURT: 18 is in evidence. Go ahead.

MR. CASABIELLE: May I approach?

THE COURT: Yes.

MR. CASABIELLE: Thank you.

BY MR. CASABIELLE:

Q. Let me give you the hard copy so we can go over it together.

A. This is from Bart to Nathan not even copying me again, which was typical because of all my prior testimony. It didn't even have an amount. It didn't say capital contribution. It didn't say profit sharing agreement subject to dilution. It didn't say any of these real -- it wasn't a default notice.

Q. Are you saying that this was not shared with you by Nathan? Is that your testimony?

A. My testimony is that Nathan made me aware of the fact that he was in communication with Bart -- by the way, this is for about the tenth time, I will say it again nicely -- that he was in communication with Bart, he was sending him, quote, "everything I could," it was way less money than was coming in originally, and he --

I believed that Bart was okay with it since I didn't get any calls from Bart, any notices, and, most importantly, according to

04:08PM the agreement, my capital contribution call or a default notice or anything of the sort.
04:08PM Q. Are you now done?
04:08PM A. Yes.
04:08PM Q. So it's your testimony -- strike that.
04:08PM You've testified that Bart agreed to whatever was being sent to him, yes?
04:08PM A. Yes.
04:08PM Q. Okay. If he had agreed to everything that was being sent to him, why would he be sending an email saying "need money now"? Why would he do that?
04:08PM A. That was Bart's style. That was his way of trying to get as much as he can get under any certain situation.
04:09PM Q. That's what he was entitled to, wasn't he, sir?
04:09PM A. That's how he felt.
04:09PM Q. That's what the agreement -- go ahead.
04:09PM A. He was telling it to Nathan.
04:09PM Q. That's what the agreement called for, yes?
04:09PM A. No, we went through that yesterday.
04:09PM Q. The agreement did not call for Transpark to pay -- I know we went over it yesterday.
04:09PM A. No, but the notices section, there was a way to say it, you didn't do it properly.
04:09PM Q. We're not talking about notice, you keep bringing that up.
04:09PM A. Well, that's the whole -- that's what this case is about.

04:09PM Q. That's your case sir. We have our case.
04:09PM A. Right.
04:09PM MR. PARDO: Objection, Your Honor.
04:09PM THE COURT: Overruled.
04:09PM BY MR. CASABIELLE:
04:09PM Q. Please answer my questions.
04:09PM A. I did already. If you ask me again, I will answer you again.
04:09PM Q. Okay. Transpark had an obligation to pay FTP $30,000 a month, yes?
04:09PM A. That's been well established.
04:09PM Q. Yes, okay. Now, the question I had was if Bart was satisfied with what he was already receiving, the question is why would he be asking for more money? Send money now, why would he be doing that? Do you have any explanation --
04:10PM A. I guess he is an amateur.
04:10PM Q. Let me finish.
04:10PM A. Okay.
04:10PM Q. Do you have any other explanation other than the fact that he was entitled to the money and he was not receiving it?
04:10PM A. Yes, he was -- he was going about it completely the wrong way. It was like a baby. You don't cry and say "Send dollars now" with ten dollar signs. You say "In accordance with the lease and Section 2.0, you owe me," you know, "and I'm holding you in default."
04:10PM You know how a legal letter is written; the same way you got

it from the bank, the ones that withheld it from me didn't show me, that's how letters get written; not like this. This is baby. This is being a cranky, you know, type thing over here.

This isn't the way you tell somebody your -- your -- your millions and millions of real estate dollars are at stake because you're ten grand short.

If you tell me them "You're ten grand short" in a default letter and then you have 15 days to pay it, then you would -- and you don't receive it, then you're entitled to dilute, do all of that.

That's why the agreement said what it said, and that is our defense, correct.

Q. Are you done?

A. Yes.

Q. The question has to do with why would Bart send an email saying "Send money now" if he was satisfied with what he was already receiving?

MR. PARDO: Objection, Your Honor.

THE COURT: Overruled.

BY MR. CASABIELLE:

Q. Please answer that question and limit your answer to that question, if you could, please.

A. In my experience, when people ask me why someone would do something, it's unfair because you're asking me to speculate as to why they would do it that way.

04:12PM My answer, I want to try to be as respectful as possible, is that instead of taking the right measures, he was taking the complete wrong measures in his way of going about asking for these moneys.

04:12PM There was a procedure; he failed to use the proper procedure; therefore, being told by Nathan everything was copacetic, believing I had a friendship, I had no reason to believe that there was anything at stake here.

04:12PM Q. Are you done?

04:12PM A. Whenever I stop, I'm done. I did stop. That meant I was done, yeah.

04:12PM Q. Okay, I just wanted to make sure.

04:12PM A. Okay.

04:12PM MR. CASABIELLE: Can we put up DA -- I'm sorry, D18.

04:13PM MR. NIELSEN: This is D18.

04:13PM MR. CASABIELLE: Wait, D18, that was admitted, yes.

04:13PM Your Honor, let me find D18 in hardback because I thought I had it here.

04:13PM MR. NIELSEN: The witness has it. We just did it.

04:13PM MR. CASABIELLE: We just did D18, my apologies. Let's move on then to D22.

04:13PM May I approach, Your Honor?

04:13PM THE COURT: You may.

04:13PM MR. PARDO: This is in evidence.

04:13PM MR. CASABIELLE: What?

MR. PARDO: It's in evidence.

THE COURT: Yes, it is, Your Honor. Here you go.

MR. CASABIELLE: Put D22 up.

BY MR. CASABIELLE:

Q. This is 2010 email from Bart to Nathan reading, "Send more money, January financial statements."

How would you interpret this email?

A. Wouldn't this be a question for Nathan? I mean, I'm not even -- I have three papers in front of me and none of them even copy me, so how can I answer for -- it's just -- it's just evidence to the fact that they had -- they had some kind of plan and this is it.

Q. Isn't this evidence that Nathan --

A. It's not notice. "Please send money and January financial statements."

Q. Are you done?

A. Yes.

Q. Isn't this Bart saying he is not satisfied with the amount of money that he has received to date -- to that date -- up to that date?

A. This is Bart's way, not the way according to the agreement.

Q. Sir, I'm trying to address your assertion that Bart was hunky-dory with what Transpark was sending him. This proves otherwise, does it not?

A. He was hunky-dory according to what I was being told from

04:15PM Nathan, who was getting these emails. He wasn't sending these to me and he wasn't doing it according to the notice that he was supposed to be doing it by.
04:15PM Q. Okay. Whether you --
04:15PM A. If he was sure that I couldn't make the payments, why didn't he just send me the notice?
04:16PM Q. We'll get into whether or not you were made aware of that Bart was dissatisfied.
04:16PM A. If he was dissatisfied --
04:16PM MR. CASABIELLE: Your Honor.
04:16PM THE COURT: There is no question before you, sir.
04:16PM (Crosstalk.)
04:16PM THE COURT: Sir, there is no question that's being posed.
04:16PM Can you pose a question that doesn't ask him to speculate? Can you please ask him a question, a pointed question, so that we can move along with his testimony.
04:16PM MR. CASABIELLE: Yes, ma'am.
04:16PM BY MR. CASABIELLE:
04:16PM Q. I presume that this email speaks for itself, yes?
04:16PM THE COURT: Ask your next question.
04:16PM MR. CASABIELLE: Yes, ma'am.
04:16PM BY MR. CASABIELLE:
04:16PM Q. Can you please read what the email says?
04:16PM A. Bart Seidler, Bseidler@parkbell.net.
04:16PM THE COURT: Sir, the question is: What does the email

04:17PM say? Start with "please," that's what the email says.

04:17PM Can you please read that?

04:17PM THE WITNESS: Not to who it was from and to?

04:17PM THE COURT: No, sir. The jury can see who it's from. He's just asking you to read the statement.

04:17PM THE WITNESS: Okay. "Please send more money and January financial statements." I already read that, like, five times.

04:17PM THE COURT: I asked you to read it. If I ask you to read it six times, seven times, however many times, I'm just asking you to read it so we can move it along.

04:17PM THE WITNESS: Okay.

04:17PM THE COURT: And when I'm speaking, it's best you don't speak over me, please, sir.

04:17PM THE WITNESS: It was not my intention to speak over you. Sorry (indicating).

04:17PM THE COURT: Right. You continue to speak over me, to speak over the lawyer. The lawyer continues to speak over everybody, too; so let's move it along.

04:17PM What is the question you have for that email, sir?

04:17PM MR. CASABIELLE: No more, I'd like to move on if I could, Your Honor.

04:17PM THE COURT: All right. Next question.

04:17PM MR. CASABIELLE: That was 22. Can we go to 21?

04:17PM MR. PARDO: In evidence, Judge.

04:17PM MR. CASABIELLE: May I approach, Your Honor?

04:17PM THE COURT: You may.

04:17PM BY MR. CASABIELLE:

04:18PM Q. This is an email dated November 16, 2009, from Bart to Nathan. Can you read this email to the jury, please, that portion of it?

04:18PM A. Don't include the parties, just strictly the context?

04:18PM Q. Include -- answer my question, please.

04:18PM A. So Nathan is writing an email, he's copying a girl named Slade, who he hired to be his assistant who I had nothing to do with. Although he probably billed me to pay for her salary --

04:19PM THE COURT: Stop, stop. You're not answering a question anymore.

04:19PM Excuse me, sir, I said stop.

04:19PM What is your question, Counsel? What is it that you want? What question do you have for him? Pose a question. I don't want him reading into the record. Everybody can see what the exhibits are.

04:19PM What's your question?

04:19PM MR. CASABIELLE: I'm just trying to highlight.

04:19PM THE COURT: You're not highlighting anything. I don't know if your tech folks can highlight something. If they can highlight something for him to read, that's great; if not, ask him a question.

04:19PM MR. CASABIELLE: Can we highlight the portion that says "Need more money. I have to pay 30,000 in three days."

04:19PM BY MR. CASABIELLE:

04:19PM Q. Were you made aware that Bart Seidler was asking Nathan or telling Nathan that he needed more money in 2009?
04:19PM A. I have no recollection of him ever telling me this or asking me this and, again, even if he did, he still had to do it with proper notice.
04:19PM MR. CASABIELLE: Okay. Can we move on -- can we go back a moment. We're done with 21 then.
04:20PM All right. Can we put up DX2, the ground lease. Section 1, can we highlight that, please?
04:21PM BY MR. CASABIELLE:
04:21PM Q. Can you read that to the jury, please?
04:21PM A. Section 1?
04:21PM Q. Yes, sir, the one that's highlighted.
04:21PM A. We did this already. I have to do it again.
04:21PM "Landlord and tenant agree that the term of this lease shall be five years and shall commence on June 1, 2006, commencement date, and expire on May 31, 2011, termination date. At the end of the initial term, tenant shall have the right to renew, for additional one year terms, until property is sold or developed. At any time, in the event the property is sold, then the landlord can terminate this lease within three months with notice to tenant."
04:22PM MR. CASABIELLE: Can we, please, highlight in yellow beginning at the end of the term -- initial term to the end of that sentence?

04:22PM THE WITNESS: You could do it for everyone but me because I don't have a TV working.
04:22PM BY MR. CASABIELLE:
04:22PM Q. Well, I'll direct you to it.
04:22PM A. Okay.
04:22PM Q. You just read it. The second sentence of that particular clause says that, "At the end of the initial term, you shall have the right to renew the lease."
04:22PM Did you make any effort to renew this lease, any effort at all?
04:22PM A. By this time, Bart, through Nathan, had made it crystal clear to me that he wanted Nathan running the lot and he was happy with Nathan running the lot, and my only interest was to make money off the real estate.
04:23PM So I allowed him to do as he desired, in accordance with the profit participation. So, for that reason, no, I made no effort to try to try to make waves or renew the lease.
04:23PM Q. So you just basically said I no longer want a part of this, right?
04:23PM A. I mean, as you could see, I was shunned. I wasn't even being copied. I wasn't being given proper notice. I was --
04:23PM Q. All right, sir.
04:23PM A. -- being abandoned by -- by everybody.
04:23PM Q. You're saying you were being abandoned by Mr. Seidler and Nathan?

A. Correct.
Q. The whole world is against you at this point, yes?
A. It was pretty ugly, yes.
Q. It was a pretty ugly period in your time, yes?
A. Yes.
Q. Pretty ugly period in your life, yes, it was around 2008, 2009?
A. It was, but not compared to most.
Q. Okay. This is when the market pretty much collapsed, yes?
A. Yes.
Q. And you were overleveraged in all your other properties so you had no money to pay for your outstanding debts, correct, sir?
A. That is incorrect.
Q. That is incorrect.
You had the ability to pay all these outstanding debts?
A. I had the ability to pay my $4 million mortgage on my mansion on Sunset Island. I had the ability to pay my rent on multiple parking lots. I had the ability to pay my rent on my other real estate holdings.
And, like we talked about earlier, I had to pick and choose my battles, and I picked and chose which ones I could; so I didn't reach the point where I was completely underwater, I just reached the point where I had to pick and choose which I considered to be my trophies and protect my trophies the best that I can.
Q. May I proceed?

A. Yes.
Q. Did there not come a time when you were sleeping in your friend's guest house?
A. There became a time --
Q. Yes?
A. -- where I was sleeping in my friend's house in a beautiful, beautiful mansion, yes.
Q. Why were you sleeping --
A. -- the way you put it, I don't want it to be -- come out the wrong way. It was a North Bay Road mansion.
Q. Were you done?
A. I'm always done when I stop speaking, but yes, I'm done.
Q. Why were you sleeping in a friend's guest house if you could afford to pay for your beautiful mansions and all these other properties and all these other debts, you're sleeping in somebody's else's guesthouse. Why?
A. Because I was offered a substantial amount of money to rent my house. So I took the money, and therefore, I was able to save my trophies in a better fashion. It was a good business decision.
Q. Could you not have taken the money that you were offered on your house and lived in another property that you own, that you paid for with the money you received from the sale of your home?
A. Could I what?
Q. Could you not have paid, you, paid for a house or an apartment to live in?

04:26PM A. I -- shortly after staying at my friend's house I went and rented another place in the same building Bart lived in, and that's the one we were talking about, Century Lane.
04:26PM Q. But you had -- you said you had no need to live in your friend's guesthouse. Why didn't you just rent or buy a house soon after you purchased -- or sold your home? Why didn't you do that?
04:26PM A. He was a very close friend, he still is, and we just enjoyed each other's company. He's a single father with young kids, and just everything made sense. It was just a friendship where a friend said to another: Yeah, if you can rent your house for that kind of money, come live in my guesthouse. I've got this big mansion, and we will, you know, you'll have your own space, you'll have your own entrance, you'll have your own exit. Nobody is on top of each other.
04:27PM And, you know, after -- after a short period of time, I decided on my own that I don't want to be greedy. I went and rented an apartment in the building that Bart currently resides at --
04:27PM Q. Right.
04:27PM A. -- in Century.
04:27PM Q. So your testimony is the reason you went to live in your friend's guesthouse was not for economic reasons, it was because it would be fun?
04:27PM A. It was a combination. I could have stayed in my house and afforded it.

Q. But you didn't?
A. No, I chose to do what was smartest. As I should.
Q. So, again, the reason you were staying -- excuse me, you were staying in your friend's guesthouse was not because of academic -- I'm sorry. My bad.
Was not because of economic need. Is that your testimony?
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: I was a single guy in a seven-bedroom home. I got offered money to rent the house out, and it made sense, yeah, you want to say economically. It made economic sense for me to rent it out when I had this great opportunity to go right down the block and live in a beautiful guesthouse at my friend's mansion.
MR. CASABIELLE: Your Honor, I'm going to seek to admit DX 15, which has not been admitted to -- by agreement, so if I may approach, I want to show 15 to Mr. Mirmelli.
If we could put it up so that I could see it but not the jury. Is that okay, Your Honor?
THE COURT: Yes. You have to give him a copy of it, obviously.
MR. CASABIELLE: I'm going to do that.
BY MR. CASABIELLE:
Q. This is an email from Herbert -- I'm sorry, from Nathan Heber in 2008, yes?

04:30PM A. Yes.
04:30PM Q. And without telling us what it says, can you tell us -- describe the contents of the message or at least --
04:30PM THE COURT: No, no, no, sir. It's not in evidence, so you need to put it in evidence or you can ask him questions about this time period, but you can't ask him to read an email that's not in evidence.
04:30PM MR. CASABIELLE: I asked -- without reading it. I'm trying to lay a predicate for relevance.
04:30PM THE COURT: I know, but you just told him to describe what the email said.
04:30PM MR. CASABIELLE: Without reading it.
04:30PM THE COURT: It doesn't matter, sir. You can't ask him to describe.
04:30PM MR. CASABIELLE: I will rephrase.
04:30PM BY MR. CASABIELLE:
04:31PM Q. This email deal with --
04:31PM THE COURT: No, sir. You can't ask questions like that. This email is not in evidence. You can ask him questions about the time period, you can ask him questions about the subject matter, but you cannot ask him to describe the email or you can't be describing an email that is not in evidence before the jury.
04:31PM BY MR. CASABIELLE:
04:31PM Q. When was this email written?
04:31PM A. When was it written?

Q. Yes.
A. August 14th, 2008.
Q. What was the subject -- I'm sorry, what was the email about, without telling us --
THE COURT: No, sir.
MR. CASABIELLE: I'm trying to phrase it, Your Honor.
THE COURT: Move on. Why don't you move on. Give it a chance some other time.
Sir, I can't tell you anymore the same thing over and over. Move on.
MR. CASABIELLE: Yes. Let's talk about the $300,000 loan. Can we put up DX 78, please.
MR. PARDO: This is not in evidence, Judge.
THE COURT: 78 is not in evidence, sir. Do you have a copy that you're going to show him?
MR. CASABIELLE: I do, Your Honor.
Can I see it, please, without showing the jury.
BY MR. CASABIELLE:
Q. Sir, when you borrowed $300,000, did you sign a promissory note?
A. Yes.
Q. And did you sign that promissory note on or about August 27th, 2007?
A. Yes.
Q. Is what you have in front of you the promissory note you

signed?
A. It sure looks like it.
MR. CASABIELLE: Move it into evidence, Your Honor.
THE COURT: Any objection?
MR. PARDO: No objection, Your Honor.
THE COURT: All right. 78 is admitted.
(Defense Exhibit 78 was received.)
MR. CASABIELLE: May we publish?
THE COURT: You may.
MR. CASABIELLE: Please publish to the jury.
BY MR. CASABIELLE:
Q. Okay. Let's go over this. Can you tell us in your own words what you understood your obligation was under this promissory note.
A. As mentioned prior, I was in the process of buying a house, and I had multiple other contracts going on where money was supposed to be coming in over the next few months, millions and millions of dollars.
So I called Bart, and I said: Bart, I'm going to have these millions of dollars coming in; could I borrow this $300,000? I will pay it back to you as soon as they close on these deals. He said: Okay. I signed it; he sent me the money.
Q. What was your obligation under the promissory note after you receive the money from Mr. Seidler?
A. My obligation was to pay it back.

Q. When?
A. According to this, which, you know, everything was happening so fast back then, I don't even remember that multiples times said to myself "I really should have asked for more time," but January 1st, 2008.
Q. Can we scroll down to that part of the promissory note where that date is. Can we highlight it, please, where it says: Interest only will be payable. The entire principal and unpaid balance will be due and payable in full. Can we put that in the -- okay.
Did you pay the $300,000 back -- the $300,000 that you owed that was collateralized by this promissory note --
MR. PARDO: Objection, Your Honor.
MR. CASABIELLE: I haven't even finished the question.
THE COURT: Sustained. Sustained.
BY MR. CASABIELLE:
Q. Did you --
A. I -- you speak first.
Q. Did you comply with the terms of this promissory note, which was that you were required to pay the principal amount by January 8th -- I'm sorry, January 1st, 2008? Did you comply?
A. So my memory, which is not photographic, as discussed before, is as follows.
Prior to the $200,000 payment which was sent in right before the January 1st, 2008, date, my Park West Parking company, which

was with Wachovia Bank at that same time had gone out of business and turned over to Wells Fargo, sent him 50,000 from one account, 25,000 from another account, X amount from another account.

So there's no -- I've done everything. I've gone to Wells Fargo. I have asked them if they could help me find old bank accounts. My assistant from the time, who is now in her mid-80s, has obviously told me she has no way of proving anything. Nathan is -- won't even take my phone calls for over a decade, certainly isn't here to help me.

So I can't find the first -- multiple payments that I made prior to the $200,000. But I believe a hundred percent that there is no way in the world I would have sent him $200,000 the day before had I not given him the first $100,000. But I can't prove it, and that's -- that's the way I remember it.

Q. You cannot prove that you paid Bart Seidler back $300,000, yes?

A. I can only prove $200,000.

Q. Listen to my question. You cannot prove that you paid Bart Seidler the total amount of $300,000 by January 1st, 2008, can you?

A. Unfortunately, no.

Q. Would you have any documents, any evidence to refute testimony that you did not pay Bart Seidler back $300,000 by January 1st, 2008?

A. Do I have evidence that I did not pay him back? Is that what

04:38PM you're asking me?
04:38PM Q. That you paid him?
04:38PM A. That I paid him back? I told you, I -- I searched. I mean the few things I can do, I tried. But no, I don't have evidence of it.
04:38PM Q. Okay. What did you understand the consequences of not fulfilling this agreement to be when you signed it?
04:39PM A. That he had every right in the world to sue me for his money that he felt I owed him.
04:39PM MR. CASABIELLE: Can we put up Exhibit 79. Again, that has not been introduced, correct?
04:39PM MR. PARDO: Not in evidence, Judge.
04:39PM BY MR. CASABIELLE:
04:39PM Q. Now, as collateral for the promissory note, the $300,000 that you borrowed, did you sign a collateral assignment of rights?
04:40PM A. I need to see it.
04:40PM Q. Well, do you remember signing a collateral assignment of rights?
04:40PM A. It's too long ago. I have signed 10,000 papers in a period of three years back then, so it would be best, like everything else, if you just bring it up here and let me see it.
04:40PM MR. CASABIELLE: May I approach, Your Honor?
04:40PM THE COURT: You may.
04:40PM BY MR. CASABIELLE:
04:40PM Q. I'm handing you 79. Please review it. Without reading it,

04:40PM just review it and tell me when you're done.
04:40PM Could you put it up so I can see it, please. Thank you.
04:41PM A. Can you just -- it's missing the memorandum of understanding.
04:41PM Q. All right. Let me ask you something.
04:41PM After reading what I just showed you, does that refresh your recollection as to whether or not you signed a collateral of rights to collateralize the $300,000 loan, yes or no?
04:41PM A. Subject to terms.
04:41PM Q. Okay. So the answer is yes, you signed a collateral of rights to collateralize the $300,000 loan?
04:41PM MR. PARDO: Objection, Your Honor.
04:41PM THE WITNESS: Subject to an exhibit that specified the terms of what this meant.
04:42PM THE COURT: Your objection is overruled.
04:42PM BY MR. CASABIELLE:
04:42PM Q. Can you answer the question, please?
04:42PM A. I just did.
04:42PM THE COURT: He answered the question, sir. Next question.
04:42PM BY MR. CASABIELLE:
04:42PM Q. Okay, moving on.
04:42PM Was -- when was that collateral assignment of rights signed?
04:42PM A. I'm not comfortable talking about this document unless you bring me the rest of the document because we had a very serious negotiation about this. This was my collateral assignment of

rights. That's not something I take lightly.

So we made a memorandum of understanding, which limited it to the $300,000, which had other clauses. We need to see that.

Q. Okay. The question I have, though, is did you sign this particular document that you have in front of you, yes or no?

A. This is a partial document.

Q. Did you sign this particular document, yes or no?

MR. PARDO: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: I signed this partially.

MR. CASABIELLE: Can we turn to the last page of this document, please, for me to look at.

BY MR. CASABIELLE:

Q. There is a signature space there, right, for Gregory Mirmelli?

A. Yes.

Q. Is that your signature?

A. There is no signature.

Q. That is?

A. It just says -- my name is just printed.

Q. You don't see a signature on that?

A. On the second page, not on the --

Q. The second page, yes.

A. Yes.

Q. So you did sign this agreement, yes or no?

A. Yes, it refers to a memorandum of understanding, which is

04:43PM Exhibit A, which is not here, so this agreement is incomplete.
04:43PM Q. Did you sign this agreement, sir?
04:43PM A. I'm not answering it again. I answered you.
04:43PM THE COURT: Sir, answer the question.
04:43PM THE WITNESS: I signed -- I signed this agreement with an attachment that's missing, and it says it in here, right here in paragraph B, Exhibit A, memorandum of understanding.
04:43PM THE COURT: Is that your signature?
04:44PM THE WITNESS: Yes.
04:44PM THE COURT: Okay. Next question.
04:44PM BY MR. CASABIELLE:
04:44PM Q. Now you make reference to attachments. These are attachments that you negotiated, yes?
04:44PM A. Yes.
04:44PM Q. To protect your interest, yes?
04:44PM A. Yes.
04:44PM Q. Do you have those attachments, you personally have them?
04:44PM A. No.
04:44PM Q. No?
04:44PM A. No.
04:44PM Q. So we can't produce them to you, can we, if we don't have them, can we?
04:44PM A. No.
04:44PM Q. Okay.
04:44PM MR. CASABIELLE: Your Honor, I would move into evidence

04:44PM Exhibit 79.

04:44PM MR. PARDO: Objection, Your Honor.

04:44PM THE COURT: What is the objection?

04:44PM MR. PARDO: Completeness, relevance, and the legal issue raised in limine.

04:44PM MR. CASABIELLE: Your Honor, the Court --

04:44PM THE COURT: I'll take the argument outside the presence of the jury. I'll defer ruling on this exhibit until after we break.

04:44PM Can you move to another series of questions, sir?

04:44PM MR. CASABIELLE: Yes, ma'am, I'll try.

04:44PM BY MR. CASABIELLE:

04:45PM Q. Let me ask you this question, without referring to the actual assignment of rights.

04:45PM What was your understanding to be back when you signed this that would be -- what would happen if you did not pay the $300,000, as you had agreed to? What were the consequences of that?

04:45PM MR. PARDO: Objection, Your Honor.

04:45PM THE WITNESS: That he would have the right to take legal action.

04:45PM THE COURT: Sir -- what is the objection?

04:45PM MR. PARDO: Asked and answered.

04:45PM THE COURT: Overruled. Answer.

04:45PM THE WITNESS: The same as any loan, he would have the

04:45PM right to sue me for his money.
04:45PM BY MR. CASABIELLE:
04:45PM Q. And where did that right come from?
04:45PM A. From the loan.
04:45PM Q. From the assignment?
04:45PM A. The assignment is incomplete, so again, that's going to be
04:45PM taken up, as the judge said, outside of this and asked you to go
04:45PM on to your next question.
04:45PM Q. I'm asking you, right now, what your understanding was, your
04:45PM understanding sir, with regard -- without -- may I finish?
04:46PM What was your understanding, without regard to the
04:46PM attachments, were the consequences of your failing to pay the
04:46PM promissory note in full by January 1, 2008?
04:46PM MR. PARDO: Objection, Your Honor.
04:46PM THE COURT: Overruled.
04:46PM THE WITNESS: My understanding was exactly what it was
04:46PM intended to mean, which is that if the jury determines I'm owed
04:46PM 17-and-a-half million and I gave him back 300,000 out of --
04:46PM 200,000 out of 300,000, then they could deduct 100,000 from it,
04:46PM it's a setoff. And if it's 11.4, it could become 11.3, but he had
04:46PM to take action and claim those rights, which he never did.
04:46PM BY MR. CASABIELLE:
04:46PM Q. But you understood that if you didn't pay, you lost your
04:46PM interest in the lot, correct?
04:46PM MR. PARDO: Objection, Your Honor.

THE WITNESS: Never.
THE COURT: Overruled.
BY MR. CASABIELLE:
Q. I'm sorry. Answer -- please respond.
A. Never.
Q. That was never your understanding?
A. Never.
Q. How did you collateralize this loan that you took for $300,000?
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: It was collateralizing the $300,000, not the entire --
BY MR. CASABIELLE:
Q. I'm not talking about the entire debt, I'm talking about the $300,000. How did you collateralize the $300,000?
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: As -- as any outstanding amount that he can prove was due on the due date, would be owed to him as a setoff against my profits.
BY MR. CASABIELLE:
Q. Right. You're a businessman, aren't you?
A. Sure.
Q. When you borrow money, you usually collateralize the loan,

don't you?
A. Right.
Q. You say, "Let me borrow X amount of money, and if I don't pay, this is what you can have," yes? That's a pretty standard agreement, yes?
A. Sure.
Q. And was that the agreement you had in this particular case, the $300,000 agreement. You must have collateralized it somehow, did you not?
A. So, for example, if you borrow $300,000 to buy a house, and you default, and the bank puts it up for sale, and it sells for a million-two and the bank is owed 350,000, the bank gets their 350 and the balance still goes to you.
Q. We're not talking about a loan or a property or anything, sir. We're talking about --
A. That's what collateral does. It collateralizes the amount of the loan.
Q. We agree.
A. Right. So that's it. So you could claim I owe him $100,000, but he never sued me on it so I don't see why this is a point anymore.
Q. The question is not whether he sued you on it or not. The question is when you entered into this agreement, what did you lose -- what did you use as collateral?
When you said "Bart, let me borrow $300,000," did you say

"Just give it to me because you're my friend," or did you say "Bart, let me borrow $300,000; and if I don't pay you by January 8th -- January 1st, 2008, you can have this?" Which of the two was it?

A. It was -- you could have it -- you could take it out of my profits.

Q. Where does it say that?

MR. PARDO: Objection, Your Honor.

THE WITNESS: It says it in the missing documents.

MR. PARDO: Objection, Your Honor.

THE COURT: Well, your client thinks it's really okay just to answer questions after you object, so I'll tell you what, I think we've had enough for today.

I'll see you all tomorrow at 9:00 a.m. Don't talk about the case with each other, don't talk about it with anybody else, and don't do any research on the case.

THE COURTROOM DEPUTY: All rise for the jury.

MS. MACKIEWICZ: Your Honor --

(Jury out at 4:49 p.m.)

THE COURT: Everybody be seated. Go back to the table.

What's your argument on the exhibit, sir?

Mr. Casabielle, everybody back to the table. I want to hear what your argument is on the exhibit, quickly.

THE WITNESS: Including me?

THE COURT: Yes, please sit down.

Can you just argue from your table, please. Thank you.

MR. PARDO: The document is incomplete. It doesn't have Exhibit A, and now the defendants are seeking affirmative relief after the statute of limitations has expired, when they never sued on the note, they never sued on the collateral assignment.

THE COURT: All right your objection is overruled. That exhibit will come into evidence.

(Defense Exhibit 79 was received.)

MR. CASABIELLE: Thank you, Your Honor.

THE COURT: This is what needs to happen tomorrow, I have had it, I have had it.

So, Mr. Casabielle, the next time you interrupt the witness, I'm going to ask you to sit down. You will be done. Sir, the next time you fail to answer a question or you interrupt Mr. Casabielle, you will sit down and your testimony will be done.

Mr. Casabielle, do you understand my instruction?

MR. CASABIELLE: Clearly.

THE COURT: Sir, do you understand my instruction?

THE WITNESS: Yes.

THE COURT: All right. It is beyond rude to the jury and beyond rude to my court reporter, not to mention beyond rude to me where I have specifically asked you again and again and again not to interrupt each other, not to speak over each other, to speak clearly, and it's like you don't -- you don't care what I have to say about it. So I run the courtroom, you may like it, you may

not like it, that's how I'm going to run it.

So tomorrow, Mr. Casabielle will ask questions, sir, I don't care if you don't like the question. I don't care if you think it's been asked 50 times, he'll ask it 51 if I let him. I run the courtroom, do you understand me? That's how this runs.

So you will answer whatever question I allow him to ask, and you will let him finish his question. That's how this is going to happen. And, Mr. Casabielle, you have been practicing law for probably 40 years.

MR. CASABIELLE: 40-plus.

THE COURT: You know better.

MR. CASABIELLE: I do.

THE COURT: You do know better. This is not a game, this is not a show, I don't know where you think you are but you continue to do this.

I don't want to hear from anybody. I've had it from all of you.

I want you here bright and early. Get a good night's rest. Everybody take a deep breath, and tomorrow let's conduct ourselves professionally in front of this jury.

I don't know what you all think or who thinks they're scoring points with this jury. You're not doing anything. You're going on and on and on and on, and it's a pretty good jury. I'm surprised they're still awake, quite frankly, at this point. But they can't follow. No one can follow this this way. No one.

04:52PM It's just not fair to the jury; it's not fair to my court
04:52PM reporter. I have been all day long, all day long asking this to
04:53PM stop, and all day long it's continued.

04:53PM MR. CASABIELLE: Your Honor --

04:53PM THE COURT: No, sir.

04:53PM MR. CASABIELLE: No response?

04:53PM THE COURT: I will see you in the morning.

04:53PM MR. CASABIELLE: What time?

04:53PM THE COURT: We're starting tomorrow at 9:00 a.m.

04:53PM MR. CASABIELLE: Thank you, Judge.

