UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CV-20631-JB

TRANSPARK, LLC, Miami, Florida

Plaintiff, October 1, 2025

vs. 9:11 a.m. - 4:10 p.m.

FTP INVESTMENT CORPORATION, Trial Day 3

Defendant. Pages 1 to 214

---

JURY TRIAL
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:
JOSEPH ISAIAH PARDO, ESQ
MELISSA LEA MACKIEWICZ, ESQ
SAVANNAH LEE DUFFY, ESQ
Pardo Law PLLC
1205 Lincoln Road
Suite 211
Miami Beach, Florida 33139

FOR THE DEFENDANT:
MARCUS ANTONIO NIELSEN, ESQ
MANUEL LAZARO CASABIELLE, ESQ
Boyd Richards Parker Colonnelli
100 SE 2nd Street
Suite 2600
Miami, Florida 33131

STENOGRAPHICALLY REPORTED BY:

VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR
Official Court Reporter to:
The Honorable Jacqueline Becerra
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
Vernita_Allen-Williams@flsd.uscourts.gov

INDEX OF WITNESSES

GREGORY MIRMELLI:
Continued Cross-Examination...Page 5
Redirect Examination..........Page 22

NATHAN HEBER:
Direct Examination............Page 56
Cross-Examination.............Page 86
Redirect Examination..........Page 108

BART SEIDLER:
Direct Examination............Page 111
Cross-Examination.............Page 116

EXHIBITS ADMITTED

Defendant's Exhibit 83........................Page 12
Defendant's Exhibit 90........................Page 17
Defendant's Exhibit 9.........................Page 21
Defendant's Exhibits en masse.................Page 55

09:07AM (Call to order of the Court at 9:11 a.m.)

09:11AM THE COURTROOM DEPUTY: Calling Case No. 24-CV-20631-Becerra, Transpark, LLC, vs FTP Investment Corporation.

09:11AM Counsel, please state your appearances for the record starting with the plaintiff.

09:11AM MR. PARDO: Good morning, Your Honor, Joseph Pardo, Pardo Law, PLLC, with me at the table -- excuse me, for the plaintiff Transpark, LLC.

09:11AM With me are Melissa Mackiewicz and Savannah Duffy, cocounsel, Patrick Justesen, our technician, and Elizabeth Osoria, my paralegal.

09:12AM MS. MACKIEWICZ: Good morning, Your Honor.

09:12AM THE COURT: Good morning.

09:12AM MR. NIELSEN: Good morning, Your Honor, Marcus Nielsen on behalf of defendant, along with Manny Casabielle, Bart Seidler, Nanette Bauza and Dan Smith.

09:12AM THE COURT: All right.

09:12AM MR. CASABIELLE: Good morning, Your Honor.

09:12AM THE COURT: Good morning, you may all be seated.

09:12AM Donna, are these screens working like this?

09:12AM THE COURTROOM DEPUTY: Yes, they are working. Everything is working.

09:12AM THE COURT: I apologize for the delay. As you know, we had an issue with the screens. I want to make sure we are all going to start off on the right foot.

Mr. Mirmelli --

THE WITNESS: Yes.

THE COURT: -- the first time you fail to answer a question, you'll go back to the table; we will be done with your testimony.

Mr. Casabielle, the next time you interrupt the witness, that will be the last question you ask of that witness.

Mr. Seidler, we can hear you here when you talk. Yesterday, as we were dismissing the jury, you had a comment about the testimony that included some profanity. We heard it here, so let me be very clear to you that the next time that happens, you will sit outside, right. This is like church or temple or your kindergarten grandchild's recital, right, we don't curse here, under our breath, over our breath. So if I hear it again, you will sit outside, all right.

We are not doing this again today, period. Absolutely, period.

Mr. Mirmelli, do you understand me?

THE WITNESS: Yes.

THE COURT: Counsel, Mr. Pardo, do you understand me.

MR. PARDO: On behalf of the plaintiff, we understand you, Your Honor.

THE COURT: Mr. Casabielle, do you understand me?

MR. CASABIELLE: Yes, Your Honor.

THE COURT: Mr. Seidler, do you understand me?

MR. SEIDLER: Yes.

THE COURT: Great, let's bring in the jury.

(Jury in at 9:13 a.m.)

THE COURT: All right, everyone be seated. Good morning.

JURORS: Good morning.

THE COURT: Thank you for your patience this morning. We don't know what happened overnight but, like, five or something of the TV screens were down when we arrived this morning. They were able to fix them. We think they're working, I guess we will see as the day goes along how well the fix was, but Mr. Casabielle, please continue.

MR. CASABIELLE: Thank you, Your Honor.

GREGORY MIRMELLI, THE PLAINTIFF, PREVIOUSLY SWORN

CONTINUED CROSS-EXAMINATION

BY MR. CASABIELLE:

Q. Good morning.

A. Good morning.

MR. CASABIELLE: Could we please put up Exhibit No. 2, Defense Exhibit No. 2, which has already been admitted into evidence.

BY MR. CASABIELLE:

Q. Mr. Mirmelli, when you saw -- well, let's discuss Section 14, default. Can you read this to the jury, we are -- the next questions that I am going to follow up with is, did you understand this when you signed the lease, so please go ahead.

09:15AM A. No, I -- I failed to pay attention to that section as it had been modified.
09:15AM Q. Can you repeat that, please, I didn't quite --
09:15AM A. I said I failed to -- to notice that section because it had been modified from an original draft, and this was done in a hurry, so.
09:15AM Q. But you signed this document, yes?
09:15AM A. Yes.
09:15AM Q. Now, I asked you to read it to the jury, I'll do that.
09:16AM "If the tenant fails to pay rent by the first of the month twice in one year, tenant shall no longer be granted a cure period."
09:16AM Do you understand what that means, sir?
09:16AM A. Yes.
09:16AM Q. What does it mean to you?
09:16AM A. It means exactly what you just said, if tenant fails to pay rent within the first year, according to the way it was written that the cure period -- during the cure period shall be immediately held in default.
09:16AM Q. So when you failed to pay rent following the year 2008, we're talking about 2009, 2010, moving forward, failed to pay rent twice in one year, you were in default, weren't you?
09:16AM MR. PARDO: Objection, Your Honor.
09:16AM THE WITNESS: I felt that the profit -- no, is the answer.

09:17AM THE COURT: So, sir, if your lawyer objects -- this is what I am going to do, if he objects and you answer anyway, I'm going to let you answer.

09:17AM THE WITNESS: Okay.

09:17AM THE COURT: If he objects, you have to stop.

09:17AM THE WITNESS: I didn't hear him, I'm sorry.

09:17AM THE COURT: You have to be closer to the microphone. I heard him. So you just have to be mindful when he finishes a question there might be an objection.

09:17AM Continue, please.

09:17AM BY MR. CASABIELLE:

09:17AM Q. Your answer is no, you were not in default?

09:17AM A. Correct.

09:17AM Q. So you were disregarding this particular section of the lease that you signed, yes?

09:17AM A. No, I was not disregarding it.

09:17AM Q. Well, you disregarded the black letter of this particular agreement. Can you explain why you do not believe you were in default when you failed to pay twice, failed to pay rent twice in one year, when you did that multiple years?

09:17AM A. Yes, I can explain that.

09:17AM Q. Please.

09:17AM A. In the Profit Participation Agreement, when it referred to the lease, it clearly stated that I had a 15-day cure period, which superseded anything whatsoever, as that is the basis of the reason

we're in this room is we're suing on the Profit Participation Agreement, so that superseded this.

Q. Do you have any authority to support your assertion that that particular agreement supersedes this particular agreement?

MR. PARDO: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: That was my understanding.

MR. CASABIELLE: Okay. Can we put up 79, please? It was introduced into evidence.

MR. PARDO: Your Honor, we'd like to lodge an objection and request a very brief sidebar.

THE COURT: Is 79 not in evidence sir?

MR. CASABIELLE: Are you asking me, Your Honor?

THE COURT: I'm asking Mr. Pardo, who is objecting. I thought 79 was in evidence.

MR. PARDO: 79 was ruled on as a matter of law by Your Honor yesterday outside the presence of the jury.

THE COURT: Correct.

MR. PARDO: And I would request a very brief sidebar.

THE COURT: Come.

(Sidebar conference.)

MR. PARDO: Your Honor, we'd like to move for reconsideration of Your Honor's ruling and assert a hearsay objection and if Your Honor overrules that objection, request a limiting instruction to the jury that this document shall not be

09:19AM deemed evidence that a foreclosure took place.

09:20AM THE COURT: It's denied. You could have asked for the reconsideration before the jury got here and not interrupted the proceedings with sidebar. That's denied. I have already given you plenty of instruction on -- I have even given you ideas and instructions on how you argue that, right, it's a relevant document. I understand that you have issues with it, that it doesn't fall in line with your theory of the case, that's fine, you will get to argue all of that to the jury, all right?

09:20AM MR. PARDO: Understood, Your Honor, thank you.

09:20AM (End of sidebar conference.)

09:20AM THE COURT: Please continue.

09:20AM MR. CASABIELLE: Can we publish 79, Your Honor?

09:21AM May we publish 79, Your Honor?

09:21AM THE COURT: Yes, it's in evidence.

09:21AM MR. CASABIELLE: Thank you.

09:21AM BY MR. CASABIELLE:

09:21AM Q. All right. Mr. Mirmelli, do you know what this document is?

09:21AM A. Yes.

09:21AM Q. Can you tell us what you believe it is?

09:21AM A. It was a document where it's called a collateral assignment of rights, and I was borrowing $300,000 from Mr. Seidler personally as opposed to my company Transpark, and this document was collateral that I would pay back the $300,000.

09:22AM Q. Okay. Did you pay it back, the $300,000?

A. As discussed yesterday, we only have evidence of 200,000 of it, but I firmly believe that other chunks, through different entities, it was fully paid back. I just can't prove it.
Q. Now, let's talk about Recitals B. Can you read that for the jury? I want to focus on that.
A. "As security for the loan, and intending to be legally bound, borrower does hereby covenant, agree, warrant, represent, assign, set and transfer to lender all of its rights, in and to that certain real estate project generally known as the Central Lot located at 130 Southeast 1st Street, Miami, Florida, the project, including, but not limited to, all rights the borrower set forth in that certain memorandum of understanding between borrower and Bart Seidler, a copy which attached hereto as Exhibit A, the contract."
Q. Do you understand that to mean that if you didn't pay back the $300,000 loan, you'd lose the property?
A. No.
Q. Can you explain why that is your belief?
A. Number 1, it was expressed in the memorandum of understanding, which is absent and, Number 2, because it would have acted as an offset towards profits of millions of dollars versus what turned out to be $100,000.
Q. Now, are you done?
A. Yes.
Q. You're talking about some memorandum that's supposed to be

attached. This is a document you signed, yes?
A. Yes.
Q. And you had that attachment, correct?
A. Yes.
Q. Do you have it with you today?
A. No.
Q. Have you ever produced that attachment?
A. Produced it?
Q. Yes.
A. No.
MR. CASABIELLE: Okay. We can take that down now, please.
I'd like to put up -- Your Honor, these two -- the following exhibit has not been admitted into evidence. I need to lay a predicate.
THE COURT: What number is that?
MR. CASABIELLE: We're talking about 83.
THE COURT: Okay.
MR. CASABIELLE: And if I could point out, there is four copies attached as 83, they're just duplicates.
Counsel, do you have those? 83?
MR. PARDO: Sure, I'll take a copy. Thank you. Thank you, sir.
MR. CASABIELLE: Sure.
(Brief pause to confer with plaintiff's counsel.)

09:25AM MR. CASABIELLE: Can the witness see 83, Dan?

09:25AM IT STAFF: Sure.

09:25AM BY MR. CASABIELLE:

09:25AM Q. Sir, I want you to look at this document -- I'm sorry, what is depicted on your screen. Can you tell us what that is?

09:25AM A. It is a check on July 18th of 2013 for $1,000. It says, "Interest back payment."

09:25AM Q. What interest -- I'm sorry. Does this signature fairly and accurately reflect the instrument that you signed?

09:26AM A. Can you repeat -- explain.

09:26AM Q. That's -- I apologize that's a bad question.

09:26AM Is this a copy of the check you signed?

09:26AM A. Yes.

09:26AM Q. Is that your signature?

09:26AM A. It is -- it looks like my signature stamp, but it is my signature.

09:26AM MR. CASABIELLE: Your Honor, I would move 83 into evidence, which consists of the images of two checks.

09:26AM THE COURT: Any objection?

09:26AM MR. PARDO: No objection.

09:26AM THE COURT: Okay. Then Defense Exhibit 83 is evidence.

09:26AM (Defense Exhibit 83 was received.)

09:26AM MR. CASABIELLE: Can we publish that, please.

09:26AM BY MR. CASABIELLE:

09:26AM Q. You wrote this check to Mr. Seidler, right?

A. Yes.
Q. And this is interest payment on which loan?
A. It -- it must have been -- I mean, I can't say for sure, but I am willing to acknowledge that it would most likely be in reference to the loan we've been talking about.
Q. The $300,000 loan?
A. Yes.
Q. And what is the date on this check?
A. July 18th, 2013.
Q. Sir, by issuing these checks, are you not acknowledging that the debt on that $300,000 loan still existed by July 18th of 2013?
A. Again, it doesn't refer to it, so I cannot be 100 percent sure.
Q. Are you done?
A. Yes.
Q. You would not be issuing a payment on a loan that you had already paid -- repaid, correct?
A. Correct.
Q. Sir, during the years 2006 through 2012, did Nathan Heber act on behalf of Transpark?
A. Yes.
Q. (Indicating.)
A. Yes.
Q. So, sir, let me try to sum up your testimony. By the year 2010, you had defaulted on the $300,000 loan, yes?

09:30AM A. I was not held in default.
09:30AM Q. But you had not repaid the loan by the due date, correct?
09:30AM A. I don't have evidence of that, but I believe that I did.
09:30AM Q. But you cannot prove that, right?
09:30AM A. No.
09:30AM Q. You were also -- Transpark, rather, was also in automatic default as a result of not paying your rent beginning of the month twice in one year, correct?
09:31AM A. Not correct.
09:31AM Q. No, you were not in default of that particular lease?
09:31AM A. No.
09:31AM Q. Based upon the explanations you've already given us, yes?
09:31AM A. Yes.
09:31AM Q. And also, sir, you had continued -- I'm sorry, you had failed to continue to manage Transpark by 2010, yes?
09:31AM A. The management of the day-to-day operations were being managed by Nathan Heber per a relationship with Mr. Seidler.
09:31AM Q. Okay. So those are three events that theoretically could have caused you to lose the property because you had defaulted on promises, correct?
09:31AM MR. PARDO: Objection, Your Honor.
09:31AM THE WITNESS: No.
09:31AM THE COURT: Next question.
09:31AM MR. CASABIELLE: I'm sorry. What was the response?
09:31AM THE COURT: No.

MR. CASABIELLE: Okay.
BY MR. CASABIELLE:
Q. And you're relying on the explanations you've already given, yes? For the reasons why you were not in default?
A. Yes.
Q. Now, sir, by 2010 Transpark as an entity ceased to exist, did it not?
A. I don't recall the years, but I'm sure your -- I would assume you have paperwork to back that up; and if so, then if it was administratively dissolved accidentally, then yes.
Q. Okay.
MR. CASABIELLE: Just a moment, Your Honor.
(Brief pause to confer with cocounsel.)
MR. CASABIELLE: Could we just put up 41. I believe this has already been admitted, just to be safe.
MR. PARDO: No objection. Defendant's 41 is in evidence.
MR. CASABIELLE: Right. Could we scroll down through the entire Exhibit 41. Not too fast but not too slow. Okay. Can we turn to the year 2010, please, of these reports. Stop there, please. Scroll down. I'll need a few moments, Your Honor.
(Brief pause to confer with cocounsel.)
BY MR. CASABIELLE:
Q. Mr. Mirmelli, this shows the reports that were filed -- or were not filed by your -- by the company Transpark. Can you tell the jury, and here are all the reports, why Transpark stopped

09:35AM filing reports with Sunbiz after 2010?
09:35AM A. Because, as we've seen in prior documents, I would normally receive an email and I would have to check off X, meaning keep active and, you know, an X, keep inactive. And that year either I didn't receive the email, it was sent and I didn't see it, so one way or another it was accidentally administratively dissolved, but Greg Mirmelli was always there.
09:36AM Q. Okay. So Transpark ceased to exist after 2010 for a period of time, yes?
09:36AM A. That's a legal argument that I can't really answer.
09:36AM Q. Okay. But you can't refute that, can you?
09:36AM MR. PARDO: Objection, Your Honor.
09:36AM THE COURT: Overruled.
09:36AM THE WITNESS: I have seen documents to the effect that say that even if it was administratively dissolved that all of my rights under the company still exist, so that would be the way I would refute that.
09:37AM MR. CASABIELLE: Can we put up Exhibit 90 -- Bates-stamped 90-46, which has already been admitted into evidence, Your Honor. 46.
09:37AM BY MR. CASABIELLE:
09:37AM Q. Do you recognize this document, Mr. Mirmelli?
09:37AM MR. PARDO: Your Honor, housekeeping matter. The document is not in evidence, but we have no objection to it.
09:37AM THE COURT: What number is that?

09:37AM MR. CASABIELLE: 90. It's a multipage exhibit. We're focusing on Bates stamp 90-46, Your Honor.
09:37AM THE COURT: You're moving it into evidence, sir?
09:37AM MR. CASABIELLE: Yes, Your Honor.
09:37AM THE COURT: There is no objection by the plaintiff. 90 is admitted.
09:37AM (Defense Exhibit 90 was received.)
09:37AM BY MR. CASABIELLE:
09:37AM Q. Can you tell us, sir, what this document is.
09:37AM A. I'm trying to figure it out.
09:38AM Q. Okay. You know what, let's go back to 90, Bates stamp 90-1, please. And scroll down slowly, but not too slow, so that Mr. Mirmelli can get context.
09:38AM BY MR. CASABIELLE:
09:38AM Q. Go ahead, please.
09:38AM A. The page just moved while I was reading it.
09:38AM Q. Tell us which page you want us on.
09:38AM A. You tell me. You're producing it. I'm just saying the one you started with was -- moved while I was reading it. So this is the one you started with, so this is the one I would like to read -- start reading first.
09:38AM Q. Are you done, sir?
09:38AM A. Yes.
09:38AM Q. All right. I'm looking at the -- the page you have in front of you right now is the beginning of document -- I'm sorry,

Exhibit No. DX 090. You are looking at Document 090-1. That is a little Bates stamp at the very bottom of the document. Do you see that?
A. Yes.
Q. Underneath it says -- where it says "confidential" right above it?
A. Yes.
Q. Okay. Can you read this document and tell us when you want us to move to 090-2. And we're going to do this for each page, so take your time.
THE COURT: I can just give him a hard copy. Would that be easier?
MR. CASABIELLE: I'm sorry?
THE COURT: Do you have an extra hard copy?
MR. CASABIELLE: I could get one, Your Honor.
THE COURT: I will just give him mine.
MR. NIELSEN: I've got it, Your Honor.
MR. CASABIELLE: May I approach, Your Honor?
THE COURT: I have it. Don't worry about it. I'm going to give him mine.
THE COURTROOM DEPUTY: Here you are, sir.
MR. CASABIELLE: Thank you, ma'am.
BY MR. CASABIELLE:
Q. Mr. Mirmelli, tell us when you're finished reading document Bates-stamped 090-1.

A. I have finished reading.
Q. Can we please move on to 090-2. Tell us when you're done.
A. I'm done.
Q. Move to the next page. Tell us when you're done with 090-3.
A. Okay. I've finished.
Q. Can we move on to the next page. Thank you. Tell us when you're done with this, please.
A. I'm done.
Q. Next page, please.
A. I'm done.
Q. All right. Before we continue, let me represent to you that these are what we believe to be your 2009 tax returns. Do you dispute that?
A. My 2009 tax returns?
Q. Yes, sir.
A. I'm just looking where it says that.
Q. We can continue doing the exercise of going page by page if you want. You tell us.
A. I mean, I'm seeing 2011, 2010. I'm seeing on the cover it says carryovers to 2012. So if you can help me find it, the 2009 section, it would help; but I'll keep looking.
This says Form 1040 with the year 2011 next to it, again, the year 2011.
Q. If I may interrupt for a moment?
A. Sure.

Q. I believe I misspoke. I believe these are your 2011 tax returns, and that is what I'm asking you. Do you dispute that these are your 2011 tax returns?
A. No.
Q. You do not?
A. I do not.
Q. Okay. Can we now go to page 90-46. You want to look at the middle -- can we highlight the middle of this particular page, right there, and bring it up.
A. Yes.
Q. Okay. This represents to the federal government that Transpark, LLC, was entirely disposed of. This is your tax return. Do you disagree with that?
A. No.
Q. So by 2011 Transpark was totally dissolved, yes?
MR. PARDO: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: Transpark had bank accounts which operated the parking lot under a five-year lease, which began in 2006, and in 2011, those operations ceased to exist. So the purpose for this confusing document was that I was no longer going to be having income and losses, so there would be no need to show that, but as for -- as for the company's profit participation, that right never went away.

09:45AM BY MR. CASABIELLE:
09:45AM Q. I didn't hear the last part. I apologize.
09:45AM A. As for the -- Transpark's profit participation interests, that had remained.
09:45AM Q. Okay. The documents we have been reviewing, the 2011 tax returns, this is a representation you made to the U.S. federal government about your income, correct?
09:45AM MR. PARDO: Objection, Your Honor.
09:45AM THE COURT: Overruled.
09:45AM THE WITNESS: Yes.
09:45AM BY MR. CASABIELLE:
09:45AM Q. And you would not lie to the U.S. government about your income sources, would you?
09:45AM A. No.
09:45AM Q. And if you had to remove an object that could have reflected a positive income, which would have been a negative liability -- tax liability, you would eliminate that if you could, would you not?
09:45AM A. I didn't understand.
09:45AM Q. Fair enough. If there was a source of income that you had to report, you would -- well, let me rephrase that.
09:46AM If you were no longer making money from a source of income, you would want the IRS to know that, right?
09:46AM A. Yes.
09:46AM Q. And that's why this says the activity for Transpark, LLC, is entirely disposed of; isn't that what you were reporting to the

U.S. government?
A. That was an oversight that I didn't -- never read at the time because I -- my taxes that year included over a thousand pages. It would be impossible to have noticed that.
Q. But did you sign off on it, didn't you?
A. Yes.
MR. CASABIELLE: Your Honor, if I could have sidebar to confer with cocounsel. I think I'm done. I just need to confirm that I'm done.
THE COURT: Sure. You don't need a sidebar; you just need a minute with your --
MR. CASABIELLE: I'm sorry. My mistake. Thank you.
THE COURT: No problem.
(Brief pause to confer with cocounsel.)
MR. CASABIELLE: Your Honor, I have no further questions. Thank you.
THE COURT: Thank you very much. Redirect.
MR. PARDO: Patrick, would you please pull up and show to the witness and the jury Defendant's Exhibit 78 in evidence, the promissory note dated August 27, 2007.

REDIRECT EXAMINATION

BY MR. PARDO:
Q. Greg, I'm showing you the promissory note dated October 27, 2007.
When did you individually understand the note was due?

09:49AM A. I only understood it later. When I signed it, as with many of my other partnerships, I felt that the -- the loan was a loan from a friend and I would pay it back and I didn't pay a lot of attention to when it was due, but according to the document, it was very quickly, January 1, 2008.

09:49AM Q. At any time between August 27, 2007, and August 21, 2021, did you understand that Transpark, LLC, was responsible directly or indirectly under this note?

09:49AM A. During which periods?

09:49AM Q. Between August 27, 2007, and August 21st of 2021, when the property was sold, did you have any understanding that Transpark, LLC, was responsible under this note?

09:50AM A. No.

09:50AM Q. Who did you understand during that period of time to be responsible under this note?

09:50AM A. The signer, myself, Gregory Mirmelli.

09:50AM Q. And who did you, Gregory Mirmelli, borrow money from?

09:50AM A. Bart Seidler.

09:50AM Q. At any time between August 27, 2007, and August of 2021, did Bart Seidler ever sue you under this note?

09:50AM A. No.

09:50AM Q. At any time between August 27, 2007, and August of 2021, did Bart Seidler take any legal action arising from or related to this note?

09:50AM A. No.

09:50AM Q. At any time between August 27, 2007, and August of 2021, did you or Transpark receive any notice of any kind arising from or related to this note?
09:51AM A. No.
09:51AM MR. PARDO: Patrick, would you please pull up and present to the jury Defendant's Exhibit 83, which is in evidence.
09:51AM BY MR. PARDO:
09:51AM Q. Greg, do you have an independent understanding of the term "statute of limitations"?
09:51AM A. Yes.
09:51AM Q. What's your independent understanding of the term "statute of limitations"?
09:51AM A. It's a legal expression for how many years a business person has if they would like to file a lawsuit regarding a matter.
09:52AM Q. Is one such matter which you understand a statute of limitations to apply suing on a promissory note?
09:52AM A. Yes.
09:52AM Q. Do you have an independent understanding and -- did you have an independent understanding of what the statute of limitations was, what amount of years was the statute of limitations arising from or related to suing on a promissory note?
09:52AM THE COURT: No, no, sir. So he is not a legal expert. Did he have an understanding of it at the time?
09:52AM MR. PARDO: Yes, Your Honor.
09:52AM THE COURT: He had an understanding of the statute of

09:52AM limitations at the time?

09:52AM MR. PARDO: Yes, Your Honor.

09:52AM THE COURT: I'd like to hear that answer.

09:52AM THE WITNESS: Five years.

09:52AM BY MR. PARDO:

09:52AM Q. Now, if the note was due in August -- excuse me, January of 2021, when did you understand the statute of limitations to expire, at the latest?

09:52AM A. January of 2013.

09:53AM Q. So looking at this exhibit, Defendant's Exhibit 83, was it sent with any particular purpose?

09:53AM A. I -- it was sent because, again, in my friendship with Bart and in the spirit of acknowledging we're still in this deal together, he asked me for $1,000, and I looked at it like it was a nominal amount of money, so I just sent it to him.

09:53AM Q. I'd like to turn now to your relationship with Nathan Heber.

09:53AM A. Okay.

09:53AM MR. PARDO: Let's pull up Defendant's Exhibit 9. This is in evidence; and if it's not already, we'll introduce it into evidence because there is no objection.

09:53AM THE COURT: What's the number?

09:54AM MR. PARDO: Defendant's Exhibit 9 is not in evidence. At this time we would like to move it into evidence without objection.

09:54AM THE COURT: Is there an objection to 9?

09:54AM MR. NIELSEN: One second, Your Honor. Do you have a copy of it?

09:54AM MS. MACKIEWICZ: It's your exhibit.

09:54AM MR. NIELSEN: No, Your Honor.

09:54AM THE COURT: No objection to nine. Nine is admitted.

09:54AM (Defense Exhibit 9 was received.)

09:54AM MR. PARDO: Permission to publish to the jury?

09:54AM THE COURT: You may.

09:54AM MR. PARDO: Thank you, Your Honor.

09:54AM BY MR. PARDO:

09:54AM Q. Greg, as of June of 2006, was your relationship with Nathan Heber good or bad?

09:54AM A. I felt that it was good.

09:54AM MR. PARDO: Your Honor, we'd like to -- let's pull up Plaintiff's Exhibit 175. This document is in evidence.

09:55AM IT STAFF: 175?

09:55AM MR. PARDO: 175, yes, Patrick.

09:55AM Let's pull up Plaintiff's Exhibit 11. This document is in evidence.

09:55AM BY MR. PARDO:

09:55AM Q. As of July of 2006, was Nathan still copying you on emails related to the property?

09:55AM A. Yes.

09:55AM MR. PARDO: Let's pull up Plaintiff's Exhibit 56 in evidence.

BY MR. PARDO:
Q. As of 2009, was this the list of annual reports that you would check off "keep alive or not" for which Nathan Heber was responsible?
A. Yes.
MR. PARDO: And let's turn to the second page of this document.
BY MR. PARDO:
Q. Do you recall we went through this yesterday, the documents you would keep alive, Transpark being one of them?
A. Yes.
Q. Now, there came a time in 2010 when your relationship with Nathan Heber changed for the worse?
A. Yes.
MR. PARDO: Let's pull up Plaintiff's Exhibit 170 in evidence. And let's start at the bottom and work our way up. Let's actually start at the last page, please.
BY MR. PARDO:
Q. Do you recognize a signature block for Nathan Heber?
A. Yes.
Q. Which office address, if any, do you recognize to be 123 Southeast 2nd Avenue?
A. That's the office he kept in Mr. Seidler's building.
Q. And let's start at the date of this email up top, please. So by April of 2010, Nathan Heber had moved his office into the

Ingraham Building where Mr. Seidler owned the building?
A. Yes.
Q. Now let's start at the bottom of the email thread, the second to the last page, please.
A. Okay.
Q. Orient yourself with the contents of this email, and can you explain to the jury what was going on, if anything, between you and Nathan Heber in April of 2010? And if you need to scroll up, just let us know.
A. Just stop scrolling, please, because I'm reading. Go up a little.
MR. PARDO: Scroll down, Patrick, please.
THE WITNESS: No, up. The other way.
MR. PARDO: Scroll down, please, Patrick. Down, please.
THE WITNESS: I'll let you know when to scroll, that way it will be easier.
Okay. I'm finished reading that.
MR. PARDO: Okay. Let's go to the next email up.
THE WITNESS: Okay.
MR. PARDO: Next email up, please.
THE WITNESS: Okay.
MR. PARDO: Next email up, please.
THE WITNESS: Okay.
MR. PARDO: Next email up, please. And we'll start at the bottom of the first page and pull up the email all the way

09:59AM through the end of -- or the middle of the second page. Next page, scroll. There we go.

09:59AM I think there was one more line that you missed, Patrick. Thank you.

10:00AM MR. CASABIELLE: Counsel, what exhibit is this?

10:00AM THE WITNESS: Okay.

10:00AM MR. PARDO: This is 170. Plaintiff's Exhibit 170.

10:00AM MR. CASABIELLE: One seven zero?

10:00AM MR. PARDO: One seven zero, yes, sir.

10:00AM Scroll up.

10:00AM THE WITNESS: I've read everything you posted. I've read all this. Okay.

10:01AM MR. PARDO: The next email up, please.

10:01AM THE WITNESS: Okay.

10:01AM BY MR. PARDO:

10:01AM Q. Now having gone through this email thread, how would you character -- excuse me, how would you characterize the relationship between you and Nathan Heber in and around April of 2010.

10:01AM A. It had become clear to me that he was doing everything he could to take possession and manage parking lots, which I spent my whole career, meaning from the year -- the early 2000s all the way through 2009, forming relationships and making those relationships to get control of those lots; his responsibilities were to be loyal to me and to work with me and to make sure that our company

10:02AM was successful, but he started taking the position that he just had the right to go call the landlords now that he had their contact information, negotiate deals, and I shouldn't be mad at him, I should, in fact, be happy for him.

10:02AM Q. Did your trust in him improve or get worse?

10:02AM A. In the most shocking way possible, it got worse.

10:02AM Q. Now, in this email of April 2, 2010, there is reference to a meeting that you had -- you were looking to have a few days later. Did that meeting happen?

10:02AM A. Yes.

10:02AM MR. PARDO: Let's pull up Plaintiff's Exhibit 169, also in evidence.

10:03AM THE WITNESS: Okay.

10:03AM BY MR. PARDO:

10:03AM Q. Do you recall meeting with Nathan Heber in and around April of 2010?

10:03AM A. Yes.

10:03AM Q. Do you recall what the topic of conversation was?

10:03AM A. Yes.

10:03AM Q. What was your understanding of the topic of conversation?

10:03AM A. The topic of conversation was we had already had our arguments regarding the fact that he felt he had the right to just, what I would call, pilfer or take from me what I built, use my relationships and so on, and we went through various, various different entities, but most importantly I remember him saying to

10:03AM me, "I insist you give me a 20 percent interest in all -- all of your assets or else you're on your own, and I'm going to get whatever I can get," and it got contentious, and that was the last time I've actually ever seen him till this day.

10:04AM MR. PARDO: Let's pull up Plaintiff's Exhibit 172, also in evidence.

10:04AM MS. MACKIEWICZ: No, it's not.

10:04AM MR. PARDO: It's not in evidence? I apologize.

10:04AM How about Plaintiff's Exhibit 41? This is in evidence. Thank you.

10:04AM THE WITNESS: Okay.

10:04AM BY MR. PARDO:

10:04AM Q. In August of 2011, Nathan Heber was communicating with Wells Fargo, and he told Wells Fargo to update the office address for Transpark. Do you recognize the address there?

10:04AM A. Yes.

10:04AM Q. What do you understand that address to be?

10:05AM A. Nathan's new office, probably at the Ingraham Building.

10:05AM Q. Did you authorize Nathan Heber to change the address for which Wells Fargo should communicate relating to Transpark?

10:05AM A. Absolutely not.

10:05AM Q. Were you copied on this email communication to Wells Fargo?

10:05AM A. No, it's shocking to me.

10:05AM Q. Did Nathan Heber consult with you before he reached out to Wells Fargo to tell them to change the address for Transpark?

10:05AM A. Definitely not.

10:05AM MR. PARDO: You can take this exhibit down. Let's pull up Plaintiff's Exhibit 158. This is in evidence.

10:06AM IT STAFF: What document?

10:06AM MR. PARDO: 158 in evidence.

10:06AM MS. MACKIEWICZ: In evidence.

10:06AM MR. PARDO: In evidence.

10:06AM BY MR. PARDO:

10:06AM Q. These are billing statements in 2013. It's a composite exhibit. Do you recognize the address where these bills are being sent to?

10:06AM A. Yes.

10:06AM Q. Which address is that?

10:06AM A. 25 Southeast 2nd Street, Suite 250, Miami, Florida.

10:06AM Q. Did you authorize the changing of the billing address for AT&T?

10:06AM A. No.

10:06AM Q. In 2013, was Transpark, LLC, still in business?

10:06AM A. Yes.

10:06AM MR. PARDO: If I may?

10:06AM (Brief pause to confer with cocounsel.)

10:07AM MR. PARDO: Let's pull up Plaintiff's Exhibit 175. Is that in evidence?

10:07AM MS. MACKIEWICZ: In evidence.

10:07AM MR. PARDO: 175 in evidence.

10:07AM BY MR. PARDO:
10:07AM Q. In August of 2009, were you still being copied on emails with Nathan Heber?
10:07AM A. Yes.
10:07AM Q. And was it typical of him to send the portfolio of all of your parking lots like this?
10:07AM A. Yes.
10:07AM MR. PARDO: Let's scroll down on the attachments. The next page, please.
10:07AM BY MR. PARDO:
10:07AM Q. And do you see under the second subheading of Miami parking management the 130 Southeast 1st Street address?
10:07AM A. Yes.
10:07AM MR. PARDO: Let's pull up Plaintiff's Exhibit 177 in evidence.
10:08AM BY MR. PARDO:
10:08AM Q. In April of 2009, you communicated again with Nathan Heber listing all of your partnership entities. And you see the central lot on the right-hand side, 130 Southeast 1st Street.
10:08AM MR. PARDO: And if we can zoom out, Patrick --
10:08AM THE WITNESS: Yes, I see it.
10:08AM MR. PARDO: If we can un-call that section, please. And see the column status -- no. Let's look at it from partnership liabilities and then call up everything down to -- a little more, a little more, a little more, a little more; perfect. Thank you.

10:08AM BY MR. PARDO:
10:08AM Q. So the central lot had the 4-and-a-half-million-dollar loan, monthly interest payments, and it reflected a GM interest of 33 percent. Do you see that there?
10:09AM A. Yes.
10:09AM Q. It's not 30 percent, but what was your understanding of what that column meant?
10:09AM A. It meant that that was my ownership, profit participation in ownership.
10:09AM Q. And you see the status: Current. What did that mean to you?
10:09AM A. That the status was current.
10:09AM Q. And do you see the map, a-b-c-d-e-f-g, what did that refer to? At the right of current, there is a map and then a letter indicator.
10:09AM A. It's called a Map Key. So B, it looks like, was related to 130 Southeast 1st Street.
10:09AM Q. Was it Nathan's responsibility, if at all, to map out properties for the Park West Parking portfolio?
10:09AM A. Yes.
10:09AM Q. And let's just scroll through the partnership document again and see the extent of the portfolio that Nathan Heber was managing for you. Previous page, please. Is this consistent with your testimony that he was managing dozens of lots for you?
10:10AM A. Yes.
10:10AM Q. Does it surprise you that he missed filing an annual report?

A. No.
Q. Sitting here today, does it surprise you that he missed filing an annual report?
A. No.
MR. PARDO: No further questions, Your Honor.
THE COURT: All right. Does the jury have any questions for this witness?
(Jurors shaking their heads.)
THE COURT: All right. No questions. Thank you very much, sir.
(The witness is excused.)
THE COURT: Call your next witness.
MR. PARDO: Your Honor, at this time the plaintiff rests.
THE COURT: All right. Defense.
MR. NIELSEN: Your Honor, we have motions we'd like to make.
THE COURTROOM DEPUTY: Sir, let me have that one exhibit back the judge gave you.
THE COURT: Ladies and gentlemen of the jury, the plaintiffs have rested. I have to handle some legal matters before we hear the case any further. It's not quite the 10 o'clock break, but I am going to go ahead and do the break now. It might be 20 minutes before we get back to you. Like I said, we're going to do some work. It will make things go faster, I promise you. So go ahead and enjoy some of our government-issued

10:11AM coffee.

10:11AM (Jury out at 10:11 a.m.)

10:11AM THE COURT: All right, counsel, you may proceed.

10:12AM MR. NIELSEN: Your Honor, we want to move for a directed verdict on certain issues.

10:12AM THE COURT: Okay.

10:12AM MR. NIELSEN: The first one being futility. We have raised that it was futile to send notice to a physical address because they no longer maintain an address there, and the person who they said was going to receive it also did not maintain an address at the notice address listed in the agreement.

10:12AM May I use the lapel?

10:12AM THE COURT: I'm sorry?

10:12AM MR. NIELSEN: May I use the lapel?

10:12AM THE COURT: Yes.

10:12AM MR. NIELSEN: And, Your Honor, the record --

10:12AM THE COURT: That's not working, sorry.

10:12AM MR. NIELSEN: The record evidence reflects that it was pointless to send notice to that physical address because they no longer had an address there, and no reasonable juror could find otherwise based on the evidence in the record.

10:12AM THE COURT: All right. Do you have any other argument to make?

10:12AM MR. NIELSEN: Yes. We also want to move for directed verdict on the second and third elements of breach of contract,

10:12AM which is the plaintiff has failed to prove that he complied with the obligation of the agreement, and he has failed to prove that there was an excuse for his failure to comply with said obligations.

10:12AM We're also moving for a directed verdict on damages and an affirmative defense of abandonment because the record evidence reflects that the business was shut down in 2011.

10:13AM And there is -- I already said that.

10:13AM (Brief pause.)

10:13AM MR. NIELSEN: Also, the plaintiff hasn't established by using the terms of the contract that there are damages.

10:13AM THE COURT: Are you going to make any further arguments?

10:13AM MR. NIELSEN: No, Your Honor. That's all.

10:13AM THE COURT: Are you going to call anything --

10:13AM MR. NIELSEN: I will go through each one, but I was listing the arguments.

10:13AM THE COURT: Yes, that's fine. I just needed to know if you were going to go through them.

10:13AM MR. NIELSEN: Your Honor, the evidence has shown that the plaintiff has failed to comply with the agreement by failing to pay rent and going out of business in 2010 --

10:13AM THE COURT: All right. Hold on. I thought you had four arguments: Futility?

10:13AM MR. NIELSEN: Yes.

10:13AM THE COURT: That he failed to prove he met his

obligations, right; the contract issue?

MR. NIELSEN: Yes, Your Honor.

THE COURT: Failure to show damages, third. And fourth, abandonment; is that right?

MR. NIELSEN: Yes, Your Honor.

THE COURT: So let me hear your argument on futility.

MR. NIELSEN: Okay, Your Honor. Your Honor, the notice -- in the contract there is a specific address.

THE COURT: I'm sorry, we can't hear you.

MR. CASABIELLE: Go to the podium.

THE COURT: Just go to the podium, yes.

MR. NIELSEN: Your Honor, within that, the contract, there is a specific address, which is Suite 2650. The record evidence has reflected that after 2008 the plaintiff no longer had an address there. The plaintiff tried to rebut this assertion by having Stewart Mirmelli's law firm come and testify that it would have received its mail.

However, the testimony from that witness reflected that he did not also have an office at the Suite 2650 address, and in fact, he had moved addresses as well. And there is no record evidence to show that they would have received notice at that physical address, and no reasonable juror could conclude otherwise.

THE COURT: All right.

MR. NIELSEN: I have no further argument on that issue.

10:14AM THE COURT: Okay. Go to your next issue.

10:15AM MR. NIELSEN: As for the breach of contract and their failure to meet -- a showing that they have complied with the agreement, the record evidence reflects that they failed to pay rent under the lease and under the agreement. And they also went out of business by 2010, showing that it was impossible for them to comply with any obligations within the agreement. The record evidence reflects that they were dissolved and that they represented to the United States government that the activity had been entirely disposed of, and no reasonable juror could find otherwise.

10:15AM THE COURT: Okay.

10:15AM MR. NIELSEN: And as for the third element, they have failed to establish that there is an excuse for their failure to comply with the terms of the agreement.

10:15AM And four, abandonment, which is the totality of the circumstances, the record evidence reflects that the plaintiff went out of business in 2010, and it -- no reasonable juror could find otherwise that they had not abandoned the agreement because they went out of business. You can't do business with a entity that doesn't exist.

10:16AM THE COURT: Okay.

10:16AM MR. NIELSEN: I have no further arguments, Your Honor.

10:16AM THE COURT: I think you had an argument on damages.

10:16AM MR. NIELSEN: Oh, yes, Your Honor. And damages, Your

Honor, the plaintiff has failed to establish by using actual terms of the agreement and calculating any compounding interest on any of the contributions owed under the agreement to FTP to establish with any degree of certainty the damages owed to plaintiff and has not proffered any expert testimony on the topic.

So we're moving for directed verdict on damages because not enough information for the jury to make a determination of damages under the terms of this agreement.

THE COURT: Okay. Any response?

MR. PARDO: Thank you, Your Honor. With respect to futility, the notice provision of the Profit Participation Agreement directs any notice that FTP may desire or want to give or is required to give to a specific person, Gregory Mirmelli, and a specific address, the 2650 address.

With respect to the address, Stewart Mirmelli testified competently that he was able to receive forwarded mail; but more importantly, Your Honor, Mr. Seidler conceded that he did not attempt or even contemplate giving notice under the Profit Participation Agreement.

There is also sufficient evidence that Mr. Seidler knew how and FTP knew how to get ahold of Gregory Mirmelli. Therefore, the absence of an attempt and the knowledge of how to find Mr. Mirmelli negate futility.

THE COURT: I am not sure that how -- that he could have found Mr. Mirmelli negates futility. The reason why you have a

notice provision is to have a specific place to send it. If your argument is that the notice was to the person and to that address, that's incorrect, right. The notice is to that address in care of that person, right.

If he had actually sent the notice or handed a notice to Mr. Mirmelli, you probably wouldn't have a great argument, right, that he didn't get notice. But the notice that's required under the agreement is notice to him at that address. So if what you're trying to argue is that there is a separation between the two and that he knew how to reach Mr. Mirmelli and didn't, I don't think you have anything there.

Now, that said, I do think the record evidence also shows that there was no attempt made. And what is the evidence that, had he made that, that Mr. Mirmelli could have received that notice?

MR. PARDO: So the corollary argument, Your Honor, is during the relevant period of time that he would have wanted to make notice, the assignment provision under the profit participation enured to Gregory Mirmelli's individual benefit.

Therefore, if Transpark was administratively dissolved, and if I may, once Transpark was administratively reinstated, he could have gone to Sunbiz; he could have gone on the public record and found an alternative address for Transpark.

THE COURT: Right. He has no obligation to do that. So let's go back to the argument that I thought you were going to

make, which is if he had sent notice at the time to the name and the address listed in the participation agreement, I thought the whole point of putting his father on was to suggest that he would have, in any event, received it or could have received it.

MR. PARDO: Correct, Your Honor.

THE COURT: I don't know that the jury is going to believe that, but I thought your argument was that there is enough evidence in the record that a reasonable juror could. They may not, I don't know what they will do, right?

MR. PARDO: Correct, Your Honor, that Stewart Mirmelli was responsible for being the registered agent and his son's lawyer, and that they could have found on the Florida Bar's website --

THE COURT: No, sir. No, no, no, no.

So that argument would completely undo notice in the contract, right. You're not obligated to dig out the address or to find where the person is. You're only obligated to send the notice as the PPA had it, period. You don't have to do anything else. That he could have found him, that he could have looked for him, that it was not that hard to find him, is not neither here nor there, right?

The contract or the PPA required notice; it required notice to be sent to Greg Mirmelli at a certain address. I don't think there is any dispute that Greg Mirmelli, at that time, was not at that address. I thought your argument was that even though

he wasn't at that address, it wouldn't have been futile because they had an obligation to send it.

MR. PARDO: Correct.

THE COURT: And if they had sent it, Greg Mirmelli would have actually gotten it because his father was associated with that address.

MR. PARDO: That's correct.

THE COURT: And they would have still gotten the mail, right? I thought that was your argument.

MR. PARDO: Yes, it is, Your Honor, that Stewart Mirmelli testified that he would frequently go to the 2650 address and pick up mail and that he was capable of receiving forwarded mail that was sent to the 2650 address, correct, Your Honor.

THE COURT: I don't know that there is -- I don't know how powerful that evidence is going to be, but at this stage, I have to take the inference on you, right, give you the inference of it. But that's really the only evidence that you have. The jury will have to believe his father; that had that notice been sent, it would not have been futile because he could have still -- Greg Mirmelli could still have gotten notice as the PPA contemplated, and I think your evidence of that is his father was associated with that address, was getting some of that mail, the mail would not have been returned, right, he would have gotten it. And your only evidence of that is his father saying that, right?

MR. PARDO: We believe the totality of the evidence is

broader than that, but I agree with Your Honor as you phrased it.

THE COURT: Right. I mean, the issue is, I don't know how -- the fact that they could have found Greg Mirmelli, that they could have looked him up, that all might be true, but I don't think they're required to do that.

MR. PARDO: Well, we'll proffer to Your Honor that when Mr. Seidler gets on the stand, his testimony will be that the parties had other ways of communicating with one another.

THE COURT: That doesn't matter. It's completely irrelevant. The PPA requires notice a certain way.

MR. PARDO: An oral modification of the contract could alter the terms of the contract, Your Honor.

THE COURT: There's not -- I have not heard anything or seen anything in everything I know about this case to suggest there was an oral modification of this contract as to where notice could have been received.

I mean, yes, of course, an oral modification can be made to a contract, but do you have any evidence of that? Your client testified for a day. Is there any evidence? Did he testify to that?

MR. PARDO: We believe that when the defendants put on their case of futility, we'll have an opportunity to cross-examine and probe those issues, Your Honor.

THE COURT: Well, you had him on the stand as well. Like I said, we're at the standard that we're at for a directed

verdict, but I think the argument -- the only argument can be or the only evidence could be what you have of the father, and that is what it is.

All right. Do you have any further arguments on the breach of contract?

MR. PARDO: Yes, Your Honor. With respect to not paying rent as an independent obligation of the contract, the Profit Participation Agreement has two buckets, 30 percent is the total profit participation, 15 percent was his equity contribution, the 300,000, and with respect to not paying rent, even if there was a default in not paying rent, and if there was notice given under the contract, at max, just the 15 percent promote would be diluted and, therefore, it's not an entire dismissal of the claim because the jury can find that no notice of the default was given; therefore, that Transpark wasn't given an opportunity to cure that default and, therefore, there is still profit participation to be had.

With respect to not being in business, once Transpark was administratively reinstated, it's as if the dissolution never occurred, and the jury can find that Transpark never waived and never gave up its rights to the Profit Participation Agreement, even if it stopped operating the lot.

THE COURT: And your argument on damages?

MR. PARDO: Your Honor, Mr. Seidler conceded there were profits. He testified there were profits. The net cash flow in

Mr. Colletti's testimony, that there 17-and-a-half million dollars of cash flow, the plain language of the contract, which obligates FTP to disburse cash flow and FTP's tax return to the government, which reflects profit in the form of $11.4 million of capital gains, which Mr. Seidler testified was taxable income.

THE COURT: All right. Let me hear -- any response from the defense?

MR. NIELSEN: Your Honor, with regards to the futility argument, I do not believe that the argument that mail may have gotten somewhere could lead a reasonable jury to believe that it was not futile to send mail.

And the record evidence shows that in 2009, the place where they're proposing the mail may have arrived was not the same address as is listed in the Profit Participation Agreement. No reasonable juror could conclude otherwise.

And, in fact, Stewart Mirmelli did not testify with any certainty that the mail would have gotten there, and he also changed offices around 2014 to a completely different building and changed again.

So part of their argument is that they would not have received -- that they should have gotten the right of first refusal. How would they have received it when we sent them the mail? They would never have received it. And we have testified -- Bart Seidler testified that by 2021, he was aware and he believed that Transpark was out of business, and the record

evidence reflects that they were out of business or at least gave the impression to Bart Seidler that it was.

And that leads also to the abandonment argument, which is state of mind. So all these arguments kind of flow together.

And with regards to damages, Your Honor, the plaintiff has brought up smoke and mirrors with returns to what the damages are because what's on the tax records does not reflect what's owed under the agreement, Your Honor. The agreement has very specific terms on how a calculation of profits are done.

First, the profits -- first they have to calculate the compounding interest owed to Bart Seidler on his investments and expenses. After that, if there is anything left over, it goes to Transpark, if.

No one has presented testimony applying the money from the property to those terms, which is what's required for damages. So the plaintiff should have put on an expert in their case in chief to establish damages, and they have failed to do that, and the record evidence cannot provide any degree of certainty for the jury to conclude damages under the terms of this agreement. And I do not believe the plaintiff got a chance to argue the abandonment portion of my argument, but...

THE COURT: I thought he did. I had notes that said that once Transpark was administratively reinstated --

MR. NIELSEN: Yes, Your Honor, excuse me. You are correct, my apologies.

Your Honor, abandonment is about an action that is interpreted by another party and accepted by that party as abandonment. The defendant has testified that he believed that Transpark was out of business. We have proffered evidence showing that they were administratively dissolved, which was a matter of public record, and he accepted that as abandonment of the contract.

The plaintiff himself has testified that he went out of business. What other -- what other type of signification to somebody that they cannot conduct terms under the agreement besides going out of business?

THE COURT: I am going to take a minute, and then I will come back and rule. How long is the defense case?

MR. NIELSEN: Your Honor, we have three witnesses including our expert.

THE COURT: Okay. How long do you think that will take?

MR. NIELSEN: Your Honor, there is one issue we wanted to raise with one of our witnesses, he is observing the holidays, he needs to be back in Fort Lauderdale by 4:00, and he is our next witness. And we need to also read our exhibits into the record.

THE COURT: I mean, it is only 10:30, do you think he --

MR. NIELSEN: No, no. I just want to highlight to the Court's attention.

THE COURT: I was going to break at 4:30 today. I know

tomorrow is a high holiday, and with the traffic in Miami, I don't want anybody to be stressed out about getting home or getting to services, so I was going to break at 4:30.

What witness is this?

MR. NIELSEN: Nathan Heber, Your Honor. He is here. I believe that he -- we will get through Nathan Heber today and start Bart Seidler towards the end, or if we don't have enough time, on Friday.

THE COURT: All right. He is not an insignificant witness. How long is your direct?

MR. NIELSEN: I'm not sure, maybe two, three hours, two hours.

THE COURT: Do you have any sense, Mr. Pardo, how long?

MR. PARDO: It won't be more than two hours, we should finish Nathan Heber today.

THE COURT: We should be able to finish today. That being said, if it's 4:00 o'clock and we haven't finished him, I'm not going to -- I'm obviously not going to make him stay on the stand given the holiday.

MR. NIELSEN: Of course, Your Honor. Thank you.

THE COURT: I will be back in about ten minutes.

(Recess at 10:30 a.m.)

(Back on the record at 10:50 a.m.)

THE COURT: You can be seated, I'm going to reserve my ruling on the motion. Let me just say, I mean, on the futility

10:51AM argument, again, I have to take the evidence in the light most favorable to the plaintiff. I don't think, Mr. Pardo, that you can argue to this jury that notice in the contract was anything other than what's the notice in the participation agreement. I am going to be listening to your closing really carefully because arguing that he knew how to find him, anyway, that's absolutely not the notice that was required.

So it's closing, I understand, but I'm going to be listening keenly to that because that's not notice under the participation agreement.

I'm also going to be listening quite keenly if the defendant calls their damage expert to what your examination of the damages expert is, and what you intend to do with the rebuttal, because damages in this case is not their net profit, that's not what the PPA called for, and you rested without a calculation of the damages.

So, again, I'm going to reserve. We'll see if they call a damage expert. You can cross-examine their expert, you know, obviously till the cows come home, and I have also said to you, you can call your own expert in a rebuttal case to rebut that opinion. But I'm not letting you put in your own evidence, right, that's outside the scope of a direct on what the damages would have been, nor am I letting you -- allowing you to call in rebuttal a damage expert that you chose not to call in your case in chief.

10:53AM So, again, this is what the Dauberts were about in great part, right? You all argued this in the motion in limine, and I said we'll wait to see how the trial pans out, but I am going to be listening to what your questions are because you've rested with a damage calculation. I mean, what evidence is in this record from anybody of what the damages were pursuant to the participation agreement.

10:53AM MR. PARDO: The obligation to distribute net cash flow and profit derives from the Profit Participation Agreement.

10:53AM THE COURT: What does the participation agreement say is the damage? I mean, the participation agreement is pretty clear on that, so what is that?

10:53AM MR. PARDO: The net cash flow and profits from the sale.

10:54AM THE COURT: No, that's not a complete recitation of the damages. I mean, I don't think there's any dispute that the costs have to be taken into account, right? Or are you arguing to the jury that the costs are not at issue?

10:54AM MR. PARDO: I'm reading from the bottom of Section 3 of the Profit Participation Agreement: Upon any sale of the property, all mortgages, secured debt, and outstanding expenses shall be retired first.

10:54AM THE COURT: Right. There you go. Stop right there. So what evidence do we have of what that would have meant in this case?

10:54AM MR. PARDO: Well, according to Mr. Seidler, it was the

net moneys in, minus his belief that there were capital contributions made, plus accruing interest thereon.

THE COURT: Like I said, I'm going to reserve, and I'm going to be listening closely. You don't need to have an expert. I know of no case law that says you have to have an expert calculate your damages, but you do have to have evidence of your damages.

And the damages here are calculated by a particular way in the agreement. I didn't really hear anybody on your side do that. You have a theory that with this evidence, it's enough. We'll see if it's enough. But I am not going to let you backdoor a different calculation through an expert is all I'm telling you because I don't think that's appropriate, right.

You put on your case. You rested. They're going to put on their expert, if they put on a expert to calculate damages -- I don't know if they will. If they do, you can cross-examine him on his methodology. You can cross-examine him, but I'm not letting you use, you know, I'm not letting you go outside of the scope of the direct, so you will have to be real careful not to do that.

And when you put your rebuttal expert on, if you do, it's going to be rebuttal to what that testimony was.

MR. PARDO: Understood, Your Honor.

THE COURT: All right. Like I said, you've rested on the damages calculation as you saw it. All right. So I am going to reserve on the motion.

Let's bring the jury back.

MR. NIELSEN: Your Honor, there is one more issue I want to raise. Just a housekeeping matter.

THE COURT: Yes.

MR. NIELSEN: Your Honor, if we do decide to call our expert and the plaintiff calls their rebuttal expert, you reserved ruling on our Daubert motion. You denied it without prejudice, I mean. And I would like to reserve the right to voir dire the expert prior to him testifying to the jury so the Court can properly rule on our Daubert motion because we raised issues of reliability of his opinion.

THE COURT: That's not what the voir dire is for. The voir dire is to determine whether or not he is an expert in the field.

MR. NIELSEN: Okay.

THE COURT: So you can voir dire for that purpose, but on reliability, that's cross-examination.

MR. NIELSEN: Well, in our Daubert motion, which was denied without prejudice, we raised issues that his opinion was unreliable as a matter of law.

THE COURT: I know. I denied your motion. I denied the motion, and I said -- and I'm almost positive that I noted that there was no issue with respect to the qualifications of either expert. Typically you get to voir dire on the qualifications, not on the reliability of the report.

So if you call an expert, I don't know if you will, but if you call the expert, and if they call their rebuttal expert, you're entitled to voir dire before I determine if that person is an expert. But that typically -- we'll see what your questions are -- if you're not stipulating to his expertise, of course you will get to voir dire him.

But that's typically not a reliability issue; that's a methodology -- not methodology, that goes to his qualifications. So you can -- at some point they will have to move to have him, you know, designated an expert. You can ask to voir dire, and you can voir dire on that issue. I don't see what the issue is.

MR. NIELSEN: Understood, Your Honor.

THE COURT: All right. Let's bring in the jury.

(Jury in at 10:57 a.m.)

THE COURT: All right. You may all be seated. Thank you very much.

Defense, call your first witness.

MR. NIELSEN: Your Honor, could we please read the admitted exhibits that we stipulated to prior to calling the witness.

THE COURT: You may. You can.

MR. NIELSEN: Your Honor, do I mind if I sit down and read off my computer regarding the exhibits?

THE COURT: Sure. That's fine.

MR. NIELSEN: Thank you.

10:59AM Is the Court ready, Your Honor?

10:59AM THE COURT: I'm ready.

10:59AM MR. NIELSEN: Defendants seek to admit Defendant's Exhibit 032, 033.

10:59AM THE COURTROOM DEPUTY: So you're going to need that. I have that one turned on. Is it on?

10:59AM MR. NIELSEN: Now is it working, yes.

10:59AM THE COURT: You mean 32, correct?

10:59AM MR. NIELSEN: 32, Your Honor.

10:59AM THE COURT: All right. 32.

10:59AM MR. NIELSEN: 33, 35, 36, 38, 46, 47, 48, 49.

10:59AM THE COURTROOM DEPUTY: Hold on. 47, 48.

10:59AM MR. NIELSEN: 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 65, 66, 68, 69, 70 --

11:00AM MS. MACKIEWICZ: Hold on. Hold on.

11:00AM MR. NIELSEN: 71, 72, 75, 76, 80, 85, 88, 89, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 125, 126, 127, 128, and 130.

11:01AM THE COURT: All right. Any objection to those, counsel?

11:01AM MS. MACKIEWICZ: No, Your Honor.

11:01AM THE COURT: All right. Those will all be admitted into evidence.

11:01AM (Defense Exhibits en masse were received.)

11:01AM MR. NIELSEN: Your Honor, the defense calls Nathan Heber.

11:01AM THE COURT: All right. You may proceed.

11:02AM (The witness is sworn. )

11:02AM THE WITNESS: I do.

11:02AM THE COURTROOM DEPUTY: Okay, thank you. Please have a seat. Please state your first and last name for the record.

11:02AM THE WITNESS: Nathan Heber.

11:02AM THE COURTROOM DEPUTY: Thank you.

11:02AM MR. NIELSEN: Your Honor, may I reorient the podium, please?

11:02AM THE COURT: Sure.

11:02AM MR. NIELSEN: Thank you, Your Honor.

11:02AM NATHAN HEBER, DEFENDANT'S WITNESS, SWORN

11:02AM DIRECT EXAMINATION

11:02AM BY MR. NIELSEN:

11:03AM Q. Good morning, Mr. Heber. How are you doing?

11:03AM A. Good morning. Well.

11:03AM Q. Do you know who Greg Mirmelli is?

11:03AM A. I do.

11:03AM Q. Who is he?

11:03AM A. I worked with Greg. He's sitting over there. I worked with Greg starting around 2005, 2006.

11:03AM Q. And what did you do for Greg starting in 2005, 2006?

11:03AM A. I managed parking lots, helped him with real estate acquisitions, general operations administration, that type of thing.

11:03AM Q. Do you recognize the property located at 130 -- excuse me, 130 Southeast 1st Street, Miami, Florida 33131?
11:03AM A. I do.
11:03AM Q. What is that property?
11:03AM A. We refer to it as the central lot. It was a parking lot in Downtown Miami.
11:03AM Q. When did you first hear about this property?
11:03AM A. Around 2006 when it was being acquired.
11:03AM Q. What was Gregory Mirmelli's involvement in that property, to your understanding?
11:03AM A. He originally got it as a contract and then leased it as a parking lot.
11:04AM Q. Okay. Do you know who Bart Seidler is?
11:04AM A. I do.
11:04AM Q. How do you know Bart Seidler?
11:04AM A. Bart was Greg's partner on the lot.
11:04AM Q. Let's rewind a bit, before the lot was purchased.
11:04AM What was your involvement with the actual initial assignment of the property?
11:04AM A. I drafted the lease. I probably worked with Greg on some of the details, but, yeah, just worked on the acquisition.
11:04AM Q. Was Greg seeking a partner to purchase the property?
11:04AM A. He was.
11:04AM Q. Why?
11:04AM MR. PARDO: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: You know, as a financial partner to put up the money, the majority of the money to purchase the property.

BY MR. NIELSEN:

Q. Why did he need assistance with the majority of the money to purchase the property?

A. I believe the purchase price was $6 million, and I think it was more than he had available.

Q. And who introduced you to Bart Seidler?

A. Greg.

Q. Do you recognize the company FTP Investment Corporation?

A. I do.

Q. What was FTP Investment Corporation's involvement in the property, to your understanding?

A. It was the ownership entity that purchased the property.

Q. Do you know what Transpark is?

A. I do.

Q. How do you know what Transpark is?

A. Transpark was the ownership entity for Greg, who leased the lot from Bart -- or from the ownership, from FTP.

Q. What did you understand Transpark's relationship with FTP to be?

A. It was the lessee or lessor -- lessee, excuse me, of the parking lot, and it was responsible for paying rent.

Q. Did it have any other responsibilities?

11:05AM A. I believe it held Greg's ownership interest, so, you know, whatever obligations he had as the owner of the property.
11:06AM Q. Did you ever work for Transpark?
11:06AM A. I did.
11:06AM Q. When did you start working for Transpark?
11:06AM A. When it was created in 2006.
11:06AM MR. NIELSEN: Could we pull up Defendant's Exhibit 001, which has already been introduced into evidence. Can you please slowly scroll through it for the witness.
11:06AM MR. CASABIELLE: Your Honor, respectfully, Mr. Seidler could not hear. If perhaps Mr. Heber could speak into the mic.
11:06AM Thank you, sir.
11:06AM THE WITNESS: Sure.
11:06AM BY MR. NIELSEN:
11:06AM Q. Do you recognize this document?
11:06AM A. I do.
11:06AM Q. What is this document?
11:06AM A. This was the Profit Participation Agreement between Greg and Bart to purchase the property.
11:06AM Q. Did you read this agreement when you worked for Transpark?
11:06AM A. I did.
11:06AM Q. Did you have familiarity with its terms when you worked for Transpark?
11:07AM A. I was familiar, yes.
11:07AM Q. Did you help Transpark with any part of the agreement?

11:07AM A. I drafted the parking lease.
11:07AM Q. The lease that's referred to in this agreement?
11:07AM A. Yes.
11:07AM Q. Did you understand Transpark's responsibility to be to manage
11:07AM the daily operations of the lot?
11:07AM MR. PARDO: Objection, Your Honor.
11:07AM THE COURT: Overruled.
11:07AM THE WITNESS: I did.
11:07AM BY MR. NIELSEN:
11:07AM Q. Under this agreement, was Transpark obligated to pay $30,000
11:07AM in rent to FTP?
11:07AM A. It was.
11:07AM MR. PARDO: Objection, Your Honor.
11:07AM THE COURT: Overruled. Your client testified he was an
11:07AM agent of Transpark, did he not? Overruled.
11:07AM BY MR. NIELSEN:
11:07AM Q. Was Transpark required to contribute money if a need arose?
11:07AM A. I believe, as a partner in the property, it was responsible
11:07AM for its percentage of capital contributions.
11:07AM Q. Was that 30 percent?
11:07AM A. Yes.
11:08AM MR. NIELSEN: Can you bring up Defense Exhibit 2, which
11:08AM has already been introduced in evidence, please.
11:08AM BY MR. NIELSEN:
11:08AM Q. Do you recognize this document?

11:08AM A. I do.
11:08AM Q. Is this the lease you drafted?
11:08AM A. It is.
11:08AM Q. Did Greg Mirmelli instruct you to draft this lease?
11:08AM A. Yes.
11:08AM Q. And you drafted it for Transpark?
11:08AM A. Yes.
11:08AM Q. When you worked for Transpark, did you have familiarity with the terms of this lease?
11:08AM A. I was familiar, yes.
11:08AM Q. And what was Transpark's obligations under this lease?
11:08AM A. To pay $30,000 per month in rent.
11:08AM Q. When was it supposed to pay the rent?
11:08AM A. I believe on the first of the month.
11:08AM Q. Okay. Did you understand the purpose of why Transpark had to pay rent in terms of the entire purpose of the Profit Participation Agreement?
11:09AM A. Yes. It was to offset the expenses of owning the property.
11:09AM Q. Offset whose expenses?
11:09AM A. The ownership group.
11:09AM Q. And who is the ownership group?
11:09AM A. FTP and Transpark.
11:09AM Q. What was your role at Transpark?
11:09AM A. I managed the parking lot.
11:09AM Q. The parking lot referenced in the Profit Participation

Agreement?
A. Yes.
Q. Who gave you that role?
A. Greg.
Q. When did you start managing the parking lot?
A. 2006.
Q. Did your responsibilities include managing the daily operations of the property?
A. It did.
Q. Did it include collecting revenue from the parking lot?
A. Yes.
Q. Did it include preparing Transpark's accounting statements?
A. Yes.
Q. Sending rent payments to FTP?
A. Yes.
Q. Did it include working with third parties --

THE COURT: Sir, you're speaking quickly, and mumbling.

MR. NIELSEN: Understood, Your Honor.

BY MR. NIELSEN:
Q. Did it include preparing Transpark's accounting statements?
A. I did prepare profit and loss reports, yes.
Q. Did it include working with third parties on behalf of Transpark?
A. Yes.
Q. Did it include handling Transpark's mail?

11:10AM A. Yes.
11:10AM Q. Did it include managing Transpark's finances and paying Transpark's bills?
11:10AM A. Yes.
11:10AM Q. Did you act on behalf of Transpark?
11:10AM A. I did.
11:10AM Q. Under the agreement, the Profit Participation Agreement, was Transpark required to assist FTP in getting financing for the property?
11:10AM A. I believe it was, yes.
11:10AM Q. Did you participate in that process?
11:10AM A. I did. Yes, I helped where I could.
11:10AM Q. You helped what?
11:10AM A. I helped where I could, yes.
11:10AM Q. While you were Transpark's manager, were you aware that FTP had a loan and a mortgage on the property?
11:11AM A. I was aware that there was a mortgage, yes.
11:11AM Q. Was that the same financing contemplated by the agreement which you --
11:11AM A. Yes, it was.
11:11AM Q. From 2006 to April 2008, what was Trans -- what was Gregory Mirmelli's involvement in the property?
11:11AM A. He was, you know, he was in charge of managing the property, he was the principal at Transpark, paying the rent.
11:11AM Q. From 2006 to 2008, was Transpark able to meet its rent

obligations?
A. Yes.
Q. What was Gregory Mirmelli's involvement in making sure Transpark met its --
THE COURT: Sir, I don't understand what you're asking.
MR. NIELSEN: Of course, Your Honor.
THE COURTROOM DEPUTY: I think you're better off without the lapel. Let's just try the microphone at the lectern.
THE COURT: And try slowing down and try not mumbling.
MR. NIELSEN: Yes, Your Honor.
(Brief pause to confer with cocounsel.)
THE COURT: I'm looking at the daily, which I can see what the court reporter is typing, and I'm trying to follow along there, and there is nothing for me to follow along, you're not developing a record, sir.
MR. NIELSEN: Understood, Your Honor.
BY MR. NIELSEN:
Q. Nathan, from 2006 to 2008, was Transpark meeting its rent obligations?
A. It was.
Q. What was Gregory Mirmelli doing at that time to ensure Transpark met its rent obligations?
A. He would make up the difference between what we had collected and what was due in rent and make sure that it was paid.
Q. Did that involvement ever change?

11:12AM A. It did.
11:12AM Q. How did it change?
11:12AM A. After around 2008, '09, we couldn't meet our rent obligations with the revenue that was being generated from the lot, as we weren't able to previously, but the difference wasn't being made up.
11:13AM Q. So from 2008 to 2010, was Transpark able to meet its rent obligations?
11:13AM A. It wasn't.
11:13AM Q. Do you recognize the address of 100 Southeast 2nd Street, Suite 2650, Miami, Florida, 33131?
11:13AM A. Yes, it was an office for Transpark at one point.
11:13AM Q. Where did Transpark move its office after 2008?
11:13AM A. After 2008, we moved to 123 Southeast 2nd Avenue.
11:13AM Q. While you were Transpark's manager, did you communicate with Bart Seidler often?
11:13AM A. Yes, I did.
11:13AM Q. Regularly?
11:13AM A. Yes, regularly.
11:13AM Q. How would you communicate with him?
11:13AM A. Phone calls, emails, text message.
11:13AM Q. Did you ever tell Bart that Transpark no longer had an office at 100 Southeast 2nd Street, Suite 2650, Miami, Florida, 33131?
11:14AM A. Yes, I'm sure I did.
11:14AM MR. NIELSEN: Could we pull up Defense Exhibit 1.

11:14AM BY MR. NIELSEN:
11:14AM Q. Do you recall around the time you told Bart this?
11:14AM A. Probably when we moved, I don't remember exactly.
11:14AM MR. NIELSEN: Would you please scroll down to the notice section.
11:14AM BY MR. NIELSEN:
11:14AM Q. When you worked at Transpark, were you aware of this provision in the agreement?
11:14AM A. I was.
11:14AM Q. After 2008, did you demand that FTP send you notice to 100 Southeast 2nd Street, Suite 2650, Miami, Florida?
11:14AM A. I did not.
11:14AM Q. Why not?
11:14AM A. Because we weren't there, it would have been pointless.
11:14AM Q. Do you know who Stewart Mirmelli is?
11:15AM A. I do.
11:15AM Q. Who was he?
11:15AM A. He's Greg's father.
11:15AM Q. As part of your responsibility to handle Transpark's mail, did you ever go to Stewart Mirmelli's office to pick up the mail?
11:15AM A. I don't believe so.
11:15AM Q. Did Gregory Mirmelli ever tell you to go to Stewart Mirmelli's office to pick up Transpark's mail?
11:15AM A. I don't think he did.
11:15AM Q. Were you aware of any agreement between Stewart Mirmelli and

11:15AM his law firm and Transpark regarding Transpark's mail?
11:15AM A. I was not.
11:15AM Q. What would happen when Transpark wouldn't pay rent?
11:15AM MR. PARDO: Objection, Your Honor.
11:15AM THE COURT: So you need to lay a foundation.
11:15AM MR. NIELSEN: Of course.
11:15AM THE COURT: The objection is sustained.
11:15AM BY MR. NIELSEN:
11:15AM Q. When Transpark stopped paying rent in 2008, would Bart Seidler contact you?
11:15AM A. Yes.
11:15AM Q. Would Bart Seidler send you written correspondence via email regarding the payment of late rent?
11:16AM A. Yes, he would.
11:16AM Q. Did he also call you?
11:16AM A. Yes.
11:16AM MR. NIELSEN: Your Honor, can we bring up Defense Exhibit 12, which has not been introduced in evidence yet?
11:16AM THE COURT: Not introduced?
11:16AM MR. NIELSEN: Not introduced to just show it to the witness, please.
11:16AM BY MR. NIELSEN:
11:16AM Q. Do you recognize this document?
11:16AM A. Yes.
11:16AM Q. Is that your email address where it says "from"?

11:16AM A. Yes.
11:16AM Q. Is that Bart's email address where it says "to"?
11:16AM A. It is.
11:16AM Q. Is this an accurate representation of an email you sent from your email to Bart's email on February 13, 2008?
11:16AM A. It is.
11:16AM MR. NIELSEN: Your Honor, defense moves to introduce Defendant's Exhibit 12 into evidence.
11:16AM MR. PARDO: Objection, Your Honor.
11:16AM THE COURT: What's the basis?
11:16AM MR. PARDO: Hearsay.
11:16AM THE COURT: It is hearsay.
11:17AM MR. NIELSEN: Your Honor --
11:17AM THE COURT: Sustained.
11:17AM MR. NIELSEN: May I --
11:17AM THE COURT: Sustained. Move on.
11:17AM MR. NIELSEN: May I have a sidebar?
11:17AM THE COURT: No. Move on.
11:17AM MR. NIELSEN: I'd like to introduce Defendant's Exhibit 14, which has already been admitted into evidence.
11:17AM BY MR. NIELSEN:
11:17AM Q. Do you recognize this document?
11:17AM A. I do.
11:17AM Q. What does this document pertain to?
11:17AM A. It looks like it was an email from Bart to one of his

11:17AM employees forwarding an email that I had sent letting him know after he had asked for the rent for June that I had sent a portion of the rent and would send the rest as soon as I was able to collect it in receipts from the lot.

11:17AM Q. Why is he asking you for June rent money?

11:17AM A. We were late.

11:18AM MR. NIELSEN: Your Honor, I would like to introduce Defendant's Exhibit 15, but it hasn't been admitted into evidence, so please only publish it to the witness.

11:18AM BY MR. NIELSEN:

11:18AM Q. Do you recognize this document?

11:18AM A. Yes.

11:18AM Q. Did you draft these emails?

11:18AM A. I did.

11:18AM Q. And you sent these emails to Bart and Greg?

11:18AM A. I did.

11:18AM Q. Is it an accurate representation of the email you sent on August 14, 2008?

11:18AM A. Yes.

11:18AM MR. NIELSEN: Your Honor, the defense moves to introduce Defendant's Exhibit 15 into evidence.

11:18AM MR. PARDO: Objection, Your Honor.

11:18AM THE COURT: Can I see you sidebar.

11:18AM (Sidebar conference.)

11:19AM THE COURT: So, counsel, emails are hearsay, right? For

some reason you had a stipulation to enter some emails into evidence. It is what it is. You can show me that he stipulated to some and not others and that that created some kind of incompleteness; I'd hear you.

Why can't you just ask this man the question that the email relates to? I don't understand what you're doing with the email.

MR. NIELSEN: Well, Your Honor, I want to show that there was notice to Greg, so hearsay exception.

Your Honor, under United States v. -- (inaudible) -- notice is a hearsay exception. It is about the effect on the listener, so.

THE COURT: There is no such exception to the hearsay, notice -- no, sir, that is not an exception to the hearsay rule.

First of all, this is not even the notice. You're not trying to prove notice either, so I'm not really sure what you're talking about.

MR. NIELSEN: I am trying to prove Gregory Mirmelli had notice that his company was not paying rent.

THE COURT: Why don't you ask him:

Did Mr. Mirmelli know that his company wasn't paying rent?

Yes.

How did he know that?

Because I would email him, tell him that.

Can't you ask him that? I don't think that Mr. Mirmelli denied; I think he admitted that they weren't paying rent. I think their case is that it is irrelevant to the Profit Participation Agreement.

MR. NIELSEN: I just want the jury -- can I try to get it in as a hearsay exception under business records?

THE COURT: No. Emails are not under -- you all need to go research what business record it is that it is in your file. It is not a business -- an email is not a business record. I don't know how you'd lay a proper foundation for a business record, especially this, which is not even -- you're asking him who he forwarded the email to. And he is not even the person that forwarded it.

MR. NIELSEN: I couldn't -- he didn't forward it, Your Honor; he wrote that email.

THE COURT: I understand that he wrote the email, but it is forwarded to people. Does he run the email server? Is it his company? You're not going to get it through as a business record. Ask him --

If you want to meet and confer with Mr. Casabielle, you can.

MR. CASABIELLE: Your Honor, can we assure that the witness speaks into the mic? And I will remind Mr. Nielsen because our client is deaf.

THE COURT: Listen, I don't understand what the jury is

even doing here anymore, honestly. Sir, you speak so quickly.

MR. NIELSEN: Understood, Your Honor.

THE COURT: I'm looking -- I have to look at the screen to see what Vernita is typing sometimes to see if she can figure out better.

And that's not just you, it's Mr. Casabielle, Mr. Pardo as well.

THE COURTROOM DEPUTY: Judge, I have the volume all the way up. I can't turn it up any more.

MR. NIELSEN: Our client has hearing problems.

THE COURT: It is not a hearing problem.

THE COURTROOM DEPUTY: But you are getting softer and softer, and I have the volume up high.

THE COURT: You speak incredibly quickly, you totally mumble your words, you're nowhere near the microphone, and you have a witness that's so --

Honestly, clearly he's prepared to testify. He is just rambling on just like the plaintiff did yesterday, regardless of what the question was. That's not helpful to anybody.

MR. NIELSEN: Understood, Your Honor.

THE COURT: He is literally just, like, rambling into a microphone. You know how I feel about this.

MR. NIELSEN: Yes, Your Honor.

THE COURT: You're the lawyer on the case. You can tell your witness -- you can tell him: Sir, I need you to slow down.

If you don't do it, I will do it, and I will take him off the stand if I have to tell him twice.

MR. NIELSEN: Yes, Your Honor.

THE COURT: How you didn't talk to this witness last night and say: The judge is losing her mind. You all, I mean really like you didn't tell him: We have a judge who is losing her mind about how fast everyone is speaking and how quickly everyone is speaking, so make sure you speak really slowly. I'm sure you told this witness that.

MR. CASABIELLE: Thank you, Your Honor.

(End of sidebar conference.)

THE COURT: All right. Let's continue.

BY MR. NIELSEN:

Q. Mr. Heber, when Transpark could not pay rent, would you contact Gregory Mirmelli and tell him that Transpark was not meeting its rent obligations?

A. I'm sorry, could you repeat the question.

Q. When Transpark failed to pay rent, did you ever put Gregory Mirmelli on notice that Transpark was not meeting its rent obligations?

A. I mean Greg was aware. I made Greg aware, and Greg was aware on his own, and Bart also contacted him. So after a certain point I, you know, didn't need to tell him every month, but yeah.

Q. Could you please slow down when you're responding to the questions.

A. (Nodding.)
Q. Would Bart Seidler send you multiple emails demanding rent?
A. He would.
MR. NIELSEN: Can we pull up Defendant's Exhibit 17.
THE COURTROOM DEPUTY: Was it admitted?
MR. NIELSEN: It has been admitted into evidence. Could you please publish it to the jury.
BY MR. NIELSEN:
Q. What is this email regarding?
A. This is one of the emails he would send letting me know that he felt he wasn't paid the full rent for the previous month. This is my -- my response is that we paid some portion of it and I would get back to him but that we hadn't paid the full amount.
Q. What did you understand "must pay bank interest" to mean?
A. The mortgage on the property.
Q. So you were aware that if FTP did not receive the rent from Transpark, it would be short on the mortgage payment?
A. Yes.
Q. And why did you forward this to Gregory Mirmelli -- or why did you cc Gregory Mirmelli on this email?
A. Just to keep him in the loop, keep him aware of the conversations I was having with Bart.
Q. So in January -- on January 12th, '09, you made Gregory Mirmelli aware that Transpark was not meeting its rent obligations?

11:25AM A. Yes.
11:25AM Q. By 2009 did Transpark fail to pay rent more than twice in one year?
11:25AM A. Yes.
11:25AM Q. Was it the same in 2009?
11:25AM A. Yes.
11:25AM Q. Was it the same in 2010?
11:25AM A. Yes.
11:25AM Q. Now, after 2008 did Gregory Mirmelli's supervision of Transpark change?
11:25AM A. Yes.
11:25AM Q. How did it change?
11:25AM A. He was no longer making up the difference in the rent, in the revenue that would go to Bart to pay the rent.
11:26AM Q. Would you please speak into the mic and speak a little slower.
11:26AM A. He would no longer make up the difference between the money that we collected and the rent to make the full rent payment.
11:26AM Q. Can you pull the mic a little bit closer to you if that's possible.
11:26AM A. Sure.
11:26AM THE COURTROOM DEPUTY: Can you as well.
11:26AM MR. NIELSEN: Yes.
11:26AM THE COURTROOM DEPUTY: Thank you.
11:26AM BY MR. NIELSEN:
11:26AM Q. So after 2008, Gregory Mirmelli stopped managing Transpark?

11:26AM A. Effectively.
11:26AM Q. Were you aware that Gregory Mirmelli signed a personal guaranty in the Profit Participation Agreement?
11:26AM A. I was.
11:26AM Q. Did Gregory Mirmelli stop guaranteeing Transpark's performance under the agreement after 2008?
11:26AM MR. PARDO: Objection, Your Honor.
11:26AM THE COURT: Sustained.
11:26AM MR. NIELSEN: Moving on, Your Honor.
11:26AM BY MR. NIELSEN:
11:26AM Q. Did Transpark ever become current on its unpaid rent to FTP?
11:27AM MR. PARDO: Objection, Your Honor.
11:27AM THE COURT: He can answer to his knowledge.
11:27AM THE WITNESS: Not to the best of my knowledge.
11:27AM MR. NIELSEN: Can we bring up Defense Exhibit 43, which has already been admitted into evidence, and publish it to the jury. Can we please scroll slowly so the witness can see each page.
11:27AM BY MR. NIELSEN:
11:27AM Q. What do you understand this document to be?
11:27AM A. A list of the rent payments we made over the different years.
11:27AM Q. Does it describe the times that Transpark also missed rent payments?
11:27AM A. It looks accurate, yes.
11:27AM Q. Do you have any reason to question the accuracy of the

11:27AM information contained in this document?
11:27AM A. I don't.
11:27AM Q. By 2010 how much rent did Transpark owe FTP?
11:28AM A. I'm not sure of the exact amount, but I think it was about
11:28AM $300,000.
11:28AM Q. Did Bart Seidler ever tell you that Transpark did not have to
11:28AM pay back the overdue rent?
11:28AM A. He did not.
11:28AM MR. PARDO: Objection, Your Honor.
11:28AM THE COURT: It's sustained.
11:28AM So, sir, a couple of things. You have to speak into the
11:28AM microphone. You have to speak really slowly because my court
11:28AM reporter here has to take down everything you say and if you speak
11:28AM so quickly that she can't do that, I can assume that people will
11:28AM have even trouble understanding you. I'm looking at the court
11:28AM transcript, and it's very difficult at the speed you're going
11:28AM with.
11:28AM I also need to make sure you don't speak over anyone, so
11:28AM you have to wait for the lawyer to finish his answer and then give
11:29AM it like half a second because if there is an objection, the
11:29AM objection has to be heard before you continue to answer.
11:29AM THE WITNESS: Okay. Thank you, Your Honor.
11:29AM THE COURT: All right.
11:29AM THE WITNESS: Yes.
11:29AM THE COURT: Proceed.

MR. NIELSEN: Thank you, Your Honor.
BY MR. NIELSEN:
Q. Did Transpark ever receive any notice that it was no longer required to pay the full amount of rent?
A. No.
Q. Throughout the entire lifetime of the lease, was it your understanding that Transpark still had to pay $30,000 a month?
A. That was my understanding.
Q. Did you ever -- as Transpark's manager, did you ever admit to Bart Seidler that Transpark could not meet its rent obligations?
A. Yes, I'm sure I did.
Q. Did you ever admit to Bart Seidler that Transpark was not capable of meeting its financial obligations to FTP?
MR. PARDO: Objection, Your Honor.
THE COURT: Sustained.
BY MR. NIELSEN:
Q. Did you have an understanding of Transpark's finances while you were the manager of Transpark?
A. I did.
Q. Was Transpark financially capable of making contributions towards the property outside of paying rent?
A. Not to the best of my knowledge, no.
Q. When you worked for Greg, how did you get paid?
A. I don't remember if I ever received checks, but I was definitely paid in cash, and also the company covered my car

payment.
Q. Okay. Have you ever stolen money from Transpark?
A. Of course not.
Q. How did the lot collect money?
A. We had an attendant at the exit. There was a ticketing system with timestamps. The lot attendant would note all of the receipts -- all the money that they collected, what the amounts of time were. They kept, you know, records of all of that so that we could then audit it against the tickets that were collected and any other information we had on the amount of cars that had come in.
Q. Were there safeguards in place to prevent theft?
A. Yes.
Q. Could you describe those safeguards, please.
A. Well, one was that daily report, and the person who deposited the money was never the person who collected it. The people who collected it would drop the money in a safe or drop box, and then the person depositing the money would count it separately, check it against the tickets. And we would also do spot checks from time to time to mitigate any opportunities for theft. At a certain point, cameras were also installed on the lot, so, you know, the lot could be monitored at all times.
Q. So would it have been easy to catch someone stealing from Transpark?
A. It -- we did catch people occasionally, even small amounts of

11:32AM money, yes.
11:32AM Q. After 2008 did Greg Mirmelli express any interest in managing and supervising the property?
11:32AM A. Not to me.
11:32AM Q. Did the ground lease ever expire?
11:32AM A. It did.
11:32AM Q. Do you recall when?
11:32AM A. I believe it was 2011.
11:32AM Q. Did Greg Mirmelli ever express any interest in renewing the ground lease?
11:32AM A. Not to me.
11:32AM Q. And who operated the property after the ground lease expired?
11:33AM A. We continued to operate Transpark month-to-month after the lease had expired.
11:33AM Q. So after the lease expired, Transpark continued managing the lot on a month-to-month basis?
11:33AM A. It did.
11:33AM Q. Okay. Do you recall when it stopped managing the lot?
11:33AM A. I believe it was in 2012.
11:33AM Q. What happened in 2012 when Transpark stopped operating the lot?
11:33AM A. Bart took over the lot with FTP Investment Corp.
11:33AM Q. Why did Bart hire you?
11:33AM A. I was familiar with the lot. I was managing another property nearby, so I was able to help drive more business there, and I

11:33AM think he trusted me.
11:33AM Q. During the time -- so let me back up a second.
11:34AM So you worked for Transpark from 2006 to 2012?
11:34AM A. Yes.
11:34AM Q. While you were Transpark's manager, did Transpark have enough assets to make capital contributions towards the property?
11:34AM A. Not that I was aware of.
11:34AM Q. Were you aware of any consequences that FTP suffered when Transpark did not pay rent?
11:34AM MR. PARDO: Objection, Your Honor.
11:34AM THE COURT: Sustained.
11:34AM MR. NIELSEN: I'll move on.
11:34AM BY MR. NIELSEN:
11:34AM Q. When you worked for Gregory Mirmelli, did you have knowledge of his personal finances?
11:34AM A. I did.
11:34AM Q. Did he ever have you prepare personal financial statements?
11:34AM A. He would, yes.
11:34AM Q. In 2010, did he have you prepare a personal financial statement?
11:35AM A. I believe he did.
11:35AM Q. Do you recall what Gregory Mirmelli's net worth was in that personal financial statement you prepared?
11:35AM MR. PARDO: Objection, Your Honor.
11:35AM THE COURT: Sustained.

11:35AM BY MR. NIELSEN:
11:35AM Q. What was Gregory Mirmelli's personal -- excuse me.
11:35AM What was Gregory Mirmelli's net worth in 2010?
11:35AM MR. PARDO: Objection, Your Honor.
11:35AM THE COURT: That was the question you just asked, it got an objection, and I sustained it. You've laid no foundation for this.
11:35AM MR. NIELSEN: Okay.
11:35AM THE COURT: And the basis of any testimony, in any event, would be hearsay.
11:35AM So if you want to try to lay a non-hearsay foundation, I'll hear it; but if I sustain an objection, please do me the courtesy of not repeating the same question.
11:35AM MR. NIELSEN: Understood, Your Honor, I thought it was different.
11:35AM BY MR. NIELSEN:
11:35AM Q. When you worked for Greg Mirmelli, was part of your responsibility preparing personal financial statements for Gregory Mirmelli?
11:35AM A. It was one of many things I would do for him, yes.
11:36AM Q. Did that responsibility give you knowledge of his personal finances?
11:36AM A. Yes.
11:36AM Q. What was your knowledge of his personal finances in 2010?
11:36AM MR. PARDO: Objection, Your Honor.

THE COURT: It's sustained.

BY MR. NIELSEN:

Q. What was Transpark's value in 2010?

MR. PARDO: Objection, Your Honor.

THE COURT: I'm sorry, can you repeat the question?

MR. NIELSEN: Let me rephrase the question, Your Honor.

THE COURT: Again, you're speaking so quickly, I can't even -- so try it again.

BY MR. NIELSEN:

Q. What was Transpark's value as a company in 2010?

MR. PARDO: Objection, Your Honor.

THE COURT: I don't know what that means, its value?

MR. NIELSEN: Yes.

THE COURT: Sustained.

MR. NIELSEN: Give me one second, Your Honor.

(Brief pause to confer with cocounsel.)

BY MR. NIELSEN:

Q. In 2010, did Transpark have any assets?

A. To the best of my knowledge, it had the ground -- you know, the lease, whatever operating income we had in the bank, but that's all I'm aware of.

Q. What was its estimated net value in 2010?

MR. PARDO: Objection, Your Honor.

THE COURT: Sustained.

MR. NIELSEN: Moving on.

BY MR. NIELSEN:
Q. Was there a point in time when Transpark no longer had an office?
A. Yes.
Q. When was that?
A. After FTP took it over and we were no longer at 123 Southeast 2nd Avenue.
Q. Did Transpark ever go out of business?
A. I was informed by the bank that we were going to have to close our account because it had been administratively dissolved.
MR. PARDO: Objection, Your Honor. Move to strike.
THE COURT: I don't know why you weren't objecting in a timely fashion.
Sir, you can't testify about what other people told you. That's called hearsay, and so if you know something because someone said something to you, that's hearsay.
So, can you ask a question that doesn't require him to base it on hearsay?
MR. NIELSEN: Yes, Your Honor.
BY MR. NIELSEN:
Q. Did you ever tell Bart Seidler that Transpark was dissolved?
A. I did.
Q. Do you recall what time period that was?
A. I don't remember exactly, but I believe around 2012.
Q. Did you ever tell Gregory Mirmelli that Transpark was

dissolved?
A. I did.
Q. After you informed Gregory Mirmelli that Transpark was dissolved, did it get reinstated?
A. I'm sorry, you asked did it ever get reinstated?
Q. Yes. Let me rephrase the question.
After you informed Greg Mirmelli that Transpark was dissolved, did he reinstate it within a year of you telling him?
A. Not to the best of my knowledge.
Q. Did Transpark ever send FTP any written notices via U.S. mail or using the mail system at all?
A. Did Transpark ever send FTP? Not that I'm aware of.
Q. Did you ever demand that FTP send Transpark written correspondence via U.S. mail?
MR. PARDO: Objection, Your Honor.
THE COURT: Basis?
MR. PARDO: Foundation, relevance, hearsay.
THE COURT: Overruled.
THE WITNESS: I'm sorry, can you repeat the question?
BY MR. NIELSEN:
Q. Did -- as Transpark's manager, did you ever demand that FTP send notice to Transpark via U.S. mail?
A. I did not.
Q. How would you typically communicate?
A. Email or phone calls.

Q. By 2014, did you consider Transpark to be out of business?
A. I did.
MR. NIELSEN: May I have a second to confer with my cocounsel, please?
THE COURT: Sure.
MR. NIELSEN: Thank you, Your Honor.
(Brief pause to confer with cocounsel.)
MR. NIELSEN: No further questions, Your Honor.
THE COURT: Thank you very much. Let's proceed to cross-examination.

CROSS-EXAMINATION

BY MR. PARDO:
Q. Good afternoon, Mr. Heber. How are you?
A. Good afternoon. I'm well, thank you.
Q. My name is Joseph Pardo, I represent Transpark, LLC, in this lawsuit. Thank you for being here today.
A. Thank you, you're welcome.
Q. I heard during your testimony just now that you referred to Bart as Greg's partner, correct?
A. I did.
Q. You believe they had a close and trusting relationship?
A. At one point.
Q. At what point did they have a close and trusting relationship?
A. When they entered into an agreement to purchase the property.
Q. And when they entered into a Profit Participation Agreement

related to that property, correct?

A. That's correct.

MR. PARDO: Let's pull up Plaintiff's Exhibit 1, the Profit Participation Agreement. Bless you.

THE WITNESS: Thank you.

BY MR. PARDO:

Q. And while that's happening, your understanding is that you were a manager and agent of Transpark?

A. Yes.

Q. Your understanding is that you could receive notice on behalf of Transpark?

A. Yes.

MR. PARDO: Let's go to the last page, the signature page, one up -- sorry, the page prior.

BY MR. PARDO:

Q. Were you with Greg Mirmelli when he signed this document?

A. Honestly, I don't remember.

Q. Prior to the signing of the Profit Participation Agreement --

THE COURT: We are having an issue with the jury monitors. They're all off.

THE JURY: Yes.

THE COURT: You almost made it to lunch, I mean --

MR. PARDO: If Your Honor would prefer, I'm happy to take an early lunch.

THE COURT: No, because we're breaking early today, so

let's figure out.

THE COURTROOM DEPUTY: Can you all swipe your hand at the bottom, across the front at the bottom? Does that work? No?

THE JURY: No.

THE COURTROOM DEPUTY: May I shut it down; bring it back up?

THE COURT: Sure.

THE COURTROOM DEPUTY: I have to shut the entire system down, counsel. Shutting it down.

Now?

THE JURY: Uh-huh.

MR. PARDO: Patrick, let's call back up Plaintiff's Exhibit 1, thank you. And let's go to the first page, just overview again.

BY MR. PARDO:

Q. Mr. Heber, you were involved in the discussions between Transpark and FTP as they were negotiating the Profit Participation Agreement?

A. I don't believe so.

Q. But you are familiar with the terms of the Profit Participation Agreement, correct?

A. Yes, I am.

Q. You understood that Transpark had to receive notice under this Profit Participation Agreement, correct?

A. Correct.

MR. PARDO: Let's go to the notice provision, please. Next page.

BY MR. PARDO:

Q. Now, the office, 100 Southeast 2nd Street, 2650, in Miami, Florida, that was Transpark's office around 2006, correct?

A. Correct.

Q. And then Transpark's office moved to the Ingraham Building at 123 Northeast 2nd Avenue, correct?

A. I think it's Southeast, but yes.

Q. The Ingraham Building, correct?

A. No, excuse me. The Ingraham garage.

Q. The Ingraham garage, that's where Transpark's offices moved?

A. Yes.

Q. And certainly FTP knew that?

A. Yes.

Q. Certainly Bart Seidler knew that?

A. I believe so.

Q. Certainly Bart Seidler would have known how to send a notice to Transpark once their offices moved to the Ingraham garage?

MR. NIELSEN: Objection.

THE COURT: Sustained.

BY MR. PARDO:

Q. Do you have personal knowledge of how FTP would communicate to Transpark pursuant to this agreement?

A. Typically, Bart would contact Greg or me directly.

Q. And that's how you understood FTP would communicate with Transpark pursuant to this agreement?
A. As far as I know.
Q. Those might take the form of emails to you, sir?
A. It could.
Q. Notice might take the form of an email to Greg directly, sir?
A. It could, yes.
Q. So you were absolutely certain that notice from FTP to Transpark, pursuant to this agreement, could be by email, sir?
A. I'm not certain.
Q. But it's possible?
A. It's possible.
Q. And if I heard your testimony during your direct examination, you told Bart, "Don't send mail anymore to the 100 Southeast 2nd Street, 2650 office, we've moved to the Ingraham garage," correct?
MR. NIELSEN: Objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: I don't believe that's what I said. I believe I said that I told Bart that we moved.
BY MR. PARDO:
Q. Well, how did -- how did Bart know to send notice -- if you know, how would Bart send mail to Transpark after you moved offices?
A. Yeah, I -- I don't know.
Q. Okay. But certainly FTP knew that the office address for

11:50AM Transpark had changed?
11:50AM A. Yes.
11:50AM Q. And it had changed to the Ingraham garage where he owned the building, correct?
11:50AM A. No, he didn't own the Ingraham garage.
11:50AM Q. He just owned the Ingraham Building?
11:50AM A. Correct.
11:51AM Q. Now, I heard also that you were responsible for actually transmitting the rent from Transpark to FTP, correct?
11:51AM A. Yes.
11:51AM Q. And I heard during your examination that Mr. Seidler on behalf of FTP would send emails to you about rent shortages, correct?
11:51AM A. Correct.
11:51AM Q. Your understanding was that FTP was trying to give a notice to Transpark?
11:51AM A. My understanding is that Bart was demanding rent per the agreement.
11:51AM Q. Per the lease agreement?
11:51AM A. Per the lease agreement.
11:51AM Q. Okay. So you understood at that time, certainly, that's how FTP was trying to send a notice to Transpark?
11:51AM A. Yes.
11:51AM Q. By email, correct?
11:51AM A. By email or phone.
11:51AM Q. Now, I heard during your direct examination that for some line

of inquiry you testified you didn't receive a notice from FTP. Do you recall that testimony?
A. I don't.
Q. Okay. So you're confident that you received every conceivable notice that FTP desired to give Transpark under the Profit Participation Agreement?
A. I can't say that with certainty.
Q. Well, how would you know whether or not a notice was being received on behalf of Transpark?
A. If I received it.
Q. Any other way?
A. If I was told that it was sent.
Q. Any other way?
A. I can't think of one.
Q. Did FTP or Bart Seidler -- I apologize -- ever give you notice that was intended for Transpark under the Profit Participation Agreement specifically?
A. I don't know if the emails that were sent demanding rent constituted notice under the Profit Participation Agreement or the lease, but I would get demands from FTP or Bart for the rent.
Q. Which you understood he was trying to send notice?
A. As legally under the agreement?
Q. Yes.
A. I mean I -- I understood it as he was saying that we were in default of our commitments to him.

Q. Default is the sort of notice that you might send to someone else?
A. Sure.
Q. Did you ever receive on behalf of Transpark a capital call pursuant to the Profit Participation Agreement?
A. Not me personally, no.
Q. Did anybody on behalf of Transpark, to the best of your knowledge, receive a capital call from FTP pursuant to the Profit Participation Agreement?
A. I am not aware of one.
Q. Did you ever receive a notice on behalf of Transpark from FTP terminating the Profit Participation Agreement?
A. I'm sorry, can you repeat the question.
Q. Did you ever receive a notice from FTP on behalf of Transpark that was terminating the Profit Participation Agreement?
A. From FTP on behalf of Transpark?
Q. From FTP to Transpark. Did you ever receive a notice on behalf of Transpark where FTP was terminating the Profit Participation Agreement?
A. No, I did not.
Q. Did you ever receive a notice on behalf of FT -- excuse me, on behalf of Transpark, and did that notice ever come from FTP whereby FTP was notifying Transpark that FTP had deemed the Profit Participation Agreement abandoned?
MR. NIELSEN: Objection.

THE COURT: Sustained.
BY MR. PARDO:
Q. Did you ever receive a notice on behalf of Transpark from FTP whereby FTP informed Transpark that the Profit Participation Agreement had been abandoned?
A. I did not.
MR. PARDO: Let's pull -- before I do this, we can bring that document down, Patrick.
BY MR. PARDO:
Q. Mr. Heber, you would agree with me that after Transpark stopped operating the lot, I thought I heard you say: We continued to operate Transpark on a month-to-month basis after the lease expired?
A. That's correct.
Q. Who is "we" that you were referring to?
A. Transpark.
Q. So Transpark continued to operate until the lease expired, correct?
A. That's correct.
Q. And then it operated on a month-to-month lease thereafter?
A. It did.
Q. And that was pursuant to FTP's direction, correct?
A. That there was no direction on that. There was just no action taken once the lease had expired until FTP took over the lot.
Q. So FTP was okay -- let me ask a different question.

11:56AM Eventually you continued to operate the lot under Concept Park, correct?
11:56AM A. It wasn't under Concept Park. But yes, I did continue to operate the lot.
11:56AM Q. FTP wanted you to continue operating the lot after it stopped -- after Transpark stopped operating the lot, correct?
11:56AM A. Correct.
11:56AM Q. And then after that, FTP brought in City Parking as a new tenant, correct?
11:57AM A. That is correct.
11:57AM Q. And City Parking was paying over half a million dollars a year in rent?
11:57AM A. I'm not familiar with the terms of that agreement.
11:57AM Q. Well, do you know whether or not the parking lot operations were profitable between 2017 and 2021?
11:57AM A. I have no idea.
11:57AM Q. In 2012 BB&T initiated a foreclosure proceeding against FTP and Bart Seidler, correct?
11:57AM A. That is correct.
11:57AM Q. And that was litigation in Miami-Dade County?
11:57AM A. As far as I know.
11:57AM Q. And BB&T assigned its rights under the note to Crimson Plaza?
11:57AM A. I'm not familiar with that.
11:57AM Q. In any event, you cooperated with FTP and Mr. Seidler during that litigation, correct?

A. I helped provide any documentation that, you know, FTP or Transpark needed for any of it.
Q. And you're cooperating with FTP in this litigation as well, correct?
A. I'm not sure what you mean.
Q. You're providing documentation and other documents that were requested of you during the course of the litigation, correct?
A. I was subpoenaed to provide that documentation.
Q. Now, did there come a point in time where your relationship with Greg Mirmelli deteriorated?
A. Yes.
Q. Approximately when?
A. Probably around 2008, 2009.
Q. Now, up until then, you were responsible for filing annual reports with the Florida Department of Corporations for all of Greg's various entities that operated parking lots in Miami-Dade County?
A. No.
MR. PARDO: Let's pull up Plaintiff's Exhibit 56, which is in evidence. And let's start with Greg's email in April of 2009 to parkwestnh@gmail.com.
BY MR. PARDO:
Q. That's you, correct?
A. That is.
Q. And Greg's email to you said: See my comments attached.

11:59AM Where the subject was the list of annual reports, correct?
11:59AM A. It looks like it, yes.
11:59AM Q. Go to page 2 and see the list of company Excel spreadsheet that Greg had commented on which companies he wanted to keep alive, correct?
11:59AM A. It looks like it, yes.
11:59AM Q. And Transpark was one of those companies he wanted to keep alive, correct?
11:59AM A. Yes.
11:59AM Q. And then Greg forwarded his comments to you. He delegated that responsibility to you, sir, correct?
12:00PM A. Well, it looks like it, but as you can see, I forwarded it on to his accountant, who would have taken care of that.
12:00PM Q. Well, certainly as between you and Greg, he was delegating it to you, sir, correct?
12:00PM A. To get it to the appropriate people, it looks like.
12:00PM Q. Very well. Now, in 2008 you continued to send emails describing Bart and Greg's relationship as a partnership in connection with the property, correct?
12:00PM A. I mean, yes, I'm sure -- it's possible I have, yeah.
12:00PM Q. Now, in 2009 you were also communicating with FTP by email, and you would copy Greg on those emails, correct?
12:00PM A. Correct.
12:00PM Q. So, for example, let's pull up Defendant's Exhibit 17, which is in evidence, and let's publish it to you and the jury.

This was an email in January of 2009 where Bart was sending an email to -- at least you, and he said: You shorted me $30,000 last month. Deposit dollar signs. And you responded to Bart: There's no way we shorted you last month; the total rent is 30 a month. Right?
A. Yeah, I was disputing the amount that we had not paid in full.
Q. Sure, and I recognize somewhat in jest that he couldn't have shorted you 30,000 if the total amount was 30,000.
My question to you, sir, is you were copying Greg on these emails as you were liaising with FTP on behalf of Transpark, correct?
A. That is correct.
Q. Now, there came a point in time where you passed on that responsibility?
A. I'm sorry?
Q. Well, let's look at Plaintiff's Exhibit 30, which is in evidence. In 2010, for example, were you still sending emails on behalf of Transpark?
A. I'm sure that I was, yes.
Q. You would send invoices on Transpark letterhead with its address at the Ingraham garage, correct?
A. Correct.
Q. Now let's turn to Plaintiff's Exhibit 32, which is in evidence.
In October of 2010, you're communicating with Bart Seidler.

And for the jury's benefit, I'll read it: I'm a signatory, so we're fine for now. Greg came at me like a junkyard dog today threatening to sue me for God knows what in text messages. I'll do what I can to get the numbers up for the rest of the month, but I don't know how much longer I can do it for free. If I get the numbers up $250 a day, I think I should get 250 a week for it. Think about it. NH.

And you sent that email to Bart, correct?

A. Correct.

Q. Now you're communicating with Bart and not copying Greg, certainly by October of 2013, correct?

A. It looks like that specific one at least, yes.

Q. Let's pull up Plaintiff's Exhibit 58, which is in evidence. I want to ask if you've ever seen --

MR. PARDO: Let's do the whole document, Patrick, thank you. Just the first page.

BY MR. PARDO:

Q. Take a very brief look at the document and tell me if it looks familiar to you.

A. I'm not sure, to be honest. I don't remember it.

Q. The BB&T lawsuit that was filed in 2012, do you recall whether or not FTP informed you on behalf of Transpark that it had received a default notice from the Jones Walker law firm?

A. I don't recall, but I was aware.

Q. You were aware that Jones Walker was sending default notices

to FTP?
A. Not that Jones Walker specifically, but that the bank was, you know, putting the loan into default.
Q. And how did you become aware of that?
A. I don't remember exactly.
Q. Do you know whether you became aware of it because FTP told you so?
A. That's very possible.
Q. And did you understand that you were receiving notice on behalf of Transpark of those -- of what was going on?
A. I don't know that I thought that one way or the other.
Q. But certainly, FTP didn't formally send Transpark notice of these Jones Walker letters, correct?
A. If they did and it was to me, I would have forwarded it on to Greg.
Q. That would have been emblematic of your relationship with Greg, if you had received notice from FTP, you would have forwarded it to Greg, right?
A. Yes.
Q. Now, by 2013, Concept Park was invoicing FTP for its management of the lot, correct?
A. I don't recall.
MR. PARDO: Let's pull up Plaintiff's Exhibit 77, which is in evidence.
BY MR. PARDO:

Q. Take a look at the document.
MR. PARDO: We can zoom out, if that's okay. Thank you, maybe just the top half.
BY MR. PARDO:
Q. Take a look at the document and let me know if it changes your testimony in any way.
A. It looks like an invoice from Concept Park.
Q. So whose company was Concept Park?
A. It was mine.
Q. And you were billing FTP for your management of the parking lot at 130 Southeast 1st Street in 2013, correct?
A. It looks like it, yes.
Q. So this would have been consistent with Transpark's lease expiring in 2011, operating it from month to month until that time that Concept Park became the operator and continued operating it thereafter, correct?
A. No, that's not correct. You can see from the email you showed before that I was operating it on behalf of FTP, and for a while, I was not taking anything. I was not getting paid, but I did it in exchange for some office space.
This started -- this started later.
Q. Okay.
A. So there was a gap in between.
Q. Very well. Thank you for that clarification. I do appreciate it.

12:06PM Now, even after that in 2013, you would still send and receive correspondence related to Transpark, LLC, though, correct?
12:07PM A. It's possible, yes.
12:07PM MR. PARDO: Let's pull up Plaintiff's Exhibit 158, which is in evidence.
12:07PM BY MR. PARDO:
12:07PM Q. And, for example, Transpark, LLC, would receive its utility bill statements and other documents to the 25 Southeast 2nd Ave. address, right?
12:07PM A. Yes, that's correct.
12:07PM Q. What's the 25 Southeast 2nd Ave. address?
12:07PM A. That was the office we moved to once FTP took over the lot.
12:07PM Q. So now, Transpark's office is moving into the Ingraham Building?
12:07PM A. It wasn't Transpark at the time, but we still got mail there --
12:07PM Q. Certainly FTP --
12:07PM A. -- for the lot.
12:07PM Q. I apologize.
12:07PM A. No.
12:07PM Q. Certainly FTP knew that those offices were being moved into the Ingraham Building, correct?
12:07PM A. Yes.
12:07PM MR. PARDO: Let's go to Plaintiff's Exhibit 118 in evidence.

12:07PM BY MR. PARDO:
12:08PM Q. Now, in 2019, you were emailing Bart Seidler recommending that someone go to Mermelli's office -- excuse me -- to grab a backup of the FTP QuickBooks file. Do you see that there?
12:08PM A. I do see that, yeah.
12:08PM Q. The office that it is referring to is the office in the Ingraham Building, correct?
12:08PM A. I do not remember, but.
12:08PM Q. Well, what floor on the Ingraham Building was that office?
12:08PM A. There were two -- two offices like in the Ingraham Building. We would rent one for a short period of time at 2650, and then another one for, I don't remember how long, I forgot what the suite number was.
12:08PM Q. What floor were they on?
12:08PM A. The 2650, I'm assuming 26th floor, and the other one was on the sky -- I think the sky lobby, but I don't remember exactly.
12:09PM Q. Any office on the second floor?
12:09PM A. Or maybe it was the second. That's the one I don't remember.
12:09PM Q. Very well. Isn't it a fact, sir, that prior to the expiration of Transpark's lease in 2011, Transpark was allowed to manage the lot in exchange for paying a rent equal to all revenues after agreed upon expenses were paid; that's a correct statement, sir?
12:09PM A. I am not familiar with that agreement.
12:09PM Q. Would it refresh your recollection to see an email to that effect?

A. Sure, yeah.

MR. PARDO: I'm about to show the witness an exhibit that's not in evidence. Let's pull up Plaintiff's Exhibit 79 not in evidence. Next page, please. Let's zoom out a little bit, Patrick, please. Let's look at the last sentence in the third paragraph.

Just a moment, Judge.

(Brief pause to confer with Mr. Justesen.)

BY MR. PARDO:

Q. Just take a moment to read it.

MR. PARDO: And, Patrick, can we call up -- exactly, please, yes, the sender and the recipient of this email.

BY MR. PARDO:

Q. Let me know when you've had a chance to look at this email that's not in evidence.

A. Okay.

MR. PARDO: Okay. Let's take this email down, please.

BY MR. PARDO:

Q. Does that refresh your recollection that prior to being terminated, your understanding was that Transpark was allowed to manage the lot in exchange for paying a rent equal to all revenues after agreed upon expenses were paid?

A. I mean, I did see that, I wrote that. I -- I don't remember, I mean, honestly, I don't remember them having an agreement that that would -- you know, that was to cover the rent.

Q. Well, but that was certainly your understanding at that time, correct?
A. Appears to be.
MR. PARDO: Just a moment, Your Honor.
(Brief pause to confer with cocounsel and his client.)
MR. PARDO: Sir, thank you very much for your time. No further questions.
THE COURT: All right. It's almost 12:15 so we're going to take our lunch hour now. We're going to come back at 1:15. We'll have two sessions in the afternoon, so we'll take one afternoon break.
My plan is to let everyone leave a little earlier, like closer to 4:30. It is a Jewish holiday tomorrow, people have to get home, people have to go to services, so we're probably going to break closer to 4:30, so be back at 1:15. I'm hoping we will take a break like at 2:45 and then come back three to 4:30.
All right. Enjoy your lunch. Don't talk to each other about the case. Don't talk to anybody else. Don't research anything about the case.
(Jury out at 12:13 p.m.)
THE WITNESS: Am I excused?
THE COURT: Actually, if I could keep you around because I didn't ask any of the jurors if they had questions for you; so if you could just come back after lunch, I would appreciate it. My apologies.

All right. How much longer for the defense case?

MR. NIELSEN: We have Bart Seidler's testimony today and then our expert witness, Your Honor, if we choose to call him.

THE COURT: So you could be resting Friday.

MR. NIELSEN: Yes, Your Honor, that's correct.

THE COURT: And you may or may not have a rebuttal case Friday.

MR. PARDO: (Nodding.)

THE COURT: How long do you think your closing arguments are going to be?

MR. PARDO: My best guesstimate right now is between an hour and an hour and a half.

THE COURT: It will not be an hour and a half.

MR. PARDO: In which case, I will take as much time as Your Honor will afford.

THE COURT: For a four-day trial, I am not giving an hour and a half.

MR. PARDO: Let's go with an hour if Your Honor would indulge.

THE COURT: Right. I think an hour is fair.

I have taken already a look at the jury instructions and the verdict form, so we're going to have to have -- you know, put in some time for those.

I hope you have recently conferred on the jury instructions and the verdict form. Sometimes people getting ready

for trial just shove something out there into the wind on jury instructions, and then when you're sitting here in the jury charge is when you're really thinking about them for the first time. I am not suggesting that you do that; I'm just saying it happens a lot.

So maybe today's lunch break, or if you have a little opportunity before or after we rest today, to take a good look at those jury instructions to make sure that there are no other things you want removed or added or debated at the charge conference, okay?

MS. MACKIEWICZ: Your Honor, I recall Your Honor saying that we were going to be starting late on Friday because you had sentencings.

What time on Friday will we be starting?

THE COURT: I have a sentencing at 8:30 in the morning. I think that sentencing -- they have asked for an hour and a half. I think it is likely to take two hours; so we'll end at 10:30. I have to give Vernita a break; I have to break.

So my guess is we will start at 11:00; I just haven't timed it out. Like, I expect we will take a very late lunch then if we're starting at 11:00. I haven't figured that part out yet, but I will do that this afternoon so that I can let the jury know what our Friday schedule looks like.

It doesn't look like you will close on Friday, but I don't know what they're going to do with that expert; if they

don't call an expert, you might have another kind of rebuttal case, but it is possible you could be closing Friday. I have no way of knowing that; you would know better than me.

So if you all don't mind, I'm swearing somebody into the Bar at around 12:30, so you're usually welcome to stay inside of the courtroom, but if you don't mind, unless you want to take pictures, I will have people here at 12:30. You can leave your things where they are, though.

MR. PARDO: Thank you, Your Honor.

(Recess at 12:16 p.m.)

(Back on the record at 1:22 p.m.)

THE COURT: My apologies. I forgot to ask the jury about the questions. Let's bring them in. If they have no questions for you, sir, you can be excused.

(Jury in at 1:23 p.m.)

THE COURT: Welcome back. Everybody be seated.

Does anybody have questions for this witness?

MR. NIELSEN: Your Honor, I had a redirect.

THE COURT: Oh, I'm sorry. You're right; you do have redirect. Go ahead.

MR. NIELSEN: Could we please bring up Plaintiff's Exhibit 32, please.

REDIRECT EXAMINATION

BY MR. NIELSEN:

Q. Mr. Heber, could you please tell the jury what this email is

about?

A. So I'm not 100 percent sure what I was referring to when I say I'm a signatory, so we're fine for now. Likely it was about a bank account, but I was letting Bart know that Greg had texted me, you know, some threats. We had had a personal falling-out prior to that and he was not acting rationally.

Q. Why did you describe him as a "junkyard dog"?

MR. PARDO: Sorry, Your Honor, I couldn't hear the question.

BY MR. NIELSEN:

Q. Why did you describe him as a "junkyard dog"?

MR. PARDO: Objection, Your Honor, sidebar.

(Sidebar conference.)

THE COURT: What's the objection?

MR. PARDO: I believe that the defendant is seeking to violate the motion in limine, they agreed not to elicit evidence about Gregory Mirmelli's past drug or alcohol use, and reference to the junkyard dog I believe was intended to indirectly elicit that testimony from the witness.

THE COURT: I have ruled on that so if that's what you were doing --

MR. NIELSEN: That was not.

MR. PARDO: I want to be absolutely sure and if, for example, the witness does testify to that, I believe a curative instruction would be appropriate.

THE COURT: We're not in --

MR. PARDO: That's why I wanted to preempt it.

THE COURT: You don't need to preempt it with sidebar. I ruled they are not entitled to do that and I think I even said if they thought that the door had been opened they would have to give me advance warning of that.

So I assume that this is your witness, you have prepared him.

MR. NIELSEN: That wasn't my intention. If he does say that, that's not --

THE COURT: No, no. Hold on. I assume you instructed him that he is not to say anything like that because I have ruled so when you prepared the witness I would expect that as a good lawyer you would let him know that he shouldn't blurt that out or mention that.

MR. NIELSEN: Yes.

THE COURT: Okay.

(End of sidebar conference.)

THE COURT: All right. Let's proceed.

BY MR. NIELSEN:

Q. Can you please answer the question?

A. Can you just repeat it one more time?

Q. Why did you describe Greg as coming at you like a junkyard dog?

A. He had sent me text messages that were very aggressive,

frankly didn't seem very rational to me, so just that was the nearest analogy I could come up with.

MR. NIELSEN: Okay, you can take down this exhibit, please.

BY MR. NIELSEN:

Q. Who at Transpark was ultimately responsible for Transpark's actions?

A. Greg.

MR. NIELSEN: No further questions.

THE COURT: All right. Now I can ask if any ladies and gentlemen of the jury have questions for this witness?

THE JURY: (Nodding.)

THE COURT: Thank you very much, sir. You're excused.

THE WITNESS: Thank you very much.

(Witness excused.)

THE COURT: Call your next witness.

MR. NIELSEN: The defense calls Bart Seidler, Your Honor.

THE COURT: Swear him in again. It doesn't hurt.

(The witness is sworn.)

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Okay, thank you.

BART SEIDLER, THE DEFENDANT, SWORN

DIRECT EXAMINATION

BY MR. NIELSEN:

Q. Good morning [verbatim], Mr. Seidler. Good morning

[verbatim], Mr. Seidler.
A. Good morning.
MR. NIELSEN: Can we please bring up Defense Exhibit 78.
BY MR. NIELSEN:
Q. Do you recognize this document?
A. Yes.
Q. What is this document?
A. It's the promissory note for the $300,000 loan to Greg Mirmelli.
Q. When was the loan due?
A. Pardon?
Q. When was the loan due?
A. January 1, 2008.
Q. Did Gregory Mirmelli repay you in full by January 1, 2008?
A. No.
Q. To this day, has Gregory Mirmelli repaid you in full under this note?
A. No, nor the interest either.
MR. NIELSEN: Can we please bring up Defense Exhibit 80 -- 79.
BY MR. NIELSEN:
Q. Do you recognize this document?
A. Yes.
Q. What is this document?
A. That's the assignment of his rights.

01:29PM Q. What's the relation of this document to the promissory note?
01:29PM A. It goes hand in hand with the promissory note.
01:30PM Q. Was Gregory Mirmelli collateralizing an asset in regards to the promissory note?
01:30PM MR. PARDO: Objection, Your Honor.
01:30PM THE COURT: Overruled.
01:30PM BY MR. NIELSEN:
01:30PM Q. You can answer.
01:30PM A. Oh, yes.
01:30PM Q. What was the asset he was collateralizing?
01:30PM A. His rights under the Profit Participation Agreement.
01:30PM MR. NIELSEN: Can we please highlight Section B.
01:30PM THE WITNESS: Do you want me to read it?
01:30PM BY MR. NIELSEN:
01:30PM Q. No.
01:30PM A. Oh.
01:30PM Q. Is this the section of the agreement you were referring to when you talked about his profit participation --
01:30PM A. Yes.
01:30PM Q. -- his interest in the agreement?
01:30PM A. Yes.
01:30PM Q. Did you consider Greg Mirmelli in default of the promissory note?
01:30PM MR. PARDO: Objection, Your Honor.
01:30PM THE WITNESS: Yes.

01:30PM THE COURT: Overruled. It's what he considers.

01:30PM THE WITNESS: Yes.

01:30PM THE COURT: So you can't talk over me, you have to give it a minute. I was speaking so you have to give it a minute for the record.

01:30PM This is only with respect to his knowledge or his opinion, so go ahead. Just ask your next question. He already answered it.

01:31PM BY MR. NIELSEN:

01:31PM Q. In your opinion, under the collateral assignment of rights, did Greg Mirmelli give up his interest in the property under the Profit Participation Agreement?

01:31PM MR. PARDO: Objection, Your Honor.

01:31PM THE COURT: Overruled.

01:31PM THE WITNESS: Absolutely.

01:31PM BY MR. NIELSEN:

01:31PM Q. Thank you. And did you hold this belief in August 2021 when you sold the property?

01:31PM A. Yes.

01:31PM Q. So in 2021, you did not believe Greg Mirmelli had any interest in the property?

01:31PM MR. PARDO: Objection, Your Honor.

01:31PM THE COURT: What's the basis for your objection?

01:31PM MR. PARDO: Leading.

01:31PM THE COURT: Overruled.

THE WITNESS: Could you repeat that?
BY MR. NIELSEN:
Q. Yes. So in 2021, you did not believe Greg Mirmelli had any interest in the property?
A. Yes, correct.
Q. Did this lead you to believe that the Profit Participation Agreement had been abandoned?
MR. PARDO: Objection, Your Honor.
THE COURT: No, no, no, no, no. So you can certainly introduce things even if it's your own witness, you're trying to get into a topic area and you lead him a little bit, I'm not going to get too offended, but this is like leading question after leading question.
So you can ask him what he thought, I am allowing that, but you can't tell him what he thought in your question because that makes it leading and you can't do that.
So try again.
MR. NIELSEN: Understood, Your Honor.
BY MR. NIELSEN:
Q. Did you believe that Greg Mirmelli had given up on the agreement?
MR. PARDO: Objection, Your Honor.
THE COURT: No. What is it that you believed with respect to Mr. Mirmelli and this agreement?
MR. NIELSEN: Understood, Your Honor.

01:32PM BY MR. NIELSEN:
01:32PM Q. What did you believe the status of the Profit Participation Agreement was?
01:32PM A. I believed it was over, abandoned, done, finished.
01:32PM Q. Why did you believe that?
01:32PM A. Well, for several reasons. One, the assignment, when he didn't pay me back the $100,000. Second, he abandoned or he stopped managing the property. He owed me 300 -- over 300, and I think it was 330, 330,000 in rent, and, let me see. Basically he -- he had given up on the property.
01:33PM Q. Did you hold these beliefs in 2021 when you sold the property?
01:33PM A. Yes.
01:33PM MR. NIELSEN: Your Honor, one second to confer with my cocounsel.
01:33PM THE COURT: Sure.
01:33PM (Brief pause to confer with cocounsel.)
01:34PM MR. NIELSEN: Your Honor, the defense rests.
01:34PM THE COURT: You're done with this witness you mean?
01:34PM MR. NIELSEN: Yes, Your Honor.
01:34PM THE COURT: Yes. Cross-examination.
01:34PM CROSS-EXAMINATION
01:34PM BY MR. PARDO:
01:34PM Q. Mr. Seidler, your sworn testimony today under oath is that you believe in August of 2021 that the agreement between FTP and Transpark was completely gone, abandoned, and over with, correct?

A. Yes, he breached the contract and the other reasons I said.
Q. Yet, you didn't give him notice of that belief in your head in any way?
A. What's the question?
Q. Why, if you held this firmly held belief in August of 2021 that the contract was over, abandoned, done with, that he was in breach, that he was in default, if you held all of these beliefs in your head, how come at no time during the period that FTP operated the lot did you ever send notice to Transpark or Greg Mirmelli of those beliefs?
A. There were emails talking about what was discussed, but I didn't give him specific notice of that.
Q. Of anything, correct? Everything you ever desired to give notice of to Transpark under the Profit Participation Agreement, you always kept it in your head and you never actually sent a notice of any kind, correct?
A. No, you're trying to put words in my mouth.
Q. Okay.
A. There were email notices, there were phone calls, there were text messages, there was a lot of notices.
Q. Okay. So now, you would agree with me with 100 percent certainty that FTP had an understanding during the time that it operated -- excuse me, that it owned the property that one form of acceptable notice to Transpark could have been by email or by phone?

01:37PM A. That's -- that's the course of business how we both operated.
01:37PM Q. Wonderful. So now that we've conclusively established that it would have been acceptable under the Profit Participation Agreement to give notice through some alternative mechanism, other than a letter to 100 Southeast 2nd Street, Suite 2650, Miami, Florida, did you send a notice of any other kind to Transpark during the time that FTP owned the property?
01:37PM A. That's kind of a compound question. A notice of any other kind than what?
01:37PM Q. Than a letter sent by mail to the address -- let's pull it up. Plaintiff's Exhibit 1, the section --
01:37PM A. No, I've already testified I didn't send U.S. mail letters.
01:37PM Q. Right. You didn't send U.S. mail letters. It would have been acceptable to send emails or even have a phone call according to you, right?
01:38PM A. According to the way the parties acted, yes.
01:38PM Q. Excellent. Did you ever send an email to Transpark at any time during FTP's ownership of the property or the capital call?
01:38PM A. I -- I don't recall.
01:38PM Q. How about that the Profit Participation Agreement had been abandoned?
01:38PM A. I don't think I did.
01:38PM Q. How about that you believed the Profit Participation Agreement had been abandoned?
01:38PM A. I -- I didn't have to do that. I didn't.

Q. How about that you believed there was some assignment of rights?
A. I did not.
Q. How about that you believed he was dissolved and no longer in business or that you had been informed that he had been -- that Transpark was dissolved and no longer in business?
A. I didn't have to do that. He was -- why do I have to tell him he's out of business? He knows he's out of business.
MR. PARDO: Let's pull up the Profit Participation Agreement, Section 10.
THE WITNESS: His bank accounts were closed.
MR. PARDO: Profit Participation Agreement, Section 10, Plaintiff's Exhibit 1.
BY MR. PARDO:
Q. Thank you, and I'll read Section 10, "Notice. Any notice, demand or document which any party is required or may desire or give or deliver to or make upon any party hereto shall, in the case of notice, be in writing."
You didn't even desire to then?
A. He said -- he knows he's out of business.
Q. I'm not asking about what he knows, I'm asking about what you know.
A. I did not send him a notice that he was out of business.
Q. Not that he was out of business, all the things we talked about.

A. I did not send him a notice.
Q. You didn't even desire to, correct?
A. There's no reason to, he was out of business.
Q. Not whether you thought there was a reason to, you didn't even desire to, correct?
A. I sent emails and other phone calls. I don't recall exactly. I desired to let him know he owed me money.
Q. No, no, no, all the things we talked about, that you were holding the profit participation in default, that you believed that he had abandoned, all those things you didn't even desire to send him notice, correct, sir?
A. It was automatic.
Q. No, no. I'm asking if you desired.
A. I don't remember if I desired, but I didn't send it.
MR. PARDO: Judge, I'd like an answer to the question of whether or not he desired to send those notices, yes or no.
THE COURT: Well, then ask him a yes or no question, I don't think you've asked him yes or no.
So go ahead and ask him a yes or no question, and then don't speak over him.
Thank you.
BY MR. PARDO:
Q. Mr. Seidler, yes or no, did FTP desire to send a notice to Transpark or Greg Mirmelli at any time during FTP's ownership of the property that FTP believed the contract was no longer

enforceable, had been abandoned, or anything else, yes or no?

A. I didn't think about desire. I didn't send the notice.

Q. So that's a no?

A. I guess that's a no.

MR. PARDO: No further questions.

THE COURT: Any redirect?

MR. NIELSEN: No, Your Honor. The defense rests.

THE COURT: All right. Are there any questions for this witness?

THE JURY: (Nodding their heads.)

THE COURT: All right. Thank you very much, sir. You can go back to the table. Thank you.

(The witness is excused.)

THE COURT: Is the defense resting, no other witnesses?

MR. NIELSEN: No other witnesses, Your Honor.

THE COURT: All right. Any rebuttal case by the plaintiff?

MR. PARDO: No rebuttal case for the plaintiff, Your Honor.

THE COURT: Well, okay. I'm going to ask to you go back to the jury room so I can talk to the lawyers about whether we're going to be ready to proceed to closing argument this afternoon or not. This is obviously a little faster than we had expected, so just give us a minute, all right?

(Jury out at 1:42 p.m.)

THE COURT: All right. You can be seated. It would have been helpful for someone to have given me more of a heads-up, just as a courtesy, really, to the jury because now we have to go to the charge conference. We might be able to do the charge conference. I would have done it at lunch, right, we might be able to do the charge conference and close today. Your closing is an hour, your closing is an hour, right, even if we started closings by 2:30, what do you -- what would you like us to do?

MR. PARDO: Your Honor, on behalf of the plaintiff, we would recommend a charging conference this afternoon with jury instructions and closing arguments on Friday so that the jury has time to deliberate before the weekend, whereas today, because of the holiday, including myself and my client, the 4:30 hard stop would be difficult to accommodate and, therefore, we might not even be here or available if the jury came back with a verdict at 4:31.

THE COURT: No, because I would send them home at 4:30.

MR. PARDO: Correct.

THE COURT: Let me hear from the defense.

MR. NIELSEN: Your Honor, we would like to renew our motions for directed verdict at this time and then --

THE COURT: So the motion I reserved ruling. I'm going to reserve now. I don't think your argument is any stronger after your client's testimony, but, in any event, I will go ahead and reserve.

So what would you like to do with respect to closing arguments?

MR. CASABIELLE: Your Honor, that's my task. Can I be heard? That is my task. I would like, if we're going to do closing, if we're ready to do closing, to do it on Friday, give me an opportunity to prepare them tomorrow.

THE COURT: Well, that doesn't really help the plaintiff or your cocounsel since they're observing a Jewish holiday, so I'm certainly not going to do it for that reason, to give you more time to prepare.

My issue is whether or not we can really get it done, we can get the jury charge done. I can have you close and -- we can do a jury instruction charge now, I can have you close and then Friday they hear my instructions and deliberate.

MR. PARDO: For the plaintiff, that would be acceptable, Your Honor.

MR. CASABIELLE: Your Honor, if I may, maybe I'm getting old but to be able to summarize, even though it is only two days' worth of testimony, still requires me to sit down and collect my thoughts, review the dailies, so I could put some kind of a coherent argument before the jury.

So I would ask that I be allowed to prepare in between charge conference and closing argument, if I'm not given an opportunity, I'm not going to be able to prepare a coherent closing argument.

THE COURT: Give me a minute.

All right. There are too many jury instructions that you all disputed, and they go to some critical issues that I suspect you will address, or should be addressing in your closing arguments.

So, you know, it would have been helpful, after telling me this was a seven- to nine-day case, to have given me some direction because, like I said, we could have worked through the lunch break, we could have worked, right, yesterday later in the evening, like we could have taken care of this.

We are asking members of the community to now, sort of in the middle of the day, leave and have to come back on a Friday, and given that Friday is a shortened day, potentially come back Monday to deliberate.

And, by the way, like, I moved all sorts of things on my calendar as well. So it is what it is. I am going to tell them they can go home. I'm going to have them back on Friday at 11:00 o'clock. I'm going to be telling them that they will hear closing arguments from you all and my jury instructions, so I'm going to tell them to have a big breakfast because what I am going to do is let the closings and my instructions all go with just a break, like a 10- or 15-minute break, and then they can have a late lunch, right, so their lunch will be more like 2:30, right, will be their lunch.

THE COURTROOM DEPUTY: They close downstairs at 2:00.

THE COURT: No, that's fine. So the food will be here at 2:00. It will just be waiting for them.

THE COURTROOM DEPUTY: All right.

THE COURT: Because if we start at 11:00, right, let's say the plaintiff's entire closing is an hour, right, rebuttal and closing, so that's 12:00. Let's say yours goes till 1:00, the jury instructions will take me probably 45 minutes to read. So that's still some time before 2:00, right, so I think we will be fine, Donna.

THE COURTROOM DEPUTY: Okay, Judge.

THE COURT: So I'm going to bring them back, I'm going to tell them that I have to have a charge conference, exactly what's happening, there is a charge conference that has to happen with respect to the rules or the law that they will be read. That might take me more than an hour or two with you all to do and, in light of that, it doesn't make any sense to just have them wait, they can just come back Friday at 11:00 a.m. All right?

Any objection from the plaintiff?

MR. PARDO: No objection on behalf of the plaintiff, thank you, Your Honor.

THE COURT: On behalf of the defendant?

MR. NIELSEN: No objection, Your Honor.

THE COURT: All right. Let's bring them in.

(Jury in at 1:49 p.m.)

THE COURT: Everyone can be seated. I guess we shouldn't

be seated, we're still waiting for a juror. My apologies.

We can all be seated now. All right. So ladies and gentlemen, the evidence is now closed in the case, you heard the defense case, there is no rebuttal case from the plaintiff. What happens now is the plaintiffs give their closing argument, then the defense gives a closing argument. Plaintiff, because it is their case, right, they get the last word. But not so fast, I really get the last word because I have to instruct you on the law.

In order for me instruct you on the law, the way that it's done is the parties each propose, right, what they think these instructions should say, and I have to have a charge conference with the lawyers to hear argument -- legal argument on each instruction that's not agreed to. It's very typical, this is how all cases work, all civil and criminal cases. We have to have the charge conference. Some charge conferences are shorter than others. It's not atypical in a civil case for a charge conference to be an hour or maybe even more.

So it doesn't make any sense to have you all just hanging out in the jury room for two hours while we finish. You'll have to come back Friday anyway because, even if I did that, you wouldn't have time to hear all the closing arguments.

So what I am going to do -- it is actually a beautiful day, I won't tell anybody that you left early, so, you know, go about your day, go shopping, go sit on the beach, that's fine. I

am going to release you today, I mean, at this hour from today's service. You will come back Friday. I have a criminal sentencing that has experts involved in it. I moved it to 8:30 in the morning because originally it was scheduled for the middle of the day. So I'm going to have you all come back Friday at 11:00 in the morning. You will hear right at 11:00 the plaintiff, you'll hear from the defense, plaintiff again, and my charge. And then you will begin to deliberate.

Because you're coming in late, I'm just going to, as nicely as I can, ask that you have a good breakfast because I'm not going to interrupt those three things or the closings and my instructions for lunch, all right. So you will have sort of a late lunch, like an after 1:30 lunch. Lunch is on us on Friday because you're deliberating so Donna, when you go back to the jury room now, Donna will have menus for you for you to pick your lunch on Friday.

Remember we're in recess tomorrow in observance of the holiday, right, so we will be back Friday at 11:00 a.m.

THE COURTROOM DEPUTY: And they should report to work tomorrow. They should report to work tomorrow.

THE COURT: Donna says you have to report to work tomorrow. Donna said that.

I will see you Friday at 11:00 o'clock. I know there is a lag now and, yes, the evidence is clearly closed. However, the arguments of counsel are important, they're not the law, they're

01:54PM not evidence, but they're important for you to hear. We like to think they would be helpful. And my instructions on the law you must have before you begin deliberating, right?

01:54PM So you still can't talk about the case with anybody. You still can't look anything up, and you still can't talk about it with each other. So leave your notes behind. Try to keep a fresh mind as to what you've heard the last few days and, like I said, we'll hear closing arguments, we will start promptly at 11:00 o'clock.

01:55PM Like I said, I was trying to figure out if we could squeeze everything in today and to do that would mean you would be sitting in that jury room for an unknown amount of time while we had legal argument. I thought you probably would prefer just to have the afternoon. All right.

01:55PM You will be back then on Friday. It's still a lot shorter than the two-, possibly three-week time frame that we told you about on Monday.

01:55PM So I appreciate your patience, I appreciate your service, don't talk about the case, don't look anything up, don't talk about it with each other. We will see you Friday at 11:00 a.m. Make sure that before you leave you give Donna your lunch order. We take lunch -- we order from the cafe downstairs, I don't know if any of you have eaten here this week, I think it's pretty good, so you're obviously welcome to bring your own lunch if you wanted to, but you won't be able to leave because you will be in

deliberations on Friday, all right, so that's why we order lunch for you.

Anyway, thank you very much. We'll see you on Friday.

(Jury out at 1:56 p.m.)

THE COURT: I'm going to take a 30-minute break because I'm going to make my own notes and finish my own notes on the instructions and especially the verdict form, which seems to be pretty different. I would encourage you to do the same.

I don't know when the last time you all looked at your jury instructions was, but I am going to encourage you to do the same and encourage you to talk to each other.

If you think there is something for which there had been a previous objection that now you think shouldn't be an objection or if there is an instruction that you suggested or are recommending, but that now that the evidence is closed, believe it's no longer appropriate. All right.

So I'll give you 30 minutes to do that. I'll do the same.

When I get back, we're just going to go instruction by instruction, instruction, even ones for which you have no objection, I will go through each one because some of those you might want to withdraw at this point, right? I don't know. But you might.

So we'll go through each instruction.

All right, so you can stay here, you can work here, you

can use the lawyers' suites in the back, but I will see you at 2:30.

MR. PARDO: Thank you, Your Honor.

MR. CASABIELLE: Thank you, Your Honor.

MR. NIELSEN: Thank you, Your Honor.

(Recess at 1:57 p.m.)

(Back on the record at 2:41 p.m.)

THE COURT: Everybody be seated.

THE COURTROOM DEPUTY: Does everyone have the microphones where they need to be? Thank you.

THE COURT: All right. So as an initial matter, nobody read the stipulations to the jury, so at some point in these jury instructions I'll have to read the stipulations, so. I don't know exactly where I'm going to slide them in, but I will do that. All right.

So by my count, we begin at page 18 of 14, Joint Proposed Jury Instruction No. 9.

Plaintiff?

MR. PARDO: No objection, Your Honor.

THE COURT: Defense?

MR. NIELSEN: No objection, Your Honor.

THE COURT: All right so that will be read.

Joint Proposed Jury Instruction No. 10.

Plaintiff?

MR. PARDO: No objection.

THE COURT: Defense?

MR. NIELSEN: No objection, Your Honor.

THE COURT: Plaintiff, Joint Proposed Jury Instruction No. 11?

MR. PARDO: No objection, Your Honor.

MR. NIELSEN: No objection, Your Honor.

THE COURT: Joint Proposed Jury Instruction 12?

MR. PARDO: No objection, Your Honor.

MR. NIELSEN: No objection, Your Honor.

THE COURT: Joint Proposed Jury Instruction 13?

MR. PARDO: No objection, Your Honor.

MR. NIELSEN: No objection, Your Honor.

THE COURT: Joint Proposed Jury Instruction 14?

MR. PARDO: No objection, Your Honor, if I may actually, I don't believe the instruction is necessary.

THE COURT: Right, so plaintiff is withdrawing?

MR. PARDO: Withdrawn.

THE COURT: Defense.

MR. NIELSEN: We're in agreement, Your Honor. No objection.

THE COURT: Joint Proposed Instruction No. 15?

MR. PARDO: No objection, Your Honor.

MR. NIELSEN: No objection, Your Honor.

THE COURT: Proposed Instruction 16?

MR. PARDO: No objection, Your Honor.

02:43PM MR. NIELSEN: No objection, Your Honor.

02:43PM THE COURT: Proposed Instruction 17?

02:43PM MR. PARDO: No objection.

02:44PM MR. NIELSEN: We object, Your Honor, on the basis that plaintiff hasn't proven damages.

02:44PM THE COURT: Okay, but I'm letting it go to the jury so they need an instruction on that.

02:44PM MR. NIELSEN: Of course, Your Honor.

02:44PM THE COURT: So I will be reading that instruction.

02:44PM Jury Instruction No. 18?

02:44PM MR. PARDO: No objection.

02:44PM MR. NIELSEN: No objection, Your Honor.

02:44PM THE COURT: Proposed Jury Instruction No. 19.

02:44PM MR. PARDO: We have no objection as drafted on the page, Your Honor.

02:44PM MR. NIELSEN: Your Honor, the defendant --

02:44PM THE COURT: I know, this is -- you're the one that's adding the word "valid," correct?

02:44PM MR. PARDO: Correct, Your Honor.

02:44PM THE COURT: And that is not part of the standard jury instruction, correct?

02:44PM MR. PARDO: Correct.

02:44PM THE COURT: What is your basis for modifying the standard -- the pattern?

02:44PM MR. PARDO: The parties have agreed over the course of

the litigation that the contract was validly entered into, therefore, it's a valid contract, and over the course of several hearings throughout the litigation, not only was it admitted in the normal course of litigation, but even at the summary judgment hearing, the only question is not validity, but enforceability.

THE COURT: Let me hear from the defendant.

MR. NIELSEN: Your Honor, because we are in agreement that the contract is valid, referring to whether the contract is valid or not is rather irrelevant because we don't even have jury instructions on whether the parties entered into a contract because we already agreed to that.

THE COURT: Well, you didn't, though, because in the stipulation it looks like you disagree on Stipulation No. 9.

MR. NIELSEN: May I continue, Your Honor?

THE COURT: Yes.

MR. NIELSEN: Your Honor, whether a party has entered into agreement and whether it is valid, one is a factual determination, one is a legal conclusion, and the stipulations are factual stipulations, whether a contract is valid is a legal conclusion that should not go to the jury since it is not in dispute.

We are in agreement that the contract was entered into. I don't want the jury to get confused that because the contract was valid, it can no longer be unenforceable, and it is not part of the standard form.

THE COURT: Okay. So let's break this down. You're not disputing that it's a valid contract?

MR. NIELSEN: That's correct, Your Honor.

THE COURT: I agree with you, I don't think the pattern needs to be modified so I am not going to modify the pattern.

My issue, though, is you also dispute that the Profit Participation Agreement is a valid contract. That was a stipulation and you disputed that -- you dispute that stipulation being read, I should say.

MR. NIELSEN: Your Honor, that's a -- that's not a factual determination, that's a legal issue, validity. That's about, you know, consideration, offer, acceptance, and we are not -- that's not at issue in this case.

THE COURT: Well, I don't have to read something you haven't stipulated to and I am not going to amend the pattern, so over plaintiff's objection, the pattern will be read but without the word "valid."

All right. So now let's go to these breach of contract instructions. So proposed Jury Instruction No. 20, there's two parts to it, right, there is the breach of contract and the essential elements, it's page 29 and 30, and then I'm literally trying to figure out what it is that you all did because this isn't the way I typically ask for them to be submitted, so I don't know if you were traveling under an old scheduling order.

So what is it that the plaintiff seeks in this jury

instruction?

MR. PARDO: The plaintiffs seek Instruction No. 20. The defendants seek -- excuse me, the plaintiffs seek what's on page 29. The defendants seek what's on page 30. It seems like they believe they're mutually exclusive, but if Your Honor believes that both would be appropriate, the plaintiff would have no objection to that.

THE COURT: No, they're clearly not both appropriate. I'm trying to -- in my reading of it, so, your breach of contract jury instruction is based on an Eleventh Circuit case and a Fourth DCA.

The defense jury instruction, is that the pattern, exactly the pattern or not?

MR. NIELSEN: Yes, yes, Your Honor, I just included the names.

THE COURT: All right. So let me ask counsel for plaintiff, Mr. Pardo, why would I read anything other than the pattern?

MR. PARDO: Because it would be appropriate to follow binding Eleventh Circuit case law. That would be the argument, Your Honor.

THE COURT: I understand, but typically binding Eleventh Circuit case law doesn't contradict the pattern instruction, so I'm going to read the pattern instruction.

Is there anything objectionable to the pattern jury

02:49PM instruction, Mr. Pardo?

02:49PM MR. PARDO: No objection, Your Honor.

02:49PM THE COURT: Okay. So I'm not going to read the Plaintiff's Proposed Jury Instruction 20, I will read defense Instruction 20.

02:49PM MR. PARDO: And for the record, the plaintiff withdraws its objection to defendant's proposed Jury Instruction 20 on page 30.

02:49PM THE COURT: Okay. So now we go to Special Instruction 21, which I believe only defense is proposing, correct?

02:49PM MR. NIELSEN: Correct, Your Honor.

02:49PM THE COURT: All right. So let me hear from the defendant why you propose this condition precedent?

02:50PM MR. NIELSEN: Your Honor, I believe it is a central part of our theme and we have proffered enough evidence to show its importance in this case, and the jury should consider this condition precedent when making its decision.

02:50PM THE COURT: Let me hear from you, Mr. Pardo.

02:50PM MR. PARDO: Yes, Your Honor. If you look at page 30, Defendant's Proposed Jury Instruction No. 20, the form instruction that Your Honor has now ruled will be read to the jury, it would subsume and include what the defendants are now suggesting be separated out, and a special instruction would be cumulative and, quite frankly, I'm not sure what condition precedent they have

02:51PM even proffered or shown to the jury was required of Transpark.

02:51PM THE COURT: I don't see this as a condition precedent either. You had affirmative defenses of futility, abandonment, anticipatory breach. I didn't see the condition precedent and I do agree with the plaintiff's counsel that it's repetitive of the jury instruction on breach.

02:51PM MR. NIELSEN: Defendant will withdraw the instruction, Your Honor.

02:51PM THE COURT: Okay. It's withdrawn then.

02:51PM All right, so then the plaintiff has a breach of implied covenant of good faith and fair dealing, so does the defendant.

02:51PM MR. PARDO: If I may, Your Honor.

02:51PM THE COURT: Sure.

02:51PM MR. PARDO: This is very similar to the setup for breach of contract, and if Your Honor is going to rule consistently, we'll withdraw our objection to what's on page 33.

02:52PM THE COURT: All right. So I'm going to read the pattern.

02:52PM MR. PARDO: Correct, Your Honor.

02:52PM THE COURT: On page 33. All right. There is a Joint Proposed Jury Instruction --

02:52PM MR. PARDO: Sorry, I hate to be stickler but can we get defendant's agreement on the record to that effect.

02:52PM THE COURT: Well, the defendant has an objection --

02:52PM MR. PARDO: We're still on page 33, right?

02:52PM THE COURT: Hold on. So on page 32, the plaintiff is

withdrawing 32 and then withdrawing its objection to page 33.

So that Defense Proposed Jury Instruction No. 22 is what will be read.

Any objection from the defense?

MR. NIELSEN: No, Your Honor.

THE COURT: Okay.

MR. CASABIELLE: No, Your Honor.

THE COURT: So 23 says it is a Joint Proposed Instruction but I don't think so, because there is an objection.

MR. PARDO: That was a clerical error. The plaintiff withdraws its objection, Your Honor.

THE COURT: So there is no objection?

MR. PARDO: On behalf of the plaintiff, none.

THE COURT: There is no objection to 23, sir?

MR. NIELSEN: No, Your Honor.

THE COURT: All right, so we will be reading 23.

Okay. So now we're going to get to the affirmative defenses. So I guess I'm trying to understand here from the plaintiff, do you not think that the jury should be instructed on the affirmative defenses, because I see this as a defense proposed with an objection, but I don't think there was a plaintiff's proposal.

MR. PARDO: Correct, Your Honor. If I may elaborate, there are only two paragraphs or two sentences in this Proposed Jury Instruction 24 on page 35. And that's the third and fourth

paragraphs to which we object. Everything else is acceptable.

THE COURT: All right. So you object to the sentence or the paragraph that begins with "abandonment"?

MR. PARDO: And the sentence preceding it, correct, those two paragraphs we object to. Everything else is acceptable.

THE COURT: No, no. We're not on the right page.

So I have the fourth paragraph as "abandonment of a contract."

MR. PARDO: Correct.

THE COURT: Okay. That whole paragraph you object to?

MR. PARDO: Yes.

THE COURT: And you object to the paragraph which is just a sentence above it, the "and defendant"?

MR. PARDO: Correct, Your Honor.

THE COURT: So it's three and four that you have an objection to?

MR. PARDO: Correct, Your Honor.

THE COURT: All right. Just give me a minute to read it without 3 and 4.

MR. CASABIELLE: Your Honor, so I understand, you're eliminating paragraphs 3 and 4?

THE COURT: No, sir, I said I need to read it without 3 and 4. Give me a minute.

MR. CASABIELLE: Oh, my bad. Sorry.

THE COURT: All right. Let me hear your argument on

paragraph 3 and 4, Mr. Pardo.

MR. PARDO: Thank you, Your Honor. We believe that paragraphs 3 and 4 are not part of the form and they are additional language that is cumulative of the legal instruction in the first two paragraphs and the final paragraph.

THE COURT: Is the form just paragraph 1, 2 and 5?

MR. PARDO: Unless I am mistaken, that's my understanding, Your Honor.

THE COURT: All right. Let me hear from you, counsel, as to why -- is that accurate that you've added paragraph 3 and 4 and, if you have, what's your argument?

MR. NIELSEN: I don't recall exactly what the form said. This is a form I got off of LexisNexis.

But, Your Honor, I think withdrawing those paragraphs doesn't really make sense. The fourth paragraph provides context as to the elements and how they're met, and I think that's pivotal to the abandonment instruction. It shows how abandonment can be proven. I don't understand the prejudice the plaintiff can get from that.

It just shows how they can prove abandonment, and I cite to the case law supporting those statements.

THE COURT: It's confusing because your second paragraph specifically says four ways in which it was abandoned, and so this paragraph I think it contradicts paragraph 2.

MR. NIELSEN: I have a proposal, Your Honor, that I

wanted to make.

THE COURT: Okay.

MR. NIELSEN: I would like to -- this is going to get a tad confusing. I think if we strike the second and third paragraphs, the instruction is much more acceptable.

MR. PARDO: May I, Your Honor?

THE COURT: I'm going to pull the pattern. Give me a minute. I can't find the pattern.

MR. NIELSEN: Your Honor, that's a citation directly from Lexis, I can download it and try to send it to the Court, if that would be easier.

THE COURT: No. I want to find the pattern. I should be able to find the pattern.

MR. NIELSEN: Your Honor, there is no pattern jury instruction from the Florida Bar regarding this affirmative defense.

THE COURT: Then why did you cite as your authority Florida Forms of Jury Instructions 33.27?

MR. NIELSEN: That's the direct citation from Lexis. They have their own form.

MR. PARDO: Respectfully, Your Honor, then that should have been a Lexis citation.

THE COURT: Yes.

MR. NIELSEN: No, that's the direct citation that it provided me.

MR. PARDO: There should have been a Lexis numbering.

THE COURT: That's a Lexis citation. There is no Florida Pattern Instruction on abandonment, unless there is; but I'm not finding one. That doesn't mean it's not there. Just give me a minute.

MR. PARDO: And while that's happening, for the record, in which case plaintiff would object to the instruction as a whole and defer to Your Honor for the appropriate legal instruction for abandonment.

THE COURT: I'll come up with my own. I mean, this citation is improper because it is not a Florida form. You're citing -- the only Third DCA case you're citing is from 1965, so we'll have to do some research and come up with our own.

I mean, what you propose, sir, unless you want to amend it some other way, is contradictory so you can't both claim how plaintiff abandoned the agreement with specificity, as you do in paragraph 2, and then you seem to have a standard which is what you have in paragraph 4, but I don't know where you got that from. If you got that from Lexis, if you got that from a case, I can't tell.

So, Mr. Pardo, you agree that the jury has to be charged on abandonment?

MR. PARDO: Absolutely, Your Honor.

THE COURT: But we just don't have a charge for it.

MR. PARDO: Correct, Your Honor.

03:02PM THE COURT: All right. Then there is a proposed special instruction by plaintiff on page 36 on dissolution.

03:02PM MR. PARDO: Dissolution and reinstatement, Your Honor. Those are the two Florida statutes that we cite.

03:02PM THE COURT: So walk me through the timeline here. So you have a company that's dissolved, a plaintiff company. Defendant says, well, when I needed to have given you notice, you were dissolved. Then there is a reinstatement.

03:03PM I understand that for legal purposes, right, you go back as if the dissolution had not occurred. But how would the defense be able to give notice if the thing it was giving notice, or should have given notice about, has now passed?

03:03PM So walk me through that timeline because this is -- it could confuse the jury that the jury thinks, well, once it was reinstated, poof, that obligation was back.

03:03PM So can you just walk me through that timeline?

03:03PM MR. PARDO: Yes, Your Honor. In 2006 when the contract was formed, Transpark was a valid and registered company.

03:03PM THE COURT: Right.

03:03PM MR. PARDO: In 2011, the annual report was not filed. The company was dissolved.

03:04PM THE COURT: Correct.

03:04PM MR. PARDO: In 2017, it was reinstated and, according to the case law and the statute, it related back and took effect as of 2021 -- excuse me, 2011, such that at no point between 2017 and

03:04PM '21 was there any interruption. When we allege the breach occurred in 2021, it was invalid in existence. That's the timeline.

03:04PM THE COURT: So the timeline here is the notice that your client didn't get and should have gotten, right, was in 2021?

03:04PM MR. PARDO: That's the position we take. And during the time that it was administratively dissolved, that the notice should have gone to Mr. Mirmelli individually, which --

03:04PM THE COURT: Okay. Hold on. So that's my question to you because now you've said something that contradicts itself.

03:04PM Between 2011 and 2017, is there any notice that you contend your client should have received and didn't receive?

03:05PM MR. PARDO: No, Your Honor.

03:05PM THE COURT: So the only notice that you allege your client should have received and didn't happened in 2021?

03:05PM MR. PARDO: Correct, Your Honor.

03:05PM THE COURT: Such that this dissolution phase is of no moment, it's irrelevant because no kind of notice could have happened during that time period?

03:05PM MR. PARDO: If the instruction to the jury is that the dissolution is irrelevant, then we'll withdraw this objection and ask --

03:05PM THE COURT: No, I'm not going to instruct the jury that. I'm trying to figure out from you, because this instruction, if I read it this way, I don't -- I'm trying to get from you what your

argument is going to be to this jury with respect to what's the date of the notice that it didn't receive, which is the sale, so when was the sale?

MR. PARDO: Right. On behalf of the plaintiff, our position is that because no notice was sent, contemplated or even desired, you fast-forward to 2021.

The defendant's position is they made capital contributions between 2006 and 2011, and that they made this capital contribution in 2013, to which we say if, during that period of time, there was a capital contribution, it still had to be reconciled in 2021, at which point we never got notice.

So during that period of time, 2011 to '17, A, one, we don't believe notice was required nor desired nor given; but, two, if it was, because it should have been reconciled in '21, the administrative dissolution does not negate the obligations of the parties at closing.

That's, in summary, what I plan to argue to the jury.

THE COURT: I understand less what you said when you finished than when you began. So this is really a time frame issue with me with this instruction, so if, for example, let's just go back to hypotheticals, right?

MR. PARDO: Yes.

THE COURT: If a party, for example, was required to give notice, using the same timeline, in 2013 --

MR. PARDO: Correct.

THE COURT: -- and it didn't give notice in 2013 because the company was dissolved, when you come back and reinstate the company, you can't retroactively say, "You owe me that notice."

MR. PARDO: Agreed.

THE COURT: Right.

MR. PARDO: Semicolon, and during the time period that the company was administratively dissolved, the statute and the case law says it doesn't terminate the authority and ability of the registered agent, Mr. Greg Mirmelli, from receiving service, notice, et cetera.

So he, individually, during that time period, under the statute and case law, could still have received the notice that they're contending maybe kind of should have been given, unless they're prepared to stipulate that they didn't attempt, didn't desire, didn't give any notice during the period of time that the company was administratively dissolved.

But if they're going to argue that, well, we wanted to make this capital call but we couldn't find him, then our argument and the law has to be, you could have, and the law allowed you to go find the registered agent of the company, Greg Mirmelli, individually.

THE COURT: Well, I don't think the law requires.

MR. PARDO: Allowed. Allowed.

THE COURT: Right. The law didn't allow or require -- it's really require them to find him. The issue here is the

contracts at issue had specific notice provisions. Whether or not -- and I think your argument is just because the company was dissolved doesn't mean they weren't supposed to still get notice.

MR. PARDO: Correct.

THE COURT: Right? My problem with this is I think it is confusing to tell the jury that the reinstatement relates back -- I know that's a proper ruling -- I mean, I know that's a proper statement of the law, but in this case it might confuse the jury to think that somehow notice sort of had to retroactively be given, or something like that, when the time had passed.

I think that might lend itself to some confusion.

MR. PARDO: If Your Honor would be amenable to an accurate statement of the law, with whatever clarification Your Honor believes would avoid any confusion, the plaintiff would be amenable to that. And we would defer to Your Honor to fashion an equitable and legally appropriate instruction consistent with the two statutes we cite.

THE COURT: So, for example, sentence one, the administrative dissolution of a Florida business does not extinguish contractual rights or obligations belonging to that business.

That's one thing.

The second, whether or not it doesn't terminate the authority of its registered agent for service of process, this wasn't a service of process case, right?

So they didn't need to serve him a subpoena or a complaint, right? They were serving him notice, and notice, right, was provided for in the contract. It's a different -- I think that could be confusing, and I think sentence three about the reinstatement relating back, again, could also be confusing because I don't think that's your argument.

MR. PARDO: Very well, Your Honor. Then this somewhat relates to the suing on the promissory note and the non-suit of the promissory note for which the time period that the statute of limitations would have expired is during the time that Transpark was administratively dissolved.

Greg Mirmelli, individually, would have still had authority to accept service of process during that period of time. We have a separate instruction that we're going to propose to Your Honor relating to suing on a promissory note with collateral.

THE COURT: Let me hear from the defense.

MR. NIELSEN: Your Honor, I think it's entirely confusing because the registered agent issue is completely irrelevant because there is a provision of the contract that's specific about what that address should be, and the registered agent of the -- of Transpark during the relevant time period when it was dissolved was not that address.

So even if the registered agent could have received mail, it wouldn't have got it because it wasn't the address listed in the agreement.

THE COURT: What? No, sir, that's not the issue.

Can you answer the last argument that the service of process is still relevant on the issue of their failure to sue on the default for the collateral assignment?

MR. NIELSEN: With regards to the collateral assignment, I don't think the failure to sue is really the issue. The collateral assignment is more about the parties' state of mind with regards to their interest in the property. No one -- there is no claim on these contracts, Your Honor, we're not bringing a claim for breach of promissory note or the assignment.

We're just stating that because they were not complied with, that led the parties to believe that there was no agreement any more because he lost his interest, not that we are suing to recover that amount.

THE COURT: What say you to just reading the first sentence, which is that the administrative dissolution of a Florida business doesn't extinguish either its contractual rights or its obligations?

MR. NIELSEN: My issue with this, Your Honor, is that we did not bring in the dissolution to argue that its contractual rights were extinguished, just by that one event. Our story in this case is that the contract was abandoned by the totality of the circumstances that culminated in the dissolution and them going out of business.

THE COURT: I understand that but -- so if the facts had

been that plaintiffs were doing everything they should have been doing, your client was doing everything they should have been doing, but your client didn't serve them notice under the participation agreement because the company was dissolved, I think as a matter of law we wouldn't be here because the fact that the company was dissolved didn't mean it no longer had contractual rights. So, I mean, Florida law I think is clear on that, isn't it?

MR. NIELSEN: Well, Your Honor, we brought in the dissolution to show that that's the reason why --

THE COURT: It's different. The dissolution, the fact that it's dissolved goes to your client's state of mind because that, and a lot of other things, made him think, right? It wasn't just the dissolution.

MR. NIELSEN: Yes, Your Honor.

THE COURT: It was the dissolution, he wasn't getting paid, he didn't get paid the other money on the collateral, right? The office, he knew the office was closed. You have all sorts of issues and facts, right? But it is not your argument because that's not -- I don't think that's what you argued to the jury in opening either, that just because the company is dissolved, there were no obligations to give it notice, right?

MR. NIELSEN: Correct, Your Honor.

THE COURT: My issue with it is the -- my issue is I don't want the jury getting confused because there is -- your

client did testify that he thought the company had been dissolved, right?

MR. NIELSEN: Yes, Your Honor.

THE COURT: That the jury have the opinion or form the conclusion that because it was dissolved, that's it, there is no company, because that's not what Florida law is. He thought that it being dissolved and a bunch of other things meant that giving notice was futile because that's your affirmative defense.

I am inclined to read the first sentence because I think it is a correct statement of Florida law. I don't think the second sentence, the service of process, that's not what this case is about with respect to whether or not that other loan was defaulted or they pursued that or not.

And I think the issue of reinstatement is confusing because a jury might think, oh -- a jury could then say, yeah, he thought it was abandoned, and that's -- we agree, but once the company gets reinstated, like as a legal matter, poof, that defense goes away.

MR. PARDO: On behalf of the plaintiff, it would be acceptable to just read the first sentence.

THE COURT: All right, I am going to read the first sentence over the objection of the defense or does the defense agree to the first sentence now?

MR. NIELSEN: We maintain our objection, Your Honor.

THE COURT: Okay. Then let's go to Defense Proposed Jury

Instruction -- so I am not going to read this one because I've read the plaintiff's. It is a correct statement of the law that a dissolved company obviously can't conduct affairs except those as necessary to wind up and liquidate its affairs. I think that's the whole point of the first sentence I'm reading.

MR. PARDO: On behalf of the plaintiff, we would agree.

THE COURT: Right, because if you're liquidating your affairs, right, I mean your contract rights don't just dissipate, right? The plaintiff's rights, right, would have been an asset of the company's, that it would have been entitled to wind up or liquidate, and could do so based even on your proposed instruction.

All right. Since I'm reading the plaintiff's, over the objection of the defense, I will not read the Defendant's Special Jury Instruction 25.

MR. CASABIELLE: 25.

MR. PARDO: On page 37, on behalf of the plaintiff, that's acceptable, Your Honor.

MR. NIELSEN: Your Honor, may I?

THE COURT: I'm sorry?

MR. NIELSEN: May I get a chance to respond or are you closing?

THE COURT: You can respond for the record. I mean, I ruled, but if you want to put something on the record, that's fine.

MR. NIELSEN: Your Honor, this instruction is important because it goes to the fact that during that time period when -- in 2013 when we made a capital contribution of $5.7 million to save the property from foreclosure, during that time frame Transpark was dissolved, they could not help us. That's the importance of this instruction is they could not -- they could not conduct any affairs. They couldn't conduct business.

THE COURT: You have to finish your thought. I'm not understanding why you think that's a favorable point for you. I'm missing something.

MR. NIELSEN: Your Honor, I will withdraw my argument.

THE COURT: All right. I would give you a chance to explain it but --

All right. So defense wants Special Jury Instruction No. 26, the definition of disposed asset.

MR. PARDO: Sorry, may I be heard on that, Your Honor?

THE COURT: No, I want to hear from them as to why they think I should read this.

MR. NIELSEN: Your Honor, we presented Greg Mirmelli's tax forms where he said that Transpark was a disposed asset and it's important for the jury to understand what that context is of that word, and here it lists how you can dispose of an asset.

Our argument has been that he gave up on the agreement and went out of business, and that tax form that we showed him that said this activity had been entirely disposed of supports

03:18PM that contention that it was Greg Mirmelli's belief that --

03:18PM THE COURT: No, I'm not reading that.

03:18PM So, again, the jury is going to be left with figuring out 03:18PM in terms of the credibility of both of these witnesses if 03:18PM Mr. Mermelli and the defense's witnesses as to what they believed 03:19PM was still viable or not with this contract.

03:19PM Of course, I am just summarizing that, but I don't think 03:19PM bringing in the IRS definition of it is really appropriate. I am 03:19PM not going to read that.

03:19PM MR. CASABIELLE: Your Honor, some clarification with 03:19PM regard to No. 25, was that a no, it's not going to be read? 03:19PM Page 37.

03:19PM THE COURT: I am not reading 37. I'm reading the first 03:19PM sentence on page 36.

03:19PM MR. CASABIELLE: Very well.

03:19PM THE COURT: So let's now go to the affirmative defense of 03:19PM anticipatory breach. We have a defense instruction.

03:19PM Is this also one of these Lexis ones --

03:19PM MR. NIELSEN: Yes, Your Honor.

03:19PM THE COURT: -- or is this a pattern?

03:19PM MR. NIELSEN: No, I think this one is --

03:19PM THE COURT: This is a standard jury instruction?

03:19PM MR. NIELSEN: Let me Google it.

03:19PM THE COURT: What is the objection?

03:19PM MR. PARDO: So if I may, Your Honor we're going to

withdraw our objection to 27 on page 39.

THE COURT: All right, so I am going to read 27.

Let's go to 28, equitable estoppel. I think that's, at least if the citation is correct, this would be also a pattern.

What is the objection to 28, Mr. Pardo.

MR. PARDO: I believe it should be the elements of estoppel, not the facts that they contend need to be proved because it is giving a jury a preview of their argument as opposed to a statement of the law. It's prejudicial.

THE COURT: Let me try to find the pattern.

MR. CASABIELLE: Is this standard?

MR. NIELSEN: I mean, I modified it to comply with the facts.

MR. PARDO: And while you're arguing that -- while you're looking that up, Your Honor, the specific reference to the --

THE COURT: Sir, I can't both be looking at it and listening, too, so just give me a minute.

MR. PARDO: Understood, my apologies.

THE COURT: Because I cannot find pattern 416.33, so I'm not sure where it's coming from because it does not appear to be on the website.

I'm on the Florida Bar website and there is no 416, sir, it doesn't exist.

MR. NIELSEN: 416.33, I'm looking at it right here, Your Honor.

THE COURT: Where are you looking at it?

MR. NIELSEN: The Florida Bar website.

THE COURT: I'm sorry.

MR. NIELSEN: I'm on the Florida Bar website looking at 416.33, which is the citation I used.

THE COURT: Let me try to do it another way.

MR. NIELSEN: All I did was type in Google equitable estoppel, Florida standard jury instruction. It is the first link. There is a separate page for business instructions.

THE COURT: So, Mr. Pardo, the standard, the pattern contemplates the language that was added.

MR. PARDO: Yes, Your Honor, the specific language that I would direct you to that we object to is in paragraph 2 because now the defendant is not using the purported assignment of rights to prove state of mind; rather, they're trying to prove that those rights were assigned and that's a very different element that is not at issue that they're not arguing to the jury. And again, it somewhat relates to the proposed instruction on the enforcement of a promissory note that we have, Your Honor.

So when we get there, we believe that the two ought to go together, if they're going to use the collateral assignment to prove that the assignment actually occurred rather than Mr. Seidler's state of mind that the contract was no longer in effect.

THE COURT: Give me a minute.

So I'm not sure the defense had thought this jury instruction through. Is your argument that in order for your affirmative defense of equitable estoppel to apply that both of these things have to be true, because it says, "To establish this defense, defendant must prove all of the following"?

MR. NIELSEN: Your Honor, I can make this really easy. We can strike that second paragraph.

THE COURT: Mr. Pardo?

MR. PARDO: The plaintiff would have no objection to that and paragraphs 1, 3, 4 would be acceptable instructions.

THE COURT: All right. So that's how we're going to read it. Acceptable to the plaintiff and the defense has withdrawn paragraph 2.

All right. The affirmative defense of futility. Mr. Pardo, where -- what's your objection to this?

MR. PARDO: This is another Lexis citation, Judge.

Now, again, it's the same as before, we would defer to Your Honor on an appropriate instruction on the legal elements of futility, but not the facts as they have been presented or a Lexis form from relying on a case from 1958.

THE COURT: I will tell you, so -- I'll tell you what I'm going to do because -- well, I'll tell you at the end because I don't see why -- this is your affirmative defense and you have given me a jury instruction with an incorrect citation to a pattern, and that isn't based on -- I don't know why I'm not

making you resubmit this to me. This is unacceptable, right, this is not a pattern instruction.

MR. NIELSEN: May I respond, Your Honor?

THE COURT: Yes.

MR. NIELSEN: There is no pattern instruction for this affirmative defense, Your Honor.

THE COURT: I understand, sir, but you have quoted it as if it were. "1 Florida Forms of Jury Instruction (modified)." That is absolutely, at best, a misleading citation. There is no form, right?

MR. NIELSEN: There is no form, Your Honor. I could not find one.

THE COURT: I understand, but are you not reading along with me that you cited it as a form with a section number?

MR. NIELSEN: I understand that it is confusing. It was not my intention. It was a direct citation from Lexis.

THE COURT: That is not a direct citation from Lexis.

Moving on. Let's go to the affirmative defense of waiver.

MR. CASABIELLE: I'm sorry, Your Honor, are you reading --

THE COURT: No, no, I will go back to these.

MR. CASABIELLE: So that's a question mark?

THE COURT: Yes, I will go back to them.

MR. CASABIELLE: Thank you.

THE COURT: I don't know what I'm going to do because when the defense purports to be providing a pattern instruction and then it is not a pattern at all, I don't see why you shouldn't have to resubmit something based on Florida law. It's your defense. But let's go to waiver.

MR. PARDO: Yes, Your Honor, we believe that this instruction is no longer necessary based on the evidence that's been adduced. I don't believe there is now any dispute that the parties didn't have to do this. This was the defendant's proposed instruction.

So we believe this instruction is no longer necessary. There is no argument of waiver here.

THE COURT: Let me hear from the defense.

MR. NIELSEN: Your Honor, we have produced evidence of waiver through Nathan Heber's testimony. He was an agent of Transpark. He had knowledge of the notice -- he had knowledge of the notice provision and accepted notice otherwise, and he testified that he informed Bart Seidler that they no longer had an office at the notice address.

THE COURT: That's not waiver, though. How is that waiver? Did you plead an affirmative defense of waiver?

MR. NIELSEN: Yes, I did, Your Honor.

THE COURT: Let me go back and look at your complaint because I don't think -- I don't think that's the waiver you pled, right?

03:30PM Give me a minute.

03:30PM MR. PARDO: Your Honor, if I may, Docket Entry 130, the fifth affirmative defense on Page 19.

03:32PM THE COURT: So, Mr. Pardo, what's your argument now? I have looked at the fifth affirmative defense, which does include that the plaintiff no longer occupied the location.

03:32PM MR. PARDO: Your Honor, even if they proved that we no longer occupied the location, that's not an extinguishment or waiver of our rights under the contract. We don't, quite frankly, believe that the way the defense should go to the jury, as it is instructed here, because the issue of where the office address was is not a condition of the plaintiff's rights to recover under the Profit Participation Agreement, and Mr. Seidler testified clear as day that there was an oral modification.

03:32PM I would suggest to Your Honor that we believe that the oral modification of the contract instruction that we have prepared for Your Honor should go right after this, if it is going to be included at all.

03:33PM THE COURT: All right. Let's start with the first principle which is there is an affirmative defense of waiver, right?

03:33PM MR. PARDO: Yes, Your Honor, we acknowledge that.

03:33PM THE COURT: That affirmative defense, the definition of waiver, has to go to the jury.

03:33PM MR. PARDO: Agreed, Your Honor.

03:33PM THE COURT: Okay. And so what definition of waiver do you propose should go to the jury?

03:33PM MR. PARDO: The -- a known right of the plaintiff, an unintentional relinquishment of that right.

03:33PM THE COURT: Where are you reading?

03:33PM MR. PARDO: I mean, unfortunately, Judge, I don't have the form in front of me so I'm -- my point, Your Honor, is that the waiver of facts that they're seeking to introduce here the parties, I believe, have now conceded. They're stipulated that we're not looking to prove that they didn't have to send notice to the 100 Southeast 2nd Street, 2650.

03:34PM How does that impact our right to receive profits upon the closing? That's where my confusion comes from on the waiver defense as they have instructed it here, because let's assume there was a waiver of a right to receive notice by the plaintiff. In fact, I think they're the ones who wanted it. They're the ones who were initially arguing in this case, we didn't have to give notice, physical copy, mail, we could just do it by e-mail. That's what they wanted. They wanted to prove that we waived our right to receive a physical hard copy at that address.

03:34PM Now I think there is an agreement that that's exactly what the evidence showed; so why is this instruction of defense necessary? How, for example, if we prove damages, does agreeing not to accept notice, physical copy, affect or relinquish? It doesn't connect in any way to the claim for damages, Your Honor.

We didn't get an opportunity to file our motion for judgment as a matter of law, which we believe would eliminate this defense altogether.

THE COURT: What do you mean you didn't get to file it.

MR. PARDO: Your Honor didn't prompt and we haven't been afforded an opportunity to file a judgment as a matter of law and certain defenses upon the conclusion of the defendant's case.

Some of these defenses we don't believe were supported by the evidence. We should be afforded an opportunity to remove some of these defenses from the jury's consideration.

THE COURT: Why didn't you make that motion? I'm not following.

MR. PARDO: My understanding and, again, I can find the authority for this is that until the jury is charged, we have the right to make that motion. It didn't have to be immediately upon the --

THE COURT: I know, but you're suggesting I haven't afforded you the opportunity. Why aren't you making the motion now? Are you making the motion now? I'm trying to figure out what you're doing.

MR. PARDO: I sincerely apologize. Yes, Your Honor, we would suggest that the evidence doesn't support the affirmative defense of waiver, that the waiver defense doesn't apply and, as a matter of law, it should be dismissed.

THE COURT: Okay.

03:36PM MR. PARDO: Thank you, Your Honor.

03:36PM THE COURT: They're arguing that the waiver should be dismissed.

03:36PM What's your response, sir?

03:36PM MR. NIELSEN: Your Honor, our response is that the record evidence has shown that Gregory Mirmelli had a right to receive mail at a certain address, and that he stopped maintaining an address there to receive that mail.

03:36PM I don't know how else you could be more affirmative about relinquishing a right to receive mail at a certain place.

03:36PM If it was that important, wouldn't you maintain your address there in this contract where it was?

03:36PM MR. PARDO: Your Honor, that may speak to abandonment but not to a waiver of rights to receive profits.

03:36PM THE COURT: I don't know how that's a waiver. So you could abandon the property and not waive, right, because you could have a forwarding address. He could have sent notice back to your client saying, "My new address is X," and that would have been sufficient, right?

03:37PM I don't think he waives it by virtue of moving. I mean, I hear you on the abandonment, but I don't know that he waives his right to receive notice by moving. I don't know that that alone is waiver.

03:37PM MR. NIELSEN: I understand it's somewhat of a novel claim, but I believe that if you have a right to receive mail at a

certain place and you're aware of it and then you change that address, and then subsequently demand that you receive mail at that place, the defendant -- the plaintiff is essentially trying to have its cake and eat it, too. It's demanding that we send it physical mail, and then it doesn't ultimately maintain an address there.

MR. PARDO: Your Honor, I don't believe that is an accurate statement of the plaintiff's position in this case.

MR. NIELSEN: And the agreement is very clear that Greg Mirmelli demanded notice at a very specific address.

MR. PARDO: I don't believe that's the plaintiff's position in this case.

THE COURT: I'm going to have to do some research on waiver. I don't see that as a waiver. You could move; that doesn't mean you're waiving your right to receive notice, right, because he could have moved.

I hear you that he didn't give notice that he had moved, right? That's part of your defense, that's part of abandonment, right, he moved and didn't tell us where he was, like that's your futility argument, right? That's your abandonment argument.

I'm not sure how it's a waiver argument, though. I'm not sure it's waiver.

And so there is a motion to dismiss the waiver from your defense or to deny it?

MR. PARDO: I think it's either a motion for judgment as

a matter of law or for a directed verdict, but form and substance are the same, Judge.

THE COURT: Right. All right. I will take that into consideration.

Let's move to damages. This is the Plaintiff's Proposed Instruction on 31, and then there is a defendant's -- the defendants have like a two-page and the plaintiffs have the one. All right.

Let me hear from the plaintiff on the damages jury instruction.

MR. PARDO: Having one instruction is simpler than two, and we have cited the pattern jury instructions that we've used and I think it's self-explanatory.

We defer to Your Honor.

THE COURT: Let me hear from the defense.

MR. NIELSEN: Your Honor, with regards to damages, the Court can pick which one. I believe they're very similar.

THE COURT: I'm going to -- I'm going to read the plaintiff's and I won't -- so I'll read Plaintiff's 31 and I'm denying defendant's 31 and 32.

MR. PARDO: On behalf of the plaintiff, that's acceptable, Your Honor.

THE COURT: Defense?

MR. NIELSEN: That's fine, Your Honor, acceptable.

THE COURT: All right. So --

MR. PARDO: If I may, Your Honor, there are two additional instructions that we've prepared.

May I approach?

THE COURT: You have not given them to me, have you?

MR. PARDO: Well, I can either give them to you in hard copy, I can email them to you, whatever Your Honor's preference. You have not seen them yet.

THE COURT: Have you given them to the defense?

MR. PARDO: I have, Your Honor.

THE COURT: All right. Somebody is going to have to --

MR. PARDO: May I approach?

THE COURT: Give it to the CSO because otherwise you can't get up here.

MR. CASABIELLE: Your Honor, as this is being accomplished, can I confirm that we will receive a clean copy --

THE COURT: Of course.

MR. CASABIELLE: -- before we do closing?

THE COURT: Yes, yes, of course.

Are you prepared to address these, sir?

MR. NIELSEN: Your Honor, I just received these maybe 30 minutes ago.

MR. PARDO: He saw them certainly at least ten minutes before we came back in front of Your Honor.

MR. NIELSEN: Right.

THE COURT: A whopping ten minutes to take a look at

that. Why don't you have a moment to look at that.

Let me know when you're ready, sir.

(Brief pause.)

MR. NIELSEN: Your Honor, I'm ready. I can argue this.

THE COURT: Give me a second. All right. Let me hear you -- your argument on 34, sir.

MR. PARDO: Thank you, Your Honor. There are two oral modifications that we believe are appropriate. Number one, and we would contend that we are going to argue to the jury the amount of rent, and the defendant -- excuse me, the defendant's acceptance of whatever rent we would pay together with the month-to-month tenancy that Mr. Heber testified to, and taken together with Mr. Seidler's testimony that the parties absolutely agreed that they could modify the contract, and their course of dealings by giving notice by email, phone call, what have you, makes the need for an instruction on modification necessary.

THE COURT: Let me hear from you, counsel.

MR. PARDO: And if I may, sorry, it is a standard jury instruction.

MR. NIELSEN: Your Honor, I believe this issue wasn't raised in the pleadings -- in their pleadings and now they're trying to bring it in at the last minute, and I don't think it's appropriate.

THE COURT: I think their point is they're bringing it in because your client testified to it. I mean, that's their reading

of his testimony, that there were modifications made to the contract orally between your client and the plaintiff. I mean, this is just a standard instruction. I mean, he is going to have to argue to the jury that that's true. I think you'll argue to the jury that it wasn't. The question is whether there is enough evidence in the record, right, for which --

MR. NIELSEN: I don't believe there is enough evidence in the record, Your Honor.

THE COURT: So tell me what modifications you think were orally made and what the evidence is of that.

MR. PARDO: Number one, the mean and method of notice under the contract -- excuse me, under the Profit Participation Agreement and, number two, there are two subparts, the term of the lease, month-to-month after it expired, as opposed to the five-year term and renewal term, or as long as FTP desired, and the amount of rent that had to be paid, whatever they could, gross profits less expenses. That was testimony elicited from Nathan Heber.

So under the Profit Participation Agreement notice and under the lease, the term, and amount of rent, and generally, Your Honor, the relationship between the parties, how FTP and Transpark conducted business, Mr. Seidler testified directly that notice could be an alternative method, and if Your Honor needs, I can show you the testimony, but...

THE COURT: I don't think I agree with you, but I don't

think it's to me to agree with you or not. I mean, there was testimony elicited from the defendant or the defense that there was a business practice of providing notice, that was the redirect examination this afternoon, or the cross-examination this afternoon. And there was certainly other evidence with respect to the lease payments.

Whether that's enough for an oral modification or not, I think you'll argue, sir, that it's not, but the question is, is there enough evidence in the record for him to argue to the jury that there was.

MR. NIELSEN: I don't believe there is, Your Honor, and this is very last minute.

THE COURT: I'm going -- I'm inclined to read it.

And then enforcement of the promissory note, let me hear your argument on that.

MR. PARDO: Yes, Your Honor. We have now, upon reflection and review of the transcript, we understand Your Honor's ruling that the collateral assignment document was admitted. We have obviously preserved our objections on the admissibility of the document as evidence, but for them to argue that those rights were actually foreclosed, that the assignment actually took place, requires an instruction on the law of notes, statute of limitations, and enforcement of collateral, and Florida law is clear, you can only foreclose and get a judgment on collateral pursuant to judicial procedure, that's the 601 statute,

and that, if there was collateral, it could only be used to satisfy the amount of the debt, not the entire unrestricted -- the entire contract right. That would have required judicial procedure, so that it can only be applied to the debt is the 2071, and then statute of limitations, there was enough evidence of Mr. Mirmelli's understanding of the law. We believe that rather than rely on his understanding of the law, Your Honor should instruct the jury on the statute of limitations on the enforcement of a note which, in full candor, was consistent with Mr. Mirmelli's testimony, and we believe that the jury should be instructed on these issues to give context and framework for the argument that the inherent existence of a collateral assignment document over the objection of plaintiff's counsel as to incompleteness, et cetera, you need that scaffolding so they don't run with that and we have maintained that every step of the way.

The mere existence of the collateral assignment is not evidence that the collateral was actually foreclosed.

THE COURT: Let me hear you, counsel.

MR. NIELSEN: Your Honor, we haven't produced -- we haven't proposed evidence that it was actually foreclosed. We brought it in for the --

THE COURT: I'm not going to read this instruction. There's -- look, you're going to argue to the jury, the defense is going to argue to the jury that Mr. Mirmelli's assignment of it was really part of their abandonment argument. I think that's

where it belongs. There is no evidence there was actually default on it. Your client testified clearly that he thought there was a five-year statute of limitations. There is plenty of evidence in the record for there to be argument on it.

I think for me to read this instruction on something that is really tangential to the elements we're trying to prove here is confusing to the jury. The jury has enough on the record. If you all -- as long as you all do not argue something that's contrary to Florida in closing, we should be fine.

MR. PARDO: On that point, Your Honor, two issues. One, I would request an acknowledgment by the defendants that in their closing they will not argue, insinuate or suggest that the collateral was actually foreclosed; and, two, my inquiry to Your Honor is, how am I supposed to reinforce that to the jury by saying there was no foreclosure which Florida law requires?

THE COURT: Because you're going to say there is no evidence of foreclosure and you're going to say that the five-year mark had passed and that your client believed that to the extent there was going to be any foreclosure on that, that would have happened and it didn't. And that's what he testified to.

MR. PARDO: I am renewing my request for that agreement on the record by counsel.

THE COURT: No, I won't do that. I will say, again, we'll see what he says at closing, if he makes an argument to the jury that is misleading on an issue of Florida law, because I

03:50PM instruct after closings, then you can make a motion at that time.

03:50PM MR. PARDO: Sorry, I want to clarify because I want to make sure Your Honor's ruling is clear.

03:50PM Your Honor, if the defendant makes an argument that's, as you said, misleading or inconsistent with that instruction, you want me to make a motion or to just stand up and object?

03:50PM THE COURT: No. Well, you should probably do both. If they're making an argument that is contrary to Florida law, you should object. And then you should also -- I'm not telling you how to practice law, I suspect you should object to that.

03:50PM If you don't object, I suppose you could still make the motion to add a jury instruction or add some clarification, not only on this, but anything else for that matter. If they make an incorrect statement of the law, you have a right to object and/or to ask me for an instruction.

03:51PM MR. PARDO: In the interest of fairness and for wanting to not have to interrupt Mr. Casabielle's closing, I want an understanding that it's okay for me to ask for and make that motion for this instruction upon the conclusion of his closing, rather than interrupting his closing altogether.

03:51PM THE COURT: No, if he makes an argument that's contrary to Florida law, you can object.

03:51PM MR. PARDO: And make the motion right then and there.

03:51PM THE COURT: You're not going to make the motion there, you'll object, and I will either sustain your objection, we'll see

how far along Mr. Casabielle got in the argument, it could be that he just started, I sustain your objection, he moved along, and depending on what he said, I might think no further instruction is necessary, I don't know how he's going to pose it. I mean -- like we just have to wait to see what happens.

MR. PARDO: Understood completely. Thank you, Your Honor.

THE COURT: So I'm done with the instructions. I think with the proposed stipulations I'll figure out where I will put those. I have removed the one line that was an objection. I will put these someplace in the jury instructions.

With respect to the affirmative defense of abandonment, the affirmative defense of futility, and the affirmative defense of waiver, by when would the defense like to resubmit if it intends -- do you want an opportunity to resubmit instructions on this or not?

MR. NIELSEN: Yes, Your Honor.

THE COURT: By when can you do that?

MR. NIELSEN: Tomorrow afternoon -- oh, today, Your Honor. We'll do it today.

THE COURT: But Mr. Pardo is not going to have a chance to look at them or he shouldn't be looking at them until -- I'm not expert on Jewish traditions but I think you shouldn't be looking at them until sundown tomorrow, right?

MR. PARDO: Until after the Sukkot, correct, Your Honor.

THE COURT: So what I will do is -- I'm obviously going to do some research on it to see where it should go, I will look to see what they do and what they propose. I will propose something to you by tomorrow evening, and then I would expect that any further objections to the jury instructions, because I will resubmit or submit to you all what I believe the jury instructions should be.

Remember, I have that sentencing in the morning, so you can look at it in the morning, let me know if you can by, you know, 9:00 a.m. Friday morning what objections you have. I will hear you as soon as I'm done with the sentencing, right, so that you at least know where you are for closing.

MR. PARDO: If Your Honor has that proposed instruction packet by sunrise on Friday morning, I will get you my response by 9:00 a.m.

THE COURT: I mean, I'm going to be conducting a criminal sentencing, so I am not going to be looking at it, but just do something with it so that as soon as I'm done with the sentencing, right, I can take a look at it.

MR. PARDO: Thank you, Your Honor.

THE COURT: Let's continue to these verdict forms which, you know, the defense verdict form is a no. The plaintiff verdict form is a no.

So let me just start with big picture here, and then I will submit a verdict form and you can also comment on the verdict

form on Friday.

I think we all agree the first count is a breach of contract count, right?

MR. PARDO: Correct, Your Honor.

THE COURT: If the jury says there's no breach, we're done, because they don't go to Count 2. If there is no breach, do you still go to 2?

MR. PARDO: I believe so, Your Honor.

THE COURT: What's the defense's position? Do you go to 2?

MR. NIELSEN: No, Your Honor, if there is no breach of the contract, there is no breach of implied covenant of good faith. And we have that in our affirmative defenses as well.

THE COURT: I think that's right.

MR. PARDO: Your Honor is going to propose a verdict form. If there is case law or any reason to the contrary, we will have it ready for you tomorrow morning.

THE COURT: So then I think what happens is if they say yes, there is a breach, then let's go through what the affirmative defenses are, because I want to make sure that I'm clear on each affirmative defense, and if they find on behalf of the defendant on any of these affirmative defenses, are we done or are there some affirmative defenses that don't completely negate the breach?

MR. PARDO: We would argue -- before we get to that, Your Honor, where does implied covenant of good faith and fair dealing

03:55PM fall as between breach of contract and defenses, because if there is a breach of contract then, as I understand it, there can also be a breach of implied covenant which should go before defenses.

03:56PM THE COURT: So if there is a breach, then I think the issue is do they go to 2 or do they go to affirmative defenses?

MR. PARDO: Correct, that's the inquiry for Your Honor.

THE COURT: No, what is your position?

MR. PARDO: We propose that it should be 2, that the breach of implied covenant should go before defenses.

THE COURT: What's the defense's position?

MR. NIELSEN: I disagree, Your Honor. If there is no breach of contract, there can't be any breach of implied covenant of good faith.

THE COURT: We've moved past that. So that's one issue, and Mr. Pardo is going to look at the case law and submit some case law to me. I think if there is no breach of contract, there is no implied breach either. I could be wrong on that, you all let me know if I'm right or wrong.

But we all agree that if there is a breach, you definitely get to 2, you get to implied, right?

MR. PARDO: Correct, Your Honor.

THE COURT: So Mr. Pardo's argument is that the jury should do 1, you know, first, breach, then implied, then affirmative defenses, as opposed to breach of contract, affirmative defenses, and then breach of implied contract.

03:57PM MR. NIELSEN: That's how I have my forms proposed, I believe.

03:57PM THE COURT: I can't make heads or tails of these forms, so that's why I'm asking you.

03:57PM MR. NIELSEN: That's the order I have it in my form, so there is no objection.

03:57PM THE COURT: So it's 1, 2, right, and then affirmative defenses, right?

03:57PM MR. NIELSEN: Correct, Your Honor.

03:57PM THE COURT: Okay. The affirmative defenses are -- can somebody read them to me because I'm just writing out here? There's futility.

03:57PM MR. NIELSEN: Anticipatory breach.

03:57PM THE COURT: Anticipatory breach.

03:57PM MR. NIELSEN: Equitable estoppel.

03:57PM THE COURT: Equitable estoppel.

03:57PM MR. NIELSEN: And waiver.

03:57PM THE COURT: Not anymore, I thought I said no to waiver.

03:57PM MR. NIELSEN: I thought you reserved.

03:57PM THE COURT: Hold on. Did I reserve on waiver? Yes, I reserved on waiver, you're right, so let's just assume that waiver is still in the mix.

03:58PM Any others? I think there's only five.

03:58PM MR. PARDO: On behalf of the plaintiff, we don't believe there are any other defenses other than the ones that you have

03:58PM listed subject to Your Honor's reserved ruling on waiver.

03:58PM THE COURT: There's only five, correct, counsel?

03:58PM MR. NIELSEN: That's correct, Your Honor.

03:58PM THE COURT: So what is the plaintiff's position if the defense wins on any one of them, does that negate your case completely?

03:58PM So if they win on futility, are your damages zero is, I guess, what I am asking because I'm just trying to structure in my head this verdict form.

03:58PM MR. PARDO: The answer, Your Honor, is no, because futility can imply -- can apply to breach, but not to the breach of implied covenant, meaning even if there is a legal defense to the breach of contract, the elements of breach of implied covenant are such that arising from their conduct, it could still be unfair for which a futility defense might not apply.

03:59PM THE COURT: That's why I asked you -- that's why I thought the affirmative defenses belonged with breach of contract, not with the fair dealing.

03:59PM MR. PARDO: I understand Your Honor's distinction and if it's okay with defendants, I think I'd like to revisit the order in light of that, meaning I think each claim requires an analysis of defense which apply to it. I don't believe futility applied to breach of implied covenant of good faith and fair dealing.

03:59PM THE COURT: All right. Let me do it this way.

03:59PM Which of these defenses do you think apply to the breach

of fair dealing -- good faith and fair dealing?

MR. PARDO: Equitable estoppel and abandonment. Those are equitable defenses.

THE COURT: So those are the only two that go to Count 2?

MR. PARDO: Correct, Your Honor. At least according to the plaintiff, correct.

THE COURT: Right. And as to Count 1, all five would apply?

MR. PARDO: We would agree with that, Your Honor, subject to Your Honor's reservation of ruling on waiver.

THE COURT: So I think the verdict form has to read breach of contract and all five affirmative defenses below it.

MR. PARDO: Subject to Your Honor's ruling on waiver.

THE COURT: Correct, but let's just assume that I am going to let the waiver in for a second.

If any one of those five is a yes, it's a zero as to Count 1.

Then you go to Count 2 and the affirmative defenses are only abandonment and equitable estoppel. If they find on behalf of the defense for those, it's also a zero.

MR. PARDO: Your Honor, I don't believe that equitable estoppel is an absolute defense, and perhaps it's because Your Honor hasn't finalized the instruction that I haven't seen in final form.

So if Your Honor is amenable, I would like to reserve my

04:00PM position on whether yes, it's a zero, until after I see the final verdict form, meaning they could still prove a defense and the jury could still find that some amount of money is arising from the breach of implied covenant, because it's an equitable defense.

THE COURT: The same would be true for abandonment then.

MR. PARDO: Correct, that's exactly right.

THE COURT: So even though they find a yes --

MR. PARDO: The jury would nevertheless award those damages which were arising from their unfair conduct. That's the plaintiff's position on that issue.

MR. NIELSEN: May I respond, Your Honor?

THE COURT: Give me just a second to take my notes down.

What does the plaintiff say with respect to damages? So if you have a breach of contract, you can't double the damages.

MR. PARDO: That is absolutely right, and I want the jury verdict form to be abundantly clear so that there is, one, no suggestion of duplicative recovery and, that each measure of damages would be appropriate for that claim. I want the jury to understand that the damages they award for breach of contract relate to, and only to that breach, if they found that it was a breach and no defenses apply.

THE COURT: It is interesting that you like that because your proposed verdict form doesn't do that. So that's not particularly helpful.

MR. PARDO: Because of the way I proposed the verdict

form having considered the defenses, that's how I would have done.

In light of how Your Honor has ruled on the order, and to which the plaintiff has agreed, this is now what I believe is most appropriate.

THE COURT: No, sir. This has nothing to do with my ruling. In fact, I have agreed with you that certain affirmative defenses have to go to breach of contract and certain affirmative defenses have to go to the breach of implied covenant of good faith and fair dealing.

Please explain to me how your verdict form distinguishes between those two damages.

MR. PARDO: Yes, Your Honor. On the bottom of Page 1, there is a damage line for the breach of this claim. And then at the middle of Page 2, there is a separate damage line for the breach of implied covenant claim.

I want the jury to be able to independently award damages arising from each count. And then, as the plaintiff, we get to elect our remedy upon the entry of final judgment. That's how we avoid duplicative recovery; we tell the jury what damages flow from the breach, what damages flow, if any, from implied covenant. They're not duplicative; they just arise from a separate count under the complaint.

So I believe there needs to be two separate damage line items so that the jury doesn't award duplicative recovery, or else, Your Honor, and I have been in this scenario before, if the

jury finds yes for breach and no defenses apply, yes for implied covenants, some defenses apply, and a damage figure, I don't want the defendants to come in and say, "We don't know the basis of the jury's damage award. How do we know it wasn't under the breach, but not a partial setoff?" I want there to be a line in the sand because the damages that arise and flow from the alleged breach and a damages figure that arise and flow from the alleged breach of implied covenant of good faith and fair dealing.

THE COURT: Let me hear from the defense.

MR. NIELSEN: Your Honor, I think that abandonment and anticipatory breach and equitable estoppel all apply to the breach of covenant and --

THE COURT: I'm sorry. Say that again. You think it's which ones?

MR. NIELSEN: Abandonment, anticipatory breach, and equitable estoppel. If any of those three are granted, both claims are gone.

THE COURT: How is anticipatory breach an equitable defense? He is saying that the only affirmative defenses that apply to 2 are equitable affirmative defenses, because it's an equitable claim.

So, in other words, all five apply to Count 1, assuming waiver is in; and only two apply to Count 2.

MR. NIELSEN: Your Honor, I believe if you prevail on a breach of contract, that there should be no -- based on

affirmative defense, you can't prevail on a breach of implied covenant of good faith. There is no actual --

THE COURT: I don't think you're following, sir.

Let me just try to walk you through it this way.

MR. NIELSEN: Okay.

THE COURT: If the jury finds there is a breach of contract, all right, is it your position that they cannot, therefore, go to the breach of the covenant of good faith and fair dealing?

MR. NIELSEN: No. My position is that if those three affirmative defenses are granted, it extinguishes the breach of implied covenant of good faith and fair dealing.

THE COURT: Wow. Try this again.

If the jury finds there is a breach, it rules in their favor, right, there are no affirmative defenses that apply, you lose all the affirmative defenses on Count 1, they get a verdict, and they get a number on breach of contract.

The jury can still go to a good faith and fair dealing; yes or no?

MR. NIELSEN: I don't believe so, Your Honor.

THE COURT: And your basis for saying that is?

MR. NIELSEN: Because there is only one way to calculate damages under this agreement, and that's based on the terms of this agreement; so it would be duplicative.

THE COURT: Sir, there is a count for the breach of good

faith and fair dealing that I didn't dismiss, right?

MR. NIELSEN: Yes, Your Honor.

THE COURT: I mean, I hear you but I didn't dismiss that count, so I have to send it to the jury.

So the question is: If there is no breach, right -- I think if there is no breach, we're done.

And so if there's no breach -- Mr. Pardo is going to look at case law to see if he can convince me otherwise -- but I think if there's no breach of contract, you don't get to good faith and fair dealing.

And if there is no breach of contract, because one of the affirmative defenses applied, I think we're done.

The question is: The jury finds that there is a breach of contract, it rules against you on the affirmative defenses, the jury can also now consider a second claim for a breach of good faith and fair dealing, and you have some affirmative defenses there, too.

The question is: What affirmative defenses do you have to the good faith and fair dealing count?

Mr. Pardo's position is that you only have -- it's an equitable claim, you only have equitable affirmative defenses. He says it's only abandonment, equitable estoppel. You're telling me anticipatory breach should also go to good faith and fair dealing.

That doesn't sound right to me.

MR. NIELSEN: One second, Your Honor. Let me take a look

at it.

Yes, my position is that if anticipatory breach is found, there cannot be a breach of implied covenant of good faith and fair dealing, Your Honor. I maintain that position. If you read the verdict form --

THE COURT: I'm sorry. Slow down and say that again.

MR. NIELSEN: If the Court could take a look at the proposed verdict form --

THE COURT: I am not looking -- I cannot. I have spent more brain cells trying to figure out what you did in the verdict form. I couldn't understand what either of you were trying to do; so just talk to me, explain to me what you want.

MR. NIELSEN: The first question on the proposed verdict form is: If you find by the greater weight of the evidence that plaintiff breached the contract by clearly and positively indicating (unintelligible) --

MR. CASABIELLE: Slow down.

THE COURT: Sir, I'm done. So I am going to put a verdict form together. You will tell me why it's wrong on Friday --

MR. NIELSEN: Of course, Your Honor.

THE COURT: -- because your verdict form, sir, was -- I literally can't believe that anybody thought I could send that to the jury. Don't take it personally. I don't know what Mr. Pardo was thinking that I was going to send a verdict form that didn't

04:08PM even outline what the affirmative defenses were; so neither were particularly helpful. I will come up with my own.

04:09PM I apologize. I know the holiday is in the middle. Do your best to get your most cogent and specific objections to me. If you have case law for that, give it to me. Like I said, the sentencing should be done around 10:30. I have half an hour before the jury gets here to read your case law, to read your objections, to hear from you so that you know what the instructions are and so that you know, more importantly, what the verdict form will look like.

04:09PM MR. PARDO: How do you want those sent to you, Your Honor; email as opposed to filing?

04:09PM THE COURT: I would rather you file it only because I still get it by email.

04:09PM MR. PARDO: Very well, Your Honor.

04:09PM THE COURT: File it, and I need a record for it anyway.

04:09PM MR. PARDO: Thank you, Your Honor.

04:09PM THE COURT: All right. So anything else on behalf of the plaintiff?

04:09PM MR. PARDO: Nothing on behalf of the plaintiff. Thank you, Your Honor.

04:09PM THE COURT: On behalf of the defendant?

04:09PM MR. NIELSEN: Your Honor, may I just confirm that the jury instructions you want me to submit are abandonment, futility, and waiver?

04:10PM THE COURT: If you want, yes, I would appreciate if you submitted something, I will consider it.

04:10PM I am going to give you back the full set of jury instructions and a verdict form. I would appreciate it if at least no later than by the time I'm done with that sentencing, whatever objections, whatever issues you have are submitted so that I can take some time to look at it. If you get it to me before then -- I wake up at 5:30 in the morning, so if you get it to me before then, I will read them then; but otherwise, I do have that sentencing and I don't multitask during a criminal sentencing for obvious reasons, so.

04:10PM All right. Anything else on behalf of the defendant?

04:10PM MR. NIELSEN: No, Your Honor. Thank you.

04:10PM THE COURT: All right. Thank you very much.

04:10PM MR. CASABIELLE: Thank you, Your Honor.

04:10PM MS. MACKIEWICZ: Thank you, Your Honor.

04:10PM (Recess at 4:10 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 10/1/25

/s/Vernita Allen-Williams
VERNITA ALLEN-WILLIAMS, RMR, FCRR
Official Court Reporter
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
(305) 523-5737

**$**

**$1,000** [2] - 12:6, 25:14
**$100,000** [2] - 10:22, 116:7
**$250** [1] - 99:6
**$30,000** [4] - 60:10, 61:12, 78:7, 98:2
**$300,000** [9] - 9:22, 9:24, 9:25, 10:16, 13:6, 13:11, 13:25, 77:5, 112:8

**'**

**'09** [2] - 65:3, 74:23
**'17** [1] - 145:12
**'21** [2] - 144:1, 145:14

**/**

**/s/Vernita** [1] - 187:22

**0**

**001** [1] - 59:7
**032** [1] - 55:4
**033** [1] - 55:4
**090** [1] - 18:1
**090-1** [2] - 18:1, 18:25
**090-2** [2] - 18:9, 19:2
**090-3** [1] - 19:4

**1**

**1** [21] - 1:4, 1:7, 10:19, 23:5, 65:25, 87:3, 88:13, 112:13, 112:14, 118:11, 119:13, 140:6, 157:10, 158:8, 176:23, 177:7, 179:7, 179:17, 181:12, 182:22, 183:16
**10** [6] - 35:22, 119:10, 119:12, 119:15, 124:22, 130:23
**10/1/25** [1] - 187:22
**100** [12] - 1:18, 13:12, 55:17, 65:10, 65:23, 66:10, 89:4, 90:14, 109:2, 117:21, 118:5, 161:11
**101** [1] - 55:17
**102** [1] - 55:17
**103** [1] - 55:17
**104** [1] - 55:17
**1040** [1] - 19:22
**105** [1] - 55:17
**106** [1] - 55:17
**107** [1] - 55:17
**108** [2] - 2:5, 55:18
**109** [1] - 55:18
**10:11** [1] - 36:2
**10:30** [4] - 48:21, 49:22, 107:17, 186:6
**10:50** [1] - 49:23
**10:57** [1] - 54:14
**11** [2] - 26:18, 131:4
**11.4** [1] - 46:4
**110** [1] - 55:18
**111** [1] - 2:7
**112** [1] - 55:18
**113** [1] - 55:18
**114** [1] - 55:18
**115** [1] - 55:18
**116** [2] - 2:7, 55:18
**117** [1] - 55:18
**118** [2] - 55:18, 102:24
**119** [1] - 55:18
**11:00** [11] - 107:19, 107:21, 124:18, 125:4, 125:17, 127:5, 127:6, 127:18, 127:23, 128:9, 128:20
**12** [4] - 2:10, 67:18, 68:8, 131:7
**120** [1] - 55:18
**1205** [1] - 1:15
**121** [1] - 55:18
**123** [4] - 27:21, 65:14, 84:6, 89:8
**125** [1] - 55:19
**126** [1] - 55:19
**127** [1] - 55:19
**128** [1] - 55:19
**12:00** [1] - 125:6
**12:13** [1] - 105:20
**12:15** [1] - 105:8
**12:16** [1] - 108:10
**12:30** [2] - 108:5, 108:7
**12th** [1] - 74:23
**13** [2] - 68:5, 131:10
**130** [9] - 10:10, 33:12, 33:19, 34:16, 55:19, 57:1, 101:11, 160:2
**14** [5] - 5:22, 68:20, 69:18, 130:16, 131:13
**15** [5] - 45:9, 45:12, 69:8, 69:21, 131:21
**15-day** [1] - 7:24
**15-minute** [1] - 124:22
**158** [3] - 32:3, 32:5, 102:4
**16** [1] - 131:24
**169** [1] - 30:11
**17** [4] - 2:10, 74:4, 97:24, 132:2
**17-and-a-half** [1] - 46:1
**170** [3] - 27:15, 29:7
**172** [1] - 31:5
**175** [5] - 26:15, 26:16, 26:17, 32:22, 32:25
**177** [1] - 33:14
**18** [2] - 130:16, 132:10
**18th** [3] - 12:6, 13:9, 13:11
**19** [2] - 132:13, 160:3
**1958** [1] - 157:20
**1965** [1] - 142:12
**1:00** [1] - 125:6
**1:15** [2] - 105:9, 105:15
**1:22** [1] - 108:11
**1:23** [1] - 108:15
**1:30** [1] - 127:13
**1:42** [1] - 121:25
**1:49** [1] - 125:24
**1:56** [1] - 129:4
**1:57** [1] - 130:6
**1st** [6] - 10:10, 33:12, 33:19, 34:16, 57:2, 101:11

**2**

**2** [23] - 5:18, 5:19, 10:20, 30:7, 60:22, 97:3, 140:6, 140:24, 142:17, 156:13, 157:13, 175:6, 175:7, 175:10, 176:5, 176:8, 176:20, 177:7, 179:4, 179:18, 181:14, 182:20, 182:23
**20** [8] - 31:1, 35:23, 134:19, 135:2, 136:4, 136:5, 136:7, 136:21
**200,000** [1] - 10:1
**2000s** [1] - 29:22
**2005** [2] - 56:21, 56:22
**2006** [16] - 13:19, 20:19, 26:11, 26:21, 56:21, 56:22, 57:8, 59:6, 62:6, 63:21, 63:25, 64:18, 81:3, 89:5, 143:17, 145:8
**2007** [7] - 22:20, 22:24, 23:6, 23:10, 23:19, 23:22, 24:1
**2008** [22] - 6:20, 23:5, 38:14, 63:21, 63:25, 64:18, 65:3, 65:7, 65:13, 65:14, 66:10, 67:9, 68:5, 69:18, 75:9, 75:25, 76:6, 80:2, 96:13, 97:17, 112:13, 112:14
**2009** [15] - 6:21, 19:12, 19:14, 19:20, 27:2, 29:23, 33:2, 33:17, 46:12, 75:2, 75:5, 96:13, 96:21, 97:21, 98:1
**2010** [29] - 6:21, 13:25, 14:15, 15:6, 15:19, 16:1, 16:8, 19:19, 27:12, 27:25, 28:8, 29:19, 30:7, 30:16, 37:21, 39:6, 39:18, 65:7, 75:7, 77:3, 81:19, 82:3, 82:24, 83:3, 83:10, 83:18, 83:22, 98:17, 98:25
**2011** [18] - 19:19, 19:22, 19:23, 20:1, 20:3, 20:15, 20:20, 21:5, 31:13, 37:7, 80:8, 101:14, 103:20, 143:20, 143:25, 144:11, 145:8, 145:12
**2012** [8] - 13:19, 19:20, 80:19, 80:20, 81:3, 84:24, 95:17, 99:21
**2013** [14] - 12:6, 13:9, 13:11, 25:9, 32:9, 32:18, 99:11, 100:20, 101:11, 102:1, 145:9, 145:24, 146:1, 153:3
**2014** [2] - 46:18, 86:1
**2017** [4] - 95:15, 143:23, 143:25, 144:11
**2019** [1] - 103:2
**2021** [20] - 23:6, 23:10, 23:19, 23:22, 24:1, 25:7, 46:24, 95:15, 114:17, 114:20, 115:3, 116:11, 116:24, 117:5, 143:25, 144:2, 144:5, 144:15, 145:6, 145:11
**2025** [1] - 1:4
**2071** [1] - 170:4
**21** [3] - 2:11, 23:6, 136:10
**211** [1] - 1:15
**21st** [1] - 23:10
**22** [2] - 2:3, 138:2
**23** [3] - 138:8, 138:14, 138:16
**24** [1] - 138:25
**24-CV-20631** [1] - 3:2
**24-CV-20631-JB** [1] - 1:2
**247** [1] - 1:7
**25** [6] - 32:14, 102:8, 102:11, 152:15, 152:16, 154:11
**250** [2] - 32:14, 99:6
**26** [1] - 153:15
**2600** [1] - 1:19
**2650** [14] - 38:13, 38:19, 40:14, 43:11, 43:13, 65:11, 65:23, 66:11, 89:4, 90:15, 103:11, 103:15, 118:5, 161:11
**26th** [1] - 103:15
**27** [9] - 22:20, 22:23, 23:6, 23:10, 23:19, 23:22, 24:1, 155:1, 155:2
**28** [2] - 155:3, 155:5
**29** [2] - 134:21, 135:4
**2:00** [3] - 124:25, 125:2, 125:8
**2:30** [3] - 122:8, 124:23, 130:2
**2:41** [1] - 130:7
**2:45** [1] - 105:16
**2nd** [15] - 1:18, 27:22, 32:14, 65:10, 65:14, 65:23, 66:11, 84:7, 89:4, 89:8, 90:14, 102:8, 102:11, 118:5, 161:11

**3**

**3** [9] - 1:6, 51:18, 139:19, 139:21, 139:22, 140:1, 140:3, 140:10, 157:10
**30** [11] - 34:6, 45:8, 60:20, 98:4, 98:16, 129:17, 134:21, 135:4, 136:8, 136:20, 166:21
**30,000** [2] - 98:8
**30-minute** [1] - 129:5
**300** [2] - 116:8
**300,000** [1] - 45:10
**305** [1] - 187:25
**31** [3] - 165:6, 165:19,

165:20
**32** [8] - 55:8, 55:9, 55:10, 98:23, 108:22, 137:25, 138:1, 165:20
**33** [6] - 34:4, 55:11, 137:16, 137:19, 137:24, 138:1
**33.27** [1] - 141:18
**330** [1] - 116:9
**330,000** [1] - 116:9
**33128** [2] - 1:25, 187:25
**33131** [4] - 1:19, 57:2, 65:11, 65:23
**33139** [1] - 1:16
**34** [1] - 167:6
**35** [2] - 55:11, 138:25
**36** [3] - 55:11, 143:2, 154:14
**37** [3] - 152:17, 154:12, 154:13
**38** [1] - 55:11
**39** [1] - 155:1

## 4

**4** [8] - 139:19, 139:21, 139:23, 140:1, 140:3, 140:10, 142:18, 157:10
**4-and-a-half-million-dollar** [1] - 34:2
**400** [2] - 1:24, 187:24
**41** [4] - 15:14, 15:16, 15:18, 31:9
**416** [1] - 155:22
**416.33** [3] - 155:19, 155:24, 156:5
**43** [1] - 76:15
**45** [1] - 125:7
**46** [2] - 16:20, 55:11
**47** [2] - 55:11, 55:12
**48** [2] - 55:11, 55:12
**49** [2] - 55:11, 55:13
**4:00** [2] - 48:19, 49:17
**4:10** [2] - 1:5, 187:17
**4:30** [7] - 48:25, 49:3, 105:13, 105:15, 105:16, 122:13, 122:17
**4:31** [1] - 122:16

## 5

**5** [2] - 2:2, 140:6
**5.7** [1] - 153:3
**50** [1] - 55:13
**51** [1] - 55:13
**52** [1] - 55:13
**523-5737** [1] - 187:25
**53** [1] - 55:13
**54** [1] - 55:13
**55** [2] - 2:11, 55:13
**56** [4] - 2:4, 26:24, 55:13, 96:19
**57** [1] - 55:13
**58** [2] - 55:13, 99:13
**59** [1] - 55:13
**5:30** [1] - 187:8

## 6

**6** [1] - 58:7
**60** [1] - 55:14
**601** [1] - 169:25
**61** [1] - 55:14
**62** [1] - 55:14
**63** [1] - 55:14
**65** [1] - 55:14
**66** [1] - 55:14
**68** [1] - 55:14
**69** [1] - 55:14

## 7

**70** [1] - 55:14
**71** [1] - 55:16
**72** [1] - 55:16
**75** [1] - 55:16
**76** [1] - 55:16
**77** [1] - 100:23
**78** [2] - 22:19, 112:3
**79** [8] - 8:8, 8:12, 8:15, 8:16, 9:13, 9:14, 104:3, 112:20

## 8

**80** [2] - 55:16, 112:20
**83** [9] - 11:17, 11:20, 11:21, 12:1, 12:17, 12:21, 12:22, 24:6, 25:10
**83.......................** **Page** [1] - 2:10
**85** [1] - 55:16
**86** [1] - 2:5
**88** [1] - 55:16
**89** [1] - 55:16
**8:30** [2] - 107:15, 127:3

## 9

**9** [6] - 25:18, 25:22, 25:25, 26:6, 130:17, 133:13
**9.......................** **Page** [1] - 2:11
**90** [5] - 16:18, 17:1, 17:5, 17:7, 17:11
**90-1** [1] - 17:11
**90-46** [3] - 16:19, 17:2, 20:7
**90.......................** **Page** [1] - 2:10
**91** [1] - 55:16
**92** [1] - 55:16
**93** [1] - 55:16
**94** [1] - 55:17
**95** [1] - 55:17
**96** [1] - 55:17
**97** [1] - 55:17
**98** [1] - 55:17
**99** [1] - 55:17
**9:00** [2] - 174:10, 174:15
**9:11** [2] - 1:5, 3:1
**9:13** [1] - 5:3

## A

**a.m** [12] - 1:5, 3:1, 5:3, 36:2, 49:22, 49:23, 54:14, 125:17, 127:18, 128:20, 174:10, 174:15
**abandon** [1] - 163:16
**abandoned** [16] - 39:19, 93:24, 94:5, 115:7, 116:4, 116:7, 116:25, 117:6, 118:21, 118:24, 120:10, 121:1, 140:23, 142:16, 149:22, 151:16
**abandonment** [30] - 37:6, 38:4, 39:16, 47:3, 47:20, 48:1, 48:3, 48:6, 137:3, 139:3, 139:7, 140:17, 140:20, 142:3, 142:9, 142:22, 163:13, 163:21, 164:18, 164:20, 170:25, 173:12, 179:2, 179:19, 180:5, 182:10, 182:15, 184:22, 186:24
**ABCDEFG** [1] - 34:12
**ability** [1] - 146:8
**able** [16] - 5:9, 40:16, 49:16, 63:25, 65:5, 65:7, 69:3, 80:25, 122:4, 122:6, 123:18, 123:24, 128:25, 141:13, 143:11, 181:16
**above-entitled** [1] - 187:20
**absence** [1] - 40:22
**absent** [1] - 10:20
**absolute** [1] - 179:22
**absolutely** [10] - 4:16, 31:21, 50:6, 90:8, 109:23, 114:15, 142:23, 158:9, 167:13, 180:15
**abundantly** [1] - 180:16
**accept** [2] - 148:13, 161:24
**acceptable** [13] - 117:24, 118:3, 118:14, 123:15, 139:1, 139:5, 141:5, 151:20, 152:18, 157:10, 157:12, 165:22, 165:24
**acceptance** [2] - 134:12, 167:10
**accepted** [3] - 48:2, 48:6, 159:17
**accidentally** [2] - 15:10, 16:6
**accommodate** [1] - 122:14
**accomplished** [1] - 166:15
**according** [7] - 6:17, 23:4, 51:25, 118:14, 118:16, 143:23, 179:5
**account** [3] - 51:16, 84:10, 109:4
**accountant** [1] - 97:13
**accounting** [2] - 62:12, 62:20
**accounts** [2] - 20:18, 119:11
**accruing** [1] - 52:2
**accuracy** [1] - 76:25
**accurate** [7] - 68:4, 69:17, 76:24, 140:10, 147:13, 164:8, 187:19
**accurately** [1] - 12:9
**acknowledge** [2] - 13:4, 160:22
**acknowledging** [2] - 13:10, 25:13
**acknowledgment** [1] - 171:11
**acquired** [1] - 57:8
**acquisition** [1] - 57:21
**acquisitions** [1] - 56:24
**act** [2] - 13:19, 63:5
**acted** [2] - 10:20, 118:16
**acting** [1] - 109:6
**action** [3] - 23:23, 48:1, 94:23
**actions** [1] - 111:7
**active** [1] - 16:4
**activity** [3] - 21:24, 39:9, 153:25
**actual** [3] - 40:1, 57:18, 183:2
**add** [2] - 172:12
**added** [3] - 107:9, 140:10, 156:11
**adding** [1] - 132:18
**additional** [2] - 140:4, 166:2
**address** [62] - 27:21, 31:14, 31:15, 31:17, 31:19, 31:25, 32:10, 32:13, 32:15, 33:12, 36:8, 36:9, 36:11, 36:19, 36:20, 38:8, 38:13, 38:15, 38:19, 38:22, 40:14, 40:15, 41:2, 41:3, 41:8, 41:23, 42:2, 42:16, 42:23, 42:25, 43:1, 43:6, 43:11, 43:13, 43:22, 46:14, 65:10, 67:25, 68:2, 90:25, 98:21, 102:9, 102:11, 118:10, 124:4, 148:20, 148:22, 148:24, 159:19, 160:11, 161:20, 163:7, 163:8, 163:12, 163:17, 163:18, 164:2, 164:5, 164:10, 166:19
**addresses** [1] - 38:20
**addressing** [1] - 124:4
**adduced** [1] - 159:8
**administration** [1] - 56:24
**administrative** [3] - 145:15, 147:19, 149:16
**administratively** [13] - 15:10, 16:6, 16:15, 41:20, 41:21, 45:19, 47:23, 48:5, 84:10, 144:7, 146:7, 146:16, 148:11
**admissibility** [1] - 169:20
**admit** [3] - 55:3, 78:9, 78:12
**admitted** [16] - 5:19,

11:14, 15:15, 16:19, 17:6, 26:5, 54:19, 55:22, 68:20, 69:8, 71:2, 74:5, 74:6, 76:16, 133:3, 169:19
**ADMITTED** [1] - 2:9
**advance** [1] - 110:6
**affairs** [4] - 152:3, 152:4, 152:8, 153:7
**affect** [1] - 161:24
**afford** [1] - 106:15
**afforded** [3] - 162:6, 162:9, 162:18
**afternoon** [11] - 86:13, 86:14, 105:10, 105:11, 107:22, 121:22, 122:10, 128:14, 169:4, 169:5, 173:19
**agent** [10] - 42:11, 60:15, 87:8, 146:9, 146:20, 147:24, 148:18, 148:20, 148:23, 159:15
**aggressive** [1] - 110:25
**ago** [1] - 166:21
**agree** [15] - 10:7, 44:1, 94:10, 117:21, 134:4, 137:5, 142:21, 151:16, 151:23, 152:6, 168:25, 169:1, 175:2, 176:19, 179:9
**agreed** [11] - 103:22, 104:22, 109:16, 126:14, 132:25, 133:11, 146:4, 160:25, 167:13, 181:3, 181:6
**agreeing** [1] - 161:23
**agreement** [66] - 7:18, 8:4, 36:11, 37:2, 37:20, 39:4, 39:5, 39:7, 39:15, 39:19, 40:2, 40:3, 40:8, 41:8, 42:2, 47:8, 47:19, 48:10, 50:4, 50:10, 51:7, 51:10, 51:11, 52:9, 59:20, 59:25, 60:2, 60:10, 63:7, 63:18, 66:8, 66:25, 76:6, 86:24, 89:24, 90:2, 90:9, 91:17, 91:18, 91:19, 92:22, 95:13, 103:23, 104:24, 113:17, 113:20, 115:21, 115:24, 116:24, 131:19, 133:7, 133:17, 133:22, 137:22, 142:16, 148:25, 149:12, 150:4, 153:23, 161:21, 164:9, 171:21, 183:23, 183:24
**Agreement** [45] - 7:23, 8:2, 40:12, 40:19, 45:8, 45:21, 46:14, 51:9, 51:19, 59:18, 61:17, 62:1, 63:7, 71:4, 76:3, 86:25, 87:4, 87:18, 88:18, 88:21, 88:24, 92:6, 92:17, 92:19, 93:5, 93:9, 93:12, 93:15, 93:19, 93:24, 94:5, 113:11, 114:12, 115:7, 116:3, 117:14, 118:4, 118:20, 118:23, 119:10, 119:12, 134:7, 160:13, 168:13, 168:19
**ahead** [8] - 5:25, 17:15, 35:22, 35:25, 108:20, 114:7, 120:19, 122:24
**ahold** [1] - 40:21
**alcohol** [1] - 109:17
**alive** [4] - 27:3, 27:10, 97:5, 97:8
**allege** [2] - 144:1, 144:14
**alleged** [2] - 182:6, 182:7
**ALLEN** [2] - 1:22, 187:22
**Allen** [1] - 187:22
**ALLEN-WILLIAMS** [2] - 1:22, 187:22
**Allen-Williams** [1] - 187:22
**allow** [1] - 146:24
**allowed** [6] - 103:20, 104:20, 123:22, 146:19, 146:23
**allowing** [2] - 50:23, 115:14
**almost** [3] - 53:22, 87:22, 105:8
**alone** [1] - 163:22
**alter** [1] - 44:12
**alternative** [3] - 41:23, 118:4, 168:23
**altogether** [2] - 162:3, 172:20
**amenable** [3] - 147:12, 147:15, 179:25
**amend** [2] - 134:15, 142:14
**amount** [15] - 24:20, 25:15, 74:13, 77:4, 78:4, 79:10, 98:6, 98:8, 128:12, 149:14, 167:9, 168:16, 168:20, 170:2, 180:3
**amounts** [2] - 79:7, 79:25
**analogy** [1] - 111:2
**analysis** [1] - 178:21
**annual** [6] - 27:2, 34:25, 35:3, 96:14, 97:1, 143:20
**answer** [15] - 4:3, 6:25, 7:2, 7:3, 7:12, 16:10, 25:3, 76:13, 77:19, 77:21, 110:21, 113:8, 120:15, 149:2, 178:10
**answered** [1] - 114:8
**anticipatory** [9] - 137:4, 154:17, 177:13, 177:14, 182:11, 182:15, 182:18, 184:23, 185:2
**ANTONIO** [1] - 1:17
**anyway** [5] - 7:2, 50:6, 126:21, 129:3, 186:16
**apologies** [5] - 47:25, 105:25, 108:12, 126:1, 155:18
**apologize** [8] - 3:23, 12:11, 21:2, 31:8, 92:15, 102:19, 162:21, 186:3
**appear** [1] - 155:20
**APPEARANCES** [1] - 1:11
**appearances** [1] - 3:4
**applied** [3] - 170:4, 178:22, 184:12
**apply** [16] - 24:16, 157:3, 162:23, 178:11, 178:15, 178:22, 178:25, 179:8, 180:21, 182:1, 182:2, 182:11, 182:20, 182:22, 182:23, 183:15
**applying** [1] - 47:14
**appreciate** [6] - 101:24, 105:24, 128:18, 187:1, 187:4
**approach** [3] - 18:18, 166:3, 166:11
**appropriate** [15] - 52:13, 97:16, 109:25, 129:16, 135:6, 135:8, 135:19, 142:8, 147:16, 154:8, 157:18, 167:8, 167:23, 180:18, 181:4
**April** [8] - 27:25, 28:8, 29:18, 30:7, 30:15, 33:17, 63:21, 96:20
**area** [1] - 115:11
**argue** [20] - 9:6, 9:9, 41:9, 47:20, 50:3, 145:17, 146:17, 149:20, 167:4, 167:9, 168:4, 169:8, 169:9, 169:20, 170:23, 170:24, 171:8, 171:12, 175:24
**argued** [2] - 51:2, 150:20
**arguing** [6] - 50:6, 51:16, 155:14, 156:17, 161:17, 163:2
**argument** [61] - 16:10, 36:22, 38:6, 38:25, 39:24, 41:2, 41:6, 41:16, 41:25, 42:7, 42:15, 42:25, 43:9, 45:1, 45:23, 46:9, 46:20, 47:3, 47:21, 50:1, 121:22, 122:23, 123:21, 123:23, 123:25, 126:5, 126:6, 126:13, 128:13, 135:20, 139:25, 140:11, 145:1, 146:18, 147:2, 148:6, 149:2, 150:19, 153:11, 153:23, 155:8, 157:2, 159:12, 160:4, 164:20, 164:21, 167:6, 169:15, 170:12, 170:25, 171:4, 171:24, 172:4, 172:8, 172:21, 173:1, 176:22
**arguments** [15] - 30:21, 37:12, 37:16, 37:23, 39:23, 45:4, 47:4, 106:9, 122:11, 123:2, 124:5, 124:19, 126:22, 127:25, 128:8
**arise** [3] - 181:21, 182:6, 182:7
**arising** [7] - 23:23, 24:2, 24:20, 178:14, 180:3, 180:9, 181:17
**arose** [1] - 60:17
**arrived** [2] - 5:8, 46:13
**assert** [1] - 8:23
**assertion** [2] - 8:3, 38:15
**asset** [6] - 113:3, 113:10, 152:9, 153:15, 153:20, 153:22
**assets** [3] - 31:2, 81:6, 83:18
**assign** [1] - 10:7
**assigned** [2] - 95:22, 156:16
**assignment** [19] - 9:21, 41:18, 57:18, 112:25, 114:10, 116:6, 119:1, 149:4, 149:5, 149:7, 149:10, 156:14, 156:21, 156:22, 169:18, 169:21, 170:12, 170:16, 170:24
**assist** [1] - 63:8
**assistance** [1] - 58:5
**associated** [2] - 43:5, 43:22
**assume** [7] - 15:8, 77:14, 110:7, 110:11, 161:14, 177:21, 179:14
**assuming** [2] - 103:15, 182:22
**assure** [1] - 71:22
**AT&T** [1] - 32:16
**attached** [4] - 10:13, 11:1, 11:20, 96:25
**attachment** [2] - 11:3, 11:7
**attachments** [1] - 33:8
**attempt** [4] - 40:18, 40:22, 41:13, 146:14
**attendant** [2] - 79:5, 79:6
**attention** [3] - 6:1, 23:4, 48:24
**atypical** [1] - 126:17
**audit** [1] - 79:9
**August** [18] - 22:20, 23:6, 23:10, 23:19,

23:22, 24:1, 25:6, 31:13, 33:2, 69:18, 114:17, 116:24, 117:5
**authority** [6] - 8:3, 141:17, 146:8, 147:24, 148:13, 162:14
**authorize** [2] - 31:19, 32:15
**automatic** [2] - 14:6, 120:12
**available** [2] - 58:8, 122:15
**Ave** [2] - 102:8, 102:11
**Avenue** [6] - 1:24, 27:22, 65:14, 84:7, 89:8, 187:24
**avoid** [2] - 147:14, 181:19
**award** [5] - 180:8, 180:19, 181:16, 181:24, 182:4
**aware** [22] - 46:24, 63:15, 63:17, 66:7, 66:25, 73:21, 74:16, 74:21, 74:24, 76:2, 81:7, 81:8, 83:21, 85:12, 93:10, 99:24, 99:25, 100:4, 100:6, 164:1

## B

**backdoor** [1] - 52:11
**backup** [1] - 103:3
**bad** [3] - 12:11, 26:12, 139:24
**bank** [7] - 20:18, 74:14, 83:20, 84:9, 100:2, 109:4, 119:11
**Bar** [5] - 108:5, 141:15, 155:22, 156:2, 156:4
**Bar's** [1] - 42:12
**BART** [2] - 2:6, 111:22
**Bart** [56] - 3:15, 10:13, 23:18, 23:20, 23:23, 25:12, 46:24, 47:2, 47:11, 49:7, 57:13, 57:15, 57:16, 58:9, 58:20, 59:19, 65:16, 65:22, 66:2, 67:9, 67:12, 68:25, 69:15, 73:22, 74:2, 74:22, 75:14, 77:6, 78:10, 78:12, 80:22, 80:23, 84:21, 86:19, 89:16, 89:18, 89:25, 90:14, 90:19, 90:21, 90:22, 91:16, 92:15, 92:20, 95:18, 97:18, 98:1, 98:3, 98:25, 99:8, 99:10, 103:2, 106:2, 109:4, 111:17, 159:18
**Bart's** [2] - 68:2, 68:5
**base** [1] - 84:18
**based** [9] - 14:12, 36:21, 135:10, 152:11, 157:25, 159:4, 159:7, 182:25, 183:23
**basis** [11] - 7:25, 68:10, 80:16, 82:9, 85:16, 94:12, 114:23, 132:4, 132:23, 182:3, 183:21
**Bates** [5] - 16:19, 17:2, 17:11, 18:2, 18:25
**Bates-stamped** [2] - 16:19, 18:25
**Bauza** [1] - 3:16
**BB&T** [3] - 95:17, 95:22, 99:21
**beach** [1] - 126:25
**Beach** [1] - 1:16
**beautiful** [1] - 126:23
**became** [2] - 100:6, 101:15
**Becerra** [2] - 1:23, 3:3
**BECERRA** [1] - 1:9
**become** [3] - 29:20, 76:11, 100:4
**BEFORE** [1] - 1:9
**began** [2] - 20:19, 145:19
**begin** [3] - 127:8, 128:3, 130:16
**beginning** [2] - 14:7, 17:25
**begins** [1] - 139:3
**behalf** [38] - 3:15, 4:21, 13:20, 62:22, 63:5, 87:10, 91:11, 92:9, 93:4, 93:7, 93:11, 93:14, 93:16, 93:18, 93:21, 93:22, 94:3, 98:10, 98:18, 99:22, 100:10, 101:18, 122:9, 125:19, 125:21, 138:13, 145:4, 151:19, 152:6, 152:17, 165:21, 175:21, 177:24, 179:19, 186:18, 186:20, 186:22, 187:12
**behind** [1] - 128:6
**belief** [6] - 10:18, 52:1, 114:17, 117:2, 117:5, 154:1
**beliefs** [3] - 116:11, 117:7, 117:10
**believes** [2] - 135:6, 147:14
**belonged** [1] - 178:17
**belonging** [1] - 147:20
**belongs** [1] - 171:1
**below** [1] - 179:12
**benefit** [2] - 41:19, 99:1
**best** [8] - 76:14, 78:22, 83:19, 85:9, 93:7, 106:11, 158:9, 186:4
**better** [3] - 64:7, 72:5, 108:3
**between** [27] - 10:12, 23:6, 23:10, 23:19, 23:22, 24:1, 28:7, 29:18, 41:9, 59:18, 64:23, 66:25, 75:16, 88:16, 95:15, 97:14, 101:23, 106:11, 116:24, 123:22, 143:25, 144:11, 145:8, 168:2, 168:21, 176:1, 181:11
**big** [2] - 124:20, 174:24
**bill** [1] - 102:8
**billing** [3] - 32:9, 32:15, 101:10
**bills** [2] - 32:10, 63:3
**binding** [2] - 135:20, 135:22
**bit** [4] - 57:17, 75:18, 104:4, 115:11
**black** [1] - 7:17
**bless** [1] - 87:4
**block** [1] - 27:19
**blurt** [1] - 110:14
**borrow** [1] - 23:17
**borrower** [3] - 10:7, 10:11, 10:12
**borrowing** [1] - 9:22
**bottom** [8] - 18:2, 27:16, 28:3, 28:25, 51:18, 88:3, 181:12
**bound** [1] - 10:6
**box** [1] - 79:17
**Boyd** [1] - 1:18
**brain** [1] - 185:10
**breach** [80] - 36:25, 39:2, 45:5, 117:7, 134:18, 134:20, 135:9, 137:4, 137:6, 137:10, 137:14, 144:1, 149:10, 154:17, 175:2, 175:5, 175:6, 175:11, 175:12, 175:19, 175:23, 176:1, 176:2, 176:3, 176:4, 176:9, 176:12, 176:16, 176:17, 176:19, 176:23, 176:24, 176:25, 177:13, 177:14, 178:11, 178:13, 178:17, 178:23, 178:25, 179:12, 180:4, 180:14, 180:19, 180:20, 180:21, 181:7, 181:8, 181:13, 181:15, 181:20, 182:1, 182:4, 182:6, 182:7, 182:11, 182:15, 182:18, 182:25, 183:1, 183:6, 183:8, 183:11, 183:14, 183:17, 183:25, 184:5, 184:6, 184:7, 184:9, 184:11, 184:13, 184:15, 184:23, 185:2, 185:3
**breached** [2] - 117:1, 185:15
**break** [15] - 35:22, 48:25, 49:3, 105:11, 105:15, 105:16, 107:6, 107:18, 124:9, 124:22, 129:5, 134:1
**breakfast** [2] - 124:20, 127:10
**breaking** [1] - 87:25
**breath** [2] - 4:14
**brief** [16] - 8:11, 8:19, 11:25, 15:13, 15:21, 22:14, 32:21, 37:9, 64:11, 83:16, 86:7, 99:18, 104:8, 105:5, 116:16, 167:3
**bring** [18] - 5:2, 20:9, 53:1, 54:13, 60:22, 67:17, 76:15, 88:5, 94:7, 108:13, 108:21, 112:3, 112:19, 125:11, 125:23, 128:24, 149:20, 167:22
**bringing** [3] - 149:9, 154:8, 167:24
**broader** [1] - 44:1
**brought** [4] - 47:6, 95:8, 150:9, 170:21
**buckets** [1] - 45:8
**building** [4] - 27:23, 28:1, 46:18, 91:4
**Building** [10] - 28:1, 31:18, 89:7, 89:10, 91:6, 102:14, 102:22, 103:7, 103:9, 103:10
**built** [1] - 30:23
**bunch** [1] - 151:7
**business** [41] - 24:13, 32:18, 37:7, 37:21, 39:6, 39:18, 39:20, 45:18, 46:25, 47:1, 48:4, 48:9, 48:11, 71:6, 71:8, 71:9, 71:10, 71:18, 80:25, 84:8, 86:1, 118:1, 119:5, 119:6, 119:8, 119:20, 119:23, 119:24, 120:3, 147:19, 147:21, 149:17, 149:24, 153:7, 153:24, 156:9, 168:22, 169:3
**but..** [2] - 47:21, 168:24
**BY** [96] - 1:21, 5:15, 5:21, 7:11, 9:17, 12:3, 12:24, 15:2, 15:22, 16:21, 17:8, 17:14, 18:23, 21:1, 21:11, 22:22, 24:7, 25:5, 26:10, 26:20, 27:1, 27:8, 27:18, 29:15, 30:14, 31:12, 32:8, 33:1, 33:10, 33:16, 34:1, 56:14, 58:4, 59:14, 60:9, 60:16, 60:24, 62:19, 64:17, 66:1, 66:6, 67:8, 67:22, 68:21, 69:10, 73:13, 74:8, 75:24, 76:10, 76:19, 78:2, 78:16, 81:13, 82:1, 82:16, 83:2, 83:9, 83:17, 84:1, 84:20, 85:20, 86:12, 87:6, 87:15, 88:15, 89:3, 89:22, 90:20, 94:2, 94:9, 96:22, 99:17, 100:25, 101:4, 102:6, 103:1, 104:9, 104:13, 104:18, 108:24, 109:10, 110:20, 111:5, 111:24,

112:4, 112:21, 113:7, 113:14, 114:9, 114:16, 115:2, 115:19, 116:1, 116:22, 119:14, 120:22

## C

**cafe** [1] - 128:22
**cake** [1] - 164:4
**calculate** [4] - 47:10, 52:6, 52:15, 183:22
**calculated** [1] - 52:8
**calculating** [1] - 40:2
**calculation** [5] - 47:9, 50:16, 51:5, 52:12, 52:24
**calendar** [1] - 124:16
**cameras** [1] - 79:21
**candor** [1] - 170:9
**cannot** [8] - 13:12, 14:4, 47:18, 48:10, 155:19, 183:7, 185:3, 185:9
**capable** [3] - 43:12, 78:13, 78:20
**capital** [12] - 46:4, 52:1, 60:19, 81:6, 93:4, 93:8, 118:18, 145:7, 145:9, 145:10, 146:18, 153:3
**car** [1] - 78:25
**care** [3] - 41:3, 97:13, 124:10
**career** [1] - 29:22
**careful** [1] - 52:19
**carefully** [1] - 50:5
**carryovers** [1] - 19:20
**cars** [1] - 79:10
**CASABIELLE** [68] - 1:17, 3:18, 4:24, 5:12, 5:15, 5:18, 5:21, 7:11, 8:8, 8:13, 9:13, 9:16, 9:17, 11:11, 11:17, 11:19, 11:24, 12:1, 12:3, 12:17, 12:23, 12:24, 14:24, 15:1, 15:2, 15:12, 15:14, 15:17, 15:22, 16:18, 16:21, 17:1, 17:4, 17:8, 17:14, 18:13, 18:15, 18:18, 18:22, 18:23, 21:1, 21:11, 22:7, 22:12, 22:15, 29:5, 29:8, 38:10, 59:10, 71:22, 73:10, 123:3, 123:17, 130:4, 138:7, 139:20, 139:24, 152:16, 154:10, 154:15, 155:11, 158:20, 158:23, 158:25, 166:14, 166:17, 185:17, 187:15
**Casabielle** [7] - 3:15, 4:6, 4:23, 5:10, 71:20, 72:6, 173:1
**Casabielle's** [1] - 172:17
**CASE** [1] - 1:2
**Case** [1] - 3:2
**case** [59] - 9:8, 35:21, 44:14, 44:22, 47:16, 48:13, 50:14, 50:20, 50:24, 51:24, 52:5, 52:14, 71:3, 72:24, 105:18, 105:19, 106:1, 106:6, 106:14, 108:2, 119:18, 121:16, 121:18, 124:7, 126:3, 126:4, 126:7, 126:17, 128:4, 128:19, 134:13, 135:10, 135:20, 135:23, 136:17, 140:21, 142:7, 142:12, 142:19, 143:24, 146:8, 146:12, 147:8, 147:25, 149:22, 151:11, 157:20, 161:17, 162:7, 164:8, 164:12, 175:16, 176:15, 176:16, 178:5, 184:8, 186:5, 186:7
**cases** [2] - 126:15
**cash** [6] - 45:25, 46:2, 46:3, 51:8, 51:13, 78:25
**catch** [2] - 79:23, 79:25
**caused** [1] - 14:19
**cc** [1] - 74:20
**ceased** [3] - 15:6, 16:8, 20:20
**cells** [1] - 185:10
**Central** [1] - 10:9
**central** [4] - 33:18, 34:2, 57:5, 136:15
**certain** [15] - 10:9, 10:12, 36:5, 42:23, 44:10, 73:22, 79:21, 90:8, 90:10, 162:7, 163:7, 163:10, 164:1, 181:6, 181:7
**certainly** [15] - 89:14, 89:16, 89:18, 90:25, 91:20, 97:14, 99:11, 100:12, 102:17, 102:21, 105:1, 115:9, 123:9, 166:22, 169:5
**certainty** [5] - 40:4, 46:17, 47:18, 92:7, 117:22
**certify** [1] - 187:19
**cetera** [2] - 146:10, 170:14
**chance** [5] - 47:20, 104:14, 152:21, 153:12, 173:21
**change** [7] - 31:19, 31:25, 64:25, 65:2, 75:10, 75:12, 164:1
**changed** [5] - 27:13, 46:18, 46:19, 91:1, 91:3
**changes** [1] - 101:5
**changing** [1] - 32:15
**character** [1] - 29:17
**characterize** [1] - 29:17
**charge** [17] - 63:23, 107:2, 107:9, 122:4, 122:6, 123:12, 123:13, 123:23, 125:12, 125:13, 126:12, 126:16, 126:17, 127:7, 142:24
**charged** [2] - 142:21, 162:14
**charging** [1] - 122:10
**check** [7] - 12:6, 12:12, 12:25, 13:8, 16:3, 27:3, 79:18
**checks** [4] - 12:18, 13:10, 78:24, 79:19
**chief** [2] - 47:17, 50:25
**choose** [1] - 106:3
**chose** [1] - 50:24
**chunks** [1] - 10:2
**church** [1] - 4:12
**Circuit** [3] - 135:10, 135:20, 135:23
**circumstances** [2] - 39:17, 149:23
**citation** [13] - 141:9, 141:19, 141:22, 141:24, 142:2, 142:11, 155:4, 156:5, 157:16, 157:24, 158:9, 158:16, 158:17
**cite** [4] - 140:20, 141:17, 143:4, 147:17
**cited** [2] - 158:14, 165:12
**citing** [2] - 142:12
**City** [2] - 95:8, 95:11
**civil** [2] - 126:15, 126:17
**claim** [13] - 45:13, 142:15, 149:9, 149:10, 161:25, 163:25, 178:21, 180:18, 181:13, 181:15, 182:21, 184:15, 184:21
**claims** [1] - 182:17
**clarification** [4] - 101:24, 147:13, 154:10, 172:12
**clarify** [1] - 172:2
**clean** [1] - 166:15
**clear** [10] - 4:11, 29:20, 51:11, 150:7, 160:13, 164:9, 169:24, 172:3, 175:20, 180:16
**clearly** [6] - 7:24, 72:17, 127:24, 135:8, 171:2, 185:15
**clerical** [1] - 138:10
**client** [17] - 44:18, 60:14, 71:24, 72:10, 105:5, 122:13, 144:5, 144:12, 144:15, 150:2, 150:3, 151:1, 163:18, 167:25, 168:2, 171:2, 171:18
**client's** [2] - 122:24, 150:12
**close** [8] - 84:9, 86:21, 86:23, 107:24, 122:6, 123:12, 123:13, 124:25
**closed** [5] - 119:11, 126:3, 127:24, 129:15, 150:18
**closely** [1] - 52:4
**closer** [4] - 7:7, 75:18, 105:13, 105:15
**closing** [32] - 50:5, 50:8, 106:9, 108:2, 121:22, 122:6, 122:7, 122:11, 123:1, 123:5, 123:23, 123:25, 124:4, 124:19, 125:5, 125:6, 126:5, 126:6, 126:22, 128:8, 145:16, 152:22, 161:13, 166:17, 171:9, 171:12, 171:24, 172:17, 172:19, 172:20, 174:12
**closings** [4] - 122:8, 124:21, 127:11, 172:1
**cocounsel** [14] - 3:10, 15:13, 15:21, 22:8, 22:14, 32:21, 64:11, 83:16, 86:4, 86:7, 105:5, 116:14, 116:16, 123:8
**coffee** [1] - 36:1
**cogent** [1] - 186:4
**coherent** [2] - 123:21, 123:24
**collateral** [17] - 9:21, 9:24, 114:10, 148:15, 149:4, 149:5, 149:7, 150:17, 156:21, 169:18, 169:23, 169:25, 170:1, 170:12, 170:16, 170:17, 171:13
**collateralizing** [2] - 113:3, 113:10
**collect** [3] - 69:4, 79:4, 123:19
**collected** [6] - 64:23, 75:17, 79:7, 79:9, 79:16, 79:17
**collecting** [1] - 62:10
**Colletti's** [1] - 46:1
**Colonnelli** [1] - 1:18
**column** [2] - 33:23, 34:7
**coming** [3] - 110:23, 127:9, 155:20
**comment** [2] - 4:9, 174:25
**commented** [1] - 97:4
**comments** [2] - 96:25, 97:10
**commitments** [1] - 92:25
**communicate** [6] - 31:20, 65:15, 65:20, 85:24, 89:23, 90:1
**communicated** [1] - 33:17
**communicating** [5] - 31:13, 44:8, 97:21, 98:25, 99:10
**communication** [1] - 31:22
**community** [1] - 124:11

**companies** [2] - 97:4, 97:7
**company** [29] - 9:23, 15:24, 16:16, 29:25, 58:11, 70:19, 70:21, 71:18, 78:25, 83:10, 97:3, 101:8, 143:6, 143:18, 143:21, 146:2, 146:3, 146:7, 146:16, 146:20, 147:2, 150:4, 150:6, 150:21, 151:1, 151:6, 151:17, 152:3
**company's** [2] - 20:23, 152:10
**competently** [1] - 40:16
**complaint** [3] - 148:2, 159:23, 181:22
**complete** [1] - 51:14
**completely** [8] - 42:15, 44:9, 46:18, 116:25, 148:18, 173:6, 175:23, 178:6
**complied** [3] - 37:1, 39:3, 149:11
**comply** [5] - 37:3, 37:20, 39:7, 39:15, 155:12
**composite** [1] - 32:9
**compound** [1] - 118:8
**compounding** [2] - 40:2, 47:11
**computer** [1] - 54:23
**conceded** [3] - 40:17, 45:24, 161:9
**conceivable** [1] - 92:4
**Concept** [6] - 95:1, 95:3, 100:20, 101:7, 101:8, 101:15
**conclude** [3] - 38:22, 46:15, 47:19
**conclusion** [5] - 133:18, 133:20, 151:5, 162:7, 172:19
**conclusively** [1] - 118:2
**condition** [6] - 136:14, 136:18, 136:25, 137:2, 137:4, 160:12
**conduct** [6] - 48:10, 152:3, 153:7, 178:14, 180:9
**conducted** [1] - 168:22
**conducting** [1] - 174:16
**confer** [15] - 11:25, 15:13, 15:21, 22:8, 22:14, 32:21, 64:11, 71:20, 83:16, 86:3, 86:7, 104:8, 105:5, 116:13, 116:16
**conference** [17] - 8:21, 9:11, 69:24, 73:11, 107:10, 109:13, 110:18, 122:4, 122:5, 122:6, 122:10, 123:23, 125:12, 125:13, 126:13, 126:16, 126:17
**conferences** [1] - 126:16
**conferred** [1] - 106:24
**confident** [1] - 92:4
**confidential** [1] - 18:5
**confirm** [3] - 22:8, 166:15, 186:23
**confuse** [2] - 143:14, 147:8
**confused** [2] - 133:23, 150:25
**confusing** [10] - 20:21, 140:22, 141:4, 147:6, 148:4, 148:5, 148:17, 151:14, 158:15, 171:7
**confusion** [3] - 147:11, 147:14, 161:13
**connect** [1] - 161:25
**connection** [1] - 97:19
**consequences** [1] - 81:8
**consider** [5] - 86:1, 113:22, 136:17, 184:15, 187:2
**consideration** [3] - 134:12, 162:10, 165:4
**considered** [1] - 181:1
**considers** [1] - 114:1
**consistent** [4] - 34:22, 101:13, 147:16, 170:9
**consistently** [1] - 137:15
**consists** [1] - 12:18
**constituted** [1] - 92:19
**consult** [1] - 31:24
**contact** [4] - 30:3, 67:10, 73:15, 89:25
**contacted** [1] - 73:22
**contained** [1] - 77:1
**contemplate** [1] - 40:18
**contemplated** [3] - 43:21, 63:18, 145:5
**contemplates** [1] - 156:11
**contend** [3] - 144:12, 155:7, 167:9
**contending** [1] - 146:13
**contention** [1] - 154:1
**contentious** [1] - 31:3
**contents** [1] - 28:6
**context** [4] - 17:13, 140:15, 153:21, 170:11
**continue** [12] - 5:11, 7:10, 9:12, 14:15, 19:11, 19:17, 73:12, 77:21, 95:3, 95:5, 133:14, 174:21
**continued** [8] - 14:14, 80:13, 80:15, 94:12, 94:17, 95:1, 97:17, 101:15
**CONTINUED** [1] - 5:14
**Continued** [1] - 2:2
**contract** [73] - 10:14, 36:25, 37:11, 38:1, 38:8, 38:12, 39:2, 42:16, 42:22, 44:11, 44:12, 44:15, 44:18, 45:5, 45:7, 45:12, 46:2, 48:7, 50:3, 57:11, 117:1, 117:6, 120:25, 133:1, 133:2, 133:8, 133:10, 133:19, 133:22, 133:23, 134:2, 134:7, 134:18, 134:20, 135:9, 137:15, 139:8, 143:17, 148:3, 148:19, 149:22, 152:8, 154:6, 156:23, 160:9, 160:16, 163:12, 167:14, 168:2, 168:12, 170:3, 175:3, 175:12, 176:1, 176:2, 176:12, 176:16, 176:24, 176:25, 178:13, 178:17, 179:12, 180:14, 180:19, 181:7, 182:25, 183:7, 183:17, 184:9, 184:11, 184:14, 185:15
**contracts** [2] - 147:1, 149:9
**contractual** [4] - 147:20, 149:17, 149:20, 150:6
**contradict** [1] - 135:23
**contradictory** [1] - 142:15
**contradicts** [2] - 140:24, 144:10
**contrary** [4] - 171:8, 172:8, 172:21, 175:16
**contribute** [1] - 60:17
**contribution** [4] - 45:9, 145:9, 145:10, 153:3
**contributions** [6] - 40:3, 52:2, 60:19, 78:20, 81:6, 145:8
**control** [1] - 29:24
**conversation** [3] - 30:18, 30:20, 30:21
**conversations** [1] - 74:22
**convince** [1] - 184:8
**cooperated** [1] - 95:24
**cooperating** [1] - 96:3
**copied** [2] - 31:22, 33:2
**copies** [1] - 11:20
**copy** [12] - 10:13, 11:22, 12:12, 18:11, 18:14, 26:1, 97:22, 161:18, 161:20, 161:24, 166:6, 166:15
**copying** [3] - 26:21, 98:9, 99:10
**corollary** [1] - 41:16
**Corp** [1] - 80:22
**CORPORATION** [1] - 1:6
**Corporation** [2] - 3:3, 58:11
**Corporation's** [1] - 58:13
**Corporations** [1] - 96:15
**correct** [117] - 7:13, 8:18, 11:3, 13:17, 13:18, 14:2, 14:8, 14:9, 14:20, 21:7, 42:5, 42:10, 43:3, 43:7, 43:13, 47:25, 55:8, 86:19, 87:1, 87:2, 88:21, 88:24, 88:25, 89:5, 89:6, 89:8, 89:10, 90:15, 91:4, 91:7, 91:9, 91:12, 91:13, 91:23, 94:14, 94:18, 94:19, 94:22, 95:2, 95:6, 95:7, 95:9, 95:10, 95:18, 95:19, 95:25, 96:4, 96:7, 96:23, 97:1, 97:5, 97:8, 97:11, 97:15, 97:19, 97:22, 97:23, 98:11, 98:12, 98:21, 98:22, 99:8, 99:9, 99:11, 100:13, 100:21, 101:11, 101:16, 101:17, 102:2, 102:10, 102:22, 103:7, 103:22, 105:2, 106:5, 115:5, 116:25, 117:13, 117:16, 120:2, 120:5, 120:11, 122:18, 132:18, 132:19, 132:21, 132:22, 134:3, 136:11, 136:12, 137:18, 138:23, 139:4, 139:9, 139:14, 139:17, 142:25, 143:22, 144:16, 145:25, 147:4, 150:23, 151:10, 152:2, 155:4, 173:25, 175:4, 176:6, 176:21, 177:9, 178:2, 178:3, 179:5, 179:6, 179:14, 180:6
**correspondence** [3] - 67:12, 85:14, 102:2
**costs** [2] - 51:15, 51:17
**counsel** [18] - 3:4, 4:20, 11:21, 11:25, 29:5, 36:3, 55:20, 69:25, 88:9, 127:25, 135:16, 137:5, 140:9, 167:17, 170:13, 170:18, 171:22, 178:2
**count** [9] - 79:18, 130:16, 175:2, 175:3, 181:17, 181:21, 183:25, 184:4, 184:19
**Count** [8] - 175:6, 179:4, 179:7, 179:17, 179:18, 182:22, 182:23, 183:16
**County** [2] - 95:20, 96:17
**couple** [1] - 77:11
**course** [17] - 44:17, 49:20, 54:5, 64:6, 67:6, 79:3, 96:7,

118:1, 132:8, 132:25, 133:2, 133:4, 154:7, 166:16, 166:18, 167:14, 185:21
**court** [3] - 64:13, 77:12, 77:15
**Court** [10] - 1:22, 1:23, 3:1, 53:9, 55:1, 141:10, 165:17, 185:7, 187:23, 187:23
**COURT** [446] - 1:1, 3:13, 3:17, 3:19, 3:23, 4:3, 4:20, 4:23, 4:25, 5:2, 5:4, 5:6, 7:1, 7:5, 7:7, 8:6, 8:12, 8:14, 8:18, 8:20, 9:2, 9:12, 9:15, 11:16, 11:18, 12:19, 12:21, 14:23, 14:25, 16:13, 16:25, 17:3, 17:5, 18:11, 18:14, 18:16, 18:19, 20:17, 21:9, 22:10, 22:13, 22:17, 24:22, 24:25, 25:3, 25:21, 25:25, 26:5, 26:8, 35:6, 35:9, 35:12, 35:14, 35:19, 36:3, 36:6, 36:13, 36:15, 36:17, 36:22, 37:12, 37:14, 37:17, 37:22, 37:25, 38:3, 38:6, 38:9, 38:11, 38:24, 39:1, 39:12, 39:22, 39:24, 40:9, 40:24, 41:24, 42:6, 42:14, 43:4, 43:8, 43:14, 44:2, 44:9, 44:13, 44:24, 45:23, 46:6, 47:22, 48:12, 48:16, 48:21, 48:25, 49:9, 49:13, 49:16, 49:21, 49:24, 51:10, 51:14, 51:22, 52:3, 52:23, 53:4, 53:12, 53:16, 53:21, 54:13, 54:15, 54:21, 54:24, 55:2, 55:8, 55:10, 55:20, 55:22, 56:1, 56:10, 58:1, 60:7, 60:14, 62:17, 64:5, 64:9, 64:12, 67:5, 67:7, 67:19, 68:10, 68:12, 68:14, 68:16, 68:18, 69:23, 69:25, 70:13, 70:20, 71:7, 71:16, 71:25, 72:3, 72:11, 72:14, 72:21, 72:24, 73:4, 73:12, 76:8, 76:13, 77:10, 77:23, 77:25, 78:15, 81:11, 81:25, 82:5, 82:9, 83:1, 83:5, 83:7, 83:12, 83:14, 83:24, 84:12, 85:16, 85:18, 86:5, 86:9, 87:19, 87:22, 87:25, 88:7, 89:21, 90:17, 94:1, 105:8, 105:22, 106:4, 106:6, 106:9, 106:13, 106:16, 106:20, 107:15, 108:12, 108:16, 108:19, 109:14, 109:20, 110:1, 110:3, 110:11, 110:17, 110:19, 111:10, 111:13, 111:16, 111:18, 113:6, 114:1, 114:3, 114:14, 114:23, 114:25, 115:9, 115:23, 116:15, 116:18, 116:20, 120:17, 121:6, 121:8, 121:11, 121:14, 121:16, 121:20, 122:1, 122:17, 122:19, 122:22, 123:7, 124:1, 125:1, 125:4, 125:11, 125:21, 125:23, 125:25, 127:21, 129:5, 130:8, 130:11, 130:20, 130:22, 131:1, 131:3, 131:7, 131:10, 131:13, 131:16, 131:18, 131:21, 131:24, 132:2, 132:6, 132:9, 132:13, 132:17, 132:20, 132:23, 133:6, 133:12, 133:15, 134:1, 134:4, 134:14, 135:8, 135:16, 135:22, 136:3, 136:9, 136:13, 136:19, 137:2, 137:9, 137:13, 137:17, 137:19, 137:23, 137:25, 138:6, 138:8, 138:12, 138:14, 138:16, 139:2, 139:6, 139:10, 139:12, 139:15, 139:18, 139:22, 139:25, 140:6, 140:9, 140:22, 141:2, 141:7, 141:12, 141:17, 141:23, 142:2, 142:10, 142:24, 143:1, 143:5, 143:19, 143:22, 144:4, 144:9, 144:14, 144:17, 144:23, 145:18, 145:23, 146:1, 146:5, 146:22, 146:24, 147:5, 147:18, 148:16, 149:1, 149:15, 149:25, 150:11, 150:16, 150:24, 151:4, 151:21, 151:25, 152:7, 152:20, 152:23, 153:8, 153:12, 153:17, 154:2, 154:13, 154:16, 154:20, 154:22, 154:24, 155:2, 155:10, 155:16, 155:19, 156:1, 156:3, 156:6, 156:10, 156:25, 157:8, 157:11, 157:21, 158:4, 158:7, 158:13, 158:17, 158:22, 158:24, 159:1, 159:13, 159:20, 159:23, 160:4, 160:19, 160:23, 161:1, 161:5, 162:4, 162:11, 162:17, 162:25, 163:2, 163:15, 164:13, 165:3, 165:15, 165:18, 165:23, 165:25, 166:4, 166:8, 166:10, 166:12, 166:16, 166:18, 166:25, 167:5, 167:17, 167:24, 168:9, 168:25, 169:13, 170:18, 170:22, 171:16, 171:23, 172:7, 172:21, 172:24, 173:8, 173:18, 173:21, 174:1, 174:16, 174:21, 175:5, 175:9, 175:14, 175:18, 176:4, 176:7, 176:10, 176:14, 176:22, 177:3, 177:7, 177:10, 177:14, 177:16, 177:18, 177:20, 178:2, 178:4, 178:16, 178:24, 179:4, 179:7, 179:11, 179:14, 180:5, 180:7, 180:12, 180:22, 181:5, 182:9, 182:13, 182:18, 183:3, 183:6, 183:13, 183:21, 183:25, 184:3, 185:6, 185:9, 185:18, 185:22, 186:13, 186:16, 186:18, 186:22, 187:1, 187:14
**Court's** [1] - 48:24
**courtesy** [2] - 82:13, 122:3
**courtroom** [1] - 108:6
**COURTROOM** [23] - 3:2, 3:21, 18:21, 35:17, 55:5, 55:12, 56:4, 56:7, 64:7, 72:8, 72:12, 74:5, 75:21, 75:23, 88:2, 88:5, 88:8, 111:21, 124:25, 125:3, 125:10, 127:19, 130:9
**covenant** [20] - 10:7, 137:11, 175:12, 175:25, 176:3, 176:9, 176:12, 178:12, 178:13, 178:23, 180:4, 181:8, 181:15, 181:20, 182:8, 182:12, 183:2, 183:8, 183:12, 185:3
**covenants** [1] - 182:2
**cover** [2] - 19:19, 104:25
**covered** [1] - 78:25
**cows** [1] - 50:19
**created** [2] - 59:6, 70:3
**credibility** [1] - 154:4
**criminal** [4] - 126:15, 127:2, 174:16, 187:10
**Crimson** [1] - 95:22
**critical** [1] - 124:3
**cross** [8] - 44:22, 50:18, 52:16, 52:17, 53:17, 86:10, 116:20, 169:4
**CROSS** [3] - 5:14, 86:11, 116:21
**Cross** [3] - 2:2, 2:5, 2:7
**cross-examination** [4] - 53:17, 86:10, 116:20, 169:4
**CROSS-EXAMINATION** [3] - 5:14, 86:11, 116:21
**Cross-Examination............Page** [2] - 2:5, 2:7
**Cross-Examination...Page** [1] - 2:2
**cross-examine** [4] - 44:22, 50:18, 52:16, 52:17
**CSO** [1] - 166:12
**culminated** [1] - 149:23
**cumulative** [2] - 136:24, 140:4
**curative** [1] - 109:24
**cure** [5] - 6:11, 6:18, 7:24, 45:15
**current** [4] - 34:10, 34:11, 34:13, 76:11
**curse** [1] - 4:13

## D

**Dade** [2] - 95:20, 96:16
**dailies** [1] - 123:20
**daily** [4] - 60:5, 62:7, 64:12, 79:15
**damage** [10] - 50:12, 50:18, 50:24, 51:5, 51:11, 181:13, 181:14, 181:23, 182:2, 182:4
**damages** [44] - 37:5, 37:11, 38:3, 39:24, 39:25, 40:4, 40:6, 40:8, 45:23, 47:5, 47:6, 47:15, 47:17, 47:19, 50:13, 50:14, 50:16, 50:22, 51:6, 51:15, 52:6, 52:7, 52:8, 52:15, 52:24, 132:5, 161:23, 161:25, 165:5, 165:9, 165:16, 178:7, 180:9, 180:13, 180:14, 180:18, 180:19, 181:11, 181:16, 181:19, 181:20, 182:6, 182:7, 183:23

**Dan** [2] - 3:16, 12:1
**DATE** [1] - 187:22
**date** [4] - 13:8, 14:2, 27:24, 145:2
**dated** [2] - 22:20, 22:23
**Daubert** [3] - 53:7, 53:10, 53:18
**Dauberts** [1] - 51:1
**day-to-day** [1] - 14:16
**days** [2] - 30:8, 128:7
**days'** [1] - 123:18
**DCA** [2] - 135:11, 142:12
**deaf** [1] - 71:24
**deal** [1] - 25:13
**dealing** [17] - 137:11, 175:25, 178:18, 178:23, 179:1, 181:9, 182:8, 183:9, 183:12, 183:18, 184:1, 184:10, 184:16, 184:19, 184:23, 185:4
**dealings** [1] - 167:14
**deals** [1] - 30:3
**debated** [1] - 107:9
**debt** [4] - 13:11, 51:20, 170:2, 170:4
**decide** [1] - 53:5
**decision** [1] - 136:18
**deemed** [2] - 9:1, 93:23
**default** [22] - 5:23, 6:19, 6:22, 7:12, 7:19, 14:1, 14:7, 14:10, 15:4, 45:11, 45:14, 45:16, 92:25, 93:1, 99:23, 99:25, 100:3, 113:22, 117:7, 120:9, 149:4, 171:1
**defaulted** [3] - 13:25, 14:19, 151:13
**defendant** [22] - 3:15, 48:3, 50:12, 109:15, 125:21, 132:16, 133:6, 136:13, 137:7, 137:11, 137:23, 139:13, 143:6, 156:14, 157:5, 164:3, 167:10, 169:2, 172:4, 175:21, 186:22, 187:12
**Defendant** [1] - 1:7
**DEFENDANT** [2] - 1:17, 111:22
**DEFENDANT'S** [1] - 56:12
**defendant's** [9] - 15:16, 136:7, 137:22, 145:7, 159:9, 162:7, 165:6, 165:20, 167:10
**Defendant's** [19] - 2:10, 2:10, 2:11, 2:11, 22:19, 24:6, 25:10, 25:18, 25:22, 55:3, 59:7, 68:8, 68:19, 69:8, 69:21, 74:4, 97:24, 136:21, 152:14
**defendants** [9] - 44:21, 55:3, 135:3, 135:4, 136:23, 165:7, 171:11, 178:20, 182:3
**Defense** [14] - 5:19, 12:21, 12:22, 17:7, 26:6, 55:24, 60:22, 65:25, 67:17, 76:15, 112:3, 112:19, 138:2, 151:25
**defense** [82] - 35:14, 37:6, 46:7, 48:13, 54:17, 55:25, 68:7, 69:20, 106:1, 111:17, 116:17, 121:7, 121:14, 122:19, 126:4, 126:6, 127:7, 130:20, 131:1, 131:18, 135:12, 136:4, 136:10, 138:4, 138:20, 141:16, 143:10, 148:16, 151:8, 151:18, 151:22, 152:14, 153:14, 154:16, 154:17, 157:1, 157:3, 157:5, 157:12, 157:14, 157:23, 158:6, 158:18, 159:2, 159:5, 159:13, 159:21, 160:3, 160:5, 160:10, 160:20, 160:23, 161:14, 161:22, 162:2, 162:23, 164:18, 164:24, 165:15, 165:23, 166:8, 169:2, 170:23, 173:12, 173:13, 173:14, 174:22, 175:21, 178:5, 178:12, 178:15, 178:22, 179:20, 179:22, 180:2, 180:4, 182:9, 182:19, 183:1
**defense's** [3] - 154:5, 175:9, 176:10
**defenses** [41] - 137:3, 138:18, 138:20, 162:7, 162:8, 162:10, 175:13, 175:20, 175:22, 175:23, 176:1, 176:3, 176:5, 176:9, 176:24, 176:25, 177:8, 177:10, 177:25, 178:17, 178:25, 179:3, 179:12, 179:18, 180:21, 181:1, 181:7, 181:8, 182:1, 182:2, 182:19, 182:20, 183:11, 183:15, 183:16, 184:12, 184:14, 184:16, 184:18, 184:21, 186:1
**defer** [4] - 142:8, 147:15, 157:17, 165:14
**definitely** [3] - 32:1, 78:25, 176:20
**definition** [4] - 153:15, 154:8, 160:23, 161:1
**degree** [2] - 40:4, 47:18
**delay** [1] - 3:23
**delegated** [1] - 97:10
**delegating** [1] - 97:14
**deliberate** [4] - 122:12, 123:14, 124:14, 127:8
**deliberating** [2] - 127:14, 128:3
**deliberations** [1] - 129:1
**deliver** [1] - 119:17
**demand** [5] - 66:10, 85:13, 85:21, 119:16, 164:2
**demanded** [1] - 164:10
**demanding** [4] - 74:2, 91:16, 92:18, 164:4
**demands** [1] - 92:20
**denied** [7] - 9:2, 9:4, 53:7, 53:19, 53:21, 71:2
**deny** [1] - 164:24
**denying** [1] - 165:20
**Department** [1] - 96:15
**depicted** [1] - 12:5
**deposit** [1] - 98:3
**deposited** [1] - 79:15
**depositing** [1] - 79:18
**DEPUTY** [23] - 3:2, 3:21, 18:21, 35:17, 55:5, 55:12, 56:4, 56:7, 64:7, 72:8, 72:12, 74:5, 75:21, 75:23, 88:2, 88:5, 88:8, 111:21, 124:25, 125:3, 125:10, 127:19, 130:9
**derives** [1] - 51:9
**describe** [5] - 76:22, 79:14, 109:7, 109:11, 110:23
**describing** [1] - 97:18
**designated** [1] - 54:10
**desire** [9] - 40:12, 119:16, 119:19, 120:2, 120:5, 120:10, 120:23, 121:2, 146:15
**desired** [9] - 92:5, 117:13, 120:7, 120:13, 120:14, 120:16, 145:6, 145:13, 168:15
**details** [1] - 57:21
**deteriorated** [1] - 96:10
**determination** [3] - 40:7, 133:18, 134:11
**determine** [2] - 53:13, 54:3
**developing** [1] - 64:15
**difference** [4] - 64:23, 65:5, 75:13, 75:16
**different** [11] - 10:2, 30:25, 46:18, 52:12, 76:21, 82:15, 94:25, 129:8, 148:3, 150:11, 156:16
**difficult** [2] - 77:16, 122:14
**dig** [1] - 42:16
**diluted** [1] - 45:12
**dire** [9] - 53:8, 53:12, 53:13, 53:16, 53:24, 54:3, 54:6, 54:10, 54:11
**DIRECT** [2] - 56:13, 111:23
**direct** [10] - 49:10, 50:22, 52:19, 90:13, 91:25, 141:19, 141:24, 156:13, 158:16, 158:17
**Direct** [2] - 2:4, 2:7
**directed** [7] - 36:4, 36:24, 37:5, 40:6, 44:25, 122:21, 165:1
**direction** [3] - 94:22, 94:23, 124:8
**directly** [5] - 23:7, 89:25, 90:6, 141:9, 168:22
**directs** [1] - 40:12
**disagree** [3] - 20:13, 133:13, 176:11
**disburse** [1] - 46:3
**discuss** [1] - 5:22
**discussed** [2] - 10:1, 117:11
**discussions** [1] - 88:16
**dismiss** [3] - 164:23, 184:1, 184:3
**dismissal** [1] - 45:13
**dismissed** [2] - 162:24, 163:3
**dismissing** [1] - 4:9
**dispose** [1] - 153:22
**disposed** [6] - 20:12, 21:25, 39:10, 153:15, 153:20, 153:25
**dispute** [8] - 19:13, 20:2, 42:24, 51:15, 133:21, 134:6, 134:8, 159:8
**disputed** [2] - 124:3, 134:8
**disputing** [2] - 98:6, 134:2
**disregarded** [1] - 7:17
**disregarding** [2] - 7:14, 7:16
**dissipate** [1] - 152:8
**dissolution** [15] - 45:19, 143:2, 143:3, 143:10, 144:17, 144:21, 145:15, 147:19, 149:16, 149:20, 149:23, 150:10, 150:11, 150:14, 150:16
**dissolved** [33] - 15:10, 16:6, 16:15, 20:15, 39:8, 41:20, 48:5, 84:10, 84:21, 85:1, 85:4, 85:8, 119:4, 119:6, 143:6, 143:8, 143:21, 144:7, 146:2, 146:7, 146:16, 147:3, 148:11, 148:21, 150:4, 150:6, 150:12, 150:21,

151:1, 151:5, 151:7, 152:3, 153:5
**distinction** [1] - 178:19
**distinguishes** [1] - 181:10
**distribute** [1] - 51:8
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [4] - 1:23, 1:24, 187:23, 187:24
**Docket** [1] - 160:2
**document** [46] - 6:7, 8:25, 9:7, 9:18, 9:21, 9:23, 11:1, 12:4, 16:22, 16:24, 17:9, 17:25, 18:2, 18:8, 18:24, 20:21, 23:4, 26:15, 26:18, 27:7, 32:4, 34:20, 59:15, 59:17, 60:25, 67:23, 68:22, 68:24, 69:11, 76:20, 77:1, 87:16, 94:8, 99:15, 99:18, 101:1, 101:5, 112:5, 112:7, 112:22, 112:24, 113:1, 119:16, 169:18, 169:20, 170:13
**Document** [1] - 18:1
**documentation** [3] - 96:1, 96:6, 96:8
**documents** [6] - 16:2, 16:14, 21:5, 27:9, 96:6, 102:8
**dog** [5] - 99:2, 109:7, 109:11, 109:18, 110:24
**dollar** [1] - 98:3
**dollars** [3] - 10:21, 46:1, 95:11
**done** [32] - 4:4, 6:5, 10:23, 13:14, 17:22, 19:2, 19:3, 19:4, 19:7, 19:8, 19:10, 22:8, 22:9, 47:9, 116:4, 116:18, 117:6, 122:5, 123:11, 123:12, 126:11, 173:8, 174:11, 174:18, 175:6, 175:22, 181:1, 184:6, 184:12, 185:18, 186:6, 187:5
**Donna** [7] - 3:20, 125:9, 127:14, 127:15, 127:21, 127:22, 128:21
**door** [1] - 110:5
**double** [1] - 180:14
**down** [29] - 5:8, 11:11, 15:17, 15:20, 17:12, 28:12, 28:14, 32:2, 33:8, 33:24, 37:7, 54:22, 64:9, 66:4, 72:25, 73:24, 77:13, 88:5, 88:9, 94:8, 104:17, 111:3, 123:19, 134:1, 180:12, 185:6, 185:17
**download** [1] - 141:10
**downstairs** [2] - 124:25, 128:22
**Downtown** [1] - 57:6
**dozens** [1] - 34:23
**draft** [3] - 6:5, 61:4, 69:13
**drafted** [5] - 57:20, 60:1, 61:2, 61:6, 132:14
**drive** [1] - 80:25
**drop** [2] - 79:17
**drug** [1] - 109:17
**due** [7] - 14:2, 22:25, 23:4, 25:6, 64:24, 112:10, 112:12
**Duffy** [1] - 3:9
**DUFFY** [1] - 1:14
**duplicates** [1] - 11:20
**duplicative** [5] - 180:17, 181:19, 181:21, 181:24, 183:24
**during** [30] - 6:18, 13:19, 23:9, 23:14, 41:17, 81:2, 86:18, 90:13, 91:11, 91:25, 95:24, 96:7, 117:8, 117:22, 118:7, 118:18, 120:24, 144:6, 144:19, 145:9, 145:12, 146:6, 146:11, 146:15, 148:10, 148:13, 148:21, 153:2, 153:4, 187:10
**DX** [1] - 18:1

## E

**e-mail** [1] - 161:18
**early** [4] - 29:22, 87:24, 87:25, 126:24
**easier** [3] - 18:12, 28:16, 141:11
**easy** [2] - 79:23, 157:6
**eat** [1] - 164:4
**eaten** [1] - 128:23
**effect** [6] - 16:14, 70:11, 103:25, 137:22, 143:24, 156:24
**effectively** [1] - 76:1
**either** [12] - 16:4, 53:23, 70:16, 112:18, 137:3, 149:17, 150:21, 164:25, 166:5, 172:25, 176:17, 185:11
**elaborate** [1] - 138:23
**elect** [1] - 181:18
**element** [2] - 39:13, 156:16
**elements** [7] - 36:25, 134:21, 140:16, 155:6, 157:18, 171:6, 178:13
**Eleventh** [3] - 135:10, 135:20, 135:22
**elicit** [2] - 109:16, 109:18
**elicited** [2] - 168:17, 169:2
**eliminate** [2] - 21:17, 162:2
**eliminating** [1] - 139:21
**Elizabeth** [1] - 3:10
**email** [57] - 16:3, 16:5, 27:24, 28:3, 28:6, 28:18, 28:20, 28:22, 28:24, 28:25, 29:13, 29:16, 30:7, 31:22, 67:12, 67:25, 68:2, 68:4, 68:5, 68:25, 69:1, 69:17, 70:6, 70:7, 70:25, 71:9, 71:12, 71:15, 71:16, 71:17, 74:9, 74:20, 85:25, 90:6, 90:9, 91:23, 91:24, 96:20, 96:25, 97:21, 98:1, 98:2, 99:8, 101:17, 103:24, 104:12, 104:14, 104:17, 108:25, 117:19, 117:24, 118:17, 166:6, 167:15, 186:12, 186:14
**emailing** [1] - 103:2
**emails** [20] - 26:21, 33:2, 65:21, 69:13, 69:15, 69:25, 70:1, 71:7, 74:2, 74:10, 90:4, 91:12, 92:18, 97:17, 97:22, 98:10, 98:17, 117:11, 118:14, 120:6
**emblematic** [1] - 100:16
**employees** [1] - 69:1
**en** [2] - 2:11, 55:24
**encourage** [3] - 129:8, 129:10, 129:11
**end** [7] - 9:11, 29:1, 49:7, 73:11, 107:17, 110:18, 157:22
**enforceability** [1] - 133:5
**enforceable** [1] - 121:1
**enforcement** [4] - 156:18, 169:14, 169:23, 170:8
**enjoy** [2] - 35:25, 105:17
**ensure** [1] - 64:21
**enter** [1] - 70:1
**entered** [6] - 86:24, 86:25, 133:1, 133:10, 133:16, 133:22
**entire** [8] - 15:18, 45:13, 61:16, 78:6, 88:8, 125:5, 170:2, 170:3
**entirely** [5] - 20:12, 21:25, 39:10, 148:17, 153:25
**entities** [4] - 10:3, 30:25, 33:18, 96:16
**entitled** [4] - 54:3, 110:4, 152:10, 187:20
**entity** [4] - 15:6, 39:20, 58:15, 58:19
**Entry** [1] - 160:2
**entry** [1] - 181:18
**enured** [1] - 41:19
**equal** [2] - 103:21, 104:21
**equitable** [19] - 147:16, 155:3, 156:7, 157:3, 177:15, 177:16, 179:2, 179:3, 179:19, 179:21, 180:4, 182:11, 182:16, 182:18, 182:20, 182:21, 184:21, 184:22
**equity** [1] - 45:9
**error** [1] - 138:10
**especially** [2] - 71:11, 129:7
**ESQ** [5] - 1:13, 1:13, 1:14, 1:17, 1:17
**essential** [1] - 134:21
**essentially** [1] - 164:3
**establish** [5] - 39:14, 40:1, 40:3, 47:17, 157:4
**established** [2] - 37:10, 118:2
**estate** [2] - 10:9, 56:23
**estimated** [1] - 83:22
**estoppel** [12] - 155:3, 155:7, 156:8, 157:3, 177:15, 177:16, 179:2, 179:19, 179:22, 182:11, 182:16, 184:22
**et** [2] - 146:10, 170:14
**evening** [2] - 124:10, 174:4
**event** [5] - 42:4, 82:9, 95:24, 122:24, 149:21
**events** [1] - 14:18
**eventually** [1] - 95:1
**evidence** [115] - 5:20, 8:9, 8:12, 8:15, 9:1, 9:15, 10:1, 11:14, 12:18, 12:21, 14:3, 15:16, 16:20, 16:24, 17:3, 22:19, 24:6, 25:19, 25:20, 25:22, 25:23, 26:15, 26:19, 26:25, 27:16, 30:12, 31:6, 31:8, 31:9, 32:3, 32:5, 32:6, 32:7, 32:23, 32:24, 32:25, 33:15, 36:18, 36:21, 37:6, 37:19, 38:14, 38:21, 39:4, 39:8, 39:17, 40:20, 41:12, 41:13, 42:8, 43:15, 43:17, 43:21, 43:24, 43:25, 44:18, 44:19, 45:2, 46:12, 47:1, 47:18, 48:4, 50:1, 50:21, 51:5, 51:23, 52:6, 52:10, 55:23, 59:8, 60:23, 67:18, 68:8, 68:20, 69:8, 69:21, 70:2, 74:6, 76:16, 96:20, 97:25, 98:17, 98:24, 99:13, 100:24, 102:5, 102:25, 104:3, 104:4, 104:15, 109:16, 126:3, 127:24, 128:1, 129:15, 136:16, 159:7, 159:14, 161:22, 162:9, 162:22,

163:6, 168:6, 168:7, 168:10, 169:5, 169:9, 169:20, 170:5, 170:17, 170:20, 171:1, 171:3, 171:17, 185:14
**exact** [1] - 77:4
**exactly** [13] - 6:16, 66:3, 84:24, 100:5, 103:16, 104:11, 120:6, 125:12, 130:14, 135:13, 140:12, 161:21, 180:6
**examination** [9] - 50:12, 53:17, 86:10, 90:13, 91:11, 91:25, 116:20, 169:4
**EXAMINATION** [7] - 5:14, 22:21, 56:13, 86:11, 108:23, 111:23, 116:21
**Examination............. Page** [2] - 2:5, 2:7
**Examination............ Page** [2] - 2:4, 2:7
**Examination.......... Page** [2] - 2:3, 2:5
**Examination...Page** [1] - 2:2
**examine** [4] - 44:22, 50:18, 52:16, 52:17
**example** [8] - 97:24, 98:17, 102:7, 109:24, 145:20, 145:23, 147:18, 161:23
**Excel** [1] - 97:3
**excellent** [1] - 118:17
**except** [1] - 152:3
**exception** [5] - 70:9, 70:11, 70:13, 70:14, 71:6
**exchange** [3] - 101:20, 103:21, 104:21
**exclusive** [1] - 135:5
**excuse** [17] - 3:7, 25:6, 29:17, 37:3, 39:14, 47:24, 57:1, 58:23, 82:2, 89:11, 93:21, 103:3, 117:23, 135:3, 143:25, 167:10, 168:12
**excused** [6] - 35:11, 105:21, 108:14, 111:13, 111:15, 121:13
**exercise** [1] - 19:17
**Exhibit** [56] - 2:10, 2:10, 2:11, 5:18, 5:19, 10:13, 12:21, 12:22, 15:18, 16:18, 17:7, 18:1, 22:19, 24:6, 25:10, 25:18, 25:22, 26:6, 26:15, 26:18, 26:24, 27:15, 29:7, 30:11, 31:5, 31:9, 32:3, 32:22, 33:14, 55:4, 59:7, 60:22, 65:25, 67:18, 68:8, 68:20, 69:8, 69:21, 74:4, 76:15, 87:3, 88:13, 96:19, 97:24, 98:16, 98:23, 99:13, 100:23, 102:4, 102:24, 104:3, 108:22, 112:3, 112:20, 118:11, 119:13
**exhibit** [10] - 11:14, 17:1, 25:10, 26:3, 29:5, 32:2, 32:10, 35:17, 104:2, 111:3
**exhibits** [3] - 48:20, 54:19, 54:23
**EXHIBITS** [1] - 2:9
**Exhibits** [2] - 2:11, 55:24
**exist** [6] - 15:6, 16:8, 16:16, 20:20, 39:21, 155:23
**existed** [1] - 13:11
**existence** [3] - 144:2, 170:12, 170:16
**exit** [1] - 79:5
**expect** [3] - 107:20, 110:13, 174:4
**expected** [1] - 121:23
**expenses** [7] - 47:12, 51:20, 61:18, 61:19, 103:22, 104:22, 168:17
**expert** [30] - 24:22, 40:5, 47:16, 48:15, 50:12, 50:13, 50:18, 50:20, 50:24, 52:4, 52:5, 52:12, 52:15, 52:20, 53:6, 53:9, 53:13, 53:24, 54:1, 54:2, 54:4, 54:10, 106:3, 107:25, 108:1, 173:23
**expertise** [1] - 54:5
**experts** [1] - 127:3
**expiration** [1] - 103:19
**expire** [2] - 25:8, 80:5
**expired** [8] - 80:12, 80:14, 80:15, 94:13, 94:17, 94:24, 148:10, 168:14
**expiring** [1] - 101:14
**explain** [8] - 7:18, 7:21, 10:18, 12:10, 28:7, 153:13, 181:10, 185:12
**explanations** [2] - 14:12, 15:3
**explanatory** [1] - 165:13
**express** [2] - 80:2, 80:9
**expressed** [1] - 10:19
**expression** [1] - 24:13
**extent** [2] - 34:21, 171:18
**extinguish** [2] - 147:20, 149:17
**extinguished** [1] - 149:21
**extinguishes** [1] - 183:11
**extinguishment** [1] - 160:8
**extra** [1] - 18:14

## F

**fact** [11] - 30:4, 30:22, 38:20, 44:3, 46:16, 103:19, 150:5, 150:11, 153:2, 161:16, 181:6
**facts** [6] - 149:25, 150:19, 155:7, 155:13, 157:19, 161:8
**factual** [3] - 133:17, 133:19, 134:11
**fail** [2] - 4:3, 75:2
**failed** [16] - 6:1, 6:4, 6:20, 6:21, 7:19, 14:14, 37:1, 37:2, 37:20, 37:25, 39:4, 39:14, 40:1, 47:17, 73:18
**failing** [1] - 37:20
**fails** [2] - 6:10, 6:16
**failure** [6] - 37:3, 38:3, 39:3, 39:14, 149:3, 149:6
**fair** [19] - 21:19, 106:20, 137:11, 175:25, 178:18, 178:23, 179:1, 181:9, 182:8, 183:8, 183:12, 183:18, 184:1, 184:10, 184:16, 184:19, 184:23, 185:4
**fairly** [1] - 12:8
**fairness** [1] - 172:16
**faith** [18] - 137:11, 175:13, 175:25, 176:13, 178:23, 179:1, 181:9, 182:8, 183:2, 183:8, 183:12, 183:18, 184:1, 184:9, 184:16, 184:19, 184:23, 185:3
**fall** [2] - 9:8, 176:1
**falling** [1] - 109:5
**falling-out** [1] - 109:5
**familiar** [8] - 59:24, 61:10, 80:24, 88:20, 95:13, 95:23, 99:19, 103:23
**familiarity** [2] - 59:22, 61:8
**far** [3] - 90:3, 95:21, 173:1
**Fargo** [5] - 31:14, 31:20, 31:22, 31:25
**fashion** [2] - 84:13, 147:15
**fast** [4] - 15:18, 73:7, 126:7, 145:6
**fast-forward** [1] - 145:6
**faster** [2] - 35:24, 121:23
**father** [7] - 42:3, 43:5, 43:18, 43:21, 43:24, 45:2, 66:18
**favor** [1] - 183:15
**favorable** [2] - 50:2, 153:9
**FCRR** [2] - 1:22, 187:22
**February** [1] - 68:5
**federal** [2] - 20:11, 21:6
**felt** [5] - 6:24, 23:2, 26:13, 30:22, 74:11
**few** [3] - 15:20, 30:8, 128:7
**field** [1] - 53:14
**fifth** [2] - 160:3, 160:5
**figure** [11] - 17:10, 72:4, 88:1, 128:10, 134:22, 144:24, 162:19, 173:9, 182:2, 182:7, 185:10
**figured** [1] - 107:21
**figuring** [1] - 154:3
**file** [8] - 24:14, 71:8, 103:4, 162:1, 162:4, 162:6, 186:13, 186:16
**filed** [4] - 15:23, 15:24, 99:21, 143:20
**filing** [5] - 16:1, 34:25, 35:2, 96:14, 186:12
**final** [4] - 140:5, 179:24, 180:1, 181:18
**finalized** [1] - 179:23
**finances** [5] - 63:2, 78:17, 81:15, 82:22, 82:24
**financial** [6] - 58:2, 78:13, 81:17, 81:19, 81:23, 82:18
**financially** [1] - 78:20
**financing** [2] - 63:8, 63:18
**fine** [11] - 9:8, 37:17, 54:24, 99:2, 109:3, 125:1, 125:9, 126:25, 152:25, 165:24, 171:9
**finish** [6] - 49:15, 49:16, 77:19, 126:20, 129:6, 153:8
**finished** [7] - 18:24, 19:1, 19:5, 28:17, 49:17, 116:4, 145:19
**finishes** [1] - 7:8
**firm** [3] - 38:16, 67:1, 99:23
**firmly** [2] - 10:2, 117:5
**first** [31] - 4:3, 6:10, 6:17, 17:21, 28:25, 36:7, 46:21, 47:10, 51:21, 54:17, 56:5, 57:7, 61:14, 70:15, 88:13, 99:16, 107:3, 140:5, 149:15, 151:9, 151:20, 151:21, 151:23, 152:5, 154:13, 156:8, 160:19, 175:2, 176:23, 185:13
**five** [12] - 5:7, 20:19, 25:4, 168:15, 171:3, 171:17, 177:23, 178:2, 179:7, 179:12, 179:16, 182:22
**five-year** [4] - 20:19, 168:15, 171:3, 171:17
**fix** [2] - 5:9, 5:10
**floor** [4] - 103:9, 103:14, 103:15, 103:17

**FLORIDA** [1] - 1:1
**Florida** [39] - 1:3, 1:16, 1:19, 1:24, 1:25, 10:10, 32:14, 42:12, 57:2, 65:11, 65:23, 66:11, 89:5, 96:15, 118:6, 141:15, 141:18, 142:2, 142:11, 143:4, 147:19, 149:17, 150:7, 151:6, 151:10, 155:22, 156:2, 156:4, 156:8, 158:8, 159:4, 169:23, 171:9, 171:15, 171:25, 172:8, 172:22, 187:24, 187:25
**flow** [10] - 45:25, 46:2, 46:3, 47:4, 51:8, 51:13, 181:19, 181:20, 182:6, 182:7
**focus** [1] - 10:5
**focusing** [1] - 17:2
**follow** [4] - 5:24, 64:13, 64:14, 135:19
**following** [5] - 6:20, 11:14, 157:5, 162:12, 183:3
**food** [1] - 125:1
**foot** [1] - 3:25
**FOR** [2] - 1:13, 1:17
**foreclose** [1] - 169:24
**foreclosed** [4] - 169:21, 170:17, 170:20, 171:13
**foreclosure** [6] - 9:1, 95:17, 153:4, 171:15, 171:17, 171:19
**foregoing** [1] - 187:19
**forgot** [2] - 103:12, 108:12
**form** [46] - 46:4, 90:4, 90:6, 106:22, 106:25, 117:23, 129:7, 133:25, 136:21, 140:3, 140:6, 140:12, 140:13, 141:20, 142:11, 151:4, 153:24, 157:20, 158:10, 158:11, 158:14, 161:7, 165:1, 174:22, 174:23, 174:25, 175:1, 175:16, 177:5, 178:9, 179:11, 179:24, 180:2, 180:16, 180:23, 181:1, 181:10, 185:5, 185:8, 185:11, 185:14, 185:19, 185:22, 185:25, 186:10, 187:4
**Form** [1] - 19:22
**formally** [1] - 100:12
**formed** [1] - 143:18
**forming** [1] - 29:23
**forms** [4] - 153:20, 174:21, 177:1, 177:3
**Forms** [2] - 141:18, 158:8
**Fort** [1] - 48:19
**forth** [1] - 10:11
**forward** [4] - 6:21, 71:14, 74:19, 145:6
**forwarded** [9] - 40:16, 43:12, 71:12, 71:13, 71:17, 97:10, 97:12, 100:14, 100:18
**forwarding** [2] - 69:1, 163:17
**foundation** [5] - 67:5, 71:10, 82:6, 82:11, 85:17
**four** [6] - 11:19, 37:22, 39:16, 106:16, 139:15, 140:23
**four-day** [1] - 106:16
**Fourth** [1] - 135:10
**fourth** [4] - 38:3, 138:25, 139:7, 140:15
**frame** [3] - 128:16, 145:19, 153:4
**framework** [1] - 170:11
**frankly** [3] - 111:1, 136:25, 160:9
**free** [1] - 99:5
**frequently** [1] - 43:11
**fresh** [1] - 128:6
**Friday** [30] - 49:8, 106:4, 106:7, 107:12, 107:14, 107:23, 107:24, 108:2, 122:11, 123:5, 123:14, 124:12, 124:13, 124:17, 125:17, 126:21, 127:2, 127:5, 127:13, 127:16, 127:18, 127:23, 128:15, 128:20, 129:1, 129:3, 174:10, 174:14, 175:1, 185:19
**friend** [1] - 23:3
**friendship** [1] - 25:12
**front** [4] - 17:24, 88:3, 161:7, 166:23
**FT** [1] - 93:21
**FTP** [82] - 1:6, 3:3, 40:3, 40:12, 40:21, 46:3, 58:11, 58:13, 58:20, 58:21, 60:11, 61:22, 62:14, 63:8, 63:15, 66:10, 74:16, 76:11, 77:3, 78:13, 80:22, 81:8, 84:6, 85:10, 85:12, 85:13, 85:21, 88:17, 89:14, 89:23, 90:1, 90:8, 90:25, 91:9, 91:12, 91:14, 91:21, 92:1, 92:5, 92:15, 92:20, 93:8, 93:11, 93:14, 93:16, 93:17, 93:18, 93:22, 93:23, 94:3, 94:4, 94:24, 94:25, 95:5, 95:8, 95:17, 95:24, 96:1, 96:3, 97:21, 98:10, 99:22, 100:1, 100:6, 100:12, 100:17, 100:20, 101:10, 101:18, 102:12, 102:17, 102:21, 103:4, 116:24, 117:8, 117:22, 118:7, 120:23, 120:25, 168:15, 168:21
**FTP's** [4] - 46:3, 94:22, 118:18, 120:24
**full** [9] - 74:11, 74:13, 75:17, 78:4, 98:6, 112:14, 112:16, 170:9, 187:3
**fully** [1] - 10:3
**futile** [5] - 36:8, 43:1, 43:19, 46:11, 151:8
**futility** [20] - 36:7, 37:23, 38:6, 40:11, 40:23, 40:25, 44:22, 46:8, 49:25, 137:3, 157:14, 157:19, 164:20, 173:13, 177:12, 178:7, 178:11, 178:15, 178:22, 186:24

## G

**gains** [1] - 46:5
**gap** [1] - 101:23
**garage** [7] - 89:11, 89:12, 89:19, 90:15, 91:3, 91:5, 98:21
**general** [1] - 56:24
**generally** [2] - 10:9, 168:20
**generated** [1] - 65:4
**gentlemen** [3] - 35:19, 111:11, 126:3
**given** [22] - 9:4, 9:5, 14:12, 15:3, 45:11, 45:14, 45:15, 49:19, 115:20, 116:10, 122:2, 123:23, 124:7, 124:13, 143:7, 143:12, 145:13, 146:13, 147:10, 157:24, 166:4, 166:8
**GM** [1] - 34:3
**God** [1] - 99:3
**Google** [2] - 154:23, 156:7
**government** [7] - 20:11, 21:7, 21:12, 22:1, 35:25, 39:9, 46:3
**government-issued** [1] - 35:25
**grab** [1] - 103:3
**grandchild's** [1] - 4:13
**granted** [3] - 6:11, 182:16, 183:11
**great** [3] - 5:2, 41:6, 51:1
**greater** [1] - 185:14
**Greg** [61] - 16:7, 22:23, 24:8, 26:11, 42:23, 42:24, 43:4, 43:20, 44:3, 56:17, 56:20, 56:21, 56:22, 57:20, 57:22, 58:10, 58:19, 59:18, 61:4, 62:4, 69:15, 70:9, 73:21, 78:23, 80:2, 80:9, 82:17, 85:7, 87:16, 89:25, 90:6, 96:10, 97:4, 97:10, 97:14, 97:22, 98:9, 99:2, 99:10, 100:15, 100:17, 100:18, 109:4, 110:23, 111:8, 112:8, 113:22, 114:11, 114:20, 115:3, 115:20, 117:9, 120:24, 146:9, 146:20, 148:12, 153:19, 154:1, 164:9
**Greg's** [8] - 57:16, 59:1, 66:18, 86:19, 96:16, 96:20, 96:25, 97:18
**Gregory** [32] - 23:16, 23:17, 40:13, 40:21, 41:19, 57:9, 63:21, 64:3, 64:21, 66:22, 70:18, 73:15, 73:18, 74:19, 74:20, 74:23, 75:9, 75:25, 76:2, 76:5, 81:14, 81:22, 82:2, 82:3, 82:18, 84:25, 85:3, 109:17, 112:14, 112:16, 113:3, 163:6
**GREGORY** [2] - 2:2, 5:13
**gross** [1] - 168:16
**ground** [4] - 80:5, 80:10, 80:12, 83:19
**group** [2] - 61:20, 61:21
**guaranteeing** [1] - 76:5
**guaranty** [1] - 76:3
**guess** [6] - 5:9, 107:19, 121:4, 125:25, 138:18, 178:8
**guesstimate** [1] - 106:11

## H

**half** [8] - 77:20, 95:11, 101:3, 106:12, 106:13, 106:17, 107:16, 186:6
**hand** [4] - 33:19, 88:2, 113:2
**handed** [1] - 41:5
**handle** [2] - 35:20, 66:19
**handling** [1] - 62:25
**hanging** [1] - 126:19
**happy** [2] - 30:4, 87:23
**hard** [6] - 18:11, 18:14, 42:20, 122:13, 161:20, 166:5
**hate** [1] - 137:21
**head** [4] - 117:2, 117:8, 117:15, 178:9
**heads** [4] - 35:8, 121:10, 122:2, 177:3
**heads-up** [1] - 122:2
**hear** [44] - 4:8, 4:14, 7:6, 21:2, 25:3, 35:21, 38:6, 38:9,

46:6, 52:9, 57:7, 59:11, 70:4, 82:12, 109:8, 122:19, 123:14, 124:18, 126:13, 126:22, 127:6, 127:7, 128:1, 128:8, 133:6, 136:13, 136:19, 139:25, 140:9, 148:16, 153:17, 159:13, 163:21, 164:17, 165:9, 165:15, 167:5, 167:17, 169:14, 170:18, 174:11, 182:9, 184:3, 186:8
**heard** [14] - 4:10, 7:8, 44:13, 77:21, 86:18, 90:13, 91:8, 91:11, 91:25, 94:11, 123:4, 126:3, 128:7, 153:16
**hearing** [3] - 72:10, 72:11, 133:5
**hearings** [1] - 133:3
**hearsay** [15] - 8:23, 68:11, 68:12, 69:25, 70:9, 70:11, 70:13, 70:14, 71:6, 82:10, 82:11, 84:15, 84:16, 84:18, 85:17
**HEBER** [2] - 2:4, 56:12
**Heber** [31] - 13:19, 14:17, 25:16, 26:12, 27:3, 27:13, 27:19, 27:25, 28:8, 29:18, 30:15, 31:13, 31:19, 31:24, 33:3, 33:17, 34:21, 49:5, 49:6, 49:15, 55:25, 56:6, 56:15, 59:11, 73:14, 86:13, 88:16, 94:10, 108:25, 167:12, 168:18
**Heber's** [1] - 159:15
**held** [6] - 6:19, 14:1, 59:1, 117:5, 117:7
**help** [6] - 19:20, 19:21, 59:25, 80:25, 123:7, 153:5
**helped** [5] - 56:23, 63:12, 63:13, 63:14, 96:1
**helpful** [6] - 72:19, 122:2, 124:6, 128:2, 180:24, 186:2
**hereby** [2] - 10:7, 187:19
**hereto** [2] - 10:13, 119:17
**high** [2] - 49:1, 72:13
**highlight** [3] - 20:8, 48:23, 113:12
**himself** [1] - 48:8
**hire** [1] - 80:23
**hold** [10] - 37:22, 55:12, 55:15, 110:11, 114:17, 116:11, 137:25, 144:9, 177:20
**holding** [1] - 120:9
**holiday** [7] - 49:1, 49:19, 105:13, 122:13, 123:8, 127:18, 186:3
**holidays** [1] - 48:18
**home** [5] - 49:2, 50:19, 105:14, 122:17, 124:17
**honest** [1] - 99:20
**honestly** [4] - 72:1, 72:17, 87:17, 104:24
**Honor** [347] - 3:6, 3:12, 3:14, 3:18, 4:22, 4:24, 5:12, 6:23, 8:5, 8:10, 8:13, 8:17, 8:22, 8:24, 9:10, 9:13, 9:14, 11:13, 12:17, 14:21, 15:12, 15:20, 16:12, 16:20, 16:23, 17:2, 17:4, 18:15, 18:17, 18:18, 20:16, 21:8, 22:7, 22:15, 24:24, 25:2, 26:1, 26:4, 26:9, 26:14, 35:5, 35:13, 35:15, 36:4, 36:16, 37:13, 37:19, 38:2, 38:5, 38:7, 38:12, 39:23, 39:25, 40:1, 40:10, 40:17, 41:16, 42:5, 42:10, 43:10, 43:13, 44:1, 44:6, 44:12, 44:23, 45:6, 45:24, 46:8, 47:5, 47:8, 47:24, 48:1, 48:14, 48:17, 49:5, 49:20, 52:22, 53:2, 53:5, 54:12, 54:18, 54:22, 55:1, 55:9, 55:21, 55:25, 56:8, 56:11, 57:25, 59:10, 60:6, 60:13, 62:18, 64:6, 64:10, 64:16, 67:4, 67:17, 68:7, 68:9, 68:13, 69:7, 69:20, 69:22, 70:8, 70:10, 71:15, 71:22, 72:2, 72:20, 72:23, 73:3, 73:10, 76:7, 76:9, 76:12, 77:9, 77:22, 78:1, 78:14, 81:10, 81:24, 82:4, 82:14, 82:25, 83:4, 83:6, 83:11, 83:15, 83:23, 84:11, 84:19, 85:15, 86:6, 86:8, 87:23, 90:16, 105:4, 106:3, 106:5, 106:15, 106:18, 107:11, 108:9, 108:18, 109:8, 109:12, 111:17, 113:5, 113:24, 114:13, 114:22, 115:8, 115:18, 115:22, 115:25, 116:13, 116:17, 116:19, 121:7, 121:15, 121:19, 122:9, 122:20, 123:3, 123:16, 123:17, 125:20, 125:22, 130:3, 130:4, 130:5, 130:19, 130:21, 131:2, 131:5, 131:6, 131:8, 131:9, 131:11, 131:12, 131:14, 131:19, 131:22, 131:23, 131:25, 132:1, 132:4, 132:8, 132:12, 132:15, 132:16, 132:19, 133:7, 133:14, 133:16, 134:3, 134:10, 135:5, 135:14, 135:21, 136:2, 136:12, 136:15, 136:20, 136:22, 137:8, 137:12, 137:15, 137:18, 138:5, 138:7, 138:11, 138:15, 138:23, 139:14, 139:17, 139:20, 140:2, 140:8, 140:14, 140:25, 141:6, 141:9, 141:14, 141:21, 142:8, 142:23, 142:25, 143:3, 143:17, 144:13, 144:16, 147:12, 147:14, 147:15, 148:7, 148:15, 148:17, 149:9, 149:19, 150:9, 150:15, 150:23, 151:3, 151:24, 152:18, 152:19, 153:1, 153:11, 153:16, 153:19, 154:10, 154:19, 154:25, 155:15, 155:25, 156:12, 156:19, 157:6, 157:18, 158:3, 158:6, 158:11, 158:20, 159:6, 159:14, 159:22, 160:2, 160:7, 160:15, 160:17, 160:22, 160:25, 161:7, 161:25, 162:5, 162:21, 163:1, 163:5, 163:13, 164:7, 165:14, 165:16, 165:22, 165:24, 166:1, 166:9, 166:14, 166:20, 166:23, 167:4, 167:7, 167:20, 168:8, 168:21, 168:23, 169:11, 169:16, 170:7, 170:19, 171:10, 171:14, 172:4, 173:7, 173:17, 173:20, 173:25, 174:13, 174:20, 175:4, 175:8, 175:11, 175:15, 175:25, 176:6, 176:11, 176:21, 177:9, 178:3, 178:10, 179:5, 179:9, 179:21, 179:23, 179:25, 180:11, 181:2, 181:12, 181:25, 182:10, 182:24, 183:20, 184:2, 184:25, 185:4, 185:21, 186:12, 186:15, 186:17, 186:21, 186:23, 187:13, 187:15, 187:16
**Honor's** [8] - 8:23, 166:6, 169:18, 172:3, 178:1, 178:19, 179:10, 179:13
**Honorable** [1] - 1:23
**HONORABLE** [1] - 1:9
**hope** [1] - 106:24
**hoping** [1] - 105:15
**hour** [15] - 105:9, 106:12, 106:13, 106:16, 106:18, 106:20, 107:16, 122:7, 125:5, 125:15, 126:18, 127:1, 186:6
**hours** [5] - 49:11, 49:12, 49:14, 107:17, 126:20
**housekeeping** [2] - 16:23, 53:3
**hurry** [1] - 6:6
**hurt** [1] - 111:18
**hypotheticals** [1] - 145:21

## I

**idea** [1] - 95:16
**ideas** [1] - 9:5
**images** [1] - 12:18
**immediately** [2] - 6:19, 162:15
**impact** [1] - 161:12
**implied** [22] - 137:10, 175:12, 175:25, 176:3, 176:9, 176:12, 176:17, 176:20, 176:23, 176:25, 178:12, 178:13, 178:23, 180:4, 181:8, 181:15, 181:20, 182:1, 182:8, 183:1, 183:12, 185:3
**imply** [1] - 178:11
**importance** [2] - 136:17, 153:6
**important** [5] - 127:25, 128:1, 153:1, 153:21, 163:11
**importantly** [3] - 30:25, 40:17, 186:9
**impossible** [2] - 22:4, 39:6
**impression** [1] - 47:2
**improper** [1] - 142:11
**improve** [1] - 30:5
**inactive** [1] - 16:4
**inaudible** [1] - 70:10
**inclined** [2] - 151:9, 169:13
**include** [10] - 62:7, 62:10, 62:12, 62:16, 62:20, 62:22, 62:25, 63:2, 136:23, 160:5
**included** [4] - 4:10, 22:3, 135:14, 160:18
**including** [3] - 10:11,

48:15, 122:13
**income** [8] - 20:22, 21:7, 21:12, 21:16, 21:19, 21:21, 46:5, 83:20
**incompleteness** [2] - 70:4, 170:14
**inconsistent** [1] - 172:5
**incorrect** [3] - 41:3, 157:24, 172:14
**incredibly** [1] - 72:14
**independent** [5] - 24:8, 24:11, 24:18, 24:19, 45:7
**independently** [1] - 181:16
**INDEX** [1] - 2:1
**indicating** [1] - 185:16
**Indicating** [1] - 13:22
**indicator** [1] - 34:14
**indirectly** [2] - 23:8, 109:18
**individual** [1] - 41:19
**individually** [5] - 22:25, 144:8, 146:11, 146:21, 148:12
**indulge** [1] - 106:19
**inference** [2] - 43:16
**information** [4] - 30:3, 40:7, 77:1, 79:10
**informed** [7] - 84:9, 85:3, 85:7, 94:4, 99:22, 119:5, 159:18
**Ingraham** [17] - 28:1, 31:18, 89:7, 89:10, 89:11, 89:12, 89:19, 90:15, 91:3, 91:5, 91:6, 98:21, 102:13, 102:22, 103:7, 103:9, 103:10
**inherent** [1] - 170:12
**initial** [2] - 57:18, 130:11
**initiated** [1] - 95:17
**inquiry** [3] - 92:1, 171:13, 176:6
**inside** [1] - 108:5
**insignificant** [1] - 49:9
**insinuate** [1] - 171:12
**insist** [1] - 31:1
**installed** [1] - 79:21
**instruct** [6] - 61:4, 126:8, 126:10, 144:23, 170:8, 172:1
**instructed** [5] - 110:11, 138:19, 160:11, 161:14, 170:11
**instruction** [69] - 8:25, 9:5, 109:25, 123:13, 126:14, 129:14, 129:19, 129:20, 129:24, 131:15, 132:7, 132:9, 132:21, 135:1, 135:10, 135:12, 135:23, 135:24, 136:1, 136:21, 136:24, 137:6, 137:7, 140:4, 140:17, 141:5, 141:15, 142:7, 142:8, 143:2, 144:20, 144:24, 145:20, 147:16, 148:14, 152:12, 153:1, 153:6, 154:17, 154:22, 156:8, 156:18, 157:2, 157:18, 157:24, 158:2, 158:5, 159:2, 159:7, 159:10, 159:11, 160:16, 161:22, 165:10, 165:11, 167:16, 167:19, 168:3, 169:22, 170:22, 171:5, 172:5, 172:12, 172:15, 172:19, 173:3, 174:13, 179:23
**Instruction** [28] - 130:17, 130:23, 131:3, 131:7, 131:10, 131:13, 131:21, 131:24, 132:2, 132:10, 132:13, 134:19, 135:2, 136:4, 136:5, 136:7, 136:10, 136:21, 137:20, 138:2, 138:8, 138:25, 142:3, 152:1, 152:15, 153:14, 158:8, 165:6
**instructions** [31] - 9:6, 106:21, 106:25, 107:2, 107:8, 122:11, 123:14, 124:2, 124:19, 124:21, 125:7, 126:12, 127:12, 128:2, 129:7, 129:10, 130:13, 133:10, 134:19, 156:9, 157:10, 165:12, 166:2, 173:8, 173:11, 173:15, 174:5, 174:6, 186:9, 186:24, 187:4
**Instructions** [1] - 141:18
**instrument** [1] - 12:9
**intend** [1] - 50:13
**intended** [2] - 92:16, 109:18
**intending** [1] - 10:6
**intends** [1] - 173:15
**intention** [2] - 110:9, 158:16
**interest** [21] - 12:7, 12:8, 13:2, 31:1, 34:3, 40:2, 47:11, 52:2, 59:1, 74:14, 80:2, 80:9, 112:18, 113:20, 114:11, 114:20, 115:4, 149:8, 149:13, 172:16
**interesting** [1] - 180:22
**interests** [1] - 21:3
**interpreted** [1] - 48:2
**interrupt** [4] - 4:6, 19:24, 127:11, 172:17
**interrupted** [1] - 9:3
**interrupting** [1] - 172:20
**interruption** [1] - 144:1
**introduce** [7] - 25:19, 68:7, 68:19, 69:7, 69:20, 115:10, 161:8
**introduced** [7] - 8:9, 58:9, 59:8, 60:23, 67:18, 67:19, 67:20
**invalid** [1] - 144:2
**Investment** [4] - 3:3, 58:11, 58:13, 80:22
**INVESTMENT** [1] - 1:6
**investments** [1] - 47:11
**invoice** [1] - 101:7
**invoices** [1] - 98:20
**invoicing** [1] - 100:20
**involved** [2] - 88:16, 127:3
**involvement** [6] - 57:9, 57:18, 58:13, 63:22, 64:3, 64:25
**irrelevant** [6] - 44:10, 71:3, 133:9, 144:18, 144:21, 148:18
**IRS** [2] - 21:22, 154:8
**ISAIAH** [1] - 1:13
**issue** [35] - 3:24, 38:1, 38:25, 39:1, 44:2, 48:17, 51:17, 53:2, 53:23, 54:7, 54:11, 87:19, 123:11, 134:6, 134:11, 134:13, 145:20, 146:25, 147:1, 148:18, 149:1, 149:3, 149:6, 149:19, 150:24, 151:14, 156:17, 160:11, 167:20, 171:25, 176:5, 176:14, 180:10
**issued** [1] - 35:25
**issues** [10] - 9:7, 36:5, 44:23, 53:10, 53:19, 124:3, 150:19, 170:11, 171:10, 187:6
**issuing** [2] - 13:10, 13:16
**IT** [3] - 12:2, 26:16, 32:4
**items** [1] - 181:24
**itself** [2] - 144:10, 147:11

## J

**Jacqueline** [1] - 1:23
**JACQUELINE** [1] - 1:9
**January** [8] - 23:5, 25:6, 25:9, 74:23, 98:1, 112:13, 112:14
**jest** [1] - 98:7
**Jewish** [3] - 105:13, 123:8, 173:23
**Joint** [6] - 130:16, 131:3, 131:10, 131:13, 137:19, 138:8
**joint** [3] - 130:23, 131:7, 131:21
**Jones** [4] - 99:23, 99:25, 100:2, 100:13
**Joseph** [2] - 3:6, 86:15
**JOSEPH** [1] - 1:13
**Judge** [5] - 104:7, 125:10, 157:16, 161:6, 165:2
**JUDGE** [1] - 1:10
**judge** [5] - 35:18, 72:8, 73:5, 73:6, 120:15
**judgment** [6] - 133:4, 162:1, 162:6, 164:25, 169:24, 181:18
**judicial** [2] - 169:25, 170:3
**July** [4] - 12:6, 13:9, 13:11, 26:21
**June** [3] - 26:11, 69:2, 69:5
**junkyard** [5] - 99:2, 109:7, 109:11, 109:18, 110:23
**juror** [7] - 36:20, 38:22, 39:10, 39:18, 42:8, 46:15, 126:1
**JURORS** [1] - 5:5
**jurors** [1] - 105:23
**Jurors** [1] - 35:8
**jury** [147] - 4:9, 5:2, 5:3, 5:23, 6:9, 8:17, 8:25, 9:3, 9:9, 10:5, 15:25, 22:19, 24:6, 26:7, 28:7, 35:6, 35:19, 36:2, 40:7, 42:6, 43:18, 45:14, 45:20, 46:10, 47:19, 50:3, 51:17, 53:1, 53:9, 54:13, 54:14, 71:5, 71:25, 74:7, 76:17, 87:19, 97:25, 106:21, 106:24, 107:1, 107:2, 107:8, 107:22, 108:12, 108:15, 108:25, 111:11, 121:21, 121:25, 122:3, 122:10, 122:11, 122:15, 123:12, 123:13, 123:21, 124:2, 124:19, 125:7, 125:24, 126:20, 127:14, 128:12, 129:4, 129:10, 130:12, 132:6, 132:20, 133:9, 133:20, 133:23, 134:25, 135:10, 135:12, 135:25, 136:17, 136:22, 137:1, 137:6, 138:19, 141:14, 142:21, 143:14, 144:20, 144:23, 145:1, 145:17, 147:6, 147:8, 150:20, 150:25, 151:4, 151:15, 153:21, 154:3, 154:22, 155:8, 156:8, 156:17, 157:1, 157:24, 160:10, 160:24, 161:2,

162:14, 165:9, 165:12, 167:9, 167:18, 168:4, 168:5, 169:9, 170:8, 170:10, 170:23, 170:24, 171:7, 171:14, 171:25, 172:12, 173:11, 174:5, 174:6, 175:5, 176:22, 180:3, 180:8, 180:15, 180:18, 181:16, 181:19, 181:24, 182:1, 183:6, 183:14, 183:18, 184:4, 184:13, 184:15, 185:24, 186:7, 186:24, 187:3
**Jury** [21] - 105:20, 130:17, 130:23, 131:3, 131:7, 131:10, 131:13, 132:10, 132:13, 134:19, 136:4, 136:7, 136:21, 137:20, 138:2, 138:25, 141:18, 151:25, 152:15, 153:14, 158:8
**JURY** [6] - 1:9, 87:21, 88:4, 88:11, 111:12, 121:10
**jury's** [3] - 99:1, 162:10, 182:4
**Justesen** [2] - 3:10, 104:8

## K

**keenly** [2] - 50:9, 50:11
**keep** [11] - 16:3, 16:4, 19:21, 27:3, 27:10, 74:21, 97:4, 97:7, 105:22, 128:6
**kept** [3] - 27:23, 79:8, 117:15
**Key** [1] - 34:15
**kind** [11] - 24:2, 47:4, 70:3, 108:1, 117:16, 118:6, 118:8, 118:9, 123:20, 144:18, 146:13
**kindergarten** [1] - 4:13
**knowing** [1] - 108:3
**knowledge** [14] - 40:22, 76:13, 76:14, 78:22, 81:14, 82:21, 82:24, 83:19, 85:9, 89:23, 93:8, 114:6, 159:16
**known** [3] - 10:9, 89:18, 161:3
**knows** [4] - 99:3, 119:8, 119:20, 119:21

## L

**ladies** [3] - 35:19, 111:10, 126:2
**lag** [1] - 127:24
**laid** [1] - 82:6
**landlords** [1] - 30:2
**language** [4] - 46:2, 140:4, 156:11, 156:12
**lapel** [3] - 36:12, 36:14, 64:8
**last** [18] - 4:7, 21:2, 27:17, 28:4, 31:3, 56:5, 73:4, 87:13, 98:3, 98:4, 104:5, 126:7, 126:8, 128:7, 129:9, 149:2, 167:22, 169:12
**late** [7] - 67:13, 69:6, 107:12, 107:20, 124:23, 127:9, 127:13
**latest** [1] - 25:8
**Lauderdale** [1] - 48:19
**Law** [2] - 1:14, 3:7
**law** [50] - 8:16, 38:16, 52:5, 53:20, 67:1, 99:23, 125:14, 126:9, 126:10, 127:25, 128:2, 135:20, 135:23, 140:21, 143:24, 146:8, 146:12, 146:19, 146:22, 146:24, 147:8, 147:13, 150:5, 150:7, 151:6, 151:10, 152:2, 155:9, 159:4, 162:2, 162:6, 162:24, 165:1, 169:22, 169:24, 170:6, 170:7, 171:15, 171:25, 172:8, 172:10, 172:14, 172:22, 175:16, 176:15, 176:16, 184:8, 186:5, 186:7
**lawsuit** [3] - 24:14, 86:16, 99:21
**lawyer** [5] - 7:1, 42:12, 72:24, 77:19, 110:14
**lawyers** [2] - 121:21, 126:13
**lawyers'** [1] - 130:1
**lay** [4] - 11:15, 67:5, 71:10, 82:11
**LAZARO** [1] - 1:17
**LEA** [1] - 1:13
**lead** [3] - 46:10, 115:6, 115:11
**leading** [4] - 114:24, 115:12, 115:13, 115:16
**leads** [1] - 47:3
**lease** [32] - 5:25, 7:14, 7:24, 14:10, 20:19, 39:5, 57:20, 60:1, 60:2, 61:2, 61:4, 61:9, 61:11, 78:6, 80:5, 80:10, 80:12, 80:14, 80:15, 83:20, 91:18, 91:19, 92:20, 94:13, 94:17, 94:20, 94:24, 101:13, 103:20, 168:14, 168:20, 169:6
**leased** [2] - 57:11, 58:19
**least** [8] - 47:1, 98:2, 99:12, 155:4, 166:22, 174:12, 179:5, 187:5
**leave** [6] - 105:12, 108:7, 124:12, 128:6, 128:21, 128:25
**lectern** [1] - 64:8
**led** [1] - 149:12
**LEE** [1] - 1:14
**left** [3] - 47:12, 126:24, 154:3
**legal** [16] - 16:10, 23:23, 24:13, 24:22, 35:20, 126:13, 128:13, 133:18, 133:19, 134:11, 140:4, 142:8, 143:9, 151:17, 157:18, 178:12
**legally** [3] - 10:6, 92:22, 147:16
**lend** [1] - 147:11
**lender** [1] - 10:8
**less** [2] - 145:18, 168:17
**lessee** [2] - 58:23
**lessor** [1] - 58:23
**letter** [4] - 7:17, 34:13, 118:5, 118:10
**letterhead** [1] - 98:20
**letters** [3] - 100:13, 118:12, 118:13
**letting** [8] - 50:21, 50:23, 52:17, 52:18, 69:1, 74:10, 109:4, 132:6
**Lexis** [11] - 141:10, 141:19, 141:22, 142:1, 142:2, 142:19, 154:18, 157:16, 157:19, 158:16, 158:17
**LexisNexis** [1] - 140:13
**liabilities** [1] - 33:24
**liability** [2] - 21:16, 21:17
**liaising** [1] - 98:10
**lie** [1] - 21:12
**lifetime** [1] - 78:6
**light** [4] - 50:1, 125:16, 178:21, 181:2
**likely** [3] - 13:4, 107:17, 109:3
**limine** [2] - 51:2, 109:16
**limitations** [12] - 24:9, 24:12, 24:16, 24:19, 24:20, 25:1, 25:7, 148:10, 169:23, 170:5, 170:8, 171:3
**limited** [1] - 10:11
**limiting** [1] - 8:25
**Lincoln** [1] - 1:15
**line** [8] - 9:8, 29:3, 91:25, 173:10, 181:13, 181:14, 181:23, 182:5
**link** [1] - 156:9
**liquidate** [2] - 152:4, 152:11
**liquidating** [1] - 152:7
**list** [4] - 27:2, 76:21, 97:1, 97:3
**listed** [5] - 36:11, 42:2, 46:14, 148:24, 178:1
**listen** [1] - 71:25
**listener** [1] - 70:12
**listening** [6] - 50:5, 50:9, 50:11, 51:4, 52:4, 155:17
**listing** [2] - 33:18, 37:16
**lists** [1] - 153:22
**literally** [3] - 72:21, 134:21, 185:23
**litigation** [7] - 95:20, 95:25, 96:3, 96:7, 133:1, 133:3, 133:4
**LLC** [11] - 1:3, 3:3, 3:8, 20:12, 21:24, 23:7, 23:12, 32:18, 86:15, 102:2, 102:7
**loan** [18] - 10:6, 10:16, 13:2, 13:5, 13:6, 13:11, 13:16, 13:25, 14:2, 23:2, 34:2, 63:16, 100:3, 112:8, 112:10, 112:12, 151:12
**lobby** [1] - 103:16
**located** [2] - 10:10, 57:1
**location** [2] - 160:6, 160:8
**lodge** [1] - 8:10
**look** [30] - 12:4, 20:7, 33:23, 72:3, 98:16, 99:18, 101:1, 101:5, 104:5, 104:14, 106:21, 107:7, 107:24, 128:5, 128:19, 136:20, 159:23, 166:25, 167:1, 170:23, 173:22, 174:2, 174:9, 174:19, 176:15, 184:7, 184:25, 185:7, 186:10, 187:7
**looked** [5] - 25:14, 42:19, 44:4, 129:9, 160:5
**looking** [19] - 17:24, 18:1, 19:16, 19:21, 25:10, 30:8, 64:12, 72:3, 77:15, 155:15, 155:16, 155:24, 156:1, 156:4, 161:10, 173:22, 173:24, 174:17, 185:9
**looks** [14] - 12:15, 34:15, 68:25, 76:24, 97:2, 97:6, 97:12, 97:16, 99:12, 99:18, 101:7, 101:12, 107:23, 133:13
**loop** [1] - 74:21
**lose** [3] - 10:16, 14:19, 183:16
**losing** [2] - 73:5, 73:6
**loss** [1] - 62:21
**losses** [1] - 20:22
**lost** [1] - 149:13
**loyal** [1] - 29:25
**lunch** [21] - 87:22, 87:24, 105:9, 105:17, 105:24,

107:6, 107:20, 122:5, 124:9, 124:23, 124:24, 127:12, 127:13, 127:15, 128:21, 128:22, 128:24, 129:1

## M

**ma'am** [1] - 18:22
**MACKIEWICZ** [10] - 1:13, 3:12, 26:3, 31:7, 32:6, 32:24, 55:15, 55:21, 107:11, 187:16
**Mackiewicz** [1] - 3:9
**mad** [1] - 30:3
**mail** [36] - 38:17, 40:16, 43:8, 43:12, 43:22, 43:23, 46:9, 46:11, 46:13, 46:17, 46:23, 62:25, 66:19, 66:20, 66:23, 67:1, 85:10, 85:11, 85:14, 85:22, 90:14, 90:22, 102:15, 118:10, 118:12, 118:13, 148:23, 161:18, 163:7, 163:8, 163:10, 163:25, 164:2, 164:5
**maintain** [6] - 36:9, 36:10, 151:24, 163:11, 164:5, 185:4
**maintained** [1] - 170:15
**maintaining** [1] - 163:7
**majority** [2] - 58:3, 58:5
**man** [1] - 70:5
**manage** [5] - 14:15, 29:21, 60:4, 103:20, 104:21
**managed** [3] - 14:16, 56:23, 61:24
**management** [4] - 14:16, 33:12, 100:21, 101:10
**manager** [7] - 63:15, 65:15, 78:9, 78:18, 81:5, 85:21, 87:8
**managing** [12] - 34:21, 34:23, 62:5, 62:7, 63:2, 63:23, 75:25, 80:2, 80:15, 80:18, 80:24, 116:8
**Manny** [1] - 3:15
**MANUEL** [1] - 1:17
**map** [3] - 34:12, 34:13, 34:17
**Map** [1] - 34:15
**MARCUS** [1] - 1:17
**Marcus** [1] - 3:14
**mark** [2] - 158:23, 171:18
**masse** [1] - 55:24
**masse................. Page** [1] - 2:11
**matter** [17] - 8:16, 16:23, 24:14, 24:15, 44:9, 48:5, 53:3, 53:20, 130:11, 150:5, 151:17, 162:2, 162:6, 162:24, 165:1, 172:13, 187:20
**matters** [1] - 35:20
**max** [1] - 45:12
**mean** [48] - 6:15, 10:15, 13:3, 19:19, 34:10, 44:2, 44:17, 48:21, 49:25, 51:5, 51:11, 51:15, 53:8, 55:8, 73:5, 73:21, 74:14, 87:22, 92:24, 96:5, 97:20, 104:23, 104:24, 116:18, 127:1, 128:11, 142:4, 142:10, 142:14, 147:3, 147:7, 150:6, 150:7, 152:8, 152:23, 155:12, 161:6, 162:4, 163:20, 164:15, 167:25, 168:2, 168:3, 168:11, 169:1, 173:4, 174:16, 184:3
**meaning** [5] - 16:3, 29:22, 178:12, 178:21, 180:2
**means** [3] - 6:13, 6:16, 83:12
**meant** [4] - 34:7, 34:8, 51:23, 151:7
**measure** [1] - 180:17
**mechanism** [1] - 118:4
**meet** [6] - 39:3, 63:25, 65:3, 65:7, 71:20, 78:10
**meeting** [8] - 30:8, 30:9, 30:15, 64:18, 73:16, 73:19, 74:24, 78:13
**MELISSA** [1] - 1:13
**Melissa** [1] - 3:9
**members** [1] - 124:11
**memorandum** [3] - 10:12, 10:19, 10:25
**mention** [1] - 110:15
**menus** [1] - 127:15
**mere** [1] - 170:16
**Mermelli** [1] - 154:5
**Mermelli's** [1] - 103:3
**message** [1] - 65:21
**messages** [3] - 99:3, 110:25, 117:20
**met** [4] - 37:25, 64:4, 64:22, 140:16
**method** [2] - 168:11, 168:23
**methodology** [3] - 52:17, 54:8
**Miami** [20] - 1:3, 1:16, 1:19, 1:24, 1:25, 10:10, 32:14, 33:11, 49:1, 57:2, 57:6, 65:11, 65:23, 66:11, 89:4, 95:20, 96:16, 118:5, 187:24, 187:25
**Miami-Dade** [2] - 95:20, 96:16
**mic** [4] - 59:11, 71:23, 75:15, 75:18
**microphone** [5] - 7:7, 64:8, 72:15, 72:22, 77:12
**microphones** [1] - 130:9
**middle** [7] - 20:8, 29:1, 124:12, 127:4, 181:14, 186:3
**might** [18] - 7:9, 35:23, 44:4, 90:4, 90:6, 93:1, 108:1, 122:4, 122:5, 122:14, 125:15, 129:22, 129:23, 147:8, 147:11, 151:15, 173:3, 178:15
**million** [5] - 46:1, 46:4, 58:7, 95:11, 153:3
**millions** [1] - 10:21
**mind** [11] - 47:4, 54:22, 73:5, 73:7, 108:4, 108:6, 128:7, 149:7, 150:12, 156:15, 156:23
**mindful** [1] - 7:8
**mine** [3] - 18:16, 18:20, 101:9
**minus** [1] - 52:1
**minute** [15] - 22:11, 48:12, 114:4, 121:24, 124:1, 139:18, 139:23, 141:8, 142:5, 155:17, 156:25, 160:1, 167:22, 169:12
**minutes** [7] - 35:23, 49:21, 125:7, 129:17, 166:21, 166:22, 166:25
**Mirmelli** [72] - 4:1, 4:18, 5:22, 9:18, 15:23, 16:7, 16:22, 17:13, 18:24, 23:16, 23:17, 40:13, 40:15, 40:21, 40:23, 40:25, 41:6, 41:10, 41:14, 42:10, 42:23, 42:24, 43:4, 43:10, 43:20, 44:3, 46:16, 56:17, 61:4, 64:21, 66:15, 66:22, 66:25, 70:18, 70:21, 71:1, 73:15, 73:19, 74:19, 74:20, 74:24, 75:25, 76:2, 76:5, 80:2, 80:9, 81:14, 82:17, 82:19, 84:25, 85:3, 85:7, 87:16, 96:10, 112:9, 112:14, 112:16, 113:3, 113:22, 114:11, 114:20, 115:3, 115:20, 115:24, 117:10, 120:24, 144:8, 146:9, 146:20, 148:12, 163:6, 164:10
**MIRMELLI** [2] - 2:2, 5:13
**Mirmelli's** [17] - 38:16, 41:19, 57:9, 63:22, 64:3, 66:20, 66:22, 75:9, 81:22, 82:2, 82:3, 109:17, 153:19, 154:1, 170:6, 170:10, 170:24
**mirrors** [1] - 47:6
**misleading** [3] - 158:9, 171:25, 172:5
**missed** [4] - 29:3, 34:25, 35:2, 76:22
**missing** [1] - 153:10
**misspoke** [1] - 20:1
**mistake** [1] - 22:12
**mistaken** [1] - 140:7
**mitigate** [1] - 79:20
**mix** [1] - 177:22
**modification** [7] - 44:11, 44:15, 44:17, 160:14, 160:16, 167:16, 169:7
**modifications** [3] - 167:8, 168:1, 168:9
**modified** [4] - 6:2, 6:5, 134:5, 155:12
**modified)** [1] - 158:8
**modify** [2] - 134:5, 167:14
**modifying** [1] - 132:23
**moment** [7] - 15:12, 19:24, 104:7, 104:10, 105:4, 144:18, 167:1
**moments** [1] - 15:20
**Monday** [2] - 124:14, 128:17
**money** [20] - 21:21, 23:17, 25:15, 47:14, 58:3, 58:5, 60:17, 69:5, 75:16, 79:2, 79:4, 79:7, 79:16, 79:17, 79:18, 80:1, 120:7, 150:17, 180:3
**moneys** [1] - 52:1
**monitored** [1] - 79:22
**monitors** [1] - 87:20
**month** [25] - 6:10, 14:7, 61:12, 61:14, 73:23, 74:11, 78:7, 80:13, 80:16, 94:12, 94:20, 98:3, 98:4, 98:5, 99:4, 101:14, 167:11, 168:14
**month-to-month** [6] - 80:13, 80:16, 94:12, 94:20, 167:11, 168:14
**monthly** [1] - 34:3
**morning** [26] - 3:6, 3:12, 3:13, 3:14, 3:18, 3:19, 5:4, 5:5, 5:6, 5:8, 5:16, 5:17, 56:15, 56:16, 107:15, 111:25, 112:2, 127:4, 127:6, 174:8, 174:9, 174:10, 174:14, 175:17, 187:8
**mortgage** [4] - 63:16, 63:17, 74:15, 74:17
**mortgages** [1] - 51:20
**most** [6] - 13:4, 30:6, 30:25, 50:1, 181:3, 186:4
**motion** [23] - 49:25, 51:2, 52:25, 53:7, 53:10, 53:18, 53:21, 53:22, 109:16, 122:22, 162:1,

162:11, 162:15, 162:18, 162:19, 164:23, 164:25, 172:1, 172:6, 172:12, 172:19, 172:23, 172:24
**motions** [2] - 35:15, 122:21
**mouth** [1] - 117:17
**move** [17] - 8:22, 12:17, 18:9, 19:2, 19:4, 19:6, 25:23, 36:4, 36:24, 54:9, 65:13, 68:16, 68:18, 81:12, 84:11, 164:14, 165:5
**moved** [21] - 17:16, 17:19, 27:25, 38:20, 65:14, 66:3, 89:7, 89:12, 89:19, 90:15, 90:19, 90:22, 102:12, 102:21, 124:15, 127:3, 164:16, 164:17, 164:19, 173:2, 176:14
**moves** [2] - 68:7, 69:20
**moving** [10] - 6:21, 17:3, 37:5, 40:6, 76:9, 83:25, 102:13, 158:18, 163:20, 163:22
**MR** [632] - 3:6, 3:14, 3:18, 4:21, 4:24, 5:1, 5:12, 5:15, 5:18, 5:21, 6:23, 7:11, 8:5, 8:8, 8:10, 8:13, 8:16, 8:19, 8:22, 9:10, 9:13, 9:16, 9:17, 11:11, 11:17, 11:19, 11:22, 11:24, 12:1, 12:3, 12:17, 12:20, 12:23, 12:24, 14:21, 14:24, 15:1, 15:2, 15:12, 15:14, 15:16, 15:17, 15:22, 16:12, 16:18, 16:21, 16:23, 17:1, 17:4, 17:8, 17:14, 18:13, 18:15, 18:17, 18:18, 18:22, 18:23, 20:16, 21:1, 21:8, 21:11, 22:7, 22:12, 22:15, 22:18, 22:22, 24:5, 24:7, 24:24, 25:2, 25:5, 25:18, 25:22, 26:1, 26:4, 26:7, 26:9, 26:10, 26:14, 26:17, 26:20, 26:24, 27:1, 27:6, 27:8, 27:15, 27:18, 28:12, 28:14, 28:18, 28:20, 28:22, 28:24, 29:5, 29:7, 29:8, 29:9, 29:13, 29:15, 30:11, 30:14, 31:5, 31:8, 31:12, 32:2, 32:5, 32:7, 32:8, 32:20, 32:22, 32:25, 33:1, 33:8, 33:10, 33:14, 33:16, 33:20, 33:22, 34:1, 35:5, 35:13, 35:15, 36:4, 36:7, 36:14, 36:16, 36:18, 36:24, 37:10, 37:13, 37:15, 37:19, 37:24, 38:2, 38:5, 38:7, 38:10, 38:12, 38:25, 39:2, 39:13, 39:23, 39:25, 40:10, 41:16, 42:5, 42:10, 43:3, 43:7, 43:10, 43:25, 44:6, 44:11, 44:21, 45:6, 45:24, 46:8, 47:24, 48:14, 48:17, 48:23, 49:5, 49:11, 49:14, 49:20, 51:8, 51:13, 51:18, 51:25, 52:22, 53:2, 53:5, 53:15, 53:18, 54:12, 54:18, 54:22, 54:25, 55:3, 55:7, 55:9, 55:11, 55:13, 55:16, 55:25, 56:8, 56:11, 56:14, 57:25, 58:4, 59:7, 59:10, 59:14, 60:6, 60:9, 60:13, 60:16, 60:22, 60:24, 62:18, 62:19, 64:6, 64:10, 64:16, 64:17, 65:25, 66:1, 66:4, 66:6, 67:4, 67:6, 67:8, 67:17, 67:20, 67:22, 68:7, 68:9, 68:11, 68:13, 68:15, 68:17, 68:19, 68:21, 69:7, 69:10, 69:20, 69:22, 70:8, 70:18, 71:5, 71:14, 71:22, 72:2, 72:10, 72:20, 72:23, 73:3, 73:10, 73:13, 74:4, 74:6, 74:8, 75:22, 75:24, 76:7, 76:9, 76:10, 76:12, 76:15, 76:19, 77:9, 78:1, 78:2, 78:14, 78:16, 81:10, 81:12, 81:13, 81:24, 82:1, 82:4, 82:8, 82:14, 82:16, 82:25, 83:2, 83:4, 83:6, 83:9, 83:11, 83:13, 83:15, 83:17, 83:23, 83:25, 84:1, 84:11, 84:19, 84:20, 85:15, 85:17, 85:20, 86:3, 86:6, 86:8, 86:12, 87:3, 87:6, 87:13, 87:15, 87:23, 88:12, 88:15, 89:1, 89:3, 89:20, 89:22, 90:16, 90:20, 93:25, 94:2, 94:7, 94:9, 96:19, 96:22, 99:15, 99:17, 100:23, 100:25, 101:2, 101:4, 102:4, 102:6, 102:24, 103:1, 104:2, 104:9, 104:11, 104:13, 104:17, 104:18, 105:4, 105:6, 106:2, 106:5, 106:8, 106:11, 106:14, 106:18, 108:9, 108:18, 108:21, 108:24, 109:8, 109:10, 109:12, 109:15, 109:22, 109:23, 110:2, 110:9, 110:16, 110:20, 111:3, 111:5, 111:9, 111:17, 111:24, 112:3, 112:4, 112:19, 112:21, 113:5, 113:7, 113:12, 113:14, 113:24, 114:9, 114:13, 114:16, 114:22, 114:24, 115:2, 115:8, 115:18, 115:19, 115:22, 115:25, 116:1, 116:13, 116:17, 116:19, 116:22, 119:9, 119:12, 119:14, 120:15, 120:22, 121:5, 121:7, 121:15, 121:18, 122:9, 122:18, 122:20, 123:3, 123:15, 123:17, 125:19, 125:22, 130:3, 130:4, 130:5, 130:19, 130:21, 130:25, 131:2, 131:5, 131:6, 131:8, 131:9, 131:11, 131:12, 131:14, 131:17, 131:19, 131:22, 131:23, 131:25, 132:1, 132:3, 132:4, 132:8, 132:11, 132:12, 132:14, 132:16, 132:19, 132:22, 132:25, 133:7, 133:14, 133:16, 134:3, 134:10, 135:2, 135:14, 135:19, 136:2, 136:6, 136:12, 136:15, 136:20, 137:7, 137:12, 137:14, 137:18, 137:21, 137:24, 138:5, 138:7, 138:10, 138:13, 138:15, 138:23, 139:4, 139:9, 139:11, 139:14, 139:17, 139:20, 139:24, 140:2, 140:7, 140:12, 140:25, 141:3, 141:6, 141:9, 141:14, 141:19, 141:21, 141:24, 142:1, 142:6, 142:23, 142:25, 143:3, 143:17, 143:20, 143:23, 144:6, 144:13, 144:16, 144:20, 145:4, 145:22, 145:25, 146:4, 146:6, 146:23, 147:4, 147:12, 148:7, 148:17, 149:5, 149:19, 150:9, 150:15, 150:23, 151:3, 151:19, 151:24, 152:6, 152:16, 152:17, 152:19, 152:21, 153:1, 153:11, 153:16, 153:19, 154:10, 154:15, 154:19, 154:21, 154:23, 154:25, 155:6, 155:11, 155:12, 155:14, 155:18, 155:24, 156:2, 156:4, 156:7, 156:12, 157:6, 157:9, 157:16, 158:3, 158:5, 158:11, 158:15, 158:20, 158:23, 158:25, 159:6, 159:14, 159:22, 160:2, 160:7, 160:22, 160:25, 161:3, 161:6, 162:5, 162:13, 162:21, 163:1, 163:5, 163:13, 163:24, 164:7, 164:9, 164:11, 164:25, 165:11, 165:16, 165:21, 165:24, 166:1, 166:5, 166:9, 166:11, 166:14, 166:17, 166:20, 166:22, 166:24, 167:4, 167:7, 167:18, 167:20, 168:7, 168:11, 169:11, 169:16, 170:19, 171:10, 171:21, 172:2, 172:16, 172:23, 173:6, 173:17, 173:19, 173:25, 174:13, 174:20, 175:4, 175:8, 175:11, 175:15, 175:24, 176:6, 176:8, 176:11, 176:21, 177:1, 177:5, 177:9, 177:13, 177:15, 177:17, 177:19, 177:24, 178:3, 178:10, 178:19, 179:2, 179:5, 179:9, 179:13, 179:21, 180:6, 180:8, 180:11, 180:15, 180:25, 181:12, 182:10, 182:15, 182:24, 183:5, 183:10, 183:20, 183:22, 184:2, 184:25, 185:7, 185:13, 185:17, 185:21, 186:11, 186:15, 186:17, 186:20, 186:23, 187:13, 187:15
**MS** [9] - 3:12, 26:3, 31:7, 32:6, 32:24, 55:15, 55:21, 107:11, 187:16
**multipage** [1] - 17:1
**multiple** [2] - 7:20, 74:2
**multitask** [1] - 187:10
**mumble** [1] - 72:15
**mumbling** [2] - 62:17,

64:9
**must** [4] - 13:3, 74:14, 128:3, 157:5
**mutually** [1] - 135:5

## N

**name** [3] - 42:1, 56:5, 86:15
**names** [1] - 135:15
**Nanette** [1] - 3:16
**NATHAN** [2] - 2:4, 56:12
**Nathan** [26] - 13:19, 14:17, 25:16, 26:11, 26:21, 27:3, 27:13, 27:19, 27:25, 28:8, 29:18, 30:15, 31:13, 31:19, 31:24, 33:3, 33:17, 34:21, 49:5, 49:6, 49:15, 55:25, 56:6, 64:18, 159:15, 168:17
**Nathan's** [2] - 31:18, 34:17
**near** [1] - 72:15
**nearby** [1] - 80:25
**nearest** [1] - 111:2
**necessary** [7] - 131:15, 152:4, 159:7, 159:11, 161:23, 167:16, 173:4
**need** [26] - 11:14, 15:20, 20:22, 22:8, 22:10, 22:11, 28:8, 48:20, 52:4, 55:5, 58:5, 60:17, 67:5, 71:7, 72:25, 73:23, 77:18, 110:3, 130:10, 132:7, 139:22, 148:1, 155:7, 167:15, 170:14, 186:16
**needed** [3] - 37:17, 96:2, 143:7
**needs** [4] - 48:19, 134:5, 168:23, 181:23
**negate** [4] - 40:23, 145:15, 175:23, 178:5
**negates** [1] - 40:25
**negative** [1] - 21:16
**negotiate** [1] - 30:3
**negotiating** [1] - 88:17
**net** [8] - 45:25, 50:14, 51:8, 51:13, 52:1, 81:22, 82:3, 83:22
**never** [9] - 20:24, 22:2, 45:19, 45:20, 45:21, 46:23, 79:16, 117:15, 145:11
**nevertheless** [1] - 180:8
**new** [3] - 31:18, 95:8, 163:18
**next** [22] - 4:6, 4:11, 5:23, 14:23, 19:4, 19:6, 19:9, 19:22, 28:18, 28:20, 28:22, 28:24, 29:1, 29:13, 33:9, 35:12, 39:1, 48:19, 89:2, 104:4, 111:16, 114:7
**NH** [1] - 99:7
**nicely** [1] - 127:10
**Nielsen** [2] - 3:14, 71:23
**NIELSEN** [262] - 1:17, 3:14, 18:17, 26:1, 26:4, 35:15, 36:4, 36:7, 36:14, 36:16, 36:18, 36:24, 37:10, 37:13, 37:15, 37:19, 37:24, 38:2, 38:5, 38:7, 38:12, 38:25, 39:2, 39:13, 39:23, 39:25, 46:8, 47:24, 48:14, 48:17, 48:23, 49:5, 49:11, 49:20, 53:2, 53:5, 53:15, 53:18, 54:12, 54:18, 54:22, 54:25, 55:3, 55:7, 55:9, 55:11, 55:13, 55:16, 55:25, 56:8, 56:11, 56:14, 58:4, 59:7, 59:14, 60:9, 60:16, 60:22, 60:24, 62:18, 62:19, 64:6, 64:10, 64:16, 64:17, 65:25, 66:1, 66:4, 66:6, 67:6, 67:8, 67:17, 67:20, 67:22, 68:7, 68:13, 68:15, 68:17, 68:19, 68:21, 69:7, 69:10, 69:20, 70:8, 70:18, 71:5, 71:14, 72:2, 72:10, 72:20, 72:23, 73:3, 73:13, 74:4, 74:6, 74:8, 75:22, 75:24, 76:9, 76:10, 76:15, 76:19, 78:1, 78:2, 78:16, 81:12, 81:13, 82:1, 82:8, 82:14, 82:16, 83:2, 83:6, 83:9, 83:13, 83:15, 83:17, 83:25, 84:1, 84:19, 84:20, 85:20, 86:3, 86:6, 86:8, 89:20, 90:16, 93:25, 106:2, 106:5, 108:18, 108:21, 108:24, 109:10, 109:22, 110:9, 110:16, 110:20, 111:3, 111:5, 111:9, 111:17, 111:24, 112:3, 112:4, 112:19, 112:21, 113:7, 113:12, 113:14, 114:9, 114:16, 115:2, 115:18, 115:19, 115:25, 116:1, 116:13, 116:17, 116:19, 121:7, 121:15, 122:20, 125:22, 130:5, 130:21, 131:2, 131:6, 131:9, 131:12, 131:19, 131:23, 132:1, 132:4, 132:8, 132:12, 132:16, 133:7, 133:14, 133:16, 134:3, 134:10, 135:14, 136:12, 136:15, 137:7, 138:5, 138:15, 140:12, 140:25, 141:3, 141:9, 141:14, 141:19, 141:24, 148:17, 149:5, 149:19, 150:9, 150:15, 150:23, 151:3, 151:24, 152:19, 152:21, 153:1, 153:11, 153:19, 154:19, 154:21, 154:23, 155:12, 155:24, 156:2, 156:4, 156:7, 157:6, 158:3, 158:5, 158:11, 158:15, 159:14, 159:22, 163:5, 163:24, 164:9, 165:16, 165:24, 166:20, 166:24, 167:4, 167:20, 168:7, 169:11, 170:19, 173:17, 173:19, 175:11, 176:11, 177:1, 177:5, 177:9, 177:13, 177:15, 177:17, 177:19, 178:3, 180:11, 182:10, 182:15, 182:24, 183:5, 183:10, 183:20, 183:22, 184:2, 184:25, 185:7, 185:13, 185:21, 186:23, 187:13
**night** [1] - 73:5
**nine** [3] - 26:5, 124:7
**nine-day** [1] - 124:7
**NO** [1] - 1:2
**nobody** [1] - 130:11
**nominal** [1] - 25:15
**non** [2] - 82:11, 148:8
**non-hearsay** [1] - 82:11
**non-suit** [1] - 148:8
**none** [1] - 138:13
**normal** [1] - 133:4
**normally** [1] - 16:2
**North** [2] - 1:24, 187:24
**Northeast** [1] - 89:8
**note** [27] - 22:20, 22:23, 22:25, 23:8, 23:12, 23:15, 23:20, 23:24, 24:3, 24:16, 24:21, 25:6, 79:6, 95:22, 112:8, 112:17, 113:1, 113:2, 113:4, 113:23, 148:8, 148:9, 148:15, 149:10, 156:19, 169:14, 170:9
**noted** [1] - 53:22
**notes** [6] - 47:22, 128:6, 129:6, 169:22, 180:12
**nothing** [3] - 64:14, 181:5, 186:20
**notice** [133] - 6:4, 24:2, 36:8, 36:11, 36:19, 38:8, 38:21, 40:11, 40:12, 40:18, 41:1, 41:2, 41:3, 41:5, 41:7, 41:8, 41:15, 41:18, 42:1, 42:15, 42:18, 42:22, 42:23, 43:18, 43:20, 44:10, 44:15, 45:11, 45:14, 50:3, 50:4, 50:7, 50:9, 66:4, 66:10, 70:9, 70:11, 70:14, 70:15, 70:16, 70:19, 73:19, 78:3, 85:22, 87:10, 88:23, 89:1, 89:18, 90:6, 90:8, 90:21, 91:14, 91:21, 92:1, 92:5, 92:8, 92:15, 92:19, 92:21, 93:1, 93:11, 93:14, 93:17, 93:21, 93:22, 94:3, 99:23, 100:9, 100:12, 100:17, 117:2, 117:9, 117:12, 117:14, 117:16, 117:24, 118:4, 118:6, 118:8, 119:15, 119:18, 119:23, 120:1, 120:11, 120:23, 121:2, 143:7, 143:11, 143:12, 144:4, 144:7, 144:11, 144:14, 144:18, 145:2, 145:5, 145:11, 145:13, 145:24, 146:1, 146:3, 146:10, 146:12, 146:15, 147:1, 147:3, 147:9, 148:2, 150:3, 150:22, 151:8, 159:16, 159:17, 159:19, 161:10, 161:15, 161:18, 161:24, 163:17, 163:22, 164:10, 164:15, 164:17, 167:15, 168:11, 168:19, 168:22, 169:3
**Notice** [1] - 119:15
**noticed** [1] - 22:4
**notices** [5] - 85:10, 99:25, 117:19, 117:20, 120:16
**notifying** [1] - 93:23
**novel** [1] - 163:24
**nowhere** [1] - 72:15
**number** [9] - 10:19, 11:16, 16:25, 25:21, 103:13, 158:14, 168:11, 168:13, 183:17
**Number** [2] - 10:20, 167:8
**numbering** [1] - 142:1
**numbers** [2] - 99:4, 99:6

## O

**o'clock** [5] - 35:22, 49:17, 124:18, 127:23, 128:9
**oath** [1] - 116:23
**object** [16] - 21:15, 132:4, 139:1, 139:2,

139:5, 139:10, 139:12, 142:7, 156:13, 172:6, 172:9, 172:10, 172:11, 172:14, 172:22, 172:25
**objecting** [2] - 8:14, 84:12
**objection** [110] - 6:23, 7:9, 8:5, 8:10, 8:24, 12:19, 12:20, 14:21, 15:16, 16:12, 16:24, 17:5, 20:16, 21:8, 25:20, 25:24, 25:25, 26:5, 55:20, 57:25, 60:6, 60:13, 67:4, 67:7, 68:9, 69:22, 76:7, 76:12, 77:9, 77:20, 77:21, 78:14, 81:10, 81:24, 82:4, 82:6, 82:12, 82:25, 83:4, 83:11, 83:23, 84:11, 85:15, 89:20, 90:16, 93:25, 109:12, 109:14, 113:5, 113:24, 114:13, 114:22, 114:23, 115:8, 115:22, 125:18, 125:19, 125:22, 129:13, 129:21, 130:19, 130:21, 130:25, 131:2, 131:5, 131:6, 131:8, 131:9, 131:11, 131:12, 131:14, 131:20, 131:22, 131:23, 131:25, 132:1, 132:3, 132:11, 132:12, 132:14, 134:16, 135:7, 136:2, 136:7, 137:16, 137:23, 138:1, 138:4, 138:9, 138:11, 138:12, 138:14, 138:21, 139:16, 144:21, 151:22, 151:24, 152:14, 154:24, 155:1, 155:5, 157:9, 157:15, 170:13, 172:25, 173:2, 173:10, 177:6
**objectionable** [1] - 135:25
**objections** [6] - 169:19, 174:5, 174:10, 186:4, 186:8, 187:6
**objects** [3] - 7:1, 7:2, 7:5
**obligated** [3] - 42:16, 42:17, 60:10
**obligates** [1] - 46:2
**obligation** [6] - 37:2, 41:24, 43:2, 45:7, 51:8, 143:15
**obligations** [19] - 37:4, 38:1, 39:7, 59:2, 61:11, 64:1, 64:19, 64:22, 65:3, 65:8, 73:16, 73:20, 74:25, 78:10, 78:13, 145:15, 147:20, 149:18, 150:22
**observance** [1] - 127:17
**observing** [2] - 48:18, 123:8
**obvious** [1] - 187:11
**obviously** [7] - 49:18, 50:19, 121:23, 128:24, 152:3, 169:19, 174:1
**occasionally** [1] - 79:25
**occupied** [2] - 160:6, 160:8
**occurred** [4] - 45:20, 143:10, 144:2, 156:22
**October** [4] - 1:4, 22:23, 98:25, 99:11
**OF** [2] - 1:1, 2:1
**offended** [1] - 115:12
**offer** [1] - 134:12
**office** [29] - 27:21, 27:23, 27:25, 31:14, 31:18, 38:19, 65:12, 65:13, 65:22, 66:20, 66:23, 84:3, 89:4, 89:5, 89:7, 90:15, 90:25, 101:20, 102:12, 102:13, 103:3, 103:6, 103:9, 103:17, 150:18, 159:19, 160:11
**offices** [6] - 46:18, 89:12, 89:19, 90:23, 102:21, 103:10
**Official** [2] - 1:22, 187:23
**offset** [3] - 10:21, 61:18, 61:19
**often** [1] - 65:16
**old** [2] - 123:18, 134:24
**once** [8] - 41:21, 45:18, 47:23, 89:19, 94:24, 102:19, 143:14, 151:16
**one** [75] - 6:11, 6:22, 7:20, 14:8, 16:5, 17:18, 17:20, 18:15, 24:15, 26:1, 27:10, 29:3, 29:8, 29:9, 35:17, 36:7, 37:15, 44:8, 47:14, 48:17, 48:18, 53:2, 55:6, 65:12, 68:25, 74:10, 75:2, 79:15, 82:20, 83:15, 86:22, 87:14, 92:14, 93:10, 97:7, 99:12, 100:11, 103:11, 103:12, 103:15, 103:18, 105:10, 110:22, 116:6, 116:13, 117:23, 129:21, 132:17, 133:17, 133:18, 142:4, 145:12, 147:18, 147:22, 149:8, 149:21, 152:1, 154:18, 154:21, 158:12, 165:7, 165:11, 165:17, 167:8, 168:11, 171:10, 173:10, 176:14, 178:5, 179:16, 180:16, 183:22, 184:11, 184:25
**ones** [6] - 129:20, 154:18, 161:16, 177:25, 182:14
**opened** [1] - 110:5
**opening** [1] - 150:21
**operate** [5] - 80:13, 94:12, 94:17, 95:1, 95:4
**operated** [7] - 20:18, 80:12, 94:20, 96:16, 117:9, 117:23, 118:1
**operating** [9] - 45:22, 80:20, 83:20, 94:11, 95:5, 95:6, 101:14, 101:15, 101:18
**operations** [6] - 14:16, 20:20, 56:24, 60:5, 62:8, 95:14
**operator** [1] - 101:15
**opinion** [6] - 50:21, 53:11, 53:19, 114:7, 114:10, 151:4
**opportunities** [1] - 79:20
**opportunity** [10] - 44:22, 45:15, 107:7, 123:6, 123:24, 162:1, 162:6, 162:9, 162:18, 173:15
**opposed** [5] - 9:23, 155:8, 168:14, 176:24, 186:12
**oral** [7] - 44:11, 44:15, 44:17, 160:14, 160:16, 167:7, 169:7
**orally** [2] - 168:2, 168:10
**order** [10] - 3:1, 126:10, 128:21, 128:22, 129:1, 134:24, 157:2, 177:5, 178:20, 181:2
**orient** [1] - 28:6
**original** [1] - 6:5
**originally** [2] - 57:11, 127:4
**Osoria** [1] - 3:10
**otherwise** [9] - 36:21, 38:23, 39:11, 39:19, 46:15, 159:17, 166:12, 184:8, 187:9
**ought** [1] - 156:20
**outline** [1] - 186:1
**outside** [6] - 4:12, 4:15, 8:17, 50:22, 52:18, 78:21
**outstanding** [1] - 51:20
**overdue** [1] - 77:7
**overnight** [1] - 5:7
**overruled** [14] - 8:6, 16:13, 20:17, 21:9, 58:1, 60:7, 60:14, 60:15, 85:18, 90:17, 113:6, 114:1, 114:14, 114:25
**overrules** [1] - 8:24
**oversight** [1] - 22:2
**overview** [1] - 88:14
**owe** [2] - 77:3, 146:3
**owed** [6] - 40:3, 40:4, 47:7, 47:11, 116:8, 120:7
**own** [13] - 31:2, 50:20, 50:21, 73:22, 91:5, 115:10, 128:24, 129:6, 141:20, 142:10, 142:13, 186:2
**owned** [5] - 28:1, 91:3, 91:6, 117:23, 118:7
**owner** [1] - 59:2
**ownership** [10] - 34:8, 34:9, 58:15, 58:19, 58:20, 59:1, 61:20, 61:21, 118:18, 120:24
**owning** [1] - 61:18

## P

**p.m** [11] - 1:5, 105:20, 108:10, 108:11, 108:15, 121:25, 125:24, 129:4, 130:6, 130:7, 187:17
**packet** [1] - 174:14
**Page** [3] - 160:3, 181:12, 181:14
**page** [49] - 17:16, 17:17, 17:24, 18:9, 19:4, 19:6, 19:9, 19:17, 20:7, 20:8, 27:6, 27:17, 28:4, 28:25, 29:1, 29:2, 33:9, 34:22, 76:18, 87:13, 87:14, 88:13, 89:2, 97:3, 99:16, 104:4, 130:16, 132:14, 134:21, 135:4, 136:8, 136:20, 137:16, 137:19, 137:24, 137:25, 138:1, 138:25, 139:6, 143:2, 152:17, 154:12, 154:14, 155:1, 156:9, 165:7
**pages** [1] - 22:3
**Pages** [1] - 1:7
**paid** [15] - 10:3, 13:17, 64:24, 74:11, 74:12, 74:13, 78:23, 78:25, 98:6, 101:19, 103:22, 104:22, 150:17, 168:16
**pans** [1] - 51:3
**paperwork** [1] - 15:9
**paragraph** [18] - 104:6, 139:3, 139:7, 139:10, 139:12, 140:1, 140:5, 140:6, 140:10, 140:15, 140:22, 140:24, 142:17, 142:18, 156:13, 157:7, 157:13
**paragraphs** [9] - 138:24, 139:1, 139:5, 139:21, 140:3, 140:5, 140:14, 141:5, 157:10
**paralegal** [1] - 3:11
**PARDO** [304] - 1:13, 3:6, 4:21, 6:23, 8:5, 8:10, 8:16, 8:19,

8:22, 9:10, 11:22, 12:20, 14:21, 15:16, 16:12, 16:23, 20:16, 21:8, 22:18, 22:22, 24:5, 24:7, 24:24, 25:2, 25:5, 25:18, 25:22, 26:7, 26:9, 26:10, 26:14, 26:17, 26:20, 26:24, 27:1, 27:6, 27:8, 27:15, 27:18, 28:12, 28:14, 28:18, 28:20, 28:22, 28:24, 29:7, 29:9, 29:13, 29:15, 30:11, 30:14, 31:5, 31:8, 31:12, 32:2, 32:5, 32:7, 32:8, 32:20, 32:22, 32:25, 33:1, 33:8, 33:10, 33:14, 33:16, 33:20, 33:22, 34:1, 35:5, 35:13, 40:10, 41:16, 42:5, 42:10, 43:3, 43:7, 43:10, 43:25, 44:6, 44:11, 44:21, 45:6, 45:24, 49:14, 51:8, 51:13, 51:18, 51:25, 52:22, 57:25, 60:6, 60:13, 67:4, 68:9, 68:11, 69:22, 76:7, 76:12, 77:9, 78:14, 81:10, 81:24, 82:4, 82:25, 83:4, 83:11, 83:23, 84:11, 85:15, 85:17, 86:12, 87:3, 87:6, 87:13, 87:15, 87:23, 88:12, 88:15, 89:1, 89:3, 89:22, 90:20, 94:2, 94:7, 94:9, 96:19, 96:22, 99:15, 99:17, 100:23, 100:25, 101:2, 101:4, 102:4, 102:6, 102:24, 103:1, 104:2, 104:9, 104:11, 104:13, 104:17, 104:18, 105:4, 105:6, 106:8, 106:11, 106:14, 106:18, 108:9, 109:8, 109:12, 109:15, 109:23, 110:2, 113:5, 113:24, 114:13, 114:22, 114:24, 115:8, 115:22, 116:22, 119:9, 119:12, 119:14, 120:15, 120:22, 121:5, 121:18, 122:9, 122:18, 123:15, 125:19, 130:3, 130:19, 130:25, 131:5, 131:8, 131:11, 131:14, 131:17, 131:22, 131:25, 132:3, 132:11, 132:14, 132:19, 132:22, 132:25, 135:2, 135:19, 136:2, 136:6, 136:20, 137:12, 137:14, 137:18, 137:21, 137:24, 138:10, 138:13, 138:23, 139:4, 139:9, 139:11, 139:14, 139:17, 140:2, 140:7, 141:6, 141:21, 142:1, 142:6, 142:23, 142:25, 143:3, 143:17, 143:20, 143:23, 144:6, 144:13, 144:16, 144:20, 145:4, 145:22, 145:25, 146:4, 146:6, 146:23, 147:4, 147:12, 148:7, 151:19, 152:6, 152:17, 153:16, 154:25, 155:6, 155:14, 155:18, 156:12, 157:9, 157:16, 159:6, 160:2, 160:7, 160:22, 160:25, 161:3, 161:6, 162:5, 162:13, 162:21, 163:1, 163:13, 164:7, 164:11, 164:25, 165:11, 165:21, 166:1, 166:5, 166:9, 166:11, 166:22, 167:7, 167:18, 168:11, 169:16, 171:10, 171:21, 172:2, 172:16, 172:23, 173:6, 173:25, 174:13, 174:20, 175:4, 175:8, 175:15, 175:24, 176:6, 176:8, 176:21, 177:24, 178:10, 178:19, 179:2, 179:5, 179:9, 179:13, 179:21, 180:6, 180:8, 180:15, 180:25, 181:12, 186:11, 186:15, 186:17, 186:20

**Pardo** [23] - 1:14, 3:6, 4:20, 8:14, 49:13, 50:2, 72:6, 86:15, 135:17, 136:1, 136:19, 140:1, 142:21, 155:5, 156:10, 157:8, 157:15, 160:4, 173:21, 176:15, 184:7, 185:24

**Pardo's** [2] - 176:22, 184:20

**pardon** [1] - 112:11

**Park** [7] - 34:18, 95:2, 95:3, 100:20, 101:7, 101:8, 101:15

**Parker** [1] - 1:18

**Parking** [3] - 34:18, 95:8, 95:11

**parking** [16] - 20:19, 29:21, 33:6, 33:11, 56:23, 57:5, 57:12, 58:24, 60:1, 61:24, 61:25, 62:5, 62:10, 95:14, 96:16, 101:10

**parkwestnh@gmail.com** [1] - 96:21

**part** [14] - 21:2, 46:20, 51:2, 59:25, 66:19, 82:17, 107:21, 132:20, 133:24, 136:15, 140:3, 164:18, 170:25

**partial** [1] - 182:5

**participate** [1] - 63:11

**Participation** [45] - 7:23, 8:1, 40:11, 40:19, 45:8, 45:21, 46:14, 51:9, 51:19, 59:18, 61:17, 61:25, 63:7, 71:4, 76:3, 86:25, 87:4, 87:18, 88:18, 88:21, 88:24, 92:6, 92:16, 92:19, 93:5, 93:9, 93:12, 93:15, 93:19, 93:24, 94:4, 113:11, 114:12, 115:6, 116:2, 117:14, 118:3, 118:20, 118:23, 119:9, 119:12, 134:7, 160:13, 168:12, 168:19

**participation** [15] - 20:23, 21:3, 34:8, 41:19, 42:2, 45:9, 45:16, 50:4, 50:10, 51:7, 51:10, 51:11, 113:18, 120:9, 150:4

**particular** [8] - 7:14, 7:17, 8:4, 14:10, 20:8, 25:11, 52:8

**particularly** [2] - 180:24, 186:2

**parties** [13] - 44:8, 62:16, 62:22, 118:16, 126:11, 132:25, 133:10, 145:16, 149:12, 159:9, 161:9, 167:13, 168:21

**parties'** [1] - 149:7

**partner** [5] - 57:16, 57:22, 58:2, 60:18, 86:19

**partnership** [4] - 33:18, 33:23, 34:20, 97:18

**partnerships** [1] - 23:2

**parts** [1] - 134:20

**party** [6] - 48:2, 119:16, 119:17, 133:16, 145:23

**passed** [4] - 98:13, 143:12, 147:10, 171:18

**past** [2] - 109:17, 176:14

**patience** [2] - 5:6, 128:18

**Patrick** [13] - 3:10, 22:18, 24:5, 26:17, 28:12, 28:14, 29:3, 33:20, 88:12, 94:8, 99:15, 104:5, 104:11

**Pattern** [1] - 142:3

**pattern** [28] - 132:24, 134:4, 134:5, 134:15, 134:16, 135:12, 135:13, 135:18, 135:23, 135:24, 135:25, 137:17, 141:7, 141:8, 141:12, 141:13, 141:14, 154:20, 155:4, 155:10, 155:19, 156:10, 157:25, 158:2, 158:5, 159:2, 159:3, 165:12

**pause** [13] - 11:25, 15:13, 15:21, 22:14, 32:21, 37:9, 64:11, 83:16, 86:7, 104:8, 105:5, 116:16, 167:3

**pay** [30] - 6:1, 6:10, 6:16, 6:20, 6:21, 7:19, 9:24, 9:25, 10:15, 23:3, 37:21, 39:4, 60:10, 61:12, 61:13, 61:16, 67:3, 73:14, 73:18, 74:14, 75:2, 75:14, 77:7, 78:4, 78:7, 81:9, 116:7, 167:11

**paying** [15] - 14:7, 45:6, 45:10, 45:11, 58:24, 63:2, 63:24, 67:9, 70:19, 70:21, 71:2, 78:21, 95:11, 103:21, 104:21

**payment** [7] - 12:7, 13:2, 13:16, 67:13, 74:17, 75:17, 79:1

**payments** [5] - 34:3, 62:14, 76:21, 76:23, 169:6

**people** [10] - 71:17, 77:14, 79:16, 79:25, 84:14, 97:16, 105:13, 105:14, 106:25, 108:7

**per** [5] - 14:17, 61:12, 91:16, 91:18, 91:19

**percent** [10] - 13:12, 31:1, 34:4, 34:6, 45:8, 45:9, 45:12, 60:20, 109:2, 117:21

**percentage** [1] - 60:19

**perfect** [1] - 33:25

**performance** [1] - 76:5

**perhaps** [2] - 59:11, 179:22

**period** [23] - 4:16, 4:17, 6:12, 6:18, 7:24, 16:8, 23:14, 41:17, 42:18, 84:23, 103:11, 117:8, 144:19, 145:10, 145:12, 146:6, 146:11, 146:15, 148:9, 148:13, 148:21, 153:2

**periods** [1] - 23:9

**permission** [1] - 26:7

**person** [11] - 24:13, 36:9, 40:13, 41:2, 41:4, 42:17, 54:3, 71:12, 79:15, 79:16, 79:18

**personal** [11] - 76:2, 81:15, 81:17, 81:19, 81:23, 82:2, 82:18,

82:21, 82:24, 89:23, 109:5
**personally** [3] - 9:22, 93:6, 185:24
**pertain** [1] - 68:24
**phase** [1] - 144:17
**phone** [8] - 65:21, 85:25, 91:24, 117:19, 117:25, 118:14, 120:6, 167:15
**phrased** [1] - 44:1
**physical** [7] - 36:8, 36:19, 38:22, 161:18, 161:20, 161:24, 164:5
**pick** [5] - 43:11, 66:20, 66:23, 127:15, 165:17
**picture** [1] - 174:24
**pictures** [1] - 108:7
**pilfer** [1] - 30:23
**pivotal** [1] - 140:16
**place** [8] - 9:1, 41:1, 46:12, 79:12, 163:10, 164:1, 164:3, 169:22
**plain** [1] - 46:2
**Plaintiff** [1] - 1:4
**plaintiff** [73] - 3:5, 3:7, 4:21, 17:5, 35:13, 37:1, 37:10, 37:20, 38:14, 38:15, 39:17, 40:1, 40:4, 47:5, 47:16, 47:20, 48:8, 50:2, 53:6, 72:18, 121:17, 121:18, 122:9, 123:7, 123:15, 125:18, 125:19, 126:4, 126:6, 127:6, 127:7, 130:18, 130:24, 131:3, 131:16, 132:5, 134:25, 135:6, 135:17, 136:6, 137:10, 137:25, 138:10, 138:13, 138:19, 140:18, 142:7, 142:16, 143:2, 143:6, 145:4, 147:14, 151:19, 152:6, 152:17, 157:9, 157:12, 160:6, 161:3, 161:15, 164:3, 165:9, 165:21, 168:2, 174:22, 177:24, 179:6, 180:13, 181:3, 181:17, 185:15, 186:19, 186:20
**PLAINTIFF** [2] - 1:13, 5:13
**plaintiff's** [15] - 11:25, 125:5, 134:16, 137:5, 138:21, 152:2, 152:9, 152:13, 160:12, 164:8, 164:11, 165:19, 170:13, 178:4, 180:10
**Plaintiff's** [27] - 26:15, 26:18, 26:24, 27:15, 29:7, 30:11, 31:5, 31:9, 32:3, 32:22, 33:14, 87:3, 88:12, 96:19, 98:16, 98:23, 99:13, 100:23, 102:4, 102:24, 104:3, 108:21, 118:11, 119:13, 136:4, 165:5, 165:19
**plaintiffs** [6] - 35:20, 126:5, 135:2, 135:3, 150:1, 165:7
**plan** [2] - 105:12, 145:17
**Plaza** [1] - 95:22
**plead** [1] - 159:21
**pleadings** [2] - 167:21
**pled** [1] - 159:24
**plenty** [2] - 9:5, 171:3
**PLLC** [2] - 1:14, 3:7
**plus** [1] - 52:2
**podium** [3] - 38:10, 38:11, 56:8
**point** [20] - 11:19, 42:3, 54:9, 65:12, 73:22, 79:21, 84:2, 86:22, 86:23, 96:9, 98:13, 129:22, 130:12, 143:25, 145:11, 152:5, 153:9, 161:7, 167:24, 171:10
**pointless** [2] - 36:19, 66:14
**poof** [2] - 143:15, 151:17
**portfolio** [3] - 33:5, 34:18, 34:21
**portion** [3] - 47:21, 69:2, 74:12
**pose** [1] - 173:4
**position** [17] - 30:1, 144:6, 145:5, 145:7, 164:8, 164:12, 175:9, 176:7, 176:10, 178:4, 180:1, 180:10, 183:7, 183:10, 184:20, 185:2, 185:4
**positive** [2] - 21:16, 53:22
**positively** [1] - 185:15
**possession** [1] - 29:21
**possible** [8] - 30:6, 75:19, 90:11, 90:12, 97:20, 100:8, 102:3, 108:2
**possibly** [1] - 128:16
**posted** [1] - 29:11
**potentially** [1] - 124:13
**powerful** [1] - 43:15
**PPA** [5] - 42:18, 42:22, 43:20, 44:10, 50:15
**practice** [2] - 169:3, 172:10
**precedent** [5] - 136:14, 136:18, 136:25, 137:2, 137:4
**preceding** [1] - 139:4
**predicate** [1] - 11:15
**preempt** [2] - 110:2, 110:3
**prefer** [2] - 87:23, 128:13
**preference** [1] - 166:6
**prejudice** [3] - 53:7, 53:19, 140:18
**prejudicial** [1] - 155:9
**prepare** [7] - 62:21, 81:17, 81:19, 123:6, 123:10, 123:22, 123:24
**prepared** [8] - 72:17, 81:23, 110:7, 110:13, 146:14, 160:17, 166:2, 166:19
**preparing** [3] - 62:12, 62:20, 82:18
**presence** [1] - 8:17
**present** [1] - 24:5
**presented** [3] - 47:14, 153:19, 157:19
**preserved** [1] - 169:19
**pretty** [3] - 51:11, 128:23, 129:8
**prevail** [2] - 182:24, 183:1
**prevent** [1] - 79:12
**preview** [1] - 155:8
**previous** [3] - 34:22, 74:11, 129:13
**previously** [1] - 65:5
**PREVIOUSLY** [1] - 5:13
**price** [1] - 58:7
**principal** [1] - 63:24
**principle** [1] - 160:20
**probe** [1] - 44:23
**problem** [3] - 22:13, 72:11, 147:5
**problems** [1] - 72:10
**procedure** [2] - 169:25, 170:4
**proceed** [6] - 36:3, 56:1, 77:25, 86:9, 110:19, 121:22
**proceeding** [1] - 95:17
**proceedings** [2] - 9:4, 187:20
**process** [6] - 63:11, 147:24, 147:25, 148:13, 149:3, 151:11
**produced** [4] - 11:7, 11:8, 159:14, 170:19
**producing** [1] - 17:18
**profanity** [1] - 4:10
**proffer** [1] - 44:6
**proffered** [4] - 40:5, 48:4, 136:16, 137:1
**profit** [13] - 6:24, 20:23, 21:3, 34:8, 41:18, 45:9, 45:16, 46:4, 50:14, 51:9, 62:21, 113:18, 120:9
**Profit** [45] - 7:23, 8:1, 40:11, 40:18, 45:7, 45:21, 46:14, 51:9, 51:19, 59:18, 61:16, 61:25, 63:7, 71:3, 76:3, 86:25, 87:4, 87:18, 88:17, 88:20, 88:24, 92:5, 92:16, 92:19, 93:5, 93:8, 93:12, 93:15, 93:18, 93:23, 94:4, 113:11, 114:12, 115:6, 116:2, 117:14, 118:3, 118:20, 118:23, 119:9, 119:12, 134:6, 160:13, 168:12, 168:19
**profitable** [1] - 95:15
**profits** [9] - 10:21, 45:25, 47:9, 47:10, 51:13, 161:12, 163:14, 168:17
**project** [2] - 10:9, 10:10
**promise** [1] - 35:25
**promises** [1] - 14:20
**promissory** [15] - 22:20, 22:23, 24:16, 24:21, 112:8, 113:1, 113:2, 113:4, 113:22, 148:8, 148:9, 148:15, 149:10, 156:19, 169:14
**promote** [1] - 45:12
**prompt** [1] - 162:5
**promptly** [1] - 128:8
**proper** [3] - 71:10, 147:7
**properly** [1] - 53:10
**properties** [1] - 34:18
**property** [48] - 10:16, 14:19, 23:11, 26:22, 47:15, 51:20, 57:1, 57:4, 57:7, 57:9, 57:19, 57:22, 58:3, 58:6, 58:14, 58:15, 59:2, 59:19, 60:18, 61:18, 62:8, 63:9, 63:16, 63:22, 63:23, 74:15, 78:21, 80:3, 80:12, 80:24, 81:6, 86:24, 87:1, 97:19, 114:11, 114:18, 114:21, 115:4, 116:8, 116:10, 116:11, 117:23, 118:7, 118:18, 120:25, 149:8, 153:4, 163:16
**proposal** [2] - 138:22, 140:25
**propose** [9] - 126:11, 136:14, 142:14, 148:14, 161:2, 174:3, 175:15, 176:8
**Proposed** [15] - 130:16, 130:23, 131:3, 131:7, 131:10, 131:13, 131:21, 136:4, 136:21, 137:20, 138:2, 138:8, 138:24, 151:25, 165:5
**proposed** [18] - 131:24, 132:2, 132:13, 134:19, 136:7, 138:20, 143:1, 152:11, 156:18, 159:9, 170:20, 173:9, 174:13, 177:1, 180:23, 180:25, 185:8, 185:13
**proposing** [2] - 46:13, 136:10

**prove** [17] - 10:3, 14:4, 37:1, 37:2, 37:25, 70:16, 70:18, 140:20, 156:15, 156:22, 157:5, 161:10, 161:19, 161:23, 171:6, 180:2
**proved** [2] - 155:7, 160:7
**proven** [2] - 132:5, 140:18
**provide** [3] - 47:18, 96:1, 96:8
**provided** [2] - 141:25, 148:3
**provides** [1] - 140:15
**providing** [3] - 96:6, 159:2, 169:3
**provision** [7] - 40:11, 41:1, 41:18, 66:7, 89:1, 148:19, 159:17
**provisions** [1] - 147:1
**public** [2] - 41:22, 48:6
**publish** [8] - 9:13, 9:14, 12:23, 26:7, 69:9, 74:7, 76:16, 97:25
**pull** [28] - 22:18, 24:5, 25:18, 26:14, 26:18, 26:24, 27:15, 28:25, 30:11, 31:5, 32:2, 32:22, 33:14, 59:7, 65:25, 74:4, 75:18, 87:3, 94:7, 96:19, 97:24, 99:13, 100:23, 102:4, 104:3, 118:10, 119:9, 141:7
**purchase** [6] - 57:22, 58:3, 58:6, 58:7, 59:19, 86:24
**purchased** [2] - 57:17, 58:15
**purported** [1] - 156:14
**purports** [1] - 159:2
**purpose** [5] - 20:20, 25:11, 53:16, 61:15, 61:16
**purposes** [1] - 143:9
**pursuant** [8] - 51:6, 89:24, 90:2, 90:9, 93:5, 93:8, 94:22, 169:25
**pursued** [1] - 151:13
**put** [21] - 5:18, 8:8, 11:13, 15:14, 16:18, 44:21, 47:16, 50:21, 52:14, 52:15, 52:20, 58:2, 73:18, 106:22, 117:17, 123:20, 152:24, 173:9, 173:11, 185:18
**putting** [2] - 42:3, 100:3

## Q

**qualifications** [3] - 53:23, 53:24, 54:8
**questions** [18] - 5:24, 22:15, 35:5, 35:6, 35:9, 51:4, 54:4, 73:25, 86:8, 105:7, 105:23, 108:13, 108:17, 111:9, 111:11, 121:5, 121:8
**QuickBooks** [1] - 103:4
**quickly** [7] - 23:5, 62:17, 72:1, 72:14, 73:7, 77:14, 83:7
**quite** [5] - 6:3, 35:21, 50:11, 136:25, 160:9
**quoted** [1] - 158:7

## R

**raise** [2] - 48:18, 53:3
**raised** [4] - 36:8, 53:10, 53:19, 167:21
**rambling** [2] - 72:18, 72:21
**rather** [7] - 14:6, 133:9, 156:15, 156:22, 170:6, 172:20, 186:13
**rational** [1] - 111:1
**rationally** [1] - 109:6
**reach** [1] - 41:10
**reached** [1] - 31:24
**read** [56] - 5:23, 6:9, 10:4, 17:21, 18:8, 22:2, 29:11, 48:20, 54:18, 54:23, 59:20, 99:1, 104:10, 113:13, 119:15, 125:7, 125:14, 130:12, 130:13, 130:22, 134:9, 134:14, 134:16, 135:17, 135:24, 136:3, 136:4, 136:22, 137:17, 138:3, 139:18, 139:22, 144:25, 151:9, 151:20, 151:21, 152:1, 152:2, 152:14, 153:18, 154:9, 154:11, 155:2, 157:11, 165:18, 165:19, 169:13, 170:22, 171:5, 177:11, 179:11, 185:4, 186:7, 187:9
**reading** [21] - 17:16, 17:19, 17:21, 18:24, 19:1, 28:10, 28:17, 51:18, 132:9, 135:9, 138:16, 149:15, 152:5, 152:13, 154:2, 154:13, 158:13, 158:21, 161:5, 167:25
**ready** [8] - 55:1, 55:2, 106:25, 121:22, 123:5, 167:2, 167:4, 175:17
**real** [3] - 10:9, 52:19, 56:23
**really** [21] - 16:10, 43:17, 50:5, 52:9, 70:16, 73:6, 73:8, 77:12, 107:3, 122:3, 123:7, 123:11, 126:8, 140:15, 145:19, 146:25, 149:6, 154:8, 157:6, 170:25, 171:6
**reason** [9] - 7:25, 40:25, 70:1, 76:25, 120:3, 120:4, 123:9, 150:10, 175:16
**reasonable** [7] - 36:20, 38:22, 39:10, 39:18, 42:8, 46:10, 46:15
**reasons** [4] - 15:4, 116:6, 117:1, 187:11
**rebut** [2] - 38:15, 50:20
**rebuttal** [13] - 50:14, 50:20, 50:24, 52:20, 52:21, 53:6, 54:2, 106:6, 108:1, 121:16, 121:18, 125:5, 126:4
**receipts** [2] - 69:4, 79:7
**receive** [33] - 16:3, 16:5, 24:2, 36:10, 40:16, 74:16, 78:3, 87:10, 88:23, 92:1, 93:4, 93:8, 93:11, 93:14, 93:17, 93:21, 94:3, 102:2, 102:7, 144:12, 145:2, 161:12, 161:15, 161:20, 163:6, 163:8, 163:10, 163:14, 163:22, 163:25, 164:2, 164:15, 166:15
**received** [24] - 12:22, 17:7, 26:6, 38:17, 38:21, 41:14, 42:4, 44:16, 46:21, 46:22, 46:23, 55:24, 78:24, 92:4, 92:9, 92:10, 99:23, 100:17, 144:12, 144:15, 146:12, 148:23, 166:20
**receiving** [3] - 43:12, 100:9, 146:9
**recently** [1] - 106:24
**recess** [5] - 49:22, 108:10, 127:17, 130:6, 187:17
**recipient** [1] - 104:12
**recital** [1] - 4:13
**Recitals** [1] - 10:4
**recitation** [1] - 51:14
**recognize** [16] - 16:22, 27:19, 27:21, 31:15, 32:10, 57:1, 58:11, 59:15, 60:25, 65:10, 67:23, 68:22, 69:11, 98:7, 112:5, 112:22
**recollection** [2] - 103:24, 104:19
**recommend** [1] - 122:10
**recommending** [2] - 103:2, 129:15
**reconciled** [2] - 145:11, 145:14
**reconsideration** [2] - 8:23, 9:3
**record** [42] - 3:4, 36:16, 36:18, 36:21, 37:6, 38:13, 38:20, 39:4, 39:7, 39:17, 41:12, 41:22, 42:8, 46:12, 46:25, 47:18, 48:6, 48:20, 49:23, 51:5, 56:5, 64:15, 71:8, 71:9, 71:11, 71:18, 108:11, 114:5, 130:7, 136:6, 137:22, 142:6, 152:23, 152:24, 163:5, 168:6, 168:8, 169:9, 171:4, 171:7, 171:22, 186:16
**records** [3] - 47:7, 71:6, 79:8
**recover** [2] - 149:14, 160:12
**recovery** [3] - 180:17, 181:19, 181:24
**REDIRECT** [2] - 22:21, 108:23
**Redirect** [2] - 2:3, 2:5
**redirect** [5] - 22:17, 108:18, 108:20, 121:6, 169:3
**refer** [3] - 13:12, 34:12, 57:5
**reference** [4] - 13:5, 30:7, 109:17, 155:15
**referenced** [1] - 61:25
**referred** [3] - 7:23, 60:2, 86:18
**referring** [5] - 94:15, 103:6, 109:2, 113:17, 133:8
**reflect** [2] - 12:9, 47:7
**reflected** [4] - 21:15, 34:3, 38:14, 38:18
**reflection** [1] - 169:17
**reflects** [7] - 36:18, 37:7, 39:4, 39:8, 39:17, 46:4, 47:1
**refresh** [2] - 103:24, 104:19
**refusal** [1] - 46:22
**refute** [2] - 16:11, 16:17
**regard** [1] - 154:11
**regarding** [7] - 24:14, 30:22, 54:23, 67:1, 67:13, 74:9, 141:15
**regardless** [1] - 72:18
**regards** [6] - 46:8, 47:5, 113:3, 149:5, 149:8, 165:16
**registered** [8] - 42:11, 143:18, 146:9, 146:20, 147:24, 148:18, 148:20, 148:23
**regularly** [2] - 65:18, 65:19
**reinforce** [1] - 171:14
**reinstate** [2] - 85:8, 146:2
**reinstated** [8] - 41:21, 45:19, 47:23, 85:4, 85:5, 143:15, 143:23, 151:17
**reinstatement** [5] - 143:3, 143:8, 147:6, 148:5, 151:14
**relate** [1] - 180:20
**related** [8] - 23:23, 24:3, 24:21, 26:22, 34:15, 87:1, 102:2, 143:24

**relates** [4] - 70:6, 147:6, 148:8, 156:18
**relating** [3] - 31:20, 148:5, 148:15
**relation** [1] - 113:1
**relationship** [12] - 14:17, 25:16, 26:11, 27:12, 29:18, 58:21, 86:21, 86:23, 96:9, 97:18, 100:16, 168:21
**relationships** [3] - 29:23, 30:24
**release** [1] - 127:1
**relevance** [1] - 85:17
**relevant** [4] - 9:6, 41:17, 148:21, 149:3
**reliability** [4] - 53:11, 53:17, 53:25, 54:7
**relinquish** [1] - 161:24
**relinquishing** [1] - 163:10
**relinquishment** [1] - 161:4
**rely** [1] - 170:7
**relying** [2] - 15:3, 157:20
**remained** [1] - 21:4
**remedy** [1] - 181:18
**remember** [16] - 30:25, 66:3, 78:24, 84:24, 87:17, 99:20, 100:5, 103:8, 103:12, 103:16, 103:18, 104:23, 104:24, 120:14, 127:17, 174:8
**remind** [1] - 71:23
**remove** [2] - 21:15, 162:9
**removed** [2] - 107:9, 173:10
**renew** [1] - 122:20
**renewal** [1] - 168:15
**renewing** [2] - 80:9, 171:21
**rent** [71] - 6:10, 6:17, 6:20, 6:21, 7:19, 14:7, 37:21, 39:5, 45:7, 45:10, 45:11, 58:24, 60:11, 61:12, 61:13, 61:16, 62:14, 63:24, 63:25, 64:18, 64:22, 64:24, 65:3, 65:7, 67:3, 67:9, 67:13, 69:2, 69:3, 69:5, 70:19, 70:22, 71:2, 73:14, 73:16, 73:18, 73:19, 74:2, 74:11, 74:16, 74:24, 75:2, 75:13, 75:14, 75:17, 76:11, 76:21, 76:22, 77:3, 77:7, 78:4, 78:10, 78:21, 81:9, 91:9, 91:12, 91:16, 92:18, 92:20, 95:12, 98:4, 103:11, 103:21, 104:21, 104:25, 116:9, 167:10, 167:11, 168:16, 168:20
**reorient** [1] - 56:8
**repaid** [3] - 13:17, 14:2, 112:16
**repay** [1] - 112:14
**repeat** [8] - 6:3, 12:10, 73:17, 83:5, 85:19, 93:13, 110:22, 115:1
**repeating** [1] - 82:13
**repetitive** [1] - 137:5
**rephrase** [3] - 21:20, 83:6, 85:6
**report** [9] - 21:20, 34:25, 35:3, 53:25, 79:15, 127:19, 127:20, 127:21, 143:20
**REPORTED** [1] - 1:21
**reporter** [2] - 64:13, 77:13
**Reporter** [2] - 1:22, 187:23
**reporting** [1] - 21:25
**reports** [8] - 15:19, 15:23, 15:25, 16:1, 27:2, 62:21, 96:15, 97:1
**represent** [3] - 10:7, 19:11, 86:15
**representation** [3] - 21:6, 68:4, 69:17
**represented** [1] - 39:9
**represents** [1] - 20:11
**request** [5] - 8:11, 8:19, 8:24, 171:11, 171:21
**requested** [1] - 96:7
**require** [3] - 84:17, 146:24, 146:25
**required** [15] - 40:13, 41:7, 42:22, 44:5, 47:15, 50:7, 60:17, 63:8, 78:4, 119:16, 137:1, 145:13, 145:23, 170:3
**requires** [6] - 44:10, 123:19, 146:22, 169:22, 171:15, 178:21
**research** [5] - 71:8, 105:18, 142:13, 164:13, 174:2
**reservation** [1] - 179:10
**reserve** [9] - 49:24, 50:17, 52:3, 52:25, 53:8, 122:23, 122:25, 177:20, 179:25
**reserved** [5] - 53:6, 122:22, 177:19, 177:21, 178:1
**respect** [15] - 40:10, 40:15, 45:6, 45:10, 45:18, 53:23, 114:6, 115:24, 123:1, 125:14, 145:1, 151:12, 169:5, 173:12, 180:13
**respectfully** [2] - 59:10, 141:21
**respond** [4] - 152:21, 152:23, 158:3, 180:11
**responded** [1] - 98:3
**responding** [1] - 73:24
**response** [7] - 14:24, 40:9, 46:6, 74:12, 163:4, 163:5, 174:14
**responsibilities** [3] - 29:24, 58:25, 62:7
**responsibility** [7] - 34:17, 60:4, 66:19, 82:18, 82:21, 97:11, 98:14
**responsible** [10] - 23:7, 23:12, 23:15, 27:4, 42:11, 58:24, 60:18, 91:8, 96:14, 111:6
**rest** [3] - 69:3, 99:4, 107:7
**rested** [5] - 35:20, 50:15, 51:4, 52:14, 52:23
**resting** [2] - 106:4, 121:14
**rests** [3] - 35:13, 116:17, 121:7
**resubmit** [5] - 158:1, 159:4, 173:14, 173:15, 174:6
**result** [1] - 14:7
**retired** [1] - 51:21
**retroactively** [2] - 146:3, 147:9
**return** [2] - 20:13, 46:3
**returned** [1] - 43:23
**returns** [6] - 19:12, 19:14, 20:2, 20:3, 21:6, 47:6
**revenue** [3] - 62:10, 65:4, 75:14
**revenues** [2] - 103:21, 104:21
**review** [2] - 123:20, 169:17
**reviewing** [1] - 21:5
**revisit** [1] - 178:20
**rewind** [1] - 57:17
**Richards** [1] - 1:18
**right-hand** [1] - 33:19
**rights** [22] - 9:22, 10:8, 10:11, 16:16, 45:21, 95:22, 112:25, 113:11, 114:10, 119:2, 147:20, 149:17, 149:21, 150:7, 152:8, 152:9, 156:14, 156:16, 160:9, 160:12, 163:14, 169:21
**RMR** [2] - 1:22, 187:22
**Road** [1] - 1:15
**role** [2] - 61:23, 62:3
**room** [5] - 8:1, 121:21, 126:20, 127:15, 128:12
**RPR** [1] - 1:22
**rule** [4] - 48:13, 53:10, 70:14, 137:15
**ruled** [7] - 8:16, 109:20, 110:4, 110:12, 136:22, 152:24, 181:2
**rules** [3] - 125:14, 183:14, 184:14
**ruling** [11] - 8:23, 49:25, 53:7, 122:22, 147:7, 169:18, 172:3, 178:1, 179:10, 179:13, 181:6
**run** [2] - 71:17, 170:15

## S

**safe** [2] - 15:15, 79:17
**safeguards** [2] - 79:12, 79:14
**sale** [4] - 51:13, 51:19, 145:2, 145:3
**sand** [1] - 182:5
**satisfy** [1] - 170:2
**Savannah** [1] - 3:9
**SAVANNAH** [1] - 1:14
**save** [1] - 153:4
**saw** [3] - 5:22, 52:24, 166:22
**scaffolding** [1] - 170:14
**scenario** [1] - 181:25
**schedule** [1] - 107:23
**scheduled** [1] - 127:4
**scheduling** [1] - 134:24
**scope** [2] - 50:22, 52:18
**screen** [2] - 12:5, 72:3
**screens** [3] - 3:20, 3:24, 5:8
**scroll** [14] - 15:17, 15:20, 17:12, 28:8, 28:12, 28:14, 28:15, 29:2, 29:10, 33:8, 34:20, 59:9, 66:4, 76:17
**scrolling** [1] - 28:10
**SE** [1] - 1:18
**seat** [1] - 56:5
**seated** [10] - 3:19, 5:4, 49:24, 54:15, 108:16, 122:1, 125:25, 126:1, 126:2, 130:8
**second** [24] - 26:1, 27:6, 28:3, 29:1, 33:11, 36:25, 77:20, 81:2, 83:15, 86:3, 103:17, 103:18, 116:7, 116:13, 140:22, 141:4, 147:23, 151:11, 157:7, 167:5, 179:15, 180:12, 184:15, 184:25
**Section** [6] - 5:22, 51:18, 113:12, 119:10, 119:12, 119:15
**section** [9] - 6:1, 6:4, 7:14, 19:21, 33:22, 66:5, 113:17, 118:11, 158:14
**secured** [1] - 51:20
**security** [1] - 10:6
**see** [48] - 5:9, 12:1, 16:5, 18:2, 33:11, 33:18, 33:21, 33:23, 34:4, 34:10, 34:12, 34:21, 50:17, 51:3, 52:11, 54:4, 54:11, 64:12, 69:23, 72:4, 76:17, 96:25, 97:3, 97:12, 101:17, 103:4, 103:5, 103:24, 104:23, 116:9, 127:23, 128:20, 129:3,

130:1, 137:2, 137:4, 138:20, 157:23, 159:3, 164:14, 171:24, 172:25, 173:5, 174:2, 174:3, 180:1, 184:8
**seeing** [2] - 19:19
**seek** [5] - 55:3, 135:2, 135:3, 135:4
**seeking** [3] - 57:22, 109:15, 161:8
**seeks** [1] - 134:25
**seem** [2] - 111:1, 142:17
**SEIDLER** [3] - 2:6, 5:1, 111:22
**Seidler** [49] - 3:15, 4:8, 4:25, 9:22, 10:13, 12:25, 14:17, 23:18, 23:20, 23:23, 28:1, 40:17, 40:20, 44:7, 45:24, 46:5, 46:24, 47:2, 47:11, 49:7, 51:25, 57:13, 57:15, 58:9, 59:10, 65:16, 67:9, 67:12, 74:2, 77:6, 78:10, 78:12, 84:21, 89:16, 89:18, 91:11, 92:15, 95:18, 95:24, 98:25, 103:2, 111:17, 111:25, 112:1, 116:23, 120:23, 159:18, 160:13, 168:22
**Seidler's** [4] - 27:23, 106:2, 156:23, 167:13
**self** [1] - 165:13
**self-explanatory** [1] - 165:13
**semicolon** [1] - 146:6
**send** [48] - 33:5, 36:8, 36:19, 41:1, 42:17, 43:2, 46:11, 66:10, 67:12, 69:3, 74:2, 74:10, 85:10, 85:12, 85:13, 85:22, 89:18, 90:14, 90:21, 90:22, 91:12, 91:21, 92:21, 93:1, 97:17, 98:20, 100:12, 102:1, 117:9, 118:6, 118:12, 118:13, 118:14, 118:17, 119:23, 120:1, 120:11, 120:14, 120:16, 120:23, 121:2, 122:17, 141:10, 161:10, 164:4, 184:4, 185:23, 185:25
**sender** [1] - 104:12
**sending** [4] - 62:14, 98:1, 98:17, 99:25
**sense** [4] - 49:13, 125:16, 126:19, 140:15
**sent** [27] - 16:5, 25:11, 25:12, 25:15, 32:11, 41:5, 42:1, 42:23, 43:4, 43:13, 43:19, 46:22, 68:4, 69:1, 69:2, 69:15, 69:17, 92:12, 92:18, 99:8, 110:25, 117:15, 118:10, 120:6, 145:5, 163:17, 186:11
**sentence** [14] - 104:5, 139:2, 139:4, 139:13, 147:18, 148:4, 149:16, 151:9, 151:11, 151:20, 151:22, 151:23, 152:5, 154:14
**sentences** [1] - 138:24
**sentencing** [11] - 107:15, 107:16, 127:2, 174:8, 174:11, 174:17, 174:18, 186:6, 187:5, 187:10
**sentencings** [1] - 107:13
**separate** [5] - 148:14, 156:9, 181:14, 181:21, 181:23
**separated** [1] - 136:24
**separately** [1] - 79:18
**separation** [1] - 41:9
**serve** [2] - 148:1, 150:3
**server** [1] - 71:17
**service** [8] - 127:2, 128:18, 146:9, 147:24, 147:25, 148:13, 149:2, 151:11
**services** [2] - 49:3, 105:14
**serving** [1] - 148:2
**sessions** [1] - 105:10
**set** [3] - 10:8, 10:11, 187:3
**setoff** [1] - 182:5
**setup** [1] - 137:14
**seven** [3] - 29:8, 29:9, 124:7
**several** [2] - 116:6, 133:2
**shaking** [1] - 35:8
**shall** [5] - 6:11, 6:18, 8:25, 51:21, 119:17
**shocking** [2] - 30:6, 31:23
**shopping** [1] - 126:25
**short** [2] - 74:17, 103:11
**shortages** [1] - 91:12
**shorted** [3] - 98:2, 98:4, 98:8
**shortened** [1] - 124:13
**shorter** [2] - 126:16, 128:16
**shove** [1] - 107:1
**show** [11] - 20:22, 22:18, 38:3, 38:21, 67:20, 70:2, 70:8, 104:2, 136:16, 150:10, 168:24
**showed** [3] - 101:17, 153:24, 161:22
**showing** [4] - 22:23, 39:3, 39:6, 48:4
**shown** [3] - 37:19, 137:1, 163:6
**shows** [5] - 15:23, 41:12, 46:12, 140:17, 140:20
**shut** [3] - 37:7, 88:5, 88:8
**shutting** [1] - 88:9
**side** [2] - 33:19, 52:9
**sidebar** [15] - 8:11, 8:19, 8:21, 9:4, 9:11, 22:7, 22:10, 68:17, 69:23, 69:24, 73:11, 109:12, 109:13, 110:3, 110:18
**sign** [1] - 22:5
**signatory** [2] - 99:1, 109:3
**signature** [6] - 12:8, 12:14, 12:15, 12:16, 27:19, 87:13
**signed** [9] - 5:25, 6:7, 7:15, 11:1, 12:9, 12:12, 23:1, 76:2, 87:16
**signer** [1] - 23:16
**signification** [1] - 48:9
**signing** [1] - 87:18
**signs** [1] - 98:3
**similar** [2] - 137:14, 165:17
**simpler** [1] - 165:11
**sincerely** [1] - 162:21
**sit** [5] - 4:12, 4:15, 54:22, 123:19, 126:25
**sitting** [4] - 35:2, 56:20, 107:2, 128:12
**sky** [2] - 103:16
**slide** [1] - 130:14
**slow** [6] - 15:18, 17:12, 72:25, 73:24, 185:6, 185:17
**slower** [1] - 75:15
**slowing** [1] - 64:9
**slowly** [5] - 17:12, 59:9, 73:8, 76:17, 77:12
**small** [1] - 79:25
**Smith** [1] - 3:16
**smoke** [1] - 47:6
**softer** [2] - 72:12, 72:13
**sold** [3] - 23:11, 114:18, 116:11
**someone** [5] - 79:23, 84:16, 93:1, 103:3, 122:2
**someplace** [1] - 173:11
**sometimes** [2] - 72:4, 106:25
**somewhat** [4] - 98:7, 148:7, 156:18, 163:24
**somewhere** [1] - 46:10
**son's** [1] - 42:11
**soon** [3] - 69:3, 174:11, 174:18
**sorry** [30] - 7:6, 12:4, 12:8, 14:14, 14:24, 17:25, 18:13, 22:12, 36:13, 36:17, 38:9, 73:17, 83:5, 85:5, 85:19, 87:14, 93:13, 98:15, 108:19, 109:8, 137:21, 139:24, 152:20, 153:16, 156:3, 158:20, 167:18, 172:2, 182:13, 185:6
**sort** [4] - 93:1, 124:11, 127:12, 147:9
**sorts** [2] - 124:15, 150:18
**sound** [1] - 184:24
**source** [2] - 21:19, 21:21
**sources** [1] - 21:13
**Southeast** [20] - 10:10, 27:22, 32:14, 33:12, 33:19, 34:16, 57:2, 65:10, 65:14, 65:23, 66:11, 84:6, 89:4, 89:9, 90:14, 101:11, 102:8, 102:11, 118:5, 161:11
**SOUTHERN** [1] - 1:1
**Southern** [2] - 1:24, 187:24
**space** [1] - 101:20
**speaking** [5] - 62:17, 73:7, 73:8, 83:7, 114:4
**speaks** [1] - 71:23
**Special** [3] - 136:9, 152:14, 153:14
**special** [2] - 136:24, 143:1
**specific** [14] - 38:8, 38:13, 40:13, 40:14, 41:1, 47:8, 99:12, 117:12, 147:1, 148:19, 155:15, 156:12, 164:10, 186:4
**specifically** [3] - 92:17, 100:2, 140:23
**specificity** [1] - 142:16
**speed** [1] - 77:16
**spent** [2] - 29:21, 185:9
**spirit** [1] - 25:13
**spot** [1] - 79:19
**spreadsheet** [1] - 97:3
**squeeze** [1] - 128:11
**STAFF** [3] - 12:2, 26:16, 32:4
**stage** [1] - 43:15
**stamp** [4] - 12:15, 17:2, 17:11, 18:2
**stamped** [2] - 16:19, 18:25
**stand** [5] - 44:7, 44:24, 49:19, 73:2, 172:6
**standard** [11] - 44:25, 132:20, 132:24, 133:25, 142:17, 154:22, 155:11, 156:8, 156:10, 167:18, 168:3
**start** [16] - 3:25, 17:21, 27:16, 27:17, 27:24, 28:3, 28:24, 49:7, 59:5, 62:5, 96:20, 107:19, 125:4, 128:8, 160:19, 174:24
**started** [7] - 17:19, 17:20, 30:1, 101:21, 122:7, 173:2
**starting** [6] - 3:5,

56:21, 56:22, 107:12, 107:14, 107:21
**state** [7] - 3:4, 47:4, 56:5, 149:7, 150:12, 156:15, 156:23
**statement** [10] - 81:20, 81:23, 103:22, 147:8, 147:13, 151:10, 152:2, 155:9, 164:8, 172:14
**statements** [7] - 32:9, 62:12, 62:20, 81:17, 82:18, 102:8, 140:21
**STATES** [2] - 1:1, 1:10
**States** [4] - 1:23, 39:9, 70:10, 187:23
**stating** [1] - 149:11
**status** [4] - 33:23, 34:10, 34:11, 116:2
**statute** [16] - 24:9, 24:11, 24:15, 24:19, 24:20, 24:25, 25:7, 143:24, 146:7, 146:12, 148:9, 169:23, 169:25, 170:5, 170:8, 171:3
**statutes** [2] - 143:4, 147:17
**stay** [3] - 49:18, 108:5, 129:25
**stealing** [1] - 79:23
**STENOGRAPHICALLY** [1] - 1:21
**step** [1] - 170:15
**Stewart** [9] - 38:16, 40:15, 42:10, 43:10, 46:16, 66:15, 66:20, 66:22, 66:25
**stickler** [1] - 137:21
**still** [36] - 13:11, 16:16, 25:13, 26:21, 32:18, 33:2, 43:8, 43:19, 43:20, 45:16, 78:7, 98:17, 102:1, 102:15, 123:19, 125:8, 126:1, 128:4, 128:5, 128:15, 137:24, 145:10, 146:12, 147:3, 148:12, 149:3, 154:6, 172:11, 175:7, 177:22, 178:14, 180:2, 180:3, 183:18, 186:14
**stipulate** [1] - 146:14
**stipulated** [4] - 54:19, 70:2, 134:15, 161:9
**stipulating** [1] - 54:5
**Stipulation** [1] - 133:13
**stipulation** [4] - 70:1, 133:13, 134:8
**stipulations** [5] - 130:12, 130:13, 133:18, 133:19, 173:9
**stolen** [1] - 79:2
**stop** [6] - 7:5, 15:19, 28:10, 51:22, 76:5, 122:13
**stopped** [11] - 15:25, 45:22, 67:9, 75:25, 80:18, 80:20, 94:11, 95:6, 116:8, 163:7
**story** [1] - 149:21
**Street** [15] - 1:18, 10:10, 32:14, 33:12, 33:19, 34:16, 57:2, 65:10, 65:23, 66:11, 89:4, 90:15, 101:11, 118:5, 161:11
**stressed** [1] - 49:2
**strike** [3] - 84:11, 141:4, 157:7
**stronger** [1] - 122:23
**structure** [1] - 178:8
**subheading** [1] - 33:11
**subject** [4] - 97:1, 178:1, 179:9, 179:13
**submit** [4] - 174:6, 174:25, 176:15, 186:24
**submitted** [3] - 134:23, 187:2, 187:6
**subparts** [1] - 168:13
**subpoena** [1] - 148:1
**subpoenaed** [1] - 96:8
**subsequently** [1] - 164:2
**substance** [1] - 165:1
**subsume** [1] - 136:23
**successful** [1] - 30:1
**sue** [4] - 23:20, 99:3, 149:3, 149:6
**suffered** [1] - 81:8
**sufficient** [2] - 40:20, 163:19
**suggest** [5] - 42:3, 44:14, 160:15, 162:22, 171:12
**suggested** [1] - 129:14
**suggesting** [3] - 107:4, 136:23, 162:17
**suggestion** [1] - 180:17
**suing** [6] - 8:1, 24:16, 24:21, 148:8, 148:15, 149:13
**suit** [1] - 148:8
**suite** [1] - 103:13
**Suite** [9] - 1:15, 1:19, 32:14, 38:13, 38:19, 65:11, 65:23, 66:11, 118:5
**suites** [1] - 130:1
**Sukkot** [1] - 173:25
**sum** [1] - 13:24
**summarize** [1] - 123:18
**summarizing** [1] - 154:7
**summary** [2] - 133:4, 145:17
**Sunbiz** [2] - 16:1, 41:22
**sundown** [1] - 173:24
**sunrise** [1] - 174:14
**superseded** [2] - 7:25, 8:2
**supersedes** [1] - 8:4
**supervising** [1] - 80:3
**supervision** [1] - 75:9
**support** [2] - 8:3, 162:22
**supported** [1] - 162:8
**supporting** [1] - 140:21
**supports** [1] - 153:25
**suppose** [1] - 172:11
**supposed** [4] - 10:25, 61:13, 147:3, 171:14
**surprise** [2] - 34:25, 35:2
**suspect** [2] - 124:3, 172:10
**sustain** [3] - 82:12, 172:25, 173:2
**sustained** [14] - 67:7, 68:14, 68:16, 76:8, 77:10, 78:15, 81:11, 81:25, 82:6, 83:1, 83:14, 83:24, 89:21, 94:1
**swear** [1] - 111:18
**swearing** [1] - 108:4
**swipe** [1] - 88:2
**sworn** [3] - 56:2, 111:19, 116:23
**SWORN** [3] - 5:13, 56:12, 111:22
**system** [3] - 79:5, 85:11, 88:8

**T**

**table** [3] - 3:7, 4:4, 121:12
**tad** [1] - 141:4
**tails** [1] - 177:3
**tangential** [1] - 171:6
**task** [2] - 123:3, 123:4
**tax** [11] - 19:12, 19:14, 20:1, 20:3, 20:12, 21:5, 21:16, 46:3, 47:7, 153:20, 153:24
**taxable** [1] - 46:5
**taxes** [1] - 22:3
**technician** [1] - 3:10
**temple** [1] - 4:12
**ten** [3] - 49:21, 166:22, 166:25
**tenancy** [1] - 167:12
**tenant** [4] - 6:10, 6:11, 6:16, 95:9
**term** [6] - 24:8, 24:11, 168:13, 168:15, 168:20
**terminate** [2] - 146:8, 147:23
**terminated** [1] - 104:20
**terminating** [3] - 93:12, 93:15, 93:18
**terms** [16] - 37:11, 39:15, 40:1, 40:8, 44:12, 47:9, 47:15, 47:19, 48:10, 59:22, 61:9, 61:16, 88:20, 95:13, 154:4, 183:23
**testified** [19] - 40:15, 43:11, 44:19, 45:25, 46:5, 46:24, 48:3, 48:8, 60:14, 92:1, 118:12, 159:18, 160:13, 167:12, 167:25, 168:22, 171:2, 171:20
**testify** [7] - 38:16, 44:19, 46:16, 72:17, 84:14, 109:24, 151:1
**testifying** [1] - 53:9
**testimony** [27] - 4:5, 4:10, 13:24, 34:23, 38:18, 40:5, 44:7, 46:1, 47:14, 52:21, 82:9, 86:18, 90:13, 92:2, 101:6, 106:2, 109:19, 116:23, 122:24, 123:19, 159:15, 167:13, 168:1, 168:17, 168:24, 169:2, 170:10
**text** [4] - 65:21, 99:3, 110:25, 117:20
**texted** [1] - 109:4
**THE** [520] - 1:9, 1:13, 1:17, 3:2, 3:13, 3:17, 3:19, 3:21, 3:23, 4:2, 4:3, 4:19, 4:20, 4:23, 4:25, 5:2, 5:4, 5:6, 5:13, 6:24, 7:1, 7:4, 7:5, 7:6, 7:7, 8:6, 8:7, 8:12, 8:14, 8:18, 8:20, 9:2, 9:12, 9:15, 11:16, 11:18, 12:19, 12:21, 14:22, 14:23, 14:25, 16:13, 16:14, 16:25, 17:3, 17:5, 18:11, 18:14, 18:16, 18:19, 18:21, 20:17, 20:18, 21:9, 21:10, 22:10, 22:13, 22:17, 24:22, 24:25, 25:3, 25:4, 25:21, 25:25, 26:5, 26:8, 28:13, 28:15, 28:19, 28:21, 28:23, 29:6, 29:11, 29:14, 30:13, 31:11, 33:21, 35:6, 35:9, 35:12, 35:14, 35:17, 35:19, 36:3, 36:6, 36:13, 36:15, 36:17, 36:22, 37:12, 37:14, 37:17, 37:22, 37:25, 38:3, 38:6, 38:9, 38:11, 38:24, 39:1, 39:12, 39:22, 39:24, 40:9, 40:24, 41:24, 42:6, 42:14, 43:4, 43:8, 43:14, 44:2, 44:9, 44:13, 44:24, 45:23, 46:6, 47:22, 48:12, 48:16, 48:21, 48:25, 49:9, 49:13, 49:16, 49:21, 49:24, 51:10, 51:14, 51:22, 52:3, 52:23, 53:4, 53:12, 53:16, 53:21, 54:13, 54:15, 54:21, 54:24, 55:2, 55:5, 55:8, 55:10, 55:12, 55:20, 55:22, 56:1, 56:3, 56:4, 56:6, 56:7, 56:10, 58:1, 58:2, 59:13, 60:7, 60:8, 60:14, 62:17, 64:5, 64:7, 64:9, 64:12, 67:5, 67:7, 67:19, 68:10, 68:12, 68:14, 68:16, 68:18, 69:23, 69:25, 70:13, 70:20, 71:7, 71:16, 71:25, 72:3, 72:8,

72:11, 72:12, 72:14, 72:21, 72:24, 73:4, 73:12, 74:5, 75:21, 75:23, 76:8, 76:13, 76:14, 77:10, 77:22, 77:23, 77:24, 77:25, 78:15, 81:11, 81:25, 82:5, 82:9, 83:1, 83:5, 83:7, 83:12, 83:14, 83:24, 84:12, 85:16, 85:18, 85:19, 86:5, 86:9, 87:5, 87:19, 87:21, 87:22, 87:25, 88:2, 88:4, 88:5, 88:7, 88:8, 88:11, 89:21, 90:17, 90:18, 94:1, 105:8, 105:21, 105:22, 106:4, 106:6, 106:9, 106:13, 106:16, 106:20, 107:15, 108:12, 108:16, 108:19, 109:14, 109:20, 110:1, 110:3, 110:11, 110:17, 110:19, 111:10, 111:12, 111:13, 111:14, 111:16, 111:18, 111:20, 111:21, 111:22, 113:6, 113:13, 113:25, 114:1, 114:2, 114:3, 114:14, 114:15, 114:23, 114:25, 115:1, 115:9, 115:23, 116:15, 116:18, 116:20, 119:11, 120:17, 121:6, 121:8, 121:10, 121:11, 121:14, 121:16, 121:20, 122:1, 122:17, 122:19, 122:22, 123:7, 124:1, 124:25, 125:1, 125:3, 125:4, 125:10, 125:11, 125:21, 125:23, 125:25, 127:19, 127:21, 129:5, 130:8, 130:9, 130:11, 130:20, 130:22, 131:1, 131:3, 131:7, 131:10, 131:13, 131:16, 131:18, 131:21, 131:24, 132:2, 132:6, 132:9, 132:13, 132:17, 132:20, 132:23, 133:6, 133:12, 133:15, 134:1, 134:4, 134:14, 135:8, 135:16, 135:22, 136:3, 136:9, 136:13, 136:19, 137:2, 137:9, 137:13, 137:17, 137:19, 137:23, 137:25, 138:6, 138:8, 138:12, 138:14, 138:16, 139:2, 139:6, 139:10, 139:12, 139:15, 139:18, 139:22, 139:25, 140:6, 140:9, 140:22, 141:2, 141:7, 141:12, 141:17, 141:23, 142:2, 142:10, 142:24, 143:1, 143:5, 143:19, 143:22, 144:4, 144:9, 144:14, 144:17, 144:23, 145:18, 145:23, 146:1, 146:5, 146:22, 146:24, 147:5, 147:18, 148:16, 149:1, 149:15, 149:25, 150:11, 150:16, 150:24, 151:4, 151:21, 151:25, 152:7, 152:20, 152:23, 153:8, 153:12, 153:17, 154:2, 154:13, 154:16, 154:20, 154:22, 154:24, 155:2, 155:10, 155:16, 155:19, 156:1, 156:3, 156:6, 156:10, 156:25, 157:8, 157:11, 157:21, 158:4, 158:7, 158:13, 158:17, 158:22, 158:24, 159:1, 159:13, 159:20, 159:23, 160:4, 160:19, 160:23, 161:1, 161:5, 162:4, 162:11, 162:17, 162:25, 163:2, 163:15, 164:13, 165:3, 165:15, 165:18, 165:23, 165:25, 166:4, 166:8, 166:10, 166:12, 166:16, 166:18, 166:25, 167:5, 167:17, 167:24, 168:9, 168:25, 169:13, 170:18, 170:22, 171:16, 171:23, 172:7, 172:21, 172:24, 173:8, 173:18, 173:21, 174:1, 174:16, 174:21, 175:5, 175:9, 175:14, 175:18, 176:4, 176:7, 176:10, 176:14, 176:22, 177:3, 177:7, 177:10, 177:14, 177:16, 177:18, 177:20, 178:2, 178:4, 178:16, 178:24, 179:4, 179:7, 179:11, 179:14, 180:5, 180:7, 180:12, 180:22, 181:5, 182:9, 182:13, 182:18, 183:3, 183:6, 183:13, 183:21, 183:25, 184:3, 185:6, 185:9, 185:18, 185:22, 186:13, 186:16, 186:18, 186:22, 187:1, 187:14

**theft** [2] - 79:12, 79:20
**theme** [1] - 136:16
**theoretically** [1] - 14:18
**theory** [2] - 9:8, 52:10
**thereafter** [2] - 94:20, 101:16
**therefore** [8] - 40:21, 41:20, 45:13, 45:15, 45:16, 122:14, 133:2, 183:8
**thereon** [1] - 52:2
**thinking** [2] - 107:3, 185:25
**thinks** [1] - 143:14
**third** [8] - 36:25, 38:3, 39:13, 62:16, 62:22, 104:5, 138:25, 141:4
**Third** [1] - 142:12
**thoughts** [1] - 123:20
**thousand** [1] - 22:3
**thread** [2] - 28:3, 29:16
**threatening** [1] - 99:3
**threats** [1] - 109:5
**three** [10] - 14:18, 48:14, 49:11, 105:16, 127:11, 128:16, 139:15, 148:4, 182:16, 183:10
**three-week** [1] - 128:16
**throughout** [2] - 78:6, 133:3
**ticketing** [1] - 79:5
**tickets** [2] - 79:9, 79:19
**timed** [1] - 107:20
**timeline** [6] - 143:5, 143:13, 143:16, 144:3, 144:4, 145:24
**timely** [1] - 84:13
**timestamps** [1] - 79:6
**today** [19] - 4:16, 11:5, 35:2, 48:25, 49:6, 49:15, 49:16, 86:16, 87:25, 99:2, 106:2, 107:7, 116:23, 122:6, 122:12, 127:1, 128:11, 173:19, 173:20
**today's** [2] - 107:6, 127:1
**together** [6] - 25:14, 47:4, 156:21, 167:11, 167:12, 185:19
**tomorrow** [11] - 49:1, 105:13, 123:6, 127:17, 127:20, 127:22, 173:19, 173:24, 174:4, 175:17
**took** [7] - 9:1, 80:22, 84:6, 94:24, 102:12, 143:24, 169:22
**top** [2] - 27:24, 101:3
**topic** [5] - 30:18, 30:20, 30:21, 40:5, 115:11
**total** [3] - 45:8, 98:4, 98:8
**totality** [3] - 39:16, 43:25, 149:22
**totally** [2] - 20:15, 72:14
**towards** [4] - 10:21, 49:7, 78:21, 81:6
**traditions** [1] - 173:23
**traffic** [1] - 49:1
**Trans** [1] - 63:21
**transcript** [2] - 77:16, 169:17
**transcription** [1] - 187:20
**transfer** [1] - 10:8
**transmitting** [1] - 91:9
**TRANSPARK** [1] - 1:3
**Transpark** [166] - 3:3, 3:8, 9:23, 13:20, 14:6, 14:15, 15:6, 15:24, 15:25, 16:8, 20:12, 20:15, 20:18, 21:24, 23:7, 23:11, 24:2, 27:10, 31:15, 31:20, 31:25, 32:18, 41:20, 41:21, 41:23, 45:15, 45:18, 45:20, 46:25, 47:13, 47:23, 48:4, 58:16, 58:18, 58:19, 59:3, 59:5, 59:20, 59:23, 59:25, 60:10, 60:15, 60:17, 61:6, 61:8, 61:15, 61:22, 61:23, 62:23, 63:5, 63:8, 63:24, 63:25, 64:4, 64:18, 64:22, 65:7, 65:12, 65:13, 65:22, 66:7, 67:1, 67:3, 67:9, 73:14, 73:15, 73:18, 73:19, 74:17, 74:24, 75:2, 75:10, 75:25, 76:11, 76:22, 77:3, 77:6, 78:3, 78:7, 78:10, 78:12, 78:18, 78:20, 79:2, 79:24, 80:13, 80:15, 80:20, 81:3, 81:5, 81:9, 83:18, 84:2, 84:8, 84:21, 84:25, 85:3, 85:7, 85:10, 85:12, 85:13, 85:22, 86:1, 86:15, 87:8, 87:11, 88:17, 88:23, 89:19, 89:24, 90:2, 90:9, 90:22, 91:1, 91:9, 91:15, 91:21, 92:5, 92:9, 92:16, 93:4, 93:7, 93:11, 93:14, 93:16, 93:17, 93:18, 93:22, 93:23, 94:3, 94:4, 94:10, 94:12, 94:16, 94:17, 95:6, 96:2, 97:7, 98:10, 98:18, 98:20, 99:22, 100:10, 100:12, 102:2, 102:7, 102:15, 103:20, 104:20, 111:6, 116:25, 117:9, 117:14, 117:24, 118:6, 118:17,

119:6, 120:24, 137:1, 143:18, 148:10, 148:21, 153:5, 153:20, 159:16, 168:21
**Transpark's** [28] - 21:3, 58:21, 60:4, 61:11, 62:12, 62:20, 62:25, 63:2, 63:3, 63:15, 65:15, 66:19, 66:23, 67:1, 76:5, 78:9, 78:17, 81:5, 83:3, 83:10, 85:21, 89:5, 89:7, 89:12, 101:13, 102:13, 103:20, 111:6
**traveling** [1] - 134:24
**trial** [3] - 51:3, 106:16, 107:1
**Trial** [1] - 1:6
**TRIAL** [1] - 1:9
**tried** [1] - 38:15
**trouble** [1] - 77:15
**true** [4] - 44:4, 157:4, 168:4, 180:5
**trust** [1] - 30:5
**trusted** [1] - 81:1
**trusting** [2] - 86:21, 86:23
**try** [14] - 13:24, 64:8, 64:9, 71:5, 82:11, 83:8, 115:17, 128:6, 141:10, 155:10, 156:6, 183:4, 183:13
**trying** [24] - 17:10, 41:9, 64:13, 70:16, 70:18, 91:14, 91:21, 92:21, 115:10, 117:17, 128:10, 134:22, 135:9, 138:18, 144:24, 144:25, 156:15, 162:19, 164:3, 167:22, 171:6, 178:8, 185:10, 185:11
**turn** [5] - 15:19, 25:16, 27:6, 72:9, 98:23
**turned** [2] - 10:21, 55:6
**TV** [1] - 5:8
**twice** [7] - 6:11, 6:21, 7:19, 14:8, 73:2, 75:2
**two** [36] - 11:13, 12:18, 41:9, 45:8, 49:11, 49:14, 103:10, 105:10, 107:17, 123:18, 125:15, 126:20, 128:16, 134:19, 138:24, 139:5, 140:5, 143:4, 145:13, 147:17, 156:20, 165:7, 165:11, 166:1, 167:7, 168:13, 171:10, 171:13, 179:4, 181:11, 181:23, 182:23
**two-page** [1] - 165:7
**type** [3] - 48:9, 56:24, 156:7
**typical** [2] - 33:5, 126:14
**typically** [7] - 53:24, 54:4, 54:7, 85:24, 89:25, 134:23, 135:22
**typing** [2] - 64:13, 72:4

## U

**U.S** [8] - 21:6, 21:12, 22:1, 85:10, 85:14, 85:22, 118:12, 118:13
**ultimately** [2] - 111:6, 164:5
**un-call** [1] - 33:22
**unacceptable** [1] - 158:1
**under** [54] - 4:14, 16:16, 20:19, 23:8, 23:12, 23:15, 23:20, 33:11, 39:5, 40:3, 40:8, 40:18, 41:7, 41:18, 45:11, 47:8, 47:19, 48:10, 50:9, 60:10, 61:11, 63:7, 70:10, 71:6, 71:7, 76:6, 88:23, 92:5, 92:16, 92:19, 92:22, 95:1, 95:3, 95:22, 112:16, 113:11, 114:10, 114:11, 116:23, 117:14, 118:3, 134:24, 146:11, 150:3, 160:9, 160:12, 168:12, 168:19, 168:20, 181:22, 182:4, 183:23
**underneath** [1] - 18:5
**understood** [18] - 9:10, 23:1, 52:22, 54:12, 62:18, 64:16, 72:2, 72:20, 82:14, 88:23, 90:1, 91:20, 92:21, 92:24, 115:18, 115:25, 155:18, 173:6
**undo** [1] - 42:15
**unenforceable** [1] - 133:24
**unfair** [2] - 178:14, 180:9
**unfortunately** [1] - 161:6
**unintelligible** [1] - 185:16
**unintentional** [1] - 161:4
**UNITED** [2] - 1:1, 1:10
**United** [4] - 1:23, 39:9, 70:10, 187:23
**unknown** [1] - 128:12
**unless** [5] - 108:6, 140:7, 142:3, 142:14, 146:13
**unpaid** [1] - 76:11
**unreliable** [1] - 53:20
**unrestricted** [1] - 170:2
**up** [91] - 5:18, 5:24, 8:8, 11:13, 13:24, 15:9, 15:14, 16:18, 20:9, 22:18, 24:5, 25:18, 26:14, 26:18, 26:24, 27:15, 27:16, 27:24, 28:8, 28:10, 28:13, 28:18, 28:20, 28:22, 28:24, 28:25, 29:10, 29:13, 30:11, 31:5, 32:3, 32:22, 33:14, 33:24, 43:12, 44:4, 45:21, 47:6, 58:2, 59:7, 60:22, 64:23, 65:6, 65:25, 66:20, 66:23, 67:17, 72:9, 72:13, 74:4, 75:13, 75:16, 76:15, 81:2, 87:3, 87:14, 88:6, 88:12, 96:14, 96:19, 97:24, 99:4, 99:6, 99:13, 100:23, 102:4, 104:3, 104:11, 108:21, 111:2, 112:3, 112:19, 114:11, 115:20, 116:10, 118:10, 119:9, 122:2, 128:5, 128:19, 142:10, 142:13, 152:4, 152:10, 153:23, 155:15, 166:13, 172:6, 186:2, 187:8
**update** [1] - 31:14
**utility** [1] - 102:7

## V

**valid** [11] - 132:18, 133:2, 133:8, 133:9, 133:17, 133:19, 133:24, 134:2, 134:7, 134:17, 143:18
**validity** [2] - 133:5, 134:11
**validly** [1] - 133:1
**value** [4] - 83:3, 83:10, 83:12, 83:22
**various** [3] - 30:24, 96:16
**verbatim** [2] - 111:25, 112:1
**verdict** [34] - 36:5, 36:25, 37:5, 40:6, 45:1, 106:22, 106:25, 122:15, 122:21, 129:7, 165:1, 174:21, 174:22, 174:25, 175:15, 178:9, 179:11, 180:2, 180:16, 180:23, 180:25, 181:10, 183:16, 185:5, 185:8, 185:10, 185:13, 185:19, 185:22, 185:25, 186:10, 187:4
**VERNITA** [2] - 1:22, 187:22
**Vernita** [2] - 72:4, 107:18
**Vernita_Allen** [1] - 1:25
**Vernita_Allen-Williams@flsd.uscourts.gov** [1] - 1:25
**versus** [1] - 10:21
**via** [4] - 67:12, 85:10, 85:14, 85:22
**viable** [1] - 154:6
**violate** [1] - 109:16
**virtue** [1] - 163:20
**voir** [9] - 53:8, 53:12, 53:13, 53:16, 53:24, 54:3, 54:6, 54:10, 54:11
**volume** [2] - 72:8, 72:13
**vs** [2] - 1:5, 3:3

## W

**wait** [4] - 51:3, 77:19, 125:16, 173:5
**waiting** [2] - 125:2, 126:1
**waive** [1] - 163:16
**waived** [2] - 45:20, 161:19
**waiver** [38] - 158:19, 159:5, 159:12, 159:15, 159:20, 159:21, 159:24, 160:9, 160:20, 160:24, 161:1, 161:8, 161:13, 161:15, 162:23, 163:2, 163:14, 163:15, 163:23, 164:14, 164:21, 164:22, 164:23, 173:14, 177:17, 177:18, 177:20, 177:21, 178:1, 179:10, 179:13, 179:15, 182:23, 186:25
**waives** [2] - 163:20, 163:21
**waiving** [1] - 164:15
**wake** [1] - 187:8
**walk** [4] - 143:5, 143:13, 143:16, 183:4
**Walker** [4] - 99:23, 99:25, 100:2, 100:13
**wants** [1] - 153:14
**warning** [1] - 110:6
**warrant** [1] - 10:7
**ways** [2] - 44:8, 140:23
**website** [5] - 42:13, 155:21, 155:22, 156:2, 156:4
**week** [3] - 99:6, 128:16, 128:23
**weekend** [1] - 122:12
**weight** [1] - 185:14
**welcome** [4] - 86:17, 108:5, 108:16, 128:24
**Wells** [5] - 31:13, 31:14, 31:20, 31:22, 31:25
**West** [1] - 34:18
**whatsoever** [1] - 7:25
**whereas** [1] - 122:12
**whereby** [2] - 93:23, 94:4
**whole** [6] - 29:22,

42:3, 99:15, 139:10, 142:7, 152:5
**whopping** [1] - 166:25
**Williams** [1] - 187:22
**WILLIAMS** [2] - 1:22, 187:22
**Williams@flsd.uscourts.gov** [1] - 1:25
**willing** [1] - 13:4
**win** [1] - 178:7
**wind** [3] - 107:1, 152:4, 152:10
**wins** [1] - 178:5
**withdraw** [6] - 129:22, 137:7, 137:16, 144:21, 153:11, 155:1
**withdrawing** [4] - 131:16, 138:1, 140:14
**withdrawn** [3] - 131:17, 137:9, 157:12
**withdraws** [2] - 136:6, 138:11
**WITNESS** [43] - 4:2, 4:19, 6:24, 7:4, 7:6, 8:7, 14:22, 16:14, 20:18, 21:10, 25:4, 28:13, 28:15, 28:19, 28:21, 28:23, 29:6, 29:11, 29:14, 30:13, 31:11, 33:21, 56:3, 56:6, 56:12, 58:2, 59:13, 60:8, 76:14, 77:22, 77:24, 85:19, 87:5, 90:18, 105:21, 111:14, 111:20, 113:13, 113:25, 114:2, 114:15, 115:1, 119:11
**Witness** [1] - 111:15
**witness** [37] - 4:6, 4:7, 12:1, 22:19, 35:7, 35:11, 35:12, 38:18, 48:20, 49:4, 49:10, 54:17, 54:20, 56:2, 59:9, 67:21, 69:9, 71:23, 72:16, 72:25, 73:4, 73:9, 76:17, 104:2, 106:3, 108:17, 109:19, 109:24, 110:7, 110:13, 111:11, 111:16, 111:19, 115:10, 116:18, 121:9, 121:13
**witnesses** [6] - 48:14, 48:18, 121:14, 121:15, 154:4, 154:5
**WITNESSES** [1] - 2:1
**wonderful** [1] - 118:2
**word** [5] - 126:7, 126:8, 132:18, 134:17, 153:22
**words** [3] - 72:15, 117:17, 182:22
**worry** [1] - 18:19
**worse** [3] - 27:13, 30:5, 30:6
**worth** [3] - 81:22, 82:3, 123:19
**wow** [1] - 183:13
**writing** [2] - 119:18, 177:11
**written** [4] - 6:17, 67:12, 85:10, 85:13
**wrote** [4] - 12:25, 71:15, 71:16, 104:23

## Y

**year** [20] - 6:11, 6:17, 6:20, 6:22, 7:20, 13:24, 14:8, 15:19, 16:4, 19:22, 19:23, 20:19, 22:3, 29:22, 75:3, 85:8, 95:11, 168:15, 171:3, 171:17
**years** [7] - 7:20, 13:19, 15:8, 24:13, 24:20, 25:4, 76:21
**yesterday** [6] - 4:9, 8:17, 10:1, 27:9, 72:18, 124:9
**yourself** [1] - 28:6

## Z

**zero** [6] - 29:8, 29:9, 178:7, 179:16, 179:20, 180:1
**zoom** [3] - 33:20, 101:2, 104:4