04:53PM (Recess at 4:53 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 9/30/25

/s/Vernita Allen-Williams
VERNITA ALLEN-WILLIAMS, RMR, FCRR
Official Court Reporter
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
(305) 523-5938

## $

$10 [1] - 118:11
$100,000 [11] - 124:5, 126:19, 126:22, 126:24, 127:2, 127:15, 128:25, 131:22, 132:7, 206:13, 214:19
$100,000,000 [1] - 165:21
$15,000 [1] - 95:7
$18 [2] - 32:25, 34:24
$19,000 [1] - 150:4
$19,500 [1] - 148:22
$200,000 [4] - 205:24, 206:11, 206:12, 206:17
$21,800 [1] - 150:3
$261,000 [2] - 148:13, 148:17
$27 [1] - 54:13
$270,000 [1] - 147:13
$30,000 [22] - 86:15, 120:17, 123:3, 141:15, 141:18, 141:23, 142:3, 142:12, 143:8, 144:8, 144:18, 144:22, 145:8, 145:20, 148:8, 153:22, 153:25, 154:10, 163:19, 170:7, 189:8
$300,000 [45] - 29:7, 47:19, 58:11, 58:15, 76:24, 131:5, 131:9, 131:13, 134:3, 134:19, 136:10, 139:17, 140:14, 140:17, 140:22, 147:21, 162:17, 163:15, 166:10, 173:18, 173:20, 175:15, 175:16, 203:11, 203:19, 204:20, 205:11, 206:15, 206:19, 206:23, 207:14, 208:7, 208:10, 209:3, 211:17, 213:9, 213:12, 213:16, 214:8, 214:10, 214:25, 215:2
$360,000 [2] - 148:25, 170:6
$78,000 [1] - 150:8
$800 [1] - 150:8

## '

'06 [1] - 125:18
'13 [1] - 21:20
'24 [1] - 109:9

## /

/s/Vernita [1] - 218:17

## 0

01 [1] - 66:22
02 [1] - 66:21

## 1

1 [30] - 1:7, 20:7, 27:20, 28:22, 40:13, 42:16, 45:6, 45:7, 54:24, 58:4, 58:8, 59:13, 72:4, 74:1, 76:5, 95:3, 109:1, 109:3, 114:14, 126:11, 126:12, 159:9, 162:23, 163:13, 170:24, 171:3, 196:9, 196:12, 196:16, 212:13
1-and-a-half [2] - 43:3, 43:5
1-and-a-half-million [1] - 35:25
1-and-a-half-million-dollar [2] - 33:2, 35:1
1.2 [1] - 162:14
1.5 [5] - 160:23, 160:24, 161:1, 161:8, 161:12
10 [15] - 2:11, 42:16, 45:10, 45:11, 45:24, 45:25, 107:15, 108:25, 144:24, 144:25, 155:2
10,000 [16] - 142:7, 146:6, 146:12, 146:14, 146:16, 146:18, 146:20, 146:22, 146:24, 147:1, 147:3, 147:5, 147:7, 147:9, 147:11, 207:19
10-and-a-half-million [2] - 34:17, 35:2
10-day [2] - 27:21, 172:19
100 [5] - 1:18, 26:22, 26:23, 85:2, 177:2
100,000 [3] - 132:5, 132:8, 212:19
102 [1] - 2:6
1031 [18] - 33:10, 33:17, 33:19, 33:22, 34:2, 35:3, 40:3, 58:16, 77:2, 77:7, 77:9, 77:17, 77:22, 77:24, 78:1, 79:9, 80:7, 111:8
105 [1] - 28:8
10:00 [4] - 47:8, 48:22, 48:23, 57:3
10:15 [3] - 57:5, 57:13
10:27 [1] - 57:16
10th [3] - 55:14, 146:16, 157:6
11.3 [1] - 212:20
11.4 [9] - 40:11, 40:16, 40:20, 40:25, 41:10, 94:20, 94:22, 167:14, 212:20
111 [6] - 2:7, 41:16, 41:23, 42:2, 42:3, 42:16
111...................... Page [1] - 2:9
112 [1] - 28:18
114 [1] - 2:7
119 [1] - 2:5
11:29 [1] - 97:6
11:30 [3] - 96:21, 96:25, 97:21
11th [5] - 6:5, 6:8, 55:14, 55:15, 157:6
12 [5] - 6:25, 82:13, 111:8, 147:24, 150:13
120,000 [1] - 158:6
1205 [1] - 1:15
122 [7] - 42:5, 42:7, 42:8, 42:11, 42:13, 42:14, 42:17
122...................... Page [1] - 2:10
123 [3] - 29:25, 92:13, 106:24
128 [2] - 31:8, 104:20
129 [1] - 105:20
13 [5] - 2:11, 20:25, 46:1, 46:5, 111:8
13-and-a-half [1] - 35:9
13-and-a-half-million [3] - 33:9, 33:14, 34:13
130 [4] - 25:8, 50:3, 102:22, 117:18
136 [4] - 31:12, 94:12, 109:25, 110:2
137 [1] - 35:16
138 [2] - 37:25, 39:18
14 [5] - 17:1, 20:7, 20:25, 46:1, 46:5
14...............Page [1] - 2:11
142 [1] - 40:6
143 [1] - 2:13
14th [3] - 146:1, 175:23, 203:2
15 [7] - 70:4, 125:7, 154:21, 158:24, 190:8, 201:16, 201:17
15-day [1] - 152:23
15-minute [2] - 57:4, 158:22
1521 [1] - 93:22
158 [1] - 176:5
15th [3] - 145:24, 146:3, 146:20
16 [11] - 2:11, 46:6, 46:8, 46:9, 181:16, 181:19, 181:20, 181:21, 181:23, 182:16, 195:3
160,000 [1] - 158:6
16th [2] - 146:24, 147:11
17,500 [2] - 149:21, 150:8
17-and-a-half [3] - 94:20, 94:25, 212:18
17-and-a-half-million [1] - 35:9
17.5 [3] - 95:6, 167:13, 167:19
18 [8] - 46:6, 46:8, 46:9, 86:17, 186:25, 187:4, 187:5
18............Page [1] - 2:11
18th [2] - 146:14, 146:18
19,500 [3] - 149:16, 150:5, 150:7
1929 [1] - 116:11
1950 [1] - 51:15
1973 [1] - 51:10
1983 [1] - 51:10
1990 [2] - 51:16, 51:17
1990s [1] - 52:23
1998 [5] - 50:8, 50:10, 51:4, 51:5, 51:18
1999 [2] - 60:24, 61:15
1:30 [4] - 97:1, 97:2, 97:5, 97:15
1:37 [1] - 97:22
1:41 [1] - 101:5
1st [11] - 25:8, 50:3, 102:22, 117:18, 157:7, 205:5, 205:21, 205:25, 206:19, 206:23, 215:3

## 2

2 [17] - 1:6, 28:22, 45:7, 45:8, 64:17, 65:11, 66:3, 73:18, 74:25, 75:3, 76:9, 95:4, 160:22, 169:7, 171:25, 172:2, 172:4
2,200 [1] - 150:6
2,800 [2] - 149:23, 150:1
2-and-a-half-million [1] - 35:4
2.0 [1] - 189:23
20 [10] - 70:4, 86:17, 132:24, 143:12, 144:24, 147:17, 155:21, 157:5, 167:9
20,000 [9] - 142:6, 146:5, 146:6, 146:8, 146:9, 146:11, 148:2, 149:18, 150:7
200,000 [2] - 158:6, 212:19
2000 [2] - 69:22, 70:3
2000s [1] - 55:16
2003 [1] - 63:6
2004 [1] - 185:25
2005 [1] - 185:25
2006 [37] - 11:10, 49:24, 50:10, 52:24, 53:8, 53:24, 54:17, 57:24, 60:25, 61:15, 62:15, 62:18, 64:21, 65:11, 66:7, 69:22, 70:3, 72:6, 72:15, 77:15, 85:24, 95:12, 95:17, 96:3, 121:19, 124:12, 124:16, 124:20, 127:17, 144:4, 144:9, 171:3, 185:10, 186:2, 186:12, 196:16
2007 [14] - 87:12, 88:24, 88:25, 89:6, 89:13, 89:16, 124:22, 131:8, 144:13, 144:18, 144:20, 157:2, 173:20, 203:23
2008 [23] - 116:7, 116:9, 117:4, 124:24, 144:21, 145:22, 147:14, 147:20, 157:2,

182:4, 184:2, 185:10, 186:9, 198:6, 201:25, 203:2, 205:5, 205:21, 205:25, 206:19, 206:24, 212:13, 215:3
**2009** [8] - 74:16, 148:11, 148:12, 148:19, 195:3, 196:2, 198:7
**2010** [16] - 63:6, 148:21, 149:10, 149:12, 150:9, 150:17, 150:19, 150:21, 150:24, 150:25, 151:5, 151:8, 152:7, 173:7, 192:5
**2011** [8] - 13:9, 66:17, 67:3, 81:13, 91:9, 151:4, 171:5, 196:17
**2012** [9] - 6:5, 6:8, 7:18, 8:20, 9:2, 13:8, 15:10, 47:21, 116:4
**2013** [23] - 4:18, 16:16, 17:10, 17:24, 18:21, 19:23, 20:4, 20:7, 21:8, 26:24, 28:3, 47:13, 47:16, 47:18, 47:19, 84:18, 84:21, 85:5, 85:24, 95:12, 95:17, 96:3
**2014** [4] - 66:17, 67:3, 95:13, 96:16
**2017** [7] - 28:24, 29:4, 29:10, 68:10, 68:13, 81:14, 81:18
**2018** [1] - 29:7
**2021** [37] - 11:10, 17:1, 29:4, 29:10, 29:21, 31:15, 32:15, 32:22, 34:18, 40:7, 43:3, 43:15, 43:23, 43:25, 44:1, 47:25, 48:3, 48:6, 48:9, 62:15, 62:18, 66:7, 68:10, 68:13, 81:18, 84:22, 92:17, 92:21, 94:3, 95:13, 96:16, 102:22, 105:7, 106:11, 108:7, 108:11
**2024** [5] - 108:17, 108:24, 111:25, 114:20, 175:24
**2025** [2] - 1:4, 127:17
**204** [2] - 2:13, 76:21
**206** [1] - 76:22
**20th** [5] - 146:5, 146:6, 146:9, 146:11, 147:7
**21** [5] - 2:12, 46:10, 46:13, 194:23, 196:7
**21,800** [2] - 150:1, 150:8
**211** [1] - 1:15
**216** [1] - 2:14
**21st** [1] - 147:3
**22** [4] - 2:12, 46:10, 46:13, 194:23
**22nd** [1] - 8:6
**23rd** [3] - 24:9, 145:19, 145:22
**24** [6] - 26:24, 28:2, 46:14, 46:18, 46:19, 86:17
**24-CV-20631-Becerra** [1] - 3:2
**24-CV-20631-JB** [1] - 1:2
**247** [1] - 1:7
**24th** [4] - 26:4, 26:10, 26:14, 38:17
**25** [3] - 50:11, 51:1, 51:5
**25,000** [1] - 206:3
**26** [3] - 46:16, 46:18, 46:19
**2600** [1] - 1:19
**26th** [1] - 146:22
**270,000** [1] - 147:16
**27th** [1] - 203:22
**28** [3] - 46:20, 46:23, 74:16
**28...............Page** [1] - 2:12
**2800** [1] - 42:17
**283,800** [1] - 159:16
**29** [2] - 46:24, 47:2
**29........................ Page** [1] - 2:12
**2A** [3] - 23:10, 23:11, 23:18
**2C** [3] - 27:20, 27:21, 172:18
**2nd** [3] - 1:18, 147:9, 157:7

## 3

**3** [10] - 2:2, 2:10, 19:5, 27:20, 34:14, 45:8, 45:9, 67:22, 118:13, 169:24
**30** [44] - 1:4, 9:10, 59:18, 59:22, 65:17, 65:19, 78:11, 78:12, 80:2, 80:3, 80:9, 80:10, 82:22, 95:5, 135:8, 144:23, 144:24, 144:25, 145:1, 146:9, 147:17, 147:24, 155:1, 163:20, 164:1, 164:8, 164:14, 165:11, 165:19, 165:21, 166:3, 166:12
**30,000** [10] - 142:6, 144:20, 145:12, 145:22, 145:24, 146:1, 146:3, 163:22, 172:17, 195:24
**300** [3] - 147:22, 147:25, 161:10
**300,000** [7] - 131:19, 163:22, 174:16, 174:18, 212:18, 212:19
**300-** [1] - 161:12
**305** [1] - 218:20
**31** [2] - 171:5, 196:17
**31st** [2] - 146:6, 146:12
**33128** [2] - 1:25, 218:20
**33131** [1] - 1:19
**33139** [2] - 1:16, 93:23
**350** [1] - 214:12
**350,000** [1] - 214:12
**360** [3] - 147:22, 147:25, 148:3
**360,000** [2] - 158:4, 158:5, 170:6
**3:01** [1] - 158:23
**3:02** [1] - 159:1
**3:19** [1] - 159:2
**3:20** [1] - 159:5

## 4

**4** [14] - 33:13, 45:8, 68:24, 72:4, 80:24, 118:12, 160:15, 161:3, 161:5, 170:16, 172:6, 173:13, 198:16
**4-and-a-half** [2] - 160:9, 160:19
**4.5** [9] - 59:12, 160:17, 160:21, 161:6, 161:7, 162:12, 172:6, 173:13
**40** [2] - 147:17, 217:9
**40-plus** [1] - 217:10
**400** [2] - 1:24, 218:19
**401** [1] - 32:24
**41** [1] - 93:10
**41st** [1] - 77:6
**42** [2] - 2:9, 2:10
**43** [4] - 143:15, 143:18, 143:22, 143:24
**43........................ Page** [1] - 2:13
**45** [2] - 2:10, 97:18
**46** [3] - 2:11, 2:11, 2:12
**47** [2] - 2:3, 2:12
**49** [1] - 2:4
**4:49** [1] - 215:19
**4:53** [2] - 1:5, 218:11
**4th** [1] - 18:21

## 5

**5** [5] - 19:1, 30:17, 45:8, 55:1, 76:20
**5.01** [1] - 30:17
**5.4** [2] - 131:19, 175:14
**5.6** [1] - 19:6
**5.7** [2] - 131:18, 175:14
**5.75** [1] - 160:14
**5.8** [8] - 16:22, 16:25, 22:4, 23:10, 23:12, 23:18, 24:9, 25:17
**50** [3] - 118:11, 165:18, 217:4
**50,000** [1] - 206:2
**500,000** [2] - 28:24, 158:5
**51** [1] - 217:4
**515** [1] - 33:9
**523-5938** [1] - 218:20
**56** [2] - 73:16, 74:3
**58** [3] - 5:17, 9:16, 9:17
**59** [2] - 6:25, 10:11
**5th** [1] - 157:7

## 6

**6** [9] - 40:12, 45:6, 45:8, 45:9, 81:24, 160:12, 160:15, 172:5, 173:15
**6..............Page** [1] - 2:10
**60** [3] - 7:17, 147:17
**601** [1] - 33:2
**61** [1] - 8:5
**62** [1] - 8:20
**64** [1] - 9:1
**65** [1] - 9:4
**69** [1] - 13:25

## 7

**7** [5] - 72:1, 114:13, 114:18, 147:1, 160:12
**70** [4] - 78:12, 80:4, 80:11, 147:18
**70,000** [1] - 172:16
**700** [3] - 53:5, 63:2, 118:14
**7634** [1] - 25:5
**77** [1] - 20:7
**78** [7] - 14:24, 14:25, 16:7, 203:12, 203:14, 204:6, 204:7
**78........................ Page** [1] - 2:13
**79** [4] - 207:10, 207:25, 211:1, 216:8
**79........................ Page** [1] - 2:14
**7th** [2] - 8:20, 147:5

## 8

**8** [3] - 80:23, 80:24, 83:25
**80** [2] - 60:18, 147:18
**803** [1] - 34:23
**83** [1] - 4:13
**89** [3] - 17:15, 17:17, 17:18
**894** [1] - 93:23
**8:41** [2] - 1:5, 3:1
**8:42** [1] - 3:16
**8th** [4] - 55:13, 157:6, 205:21, 215:3

## 9

**9** [9] - 45:10, 45:11, 45:12, 45:19, 45:20, 54:24, 82:14, 178:7, 181:12
**9/30/25** [1] - 218:17
**90** [4] - 18:17, 147:18, 177:12
**90-floor** [1] - 60:19
**95** [1] - 21:12
**96** [1] - 22:7
**97** [3] - 24:6, 26:23, 28:1
**9:00** [2] - 215:14, 218:9
**9:58** [1] - 57:6
**9:59** [1] - 57:15
**9th** [3] - 55:13, 55:15, 157:6

# A


**a-million-and-a-half** [1] - 35:12
**a.m** [10] - 1:5, 3:1, 3:16, 57:6, 57:15, 57:16, 97:6, 97:21, 215:14, 218:9
**abandon** [1] - 156:20
**abandoned** [7] - 69:12, 84:8, 123:14, 123:15, 197:23, 197:24
**abbreviation** [1] - 75:22
**ability** [9] - 16:16, 16:20, 63:20, 149:6, 173:10, 198:15, 198:16, 198:17, 198:18
**able** [8] - 57:19, 80:20, 118:12, 157:10, 173:1, 173:6, 173:8, 199:18
**above-entitled** [1] - 218:14
**abreast** [1] - 186:16
**absolutely** [5] - 18:3, 130:23, 168:8, 168:9, 173:2
**academic** [1] - 201:4
**Academy** [1] - 70:15
**accelerate** [2] - 6:3, 10:4
**accept** [5] - 9:5, 72:13, 92:3, 143:16, 143:17
**acceptable** [1] - 72:20
**accepted** [7] - 92:5, 94:9, 94:11, 113:10, 113:25, 121:2, 148:5
**accepting** [2] - 186:15, 186:17
**access** [4] - 95:20, 95:24, 96:17, 96:19
**accident** [1] - 56:5
**accommodating** [1] - 101:7
**accomplished** [1] - 79:13
**accordance** [6] - 50:1, 110:24, 120:20, 153:17, 189:22, 197:15
**according** [12] - 89:10, 120:10, 145:4, 147:13, 148:11, 172:18, 187:25, 192:21, 192:25, 193:2, 205:2
**Account** [1] - 25:5
**account** [40] - 25:7, 25:9, 25:10, 25:13, 25:15, 25:18, 25:22, 25:25, 26:1, 35:18, 36:6, 36:7, 36:15, 36:20, 36:22, 36:23, 36:24, 37:3, 37:4, 37:18, 37:23, 37:25, 38:1, 38:5, 38:7, 38:9, 38:12, 38:15, 38:20, 38:21, 38:22, 38:25, 39:25, 42:24, 43:3, 128:24, 206:2, 206:3
**accountant** [4] - 40:22, 40:24, 41:7, 74:20
**accounting** [4] - 31:18, 43:13, 43:14, 89:13
**accounts** [13] - 36:17, 36:18, 36:25, 37:16, 38:6, 38:13, 39:2, 42:17, 44:1, 47:23, 73:7, 206:6
**accrued** [2] - 166:23, 167:3
**accruing** [4] - 16:25, 17:4, 17:7, 68:16
**accurate** [2] - 89:22, 218:13
**accurately** [1] - 161:18
**acquire** [1] - 124:3
**acquired** [3] - 54:12, 70:12, 123:24
**acquiring** [1] - 71:10
**acquisition** [9] - 49:23, 50:14, 51:18, 96:9, 96:10, 107:2, 113:16, 166:11, 175:14
**Acquisition** [1] - 30:1
**act** [2] - 70:10, 140:1
**acted** [3] - 24:3, 103:8, 140:3
**action** [2] - 211:21, 212:21
**actions** [1] - 175:18
**active** [2] - 50:14, 76:15
**activity** [4] - 43:22, 43:23, 43:24, 44:1
**actual** [2] - 169:8, 211:13
**add** [2] - 35:8, 150:5
**addition** [4] - 119:1, 134:14, 139:11, 162:17
**additional** [5] - 49:2, 140:5, 171:7, 171:16, 196:19
**address** [9] - 15:10, 40:22, 92:25, 93:2, 93:19, 93:22, 94:2, 123:20, 192:22
**addressed** [3] - 10:18, 93:25, 121:25
**addressing** [2] - 136:15, 136:24
**adds** [1] - 147:18
**administratively** [5] - 56:2, 56:6, 56:7, 81:8, 81:14
**admission** [1] - 157:24
**admit** [5] - 45:4, 45:8, 45:20, 45:22, 201:15
**ADMITTED** [1] - 2:8
**admitted** [18] - 42:2, 42:13, 45:7, 45:11, 46:4, 46:8, 46:12, 46:18, 46:22, 47:1, 126:14, 143:15, 143:19, 143:22, 191:16, 201:16, 204:6
**admonish** [1] - 138:19
**advanced** [1] - 44:6
**advising** [1] - 109:22
**advocated** [1] - 60:5
**affect** [1] - 113:6
**affected** [2] - 116:5, 116:7
**affiant** [1] - 106:4
**affidavit** [8] - 105:17, 106:3, 106:5, 106:10, 106:12, 106:14, 106:16, 106:20
**Affiliated** [2] - 62:5, 83:21
**afford** [1] - 199:14
**afforded** [1] - 200:25
**afternoon** [6] - 97:16, 98:2, 102:10, 111:16, 111:17, 158:22
**afterwards** [3] - 28:15, 106:18, 183:3
**agent** [35] - 71:20, 93:19, 103:1, 103:2, 103:4, 103:6, 104:2, 104:3, 104:6, 109:21, 110:22, 110:24, 126:20, 128:2, 128:3, 129:22, 129:23, 129:24, 130:8, 166:18, 167:8, 183:1, 183:2, 183:11, 183:13, 183:15, 183:16, 183:18, 184:2, 184:9, 184:10, 184:11, 185:13, 185:14
**agent's** [2] - 166:25, 167:6
**ago** [7] - 55:21, 88:25, 127:12, 143:12, 161:23, 167:9, 207:19
**agree** [24] - 7:15, 12:14, 16:15, 17:22, 17:25, 21:17, 26:4, 31:17, 31:20, 32:25, 38:4, 39:22, 40:25, 52:16, 68:17, 112:22, 128:16, 147:20, 148:6, 165:15, 167:22, 171:2, 196:15, 214:18
**agreed** [12] - 55:19, 58:15, 98:2, 120:17, 126:13, 141:15, 173:16, 173:17, 173:19, 188:6, 188:9, 211:17
**agreement** [119] - 22:5, 22:6, 22:8, 22:11, 22:15, 22:18, 22:21, 22:24, 23:1, 23:3, 23:15, 23:22, 24:1, 24:4, 26:16, 28:3, 29:22, 29:24, 30:1, 30:13, 44:20, 61:19, 68:7, 69:2, 80:2, 80:25, 81:1, 81:20, 82:7, 84:10, 84:12, 89:11, 92:14, 92:16, 92:20, 94:4, 97:25, 98:7, 107:1, 108:2, 108:5, 108:16, 108:18, 108:19, 109:23, 110:12, 112:18, 120:13, 120:15, 126:18, 126:25, 127:1, 133:21, 133:23, 133:24, 134:5, 138:5, 139:25, 141:8, 141:12, 141:15, 142:10, 148:7, 151:15, 153:18, 153:22, 154:1, 154:3, 154:6, 155:19, 156:15, 156:25, 159:18, 163:10, 164:5, 164:7, 164:21, 165:14, 165:17, 165:23, 166:14, 167:4, 167:23, 168:3, 168:5, 168:14, 168:18, 168:19, 168:21, 168:22, 169:1, 169:5, 169:8, 170:24, 172:4, 178:12, 178:14, 178:16, 178:17, 178:18, 181:5, 187:14, 188:1, 188:16, 188:18, 188:20, 190:11, 192:21, 201:16, 207:7, 209:24, 210:1, 210:2, 210:5, 214:5, 214:7, 214:8, 214:23
**Agreement** [61] - 5:11, 6:14, 8:12, 11:13, 11:20, 13:2, 16:16, 19:9, 19:13, 32:3, 50:2, 54:18, 54:19, 54:23, 55:20, 57:25, 58:23, 61:7, 61:25, 62:11, 64:17, 71:5, 71:24, 72:1, 72:16, 76:15, 77:10, 80:23, 81:16, 90:17, 95:3, 109:8, 109:12, 111:2, 114:14, 114:19, 120:11, 125:6, 126:13, 135:6, 135:15, 136:2, 137:7, 137:18, 139:21, 139:24, 141:8, 141:20, 144:14, 152:21, 152:23, 154:11, 154:20, 156:2, 159:11, 159:21, 169:5, 171:13, 171:15, 171:24, 178:7
**agreements** [6] - 133:17, 133:20, 134:14, 139:12, 140:7, 140:8
**agrees** [4] - 64:19, 65:2, 82:19, 170:5
**ahead** [9] - 56:21, 79:25, 135:10, 150:11, 155:17, 184:25, 185:6, 187:5, 188:16

**ahold** [7] - 21:5, 21:9, 22:2, 26:5, 26:18, 26:20, 66:8
**Airlines** [1] - 53:6
**aligned** [1] - 53:20
**alive** [5] - 76:3, 76:10, 76:13, 76:16
**allege** [2] - 14:6, 14:12
**alleging** [1] - 129:11
**ALLEN** [2] - 1:22, 218:17
**Allen** [1] - 218:17
**ALLEN-WILLIAMS** [2] - 1:22, 218:17
**Allen-Williams** [1] - 218:17
**allocate** [1] - 118:17
**allow** [5] - 20:8, 80:9, 126:6, 153:2, 217:6
**allowed** [10] - 33:17, 33:19, 34:1, 34:4, 56:7, 63:22, 134:23, 137:23, 145:3, 197:15
**almost** [1] - 176:10
**Alright** [1] - 29:22
**alter** [1] - 15:19
**Alton** [1] - 93:22
**amateur** [1] - 189:15
**American** [1] - 53:6
**amount** [26] - 58:16, 66:13, 95:23, 96:19, 133:13, 142:5, 148:18, 163:14, 166:3, 170:6, 170:11, 172:8, 173:14, 173:16, 173:17, 173:19, 187:13, 192:18, 199:17, 205:20, 206:3, 206:19, 213:19, 214:3, 214:16
**amounts** [2] - 90:4, 110:9
**annual** [6] - 73:3, 73:4, 73:12, 74:20, 74:21, 74:25
**annually** [2] - 170:6, 170:17
**answer** [65] - 21:3, 45:17, 52:1, 66:10, 78:15, 78:17, 78:19, 78:21, 79:5, 79:21, 80:1, 125:16, 125:24, 125:25, 126:1, 127:3, 127:5, 127:6, 129:7, 129:14, 130:15, 132:23, 133:5, 133:11, 134:1, 136:4, 137:9, 139:19, 140:11, 142:11, 152:11, 156:14, 156:16, 156:17, 162:2, 162:4, 162:5, 164:7, 168:24, 175:8, 175:10, 175:12, 176:9, 176:15, 179:4, 183:21, 183:22, 185:6, 189:6, 189:7, 190:21, 191:1, 192:10, 195:6, 208:9, 208:16, 210:4, 211:24, 213:4, 215:12, 216:14, 217:6
**answered** [14] - 12:4, 115:5, 127:7, 130:4, 142:18, 148:9, 166:9, 168:25, 173:24, 175:2, 175:9, 208:18, 210:3, 211:23
**answering** [9] - 37:12, 53:16, 125:12, 136:20, 184:17, 184:20, 185:6, 195:10, 210:3
**answers** [1] - 139:2
**ANTONIO** [1] - 1:17
**anyway** [3] - 80:1, 132:13, 182:23
**apart** [1] - 159:12
**apartment** [10] - 21:23, 27:6, 27:10, 27:11, 27:13, 67:4, 67:10, 67:14, 199:24, 200:17
**API** [1] - 33:10
**apologies** [3] - 10:3, 150:2, 191:20
**apologize** [6] - 30:16, 35:19, 52:4, 64:19, 87:8, 97:13
**APPEARANCES** [1] - 1:11
**appearances** [1] - 3:4
**applicable** [1] - 170:12
**appreciate** [1] - 161:17
**approach** [12] - 58:3, 101:22, 163:7, 169:11, 176:18, 182:17, 187:6, 191:22, 194:25, 201:17, 207:22
**appropriate** [2] - 11:6, 185:15
**approval** [2] - 60:19, 110:20
**approve** [3] - 22:12, 22:14, 30:23
**approved** [2] - 60:18, 61:1
**approximate** [2] - 162:10, 162:12
**April** [7] - 6:5, 6:8, 74:16, 149:23, 150:21, 150:24
**area** [4] - 62:4, 102:12, 123:21, 181:3
**Arena** [1] - 53:6
**argue** [3] - 129:9, 164:3, 216:1
**arguing** [5] - 63:18, 138:9, 138:24, 145:6, 151:25
**argument** [4] - 137:19, 211:7, 215:21, 215:23
**argumentative** [1] - 138:16
**arising** [1] - 135:19
**arose** [1] - 23:3
**aroth@accountant.com** [1] - 74:16
**assertion** [1] - 192:22
**assess** [1] - 99:21
**assessment** [1] - 133:18
**asset** [1] - 33:23
**Asset** [2] - 34:14, 35:2
**assets** [7] - 54:21, 116:16, 117:2, 117:8, 117:16, 162:14, 173:9
**assign** [1] - 140:19
**assigned** [1] - 137:16
**assignment** [24] - 109:8, 133:22, 134:15, 135:3, 135:11, 135:16, 136:7, 136:17, 137:1, 137:17, 139:12, 140:13, 141:10, 169:5, 179:13, 207:15, 207:17, 208:22, 208:25, 211:14, 212:5, 212:6, 216:5
**Assignment** [1] - 126:13
**assigns** [1] - 81:3
**assist** [2] - 59:9, 143:2
**assistant** [4] - 87:19, 89:3, 195:8, 206:6
**assisted** [1] - 58:19
**associated** [2] - 25:7, 133:25
**assume** [5] - 26:21, 41:4, 137:21, 138:17, 160:10
**assuming** [1] - 78:21
**attach** [1] - 168:20
**attached** [3] - 76:7, 137:4, 168:15
**attachment** [2] - 135:13, 210:6
**attachments** [4] - 210:12, 210:17, 212:12
**attempt** [1] - 86:6
**attempted** [1] - 157:3
**attention** [2] - 58:25, 60:12
**attorney** [5] - 102:11, 103:9, 104:2, 107:6, 168:23
**attorney's** [1] - 167:21
**attorneys** [1] - 5:25
**August** [15] - 8:20, 11:10, 32:15, 32:22, 38:17, 102:22, 105:7, 106:11, 108:7, 108:11, 146:20, 146:22, 150:13, 203:2, 203:22
**authority** [5] - 71:23, 104:14, 104:17, 105:10, 105:13
**authorized** [2] - 105:4, 110:16
**authorizes** [1] - 110:23
**available** [3] - 86:4, 98:2, 99:8
**Avenue** [2] - 1:24, 218:19
**averaged** [1] - 118:15
**avoid** [1] - 109:18
**Avrohom** [3] - 74:18, 75:1, 76:6
**awake** [1] - 217:24
**aware** [18] - 104:3, 107:10, 108:8, 108:12, 108:16, 112:13, 112:17, 112:19, 112:20, 114:19, 116:4, 116:7, 118:4, 132:13, 181:9, 187:18, 193:7, 196:1

**B**

**baby** [2] - 189:21, 190:2
**background** [1] - 123:23
**backtrack** [1] - 123:20
**backup** [2] - 132:3
**bad** [7] - 147:23, 149:2, 150:2, 155:25, 161:4, 182:6, 201:5
**balance** [2] - 205:9, 214:13
**ball** [1] - 178:25
**Bank** [6] - 13:10, 13:11, 13:20, 59:12, 206:1
**bank** [38] - 5:14, 5:19, 5:25, 6:5, 6:16, 6:18, 6:23, 7:4, 7:18, 8:6, 8:18, 8:21, 9:5, 10:16, 19:1, 20:17, 21:2, 24:23, 24:25, 25:1, 25:7, 36:15, 38:4, 38:25, 39:2, 39:9, 39:12, 47:23, 71:14, 73:7, 117:25, 153:2, 161:4, 190:1, 206:5, 214:11, 214:12
**bank's** [1] - 5:25
**banking** [1] - 43:21
**bankrupt** [1] - 106:7
**bankruptcy** [2] - 97:11, 97:15
**banks** [1] - 116:22
**Bar** [1] - 138:25
**Bart** [102] - 3:12, 18:20, 18:23, 24:3, 35:13, 36:11, 52:22, 52:25, 53:3, 53:18, 54:1, 54:13, 55:24, 58:14, 66:7, 66:18, 83:15, 83:18, 84:17, 84:21, 85:6, 85:19, 85:23, 87:14, 88:18, 90:7, 90:14, 90:16, 90:19, 90:22, 90:25, 91:3, 92:10, 100:18, 100:19, 105:3, 105:12, 121:1, 121:2, 121:3, 121:4, 121:18, 121:19, 121:21, 121:22, 122:4, 122:9, 125:2, 125:4, 135:16, 142:5, 154:16, 160:9, 160:12, 161:2, 161:7,

162:10, 173:12, 174:8, 174:11, 174:21, 175:13, 178:21, 182:2, 183:3, 185:11, 185:16, 185:18, 185:19, 186:4, 186:13, 186:14, 186:15, 186:19, 186:20, 187:11, 187:19, 187:21, 187:24, 187:25, 188:6, 189:11, 190:15, 192:5, 192:18, 192:22, 193:7, 193:24, 195:3, 196:1, 197:11, 200:2, 200:17, 204:19, 206:15, 206:18, 206:23, 214:25, 215:2
**bart** [2] - 85:7, 90:12
**BART** [2] - 2:2, 3:20
**Bart's** [11] - 53:9, 87:18, 87:22, 88:23, 89:2, 122:13, 122:14, 125:4, 186:17, 188:12, 192:21
**Bart-and-Nathan** [1] - 185:18
**base** [2] - 170:5, 170:16
**Base** [1] - 170:5
**based** [4] - 44:20, 109:16, 109:22, 111:7
**basis** [6] - 16:9, 87:20, 130:3, 132:19, 142:17, 175:5
**battles** [1] - 198:21
**Bauza** [1] - 3:12
**Bay** [1] - 199:10
**BB&T** [10] - 5:13, 10:4, 13:8, 13:11, 13:14, 13:21, 14:3, 14:10, 18:24, 25:1
**BB&T's** [1] - 13:19
**Beach** [8] - 1:16, 50:22, 51:8, 51:9, 51:22, 62:3, 64:8, 93:23
**beautiful** [5] - 67:18, 199:6, 199:7, 199:14, 201:13
**became** [9] - 60:7, 69:25, 74:19, 108:16, 122:16, 171:16, 178:21, 185:18, 199:4
**Becerra** [1] - 1:23
**BECERRA** [1] - 1:9
**become** [8] - 71:4, 78:8, 86:22, 93:14, 107:10, 108:8, 108:12, 212:20
**bedroom** [4] - 27:5, 67:20, 67:21, 201:9
**BEFORE** [1] - 1:9
**beforehand** [1] - 97:1
**begin** [2] - 101:9, 123:21
**beginning** [7] - 13:18, 86:16, 121:19, 123:22, 128:5, 165:10, 196:24
**behalf** [11] - 3:11, 15:22, 24:3, 39:14, 57:25, 105:4, 105:14, 111:8, 140:1, 140:3, 141:12
**belief** [6] - 80:13, 87:1, 88:17, 137:15, 138:4, 140:9
**below** [1] - 118:10
**bench** [1] - 97:9
**beneficial** [1] - 131:3
**beneficiary** [3] - 81:6, 81:15, 81:20
**benefit** [5] - 30:21, 80:15, 80:16, 81:2, 139:24
**Berra** [1] - 123:21
**best** [20] - 31:1, 31:4, 49:22, 59:1, 59:8, 68:20, 68:22, 89:16, 90:2, 92:3, 122:15, 136:22, 148:5, 159:14, 159:19, 162:2, 186:17, 194:12, 198:24, 207:20
**better** [14] - 12:8, 52:1, 86:11, 88:1, 88:14, 88:15, 88:17, 139:3, 167:19, 199:19, 217:11, 217:13
**between** [52] - 11:10, 11:16, 12:15, 12:23, 26:23, 29:4, 29:9, 37:16, 50:10, 51:17, 60:24, 61:15, 62:15, 62:18, 66:7, 66:13, 66:17, 67:3, 67:7, 68:10, 68:13, 69:22, 70:3, 70:4, 81:13, 84:17, 84:21, 85:24, 87:2, 87:10, 87:14, 87:25, 88:13, 90:7, 90:16, 90:19, 90:22, 90:25, 91:3, 95:12, 95:17, 96:3, 96:16, 107:2, 121:20, 122:2, 122:9, 130:8, 145:1, 151:11, 167:12, 179:8
**beyond** [3] - 216:20, 216:21
**big** [4] - 51:2, 51:11, 158:9, 200:11
**biggest** [1] - 116:11
**bill** [1] - 96:14
**billed** [1] - 195:9
**bind** [1] - 71:23
**binding** [1] - 81:2
**Biscayne** [3] - 53:5, 63:2, 118:14
**bit** [6] - 64:9, 75:9, 86:13, 123:20, 158:21, 165:10
**Blackstone's** [1] - 177:12
**blame** [1] - 167:7
**blessed** [1] - 51:8
**block** [1] - 201:13
**Blutrich** [2] - 29:22, 30:1
**bookkeeper** [2] - 39:13, 39:15
**boot** [2] - 35:6, 38:18
**born** [2] - 51:8, 177:16
**borrow** [8] - 24:21, 119:3, 204:20, 213:25, 214:3, 214:10, 214:25, 215:2
**borrowed** [8] - 124:5, 124:13, 134:2, 134:16, 139:13, 174:15, 203:19, 207:15
**Bortunk** [1] - 73:6
**bothered** [1] - 101:1
**bottom** [10] - 10:1, 15:7, 20:24, 20:25, 28:22, 38:2, 42:19, 75:12, 181:3
**bought** [4] - 33:11, 60:4, 174:11, 176:10
**Boulevard** [1] - 53:5
**bound** [2] - 171:18, 171:19
**Boyd** [1] - 1:18
**break** [18] - 35:20, 47:7, 47:8, 48:21, 48:22, 53:24, 56:20, 56:25, 57:3, 57:4, 57:7, 57:19, 66:17, 97:1, 97:3, 158:22, 211:9
**breath** [2] - 139:1, 217:19
**bridge** [1] - 45:23
**brief** [5] - 47:4, 93:8, 131:12, 145:15, 178:5
**briefly** [1] - 41:7
**bright** [1] - 217:18
**bring** [16] - 3:15, 16:12, 58:7, 67:22, 83:11, 85:12, 85:13, 97:23, 98:12, 101:4, 137:10, 159:3, 159:4, 178:8, 207:21, 208:24
**bringing** [5] - 17:22, 52:18, 71:10, 129:2, 188:24
**brings** [1] - 52:16
**broaching** [1] - 135:2
**broke** [3] - 63:18, 63:19, 172:14
**broken** [1] - 163:6
**broker** [2] - 17:12, 27:11
**brokerage** [2] - 34:25, 86:2
**brother** [4] - 119:7, 122:24, 123:4, 157:22
**brought** [9] - 18:14, 33:11, 33:13, 53:2, 85:14, 85:20, 154:25, 175:3, 177:6
**Bseidler@parkbell.net** [1] - 193:24
**build** [1] - 155:21
**building** [12] - 53:21, 53:22, 54:13, 60:5, 60:19, 87:18, 87:22, 88:23, 89:3, 200:2, 200:17
**Building** [5] - 53:25, 54:2, 54:6, 86:4, 87:24
**built** [1] - 60:25
**bunch** [1] - 101:8
**Business** [1] - 92:18
**business** [53] - 27:7, 27:9, 27:14, 27:18, 29:4, 39:1, 39:6, 39:20, 47:14, 47:15, 47:22, 48:1, 48:4, 48:7, 52:24, 53:3, 55:3, 62:9, 63:19, 66:5, 75:20, 75:23, 85:7, 85:8, 85:13, 85:23, 86:1, 86:21, 86:22, 88:19, 93:2, 93:4, 94:1, 119:18, 128:7, 128:8, 130:18, 136:13, 158:10, 168:22, 175:18, 175:20, 175:21, 176:24, 177:1, 177:11, 177:12, 177:14, 177:17, 177:24, 199:19, 206:1
**business-wise** [1] - 88:19
**businessman** [1] - 213:23
**busy** [1] - 60:6
**but..** [2] - 27:16, 29:8
**buy** [8] - 17:11, 34:14, 50:16, 94:7, 112:24, 175:19, 200:5, 214:10
**buyer** [14] - 30:19, 60:11, 60:14, 99:17, 99:18, 103:9, 104:6, 106:21, 107:2, 107:23, 109:18, 110:9, 110:14, 113:25
**buyers** [1] - 33:4
**buying** [1] - 204:15
**BY** [151] - 1:21, 3:22, 4:15, 5:21, 10:13, 11:23, 12:13, 12:22, 14:2, 15:6, 16:14, 17:21, 18:9, 18:19, 19:4, 20:11, 20:14, 21:16, 21:19, 31:13, 35:23, 36:4, 36:10, 37:15, 38:3, 39:21, 39:24, 40:8, 40:15, 42:21, 47:10, 49:17, 52:13, 53:23, 55:2, 56:22, 57:23, 58:9, 59:10, 60:21, 61:13, 61:23, 63:1, 64:16, 72:5, 74:4, 74:11, 75:5, 75:11, 75:24, 76:23, 78:23, 79:7, 82:16, 83:13, 85:4, 85:22, 88:12, 89:12, 92:15, 93:12, 94:13, 95:10, 102:9, 102:20, 104:22, 105:23, 109:4, 110:3, 110:13, 111:15, 114:17, 115:1, 116:3, 119:17, 121:16, 123:19, 125:15, 126:16, 127:8, 129:18, 130:6,

131:20, 132:22, 133:10, 134:18, 139:16, 139:18, 140:18, 140:23, 141:3, 141:6, 142:15, 142:20, 144:1, 145:16, 149:15, 152:10, 156:11, 159:10, 162:9, 163:9, 165:8, 166:21, 168:16, 169:14, 169:23, 170:18, 172:3, 174:4, 175:7, 175:17, 176:20, 178:9, 179:6, 179:22, 180:2, 182:1, 182:19, 184:1, 184:24, 185:5, 186:11, 187:9, 189:5, 190:20, 192:4, 193:18, 193:22, 195:2, 195:25, 196:10, 197:3, 201:23, 202:16, 202:23, 203:18, 204:11, 205:16, 207:13, 207:24, 208:15, 208:20, 209:13, 210:11, 211:12, 212:2, 212:22, 213:3, 213:14, 213:22

## C

**calculate** [1] - 44:20
**calculations** [1] - 147:13
**calculator** [2] - 145:15, 145:19
**calendar** [5] - 48:23, 57:3, 57:18, 57:19, 170:16
**California** [1] - 5:4
**cancel** [1] - 132:4
**cannot** [5] - 151:6, 152:15, 202:21, 206:15, 206:18
**capable** [1] - 176:7
**capacity** [2] - 55:20, 178:11
**capital** [57] - 6:9, 6:10, 6:14, 7:12, 8:11, 9:9, 17:2, 17:3, 17:7, 17:23, 19:8, 19:12, 26:7, 27:22, 31:21, 32:19, 33:10, 33:13, 33:14, 33:19, 33:24, 34:4, 34:6, 34:9, 34:10, 40:11, 40:17, 40:20, 40:25, 41:10, 42:17, 43:2, 43:10, 43:24, 44:1, 44:3, 58:10, 58:11, 63:20, 65:12, 65:15, 65:19, 65:23, 68:15, 69:14, 90:20, 94:24, 95:18, 118:2, 120:10, 142:9, 152:24, 153:12, 172:11, 173:8, 187:13, 188:1
**car** [1] - 55:14
**card** [1] - 96:8
**care** [5] - 74:20, 99:7, 216:24, 217:3
**career** [3] - 77:24, 78:25, 177:1
**careful** [1] - 114:6
**cars** [2] - 155:3, 157:5
**cartel** [1] - 51:11
**Casabielle** [15] - 3:12, 126:4, 135:2, 135:12, 138:10, 138:11, 138:22, 176:12, 178:5, 215:22, 216:12, 216:15, 216:16, 217:2, 217:8
**CASABIELLE** [192] - 1:17, 51:20, 53:13, 56:9, 57:13, 60:16, 61:16, 62:24, 63:10, 75:18, 78:6, 88:2, 88:5, 89:7, 98:8, 98:18, 99:17, 100:11, 111:13, 111:15, 114:11, 114:24, 115:5, 119:15, 119:17, 121:16, 123:19, 125:15, 125:19, 126:8, 126:16, 127:8, 129:17, 129:18, 130:2, 130:6, 131:20, 132:22, 133:4, 133:10, 134:18, 136:5, 136:21, 136:24, 138:23, 139:3, 139:7, 139:16, 139:18, 140:18, 140:23, 141:3, 141:6, 142:15, 142:20, 143:14, 143:23, 144:1, 145:14, 145:16, 149:9, 149:14, 149:15, 152:2, 152:10, 156:11, 158:25, 159:8, 159:10, 162:6, 162:8, 162:9, 162:21, 163:5, 163:7, 163:9, 165:2, 165:8, 166:21, 168:16, 169:11, 169:13, 169:14, 169:18, 169:22, 169:23, 170:18, 171:23, 172:3, 174:4, 175:7, 175:17, 176:17, 176:20, 178:1, 178:4, 178:6, 178:9, 179:2, 179:5, 179:6, 179:21, 179:22, 180:2, 181:16, 181:20, 181:22, 181:24, 182:1, 182:8, 182:11, 182:16, 182:19, 184:1, 184:20, 184:24, 185:4, 185:5, 186:11, 186:25, 187:4, 187:6, 187:8, 187:9, 189:5, 190:20, 191:14, 191:16, 191:20, 191:25, 192:3, 192:4, 193:10, 193:17, 193:18, 193:21, 193:22, 194:20, 194:23, 194:25, 195:2, 195:18, 195:23, 195:25, 196:6, 196:10, 196:23, 197:3, 201:15, 201:22, 201:23, 202:8, 202:12, 202:15, 202:16, 202:23, 203:6, 203:11, 203:16, 203:18, 204:3, 204:8, 204:10, 204:11, 205:14, 205:16, 207:10, 207:13, 207:22, 207:24, 208:15, 208:20, 209:11, 209:13, 210:11, 210:25, 211:6, 211:11, 211:12, 212:2, 212:22, 213:3, 213:14, 213:22, 216:9, 216:17, 217:10, 217:12, 218:4, 218:6, 218:8, 218:10
**Case** [1] - 3:2
**case** [28] - 11:6, 25:14, 28:13, 34:13, 48:12, 49:3, 63:23, 77:18, 77:21, 78:2, 78:10, 80:1, 97:4, 97:5, 97:15, 100:23, 100:25, 112:18, 133:17, 133:25, 136:8, 140:2, 188:25, 189:1, 214:7, 215:15, 215:16
**CASE** [1] - 1:2
**cases** [4] - 50:15, 50:17, 57:17, 185:16
**cash** [32] - 35:4, 35:10, 59:22, 59:24, 71:14, 86:21, 86:24, 95:5, 95:6, 96:5, 117:21, 131:18, 156:13, 157:10, 163:20, 164:2, 164:8, 164:15, 164:20, 165:11, 165:19, 166:1, 166:3, 166:12, 166:13, 166:17, 166:20, 166:23, 167:13, 186:19, 186:20
**catch** [2] - 30:16, 155:24
**caused** [1] - 137:15
**Causeway** [2] - 67:16, 67:19
**cease** [2] - 120:19, 120:21
**ceased** [1] - 120:22
**Central** [1] - 124:4
**cents** [1] - 170:7
**Century** [4] - 67:1, 67:3, 200:3, 200:20
**certain** [12] - 13:23, 73:8, 81:9, 98:4, 106:3, 106:15, 117:13, 117:23, 133:13, 136:25, 142:5, 188:13
**certainly** [14] - 8:3, 8:16, 11:10, 25:13, 25:18, 114:4, 114:5, 118:4, 124:12, 145:5, 151:17, 180:8, 206:8
**certificate** [4] - 82:13, 82:17, 82:25, 83:6
**certify** [1] - 218:13
**cetera** [1] - 53:11
**chance** [3] - 66:9, 131:24, 203:8
**change** [6] - 86:11, 87:2, 87:5, 87:6, 87:9, 87:13
**changed** [3] - 86:9, 86:14, 157:8
**check** [5] - 14:25, 30:6, 35:24, 36:6, 43:4
**checks** [1] - 151:12
**chief** [2] - 48:12, 49:3
**child** [2] - 70:15, 70:17
**choose** [2] - 198:20, 198:23
**chose** [5] - 118:22, 160:7, 177:7, 198:21, 201:2
**chunk** [1] - 111:7
**circles** [1] - 143:6
**cities** [1] - 51:12
**City** [1] - 28:19
**claim** [5] - 14:9, 109:20, 180:25, 212:21, 214:19
**claiming** [1] - 109:16
**clarify** [2] - 160:11, 165:10
**clause** [4] - 171:11, 172:16, 178:15, 197:7
**clauses** [2] - 178:17, 209:3
**clear** [6] - 59:7, 59:13, 85:11, 87:16, 183:2, 197:11
**clearing** [1] - 114:23
**clearly** [8] - 85:17, 88:8, 151:13, 154:20, 171:15, 174:9, 216:17, 216:24
**client** [26] - 3:9, 3:12, 37:11, 52:11, 78:14, 85:20, 88:6, 98:10, 98:15, 98:21, 107:17, 107:20, 113:10, 114:9, 135:23, 137:8, 137:10, 137:11, 137:21, 138:4, 138:16, 138:21, 140:6, 140:8, 215:11
**client's** [3] - 98:5, 100:15, 137:13
**clients** [1] - 86:6
**Clinton** [1] - 3:8
**close** [16] - 66:25, 103:8, 103:18, 103:22, 104:18,

105:14, 109:18, 110:9, 126:5, 132:1, 133:14, 159:22, 160:12, 174:23, 200:7, 204:21
**closed** [11] - 47:23, 50:25, 63:19, 109:10, 109:21, 112:14, 112:19, 112:20, 133:1, 133:16, 160:4
**closer** [2] - 84:1, 88:10
**closes** [1] - 104:4
**closing** [62] - 11:15, 11:21, 12:21, 31:14, 31:17, 31:18, 31:24, 32:3, 32:6, 32:24, 34:23, 34:25, 36:13, 37:18, 37:20, 44:8, 44:10, 44:12, 44:15, 44:18, 59:17, 76:21, 76:24, 94:14, 98:10, 103:1, 103:2, 103:4, 103:5, 103:6, 104:1, 104:2, 104:5, 104:7, 104:8, 105:5, 106:10, 107:10, 107:24, 108:23, 109:17, 109:20, 109:21, 110:8, 110:17, 110:19, 110:23, 111:6, 111:19, 111:22, 112:6, 112:13, 113:24, 114:1, 114:3, 115:4, 129:13, 166:4, 166:18, 166:25, 167:6, 167:8
**closings** [1] - 160:3
**clothing** [1] - 109:19
**cocounsel** [2] - 3:7, 47:4
**collapse** [4] - 116:11, 116:12, 116:14, 123:11
**collapsed** [2] - 117:4, 198:9
**collapsing** [1] - 116:22
**collateral** [16] - 116:18, 135:11, 136:7, 137:1, 140:13, 140:24, 207:14, 207:15, 207:17, 208:6, 208:9, 208:22, 208:25, 214:16, 214:24, 216:5
**collateralize** [5] - 208:7, 208:10, 213:8, 213:16, 213:25
**collateralized** [2] - 205:12, 214:8
**collateralizes** [1] - 214:16
**collateralizing** [1] - 213:12
**COLLETTI** [2] - 2:6, 102:7
**Colletti** [10] - 98:1, 99:13, 100:8, 100:9, 101:17, 102:5, 102:10, 111:16, 111:18, 114:18
**Colonial** [6] - 13:10, 13:11, 13:20, 13:21, 59:12
**Colonnelli** [1] - 1:18
**colors** [1] - 71:9
**column** [4] - 26:15, 76:2, 76:9, 76:22
**combination** [1] - 200:24
**comfort** [1] - 48:21
**comfortable** [1] - 208:23
**comforted** [1] - 127:24
**coming** [15] - 21:21, 26:16, 42:8, 50:22, 51:10, 57:17, 85:18, 87:16, 90:5, 172:5, 173:17, 173:18, 187:22, 204:17, 204:20
**commence** [2] - 171:3, 196:16
**commencement** [4] - 170:13, 170:15, 171:4, 196:16
**commencing** [1] - 170:12
**comments** [1] - 76:6
**commission** [3] - 27:13, 27:17, 85:21
**commitment** [4] - 103:7, 103:8, 103:13, 103:17
**common** [8] - 78:10, 78:11, 78:15, 79:1, 79:14, 79:16, 79:19, 80:8
**commonly** [1] - 177:19
**communicated** [1] - 154:16
**communicating** [1] - 91:7
**communication** [11] - 21:21, 21:24, 62:14, 90:22, 90:25, 91:3, 92:6, 98:23, 187:19, 187:21
**communications** [5] - 98:11, 98:15, 98:17, 98:19, 154:18
**community** [1] - 70:15
**companies** [5] - 24:22, 55:17, 72:23, 106:16, 134:9
**company** [41] - 4:8, 22:11, 22:14, 30:23, 31:2, 31:4, 36:17, 36:18, 36:25, 37:2, 43:14, 43:20, 43:21, 43:23, 47:24, 55:4, 69:19, 69:23, 69:24, 69:25, 91:25, 93:17, 104:8, 104:11, 104:13, 105:3, 105:14, 105:17, 106:5, 106:8, 107:6, 109:19, 111:8, 136:13, 155:22, 181:13, 184:5, 184:16, 200:8, 205:25
**company's** [3] - 42:23, 43:16, 43:24
**compared** [2] - 116:11, 198:8
**complain** [1] - 113:23
**complete** [5] - 51:9, 175:13, 178:13, 180:14, 191:3
**completely** [5] - 84:8, 171:17, 185:2, 189:20, 198:22
**completeness** [2] - 136:16, 211:4
**completing** [1] - 53:18
**complied** [1] - 55:25
**comply** [5] - 159:17, 159:20, 181:7, 205:19, 205:21
**compound** [2] - 17:1, 166:15
**concede** [1] - 117:23
**Concept** [5] - 4:8, 4:10, 4:16, 5:8, 91:14
**concern** [2] - 113:5, 131:21
**concerned** [4] - 132:14, 132:15, 133:12, 133:15
**concerning** [2] - 103:19, 104:17
**conditions** [2] - 65:18, 65:21
**condominium** [1] - 85:19
**conduct** [5] - 19:21, 20:19, 20:24, 21:1, 217:19
**confer** [1] - 47:4
**conference** [4] - 63:15, 64:14, 135:1, 139:5
**confident** [2] - 54:20, 56:1
**confidential** [13] - 22:8, 22:17, 22:20, 22:24, 23:14, 23:18, 24:4, 24:7, 26:10, 27:1, 84:10, 84:12, 118:20
**confidentiality** [2] - 23:21, 24:1
**confirm** [1] - 89:22
**confirms** [1] - 88:17
**conflict** [4] - 101:14, 108:3, 108:4, 171:13
**conflicted** [1] - 108:8
**conflicts** [2] - 30:19, 108:1
**confusing** [3] - 36:24, 121:10, 144:23
**conjunction** [3] - 73:5, 108:17, 168:18
**connected** [1] - 168:21
**connection** [5] - 103:12, 103:15, 104:12, 105:6, 107:22
**consents** [2] - 30:18, 107:21
**consequences** [3] - 207:6, 211:17, 212:12
**consider** [5] - 37:6, 47:13, 47:21, 48:9, 83:6
**considered** [2] - 55:9, 198:23
**consistent** [2] - 75:6, 175:18
**constitute** [1] - 69:2
**consult** [8] - 11:3, 11:7, 11:11, 11:18, 12:14, 12:25, 13:5, 14:16
**consummated** [1] - 69:3
**consummation** [1] - 108:3
**contacted** [1] - 122:25
**contacts** [1] - 84:23
**contemplated** [4] - 5:9, 5:10, 80:4, 153:19
**contend** [5] - 16:25, 43:11, 44:4, 135:18, 137:25
**contending** [1] - 155:2
**contention** [7] - 98:10, 151:7, 152:6, 153:4, 153:6, 153:8, 157:18
**contents** [2] - 15:8, 202:3
**context** [7] - 20:16, 32:17, 62:1, 85:5, 85:14, 91:4, 195:5
**contingencies** [1] - 154:14
**continue** [9] - 3:19, 64:15, 65:8, 91:20, 113:21, 139:6, 159:7, 194:16, 217:15
**continued** [3] - 113:25, 118:24, 218:3
**CONTINUED** [2] - 3:21, 116:2
**continues** [2] - 172:11, 194:17
**continuing** [1] - 64:7
**contract** [29] - 11:16, 12:15, 12:24, 13:5, 22:5, 30:4, 30:24, 50:19, 58:1, 59:13, 59:14, 59:20, 60:3, 60:9, 68:20, 69:6, 69:9, 91:6, 107:4, 107:9, 107:12, 107:16, 108:12, 108:13, 108:21, 126:20, 126:21, 129:22, 136:3
**contracts** [5] - 107:10, 108:1, 128:2, 132:24, 204:16
**contractual** [4] - 154:7, 154:9, 154:10, 154:13
**contrary** [1] - 82:18
**contribute** [2] - 14:7, 26:8
**contributed** [2] - 76:24, 162:17
**contribution** [24] - 14:9, 17:2, 17:4, 17:7, 17:23, 27:22, 58:10, 58:11, 63:20, 65:15, 65:19, 65:23, 68:15, 90:20, 118:3,

120:10, 128:24, 142:9, 163:14, 172:23, 172:24, 173:7, 187:13, 188:1
**contributions** [14] - 31:22, 32:19, 42:18, 43:2, 43:11, 43:24, 44:1, 44:4, 65:12, 152:24, 153:13, 172:12, 173:9
**control** [5] - 50:18, 52:15, 65:5, 65:6, 116:19
**conversations** [1] - 77:8
**convince** [2] - 50:24, 167:21
**cookie** [1] - 157:5
**cooperating** [1] - 14:19
**copacetic** [1] - 191:7
**copied** [3] - 182:23, 182:24, 197:21
**copies** [1] - 136:18
**copy** [13] - 18:11, 32:5, 58:4, 162:25, 163:2, 163:10, 169:15, 182:15, 182:20, 187:10, 192:10, 201:20, 203:15
**copying** [3] - 185:17, 187:11, 195:7
**corner** [2] - 36:7, 67:15
**Corp** [1] - 4:17
**corporation** [2] - 55:11, 105:13
**CORPORATION** [1] - 1:6
**Corporation** [5] - 3:3, 24:13, 25:9, 29:22, 29:23
**Corporations** [2] - 93:17, 93:19
**corporations** [1] - 56:7
**correct** [118] - 6:6, 6:11, 7:1, 7:8, 7:10, 7:15, 8:3, 8:7, 8:12, 9:7, 9:11, 10:20, 10:22, 12:17, 13:2, 13:20, 13:23, 14:7, 14:8, 14:10, 14:11, 14:14, 14:15, 14:17, 14:19, 14:20, 14:22, 16:1, 16:4, 16:17, 17:24, 18:21, 18:25, 19:7, 19:16, 19:17, 21:13, 22:10, 22:19, 23:3, 23:8, 23:12, 23:19, 23:20, 23:22, 23:23, 23:25, 24:12, 25:8, 25:11, 26:18, 26:20, 27:4, 28:7, 28:9, 28:13, 28:16, 28:19, 29:10, 29:23, 30:19, 30:20, 30:24, 31:15, 31:16, 31:22, 31:23, 31:25, 32:1, 32:3, 32:4, 32:10, 33:3, 34:5, 34:8, 34:15, 34:16, 34:18, 34:21, 36:12, 36:16, 38:19, 40:4, 40:20, 41:3, 41:11, 41:13, 59:24, 76:8, 76:24, 91:10, 113:6, 113:7, 113:14, 119:20, 124:2, 128:10, 134:3, 137:1, 141:13, 143:20, 147:14, 148:25, 149:23, 162:12, 162:19, 163:15, 163:17, 164:21, 165:12, 166:5, 169:18, 173:11, 190:12, 198:1, 198:12, 207:11, 212:24
**corrected** [2] - 124:21, 150:2
**correcting** [2] - 163:22, 163:23
**correspondence** [3] - 30:9, 121:20, 122:2
**cosign** [1] - 139:25
**cost** [2] - 166:24, 172:15
**costs** [1] - 166:5
**Counsel** [5] - 49:13, 57:21, 97:7, 175:5, 195:13
**counsel** [8] - 3:4, 16:11, 41:25, 45:2, 78:13, 79:3, 101:15, 111:24
**count** [3] - 66:24, 67:7, 95:25
**counterpart** [1] - 107:3
**country** [2] - 37:2, 37:17
**couple** [4] - 67:2, 95:25, 118:8, 122:19
**courier** [1] - 9:15
**course** [20] - 15:15, 15:17, 19:21, 20:19, 20:24, 21:1, 38:25, 39:6, 41:14, 66:5, 78:25, 122:6, 134:9, 155:11, 166:19, 166:22, 166:25, 167:1, 172:22, 177:19
**COURT** [250] - 1:1, 3:4, 3:14, 3:17, 11:25, 12:4, 12:8, 12:10, 12:19, 15:2, 16:9, 16:11, 17:19, 18:1, 18:3, 18:6, 20:10, 20:13, 37:10, 39:20, 41:22, 41:25, 42:2, 42:8, 42:11, 42:13, 45:2, 45:5, 45:7, 45:11, 45:14, 45:19, 45:22, 46:2, 46:4, 46:8, 46:12, 46:18, 46:22, 47:1, 47:6, 48:13, 48:15, 48:19, 48:22, 48:25, 49:3, 49:13, 51:21, 51:25, 52:2, 52:5, 53:14, 56:11, 56:15, 56:18, 56:20, 57:1, 57:7, 57:14, 57:17, 58:6, 59:2, 59:5, 60:17, 61:10, 61:18, 61:22, 62:25, 63:11, 63:14, 63:16, 63:24, 64:15, 74:8, 75:19, 78:7, 78:13, 79:3, 79:5, 85:16, 88:4, 88:8, 89:9, 93:7, 93:11, 96:23, 97:7, 97:12, 97:19, 97:23, 98:5, 98:14, 98:20, 99:1, 99:6, 99:15, 99:19, 100:5, 100:9, 100:14, 100:17, 100:23, 101:6, 101:18, 101:24, 102:16, 102:19, 111:12, 114:12, 114:25, 115:7, 115:10, 115:12, 115:15, 115:18, 115:22, 119:14, 121:15, 123:18, 125:14, 125:22, 126:4, 127:5, 129:6, 129:9, 129:12, 130:3, 130:5, 131:16, 132:19, 132:21, 134:22, 134:25, 135:8, 135:22, 136:4, 136:20, 136:22, 137:8, 137:19, 138:1, 138:7, 138:25, 139:6, 140:16, 140:21, 141:1, 141:5, 142:17, 142:19, 143:18, 143:22, 151:25, 156:9, 158:21, 158:24, 159:3, 159:6, 161:25, 162:7, 162:25, 163:4, 163:6, 163:8, 166:16, 168:11, 169:10, 169:12, 169:20, 170:8, 170:9, 173:25, 175:4, 175:10, 176:12, 176:19, 178:3, 179:3, 180:1, 181:19, 181:21, 181:23, 182:14, 182:18, 183:19, 183:25, 184:17, 184:22, 185:1, 186:6, 187:3, 187:5, 187:7, 189:4, 190:19, 191:23, 192:2, 193:11, 193:13, 193:20, 193:25, 194:4, 194:8, 194:12, 194:16, 194:22, 195:1, 195:10, 195:19, 201:8, 201:20, 202:4, 202:10, 202:13, 202:18, 203:5, 203:7, 203:14, 204:4, 204:6, 204:9, 205:15, 207:23, 208:14, 208:18, 209:9, 210:4, 210:8, 210:10, 211:3, 211:7, 211:22, 211:24, 212:15, 213:2, 213:11, 213:18, 215:11, 215:20, 215:25, 216:6, 216:10, 216:18, 216:20, 217:11, 217:13, 218:5, 218:7, 218:9
**Court** [12] - 1:22, 1:23, 3:1, 133:4, 139:7, 143:16, 143:17, 152:3, 165:2, 211:6, 218:18, 218:18
**court** [5] - 59:2, 97:11, 97:15, 216:21, 218:1
**courtroom** [2] - 216:25, 217:5
**COURTROOM** [12] - 3:2, 49:7, 49:9, 49:12, 73:22, 73:25, 101:19, 101:25, 102:3, 102:6, 159:4, 215:17
**cover** [2] - 162:3, 172:1
**CPA** [2] - 41:7, 74:17
**cranky** [1] - 190:3
**crazy** [1] - 117:21
**create** [1] - 75:25
**created** [1] - 89:22
**creating** [1] - 89:17
**credit** [2] - 96:8, 118:9
**crime** [1] - 64:8
**Crimson** [9] - 16:23, 18:24, 22:9, 23:19, 24:25, 26:11, 27:2, 28:1, 84:12
**crisis** [2] - 64:9, 118:1
**CROSS** [3] - 3:21, 111:14, 119:16
**cross** [6] - 14:9, 45:23, 111:12, 119:14, 123:18, 126:2
**Cross** [3] - 2:2, 2:5, 2:7
**cross-claim** [1] - 14:9
**cross-examination** [4] - 111:12, 119:14, 123:18, 126:2
**CROSS-EXAMINATION** [3] - 3:21, 111:14, 119:16
**Cross-Examination...........Page** [3] - 2:2, 2:5, 2:7
**Crosstalk** [2] - 156:8, 193:12
**cry** [1] - 189:21
**crystal** [2] - 178:24, 197:11
**cumulative** [1] - 130:4
**cure** [2] - 82:23, 181:8
**cured** [1] - 82:23
**current** [1] - 71:11
**customarily** [1] - 110:7
**customers** [3] - 75:21, 75:23

## D

**D18** [5] - 191:14, 191:15, 191:16, 191:17, 191:20
**D22** [2] - 191:21, 192:3
**DA** [1] - 191:14
**Dad** [1] - 124:14

**dad** [11] - 126:22, 127:14, 127:21, 128:4, 128:23, 129:19, 129:21, 130:13, 131:21, 131:25, 132:10
**daily** [1] - 87:20
**damage** [1] - 116:18
**Dan** [3] - 3:13, 53:10, 119:7
**dangerous** [1] - 51:13
**Daniel** [1] - 73:6
**Danny** [1] - 73:10
**Danuska** [1] - 73:6
**dark** [2] - 84:9, 88:22
**date** [28] - 6:4, 15:25, 16:3, 26:9, 26:10, 26:17, 26:23, 27:23, 34:4, 40:23, 82:23, 153:17, 170:13, 170:15, 171:4, 171:5, 175:25, 176:3, 182:4, 192:19, 192:20, 196:17, 205:7, 205:25, 213:20
**DATE** [1] - 218:17
**dated** [3] - 4:17, 8:6, 195:3
**dates** [1] - 88:25
**day-to-day** [1] - 185:15
**days** [10] - 6:25, 27:23, 28:2, 64:4, 66:4, 82:22, 145:1, 184:7, 190:8, 195:24
**days'** [2] - 125:7, 154:21
**deal** [70] - 52:18, 53:2, 54:14, 54:16, 54:20, 58:14, 63:25, 64:1, 69:12, 76:16, 82:5, 94:17, 94:19, 113:13, 119:3, 119:4, 122:5, 123:23, 124:6, 128:1, 128:4, 128:6, 128:13, 128:14, 130:14, 130:19, 131:1, 131:3, 131:23, 132:4, 132:16, 133:8, 133:14, 133:16, 137:10, 151:14, 155:5, 155:8, 155:9, 155:14, 156:1, 156:4, 156:12, 156:20, 162:15, 172:9, 173:12, 173:23, 174:2, 174:3, 174:5, 174:8, 174:9, 174:10, 174:16, 175:1, 175:15, 175:16, 175:19, 177:1, 177:4, 177:5, 177:22, 177:24, 184:6, 202:17
**dealing** [4] - 13:17, 36:16, 88:19, 107:5
**deals** [14] - 50:18, 53:4, 53:7, 62:8, 70:12, 72:25, 86:24, 116:19, 117:22, 117:23, 118:24, 119:8, 182:25, 204:21
**dealt** [3] - 12:20, 103:18, 151:10
**debt** [6] - 64:2, 118:10, 118:12, 178:21, 178:22, 213:15
**debts** [3] - 198:12, 198:15, 199:15
**decade** [1] - 206:8
**December** [14] - 21:8, 21:20, 24:9, 26:4, 26:10, 26:14, 26:24, 28:2, 34:18, 43:15, 85:5, 147:9, 147:11, 150:14
**decide** [1] - 167:6
**decided** [2] - 120:23, 200:16
**deciding** [1] - 24:3
**decision** [7] - 76:4, 80:14, 164:24, 164:25, 165:7, 167:21, 199:19
**decision-maker** [1] - 76:4
**declined** [2] - 53:4, 53:8
**deduct** [3] - 34:24, 166:23, 212:19
**deducting** [1] - 32:19
**deed** [1] - 117:24
**deep** [1] - 217:19
**default** [49] - 5:18, 6:16, 6:23, 6:25, 7:4, 7:7, 7:8, 7:10, 7:13, 7:18, 7:20, 7:25, 8:5, 8:17, 9:20, 9:22, 9:25, 10:2, 10:4, 10:10, 10:14, 10:15, 10:16, 10:21, 10:22, 10:25, 11:1, 11:4, 11:7, 11:12, 28:9, 28:10, 82:20, 82:22, 82:23, 83:1, 145:3, 145:4, 151:16, 153:3, 153:16, 153:18, 187:15, 188:1, 189:24, 190:7, 214:11
**defaulted** [1] - 82:10
**defaults** [1] - 153:12
**defend** [2] - 14:7, 14:10
**defendant** [4] - 3:11, 45:10, 46:6, 46:16
**Defendant** [1] - 1:7
**DEFENDANT** [2] - 1:17, 3:20
**defendant's** [1] - 46:1
**Defendant's** [22] - 2:9, 2:10, 2:10, 2:11, 2:11, 2:12, 2:12, 2:13, 2:13, 2:14, 41:15, 42:5, 42:6, 42:16, 45:6, 46:10, 46:14, 46:20, 46:24, 93:10, 143:18
**defendants** [2] - 63:18, 216:3
**defense** [8] - 41:22, 42:2, 48:15, 63:21, 64:6, 101:10, 172:20, 190:12
**Defense** [20] - 41:23, 42:3, 42:11, 42:14, 45:9, 45:25, 46:5, 46:9, 46:13, 46:19, 46:23, 47:2, 126:11, 143:15, 143:24, 159:9, 169:7, 181:20, 204:7, 216:8
**defenses** [3] - 13:23, 14:3, 14:6
**defer** [2] - 34:4, 211:8
**deficit** [1] - 147:18
**define** [5] - 168:5, 169:1, 169:3, 170:19, 171:11
**defined** [3] - 167:23, 168:2, 170:13
**definitely** [4] - 55:18, 61:8, 87:4, 88:22
**Delano** [1] - 51:18
**delegate** [3] - 73:2, 73:13, 73:14
**delegating** [1] - 75:1
**delegation** [1] - 74:22
**delivery** [3] - 81:1, 107:23, 107:25
**demanded** [3] - 6:3, 9:7, 55:25
**demanding** [4] - 6:5, 8:7, 8:23, 186:13
**Department** [1] - 92:18
**depended** [1] - 96:1
**depo** [1] - 20:7
**deposed** [1] - 138:17
**deposit** [11] - 24:9, 33:2, 33:5, 33:6, 35:1, 35:12, 126:21, 128:3, 129:24, 131:22, 132:2
**deposited** [3] - 25:4, 127:11, 127:12
**depositing** [5] - 71:14, 130:9, 130:11, 130:13, 131:5
**deposition** [14] - 19:23, 20:4, 20:9, 108:18, 111:25, 112:21, 114:19, 175:23, 175:25, 176:13, 176:16, 176:21, 179:23, 180:23
**depositions** [1] - 176:1
**deposits** [1] - 130:7
**DEPUTY** [12] - 3:2, 49:7, 49:9, 49:12, 73:22, 73:25, 101:19, 101:25, 102:3, 102:6, 159:4, 215:17
**derive** [2] - 94:23, 95:1
**describe** [4] - 202:3, 202:10, 202:14, 202:21
**described** [1] - 38:23
**describing** [1] - 202:22
**deserve** [1] - 178:24
**designated** [1] - 25:13
**desire** [3] - 91:19, 98:8, 151:14
**desired** [5] - 5:1, 5:3, 65:8, 151:15, 197:15
**desires** [2] - 65:3, 151:15
**desk** [1] - 185:21
**details** [1] - 160:3
**deteriorate** [1] - 90:4
**deteriorated** [1] - 90:5
**determine** [5] - 11:4, 11:7, 11:11, 13:1, 96:5
**determined** [4] - 34:6, 59:25, 96:4, 103:18
**determines** [1] - 212:17
**detriment** [2] - 80:18, 80:19
**develop** [2] - 60:5, 60:12
**developed** [2] - 171:8, 196:19
**developers** [3] - 62:9, 62:13, 62:16
**developing** [1] - 60:15
**development** [9] - 59:23, 60:2, 60:11, 62:1, 66:5, 163:21, 164:9, 164:15, 164:17
**diagonally** [1] - 54:4
**dictate** [1] - 168:13
**dictated** [1] - 169:5
**difference** [5] - 130:8, 150:4, 160:22, 160:23, 161:1
**different** [18] - 24:16, 71:9, 78:24, 80:5, 80:6, 96:2, 101:12, 112:24, 132:24, 134:8, 142:6, 145:2, 154:22, 155:19, 157:9, 164:23, 176:3, 176:15
**differentiated** [1] - 179:7
**differentiating** [1] - 37:16
**difficult** [1] - 85:18
**difficulties** [1] - 162:24
**difficulty** [1] - 88:7
**digest** [1] - 117:9
**digested** [1] - 117:12
**digits** [1] - 36:6
**diligence** [6] - 50:19, 132:8, 132:9, 132:10, 132:17, 133:9
**dilute** [1] - 190:9
**diluted** [1] - 153:18
**dilution** [2] - 91:1, 187:14
**DIRECT** [3] - 49:16, 102:8, 116:2
**Direct** [2] - 2:4, 2:6
**direct** [4] - 58:25, 62:14, 138:21, 197:4
**direction** [1] - 110:20
**directly** [3] - 36:11, 92:6, 185:16
**director** [1] - 105:2
**disagree** [1] - 23:5
**disappeared** [1] - 186:22
**disburse** [1] - 110:24
**disbursed** [2] - 109:21, 110:19

**disbursements** [1] - 110:22
**disclosed** [3] - 107:11, 108:24, 109:17
**disclosing** [2] - 15:8, 105:12
**discovered** [1] - 183:4
**discovery** [1] - 90:1
**discuss** [5] - 90:14, 98:21, 99:24, 141:9, 169:17
**discussed** [8] - 7:21, 8:13, 58:14, 84:1, 120:25, 122:7, 162:20, 205:22
**dismiss** [1] - 138:15
**dismissed** [1] - 28:13
**dispute** [7] - 148:15, 148:17, 148:22, 150:9, 151:7, 152:6, 152:15
**disregard** [2] - 78:17, 169:16
**dissatisfied** [2] - 193:8, 193:9
**dissolved** [9] - 47:16, 47:23, 47:24, 48:9, 56:2, 56:6, 56:7, 81:8, 81:14
**distinction** [1] - 37:19
**distribute** [3] - 111:3, 111:5, 166:20
**distributed** [4] - 34:20, 67:25, 166:4, 166:18
**distribution** [2] - 31:25, 44:6
**distributions** [1] - 110:17
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [4] - 1:23, 1:24, 218:18, 218:19
**Division** [3] - 93:16, 93:19
**document** [60] - 5:20, 9:23, 10:25, 16:12, 16:13, 18:12, 35:11, 38:14, 39:23, 40:9, 41:19, 45:13, 93:13, 96:14, 104:8, 104:23, 105:16, 105:24, 106:2, 106:7, 106:9, 106:25, 108:8, 108:15, 109:5, 109:7, 109:16, 109:24, 110:4, 110:18, 110:23, 125:5, 135:4, 135:11, 135:12, 135:14, 135:16, 135:19, 135:20, 135:22, 136:16, 136:23, 137:5, 137:17, 137:24, 138:1, 138:2, 171:17, 171:19, 182:14, 208:23, 208:24, 209:5, 209:6, 209:7, 209:12, 216:2
**documentation** [1] - 104:14
**documents** [13] - 19:19, 103:5, 104:17, 105:4, 105:14, 106:15, 108:4, 124:18, 136:25, 137:2, 171:20, 206:22, 215:9
**dog** [1] - 183:5
**dollar** [2] - 157:15, 189:22
**dollars** [28] - 28:21, 29:9, 33:9, 33:14, 34:13, 34:17, 35:2, 35:4, 35:10, 35:25, 36:11, 43:3, 43:5, 43:7, 95:21, 96:20, 117:5, 117:6, 118:9, 118:16, 170:6, 172:15, 182:21, 189:21, 190:5, 204:18, 204:20
**domicile** [1] - 92:23
**done** [28] - 33:24, 50:10, 52:24, 53:3, 62:6, 73:5, 77:24, 78:16, 96:23, 126:2, 132:11, 136:9, 167:2, 186:23, 188:3, 190:13, 191:9, 191:10, 191:11, 192:16, 196:7, 199:11, 199:12, 206:4, 208:1, 216:13, 216:15
**door** [1] - 67:19
**dory** [3] - 186:8, 192:23, 192:25
**double** [1] - 183:2
**doubled** [1] - 123:12
**doubt** [2] - 29:12, 29:14
**down** [41] - 10:2, 12:10, 16:12, 21:10, 27:25, 31:11, 35:22, 36:9, 39:23, 53:24, 63:19, 66:17, 67:22, 69:17, 71:13, 73:17, 75:9, 82:12, 83:12, 95:8, 110:1, 117:5, 117:6, 125:22, 135:8, 135:10, 148:12, 149:9, 151:25, 155:2, 169:22, 170:9, 170:10, 171:23, 201:12, 205:6, 215:25, 216:13, 216:15
**downtown** [5] - 50:23, 53:5, 60:6, 67:16, 89:2
**Downtown** [6] - 51:1, 62:6, 62:14, 64:9, 67:17, 82:6
**dozens** [1] - 161:19
**draft** [1] - 71:14
**drafted** [3] - 55:23, 55:24, 140:7
**drafting** [1] - 140:8
**drastic** [1] - 150:10
**dream** [1] - 174:24
**drop** [1] - 16:12
**due** [15] - 32:2, 50:19, 65:23, 106:6, 106:18, 110:9, 132:8, 132:9, 132:10, 132:17, 133:9, 178:21, 205:9, 213:20
**Duffy** [1] - 3:8
**DUFFY** [1] - 1:14
**duration** [3] - 141:18, 142:12, 143:8
**during** [29] - 4:10, 13:4, 14:16, 25:1, 47:7, 50:21, 63:6, 65:12, 81:13, 83:7, 84:14, 87:7, 95:23, 96:17, 98:11, 100:18, 107:9, 107:11, 111:25, 113:24, 114:2, 132:25, 143:8, 144:8, 179:7, 185:11, 185:13, 186:3, 186:7
**duties** [1] - 178:13
**DX** [2] - 201:16, 203:12
**dX** [1] - 187:4
**DX-1** [1] - 159:9
**DX2** [1] - 196:8

## E

**earliest** [1] - 57:5
**early** [4] - 3:18, 55:16, 88:24, 217:18
**earn** [2] - 27:17, 27:18
**earth** [1] - 132:4
**eased** [1] - 176:10
**eaten** [1] - 62:4
**economic** [3] - 200:22, 201:6, 201:11
**economically** [1] - 201:11
**edification** [1] - 67:9
**education** [1] - 116:15
**effect** [3] - 69:2, 132:11, 167:2
**effective** [1] - 81:1
**effort** [3] - 197:9, 197:16
**efforts** [3] - 59:1, 59:8, 159:14
**eight** [1] - 150:6
**either** [11] - 19:10, 52:5, 59:5, 71:10, 72:11, 75:20, 104:6, 127:17, 127:23, 151:1, 181:4
**elaborate** [6] - 54:11, 58:22, 61:9, 61:11, 68:5, 168:10
**elected** [2] - 6:3, 10:4
**electronic** [1] - 9:15
**elicited** [1] - 100:19
**Elidja** [1] - 3:8
**eliminate** [4] - 128:12, 128:14, 130:19, 131:2
**Elon** [1] - 181:1
**email** [43] - 15:7, 15:10, 15:12, 15:13, 15:19, 15:21, 16:3, 16:5, 20:21, 22:1, 26:24, 74:5, 74:12, 74:15, 76:5, 84:25, 85:1, 85:6, 121:8, 121:25, 131:25, 188:10, 190:15, 192:5, 192:7, 193:19, 193:23, 193:25, 194:1, 194:19, 195:3, 195:4, 195:7, 201:24, 202:6, 202:11, 202:17, 202:19, 202:21, 202:22, 202:24, 203:3
**emailing** [2] - 27:2, 94:2
**emails** [17] - 15:22, 19:22, 88:20, 90:7, 90:11, 90:16, 90:19, 121:4, 121:6, 121:9, 121:11, 121:25, 122:1, 122:9, 154:15, 183:4, 193:1
**emblematic** [1] - 10:22
**emergency** [2] - 97:11, 97:14
**employ** [1] - 70:5
**employee** [2] - 87:2, 87:10
**encumbrances** [1] - 106:5
**end** [18] - 58:17, 64:14, 116:9, 139:5, 139:22, 149:10, 150:24, 171:4, 171:5, 171:6, 174:10, 174:25, 196:17, 196:24, 197:7
**ended** [5] - 74:19, 84:16, 118:20, 183:3
**ending** [1] - 132:11
**enforce** [1] - 113:12
**enforcing** [1] - 112:8
**enjoy** [1] - 97:3
**enjoyed** [1] - 200:7
**enter** [7] - 24:4, 61:19, 61:24, 77:9, 82:7, 84:11, 133:20
**entered** [18] - 11:16, 18:20, 19:14, 22:9, 28:19, 29:21, 54:17, 54:18, 60:9, 83:14, 84:4, 84:7, 84:13, 120:13, 133:18, 141:12, 177:22, 214:23
**entering** [1] - 62:10
**entire** [14] - 33:22, 33:23, 42:23, 43:14, 43:15, 43:23, 62:3, 65:4, 70:15, 101:8, 179:12, 205:8, 213:13, 213:15
**entities** [1] - 134:8
**entitled** [15] - 59:22, 68:6, 86:24, 125:16, 138:5, 163:20, 164:18, 164:21, 165:11, 165:18, 166:11, 188:14, 189:19, 190:9, 218:14
**entity** [12] - 55:6, 55:7,

79:10, 80:9, 81:22, 104:15, 105:11, 106:6, 108:4, 174:20, 184:3
**entrance** [1] - 200:13
**entries** [1] - 43:21
**entry** [1] - 146:7
**equally** [1] - 50:17
**equipment** [1] - 157:8
**equity** [1] - 62:19
**escrow** [18] - 126:20, 127:10, 127:11, 127:12, 127:24, 128:2, 128:3, 128:24, 129:22, 129:23, 129:24, 129:25, 130:7, 130:8, 130:9, 130:12, 130:14, 131:22
**escrows** [1] - 128:4
**especially** [1] - 181:12
**ESQ** [5] - 1:13, 1:13, 1:14, 1:17, 1:17
**Esquire** [1] - 126:19
**essentially** [1] - 65:5
**established** [6] - 80:2, 80:8, 121:1, 137:16, 186:8, 189:10
**estate** [35] - 17:12, 32:16, 50:4, 50:6, 50:9, 51:2, 51:7, 52:14, 60:24, 78:5, 78:14, 79:9, 86:23, 102:14, 102:18, 102:19, 103:3, 103:22, 104:12, 105:16, 106:2, 106:11, 106:12, 116:5, 116:8, 116:14, 116:16, 117:2, 117:8, 117:13, 128:2, 183:8, 190:5, 197:14, 198:19
**estates** [1] - 81:2
**estimated** [1] - 64:3
**et** [1] - 53:11
**event** [5] - 98:11, 106:17, 116:4, 171:8, 196:20
**events** [2] - 116:7, 127:16
**eventually** [3] - 41:10, 71:4, 71:15
**evidence** [81] - 4:14, 5:18, 7:1, 7:17, 8:5, 8:20, 9:2, 9:4, 14:1, 14:25, 16:7, 17:16, 17:18, 17:19, 17:20, 18:18, 21:13, 22:7, 24:6, 26:22, 28:8, 28:18, 31:14, 35:17, 35:19, 35:20, 37:25, 39:18, 40:7, 41:16, 41:19, 42:5, 42:7, 42:9, 45:4, 63:22, 73:16, 74:7, 74:8, 76:21, 82:14, 85:3, 90:6, 92:14, 93:10, 94:14, 104:20, 105:21, 106:24, 109:25, 126:14, 129:1, 129:3, 135:20, 138:13, 158:16, 181:18, 181:21, 181:22, 181:23, 187:5, 191:24, 192:1, 192:11, 192:13, 194:24, 202:4, 202:5, 202:7, 202:19, 202:22, 203:13, 203:14, 204:3, 206:22, 206:25, 207:4, 207:12, 210:25, 216:7
**exact** [3] - 29:8, 162:11, 176:14
**exactly** [7] - 6:19, 29:16, 35:14, 67:7, 113:12, 128:14, 212:16
**examination** [5] - 100:18, 111:12, 119:14, 123:18, 126:2
**EXAMINATION** [8] - 3:21, 47:9, 49:16, 102:8, 111:14, 114:16, 116:2, 119:16
**Examination.............. ......Page** [1] - 2:3
**Examination............. Page** [3] - 2:2, 2:5, 2:7
**Examination............ Page** [2] - 2:4, 2:6
**Examination.......... Page** [1] - 2:7
**example** [6] - 55:12, 56:2, 62:21, 67:13, 168:19, 214:10
**examples** [1] - 79:20
**except** [1] - 11:14
**exchange** [14] - 33:10, 33:17, 33:19, 33:22, 34:2, 35:3, 40:3, 52:18, 58:16, 77:9, 77:17, 79:9, 80:7, 85:6
**exchanged** [1] - 90:11
**exchanges** [4] - 77:2, 77:22, 77:24, 78:1
**exchanging** [1] - 77:7
**excuse** [24] - 4:6, 7:1, 8:16, 28:10, 37:10, 41:15, 41:17, 43:15, 47:5, 51:25, 53:14, 68:9, 72:4, 81:25, 82:19, 107:14, 110:12, 120:3, 129:12, 132:6, 135:18, 195:12, 201:3
**excused** [4] - 48:18, 97:17, 115:19, 138:18
**excuses** [1] - 90:14
**execute** [4] - 104:17, 105:4, 105:13, 110:22
**executed** [2] - 106:20, 108:19
**execution** [5] - 107:9, 107:11, 108:2, 110:18, 126:18
**exercising** [1] - 103:21
**exhibit** [19] - 36:2, 41:24, 42:11, 69:17, 73:19, 73:24, 82:12, 82:14, 83:12, 93:6, 101:20, 135:13, 187:1, 187:3, 208:12, 211:8, 215:21, 215:23, 216:7
**Exhibit** [98] - 2:9, 2:10, 2:12, 2:13, 2:13, 2:14, 4:13, 5:17, 6:25, 7:17, 8:5, 8:20, 9:1, 9:4, 9:17, 10:11, 13:25, 14:24, 16:7, 17:15, 18:17, 21:12, 22:7, 24:6, 26:22, 27:20, 28:1, 28:8, 28:18, 29:25, 31:8, 31:12, 35:16, 37:25, 39:18, 40:6, 41:15, 41:16, 41:23, 42:3, 42:5, 42:7, 42:14, 42:16, 42:17, 45:6, 45:10, 45:12, 45:25, 46:1, 46:6, 46:10, 46:14, 46:16, 46:20, 46:23, 46:24, 47:2, 54:24, 58:4, 58:8, 72:4, 73:16, 74:3, 76:20, 81:24, 82:13, 85:2, 92:13, 93:10, 94:12, 104:20, 105:20, 106:24, 109:1, 109:3, 109:25, 114:14, 126:11, 126:12, 137:4, 143:15, 143:24, 159:9, 168:20, 169:7, 181:20, 204:7, 207:10, 210:1, 210:7, 211:1, 216:3, 216:8
**exhibits** [3] - 45:4, 49:2, 195:16
**EXHIBITS** [1] - 2:8
**Exhibits** [9] - 2:10, 2:11, 2:11, 2:12, 45:9, 46:5, 46:9, 46:13, 46:19
**exist** [1] - 47:24
**existed** [3] - 98:23, 122:10, 122:11
**exists** [1] - 103:18
**exit** [1] - 200:13
**expect** [2] - 59:16, 178:24
**expecting** [1] - 118:2
**expend** [1] - 166:10
**expenses** [5] - 29:3, 32:18, 32:19, 34:25, 166:18
**experience** [3] - 60:22, 60:24, 190:23
**experienced** [1] - 78:9
**expertise** [1] - 159:15
**expire** [2] - 171:4, 196:17
**expired** [4] - 71:6, 91:9, 91:11, 216:4
**explain** [10] - 50:22, 55:19, 67:13, 72:9, 85:5, 87:5, 121:10, 161:15, 168:10, 184:18
**explanation** [2] - 189:14, 189:18
**explode** [1] - 50:24
**explosion** [1] - 62:7
**express** [1] - 131:21
**expressed** [1] - 72:24
**expresses** [1] - 171:15
**extra** [1] - 161:17

**F**

**facilitate** [1] - 59:11
**facilitating** [1] - 84:2
**facility** [1] - 113:22
**facing** [2] - 67:15, 67:17
**fact** [20] - 20:4, 23:21, 58:19, 66:14, 66:15, 76:5, 86:23, 90:6, 98:16, 103:20, 118:4, 123:17, 147:20, 154:15, 167:18, 176:9, 180:11, 187:18, 189:18, 192:11
**fail** [1] - 216:14
**failed** [1] - 191:5
**failing** [1] - 212:12
**fair** [6] - 133:18, 161:21, 178:25, 179:1, 218:1
**falling** [1] - 154:4
**false** [1] - 106:17
**familiar** [4] - 69:19, 82:24, 104:8, 105:16
**family** [1] - 70:16
**famous** [1] - 117:24
**far** [3] - 42:25, 121:3, 177:16
**Fargo** [3] - 25:19, 206:2, 206:5
**fashion** [1] - 199:19
**fast** [1] - 205:3
**faster** [2] - 56:14, 56:15
**father** [5] - 70:14, 119:6, 124:5, 128:1, 200:8
**father's** [1] - 73:5
**fault** [1] - 90:15
**FCRR** [2] - 1:22, 218:17
**feared** [1] - 112:15
**February** [2] - 145:24, 149:18
**FedEx** [1] - 9:18
**fee** [4] - 4:10, 4:17, 5:8, 5:9
**fees** [1] - 34:25
**feet** [2] - 54:5, 159:16
**felt** [6] - 56:1, 72:20, 86:24, 142:8, 188:15, 207:9
**few** [5] - 30:22, 75:12, 184:7, 204:17, 207:4
**fight** [1] - 118:23
**fighting** [1] - 118:19
**figure** [2] - 150:9, 158:8
**figured** [1] - 52:20
**figures** [1] - 167:16
**file** [1] - 75:1
**filed** [9] - 6:20, 6:22,

8:24, 13:22, 16:18, 16:19, 17:14, 40:21, 45:13
**filing** [3] - 73:3, 73:4, 73:12
**filings** [1] - 72:22
**fill** [2] - 76:2, 86:25
**final** [12] - 16:19, 18:23, 19:16, 28:10, 28:12, 36:5, 83:14, 84:3, 84:6, 84:13, 109:24, 131:19
**finalizing** [2] - 132:16, 133:8
**finally** [1] - 53:8
**finance** [1] - 160:6
**financial** [16] - 29:15, 43:22, 43:23, 43:24, 44:1, 44:14, 89:5, 89:17, 89:25, 90:2, 116:11, 116:14, 118:1, 192:6, 192:14, 194:7
**financially** [1] - 176:7
**financing** [5] - 58:20, 58:22, 59:9, 59:11, 159:15
**fine** [5] - 64:12, 86:18, 97:19, 98:8, 150:5
**Finish** [1] - 184:25
**finish** [10] - 37:12, 139:2, 144:16, 150:7, 161:13, 183:21, 185:6, 189:16, 212:10, 217:7
**finished** [3] - 52:9, 184:20, 205:14
**first** [70] - 5:18, 7:7, 7:11, 9:17, 10:1, 10:3, 38:23, 49:9, 50:4, 50:6, 51:18, 60:4, 63:24, 69:23, 69:25, 72:2, 72:7, 72:10, 72:16, 80:24, 82:21, 87:5, 88:18, 93:18, 94:22, 95:17, 99:6, 102:4, 103:10, 103:12, 103:16, 103:17, 103:19, 103:23, 104:3, 108:22, 109:9, 109:15, 109:22, 112:8, 112:17, 112:22, 112:23, 113:1, 113:5, 113:8, 113:12, 113:15, 113:19, 114:22, 115:2, 117:10, 125:22, 133:21, 138:20, 141:8, 141:22, 143:11, 144:14, 144:15, 151:22, 153:23, 170:13, 170:14, 170:15, 174:13, 205:18, 206:10, 206:13
**firsthand** [3] - 60:25, 61:3, 79:15
**five** [6] - 48:21, 67:7, 171:3, 171:16, 194:7, 196:16
**five-minute** [1] - 48:21
**five-year** [1] - 171:16
**fixed** [1] - 172:15
**FLORIDA** [1] - 1:1
**Florida** [14] - 1:3, 1:16, 1:19, 1:24, 1:25, 47:24, 50:7, 56:3, 72:22, 92:17, 93:23, 102:22, 218:19, 218:20
**flow** [21] - 35:10, 59:22, 59:24, 95:5, 95:6, 96:5, 117:21, 163:20, 164:2, 164:9, 164:15, 164:20, 165:11, 165:19, 166:1, 166:3, 166:12, 166:13, 166:17, 166:20, 166:23
**focus** [5] - 59:13, 123:25, 126:14, 166:1, 168:24
**focused** [1] - 174:5
**folks** [1] - 195:20
**follow** [5] - 52:7, 103:7, 169:17, 217:25
**followed** [1] - 117:5
**following** [6] - 12:6, 133:7, 139:10, 152:5, 165:5, 177:23
**follows** [1] - 205:23
**fool** [1] - 121:12
**foot** [1] - 53:21
**FOR** [2] - 1:13, 1:17
**force** [1] - 69:2
**foreclose** [1] - 5:14
**foreclosed** [1] - 137:16
**foreclosure** [12] - 13:8, 13:22, 14:4, 14:7, 14:13, 16:18, 16:19, 17:13, 18:16, 18:20, 19:25, 26:3
**foregoing** [1] - 218:13
**forever** [1] - 174:14
**forget** [1] - 117:3
**forgot** [1] - 136:13
**forgotten** [1] - 150:13
**form** [1] - 65:24
**formal** [1] - 66:4
**formation** [1] - 163:13
**formed** [3] - 49:22, 78:10, 118:8
**former** [1] - 85:7
**forming** [1] - 49:25
**forth** [3] - 88:20, 118:25, 142:7
**foundation** [1] - 137:16
**four** [4] - 36:5, 133:17, 150:12, 150:19
**fourth** [1] - 9:25
**frame** [3] - 63:25, 64:5, 64:6
**Francisco** [1] - 155:20
**frankly** [1] - 217:24
**friend** [5] - 85:7, 174:23, 200:7, 200:10, 215:1
**friend's** [8] - 199:3, 199:6, 199:13, 200:1, 200:5, 200:22, 201:4, 201:13
**friends** [1] - 66:14
**friendship** [3] - 174:22, 191:7, 200:9
**front** [12] - 24:10, 58:2, 67:19, 81:4, 86:16, 104:23, 165:25, 169:9, 192:9, 203:25, 209:5, 217:20
**FTP** [144] - 1:6, 3:3, 4:3, 4:4, 4:5, 4:10, 4:16, 4:24, 5:3, 5:5, 6:8, 8:3, 8:16, 9:13, 10:16, 13:22, 15:23, 18:20, 18:23, 19:8, 19:12, 22:9, 23:6, 23:19, 23:24, 24:3, 24:13, 24:14, 25:9, 25:15, 26:1, 26:16, 27:22, 28:5, 30:23, 31:25, 32:2, 32:15, 33:3, 34:17, 36:1, 36:13, 36:14, 36:15, 36:17, 36:23, 36:24, 37:1, 37:3, 37:4, 37:21, 38:19, 38:21, 38:25, 39:2, 39:14, 40:7, 40:11, 40:16, 40:19, 40:21, 42:22, 53:2, 55:23, 65:2, 65:4, 65:5, 65:8, 65:22, 66:3, 66:7, 68:12, 68:17, 69:5, 69:8, 69:11, 69:15, 72:20, 77:2, 78:12, 80:3, 80:11, 82:1, 83:15, 83:18, 84:2, 84:7, 84:10, 84:14, 89:25, 90:3, 91:6, 91:11, 91:19, 91:23, 92:3, 92:8, 92:10, 94:3, 94:6, 94:9, 94:17, 95:18, 105:1, 105:4, 105:12, 107:17, 110:16, 118:3, 122:4, 126:18, 126:22, 126:25, 127:1, 135:17, 141:13, 142:13, 143:8, 144:8, 144:18, 144:22, 145:8, 147:21, 148:13, 148:18, 149:16, 149:18, 149:21, 152:23, 153:5, 155:8, 156:6, 156:7, 156:10, 156:25, 174:7, 174:8, 175:15, 178:22, 189:8
**FTP's** [11] - 14:3, 32:8, 35:18, 37:16, 43:13, 43:14, 65:12, 77:9, 80:13, 95:11, 110:20
**fulfilling** [1] - 207:7
**full** [13] - 7:5, 8:7, 8:23, 9:7, 65:4, 65:5, 69:2, 86:20, 145:12, 174:16, 205:9, 212:13
**fully** [1] - 177:2
**fun** [1] - 200:23
**functioning** [1] - 157:1
**funds** [9] - 24:7, 24:12, 24:23, 26:1, 26:2, 37:18, 37:20, 118:17, 172:9
**funny** [2] - 149:4, 154:25
**futile** [1] - 64:11
**futility** [3] - 63:18, 63:25, 64:6
**future** [3] - 34:4, 34:10, 80:6

**G**

**gain** [5] - 33:15, 33:24, 34:6, 34:9, 94:24
**gains** [11] - 33:10, 33:13, 33:14, 33:20, 34:4, 34:10, 40:11, 40:17, 40:20, 40:25, 41:10
**game** [2] - 131:11, 217:13
**garage** [1] - 54:12
**Garage** [1] - 54:13
**gate** [1] - 64:12
**gather** [1] - 103:5
**Gelpi** [1] - 13:16
**gems** [1] - 118:23
**general** [15] - 42:23, 42:24, 43:16, 43:17, 43:18, 43:20, 44:7, 44:22, 44:23, 44:25, 55:21, 67:9, 67:13, 71:12, 79:21
**generally** [1] - 66:19
**genius** [1] - 158:8
**gentleman** [2] - 4:3, 18:10
**gentlemen** [2] - 57:2, 101:6
**get-go** [1] - 128:1
**girl** [1] - 195:7
**given** [16] - 22:23, 68:19, 72:13, 77:13, 80:21, 80:22, 82:21, 89:21, 96:20, 99:21, 120:7, 120:9, 145:5, 176:15, 197:21, 206:13
**gM** [1] - 59:1
**GM** [7] - 59:21, 126:21, 159:14, 166:10, 166:11, 178:13, 178:14
**goal** [5] - 128:14, 130:20, 131:1, 131:3, 155:11
**God** [1] - 151:14
**government** [3] - 40:16, 40:19, 41:6
**governs** [1] - 122:5
**grand** [2] - 190:6, 190:7
**Grayson** [11] - 11:11, 11:14, 11:18, 12:15, 12:20, 13:1, 98:1, 98:9, 99:3, 100:20, 107:8
**great** [6] - 50:23, 54:21, 177:6, 180:9, 195:21, 201:12
**greedy** [1] - 200:16
**Greg** [53] - 7:22, 8:14, 8:17, 14:16, 17:12, 17:22, 19:12, 21:5,

21:9, 21:20, 21:23, 21:25, 23:7, 26:5, 26:18, 26:20, 26:24, 27:2, 28:2, 30:3, 30:10, 32:5, 48:20, 49:18, 49:19, 49:20, 52:14, 57:24, 63:18, 63:19, 69:11, 72:6, 74:5, 81:4, 81:7, 81:17, 81:21, 92:21, 93:13, 94:2, 95:11, 115:21, 116:4, 122:5, 122:6, 122:25, 134:6, 134:7, 134:8, 135:16, 136:1, 178:11, 184:12
**Gregory** [3] - 3:9, 49:11, 209:14
**GREGORY** [3] - 2:4, 49:15, 116:1
**grew** [1] - 70:11
**gross** [1] - 167:4
**ground** [6] - 81:24, 91:9, 91:11, 133:24, 169:8, 196:8
**Group** [2] - 62:5, 83:22
**guaranteed** [3] - 10:18, 122:6, 181:6
**guaranteeing** [4] - 140:22, 178:12, 178:18, 178:19
**guarantors** [1] - 140:5
**guaranty** [2] - 140:24, 153:2
**guess** [16] - 43:6, 54:20, 55:25, 84:15, 85:8, 86:24, 91:25, 125:10, 149:11, 153:4, 160:10, 165:1, 166:17, 167:6, 185:25, 189:15
**guest** [2] - 199:3, 199:13
**guesthouse** [6] - 199:16, 200:5, 200:11, 200:22, 201:4, 201:13
**guy** [8] - 53:9, 117:9, 138:8, 138:9, 181:2, 181:13, 183:8, 201:9
**guys** [2] - 124:7, 125:9

## H

**half** [14] - 28:21, 35:8, 35:9, 35:12, 35:15, 36:11, 43:7, 95:21, 97:17, 123:9, 123:10, 123:13, 170:11, 185:1
**half-hour** [1] - 185:1
**halfway** [1] - 10:1
**hand** [13] - 26:15, 36:7, 38:1, 38:2, 43:4, 58:4, 76:22, 87:18, 101:25, 163:1, 163:10, 169:15, 180:25
**handing** [1] - 207:25
**handled** [1] - 92:2
**handling** [2] - 97:15, 142:4
**hands** [1] - 157:4
**handwritten** [1] - 153:14
**happy** [3] - 4:24, 121:21, 197:12
**Harbor** [1] - 117:19
**hard** [10] - 33:6, 36:5, 50:20, 118:19, 157:3, 162:25, 163:2, 163:10, 182:20, 187:10
**hardback** [1] - 191:17
**hardest** [1] - 118:23
**harm** [1] - 56:1
**Harvey** [3] - 18:10, 53:11, 83:21
**head** [4] - 29:17, 29:19, 44:24, 54:15
**heads** [1] - 84:11
**heads-up** [1] - 84:11
**hear** [11] - 12:1, 25:10, 37:11, 56:12, 56:16, 102:17, 157:25, 158:1, 186:24, 215:23, 217:16
**heard** [2] - 111:23, 186:17
**hearing** [5] - 88:7, 88:11, 97:11, 97:14, 158:11
**hearsay** [4] - 16:10, 16:11, 45:18, 60:16
**Heber** [43] - 3:25, 4:20, 5:5, 7:21, 8:13, 14:18, 14:19, 15:13, 69:18, 70:6, 70:13, 70:15, 71:1, 71:16, 72:22, 84:15, 86:8, 86:9, 87:2, 87:14, 87:25, 88:14, 90:3, 90:7, 90:8, 90:17, 90:20, 90:22, 91:7, 91:12, 92:2, 120:25, 121:24, 122:24, 122:25, 151:11, 151:12, 151:15, 151:16, 151:17, 184:2, 185:11, 201:24
**Heber's** [3] - 70:8, 70:14, 71:6
**Hebrew** [1] - 70:15
**heirs** [1] - 81:2
**held** [9] - 22:11, 22:14, 83:1, 87:1, 104:5, 145:3, 145:4, 153:3, 153:18
**help** [9] - 18:12, 18:15, 35:24, 59:11, 138:23, 138:25, 175:13, 206:5, 206:9
**helped** [2] - 71:8, 159:22
**helpful** [2] - 79:22, 126:4
**helping** [2] - 71:12, 160:24
**Herbert** [1] - 201:24
**hereby** [1] - 218:13
**herein** [1] - 170:13
**hereto** [1] - 137:4
**Hernandez** [2] - 18:10, 83:21
**hiccoughs** [1] - 160:4
**hidden** [1] - 106:18
**high** [1] - 62:4
**high-rises** [1] - 62:4
**highlight** [14] - 59:21, 71:9, 107:15, 126:17, 144:21, 149:14, 162:23, 195:18, 195:20, 195:21, 195:23, 196:9, 196:23, 205:7
**highlighted** [2] - 24:10, 196:13
**highlighting** [2] - 169:16, 195:19
**highlights** [1] - 169:16
**himself** [2] - 20:13, 121:19
**hired** [5] - 4:3, 91:11, 122:24, 123:5, 195:8
**hiring** [4] - 84:16, 87:18, 89:3, 183:3
**history** [1] - 116:12
**hit** [1] - 55:14
**hold** [3] - 50:1, 73:17, 175:4
**holding** [2] - 10:16, 189:23
**holdings** [1] - 198:19
**home** [12] - 66:15, 66:16, 85:10, 87:16, 89:2, 117:18, 118:10, 118:11, 175:14, 199:22, 200:6, 201:9
**hone** [1] - 64:4
**honest** [3] - 4:22, 167:12, 183:6
**honestly** [1] - 167:20
**Honor** [140] - 3:6, 11:22, 12:3, 12:9, 12:12, 12:18, 16:6, 16:8, 20:8, 37:7, 39:17, 39:19, 41:18, 42:1, 42:12, 45:3, 45:12, 47:5, 48:11, 48:14, 48:21, 49:2, 49:14, 51:20, 52:12, 53:13, 56:9, 56:25, 57:22, 58:3, 60:16, 61:16, 63:12, 63:17, 64:13, 74:7, 75:18, 79:6, 88:2, 88:5, 89:7, 93:5, 93:9, 96:21, 97:8, 97:9, 97:16, 97:20, 97:24, 98:7, 98:16, 98:25, 99:11, 100:3, 100:11, 100:16, 101:16, 101:22, 101:23, 111:13, 114:11, 115:11, 115:20, 119:13, 119:15, 121:14, 123:16, 125:13, 125:19, 126:8, 129:17, 130:1, 131:15, 132:18, 134:17, 134:20, 135:2, 138:23, 139:15, 140:15, 140:20, 140:25, 142:14, 143:14, 143:21, 151:24, 158:25, 159:8, 162:6, 163:7, 166:15, 169:13, 169:19, 173:24, 175:2, 176:11, 176:17, 176:18, 178:1, 179:2, 179:21, 179:25, 182:8, 183:17, 184:21, 186:5, 187:1, 189:3, 190:18, 191:17, 191:22, 192:2, 193:10, 194:21, 194:25, 201:7, 201:15, 201:19, 203:6, 203:16, 204:3, 204:5, 205:13, 207:22, 208:11, 209:8, 210:25, 211:2, 211:6, 211:19, 212:14, 212:25, 213:10, 213:17, 215:8, 215:10, 215:18, 216:9, 218:4
**Honor's** [1] - 97:24
**Honorable** [1] - 1:23
**HONORABLE** [1] - 1:9
**hope** [2] - 114:4, 158:12
**hopefully** [1] - 117:22
**horrible** [2] - 123:1, 180:10
**horror** [2] - 116:24, 158:11
**host** [1] - 138:2
**hotel** [1] - 51:15
**Hotel** [1] - 51:18
**hour** [2] - 97:17, 185:1
**house** [14] - 174:24, 199:3, 199:6, 199:13, 199:18, 199:21, 199:24, 200:1, 200:5, 200:10, 200:24, 201:10, 204:15, 214:10
**hundred** [9] - 29:9, 49:21, 66:25, 78:11, 78:12, 80:9, 167:15, 172:15, 206:11
**hunky** [3] - 186:8, 192:23, 192:25
**hunky-dory** [3] - 186:8, 192:23, 192:25
**hurt** [1] - 86:25
**hypothetical** [1] - 172:15

## I

**idea** [2] - 70:22, 151:10
**identified** [1] - 104:19
**identify** [2] - 117:16, 143:3
**imagined** [1] - 60:8
**immediately** [1] - 56:13
**impact** [2] - 116:13, 116:16
**impeachment** [1] - 176:14
**importance** [1] - 93:25
**important** [2] - 72:15, 136:14
**importantly** [1] -

187:25
**impossible** [1] - 62:13
**improperly** [1] - 109:21
**inaccurate** [1] - 161:22
**inadmissible** [6] - 135:19, 135:22, 135:23, 137:25, 138:2
**Inc** [3] - 30:1, 34:14, 35:3
**include** [4] - 32:23, 152:25, 195:5, 195:6
**includes** [1] - 170:12
**including** [5] - 32:20, 32:21, 67:18, 110:21, 215:24
**income** [1] - 41:13
**incomplete** [7] - 135:4, 135:12, 136:23, 137:6, 210:1, 212:6, 216:2
**incompleteness** [1] - 136:25
**inconsistencies** [1] - 171:21
**inconsistent** [1] - 180:19
**inconvenience** [1] - 99:22
**incorrect** [3] - 149:24, 198:13, 198:14
**increase** [1] - 170:16
**incredibly** [1] - 62:8
**increments** [1] - 142:6
**INDEX** [1] - 2:1
**indicate** [1] - 76:12
**indicated** [1] - 15:11
**indicates** [5] - 104:13, 105:2, 107:21, 108:2, 110:8
**indicating)** [1] - 194:15
**indicia** [1] - 92:7
**indirectly** [1] - 92:6
**individual** [4] - 55:20, 105:11, 136:2, 178:11
**individually** [8] - 23:24, 28:6, 54:19, 57:25, 63:7, 89:17, 135:16, 135:17
**industry** [4] - 52:14, 78:5, 78:15, 79:9
**infamous** [1] - 51:11
**influence** [2] - 61:6, 82:25
**information** [1] - 61:6
**Ingraham** [6] - 53:25, 54:2, 54:5, 54:12, 86:4, 87:24
**initial** [7] - 58:10, 171:6, 172:12, 172:23, 196:18, 196:24, 197:7
**inquiry** [1] - 181:3
**insolvent** [1] - 106:7
**inspection** [1] - 132:25
**installments** [1] - 170:7
**instance** [1] - 84:19
**instead** [2] - 5:5, 191:2
**instruction** [3] - 52:6, 216:16, 216:18
**intelligent** [1] - 51:2
**intended** [2] - 180:25, 212:17
**intent** [1] - 82:6
**intention** [2] - 180:24, 194:14
**interest** [40] - 5:14, 17:1, 17:4, 17:8, 18:24, 19:6, 31:1, 31:4, 32:19, 32:20, 50:1, 52:14, 52:15, 52:19, 54:9, 62:19, 62:22, 63:2, 63:5, 63:7, 68:16, 76:18, 77:13, 77:16, 90:23, 109:16, 123:24, 134:15, 135:24, 136:9, 137:15, 139:13, 156:12, 166:23, 167:3, 179:13, 197:13, 205:8, 210:15, 212:24
**interesting** [1] - 182:22
**interests** [2] - 117:13, 137:11
**internship** [1] - 70:11
**interpret** [3] - 164:24, 180:24, 192:7
**interrupt** [7] - 98:5, 100:15, 155:17, 160:1, 216:12, 216:14, 216:23
**interrupting** [3] - 12:11, 99:8, 101:11
**introduce** [4] - 39:17, 49:18, 137:5, 181:17
**introduced** [4] - 169:8, 181:17, 187:2, 207:11
**inure** [1] - 81:1
**invalid** [1] - 125:20
**invented** [1] - 177:16
**invest** [4] - 50:24, 53:4, 53:9, 54:14
**Investment** [16] - 1:6, 3:3, 4:17, 24:13, 24:14, 25:9, 26:1, 26:2, 36:13, 36:14, 36:15, 36:16, 36:17, 36:25, 37:1, 37:21
**investment** [2] - 25:15, 84:5
**Investments** [1] - 39:14
**investor** [2] - 52:16
**investors** [8] - 50:22, 51:3, 53:12, 71:11, 116:19, 132:3
**invoice** [1] - 4:16
**involved** [9] - 11:14, 116:17, 128:1, 128:4, 128:24, 129:19, 129:21, 130:13, 160:2
**involvement** [3] - 11:21, 102:21, 102:24
**irrelevant** [1] - 135:25
**ISAIAH** [1] - 1:13
**Island** [3] - 117:18, 118:10, 198:17
**issuance** [1] - 103:6
**issue** [17] - 25:14, 63:13, 98:9, 99:10, 99:15, 99:16, 99:20, 100:13, 100:14, 100:16, 100:25, 101:3, 104:6, 136:23, 158:15, 186:9, 211:4
**issues** [6] - 99:5, 103:19, 109:18, 109:19, 109:20, 179:18
**IT** [4] - 17:17, 35:21, 73:20, 109:2
**itself** [6] - 9:22, 35:11, 136:16, 154:1, 174:3, 193:19

## J

**Jack** [4] - 72:11, 72:13
**Jacqueline** [1] - 1:23
**JACQUELINE** [1] - 1:9
**jail** [1] - 122:18
**January** [18] - 145:19, 145:21, 149:1, 149:2, 149:17, 149:18, 192:6, 192:14, 194:6, 205:5, 205:21, 205:25, 206:19, 206:23, 212:13, 215:3
**jar** [1] - 157:5
**jealous** [1] - 86:23
**Jill** [4] - 72:11, 72:12, 72:13, 72:14
**job** [3] - 12:8, 133:12, 167:21
**joins** [1] - 178:11
**joke** [5] - 180:8, 180:12, 180:13, 180:14, 180:15
**joking** [1] - 180:5
**Joseph** [4] - 3:6, 98:1, 101:17, 102:5
**JOSEPH** [3] - 1:13, 2:6, 102:7
**Judge** [9] - 61:12, 100:7, 115:13, 134:23, 161:23, 194:24, 203:13, 207:12, 218:10
**JUDGE** [1] - 1:10
**judge** [2] - 79:24, 212:7
**judgment** [19] - 16:19, 18:16, 18:20, 18:23, 19:3, 19:5, 19:10, 19:14, 19:16, 24:18, 25:17, 26:3, 28:9, 28:10, 28:12, 83:14, 84:3, 84:6, 84:13
**judgments** [1] - 28:5
**July** [3] - 146:16, 146:18, 150:13
**jump** [1] - 62:6
**jumped** [1] - 74:10
**jumping** [1] - 116:23
**June** [6] - 8:6, 108:17, 146:14, 150:13, 171:3, 196:16
**junkyard** [1] - 183:5
**jurors** [1] - 115:17
**jury** [79] - 3:15, 3:16, 4:14, 12:8, 15:3, 20:7, 21:18, 22:8, 31:21, 31:24, 36:3, 49:18, 50:6, 50:12, 51:6, 57:2, 57:6, 60:1, 61:9, 61:11, 63:23, 67:13, 70:8, 72:9, 73:18, 74:2, 74:6, 74:15, 75:15, 78:17, 79:18, 79:22, 87:11, 97:6, 97:12, 97:23, 99:7, 99:22, 100:2, 101:4, 101:5, 101:6, 104:21, 105:22, 115:13, 115:15, 121:10, 137:15, 138:12, 138:15, 138:18, 138:19, 153:10, 158:13, 158:23, 159:3, 159:4, 159:5, 167:21, 169:18, 169:20, 178:10, 181:25, 194:4, 195:4, 196:11, 201:19, 202:22, 203:17, 204:10, 211:8, 212:17, 215:17, 215:19, 216:20, 217:20, 217:22, 217:23, 218:1
**JURY** [1] - 1:9
**Justesen** [1] - 3:10

## K

**keep** [11] - 30:14, 57:17, 76:3, 76:9, 76:13, 129:1, 149:5, 154:23, 154:24, 169:22, 188:24
**keeping** [2] - 163:23, 186:16
**key** [1] - 136:8
**kid** [1] - 70:16
**kids** [1] - 200:8
**kind** [10] - 24:22, 85:17, 98:18, 123:20, 135:9, 139:22, 179:7, 181:9, 192:11, 200:11
**kindly** [1] - 20:22
**kinds** [1] - 50:12
**kitchen** [1] - 67:20
**knowing** [3] - 29:17, 66:14, 122:3
**knowledge** [14] - 45:17, 49:22, 61:3, 68:21, 68:22, 79:15, 83:23, 89:16, 90:2, 92:3, 104:4, 137:10, 159:19, 186:13
**known** [3] - 70:16, 109:11, 130:25
**Kodsi** [2] - 53:10, 119:7

## L

**ladies** [2] - 57:2, 101:6
**landlord** [10] - 82:13, 82:17, 82:19, 82:25,

83:6, 170:5, 171:2, 171:9, 196:15, 196:20
**Lane** [3] - 67:1, 67:3, 200:3
**language** [2] - 65:2, 109:22
**large** [1] - 117:11
**larger** [1] - 50:18
**largest** [1] - 82:5
**last** [11] - 18:4, 49:9, 99:18, 102:4, 110:11, 139:8, 141:25, 142:2, 152:3, 165:3, 209:11
**late** [4] - 52:23, 87:12, 88:25, 150:2
**law** [4] - 69:4, 69:9, 122:4, 217:9
**Law** [2] - 1:14, 3:7
**lawsuit** [16] - 5:13, 6:22, 8:24, 13:22, 14:4, 14:10, 14:11, 14:12, 14:17, 15:25, 16:3, 19:25, 22:25, 23:1, 25:1, 164:6
**lawyer** [21] - 11:2, 11:4, 11:7, 11:11, 53:15, 56:12, 97:25, 99:5, 99:9, 99:20, 125:23, 126:1, 129:12, 129:13, 133:13, 134:1, 162:2, 164:3, 164:5, 194:17
**lawyers** [4] - 5:18, 57:10, 101:8, 138:10
**lay** [1] - 202:9
**layman's** [1] - 72:9
**layout** [2] - 67:9, 67:13
**LAZARO** [1] - 1:17
**LEA** [1] - 1:13
**learn** [2] - 52:19, 71:3
**learned** [2] - 51:6, 78:9
**lease** [54] - 21:23, 28:19, 64:19, 64:21, 65:2, 65:6, 71:6, 81:25, 82:2, 82:7, 82:9, 82:18, 82:20, 83:2, 91:9, 91:11, 120:5, 120:15, 120:20, 122:7, 125:7, 133:24, 141:19, 142:13, 143:9, 144:9, 144:19, 144:22, 145:9, 148:7, 151:8, 151:9, 152:8, 152:9, 152:17, 152:25, 153:2, 168:3, 168:5, 168:13, 169:1, 169:8, 170:15, 171:2, 171:9, 181:5, 189:22, 196:8, 196:15, 196:21, 197:8, 197:9, 197:17
**leases** [1] - 71:15
**leasing** [1] - 65:8
**least** [14] - 27:23, 28:2, 57:4, 66:4, 99:21, 118:12, 148:22, 161:18, 169:17, 173:13, 181:14, 185:1, 185:2, 202:3
**leave** [3] - 30:21, 97:9, 164:3
**ledger** [17] - 42:23, 42:24, 43:16, 43:17, 43:18, 43:20, 44:7, 44:22, 44:23, 44:25, 143:1, 144:2, 145:6, 145:8, 148:11, 150:22
**ledgers** [1] - 143:6
**LEE** [1] - 1:14
**left** [16] - 5:13, 26:15, 32:18, 32:20, 33:14, 36:7, 42:18, 42:22, 43:14, 62:5, 64:2, 67:20, 76:22, 84:8, 88:22, 133:13
**left-hand** [3] - 26:15, 36:7, 76:22
**legal** [3] - 189:25, 211:4, 211:20
**legally** [1] - 134:10
**lender** [2] - 82:21, 82:22
**lenders** [1] - 118:8
**lengthy** [1] - 101:13
**less** [7] - 34:24, 34:25, 35:1, 71:13, 95:7, 148:24, 187:22
**letter** [8] - 6:4, 66:3, 121:2, 127:24, 153:15, 154:5, 189:25, 190:8
**letters** [1] - 190:2
**letting** [2] - 139:2, 186:16
**liability** [3] - 19:6, 55:11, 55:12
**liable** [2] - 18:24, 19:16
**lie** [4] - 180:15, 180:16, 180:20, 180:24
**lien** [1] - 106:19
**liens** [1] - 106:6
**lieu** [1] - 117:24
**life** [4] - 175:21, 175:22, 177:1, 198:6
**lifetime** [1] - 116:15
**lightly** [1] - 209:1
**likely** [1] - 90:13
**limine** [3] - 101:1, 135:3, 211:5
**limit** [4] - 156:16, 163:17, 175:19, 190:21
**limitations** [1] - 216:4
**limited** [2] - 55:11, 209:2
**limits** [2] - 55:11, 163:14
**Lincoln** [1] - 1:15
**line** [15] - 9:25, 10:1, 10:14, 20:25, 24:10, 32:24, 33:2, 33:9, 34:23, 66:3, 95:12, 147:17, 181:3
**lines** [3] - 20:7, 76:21, 118:9
**liquidity** [5] - 95:20, 95:23, 96:5, 96:17, 96:19
**list** [3] - 74:21, 117:24, 140:5
**listed** [3] - 45:14, 140:6
**listen** [3] - 78:18, 138:13, 206:18
**lists** [1] - 104:16
**literally** [1] - 51:15
**litigated** [2] - 99:10, 100:24
**litigating** [3] - 184:6, 184:7, 184:10
**live** [9] - 60:7, 92:21, 148:7, 167:23, 199:25, 200:4, 200:11, 200:21, 201:13
**lived** [6] - 66:14, 67:1, 67:3, 120:5, 199:21, 200:2
**living** [2] - 67:17, 93:1
**Liz** [1] - 3:9
**LLC** [14] - 1:3, 3:3, 22:9, 49:20, 55:9, 55:10, 75:12, 75:13, 75:15, 75:16, 76:12, 89:13, 93:17, 104:16
**LLCs** [2] - 75:6, 75:10
**loan** [57] - 6:1, 6:3, 6:6, 6:14, 6:19, 7:5, 7:25, 8:7, 8:23, 9:7, 9:10, 10:5, 10:19, 13:8, 13:10, 13:12, 13:14, 13:16, 13:19, 13:22, 24:24, 25:2, 59:12, 124:6, 128:24, 129:1, 129:3, 131:9, 131:22, 159:22, 160:2, 160:5, 160:15, 161:2, 161:5, 161:7, 162:12, 172:6, 173:8, 173:20, 174:2, 174:8, 174:13, 174:14, 174:15, 174:19, 203:12, 208:7, 208:10, 211:25, 212:4, 213:8, 213:25, 214:14, 214:17
**loaned** [3] - 174:7, 174:9, 175:13
**loans** [1] - 140:5
**local** [1] - 66:18
**look** [29] - 5:19, 20:24, 20:25, 25:5, 28:22, 31:8, 34:23, 36:5, 37:25, 38:17, 38:23, 64:18, 65:11, 72:1, 74:12, 74:25, 85:17, 90:15, 93:13, 142:23, 143:3, 147:17, 150:14, 150:16, 153:23, 158:13, 162:21, 169:24, 209:12
**looked** [4] - 27:22, 67:10, 154:19, 182:23
**looking** [6] - 14:21, 19:5, 29:15, 73:19, 95:14, 170:25
**looks** [5] - 28:11, 141:22, 158:10, 158:12, 204:2
**lose** [10] - 19:10, 25:16, 131:22, 132:1, 132:5, 132:7, 132:8, 135:8, 185:2, 214:24
**losing** [2] - 29:18, 29:19
**loss** [1] - 90:23
**lost** [2] - 137:8, 212:23
**loud** [5] - 59:2, 59:6, 126:9, 170:10
**louder** [1] - 37:11
**loudly** [2] - 12:1, 88:8
**low** [1] - 72:20
**lower** [1] - 86:19
**lunch** [2] - 97:21, 101:7

## M

**ma'am** [7] - 45:15, 45:19, 162:8, 185:4, 193:17, 193:21, 211:11
**Machiavellian** [1] - 121:12
**MACKIEWICZ** [17] - 1:13, 21:14, 45:12, 45:16, 45:21, 46:3, 46:7, 46:11, 46:15, 46:17, 46:21, 46:25, 97:9, 97:13, 97:20, 163:3, 215:18
**Mackiewicz** [1] - 3:7
**madam** [4] - 133:4, 139:7, 152:3, 165:2
**magnitude** [1] - 63:9
**mail** [9] - 9:15, 19:19, 19:20, 19:21, 20:20, 20:25, 21:1, 93:2, 93:24
**mailed** [1] - 151:12
**mailing** [1] - 93:19
**maintain** [2] - 39:2, 62:15
**maintained** [9] - 15:17, 15:19, 15:25, 16:3, 38:25, 39:5, 66:18, 89:14, 119:1
**maintaining** [3] - 39:8, 39:11, 89:5
**majority** [1] - 62:13
**maker** [1] - 76:4
**man** [1] - 87:18
**Man** [1] - 169:25
**manage** [4] - 5:1, 5:3, 91:16, 113:22
**managed** [2] - 72:23, 73:7
**management** [9] - 4:10, 4:17, 5:8, 5:9, 108:20, 112:23, 113:1, 113:3, 113:13
**manager** [6] - 70:10, 71:4, 71:20, 73:7, 104:15, 185:14
**managers** [1] - 104:16
**managing** [2] - 4:24, 70:3
**manner** [4] - 61:19, 87:19, 111:22, 180:5
**Manny** [1] - 3:12
**mansion** [5] - 198:16, 199:7, 199:10, 200:12, 201:14

**mansions** [1] - 199:14
**MANUEL** [1] - 1:17
**map** [1] - 51:13
**maps** [1] - 71:8
**Marc** [2] - 53:11, 66:23
**March** [3] - 15:10, 149:21, 149:23
**Marcus** [1] - 3:11
**MARCUS** [1] - 1:17
**Mark** [1] - 85:8
**marked** [2] - 105:19, 106:23
**market** [5] - 51:7, 116:5, 116:14, 117:4, 198:9
**master** [2] - 38:14, 67:21
**match** [1] - 72:14
**math** [11] - 145:17, 147:19, 148:2, 149:6, 149:11, 150:7, 160:24, 161:16, 161:17, 162:12
**mathematical** [2] - 149:5, 149:8
**matter** [6] - 112:15, 138:1, 181:11, 202:13, 202:21, 218:14
**matters** [2] - 27:3, 142:5
**maximum** [2] - 94:20, 95:23
**mean** [39] - 13:3, 16:18, 26:12, 32:16, 51:14, 53:9, 56:17, 64:1, 85:25, 89:10, 99:1, 99:19, 124:9, 127:23, 138:12, 138:15, 138:20, 140:5, 147:22, 155:16, 157:13, 158:10, 159:25, 161:16, 166:1, 166:13, 167:11, 167:18, 178:15, 179:7, 181:14, 182:9, 183:6, 183:9, 192:8, 197:20, 207:3, 212:17
**meaning** [7] - 32:9, 32:12, 32:13, 32:14, 74:20, 118:11, 127:21
**means** [5] - 24:18, 165:21, 166:3, 167:13, 180:6
**meant** [7] - 50:20, 83:5, 107:20, 131:11, 166:17, 191:10, 208:13
**measures** [5] - 117:1, 117:7, 117:11, 191:2, 191:3
**mechanism** [1] - 79:12
**meet** [4] - 49:19, 52:22, 70:13, 181:6
**meeting** [3] - 22:11, 22:14, 30:23
**meets** [2] - 67:23, 167:25
**Melissa** [1] - 3:7
**MELISSA** [1] - 1:13
**member** [1] - 138:25
**memorandum** [9] - 135:5, 135:7, 135:13, 137:3, 137:7, 208:3, 209:2, 209:25, 210:7
**memorize** [1] - 25:22
**memory** [7] - 180:3, 180:6, 180:9, 180:11, 180:17, 181:1, 205:22
**mention** [9] - 32:2, 90:17, 90:20, 90:23, 91:1, 91:4, 117:10, 132:3, 216:21
**mentioned** [8] - 57:17, 83:21, 88:11, 122:16, 122:19, 155:20, 179:14, 204:15
**message** [1] - 202:3
**messages** [1] - 186:4
**met** [2] - 52:23, 58:14
**method** [1] - 9:14
**Miami** [31] - 1:3, 1:16, 1:19, 1:24, 1:25, 34:15, 50:7, 51:1, 51:8, 51:9, 51:12, 51:22, 52:23, 60:24, 62:14, 64:8, 64:9, 67:18, 71:9, 82:6, 92:21, 93:23, 102:22, 116:5, 116:8, 116:14, 117:2, 155:21, 218:19, 218:20
**mic** [3] - 40:18, 47:12, 88:10
**microphone** [4] - 88:6, 88:9, 126:5, 138:9
**mid-80s** [1] - 206:6
**middle** [6] - 38:1, 57:8, 76:6, 87:12, 117:3, 122:3
**might** [10] - 12:8, 25:12, 65:12, 66:22, 80:4, 80:5, 80:6, 123:21, 138:2, 142:6
**million** [75] - 16:22, 16:25, 19:1, 19:6, 22:4, 23:10, 23:12, 23:18, 24:9, 25:17, 28:21, 32:25, 33:13, 34:14, 34:24, 35:12, 35:15, 36:11, 40:11, 40:16, 40:20, 40:25, 41:10, 43:3, 43:5, 43:7, 53:21, 54:7, 54:13, 59:12, 83:25, 94:20, 94:21, 94:22, 94:25, 95:6, 95:21, 95:25, 96:1, 111:8, 118:11, 118:12, 118:13, 118:16, 131:18, 131:19, 160:9, 160:12, 160:15, 160:16, 160:22, 160:23, 160:24, 161:1, 161:3, 161:5, 161:6, 161:7, 161:8, 162:12, 162:14, 172:5, 172:6, 173:13, 173:15, 175:14, 198:16, 212:18, 214:12
**million-and-a-half** [2] - 35:15, 36:11
**million-two** [1] - 214:12
**millions** [7] - 96:20, 118:9, 190:5, 204:17, 204:18, 204:20
**mind** [1] - 30:14
**minimum** [2] - 94:20, 141:25
**mint** [1] - 134:23
**minus** [2] - 150:6, 161:12
**minute** [3] - 48:21, 101:12, 174:17
**minutes** [1] - 97:18
**Mirmelli** [41] - 3:9, 7:22, 8:14, 8:17, 14:16, 17:12, 17:22, 21:6, 21:9, 26:5, 26:18, 26:20, 26:24, 27:3, 33:6, 48:20, 49:11, 49:19, 81:7, 81:17, 81:21, 88:6, 92:21, 94:2, 98:4, 112:2, 112:4, 115:21, 119:18, 122:5, 122:6, 126:19, 134:6, 134:7, 134:8, 135:16, 136:1, 178:11, 184:12, 201:17, 209:14
**MIRMELLI** [3] - 2:4, 49:15, 116:1
**Mirmelli's** [1] - 136:9
**missing** [4] - 148:16, 208:3, 210:6, 215:9
**mistake** [2] - 150:10, 150:11
**mistakes** [1] - 149:5
**model** [14] - 128:8, 128:9, 130:19, 175:18, 175:20, 175:21, 176:23, 176:24, 177:2, 177:11, 177:13, 177:14, 177:18, 177:24
**moderate** [1] - 126:9
**Moises** [10] - 11:11, 11:14, 11:18, 12:14, 12:20, 13:1, 98:1, 98:9, 100:20, 107:8
**Mojave** [1] - 25:10
**moment** [17] - 3:25, 6:2, 35:22, 58:24, 60:20, 87:8, 87:11, 93:5, 93:13, 96:11, 96:20, 114:20, 117:9, 145:14, 178:1, 179:21, 196:7
**money** [139] - 24:13, 24:15, 24:17, 24:21, 24:22, 25:2, 25:15, 25:16, 25:24, 26:2, 26:13, 26:17, 27:18, 27:19, 29:5, 29:18, 29:19, 32:18, 33:4, 33:6, 33:15, 33:17, 33:19, 33:23, 34:6, 34:20, 36:1, 38:18, 38:24, 40:3, 40:4, 44:17, 50:15, 50:17, 50:20, 50:21, 63:20, 64:1, 66:23, 72:21, 85:21, 90:5, 90:8, 90:12, 94:17, 94:19, 96:13, 111:7, 117:22, 119:3, 119:25, 120:4, 121:2, 121:5, 123:2, 127:11, 127:12, 127:22, 127:23, 127:25, 128:4, 128:5, 128:9, 128:23, 129:21, 129:24, 130:9, 130:11, 130:13, 130:14, 131:14, 134:16, 139:14, 142:5, 148:16, 153:11, 155:3, 155:6, 155:10, 155:12, 155:13, 155:15, 156:21, 161:8, 166:4, 172:8, 173:8, 174:7, 174:8, 174:9, 174:11, 175:13, 177:3, 177:5, 177:7, 177:10, 177:15, 181:10, 181:15, 182:2, 183:8, 186:15, 186:22, 187:22, 188:10, 189:13, 189:19, 190:16, 192:6, 192:14, 192:19, 194:6, 195:24, 196:2, 197:13, 198:12, 199:17, 199:18, 199:20, 199:22, 200:11, 201:10, 204:16, 204:22, 204:24, 207:8, 212:1, 213:25, 214:3
**moneys** [12] - 24:16, 25:4, 27:23, 32:2, 34:1, 34:3, 44:7, 66:4, 110:19, 143:5, 186:18, 191:4
**month** [25] - 86:15, 120:17, 121:1, 141:15, 141:18, 141:23, 142:3, 142:12, 143:8, 143:11, 144:8, 144:18, 144:20, 144:22, 145:9, 145:13, 147:13, 148:8, 149:3, 153:22, 154:10, 170:14, 174:13, 189:8
**month)** [1] - 170:16
**monthly** [4] - 75:21, 75:23, 169:2, 170:7
**months** [9] - 86:17, 141:25, 142:2, 150:12, 150:13, 150:19, 171:10, 196:21, 204:17
**morning** [7] - 3:6, 3:14, 3:17, 3:23, 3:24, 49:19, 218:7

**mortgage** [5] - 29:1, 96:8, 106:18, 161:3, 198:16
**mortgages** [1] - 108:5
**most** [4] - 55:22, 90:12, 187:25, 198:8
**motion** [3] - 101:1, 135:3, 135:18
**motivated** [2] - 61:18, 61:24
**mouth** [1] - 128:16
**move** [26] - 16:11, 17:20, 41:19, 42:6, 62:6, 100:7, 130:18, 144:21, 151:4, 158:20, 161:25, 162:21, 172:2, 179:2, 191:21, 193:16, 194:10, 194:18, 194:20, 196:6, 203:7, 203:10, 204:3, 210:25, 211:10
**moved** [3] - 52:23, 88:10, 88:23
**movies** [1] - 51:10
**moving** [4] - 87:18, 89:2, 172:12, 208:21
**MR** [451] - 3:6, 3:11, 3:22, 4:13, 4:15, 5:17, 5:21, 10:12, 10:13, 11:22, 11:23, 12:3, 12:7, 12:9, 12:12, 12:13, 12:18, 12:22, 13:25, 14:2, 14:24, 15:3, 15:6, 16:6, 16:8, 16:10, 16:12, 16:14, 17:15, 17:18, 17:20, 17:21, 18:9, 18:17, 18:19, 19:3, 19:4, 20:6, 20:11, 20:14, 21:10, 21:12, 21:15, 21:16, 21:18, 21:19, 31:11, 31:13, 35:16, 35:19, 35:22, 35:23, 36:2, 36:4, 36:9, 36:10, 37:7, 37:15, 37:24, 38:3, 39:17, 39:19, 39:21, 39:23, 39:24, 40:6, 40:8, 40:12, 40:15, 41:18, 41:20, 41:21, 41:23, 42:1, 42:4, 42:10, 42:12, 42:15, 42:21, 45:1, 45:3, 45:6, 45:10, 45:13, 46:1, 46:6, 46:10, 46:14, 46:16, 46:20, 46:24, 47:3, 47:5, 47:10, 48:11, 48:14, 48:20, 48:24, 49:1, 49:14, 49:17, 51:20, 51:24, 52:12, 52:13, 53:13, 53:23, 55:1, 55:2, 56:9, 56:22, 56:25, 57:13, 57:22, 57:23, 58:3, 58:7, 58:9, 59:10, 60:16, 60:21, 61:12, 61:13, 61:16, 61:21, 61:23, 62:24, 63:1, 63:10, 63:12, 63:17, 64:13, 64:16, 72:3, 72:5, 73:15, 73:21, 73:23, 74:1, 74:4, 74:6, 74:9, 74:11, 75:3, 75:5, 75:9, 75:11, 75:18, 75:24, 76:20, 76:23, 78:6, 78:23, 79:4, 79:6, 79:7, 82:12, 82:16, 83:11, 83:13, 85:2, 85:4, 85:22, 88:2, 88:5, 88:12, 89:7, 89:12, 92:13, 92:15, 93:5, 93:9, 93:12, 94:12, 94:13, 95:8, 95:10, 96:21, 97:8, 97:24, 98:7, 98:8, 98:16, 98:18, 98:25, 99:2, 99:11, 99:16, 99:17, 100:3, 100:7, 100:11, 100:16, 100:18, 101:16, 101:22, 102:9, 102:20, 104:21, 104:22, 105:21, 105:23, 108:25, 109:3, 109:4, 110:1, 110:3, 110:11, 110:13, 111:11, 111:13, 111:15, 114:11, 114:13, 114:17, 114:24, 115:1, 115:5, 115:9, 115:13, 115:20, 116:3, 119:13, 119:15, 119:17, 121:14, 121:16, 123:16, 123:19, 125:13, 125:15, 125:19, 126:8, 126:16, 127:8, 129:17, 129:18, 130:1, 130:2, 130:4, 130:6, 131:15, 131:20, 132:18, 132:20, 132:22, 133:4, 133:10, 134:17, 134:18, 134:20, 135:2, 135:11, 136:1, 136:5, 136:21, 136:24, 137:3, 137:13, 137:24, 138:6, 138:23, 139:3, 139:7, 139:15, 139:16, 139:18, 140:15, 140:18, 140:20, 140:23, 140:25, 141:3, 141:6, 142:14, 142:15, 142:18, 142:20, 143:14, 143:21, 143:23, 144:1, 145:14, 145:16, 149:9, 149:14, 149:15, 151:24, 152:2, 152:10, 156:11, 158:25, 159:8, 159:10, 162:6, 162:8, 162:9, 162:21, 163:1, 163:5, 163:7, 163:9, 165:2, 165:8, 166:15, 166:21, 168:16, 169:11, 169:13, 169:14, 169:18, 169:22, 169:23, 170:18, 171:23, 172:3, 173:24, 174:4, 175:2, 175:6, 175:7, 175:17, 176:11, 176:17, 176:20, 178:1, 178:4, 178:6, 178:9, 179:2, 179:5, 179:6, 179:21, 179:22, 179:25, 180:2, 181:16, 181:20, 181:22, 181:24, 182:1, 182:8, 182:11, 182:16, 182:19, 183:17, 184:1, 184:20, 184:24, 185:4, 185:5, 186:5, 186:11, 186:25, 187:4, 187:6, 187:8, 187:9, 189:3, 189:5, 190:18, 190:20, 191:14, 191:15, 191:16, 191:19, 191:20, 191:24, 191:25, 192:1, 192:3, 192:4, 193:10, 193:17, 193:18, 193:21, 193:22, 194:20, 194:23, 194:24, 194:25, 195:2, 195:18, 195:23, 195:25, 196:6, 196:10, 196:23, 197:3, 201:7, 201:15, 201:22, 201:23, 202:8, 202:12, 202:15, 202:16, 202:23, 203:6, 203:11, 203:13, 203:16, 203:18, 204:3, 204:5, 204:8, 204:10, 204:11, 205:13, 205:14, 205:16, 207:10, 207:12, 207:13, 207:22, 207:24, 208:11, 208:15, 208:20, 209:8, 209:11, 209:13, 210:11, 210:25, 211:2, 211:4, 211:6, 211:11, 211:12, 211:19, 211:23, 212:2, 212:14, 212:22, 212:25, 213:3, 213:10, 213:14, 213:17, 213:22, 215:8, 215:10, 216:2, 216:9, 216:17, 217:10, 217:12, 218:4, 218:6, 218:8, 218:10
**MS** [16] - 21:14, 45:12, 45:16, 45:21, 46:3, 46:7, 46:11, 46:15, 46:17, 46:21, 46:25, 97:9, 97:13, 97:20, 163:3, 215:18
**multiple** [5] - 38:10, 72:25, 198:17, 204:16, 206:10
**multiples** [1] - 205:3
**mumbled** [1] - 139:22
**mumbling** [4] - 85:17, 128:20, 138:9, 138:15
**Murano** [2] - 66:21, 85:9
**murderous** [1] - 51:11
**Musk** [1] - 181:1
**must** [2] - 103:18, 214:8
**mutual** [1] - 66:14
**mutually** [1] - 131:3
**mysteriously** [1] - 80:21

## N

**name** [12] - 49:10, 49:19, 54:13, 65:4, 75:17, 77:18, 78:2, 80:14, 102:4, 141:2, 141:5, 209:19
**named** [5] - 18:10, 22:25, 69:19, 73:6, 195:7
**naming** [1] - 105:3
**Nanette** [1] - 3:12
**narrative** [1] - 51:21
**narrowly** [1] - 64:10
**Nathan** [101] - 3:25, 4:20, 5:5, 7:21, 8:13, 14:18, 14:19, 15:13, 69:18, 70:6, 70:8, 70:13, 70:14, 70:20, 70:23, 71:1, 71:6, 71:16, 72:22, 73:8, 74:18, 75:1, 76:6, 84:15, 86:8, 86:9, 87:2, 87:7, 87:10, 87:14, 88:20, 88:21, 89:18, 89:24, 90:3, 90:7, 90:8, 90:12, 90:16, 90:19, 90:22, 90:25, 91:3, 91:7, 91:11, 92:2, 120:25, 121:6, 121:9, 121:11, 121:18, 121:20, 121:24, 122:9, 122:12, 122:17, 122:20, 123:6, 125:2, 142:4, 154:16, 154:19, 154:21, 156:12, 156:19, 157:18, 158:1, 158:17, 182:2, 182:3, 182:25, 183:1, 184:2, 185:11, 185:18, 185:19, 185:21, 187:11, 187:16, 187:18, 188:17, 191:6, 192:5, 192:8, 192:13, 193:1, 195:3, 195:7, 196:1, 196:2, 197:11, 197:12, 197:13, 197:25, 201:24, 206:7
**Nathan's** [3] - 123:4, 184:15
**nature** [1] - 82:22
**necessary** [8] - 7:12, 59:1, 103:5, 118:12, 119:3, 130:14,

152:24, 159:15
**need** [34] - 12:10, 53:15, 56:12, 56:18, 59:25, 64:4, 78:18, 97:12, 99:11, 100:3, 100:5, 113:12, 125:22, 125:23, 126:7, 131:14, 142:22, 154:2, 154:3, 160:7, 170:9, 179:21, 182:2, 182:14, 182:21, 184:23, 188:10, 195:24, 200:4, 201:6, 202:5, 207:16, 209:3
**needed** [17] - 5:4, 26:7, 93:20, 96:6, 96:13, 96:15, 114:23, 120:10, 121:5, 124:9, 124:13, 128:5, 154:16, 154:17, 160:5, 172:14, 196:2
**needless** [1] - 148:24
**needs** [6] - 30:16, 53:9, 93:25, 96:11, 99:10, 216:10
**negate** [1] - 64:6
**negotiate** [2] - 22:20, 22:23
**negotiated** [6] - 58:14, 61:7, 64:24, 107:1, 107:17, 210:13
**negotiating** [2] - 13:13, 107:3
**negotiation** [1] - 208:25
**net** [22] - 59:22, 59:24, 95:5, 163:20, 164:2, 164:8, 164:15, 165:11, 165:19, 166:1, 166:2, 166:3, 166:12, 166:13, 166:17, 166:19, 166:20, 166:22, 167:5
**never** [31] - 48:2, 56:5, 71:17, 80:20, 80:21, 83:7, 83:9, 84:9, 109:18, 117:3, 120:7, 120:22, 121:6, 122:1, 122:3, 123:15, 151:16, 153:2, 153:3, 157:15, 172:25, 180:25, 212:21, 213:1, 213:5, 213:6, 213:7, 214:20, 216:4, 216:5
**new** [4] - 28:15, 71:11, 118:24, 157:8
**next** [27] - 12:5, 15:4, 23:9, 30:18, 38:17, 48:19, 50:23, 76:12, 87:17, 89:1, 122:12, 144:11, 144:13, 148:11, 158:9, 171:25, 185:21, 186:10, 193:20, 194:22, 204:17, 208:18, 210:10, 212:8, 216:12, 216:14
**nice** [4] - 49:19, 67:15, 115:11, 138:20
**nicely** [1] - 187:20
**Nielsen** [4] - 3:11, 49:1, 176:23, 179:23
**NIELSEN** [32] - 1:17, 3:11, 11:22, 12:3, 12:18, 16:8, 16:10, 37:7, 39:19, 41:20, 42:1, 42:10, 42:12, 45:3, 45:6, 45:10, 45:13, 46:1, 46:6, 46:10, 46:14, 46:16, 46:20, 46:24, 47:3, 47:5, 47:10, 48:11, 100:16, 100:18, 191:15, 191:19
**night's** [1] - 217:18
**nine** [2] - 64:4, 84:1
**NO** [1] - 1:2
**nobody** [8] - 52:2, 52:3, 101:1, 111:21, 145:3, 145:6, 200:13
**nondisclosure** [1] - 106:15
**none** [2] - 171:22, 192:9
**nonresponsive** [4] - 51:20, 53:13, 56:9, 151:23
**nonsensical** [1] - 136:5
**normal** [4] - 15:15, 15:17, 38:25, 39:5
**north** [1] - 60:6
**North** [3] - 1:24, 199:10, 218:19
**note** [15] - 5:15, 36:5, 134:2, 140:14, 203:20, 203:22, 203:25, 204:14, 204:23, 205:6, 205:12, 205:19, 207:14, 212:13, 216:5
**noted** [1] - 103:16
**notes** [1] - 178:5
**nothing** [11] - 51:14, 62:5, 92:12, 113:8, 114:2, 174:15, 174:24, 175:16, 177:21, 186:7, 195:8
**notice** [91] - 5:18, 5:25, 6:8, 6:10, 6:17, 6:19, 6:23, 6:25, 7:4, 7:7, 7:8, 7:10, 7:13, 7:18, 7:24, 8:1, 8:2, 8:3, 8:5, 8:9, 8:12, 8:17, 9:17, 9:20, 9:22, 10:6, 10:7, 10:22, 10:25, 11:1, 11:4, 11:12, 11:19, 13:1, 13:3, 13:4, 27:21, 28:2, 47:25, 48:3, 48:6, 65:10, 65:16, 65:22, 66:4, 68:19, 69:5, 69:8, 69:11, 69:14, 82:9, 82:21, 82:23, 84:9, 93:20, 96:14, 118:2, 119:12, 120:7, 120:9, 122:5, 125:7, 145:5, 151:16, 151:18, 152:24, 153:11, 153:12, 153:14, 154:2, 154:3, 154:7, 154:21, 156:25, 171:10, 172:19, 172:20, 172:21, 178:24, 187:15, 188:1, 188:24, 192:14, 193:2, 193:6, 196:5, 196:21, 197:21
**noticed** [1] - 68:15
**notices** [12] - 9:1, 9:13, 11:8, 20:16, 80:21, 80:25, 83:7, 83:9, 179:8, 179:10, 187:25, 188:22
**noticing** [1] - 27:22
**notwithstanding** [2] - 55:19, 82:19
**November** [7] - 21:8, 147:5, 147:7, 150:14, 175:23, 176:3, 195:3
**nowhere** [3] - 31:20, 31:24, 179:10
**number** [13] - 29:8, 36:6, 38:1, 38:2, 38:22, 56:3, 89:4, 93:6, 148:15, 148:17, 148:22, 167:5, 187:3
**numbers** [13] - 25:22, 35:8, 110:24, 123:8, 123:10, 123:13, 141:22, 154:25, 157:13, 158:4, 158:13, 162:11, 163:24
**numerous** [4] - 51:1, 51:2, 116:22

## O

**o'clock** [3] - 47:8, 48:22, 57:3
**oath** [1] - 57:8
**object** [4] - 11:25, 56:12, 56:16, 215:12
**objected** [1] - 45:12
**objecting** [1] - 12:2
**objection** [105] - 11:22, 12:3, 12:18, 16:8, 16:9, 37:7, 37:10, 37:12, 39:19, 41:19, 41:24, 42:1, 42:6, 42:8, 42:12, 45:14, 45:15, 45:17, 45:18, 45:19, 45:20, 45:24, 46:2, 46:3, 46:7, 46:11, 46:15, 46:17, 46:18, 46:21, 46:22, 46:25, 47:1, 51:20, 53:13, 53:14, 56:9, 56:11, 60:16, 61:16, 62:24, 63:10, 75:18, 78:6, 78:19, 78:20, 88:2, 89:7, 98:12, 100:9, 100:20, 101:10, 114:24, 115:5, 121:14, 123:16, 125:13, 130:1, 130:2, 130:3, 131:15, 132:18, 132:19, 134:17, 134:20, 136:20, 136:22, 139:15, 140:15, 140:20, 140:25, 142:14, 142:17, 143:20, 143:21, 151:24, 166:15, 173:24, 175:2, 175:10, 176:11, 179:25, 181:19, 183:17, 186:5, 189:3, 190:18, 201:7, 204:4, 204:5, 205:13, 208:11, 208:14, 209:8, 211:2, 211:3, 211:19, 211:22, 212:14, 212:25, 213:10, 213:17, 215:8, 215:10, 216:6
**objections** [1] - 175:5
**objects** [1] - 53:15
**obligated** [4] - 151:9, 151:18, 152:8, 166:10
**obligation** [20] - 56:4, 70:25, 120:19, 142:9, 145:9, 153:7, 154:8, 154:10, 154:13, 159:17, 161:3, 166:25, 169:2, 181:4, 181:6, 181:7, 189:8, 204:13, 204:23, 204:25
**obligations** [8] - 81:20, 144:19, 168:2, 168:5, 169:3, 170:19, 171:11, 178:14
**observe** [4] - 60:25, 87:1, 88:13, 116:13
**observing** [1] - 52:20
**obtained** [2] - 69:23, 107:22
**obtaining** [1] - 59:9
**obvious** [2] - 62:6, 122:16
**obviously** [12] - 56:5, 56:6, 60:7, 65:10, 84:15, 100:12, 119:12, 127:23, 152:25, 153:3, 201:21, 206:7
**occasions** [2] - 66:15, 66:16
**occurred** [1] - 111:19
**October** [7] - 17:10, 18:21, 21:8, 117:4, 147:1, 147:3, 150:14
**OF** [2] - 1:1, 2:1
**offer** [18] - 16:6, 17:13, 18:7, 18:10, 18:14, 72:12, 72:13, 72:14, 72:19, 83:24, 84:2, 85:13, 85:14, 85:20, 94:7, 94:9
**offered** [5] - 49:1, 83:25, 199:17, 199:20, 201:10
**offers** [3] - 17:11, 17:22, 83:17
**office** [14] - 53:21, 54:6, 73:5, 73:7, 86:7, 87:17, 87:18, 87:22, 89:2, 125:2, 125:4, 158:9

**officer** [3] - 13:16, 13:19
**Official** [2] - 1:22, 218:18
**old** [4] - 51:4, 51:5, 74:19, 206:5
**older** [4] - 70:18, 70:19, 70:20, 78:8
**once** [4] - 8:6, 9:2, 150:10, 159:11
**one** [59] - 5:6, 7:11, 9:16, 15:19, 18:7, 25:18, 25:21, 25:25, 35:8, 36:18, 38:6, 38:7, 38:9, 38:11, 39:8, 39:12, 45:13, 47:5, 56:20, 61:6, 66:21, 78:2, 79:10, 82:25, 88:5, 94:11, 95:12, 97:10, 98:9, 100:16, 103:18, 117:23, 136:10, 136:13, 142:4, 142:7, 145:14, 146:7, 150:6, 157:5, 157:15, 160:3, 164:24, 167:15, 167:17, 167:20, 167:22, 171:7, 175:16, 176:3, 178:7, 184:6, 196:13, 196:19, 200:3, 206:2, 217:25
**one-and-a-half** [1] - 35:8
**ones** [2] - 190:1, 198:21
**onward** [3] - 84:18, 89:6, 89:16
**oops** [1] - 73:17
**open** [1] - 121:25
**opened** [4] - 51:19, 69:23, 125:2, 125:3
**opening** [1] - 129:13
**operate** [4] - 4:3, 5:5, 91:12, 113:22
**operated** [1] - 4:11
**operating** [5] - 5:7, 37:9, 87:19, 91:17, 91:20
**operation** [7] - 63:4, 66:5, 68:4, 68:10, 69:4, 69:9, 118:14
**operations** [8] - 36:21, 36:22, 37:8, 37:18, 68:6, 68:13, 117:20, 185:15
**operator** [6] - 4:20, 82:6, 113:10, 113:21, 113:23, 113:25
**opinion** [6] - 78:4, 111:1, 140:9, 141:2, 141:5, 152:19
**OPM** [4] - 177:9, 177:14, 177:16, 177:23
**opportunities** [2] - 70:22, 86:2
**opportunity** [12] - 22:23, 54:14, 58:15, 71:1, 71:3, 85:12, 89:21, 91:16, 116:13, 126:1, 129:9, 201:12
**order** [10] - 3:1, 11:7, 28:9, 28:12, 30:15, 80:8, 84:5, 103:8, 103:19, 110:9
**ordinary** [3] - 32:9, 32:13, 32:14
**original** [1] - 13:10
**originally** [2] - 69:24, 187:22
**Orlando** [1] - 13:16
**Osoria** [1] - 3:9
**otherwise** [1] - 192:24
**ourselves** [1] - 217:20
**outgoing** [1] - 28:1
**outside** [3] - 138:19, 211:7, 212:7
**outstanding** [3] - 198:12, 198:15, 213:19
**outweighed** [2] - 137:14, 137:20
**overleveraged** [1] - 198:11
**overrule** [1] - 78:20
**overruled** [37] - 12:19, 37:12, 53:15, 56:11, 60:17, 75:19, 78:7, 88:4, 89:9, 100:20, 115:7, 121:15, 123:18, 125:14, 130:5, 131:16, 132:21, 140:16, 140:21, 141:1, 142:19, 166:16, 173:25, 175:4, 175:10, 186:6, 189:4, 190:19, 201:8, 208:14, 209:9, 211:24, 212:15, 213:2, 213:11, 213:18, 216:6
**oversaw** [1] - 185:15
**oversees** [1] - 67:16
**owe** [5] - 47:18, 90:8, 181:14, 189:23, 214:19
**owed** [10] - 19:1, 32:19, 32:21, 178:21, 181:10, 205:12, 207:9, 212:17, 213:20, 214:12
**own** [29] - 36:19, 44:7, 44:22, 50:15, 71:16, 71:18, 77:22, 78:11, 78:12, 79:9, 79:20, 80:9, 80:14, 87:19, 89:2, 99:5, 107:19, 161:8, 176:8, 177:2, 177:3, 181:13, 183:15, 199:21, 200:12, 200:13, 200:16, 204:12
**owned** [11] - 51:15, 53:21, 53:25, 55:12, 55:13, 71:9, 72:11, 78:11, 85:8, 85:9, 116:22
**owner's** [1] - 78:2
**ownership** [10] - 50:1, 52:18, 65:13, 77:13, 77:16, 91:14, 95:11, 156:12, 156:14
**owns** [1] - 85:8

**P**

**p.m** [9] - 1:5, 97:22, 101:5, 158:23, 159:1, 159:2, 159:5, 215:19, 218:11
**page** [36] - 15:4, 19:5, 20:7, 23:9, 27:20, 28:22, 30:18, 38:17, 38:23, 40:12, 42:16, 55:1, 68:24, 72:4, 73:18, 74:1, 74:25, 75:3, 76:5, 76:9, 80:24, 95:4, 107:15, 108:25, 110:11, 171:1, 171:25, 172:2, 176:5, 209:11, 209:21, 209:22
**Pages** [1] - 1:7
**paid** [29] - 4:10, 6:4, 22:4, 26:18, 36:24, 41:13, 47:20, 143:8, 144:20, 145:19, 145:24, 148:6, 148:12, 148:18, 148:21, 148:22, 149:16, 149:18, 149:21, 149:23, 170:7, 186:13, 199:22, 199:24, 206:15, 206:18, 207:2, 207:3
**paper** [2] - 142:23, 182:8
**papers** [3] - 6:18, 192:9, 207:19
**paperwork** [3] - 71:15, 101:21, 142:22
**paragraph** [7] - 10:1, 10:3, 64:18, 64:19, 80:24, 166:7, 210:7
**paralegals** [1] - 3:8
**paraphrasing** [1] - 132:12
**PARDO** [230] - 1:13, 3:6, 3:22, 4:13, 4:15, 5:17, 5:21, 10:12, 10:13, 11:23, 12:7, 12:9, 12:12, 12:13, 12:22, 13:25, 14:2, 14:24, 15:3, 15:6, 16:6, 16:12, 16:14, 17:15, 17:18, 17:20, 17:21, 18:9, 18:17, 18:19, 19:3, 19:4, 20:6, 20:11, 20:14, 21:10, 21:12, 21:15, 21:16, 21:18, 21:19, 31:11, 31:13, 35:16, 35:19, 35:22, 35:23, 36:2, 36:4, 36:9, 36:10, 37:15, 37:24, 38:3, 39:17, 39:21, 39:23, 39:24, 40:6, 40:8, 40:12, 40:15, 41:18, 41:21, 41:23, 42:4, 42:15, 42:21, 45:1, 48:14, 48:20, 48:24, 49:1, 49:14, 49:17, 51:24, 52:12, 52:13, 53:23, 55:1, 55:2, 56:22, 56:25, 57:22, 57:23, 58:3, 58:7, 58:9, 59:10, 60:21, 61:12, 61:13, 61:21, 61:23, 63:1, 63:12, 63:17, 64:13, 64:16, 72:3, 72:5, 73:15, 73:21, 73:23, 74:1, 74:4, 74:6, 74:9, 74:11, 75:3, 75:5, 75:9, 75:11, 75:24, 76:20, 76:23, 78:23, 79:4, 79:6, 79:7, 82:12, 82:16, 83:11, 83:13, 85:2, 85:4, 85:22, 88:12, 89:12, 92:13, 92:15, 93:5, 93:9, 93:12, 94:12, 94:13, 95:8, 95:10, 96:21, 97:8, 97:24, 98:7, 98:16, 98:25, 99:2, 99:11, 99:16, 100:3, 100:7, 101:16, 101:22, 102:9, 102:20, 104:21, 104:22, 105:21, 105:23, 108:25, 109:3, 109:4, 110:1, 110:3, 110:11, 110:13, 111:11, 114:13, 114:17, 115:1, 115:9, 115:13, 115:20, 116:3, 119:13, 121:14, 123:16, 125:13, 130:1, 130:4, 131:15, 132:18, 132:20, 134:17, 134:20, 135:2, 135:11, 136:1, 137:3, 137:13, 137:24, 138:6, 139:15, 140:15, 140:20, 140:25, 142:14, 142:18, 143:21, 151:24, 163:1, 166:15, 173:24, 175:2, 175:6, 176:11, 179:25, 183:17, 186:5, 189:3, 190:18, 191:24, 192:1, 194:24, 201:7, 203:13, 204:5, 205:13, 207:12, 208:11, 209:8, 211:2, 211:4, 211:19, 211:23, 212:14, 212:25, 213:10, 213:17, 215:8, 215:10, 216:2
**Pardo** [3] - 1:14, 3:6, 3:7
**pardon** [6] - 5:2, 27:8, 29:13, 33:18, 39:10, 127:20
**parent** [4] - 37:1, 69:24, 69:25, 91:25
**parentheses** [3] - 171:4, 171:5, 171:6
**parents** [1] - 51:14
**Park** [17] - 4:8, 4:10, 4:16, 5:8, 69:19, 69:21, 70:2, 70:5, 70:9, 70:23, 71:2, 71:16, 91:14, 91:25,

184:16, 185:7, 205:25
**Parker** [1] - 1:18
**Parking** [15] - 28:19, 69:19, 69:21, 70:2, 70:5, 70:9, 70:23, 71:2, 71:16, 75:12, 91:25, 124:4, 184:16, 185:8, 205:25
**parking** [64] - 4:3, 4:17, 25:13, 25:18, 28:25, 38:5, 38:6, 38:7, 38:12, 38:13, 39:25, 42:24, 43:2, 43:25, 53:6, 53:22, 54:2, 54:12, 54:15, 55:12, 55:13, 60:15, 63:4, 64:9, 68:4, 68:6, 68:10, 68:13, 69:23, 69:25, 70:1, 70:2, 71:12, 75:20, 82:5, 86:22, 90:5, 91:8, 112:23, 112:24, 113:2, 113:3, 113:6, 113:10, 113:21, 113:22, 113:23, 117:20, 118:14, 118:18, 119:18, 143:12, 155:3, 155:5, 155:21, 157:1, 157:4, 158:8, 172:14, 174:24, 182:2, 182:21, 198:18
**parkwestmh@gmail.com** [1] - 74:16
**Part** [1] - 40:13
**part** [13] - 14:11, 19:3, 23:1, 67:17, 82:20, 106:10, 121:12, 131:5, 155:18, 178:2, 181:13, 197:18, 205:6
**partial** [2] - 170:14, 209:6
**partially** [1] - 209:10
**participation** [17] - 76:18, 91:4, 95:2, 96:9, 108:16, 108:18, 108:19, 109:23, 112:18, 133:21, 153:21, 159:17, 163:19, 169:4, 181:5, 184:15, 197:16
**Participation** [62] - 5:11, 6:13, 8:11, 11:13, 11:20, 13:2, 16:15, 19:9, 19:13, 32:3, 50:2, 54:18, 54:19, 54:23, 55:20, 57:24, 58:23, 61:7, 61:25, 62:11, 64:17, 71:5, 71:24, 72:1, 72:16, 76:15, 77:10, 80:23, 81:16, 90:17, 95:3, 109:8, 109:11, 111:2, 114:14, 114:18, 120:11, 125:6, 126:12, 135:6, 135:15, 136:2, 137:6, 137:18, 139:20, 139:24, 141:8, 141:20, 144:14, 152:21, 152:23, 154:11, 154:20, 156:2, 156:5, 159:11, 159:21, 169:5, 171:13, 171:15, 171:24, 178:7
**particular** [14] - 54:8, 65:24, 131:1, 136:14, 167:23, 171:11, 172:16, 174:25, 177:24, 186:4, 197:6, 209:5, 209:7, 214:7
**parties** [12] - 69:4, 81:2, 97:25, 98:2, 98:7, 110:21, 111:2, 131:4, 135:15, 156:5, 156:6, 195:5
**partner** [5] - 50:16, 85:7, 85:8, 85:19
**partners** [1] - 77:23
**partnership** [2] - 66:23, 155:18
**partnerships** [2] - 55:22, 116:19
**party** [17] - 22:17, 66:3, 69:3, 72:12, 92:7, 103:20, 104:2, 104:5, 104:14, 104:17, 105:10, 106:20, 107:22, 108:6, 108:19, 109:15, 109:20
**passed** [3] - 31:1, 31:3, 70:14
**past** [1] - 13:3
**patience** [1] - 185:3
**Patrick** [12] - 3:10, 5:19, 10:12, 16:13, 21:10, 55:1, 58:7, 64:19, 72:3, 73:15, 83:11, 110:1
**pause** [4] - 47:4, 93:8, 145:15, 178:5
**pay** [83] - 6:14, 6:19, 7:5, 9:5, 9:10, 19:10, 24:18, 24:22, 24:23, 25:2, 25:16, 26:2, 26:16, 34:9, 96:15, 120:2, 120:4, 120:8, 120:17, 120:23, 120:24, 121:5, 123:1, 123:2, 125:1, 125:18, 126:22, 136:10, 141:15, 141:18, 142:12, 144:8, 144:18, 144:21, 147:21, 147:25, 148:3, 148:8, 151:8, 152:7, 153:6, 153:16, 153:17, 153:22, 154:1, 154:2, 154:10, 154:17, 170:5, 170:20, 170:23, 171:12, 172:16, 172:17, 172:23, 173:1, 173:6, 188:20, 189:8, 190:8, 195:9, 195:24, 198:12, 198:15, 198:16, 198:17, 198:18, 199:14, 204:21, 204:25, 205:11, 205:20, 206:23, 206:25, 211:16, 212:12, 212:23, 214:3, 215:2
**payable** [2] - 205:8, 205:9
**paying** [15] - 14:12, 28:21, 32:18, 124:16, 124:21, 142:3, 145:8, 145:12, 153:5, 153:24, 168:6, 169:6, 173:5, 178:22, 186:19
**payment** [30] - 6:6, 7:4, 8:6, 8:7, 8:21, 8:23, 9:6, 9:7, 16:23, 16:25, 22:4, 23:2, 23:6, 23:9, 23:10, 23:12, 23:19, 23:25, 24:8, 26:10, 27:2, 28:5, 96:7, 96:8, 143:1, 169:2, 178:13, 181:4, 205:24
**payments** [21] - 8:22, 86:15, 86:19, 91:22, 91:24, 92:1, 92:2, 92:4, 92:8, 92:10, 145:1, 145:2, 145:7, 150:21, 150:23, 151:5, 151:11, 173:10, 186:9, 193:5, 206:10
**PDF** [6] - 27:20, 55:1, 68:24, 72:4, 80:24, 95:4
**pending** [1] - 100:24
**penthouse** [1] - 85:9
**Penthouse** [1] - 66:21
**people** [10] - 60:7, 72:25, 116:23, 119:2, 138:7, 138:8, 155:23, 157:4, 157:9, 190:23
**people's** [4] - 128:9, 177:5, 177:10, 177:14
**per** [3] - 28:24, 86:15, 144:20
**percent** [34] - 9:10, 17:1, 49:21, 59:18, 59:22, 65:17, 65:19, 78:11, 78:12, 80:2, 80:3, 80:4, 80:9, 80:10, 80:11, 95:5, 118:11, 163:20, 164:1, 164:8, 164:14, 165:11, 165:18, 165:19, 166:3, 166:12, 167:15, 170:16, 177:12, 206:11
**percentage** [3] - 52:17, 65:15
**perfect** [1] - 42:20
**performance** [2] - 107:23, 178:13
**perhaps** [1] - 180:22
**period** [34] - 17:6, 50:20, 50:21, 62:18, 81:9, 81:13, 86:17, 95:24, 96:3, 96:17, 107:9, 114:1, 117:21, 119:8, 131:12, 132:11, 132:17, 132:25, 133:9, 141:21, 181:8, 183:1, 185:12, 185:13, 185:21, 185:24, 186:3, 186:8, 198:4, 198:6, 200:15, 202:6, 202:20, 207:19
**periods** [1] - 132:25
**permission** [4] - 20:8, 74:6, 97:25, 187:2
**permitting** [1] - 82:22
**perplexed** [1] - 161:15
**person** [6] - 15:22, 39:11, 52:15, 157:12, 157:14, 177:7
**personal** [14] - 19:5, 26:1, 56:4, 61:3, 79:15, 81:3, 81:6, 83:23, 141:2, 141:5, 153:1, 161:8, 162:14, 172:8
**personally** [11] - 71:13, 134:7, 175:13, 178:12, 178:19, 178:23, 179:8, 179:9, 181:6, 185:9, 210:17
**PH02** [1] - 66:22
**phone** [4] - 19:22, 20:21, 89:4, 206:8
**phonetic** [3] - 29:22, 73:6, 169:25
**photographic** [7] - 180:3, 180:5, 180:10, 180:12, 180:17, 181:1, 205:22
**phrase** [2] - 116:18, 203:6
**physical** [1] - 169:15
**pick** [2] - 198:20, 198:23
**picked** [3] - 52:20, 156:13, 198:21
**picking** [2] - 71:13, 155:4
**Pine** [1] - 77:6
**place** [9] - 50:24, 51:13, 62:8, 67:1, 80:10, 93:3, 145:7, 158:9, 200:2
**placed** [1] - 126:21
**places** [2] - 66:19, 157:5
**plain** [3] - 32:9, 32:13, 32:14
**Plaintiff** [2] - 1:4, 107:14
**plaintiff** [7] - 3:5, 48:20, 100:19, 101:10, 111:23, 115:20, 136:17
**PLAINTIFF** [3] - 1:13, 49:15, 116:1
**plaintiff's** [2] - 99:9, 111:24
**Plaintiff's** [51] - 4:13, 5:17, 6:25, 7:17, 8:5,

8:20, 9:1, 9:4, 9:17, 10:11, 13:25, 14:24, 16:6, 17:15, 18:17, 21:12, 22:7, 24:6, 26:22, 27:20, 27:25, 28:8, 28:18, 29:25, 31:8, 31:12, 35:16, 37:25, 39:18, 40:6, 41:15, 54:24, 58:4, 58:7, 72:4, 73:15, 74:3, 76:20, 81:24, 82:13, 85:2, 92:13, 94:12, 104:20, 105:20, 106:23, 109:1, 109:3, 109:24, 114:14, 126:12
**PLAINTIFF'S** [1] - 102:7
**plaintiffs** [1] - 101:17
**plan** [2] - 60:12, 192:11
**planned** [1] - 3:18
**plans** [1] - 60:11
**Plaza** [7] - 16:23, 18:24, 22:9, 23:19, 26:11, 28:1, 84:12
**plenty** [1] - 174:3
**PLLC** [2] - 1:14, 3:7
**plot** [1] - 121:12
**plus** [6] - 19:6, 150:7, 150:8, 170:14, 171:16
**point** [20] - 6:8, 11:10, 19:8, 21:24, 34:1, 53:18, 71:8, 73:8, 83:7, 125:2, 171:21, 173:23, 183:12, 185:20, 198:2, 198:22, 198:23, 214:20, 217:24
**pointed** [2] - 171:22, 193:15
**points** [2] - 12:23, 217:22
**pontificate** [1] - 64:8
**Port** [1] - 169:25
**portion** [2] - 195:4, 195:23
**Portofino** [2] - 66:21, 85:9
**pose** [2] - 193:14, 195:14
**posed** [2] - 78:19, 193:13
**positive** [1] - 66:11
**possibility** [1] - 118:7
**possible** [5] - 117:23, 118:5, 128:15, 131:2, 191:1
**possibly** [1] - 141:25
**post** [1] - 104:1
**post-closing** [1] - 104:1
**potential** [4] - 50:21, 72:25, 90:23, 118:4
**potentially** [1] - 71:11
**power** [5] - 65:5, 158:3, 158:4, 158:6
**practice** [7] - 19:18, 55:16, 55:22, 73:11, 73:13, 74:22, 102:12
**practiced** [1] - 114:6
**practicing** [1] - 217:8
**precautionary** [3] - 116:25, 117:7
**precluded** [2] - 23:24, 135:21
**predicate** [1] - 202:9
**preeminently** [1] - 71:2
**preempt** [1] - 63:22
**preferred** [6] - 31:25, 32:21, 44:6, 44:12, 44:14, 68:17
**prejudice** [2] - 137:14, 137:19
**prepare** [2] - 103:4, 118:6
**prepared** [1] - 118:16
**prepped** [1] - 138:17
**prescribe** [1] - 32:12
**presence** [2] - 138:19, 211:7
**present** [1] - 83:17
**presenting** [3] - 63:22, 73:20, 90:3
**preservation** [1] - 33:24
**Preservation** [2] - 34:14, 35:3
**president** [3] - 104:15, 105:3, 105:13
**presume** [1] - 193:19
**pretty** [10] - 29:17, 66:22, 99:3, 136:13, 198:3, 198:4, 198:6, 198:9, 214:4, 217:23
**previous** [1] - 9:16
**previously** [5] - 33:3, 99:3, 104:19, 105:19, 126:21
**PREVIOUSLY** [2] - 3:20, 116:1
**price** [5] - 32:25, 33:21, 33:22, 34:24, 131:6
**principal** [2] - 205:8, 205:20
**printed** [1] - 209:19
**priorities** [1] - 118:23
**prioritize** [1] - 117:13
**private** [1] - 118:8
**privilege** [15] - 98:13, 98:23, 99:4, 99:6, 99:10, 99:15, 99:16, 99:20, 99:22, 100:1, 100:13, 100:14, 100:21, 100:25, 101:3
**privileged** [3] - 98:11, 98:22, 98:24
**pro** [1] - 9:10
**proactively** [1] - 117:1
**probative** [3] - 63:21, 137:13, 137:20
**probe** [2] - 137:12, 137:23
**probing** [3] - 137:11, 138:3
**problem** [3] - 64:12, 151:20, 151:22
**problems** [2] - 88:11, 151:21
**procedure** [2] - 191:5, 191:6
**proceed** [4] - 49:13, 52:11, 57:21, 198:25
**proceedings** [1] - 218:14
**proceeds** [7] - 37:19, 38:15, 38:18, 39:25, 109:21, 111:9, 167:13
**process** [4] - 60:19, 96:4, 204:15
**produce** [2] - 143:3, 210:21
**produced** [1] - 136:19
**profession** [1] - 102:10
**professionally** [1] - 217:20
**proffer** [1] - 98:16
**Profit** [62] - 5:10, 6:13, 8:11, 11:12, 11:19, 13:2, 16:15, 19:9, 19:13, 32:2, 50:1, 54:18, 54:19, 54:23, 55:20, 57:24, 58:23, 61:7, 61:24, 62:10, 64:17, 71:5, 71:23, 72:1, 72:16, 76:15, 77:10, 80:23, 81:16, 90:17, 95:3, 109:8, 109:11, 111:2, 114:13, 114:18, 120:11, 125:5, 126:12, 135:6, 135:15, 136:2, 137:6, 137:17, 139:20, 139:24, 141:8, 141:20, 144:14, 152:21, 152:23, 154:11, 154:20, 156:2, 156:4, 159:11, 159:20, 169:4, 171:13, 171:15, 171:24, 178:6
**profit** [22] - 32:8, 32:9, 32:12, 32:16, 44:17, 44:19, 61:14, 61:19, 76:17, 84:5, 91:4, 95:2, 155:6, 156:15, 164:20, 165:12, 165:13, 165:22, 168:14, 169:4, 187:14, 197:16
**profit-sharing** [1] - 168:14
**profitable** [16] - 28:25, 29:2, 29:16, 29:20, 44:21, 56:23, 61:4, 62:8, 62:19, 62:23, 63:3, 63:4, 63:7, 63:9, 117:20, 173:9
**profits** [29] - 44:10, 44:12, 44:15, 52:17, 59:23, 59:25, 67:24, 68:3, 68:6, 68:8, 68:9, 68:12, 77:6, 91:1, 111:2, 111:5, 118:15, 156:1, 163:20, 164:9, 164:15, 164:17, 165:14, 165:23, 167:4, 167:5, 213:21, 215:6
**project** [1] - 60:18
**projects** [4] - 60:25, 61:4, 61:14, 61:17
**promise** [1] - 141:7
**promised** [1] - 13:12
**promissory** [12] - 134:2, 140:14, 203:19, 203:22, 203:25, 204:13, 204:23, 205:6, 205:12, 205:19, 207:14, 212:13
**promote** [5] - 52:14, 52:15, 52:19, 63:5, 90:23
**proof** [12] - 122:20, 122:24, 123:6, 123:8, 129:19, 150:23, 150:25, 151:1, 154:24, 157:20, 157:21, 158:1
**proper** [8] - 111:22, 112:6, 153:12, 153:14, 176:14, 191:5, 196:5, 197:21
**properly** [2] - 21:4, 188:23
**properties** [11] - 37:2, 37:17, 50:15, 50:16, 55:3, 62:21, 118:22, 132:24, 177:2, 198:11, 199:15
**property** [127] - 11:17, 12:16, 12:17, 12:24, 12:25, 13:5, 14:13, 14:22, 16:16, 16:20, 17:11, 17:23, 19:11, 25:7, 25:11, 25:17, 28:15, 29:3, 30:10, 31:2, 31:5, 31:15, 33:11, 34:3, 34:7, 36:16, 36:19, 37:3, 37:4, 37:5, 37:18, 38:5, 38:21, 40:17, 43:11, 44:4, 49:23, 50:3, 52:15, 52:18, 53:20, 54:9, 58:20, 59:23, 60:4, 60:11, 60:14, 62:22, 63:2, 64:21, 65:2, 65:4, 65:9, 65:13, 66:6, 68:3, 68:23, 69:3, 72:11, 76:16, 76:18, 77:5, 77:7, 77:13, 77:16, 80:14, 80:20, 81:19, 83:18, 84:3, 94:7, 94:15, 95:11, 96:9, 96:10, 99:18, 102:21, 102:25, 105:7, 106:4, 106:6, 106:19, 107:2, 108:7, 108:11, 108:20, 109:16, 111:19, 113:10, 113:13, 113:14, 113:16, 114:1, 114:3, 117:18, 118:19, 119:10, 131:17, 134:15, 136:9, 139:13, 152:25, 156:1, 159:15, 160:6, 160:13, 162:18, 163:15, 163:21, 164:9, 164:16, 166:11, 171:8, 171:9, 172:24, 174:11, 175:19, 177:23, 186:4, 196:19, 196:20, 199:21, 214:14

**prorations** [2] - 110:8, 110:25
**protect** [5] - 106:14, 117:8, 118:24, 198:24, 210:15
**protected** [1] - 142:9
**prove** [7] - 122:17, 158:17, 206:13, 206:15, 206:17, 206:18, 213:20
**proves** [1] - 192:23
**provide** [3] - 52:6, 59:1, 159:14
**provided** [3] - 32:5, 45:16, 89:25
**proving** [2] - 182:25, 206:7
**provision** [5] - 23:14, 23:21, 27:21, 107:21, 108:2
**provisions** [2] - 107:16, 107:19
**public** [3] - 92:23, 92:25, 94:3
**publish** [15] - 4:14, 15:3, 20:6, 21:18, 22:7, 41:16, 73:17, 74:2, 74:6, 104:21, 105:21, 181:24, 187:2, 204:8, 204:10
**publishing** [1] - 36:3
**pull** [36] - 4:13, 5:17, 13:25, 14:24, 17:15, 18:17, 21:12, 22:7, 24:6, 28:8, 28:18, 29:25, 31:11, 35:16, 35:22, 36:2, 40:6, 41:15, 42:17, 54:23, 68:24, 73:15, 74:3, 76:20, 81:24, 82:12, 82:14, 85:2, 92:13, 93:9, 94:12, 95:8, 114:13, 118:12, 141:21
**pulling** [1] - 157:6
**purchase** [21] - 29:21, 29:24, 29:25, 30:12, 30:23, 40:23, 83:17, 92:14, 92:16, 92:20, 94:3, 107:1, 113:2, 126:20, 131:6, 132:24, 160:12, 162:18, 163:14, 172:23, 177:23
**purchased** [1] - 200:6
**purchaser** [1] - 102:25
**purchasing** [3] - 123:24, 131:17, 176:8
**purely** [1] - 139:21
**purpose** [8] - 31:17, 49:25, 55:6, 55:7, 93:18, 104:11, 163:13, 178:12
**purposes** [1] - 67:9
**pursuant** [11] - 6:13, 22:5, 32:2, 69:9, 82:9, 110:17, 110:19, 144:19, 145:9, 154:10, 181:18
**put** [52] - 24:16, 25:16, 25:24, 33:4, 33:17, 34:2, 41:8, 44:23, 51:12, 58:2, 58:13, 58:15, 58:16, 63:20, 64:7, 65:12, 65:16, 65:19, 68:16, 68:18, 72:3, 99:24, 101:1, 124:14, 126:11, 127:14, 127:21, 128:16, 141:9, 152:17, 158:15, 159:8, 160:12, 161:10, 165:24, 169:7, 175:15, 180:11, 181:16, 181:24, 186:21, 186:25, 191:14, 192:3, 196:8, 199:9, 201:18, 202:5, 203:12, 205:9, 207:10, 208:2
**puts** [1] - 214:11
**putting** [3] - 17:23, 50:17, 50:19

## Q

**qualified** [1] - 71:2
**quarter** [2] - 53:21, 54:7
**quarter-million** [1] - 54:7
**quarter-million-square-foot** [1] - 53:21
**quarters** [1] - 118:15
**question-and-answer** [1] - 162:4
**questions** [37] - 45:1, 48:11, 51:23, 52:8, 64:5, 64:10, 76:4, 96:16, 100:12, 100:19, 111:11, 114:11, 115:9, 115:14, 115:16, 119:13, 125:11, 125:16, 125:17, 125:24, 126:1, 129:7, 129:14, 149:8, 161:21, 162:5, 162:7, 168:24, 176:6, 189:6, 202:5, 202:18, 202:19, 202:20, 211:10, 215:12, 217:2
**quick** [2] - 97:10, 155:24
**quickly** [6] - 12:6, 52:20, 58:16, 62:3, 138:8, 215:23
**quit** [1] - 73:8
**quite** [2] - 118:5, 217:24
**quote** [5] - 171:3, 171:4, 171:5, 171:6, 187:21

## R

**raise** [4] - 98:9, 99:5, 100:16, 101:25
**raised** [4] - 13:22, 100:20, 135:3, 211:5
**raising** [1] - 100:13
**ramifications** [1] - 181:14
**ran** [2] - 66:13, 136:12
**rata** [1] - 9:10
**rate** [1] - 64:8
**rather** [2] - 60:7, 149:23
**ratio** [2] - 58:17, 118:10
**reach** [5] - 84:17, 84:21, 91:19, 167:4, 198:22
**reached** [4] - 84:20, 133:14, 163:17, 198:22
**reaching** [2] - 132:16, 133:8
**react** [1] - 125:21
**read** [48] - 6:1, 20:10, 20:12, 24:1, 45:3, 49:1, 59:3, 59:4, 59:5, 59:6, 68:22, 69:1, 114:20, 114:21, 115:2, 121:8, 121:9, 121:12, 121:25, 122:8, 122:11, 125:9, 125:10, 126:17, 133:5, 133:6, 139:7, 139:9, 152:3, 152:4, 165:4, 166:8, 167:12, 170:4, 170:25, 178:10, 193:23, 194:2, 194:5, 194:7, 194:8, 194:10, 195:4, 195:21, 196:11, 197:6, 202:6
**reading** [11] - 59:2, 165:24, 165:25, 170:10, 176:13, 192:5, 195:15, 202:8, 202:12, 207:25, 208:5
**ready** [5] - 3:15, 101:9, 144:6, 144:7, 159:3
**real** [37] - 17:12, 32:16, 50:4, 50:6, 50:9, 51:2, 51:6, 52:14, 60:24, 78:5, 78:14, 79:9, 86:23, 102:14, 102:18, 102:19, 103:3, 103:22, 104:12, 105:16, 106:2, 106:10, 106:12, 116:5, 116:8, 116:14, 116:16, 117:2, 117:8, 117:13, 128:2, 148:2, 183:8, 187:15, 190:5, 197:14, 198:18
**really** [12] - 27:16, 53:9, 62:5, 67:18, 85:16, 118:19, 138:12, 148:24, 183:19, 205:4, 215:11
**reason** [22] - 13:12, 29:12, 29:14, 36:23, 54:8, 55:4, 60:8, 77:9, 77:15, 83:9, 106:16, 120:8, 121:22, 124:13, 128:23, 129:2, 136:12, 177:6, 191:7, 197:16, 200:21, 201:3
**reasons** [4] - 136:8, 138:3, 152:22, 200:22
**receive** [29] - 17:10, 30:9, 59:16, 59:21, 59:22, 68:8, 68:9, 69:5, 69:11, 69:14, 80:2, 80:3, 82:8, 92:6, 92:7, 95:18, 118:2, 141:23, 164:1, 164:8, 164:14, 165:11, 165:18, 166:12, 190:9, 204:24
**received** [25] - 15:13, 15:15, 42:3, 42:14, 44:17, 45:9, 45:25, 46:5, 46:9, 46:13, 46:19, 46:23, 47:2, 83:7, 83:9, 93:3, 93:24, 94:6, 111:9, 143:24, 167:14, 192:19, 199:22, 204:7, 216:8
**receives** [1] - 72:12
**receiving** [7] - 7:13, 8:12, 8:17, 96:14, 189:12, 189:19, 190:17
**recently** [1] - 54:12
**recess** [6] - 57:12, 97:7, 97:21, 158:24, 159:1, 218:11
**Recess** [1] - 57:15
**recital** [1] - 159:14
**Recital** [2] - 159:20, 162:20
**recitals** [5] - 58:25, 126:15, 126:17, 129:20, 159:12
**recite** [1] - 20:8
**recognize** [11] - 5:22, 14:3, 23:14, 23:16, 40:9, 40:10, 74:5, 74:13, 105:24, 106:25, 110:4
**recognized** [1] - 53:19
**recollection** [7] - 18:13, 35:24, 143:7, 176:16, 179:17, 196:3, 208:6
**recollections** [1] - 179:18
**reconciliation** [4] - 31:21, 43:10, 44:3, 44:6
**record** [19] - 3:5, 39:20, 44:22, 49:10, 52:5, 52:7, 57:16, 97:22, 100:22, 102:4, 133:6, 135:9, 139:1, 139:9, 152:4, 159:2, 165:4, 176:13, 195:15
**recorded** [1] - 109:16
**records** [9] - 89:5, 89:14, 89:17, 89:19, 89:25, 90:3, 92:24, 92:25, 94:3
**recoup** [1] - 84:5
**recourse** [1] - 106:19
**Redirect** [1] - 2:7
**REDIRECT** [1] - 114:16

**redirect** [5] - 48:13, 48:14, 114:12, 126:2, 162:2
**redress** [1] - 104:5
**reduce** [2] - 161:3, 172:8
**refer** [2] - 153:1, 163:11
**reference** [3] - 58:5, 177:17, 210:12
**referenced** [1] - 137:1
**references** [1] - 135:5
**referring** [13] - 20:16, 20:18, 20:22, 21:2, 87:23, 129:4, 135:4, 135:12, 136:25, 168:18, 176:25, 181:11, 211:13
**refers** [4] - 93:17, 137:3, 181:12, 209:25
**refi'd** [1] - 58:16
**reflects** [1] - 23:18
**refresh** [5] - 18:12, 35:24, 143:7, 176:16, 208:5
**refusal** [25] - 72:2, 72:7, 72:10, 72:16, 103:10, 103:12, 103:16, 103:17, 103:20, 103:23, 104:3, 108:22, 109:15, 112:9, 112:17, 112:23, 112:24, 113:1, 113:5, 113:8, 113:13, 113:16, 113:19, 114:22, 115:2
**refute** [1] - 206:22
**regard** [8] - 111:23, 111:24, 127:1, 136:16, 169:2, 177:22, 212:10, 212:11
**regarding** [4] - 21:23, 28:23, 100:19, 186:4
**regards** [2] - 122:7, 142:8
**registered** [5] - 71:20, 92:17, 92:23, 93:19, 94:2
**regular** [2] - 21:20, 21:24
**reinstated** [6] - 30:6, 48:4, 48:7, 81:11, 81:15, 81:18
**reject** [1] - 92:3
**rejected** [1] - 8:21
**rejecting** [3] - 7:4, 8:6, 8:22
**Related** [2] - 62:5, 83:22
**relation** [2] - 54:2, 168:6
**relationship** [14] - 49:20, 69:21, 86:9, 86:14, 87:2, 87:9, 87:14, 87:25, 88:13, 88:15, 90:4, 121:1, 121:18, 138:4
**relationships** [4] - 62:9, 62:16, 118:8, 119:1
**release** [1] - 117:25
**released** [2] - 28:15, 33:3
**relevance** [7] - 45:18, 63:10, 88:3, 115:6, 124:9, 202:9, 211:4
**relevancy** [1] - 138:3
**relevant** [1] - 64:5
**relied** [1] - 65:24
**relief** [1] - 216:3
**rely** [4] - 105:6, 106:10, 119:2, 179:16
**relying** [2] - 137:24, 155:16
**remedies** [1] - 154:14
**remember** [28] - 6:19, 7:23, 8:15, 8:19, 18:8, 35:14, 37:20, 84:19, 124:8, 127:13, 127:16, 130:17, 131:25, 143:13, 151:6, 159:24, 159:25, 160:3, 160:4, 161:23, 175:23, 175:25, 176:5, 176:23, 179:23, 205:3, 206:14, 207:17
**remind** [1] - 133:13
**reminded** [1] - 132:13
**reminding** [1] - 115:15
**renew** [9] - 13:12, 13:13, 13:14, 13:15, 171:7, 196:18, 197:8, 197:9, 197:17
**renewal** [1] - 5:14
**rent** [56] - 14:13, 27:5, 27:10, 28:21, 28:23, 47:18, 85:15, 85:20, 86:6, 86:15, 86:19, 90:8, 91:22, 91:23, 92:4, 92:7, 92:10, 120:2, 120:4, 120:8, 124:17, 124:21, 125:1, 125:18, 136:10, 141:16, 147:21, 148:13, 148:18, 149:21, 151:5, 151:8, 152:7, 153:5, 153:6, 153:22, 168:6, 169:3, 169:6, 169:24, 170:5, 170:16, 170:20, 170:23, 171:12, 173:5, 198:17, 198:18, 199:17, 200:5, 200:10, 201:10, 201:12
**rental** [2] - 27:19, 60:5
**rented** [2] - 200:2, 200:17
**renting** [1] - 27:13
**rents** [1] - 47:19
**reopen** [1] - 56:10
**reoriented** [1] - 93:14
**repaid** [1] - 44:8
**repay** [2] - 134:5, 161:3
**repeat** [4] - 37:14, 111:4, 158:18, 165:3
**repercussions** [9] - 104:1, 104:4, 111:18, 111:20, 112:11, 112:12, 112:15, 112:16, 112:20
**rephrase** [2] - 114:25, 202:15
**replace** [2] - 126:23, 126:24
**replacement** [3] - 126:20, 127:7, 127:9
**report** [1] - 73:3
**REPORTED** [1] - 1:21
**reported** [3] - 40:11, 167:14, 185:16
**REPORTER** [2] - 156:9, 170:8
**Reporter** [6] - 1:22, 133:4, 139:7, 152:3, 165:2, 218:18
**reporter** [7] - 59:3, 133:6, 139:9, 152:4, 165:4, 216:21, 218:2
**reports** [4] - 73:4, 73:12, 74:21, 74:25
**represent** [2] - 42:22, 180:3
**representation** [1] - 180:7
**representations** [8] - 30:13, 30:17, 30:19, 104:16, 106:3, 106:8, 108:9, 108:13
**representative** [2] - 3:9, 81:6
**representatives** [1] - 81:3
**represented** [5] - 98:9, 99:17, 102:25, 106:21, 185:9
**request** [2] - 63:12, 134:20
**require** [2] - 106:16, 170:23
**required** [14] - 14:7, 23:2, 27:23, 65:18, 66:4, 96:7, 104:18, 105:14, 106:7, 122:4, 144:22, 153:16, 175:15, 205:20
**requirements** [2] - 103:7, 107:22
**requires** [1] - 59:8
**requiring** [1] - 152:23
**research** [2] - 97:4, 215:16
**reserve** [1] - 48:12
**resided** [1] - 66:19
**residence** [1] - 66:18
**residential** [1] - 60:23
**resides** [1] - 200:17
**resolution** [11] - 31:1, 31:3, 31:6, 31:8, 104:9, 104:11, 104:13, 105:1, 105:6, 105:12
**resolve** [3] - 57:19, 103:19, 114:23
**resolved** [1] - 115:3
**resolving** [3] - 103:22, 104:6, 112:19
**respect** [5] - 43:24, 70:23, 108:21, 119:10, 138:4
**respectful** [1] - 191:1
**respond** [3] - 121:22, 136:7, 213:4
**responded** [1] - 121:6
**responding** [1] - 27:5
**response** [3] - 121:7, 136:6, 218:6
**responses** [1] - 176:6
**responsibilities** [5] - 70:9, 70:10, 70:12, 71:13, 73:9
**responsibility** [4] - 71:7, 73:3, 73:13, 156:21
**responsible** [13] - 27:22, 39:8, 39:11, 70:3, 72:22, 73:12, 89:5, 89:17, 91:23, 103:4, 103:6, 131:5, 178:22
**responsive** [1] - 78:16
**rest** [3] - 158:15, 208:24, 217:19
**result** [8] - 9:25, 10:2, 10:4, 10:10, 28:5, 108:3, 114:9, 163:19
**retain** [1] - 15:22
**retrieve** [1] - 145:15
**return** [13] - 31:25, 32:21, 33:25, 40:7, 40:19, 40:21, 41:5, 43:3, 44:7, 44:13, 44:14, 68:17, 117:25
**returns** [3] - 41:8, 94:24, 167:14
**revenue** [1] - 85:12
**review** [3] - 41:7, 207:25, 208:1
**reviewed** [2] - 41:5, 124:18
**reviews** [1] - 178:5
**rewriting** [2] - 165:14, 165:16
**rhyme** [1] - 55:4
**Richards** [1] - 1:18
**right-hand** [4] - 38:1, 38:2, 43:4, 87:18
**rights** [14] - 5:10, 81:16, 81:20, 136:2, 137:17, 138:5, 207:15, 207:18, 208:7, 208:9, 208:22, 209:1, 211:14, 212:21
**rise** [1] - 215:17
**rises** [1] - 62:4
**risk** [5] - 128:12, 128:14, 130:19, 131:2, 175:19
**risks** [1] - 130:25
**RMR** [2] - 1:22, 218:17
**road** [3] - 67:16, 67:23, 167:25
**Road** [3] - 1:15, 93:22, 199:10
**robbing** [1] - 122:25
**Roberts** [2] - 53:11, 66:23
**role** [1] - 103:2
**roll** [1] - 34:10
**room** [4] - 67:17, 122:13, 179:12, 182:13
**Roth** [3] - 74:17, 74:18, 75:1
**RPR** [1] - 1:22
**rubber** [2] - 67:23,

167:25
**rude** [4] - 161:19, 216:20, 216:21
**rule** [1] - 151:14
**rules** [2] - 120:5, 125:17
**ruling** [2] - 53:16, 211:8
**run** [5] - 5:4, 53:6, 216:25, 217:1, 217:5
**running** [5] - 100:25, 117:20, 185:9, 197:12, 197:13
**runs** [1] - 217:5

**S**

**salary** [1] - 195:9
**sale** [43] - 29:21, 29:24, 30:12, 31:15, 32:25, 33:21, 33:22, 34:3, 34:7, 34:24, 37:19, 38:15, 38:18, 38:19, 39:25, 59:16, 59:23, 68:3, 69:3, 80:4, 80:10, 84:3, 92:14, 92:16, 92:20, 94:4, 94:14, 102:21, 105:7, 107:1, 108:7, 108:11, 108:20, 109:10, 111:10, 111:19, 113:24, 163:21, 164:9, 164:15, 164:17, 199:22, 214:11
**sales** [1] - 170:12
**San** [1] - 155:20
**sand** [1] - 95:12
**satisfied** [3] - 189:11, 190:16, 192:18
**SAVANNAH** [1] - 1:14
**Savannah** [1] - 3:8
**save** [6] - 117:14, 117:17, 117:22, 118:19, 199:18
**saving** [1] - 119:4
**savings** [1] - 25:24
**saw** [21] - 35:24, 43:4, 53:7, 53:10, 62:3, 67:2, 83:15, 86:23, 87:5, 87:6, 87:9, 87:13, 88:21, 90:16, 90:19, 90:23, 90:25, 91:3, 109:9, 122:2, 183:7
**Scarface** [1] - 51:10
**scheduling** [1] - 101:14
**schoolmate** [1] - 74:18
**scoring** [1] - 217:22
**scramble** [2] - 24:22, 26:2
**scrambled** [2] - 24:16, 25:16
**scream** [1] - 138:14
**screen** [10] - 4:16, 30:21, 72:4, 109:5, 129:20, 163:3, 163:4, 163:5, 163:6, 169:9
**scroll** [7] - 9:18, 10:2, 75:9, 148:12, 149:9, 205:6
**scrolling** [1] - 169:22
**SE** [1] - 1:18
**searched** [1] - 207:3
**seat** [2] - 49:7, 102:4
**seated** [4] - 3:19, 57:18, 159:6, 215:20
**second** [16] - 7:3, 7:8, 10:14, 47:3, 47:5, 66:3, 85:10, 142:2, 161:17, 174:14, 175:4, 184:22, 184:23, 197:6, 209:21, 209:22
**secondarily** [1] - 120:16
**seconds** [2] - 30:22, 135:9
**Secretary** [2] - 72:23, 75:1
**section** [6] - 59:8, 65:24, 67:22, 129:20, 159:12, 188:22
**Section** [33] - 23:10, 23:11, 23:18, 27:20, 27:21, 30:17, 54:24, 58:25, 59:13, 64:17, 65:11, 67:22, 68:24, 72:1, 80:23, 80:24, 82:14, 95:3, 114:13, 114:18, 126:14, 126:17, 162:23, 163:13, 170:24, 171:25, 172:4, 172:18, 178:7, 181:12, 189:23, 196:9, 196:12
**sections** [2] - 181:12
**Sections** [2] - 30:12, 107:15
**secure** [2] - 124:5, 130:14
**secured** [1] - 131:23
**securing** [1] - 159:15
**see** [61] - 4:16, 15:7, 15:8, 18:12, 24:10, 25:5, 26:14, 29:11, 30:6, 31:21, 31:24, 35:25, 41:20, 42:10, 43:4, 45:13, 45:19, 61:14, 73:18, 74:25, 75:12, 76:5, 76:6, 81:4, 87:20, 97:5, 104:23, 109:5, 110:14, 114:23, 121:6, 122:1, 124:12, 142:22, 143:10, 144:2, 148:16, 158:13, 162:22, 162:25, 169:18, 169:20, 179:15, 182:5, 182:10, 182:14, 185:19, 194:4, 195:15, 197:20, 201:18, 203:17, 207:16, 207:21, 208:2, 209:3, 209:20, 214:20, 215:14, 218:7
**seeing** [5] - 50:23, 90:1, 158:11, 158:14, 165:25
**seek** [3] - 71:10, 104:5, 201:15
**seeking** [1] - 216:3
**seem** [2] - 29:17, 161:15
**sees** [1] - 182:13
**segment** [1] - 95:17
**segments** [2] - 95:12, 95:14
**SEIDLER** [2] - 2:2, 3:20
**Seidler** [64] - 3:12, 3:23, 18:21, 18:23, 20:12, 24:3, 35:13, 36:11, 47:11, 47:13, 52:22, 52:25, 53:3, 54:1, 54:9, 66:8, 66:18, 77:5, 77:8, 77:17, 83:14, 83:15, 83:18, 84:17, 84:21, 85:6, 85:24, 87:3, 87:10, 87:14, 87:25, 88:10, 88:14, 90:7, 99:4, 100:19, 105:3, 105:12, 121:4, 122:4, 131:8, 133:15, 133:18, 135:14, 135:16, 137:6, 151:11, 151:13, 153:4, 154:15, 155:19, 167:13, 172:9, 174:9, 177:22, 178:21, 193:24, 196:1, 197:24, 204:24, 206:15, 206:19, 206:23
**Seidler's** [4] - 94:24, 100:18, 135:6, 153:1
**selective** [1] - 140:3
**sell** [9] - 12:15, 12:24, 16:16, 16:20, 17:23, 31:2, 31:3, 31:4, 31:7
**seller** [17] - 35:4, 105:1, 106:3, 106:8, 107:2, 107:23, 107:24, 108:6, 108:9, 108:12, 108:19, 110:9, 110:14, 111:9, 124:4, 127:23
**seller's** [2] - 35:6, 38:18
**selling** [5] - 11:17, 14:21, 77:5, 105:10, 108:4
**sells** [1] - 214:11
**send** [18] - 8:17, 11:19, 19:18, 20:17, 20:19, 20:23, 20:25, 21:1, 28:2, 30:9, 151:18, 156:25, 189:13, 190:15, 192:14, 193:6, 194:6
**Send** [3] - 189:21, 190:16, 192:5
**sending** [7] - 91:23, 92:1, 186:15, 187:21, 188:10, 192:23, 193:1
**sense** [10] - 50:9, 50:12, 50:16, 51:6, 157:19, 183:9, 186:22, 200:9, 201:10, 201:11
**sent** [32] - 6:16, 9:13, 9:17, 10:23, 10:25, 11:2, 11:4, 11:8, 11:12, 17:13, 18:7, 34:14, 38:18, 41:6, 47:25, 48:3, 48:6, 74:15, 92:1, 121:1, 121:4, 142:5, 143:10, 154:15, 179:9, 179:10, 188:6, 188:9, 204:22, 205:24, 206:2, 206:12
**sentence** [2] - 196:25, 197:6
**separate** [6] - 55:17, 95:11, 171:17, 174:1, 174:22
**September** [4] - 1:4, 9:2, 146:24, 150:14
**sequence** [1] - 127:16
**series** [3] - 176:5, 176:6, 211:10
**serious** [2] - 181:13, 208:24
**seriously** [1] - 180:19
**serve** [1] - 27:11
**served** [2] - 6:18, 6:23
**session** [1] - 162:4
**set** [3] - 75:6, 96:16, 118:9
**setoff** [2] - 212:20, 213:20
**settlement** [27] - 16:22, 22:4, 22:6, 22:8, 22:14, 22:17, 22:20, 22:24, 23:10, 23:15, 23:19, 24:4, 24:8, 26:10, 26:12, 26:16, 27:2, 28:3, 31:20, 84:10, 84:12, 110:7, 110:12, 110:21, 110:22, 118:20
**seven** [3] - 64:4, 194:9, 201:9
**seven-bedroom** [1] - 201:9
**several** [4] - 25:20, 29:9, 36:17, 38:13
**shall** [16] - 59:21, 59:22, 69:2, 80:25, 81:1, 166:10, 166:11, 170:16, 171:2, 171:3, 171:7, 196:15, 196:16, 196:18, 197:7
**share** [3] - 9:10, 68:19, 186:7
**shared** [2] - 186:3, 187:16
**shareholder** [2] - 49:21, 105:2
**sharing** [4] - 61:19, 156:15, 168:14, 187:14
**sheet** [2] - 45:14, 45:16
**ship** [1] - 123:14
**shoes** [1] - 86:25
**short** [4] - 114:1, 190:6, 190:7, 200:15
**shortly** [3] - 117:9, 123:21, 200:1
**show** [36] - 15:4, 20:6, 20:22, 21:3, 26:22, 31:18, 35:20, 37:24,

38:16, 41:17, 43:3, 43:10, 44:3, 44:5, 44:7, 44:9, 50:21, 64:11, 86:5, 86:6, 90:3, 104:19, 105:19, 106:23, 107:14, 109:24, 116:24, 143:14, 151:17, 157:13, 176:16, 182:11, 190:1, 201:17, 203:15, 217:14
**showed** [3] - 83:14, 92:25, 208:5
**showing** [5] - 23:16, 23:17, 40:21, 129:20, 203:17
**shown** [2] - 53:4, 73:21
**shows** [7] - 33:2, 33:9, 33:15, 43:6, 43:21, 43:22, 147:18
**shunned** [1] - 197:20
**side** [14] - 26:23, 38:1, 38:2, 42:4, 42:15, 43:4, 43:14, 43:25, 108:25, 109:5
**side-by-side** [1] - 108:25
**sidebar** [7] - 63:12, 63:15, 64:14, 101:2, 134:21, 135:1, 139:5
**sign** [12] - 54:19, 55:19, 104:14, 140:13, 151:12, 203:19, 203:22, 207:15, 209:4, 209:7, 209:24, 210:2
**signature** [6] - 110:11, 209:14, 209:16, 209:17, 209:20, 210:8
**signatures** [1] - 110:14
**signed** [30] - 24:25, 30:1, 41:6, 57:24, 59:14, 71:5, 71:15, 82:17, 92:16, 92:20, 94:3, 132:24, 134:2, 134:15, 136:18, 139:12, 139:20, 166:14, 178:16, 204:1, 204:22, 207:7, 207:19, 208:6, 208:9, 208:22, 209:10, 210:5, 211:15
**significance** [2] - 65:1, 93:22
**signing** [2] - 30:3, 207:17
**signs** [1] - 189:22
**Silverman** [1] - 53:11
**similar** [3] - 33:10, 60:25, 109:15
**simple** [3] - 142:11, 143:9, 181:11
**simultaneously** [2] - 86:22, 126:18
**single** [2] - 200:8, 201:9
**sit** [6] - 122:12, 151:25, 167:18, 215:25, 216:13, 216:15
**sitting** [11] - 60:10, 80:13, 87:17, 89:24, 90:6, 90:10, 91:6, 94:16, 109:10, 111:1, 115:2
**situation** [5] - 72:19, 117:12, 176:25, 186:16, 188:13
**six** [3] - 173:15, 174:13, 194:9
**six-month** [1] - 174:13
**skim** [2] - 86:24, 183:8
**skimmer** [1] - 154:23
**skimming** [5] - 86:21, 90:13, 122:17, 122:20, 123:7
**skin** [5] - 131:11, 173:23, 174:2, 174:8, 174:25
**Slade** [1] - 195:8
**sleeping** [5] - 199:2, 199:6, 199:8, 199:13, 199:15
**slow** [6] - 12:10, 125:22, 135:8, 135:10, 170:9, 170:10
**slower** [1] - 56:15
**slowly** [1] - 69:1
**slum** [1] - 51:9
**small** [1] - 70:17
**smartest** [1] - 201:2
**Smith** [1] - 3:13
**smooth** [1] - 160:4
**smoothly** [1] - 86:16
**snake** [2] - 154:22, 154:23
**so-called** [1] - 167:25
**social** [1] - 84:23
**socially** [2] - 52:23, 88:19
**soft** [3] - 50:20, 50:21, 126:9
**sold** [17] - 12:16, 12:25, 13:5, 13:11, 13:14, 13:21, 30:10, 43:12, 68:23, 76:19, 80:20, 81:19, 171:8, 171:9, 196:19, 196:20, 200:6
**solidify** [1] - 128:5
**someone** [3] - 5:4, 103:17, 190:23
**sometimes** [8] - 11:5, 73:4, 73:5, 95:25, 96:1, 180:9
**Son** [1] - 132:10
**soon** [5] - 86:19, 117:11, 132:1, 200:5, 204:21
**sophisticated** [1] - 51:2
**sorry** [51] - 5:16, 7:6, 9:21, 10:7, 17:5, 18:2, 18:7, 32:11, 37:14, 40:18, 48:5, 52:24, 53:17, 56:14, 78:22, 87:8, 94:25, 102:16, 107:24, 108:1, 111:4, 120:6, 124:11, 126:8, 128:20, 139:22, 141:7, 146:9, 146:11, 147:14, 150:24, 152:13, 154:9, 155:16, 156:9, 156:19, 159:25, 161:4, 165:18, 168:17, 170:8, 171:18, 184:4, 184:21, 191:14, 194:15, 201:5, 201:24, 203:3, 205:21, 213:4
**sort** [8] - 11:19, 47:7, 51:12, 85:10, 86:25, 114:22, 114:24, 188:2
**sorts** [3] - 34:1, 88:16, 100:24
**sound** [1] - 161:18
**sounds** [1] - 133:3
**source** [3] - 24:7, 24:12, 24:14
**South** [2] - 50:22, 62:3
**Southeast** [4] - 25:8, 50:3, 102:22, 117:18
**SOUTHERN** [1] - 1:1
**Southern** [2] - 1:24, 218:19
**space** [4] - 54:6, 86:4, 200:12, 209:14
**spaces** [2] - 86:5, 86:7
**SPE** [1] - 55:8
**speaking** [9] - 12:6, 107:5, 138:8, 175:5, 182:2, 186:24, 194:12, 199:12
**speaks** [3] - 35:11, 185:20, 193:19
**special** [2] - 55:6, 55:7
**specialist** [1] - 50:14
**specialty** [2] - 102:13, 102:17
**specific** [15] - 8:2, 11:1, 36:15, 37:3, 37:17, 52:8, 62:21, 73:3, 79:20, 84:19, 86:13, 93:6, 176:25, 177:1, 178:2
**specifically** [22] - 7:21, 7:23, 7:24, 23:16, 25:10, 37:23, 65:15, 70:8, 70:23, 87:6, 87:23, 88:16, 93:2, 107:16, 117:7, 119:5, 119:10, 122:6, 125:6, 141:20, 173:4, 216:22
**specified** [2] - 178:14, 208:12
**specifying** [1] - 82:21
**speculate** [2] - 190:24, 193:15
**speculation** [2] - 88:2, 132:20
**speed** [1] - 170:11
**spent** [1] - 101:8
**spreadsheet** [4] - 75:25, 76:2, 143:10, 150:15
**square** [3] - 53:21, 54:5, 159:16
**staff** [1] - 155:22
**STAFF** [4] - 17:17, 35:21, 73:20, 109:2
**stagnant** [1] - 51:16
**stake** [2] - 190:5, 191:8
**stand** [10] - 3:15, 12:1, 64:7, 98:4, 99:14, 99:25, 101:17, 115:21, 124:21, 150:2
**standard** [1] - 214:4
**standing** [2] - 83:5, 83:10
**stars** [1] - 53:19
**start** [9] - 18:4, 47:8, 58:10, 97:2, 123:23, 141:7, 151:22, 152:22, 194:1
**started** [8] - 17:7, 47:6, 86:9, 86:19, 86:20, 88:24, 90:4, 164:11
**starting** [7] - 3:5, 3:18, 9:16, 28:24, 126:5, 143:11, 218:9
**State** [5] - 47:24, 56:3, 72:23, 75:2, 92:17
**state** [3] - 3:4, 49:9, 102:4
**statement** [24] - 29:15, 31:14, 31:18, 31:21, 31:24, 32:3, 32:6, 32:24, 34:23, 38:4, 44:14, 76:21, 94:14, 103:5, 110:7, 110:12, 110:17, 110:20, 110:22, 110:25, 125:20, 129:13, 194:5
**statements** [8] - 29:11, 39:5, 39:9, 39:12, 106:17, 192:6, 192:15, 194:7
**STATES** [2] - 1:1, 1:10
**States** [2] - 1:23, 218:18
**stating** [2] - 47:25, 48:6
**status** [4] - 47:13, 47:21, 106:4
**statute** [1] - 216:4
**stayed** [1] - 200:24
**staying** [3] - 200:1, 201:3, 201:4
**steal** [5] - 155:23, 157:10, 158:3, 158:4, 158:6
**stealing** [9] - 86:21, 122:20, 123:7, 157:12, 157:14, 157:18, 157:22, 158:1, 158:17
**STENOGRAPHICALLY** [1] - 1:21
**step** [2] - 101:19, 159:13
**Steve** [3] - 122:24, 123:4
**Stewart** [2] - 33:6, 126:19
**stick** [1] - 80:5
**still** [24] - 15:21, 21:20, 35:3, 36:23, 37:4, 48:9, 53:6, 56:7, 73:20, 101:7, 118:14, 121:24, 132:8, 163:5, 171:18, 171:19, 174:16, 175:15, 183:16, 196:4,

200:7, 214:13, 217:24
**stipulation** [5] - 143:16, 143:17, 181:18, 187:2
**stock** [1] - 117:4
**stockholder** [1] - 104:15
**stood** [2] - 75:15, 75:16
**stop** [19] - 12:10, 53:15, 56:13, 56:16, 56:17, 56:18, 96:22, 125:23, 126:7, 129:4, 142:1, 151:25, 191:10, 195:10, 195:12, 199:12, 218:3
**stopped** [3] - 91:17, 142:3, 173:4
**stories** [2] - 116:23, 158:11
**story** [4] - 154:22, 157:21, 157:22, 157:25
**straight** [3] - 35:12, 36:1, 163:23
**street** [3] - 53:5, 53:20, 54:4
**Street** [20] - 1:18, 25:8, 50:4, 55:13, 55:14, 55:15, 77:6, 102:22, 116:23, 117:19, 157:6, 157:7
**stricken** [1] - 100:21
**strictly** [1] - 195:5
**strike** [3] - 161:4, 179:2, 188:5
**structured** [1] - 55:4
**study** [1] - 41:8
**stuff** [4] - 20:20, 20:25, 21:1, 157:9
**style** [1] - 188:12
**subject** [11] - 62:22, 74:21, 76:18, 135:3, 136:14, 181:8, 187:14, 202:20, 203:3, 208:8, 208:12
**subsequent** [2] - 170:14, 186:12
**substance** [1] - 57:11
**substantial** [1] - 199:17
**successful** [2] - 53:10, 119:23
**successfully** [1] - 50:25
**successor** [2] - 5:14, 18:24
**sudden** [1] - 155:3
**sue** [6] - 14:9, 55:15, 112:2, 112:8, 207:8, 212:1
**sued** [9] - 5:14, 111:21, 112:4, 114:7, 114:9, 214:20, 214:22, 216:4, 216:5
**suing** [3] - 120:11, 125:9, 133:23
**suit** [2] - 6:20, 111:24
**Suite** [2] - 1:15, 1:19
**sum** [1] - 126:19
**summarize** [1] - 107:19
**Sunbiz** [3] - 30:7, 71:21, 93:16
**Sunbiz.org** [1] - 93:16
**Sunset** [4] - 117:18, 117:19, 118:9, 198:17
**supervise** [3] - 156:20, 157:1, 157:3
**supervised** [1] - 157:3
**supposed** [9] - 56:6, 64:21, 125:21, 148:3, 155:14, 164:1, 164:8, 193:3, 204:17
**surprised** [1] - 217:24
**suspecting** [1] - 86:20
**sustain** [1] - 137:9
**Sustained** [1] - 205:15
**sustained** [8] - 39:20, 51:21, 61:22, 62:25, 63:11, 176:12, 180:1, 205:15
**swearing** [1] - 180:25
**swore** [3] - 20:2, 40:16, 40:19
**sworn** [2] - 49:5, 102:1
**SWORN** [4] - 3:20, 49:15, 102:7, 116:1

## T

**table** [6] - 48:16, 134:24, 177:6, 215:20, 215:22, 216:1
**talks** [2] - 170:24, 172:11
**tap** [1] - 96:5
**tax** [7] - 33:24, 40:7, 40:19, 40:21, 41:5, 94:24, 167:14
**taxable** [1] - 41:11
**taxes** [5] - 29:3, 41:13, 106:6, 106:18, 170:12
**tech** [1] - 195:20
**Technical** [1] - 162:24
**technicality** [3] - 154:4, 154:6, 154:7
**technician** [2] - 3:10, 30:16
**technology** [1] - 157:8
**temporarily** [1] - 81:14
**ten** [10] - 27:23, 28:2, 66:4, 67:7, 77:25, 78:1, 173:4, 189:22, 190:6, 190:7
**tenancy** [9] - 78:10, 78:15, 79:1, 79:14, 79:15, 79:18, 80:8, 83:8
**tenant** [14] - 28:16, 82:2, 82:13, 82:18, 82:20, 169:25, 170:2, 170:5, 171:2, 171:6, 171:10, 196:15, 196:18, 196:22
**tender** [1] - 126:19
**tenth** [1] - 187:20
**term** [17] - 58:14, 68:20, 68:22, 68:25, 117:24, 151:8, 152:8, 170:15, 170:25, 171:2, 171:6, 177:19, 196:15, 196:18, 196:24, 197:7
**terminate** [3] - 82:20, 171:9, 196:21
**terminated** [4] - 69:4, 69:6, 69:8, 82:9
**termination** [2] - 171:5, 196:17
**terms** [11] - 58:1, 72:9, 83:23, 144:9, 167:22, 171:7, 171:16, 196:19, 205:19, 208:8, 208:13
**terrible** [1] - 160:24
**testified** [11] - 99:3, 99:4, 112:12, 122:12, 124:7, 135:14, 137:6, 179:12, 180:20, 186:14, 188:6
**testify** [2] - 36:19, 185:19
**testifying** [3] - 122:22, 124:8, 186:12
**testimony** [31] - 20:4, 20:9, 57:9, 57:11, 98:6, 99:9, 100:15, 101:12, 121:17, 121:18, 121:24, 122:1, 122:2, 135:6, 135:19, 135:23, 145:4, 149:7, 169:3, 179:7, 179:16, 187:12, 187:17, 187:18, 188:5, 193:16, 200:21, 201:6, 206:22, 216:15
**testing** [2] - 149:6, 149:7
**text** [1] - 84:24
**texts** [1] - 66:13
**THE** [348] - 1:9, 1:13, 1:17, 3:2, 3:4, 3:14, 3:17, 3:20, 11:25, 12:4, 12:8, 12:10, 12:19, 12:20, 15:2, 16:9, 16:11, 17:19, 18:1, 18:2, 18:3, 18:5, 18:6, 18:7, 20:10, 20:13, 21:11, 35:18, 37:8, 37:10, 37:14, 39:20, 40:14, 41:22, 41:25, 42:2, 42:8, 42:11, 42:13, 45:2, 45:5, 45:7, 45:11, 45:14, 45:19, 45:22, 46:2, 46:4, 46:8, 46:12, 46:18, 46:22, 47:1, 47:6, 48:13, 48:15, 48:17, 48:19, 48:22, 48:25, 49:3, 49:6, 49:7, 49:8, 49:9, 49:11, 49:12, 49:13, 49:15, 51:21, 51:25, 52:1, 52:2, 52:4, 52:5, 53:14, 53:17, 56:10, 56:11, 56:14, 56:15, 56:17, 56:18, 56:19, 56:20, 57:1, 57:7, 57:14, 57:17, 58:6, 59:2, 59:4, 59:5, 59:8, 60:17, 60:18, 61:10, 61:18, 61:22, 62:25, 63:11, 63:14, 63:16, 63:24, 64:15, 73:22, 73:25, 74:8, 74:10, 75:4, 75:10, 75:19, 75:20, 78:7, 78:8, 78:13, 78:22, 79:3, 79:5, 85:16, 85:19, 88:4, 88:8, 88:10, 89:9, 89:10, 93:7, 93:11, 96:23, 97:7, 97:12, 97:19, 97:23, 98:5, 98:14, 98:20, 99:1, 99:6, 99:15, 99:19, 100:5, 100:9, 100:14, 100:17, 100:23, 101:6, 101:18, 101:19, 101:21, 101:24, 101:25, 102:2, 102:3, 102:5, 102:6, 102:16, 102:18, 102:19, 111:12, 114:12, 114:25, 115:7, 115:8, 115:10, 115:11, 115:12, 115:15, 115:18, 115:22, 116:1, 119:14, 121:15, 123:18, 125:14, 125:20, 125:22, 126:3, 126:4, 127:5, 127:7, 129:6, 129:8, 129:9, 129:11, 129:12, 129:16, 130:3, 130:5, 131:16, 131:17, 132:19, 132:21, 134:22, 134:23, 134:25, 135:8, 135:22, 136:4, 136:20, 136:22, 137:8, 137:19, 138:1, 138:7, 138:25, 139:6, 140:16, 140:17, 140:21, 140:22, 141:1, 141:2, 141:5, 142:17, 142:19, 143:18, 143:22, 149:13, 151:25, 156:9, 156:10, 158:21, 158:24, 159:3, 159:4, 159:6, 161:25, 162:7, 162:25, 163:4, 163:6, 163:8, 166:16, 166:17, 168:11, 168:13, 169:10, 169:12, 169:20, 170:8, 170:9, 170:11, 173:25, 174:1, 175:3, 175:4, 175:10, 175:12, 176:12, 176:19, 178:3, 179:3, 180:1, 181:19, 181:21, 181:23, 182:9, 182:13, 182:14, 182:18, 183:18, 183:19, 183:24, 183:25, 184:17, 184:22, 185:1,

186:6, 186:7, 187:3, 187:5, 187:7, 189:4, 190:19, 191:23, 192:2, 193:11, 193:13, 193:20, 193:25, 194:3, 194:4, 194:6, 194:8, 194:11, 194:12, 194:14, 194:16, 194:22, 195:1, 195:10, 195:19, 197:1, 201:8, 201:9, 201:20, 202:4, 202:10, 202:13, 202:18, 203:5, 203:7, 203:14, 204:4, 204:6, 204:9, 205:15, 207:23, 208:12, 208:14, 208:18, 209:9, 209:10, 210:4, 210:5, 210:8, 210:9, 210:10, 211:3, 211:7, 211:20, 211:22, 211:24, 211:25, 212:15, 212:16, 213:1, 213:2, 213:11, 213:12, 213:18, 213:19, 215:9, 215:11, 215:17, 215:20, 215:24, 215:25, 216:6, 216:10, 216:18, 216:19, 216:20, 217:11, 217:13, 218:5, 218:7, 218:9
**themselves** [3] - 89:1, 98:2, 99:8
**theory** [1] - 186:18
**there're** [1] - 145:1
**therefore** [4] - 23:2, 80:8, 191:6, 199:18
**thief** [1] - 154:23
**thinks** [3] - 162:3, 215:11, 217:21
**third** [13] - 9:25, 15:7, 38:2, 42:18, 69:3, 72:12, 92:7, 107:22, 108:18, 109:15, 109:20, 136:12, 153:24
**thousand** [6] - 29:9, 117:5, 117:6, 172:15, 173:4
**three** [13] - 27:5, 35:8, 74:19, 118:15, 134:14, 136:8, 139:11, 170:4, 171:10, 192:9, 195:24, 196:21, 207:20
**three-bedroom** [1] - 27:5
**three-quarters** [1] - 118:15
**throughout** [3] - 107:5, 141:18, 142:12
**throughs** [1] - 86:5
**TIC** [1] - 78:9
**tie** [1] - 50:15
**tied** [1] - 162:14
**timely** [1] - 178:12
**title** [23] - 74:17, 78:2, 80:14, 103:1, 103:2, 103:6, 103:7, 103:12, 103:17, 104:3, 106:8, 106:16, 107:25, 109:19, 113:6, 113:9, 113:11, 113:14, 113:17, 113:18, 113:19, 114:23
**today** [17] - 51:14, 53:6, 60:10, 80:13, 89:24, 90:6, 90:10, 91:6, 94:16, 97:1, 109:10, 111:1, 115:2, 118:15, 120:12, 122:22, 215:13
**together** [11] - 24:16, 25:16, 25:24, 27:3, 27:7, 27:9, 50:19, 80:5, 85:9, 163:11, 187:10
**tomorrow** [5] - 215:14, 216:10, 217:2, 217:19, 218:9
**took** [9] - 117:1, 117:7, 117:9, 117:11, 145:7, 162:10, 199:18, 213:8
**top** [12] - 23:11, 26:23, 27:20, 28:22, 36:7, 42:18, 64:18, 64:19, 117:24, 172:1, 172:2, 200:14
**torn** [1] - 167:12
**total** [3] - 148:12, 150:8, 206:19
**totaled** [1] - 142:6
**totals** [1] - 149:10
**touched** [1] - 157:15
**tough** [1] - 53:9
**toward** [1] - 76:24
**towards** [1] - 14:7
**towers** [1] - 158:9
**town** [1] - 21:22
**townhouse** [1] - 117:19
**traffic** [1] - 60:6
**tragically** [1] - 70:14
**trans** [1] - 75:21
**transaction** [25] - 32:16, 34:11, 50:3, 102:24, 103:3, 103:8, 103:22, 104:12, 105:2, 105:15, 106:2, 106:11, 106:13, 106:21, 107:6, 107:24, 108:3, 109:11, 109:18, 109:22, 110:8, 110:10, 114:10, 135:24, 142:25
**transactions** [6] - 50:9, 50:12, 51:1, 105:17, 142:24, 174:1
**transcript** [2] - 85:18, 176:21
**transcription** [1] - 218:14
**transient** [3] - 75:21, 75:22
**Transit** [1] - 75:12
**Transpark** [167] - 3:3, 4:6, 5:7, 6:9, 6:13, 6:22, 7:3, 7:7, 7:10, 7:12, 8:9, 8:16, 9:9, 11:12, 11:17, 11:18, 11:19, 12:16, 12:17, 12:24, 12:25, 13:2, 14:6, 14:9, 14:11, 14:12, 14:16, 19:13, 19:16, 20:21, 22:17, 22:20, 22:23, 30:3, 30:6, 32:5, 40:1, 40:4, 47:16, 47:18, 47:25, 48:3, 48:6, 48:9, 49:20, 49:22, 49:25, 53:2, 54:17, 56:2, 57:25, 58:19, 59:11, 59:14, 59:16, 64:21, 65:2, 65:7, 65:8, 65:11, 65:16, 65:18, 65:22, 67:23, 68:5, 68:8, 68:9, 68:12, 68:16, 68:17, 68:18, 69:5, 69:8, 69:12, 69:14, 71:18, 71:20, 71:23, 72:15, 75:13, 75:15, 75:16, 75:17, 76:12, 76:17, 76:24, 77:12, 77:16, 80:3, 81:8, 81:18, 81:23, 82:1, 82:8, 83:6, 83:17, 85:25, 89:13, 91:22, 92:17, 93:3, 93:17, 95:18, 117:19, 118:2, 119:10, 122:5, 122:6, 134:8, 135:17, 139:20, 139:21, 139:25, 140:1, 140:4, 141:13, 142:12, 142:13, 143:8, 144:8, 144:18, 144:21, 145:8, 147:20, 148:12, 148:18, 148:22, 149:16, 149:18, 149:21, 149:23, 150:20, 150:23, 151:5, 151:7, 152:7, 152:17, 153:22, 154:9, 155:8, 156:7, 160:5, 167:22, 168:2, 168:6, 169:2, 170:20, 170:23, 171:12, 171:18, 172:5, 172:16, 173:6, 173:8, 176:7, 178:21, 178:22, 179:8, 179:9, 181:4, 181:10, 183:18, 188:20, 189:8, 192:23
**transpark** [1] - 156:10
**TRANSPARK** [1] - 1:3
**Transpark's** [7] - 5:10, 47:13, 47:21, 64:20, 81:6, 83:1, 184:10
**Tree** [1] - 77:6
**trial** [1] - 64:3
**Trial** [1] - 1:6
**TRIAL** [1] - 1:9
**tried** [2] - 9:5, 207:4
**trophies** [3] - 198:24, 199:19
**true** [2] - 149:6, 177:5
**truly** [1] - 73:1
**trust** [2] - 34:20, 155:23
**truth** [6] - 20:2, 112:15, 183:6, 183:7, 183:19, 183:25, 185:1, 191:1, 197:17, 211:11
**truthful** [1] - 20:4
**truthfulness** [1] - 137:14
**try** [18] - 12:4, 45:22, 56:14, 61:20, 84:17, 86:25, 118:24, 140:10, 143:2, 143:3, 181:3,
**trying** [19] - 27:5, 27:10, 27:11, 27:13, 27:17, 27:18, 27:19, 52:6, 64:6, 85:17, 126:9, 175:21, 175:22, 178:2, 188:12, 192:22, 195:18, 202:9, 203:6
**Tuesday** [1] - 57:18
**turn** [4] - 80:23, 101:11, 180:23, 209:11
**turned** [3] - 54:16, 154:21, 206:2
**turning** [1] - 95:23
**TV** [2] - 169:21, 197:2
**twenty** [1] - 150:6
**twenty-one** [1] - 150:6
**two** [28] - 35:9, 64:22, 66:19, 95:12, 95:14, 97:25, 112:24, 117:5, 118:13, 131:3, 134:8, 136:10, 141:21, 141:22, 141:25, 142:2, 144:14, 144:15, 153:23, 156:5, 167:16, 171:16, 173:4, 174:1, 176:1, 214:12, 215:4
**two-and-a-half** [1] - 35:9
**type** [2] - 170:9, 190:3
**types** [1] - 96:10
**typical** [10] - 11:3, 55:16, 73:2, 74:22, 78:4, 78:14, 79:8, 106:2, 106:7, 187:12
**typically** [1] - 116:18

## U

**U.S** [7] - 19:19, 19:20, 19:21, 20:20, 20:25, 21:1, 116:12
**ugly** [3] - 198:3, 198:4, 198:6
**ultimate** [2] - 60:10, 76:4
**ultimately** [3] - 28:15, 69:25, 81:11
**unacceptable** [1] - 92:8
**uncle** [1] - 119:6
**unclear** [1] - 58:1
**under** [42] - 8:11,

10:25, 11:12, 11:19, 12:15, 12:24, 13:2, 13:4, 16:15, 18:23, 19:8, 19:13, 19:16, 23:3, 57:8, 62:1, 71:23, 72:16, 80:25, 81:16, 81:20, 82:2, 84:23, 111:2, 126:20, 126:21, 132:9, 136:2, 137:17, 144:9, 144:19, 144:22, 145:8, 145:9, 148:7, 159:17, 167:3, 172:15, 181:4, 188:13, 204:13, 204:23
**understood** [13] - 78:22, 98:25, 125:5, 138:6, 164:25, 165:6, 167:3, 167:7, 167:8, 167:9, 175:6, 204:13, 212:23
**underwater** [1] - 198:22
**unfair** [1] - 190:24
**unfortunate** [1] - 116:15
**unfortunately** [5] - 84:8, 155:22, 157:4, 157:10, 206:21
**unit** [2] - 67:15, 85:15
**UNITED** [2] - 1:1, 1:10
**United** [2] - 1:23, 218:18
**unless** [7] - 110:21, 129:3, 135:20, 147:19, 175:5, 176:14, 208:23
**unpaid** [1] - 205:8
**up** [125] - 4:13, 5:17, 9:25, 10:3, 12:1, 13:25, 14:24, 17:15, 18:17, 21:12, 22:7, 23:11, 24:6, 28:8, 28:18, 29:25, 30:16, 30:21, 31:11, 33:4, 35:8, 35:16, 36:2, 38:2, 40:6, 40:12, 41:15, 42:17, 50:15, 50:17, 51:15, 51:19, 52:21, 53:15, 54:23, 58:2, 58:7, 58:13, 58:15, 58:16, 58:17, 62:4, 63:20, 65:12, 65:16, 65:19, 66:24, 68:16, 68:18, 68:24, 69:23, 71:14, 72:3, 73:7, 73:15, 74:3, 74:19, 75:7, 75:12, 75:17, 76:20, 76:21, 81:24, 82:12, 82:14, 84:1, 84:11, 84:16, 85:2, 85:18, 92:13, 93:6, 93:9, 94:12, 96:19, 98:12, 101:20, 114:13, 118:9, 118:20, 124:14, 126:11, 127:21, 129:2, 131:18, 137:10, 139:23, 141:9, 141:22, 141:25, 147:18, 148:7, 154:25, 155:4, 156:13, 162:14, 169:7, 172:5, 173:13, 173:17, 173:18, 175:3, 178:8, 180:25, 181:3, 181:16, 181:24, 183:3, 186:25, 188:24, 191:14, 192:3, 192:19, 196:8, 201:18, 203:12, 207:10, 207:21, 208:2, 212:7, 214:11
**uses** [2] - 9:20, 9:22
**utilized** [1] - 77:2

## V

**vacated** [3] - 28:6, 28:9, 28:12
**value** [5] - 51:15, 118:10, 137:13, 137:20, 177:6
**various** [4] - 37:17, 72:23, 75:6, 152:22
**Venetian** [2] - 67:16, 67:19
**venture** [5] - 26:7, 50:4, 50:7, 56:23, 67:24
**ventures** [2] - 55:17, 62:19
**verbally** [1] - 83:25
**VERNITA** [2] - 1:22, 218:17
**Vernita** [1] - 135:10
**Vernita Allen** [1] - 1:25
**Vernita Allen-Williams@flsd.uscourts.gov** [1] - 1:25
**versus** [2] - 75:23, 149:3
**via** [2] - 9:15, 19:19
**Vice** [1] - 51:12
**victim** [1] - 157:10
**view** [2] - 67:16, 67:18
**violated** [1] - 108:12
**violation** [3] - 108:4, 108:5, 152:17
**voice** [1] - 126:10
**vs** [2] - 1:5, 3:3
**vultures** [1] - 116:20

## W

**Wachovia** [1] - 206:1
**wait** [8] - 18:3, 47:3, 52:9, 53:16, 97:12, 183:21, 183:22, 191:16
**waiting** [5] - 99:7, 100:2, 116:20, 119:11, 121:2
**waive** [1] - 99:6
**waived** [2] - 99:4, 100:1
**walk** [2] - 67:19, 86:5
**walk-throughs** [1] - 86:5
**Wall** [1] - 116:23
**wants** [2] - 72:13, 87:21
**warehouse** [1] - 34:15
**warranties** [2] - 30:13, 30:17
**watch** [3] - 87:19, 101:19, 155:20
**water** [1] - 67:17
**waves** [1] - 197:17
**ways** [3] - 80:5, 80:6, 164:23
**wealth** [1] - 64:11
**wealthy** [2] - 119:2, 131:14
**welcome** [2] - 73:25, 99:23
**Wells** [3] - 25:19, 206:2, 206:4
**west** [2] - 67:15, 118:18
**West** [12] - 69:19, 69:21, 70:2, 70:5, 70:9, 70:23, 71:2, 71:16, 91:25, 184:16, 185:7, 205:25
**whatsoever** [6] - 83:9, 121:22, 129:1, 133:15, 156:15, 157:19
**whereby** [1] - 108:18
**whole** [6] - 5:19, 43:16, 98:3, 168:22, 188:25, 198:2
**Williams** [1] - 218:17
**WILLIAMS** [2] - 1:22, 218:17
**Williams@flsd.uscourts.gov** [1] - 1:25
**willing** [1] - 84:1
**windows** [1] - 116:23
**wire** [6] - 24:14, 25:25, 26:14, 28:1, 142:7
**wired** [3] - 26:13, 123:3, 127:22
**wiring** [1] - 27:1
**wise** [1] - 88:19
**withheld** [1] - 190:1
**WITNESS** [82] - 12:20, 18:2, 18:5, 18:7, 21:11, 35:18, 37:8, 37:14, 40:14, 48:17, 49:6, 49:8, 49:11, 52:1, 52:4, 53:17, 56:10, 56:14, 56:17, 56:19, 59:4, 59:8, 60:18, 74:10, 75:4, 75:10, 75:20, 78:8, 78:22, 85:19, 88:10, 89:10, 101:21, 102:2, 102:5, 102:7, 102:18, 115:8, 115:11, 125:20, 126:3, 127:7, 129:8, 129:11, 129:16, 131:17, 134:23, 140:17, 140:22, 141:2, 149:13, 156:10, 166:17, 168:13, 170:11, 174:1, 175:3, 175:12, 182:9, 182:13, 183:18, 183:24, 186:7, 194:3, 194:6, 194:11, 194:14, 197:1, 201:9, 208:12, 209:10, 210:5, 210:9, 211:20, 211:25, 212:16, 213:1, 213:12, 213:19, 215:9, 215:24, 216:19
**Witness** [1] - 48:18
**witness** [29] - 3:15, 12:11, 15:4, 20:6, 20:8, 35:21, 37:24, 41:17, 45:22, 47:6, 47:8, 48:19, 49:4, 49:5, 58:4, 73:21, 73:23, 97:16, 99:12, 100:4, 100:6, 101:11, 101:13, 102:1, 115:19, 143:15, 191:19, 216:13
**witness's** [5] - 101:12, 163:3, 163:4, 163:6, 169:20
**WITNESSES** [1] - 2:1
**witnesses** [1] - 98:1
**woman** [1] - 73:6
**word** [12] - 9:20, 18:4, 32:9, 32:12, 32:15, 60:2, 62:12, 166:1, 176:4, 182:9, 182:12, 185:14
**words** [5] - 9:22, 31:6, 107:19, 128:16, 204:12
**works** [2] - 52:21, 98:21
**world** [10] - 66:24, 116:4, 116:7, 155:23, 157:9, 168:22, 181:1, 198:2, 206:12, 207:8
**worry** [1] - 121:21
**worse** [4] - 86:11, 86:12, 88:1, 88:14
**worth** [2] - 118:11, 119:4
**wrap** [1] - 181:3
**write** [1] - 168:19
**writing** [3] - 80:25, 88:20, 195:7
**written** [14] - 30:9, 35:25, 65:10, 65:22, 82:21, 153:20, 153:21, 165:24, 167:10, 189:25, 190:2, 202:24, 202:25
**wrote** [5] - 64:24, 121:11, 121:24, 151:16, 172:18

## Y

**yapping** [1] - 101:8
**year** [34] - 28:21, 28:24, 29:7, 29:9, 43:15, 87:9, 118:16, 142:2, 144:8, 144:11, 144:13, 144:18, 144:20, 147:14, 147:20, 148:11, 148:18, 149:3, 149:10, 150:8, 150:12, 150:13, 150:17,

247

150:24, 153:24, 158:5, 158:6, 158:7, 171:7, 171:16, 196:19
**year-end** [1] - 149:10
**years** [25] - 28:17, 51:5, 56:3, 63:6, 64:22, 67:2, 74:19, 88:1, 89:1, 95:20, 141:21, 141:22, 143:12, 144:15, 153:23, 153:24, 167:9, 171:3, 171:16, 183:3, 185:10, 196:16, 207:20, 217:9
**yelling** [1] - 126:6
**yellow** [1] - 196:23
**yesterday** [6] - 5:13, 36:19, 38:9, 124:7, 188:19, 188:21
**Yogi** [1] - 123:21
**young** [2] - 117:9, 200:8
**younger** [1] - 70:18
**yourself** [6] - 24:20, 49:18, 59:5, 73:12, 138:25, 156:17

**Z**

**zero** [1] - 155:2
**zone** [1] - 17:6
**zoned** [1] - 62:4
**zoom** [1] - 5:19