UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CV-20631-JB

TRANSPARK, LLC, Plaintiff,

vs.

FTP INVESTMENT CORPORATION, Defendant.

Miami, Florida
October 3, 2025
11:03 a.m. - 3:33 p.m.
Trial Day 4 of 4
Pages 1 to 96

---

JURY TRIAL
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:
JOSEPH ISAIAH PARDO, ESQ
MELISSA LEA MACKIEWICZ, ESQ
SAVANNAH LEE DUFFY, ESQ
Pardo Law PLLC
1205 Lincoln Road
Suite 211
Miami Beach, Florida 33139

FOR THE DEFENDANT:
MARCUS ANTONIO NIELSEN, ESQ
MANUEL LAZARO CASABIELLE, ESQ
Boyd Richards Parker Colonnelli
100 SE 2nd Street
Suite 2600
Miami, Florida 33131

STENOGRAPHICALLY REPORTED BY:

VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR
Official Court Reporter to:
The Honorable Jacqueline Becerra
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
Vernita_Allen-Williams@flsd.uscourts.gov

(Call to order of the Court at 11:03 a.m.)

THE COURTROOM DEPUTY: Case No. 24-CV-20631-Becerra, Transpark, LLC, vs. FTP Investment Corporation.

Counsel, please state your appearances for the record starting with the plaintiff.

MR. PARDO: Good morning, Your Honor, Joseph Pardo, Pardo Law, PLLC. With me are cocounsel Melissa Mackiewicz and Savannah Duffy, my paralegals Elizabeth Osoria and Elijah Clinton, my client representative Greg Mirmelli, and Patrick Justesen, our technician.

MR. NIELSEN: Good morning, Your Honor. Marcus Nielson on behalf of the defendant along with Manny Casabielle, Bart Seidler, and Nanette Bauza and Dan Smith.

MR. CASABIELLE: Good morning, Your Honor.

THE COURT: All right. Good morning, everyone. Be seated. One small thing before we get to the big thing: the stipulations. I didn't put them in the jury verdict form. Nobody complained about that. I still think we need the stipulations. I'm inclined to just label this an exhibit and let the jury know before you close that there's also a series of stipulations that they're going to find in evidence, and not even read it to them. They're just going to bring it back as an exhibit.

MR. PARDO: No objection on behalf of plaintiff.

MR. NIELSEN: No objection, Your Honor.

THE COURT: All right. So one of you, while people are

11:05AM closing, prepare that so that we can -- so that it looks like an exhibit, please. You should -- both of you have paralegals on staff, so you should be able to do that.

11:05AM All right. Let's go to the verdict form and the objections.

11:05AM Mr. Pardo, I am not sure that this is what you're arguing, but I think this is what I understand you're arguing. I think what you're arguing is that even if there is a waiver of the notice, let's just talk about the breach of contract, even if they waived notice, that doesn't extinguish the contract rights.

11:05AM MR. PARDO: Correct, Your Honor.

11:05AM THE COURT: And even if notice would have been futile, it doesn't extinguish the contract rights.

11:05AM MR. PARDO: And specifically doesn't extinguish Transpark's right to receive profits, if any, in accordance with the contract.

11:06AM THE COURT: Correct.

11:06AM MR. PARDO: Yes, Your Honor.

11:06AM THE COURT: I'm not there yet. Hold on.

11:06AM So I think what you want is for there to be a directed verdict on both futility and waiver.

11:06AM MR. PARDO: Correct, Your Honor.

11:06AM THE COURT: Because even if notice was futile, your argument is, all right, my notice is futile, you couldn't notify me. But you still have to pay me.

MR. PARDO: Correct, Your Honor.

THE COURT: And, yes, I waived notice, but you still had to pay me.

MR. PARDO: Correct, Your Honor.

THE COURT: They're going to argue that the waiver of notice and the futility of notice meant they didn't have to pay you, meant they didn't breach the contract. They can argue that to the jury, right. I think what they're going to argue and I think all of the facts that they have been talking about, they still argue under equitable estoppel and abandonment.

MR. PARDO: Absolutely, and we believe --

THE COURT: Those are complete defenses.

MR. PARDO: Absolutely.

THE COURT: Now, if I take out -- and you're proposing waiver is gone, futility is gone, it's gone from the jury instructions, it is also gone from the verdict form.

MR. PARDO: Correct, Your Honor.

THE COURT: I also think what you're saying is a jury can find that no express provision was breached and find a breach of fair dealing.

MR. PARDO: That is absolutely correct, Your Honor.

THE COURT: However, if a jury found a breach but had an affirmative defense of the three that still stand, you don't go to implied.

MR. PARDO: Correct, Your Honor.

THE COURT: I'm going to attribute that to my mind and not what you wrote last night, but I think -- I just want to make sure that that is what you're arguing.

MR. PARDO: 100 percent, Your Honor.

THE COURT: Okay. This is what I think about Mr. Pardo's argument. I think he's right on waiver and futility. I don't think they're complete defenses. I don't know if he's right that if there's no breach of an express term, there is no damages -- there can still be damages on implied.

I'm not sure he's right on that. He cites me the Hanzman case. Michael Hanzman is a lot smarter than I am. You can get them that copy of the transcript. That could be right, right. There is a lot of law that you can't have a breach without a contract, but it doesn't speak to there being a breach.

My inclination would be to accept his objection because that's something you can brief after the fact. If this jury zeroes him out on breach and gives him 15 million on implied, you can come back to me and say: The jury needed to have found a violation of the express term to get that second number.

And I can set it aside. Because there is a difference, for sure you cannot have an implied breach if there is no contract. But if there is a contract, which is what the jury can find, they can find there's a contract, they can find it was not breached, they don't look at your affirmative defenses, they just find there was no breach of contract, they can get to damages on

11:09AM the second.

11:09AM Now, if they find there is a breach but any one of your three standing affirmative defenses apply, they don't get to 2 because then there is no contract; the affirmative defense has obliterated the existence of a contract.

11:09AM MR. PARDO: On behalf of the plaintiff, we agree and emphasize that the methodology that I adhere would avoid any prejudice to having to move for a retrial if, in fact, posttrial briefing determines otherwise.

11:09AM THE COURT: Because let me tell you, the one thing I don't want is a retrial of this case. That, I'm really not interested in for lots of reasons, and I can't imagine any of you want a retrial of this case. So if I did that, I'm trying to get you going on closings while I work on -- continue to work on the jury instructions.

11:10AM I'm trying to see, Mr. Pardo, you still had the phrase "did not want any involvement with the property," you think that's vague. What say you to his objection to removing from page 18, paragraph 1, of the jury instructions "involvement with the property"?

11:10AM MR. NIELSEN: Your Honor, I think we've proffered sufficient evidence to show that Greg Mirmelli did not want involvement in the property, so it should remain there. I don't think it is vague or confusing.

11:11AM THE COURT: Hold on. Let me tell you what I think is

confusing about it.

Let's say -- this is a rank hypothetical -- but that he had sort of outsourced his involvement, his personal involvement in it. So he hires Heber, and he's dealing with it. It doesn't mean he's abandoning his contract rights. He just personally, right, he didn't want to be involved with the property, but that doesn't mean he didn't want the benefit of the property.

I think that's the confusing thing. If I just take out the words "did not want any involvement with the property," it would just read -- quite frankly, counsel, I think this enures to the defendant's benefit -- "plaintiff Transpark through statements, actions, and inactions indicated it gave up its rights under the Profit Participation Agreement."

Actually I think that's accurate because I think not wanting to be involved with the property doesn't mean you're willing to give up your rights to the contract.

MR. NIELSEN: No objection, Your Honor.

THE COURT: All right. So I am going to make that change.

All right. Let me hear you on argument because just because I agree with Mr. Pardo doesn't mean you can't convince me otherwise. What say you on the argument of -- let's just start with futility and waiver.

MR. NIELSEN: Well, Your Honor, our argument for that is that for futility and waiver if he waived those rights to receive

notice, the defendant made numerous capital contributions that plaintiff's position is that we do not get credit for because we did not get notice of it. And if we do not -- we don't have to give them notice, then we do get credit for those contributions. And when you do the math on all that, there is zero profits left over. So that would be the bar to the absolute bar.

Their entire case has been that they didn't get notice of anything, so they're absolved of all their breaches of the agreement. So our position is if the notice was futility, he would have breached the agreement without needing notice and their claims would be barred.

THE COURT: Repeat the last thing. You lost me. So let's assume that you've proved that it's futile. It would have been absolutely futile to send that notice.

MR. NIELSEN: Yes.

THE COURT: He is saying that's right, it was futile to get me the notice, and you didn't have to send me a notice, but when you sold the property, my right to a profit of it didn't extinguish it. I think you're saying, okay, the capital contributions, the right of first sale -- that, I didn't have to give you notice of.

I think what he's saying is that at the end of the day, yes, you didn't have to notify me of these capital contributions or whatever or the right of first -- sale, but when you have profits, that doesn't mean you don't give me profits, it doesn't

fully get rid of the agreement.

MR. NIELSEN: So, Your Honor, in the agreement there is one particular clause that says for each $10,000 FTP advances on behalf of Transpark, Transpark loses 1 percent of its capital contributions. We have proffered evidence that we have contributed $5.8 million for the Crimson payment --

THE COURT: You have to slow down.

MR. NIELSEN: -- for the Crimson payment that we consider as a capital contribution. $5.8 million, that payment would extinguish the 30 percent owed to the plaintiff.

THE COURT: Well, and I think he is saying you can argue that. You can argue that. But you can't say that if you prove that it was futile to send this notice, I have no contract rights because that's what an affirmative defense is. So he's not saying you can't argue that. He's just saying you can't have it as an affirmative defense.

Is that right, Mr. Pardo?

MR. PARDO: That's absolutely correct, Your Honor.

THE COURT: What say you to that?

MR. NIELSEN: Well, Your Honor, I think that the way I had it written, I don't think an affirmative defense has to be an absolute bar. It can be a bar to meeting a condition precedent, and we should at least get maybe an instruction that it was futile for him to get the notice, so we don't have to meet that condition precedent in terms of -- so we can get our rights to the contract

that we would be entitled to if there was no notice -- no notice needed. That's my concern with the confusion that would exist. -

THE COURT: And I'm saying I think you can argue that to the jury. I think you can argue to the jury that it was futile, that there was no point in doing that and, therefore, right, you know, you can do the math from there.

MR. NIELSEN: Okay.

THE COURT: But an affirmative defense says if you prove futility, this contract does not exist, right. It completely takes out the breach of contract. And I -- I think he's right on that. And I think he's right on the waiver too. Waiver is actually a little more powerful in the sense that if his client had waived the right, if everybody waives notice, that doesn't at all extinguish it. That just means his rights are exactly the same. Your client had to hunt them down then if there's really a waiver.

It's almost the opposite, it's actually not an affirmative defense. I think he's right on that. I think he's -- I'm going to take out the fourth and fifth affirmative defense and grant the defense motion on that. I think that's right. I think we're confusing notice with all the contract rights.

That being said, sir, everything you've argued on futility and notice to me is also equitable estoppel and abandonment, but it matters in the law the names we give things, so I don't think you're being shortcut in any way from what you've

shown this jury would have been futility and would have been waiver. I just think it's got a different name.

MR. NIELSEN: Understood, Your Honor.

THE COURT: So I think that's what I'm going to do with that.

I think you can close while I play with the jury instructions because I am going to take futility and waiver out, and I'm just going to make a modification so that if they find a breach, find that none of the affirmative -- I'm sorry.

If they find that there was no breach, they can still go to 2. They cannot go to 2 if they find an affirmative defense, which is the way it's written now anyway. It's just that Question No. 1, if there is a no to 1, they can still go to 2. The way it's written is if you answered yes to 1 but had any affirmative defense, you don't go to 2. That part is right. It's the first line in the verdict form that has to be changed.

I think you should be comfortable closing while I tinker and do that, and please behave during closing because I'm obviously doing jury instructions, so don't do anything that causes me to have to sustain an objection. Stay within your lanes for closing, please, as best you can.

Who is going to take care of the stipulations? You're doing it?

MS. MACKIEWICZ: I've already finished it, I am just going to have it printed now.

THE COURT: That's perfect. And that will just go as an exhibit?

MS. MACKIEWICZ: Yes.

THE COURT: And you don't have an objection? I don't think I got the defense on the record just letting the jury know that there is a stipulation of fact that will be an exhibit.

MR. NIELSEN: I said on the record, Your Honor, I have no objection.

THE COURT: I'm sorry, I couldn't remember.

MR. NIELSEN: We also had objections to the verdict form.

THE COURT: All right. You're right, I'm sorry. I have a decision on that.

Your objection to the verdict form -- I think I sort of addressed this -- is that you can't have damages to two if you have no damages to 1. And my point to you there is you might be right, but it doesn't make any sense to take it out of the verdict form, because then I'd have to retry the case.

Only having one line is problematic because if I only have one line, then whether or not you could have damages, right, on the implied covenant, it might get confusing as to whether those damages are for a breach, because you can't have, right -- they can't find that the contract wasn't breached and give them the damages that flow from a breach, can't have that. It has to be, right, it has to be from the implied covenant.

I have no idea what he is going to argue with damages and

that's why I'm still taking your motion on a directed verdict on damages under advisement. I don't know how he's going to argue that because -- I don't know how he is going to argue it, but I am about to find out.

MR. PARDO: Thank you, Your Honor. There is also a pending motion to conform the pleadings to the evidence to remove the specific allegation or any suggestion that strict compliance with the contract was necessary, and to allege that the parties had an oral modification of the contract.

THE COURT: Why do I need to do that?

MR. PARDO: It's not necessary, but it's --

THE COURT: I am not doing that. I don't need to do that.

MR. PARDO: Very well.

THE COURT: We have to get this jury in here. I don't think it's necessary to do that.

MR. PARDO: Understood.

THE COURT: What I will do is after you all close, we will take a break so that you can all see the verdict form and the new jury instructions, because that's important, but I think but for purposes of your argument, I don't think it really changes your argument much, maybe if you had a slide that had futility or waiver, you need to remove it, but the argument is still, he abandoned this contract, he shouldn't be allowed to enforce it.

MR. NIELSEN: Can we still argue that it was futile but

not just --

THE COURT: Oh, absolutely, you can argue that it was futile, you can argue that he waived. I don't have a problem with that. It's just that the way I structured the verdict form and the jury instructions, a jury would say if it was futile to give notice, he has no rights under the contract. I don't think that's right. I know I could be wrong, but I don't think that's right. All right.

MR. CASABIELLE: Your Honor, just to be clear, I'm doing closing. I can say to the jury that we raised the affirmative defense of futility?

THE COURT: No.

MR. CASABIELLE: No, but we can say it was futile and they waived?

THE COURT: Correct.

MR. CASABIELLE: Okay. No mention of affirmative defense.

THE COURT: Right, it is not an affirmative defense because the jury instructions tell them that if you meet your burden to an affirmative defense, well, the verdict form is going to take them to a zero. So if you prove abandonment, equitable estoppel, or anticipatory breach, it's a zero.

MR. CASABIELLE: It's a zero.

THE COURT: It's a zero to one end, so it's a zero.

MR. CASABIELLE: So just so I am clear, because I don't

want to make any mistakes that require an objection, I can say: Ladies and gentlemen of the jury, you can find -- if you find yes to there was a breach, then you would go to the affirmative defenses, you would only have to find one of three affirmative defenses --

THE COURT: And it's over.

MR. CASABIELLE: -- and it's over.

THE COURT: That's right, Mr. Pardo, right?

MR. CASABIELLE: I just want to be clear.

Thank you, Your Honor.

THE COURT: One of any of the three, it's over as to Count 1 and Count 2, it's over.

MR. CASABIELLE: Yeah.

THE COURT: Okay. Bring them in.

(Jury in at 11:22 a.m.)

THE COURT: Thank you very much. Good morning. Welcome back. We're ready for closing argument.

Counsel.

MR. PARDO: May it please the Court.

Ladies and gentlemen of the jury, I hope you all had a meaningful day off and thank you for being a part of our jury. You are the trier of fact. You get to decide what actually happened in this case. This is our contract. Plaintiff's Exhibit 1, the Profit Participation Agreement. Today the rubber meets the road.

In May 2006, Greg found an incredible opportunity to buy a parking lot in Downtown Miami, and he found an ideal buyer. FTP Investment Corporation owned the office building, 250,000 square feet, just down the street. He thought the deal would be successful. He wanted to be a part of the deal. Rather than take a commission or a finder's fee on the front end, he decided Transpark would take a profit participation and promote interest on the back end.

We're here because FTP breached the contract when they failed to honor the right of first refusal and when they failed to send 30 percent of the net profits, the net cash flow, in accordance with the contract.

We're here because FTP acted unfairly and against Transpark's reasonable expectations under the contract.

At the beginning of the trial, I came up here and gave my opening statement and I previewed for you what the evidence would show. I made a promise to you of what I thought the evidence would show. Every document that I showed you in my opening came into evidence, and keeping me honest here, I believe the evidence showed you exactly what I said it would.

Stewart Mirmelli testified Greg's a dealmaker; he finds good opportunities. Greg testified he had the means, he had the opportunity, it was his deal, and he wanted to bring in a partner. FTP took assignment of Transpark's contract and the parties entered into this Profit Participation Agreement. The validity of

the contract is not in dispute. You will not hear the defendant argue this was not a valid contract.

Mr. Seidler conceded the term of the contract, how long it lasts is just what the document says; until the property sold. That's when the rubber meets the road.

Now, the unrefuted evidence, and everyone acknowledges, Transpark put in $300,000 toward the purchase price. The evidence is unrefuted. FTP put money into the purchase price. The contract says what happens to their initial capital contribution. You get to decide, as the trier of fact, what to do with that money. The contract says if there's going to be a capital contribution, FTP has to inform or give notice to Transpark that it's coming, ten days. No such notice was given of any capital contribution during the ownership of the property.

In 2021, FTP sold the property for $18 million, and FTP directed and controlled 100 percent of those sale proceeds; 1-and-a-half million dollars back to Mr. Seidler, 13-and-a-half million dollars to the 1031 exchange, 3 million into a warehouse, 2-and-a-half dollar seller's boot. There were 17-and-a-half million dollars of sale proceeds when this property sold. FTP reported in its 2021 tax returns that it had an $11.4 million capital gain from its ownership of this property. A capital gain that ultimately was income, that was taxable.

We contend the evidence shows there were net cash flow and profits in accordance with this contract, and Transpark was

11:31AM entitled to 30 percent of them. You, as the trier of fact, get to weigh all the evidence, look at all the figures, and determine what that number is.

The evidence was that Transpark leased the property, and the contract says for how long; for as long as FTP desired. For as long as FTP desired for the first two years. You saw the rent for the first two years, the rent was paid in full. There was a separate contract, a lease, Plaintiff's Exhibit 6, that was for a five-year term. Everyone acknowledges the lease expired after five years. The lease expired and Transpark was no longer operating the lot. After then, you heard Nathan Heber testify, Transpark became a month-to-month tenant.

I gave you some themes during the case in my opening. Operations are different than ownership. The profits from the operation, the right to operate the lot, the need to be boots on the ground is separate from Transpark's rights under this contract. The Profit Participation Agreement even contemplates if there is a default under the lease, you still get 15 days' notice before your 15 percent promote is diluted, and recall what that 30 percent bucket was; 15 percent came from Transpark's $300,000, 15 percent came from procuring and leasing the property.

The defendant might argue that it wouldn't have mattered. There is an address there, the 2650 address, Stewart wasn't there, he didn't have his office there, it would have been futile. He waived his right to receive notice at that address.

11:33AM You heard Bart on the stand. You heard Nathan on the stand. The way they did business together, modified the contract. The Court's going to instruct you as matter of law on what a modification of the contract means and how to show it. Quite frankly, it was something that Bart testified to that I agreed with. He could have just given an email, he could have just sent a notice to Nathan Heber, if he intended to actually give one. There is just one problem. You heard Bart on the stand the last day of trial, he didn't even desire to give a single notice under the Profit Participation Agreement.

11:34AM The judge is going to instruct you on what the elements or what I have to prove in order to recover on a breach of contract theory.

11:34AM First, that there was a contract. Let's pull up Plaintiff's Exhibit 1 on the screen, it's the Profit Participation Agreement. The validity of the contract is not in dispute.

11:34AM To show that Transpark did all or substantially all of the essential things which the contract required it to do, what was the core of this contract? That Transpark would assign the purchase rights, assign the rights to take title to this property to FTP in exchange for 30 percent, in accordance with the contract.

11:35AM Transpark brought the deal to FTP. Transpark assigned its purchase contract to FTP. Transpark allowed FTP to replace $100,000 deposit that Transpark had put up. You remember the

colloquy with Stewart Mirmelli, how Greg had put up the initial $100,000. Once the contract was assigned, FTP replaced the $100,000 deposit and Greg's $100,000 deposit was returned to him.

Transpark facilitated a 4-and-a-half million dollar loan so that FTP's initial capital contribution was the approximate $1.2 million. That's in evidence. You should consider that. Just like you should consider Transpark's $300,000 that remained in that property through 2021.

Transpark did lease the property for as long as FTP desired. Transpark was willing, ready, and able to make any capital contribution that it was made aware of. Greg testified he did not receive a capital contribution. Mr. Seidler testified not only did he not send one, he didn't even want to. Yet, in the same breath he wants you to believe that they lost money on this deal, that he had to contribute capital contributions, that he made a 5-and-a-half million dollar settlement payment pursuant to a confidential settlement agreement that he didn't tell us about.

FTP wants you to believe that those capital contributions accrued at 14 percent compounding interest until 2021. He wants you to believe that he should have made $21 million on the deal, that he experienced some fictitious loss, and that because there were no profits upon the sale of the property, Transpark should get nothing.

Mr. Nielsen, when he gave you an opening statement, told you that a forensic accountant and a lawyer was going to come in

and do the math on all these capital contributions. Did you see them testify here? It didn't happen.

Mr. Seidler was confronted with his general ledger, which purportedly would have been his own accounting records, to show where those capital contributions came from, where they were made, how they were maintained. Didn't show any accrued expenses. Didn't show any accrued interest under the Profit Participation Agreement because it didn't happen.

Transpark, right around the time that FTP was having a final judgment entered against it when it failed to pay the rent, after it got seven default letters from Jones Walker that it didn't tell Transpark about, right around the time that final judgment was being entered, Greg was sending letters of intent: I've got Harvey Hernandez ready to buy the property, $8 million. I've got Harvey Hernandez ready to buy the property, $9 million. I think he'll go up to 10.

FTP didn't even consider it, kept all of its beliefs, all of its thoughts, all of its desires of anything it wanted to communicate to Transpark arising from this agreement in his head, including the fact that sitting at that closing table he knew there were sale proceeds, he knew there was money to distribute. And this belief that he lost money, he kept in his head.

He testified, Mr. Seidler testified he didn't tell anybody about the Profit Participation Agreement. He didn't tell Joe Colletti, the closing agent, the title agent responsible for

making sure that title cleared. Joe Colletti, the guy who is responsible for making sure that rights of first refusal, recorded or not, are resolved so that somebody doesn't come after the fact and claim: Hey, you took my right of first refusal away from me. Hey, you took my profit participation rights under the contract away from me.

Joe Colletti testified if he had known about this contract, the deal never would have closed. FTP did not tell Joe Colletti about this contract. FTP signed a resolution that it was in the best interest of the company to sell the property. It was. He made a lot of money. FTP signed a company affidavit swearing under penalty of perjury to the title agent: No one has any claims. Everything on the closing statement is true.

The evidence showed that was not true. There was somebody out there who was owed profit participation under the contract. There was somebody out there who had a right of first refusal under the contract. Transpark had those rights.

Section 3 of the contract, that's literally what I've always said, the rubber meets the road. We acknowledge exactly what the contract says. FTP gets a preferred return. Give them whatever preferred return you believe the evidence showed he actually got. Give him a preferred return of what you believe the evidence showed he actually properly noticed under the contract.

But don't forget about Transpark. Transpark's $300,000 also has rights under the contract. Transpark's 15 percent

promote also has rights under the contract. And upon the closing, it was FTP who had to do that reconciliation. It was FTP who had to make sure the closing agent, Joe Colletti, got a copy of the closing statement to Transpark.

It didn't happen because he withheld the existence of the Profit Participation Agreement from anybody who could have done -- who could have done something to stop it. He kept all the money to himself.

The third element I have to prove is that all conditions required by the contract for FTP's performance had occurred. When does the rubber meet the road? Upon the sale of the property. Upon the sale of the property, that's when the reconciliation has to happen. That's when if there is a calculation of preferred return accrued interest, that's when it has to happen. It didn't.

There were sale proceeds. There were sale proceeds and profits in accordance with the contract to distribute. You as the trier of fact get to decide what that amount is. Let's pull up Plaintiff's Exhibit 136, the closing statement.

Line 401, the sale price, $18 million. Line 601, the million-and-a-half-dollar deposit, the hard money deposit that was released to FTP prior to closing. Line 515, the 13-and-a-half-million dollars that went to the 1031 exchange, 3 million of which went to go buy a warehouse in Downtown Miami that FTP still owns today. And line 803, the 2-and-a-half-million-dollar seller's boot. 17-and-a-half-million

11:43AM dollars of discretional sale proceeds that FTP directed at the closing, not a penny of which he directed to Transpark. Kept it all for himself.

11:43AM Let's look at Plaintiff's Exhibit 142, 2021 tax returns, page 6 where FTP reported $11.4 million of capital gains. The fourth element I have to prove, that FTP failed to do something essential which the contract required it to do. What's more fundamental and essential in a Profit Participation Agreement than the profits that come from the sale of the property?

11:44AM It was FTP under the contract, under Section 6. They had to use their bookkeeper to keep the accounting. They had to reconcile when the rubber meets the road. They had to tell us that there was a right of first refusal. They had to notice a capital contribution. They didn't do it. They kept all the money for themselves.

11:44AM And the fifth element I have to prove is that Transpark was damaged by FTP's failures, deprived of the opportunity to exercise the right of first refusal, deprived of our 30 percent of net cash flow and profit after taking into account the expenses and other obligations under the Profit Participation Agreement.

11:44AM You heard testimony from Mr. Seidler that the operations were profitable from 2017 to 2021, leading up to the sale of the property. Let's pull up Plaintiff's Exhibit 112, the City Parking lease. FTP was making over -- excuse me, $500,000 a year in rent from the City Parking lease.

Defendant's Exhibit 119, this is the profit and loss statement. This is what their records show. Defendant's Exhibit 119 is the 2018 profit and loss from the parking lot operations. Maybe it's another exhibit. Defendant's Exhibit 111, the profit and loss from 2021 -- I apologize.

IT STAFF: Plaintiff's or defendant's?

MR. PARDO: Defendant's. Let's pull up Defendant's Exhibit 122, please. Let's zoom in on the general ledger, scroll down a little bit, capital contributions.

This is in 2021, the general ledger that I confronted Bart Seidler with where I asked him to explain why there is no reconciliation in the year that he purported to suffer these losses, the year that he believed he was underwater under the terms of the agreement, the agreement that FTP was trying to enforce in 2021. Don't forget that.

FTP's testimony was that they were trying to enforce the contract in 2021, they thought they were underwater because of all these capital contributions, they thought that they should have earned $21 million in 2021, they're the ones who were trying to enforce the contract.

How can that be? How can FTP come up and tell you: We thought the contract was abandoned. We thought that they had breached. We thought they were gone, done with.

How can they say that in the same breath as believing at the closing table that they were underwater? Believing at the

closing table that they had lost all this money? The two can't be true.

Now let me take a personal moment. Transpark's principal, Greg Mirmelli, he's not the Queen of England. He is not the most eloquent speaker in the world. But his story is consistent and his passion shines through his testimony. You should consider that.

Now, in addition to my claim for breach of contract, in addition to the damages that you can and we contend you should award under the breach of contract claim, when you see the verdict form there is going to be a second count for breach of implied covenant of good faith and fair dealing.

So I want to explain to you even if, even if you find that there was no breach of an express term of the contract, even if you find "Did FTP breach the Profit Participation Agreement, no," you can still find -- you can still go to Count 2 and find that there was an implied covenant, not an express term, an implied covenant that FTP breached.

That they had an obligation to exercise their obligations under Section 1, Section 3, Section 6, and Section 7 of the Profit Participation Agreement because they held the discretion, because they had the right to make a capital contribution, to keep accounting records, to distribute money in accordance with the contract at closing because that was in their bucket, their control. If they failed to do that based on the reasonable

expectation of the parties, then for the same reasons that there was ^ our obligation ^ to fulfill, they failed to meet it, we were ready and able to perform, you can award damages under breach of implied covenants theory.

Let's bring up Plaintiff's Exhibit 123. That's the purchase and sale agreement. Page 10, those representations, the seller's representations. This is when FTP entered into the purchase and sale contract without telling us and they represented to the buyer that no one else's consent was required, that the purchase and sale agreement and the sale of the property wouldn't conflict with anyone -- any other contract.

Pull up -- how about the Profit Participation Agreement. You look at the contract yourself and determine whether signing this purchase and sale agreement without telling us, accepting the offer without telling us, selling the property without telling us was inconsistent with these representations.

Plaintiff's Exhibit 129, the seller's affidavit, paragraphs 6 and 13, the affidavit that Bart Seidler gave to the closing agent, and Mr. Colletti's testimony that the existence of this Profit Participation Agreement flies in the face of this affidavit.

Greg not only didn't receive the benefit of this bargain, he didn't even get an opportunity to. You heard his testimony about what the ultimate buyer is going to do with the property. Exactly what he thought: They're going to build and develop.

You'll see reference in the Profit Participation Agreement, that's what they contemplated. The parties contemplated operating, owning, or developing the property. That right was taken away from Transpark when FTP breached the implied covenant of good faith and fair dealing and sold the property out from under them.

The judge is going to instruct you as matter of law on an oral modification of a contract. And there are a few oral modifications that I want to highlight the evidence showed to you. One was Nathan Heber's testimony that there could have been a month-to-month tenancy after the initial term of the lease expired.

And second was Nathan, Bart, Greg, everyone's testimony that notice could have been any way whatsoever. It could have been an email, it could have been a FedEx, it could have been a voicemail. FTP testified they didn't send a notice, they didn't even desire to send a notice. I asked them: Did you send a notice to Nathan Heber that there was abandonment, cancellation, he thought the deal was dead? No, he didn't send it. He didn't even try to send it.

FTP accepted every rent payment that Transpark was making. Nathan Heber said: When I moved offices, I told them don't send mail there. Nathan Heber was the boots-on-the-ground guy. He was the one that was responsible for making sure FTP's rent payments got paid under the lease, and you heard his testimony. We sent them what we could, and there was an

understanding that we pay whatever we could, less the expenses that we had, that was good enough.

Mind you, even if you find that FTP sent a notice of a default under the lease, even if you find that there was a default under the lease, the Profit Participation Agreement still says we get 15 days' notice before not all of our contract rights, just our promote rights are diluted.

Defendants are going to argue abandonment, that the company was dissolved, which we acknowledge, in 2011. You saw the list of all the companies that Greg had, the portfolio under Miami Parking Management, Park West Parking. He has dozens of lots, and he delegated the responsibility to keep those lots alive to Nathan Heber, to Avrohom Roth, the CPA.

You saw the list that Greg checked off: Keep these companies alive. Transpark was one of those companies, so when in 2010 he sent the person responsible, Nathan Heber, "Hey, keep these companies alive, see my comments attached," the company didn't get an annual report filed, mea culpa.

But you're going to hear the judge's instruction on abandonment. The administrative dissolution of a Florida business does not extinguish contractual actual rights or obligations belonging to the business. Say that again: The administrative dissolution of a Florida business does not extinguish contractual rights or obligations belonging to that business.

You should weigh the evidence. The company was

reinstated in 2017. The company was active in 2021. FTP, if it wanted to find or send or reach out to Transpark at any time between 2017 and 2021 when the property was making half-a-million dollars a year, when the property was about to be sold for $18 million, there was no dissolution then.

The company was alive and well. Greg was alive and well. They knew how to get ahold of each other. There were emails communicating with each other, even the same day that FTP was sending the $5.8 million confidential settlement payment to Crimson Plaza.

There was an argument raised by the defendants arising from a $300,000 personal loan from Greg Mirmelli, borrowed $300,000 from Bart Seidler individually. That promissory note does not reflect any agreement between Transpark and FTP. It was a personal loan from Greg Mirmelli to Bart Seidler.

Let's pull up Defendant's Exhibit 81, and let's zoom in. We have the -- excuse me. From the $300,000, this is Defendant's Exhibit 81, $200,000 was paid back by Greg Mirmelli. Greg testified candidly: I truly believe the 100,000 was paid, I sincerely believe it was. Do I have the bank statements from Wachovia and City National? I don't have them.

But when the loan came due in January of 2001 [verbatim], you also heard Greg's testimony, his understanding of the statute of limitations, the time with which FTP had to sue on this note or any document relating to this note, he had five years to do it,

and he didn't do it. He didn't sue on the loan. Bart never sued Greg, FTP never sued Transpark, no one sued anyone because FTP was perfectly content not doing anything, keeping everything in his head till the property sold and he kept all the money to himself.

I want to pull up an excerpt from the first day of trial, the first day of testimony, page 151, line 25, going on to the next page. Yes, let's zoom in on that real quick.

I was asking Mr. Seidler about the Profit Participation Agreement, and then let's go to page 153, lines 13 and 14. I was asking Mr. Seidler what his understanding was of the Profit Participation Agreement. You will recall I asked him: Was it a development contract? Was it a partnership agreement? Was it an AIA construction contract? Was it a memorandum of understanding? No. And you should believe him.

If you see any document in evidence that refers to a memorandum of understanding, you should know it is not the Profit Participation Agreement. When you consider and weigh this evidence, you should consider complete exhibits, not exhibits -- excuse me, not exhibits that are missing exhibits. If you see reference to an Exhibit A and it's not there, that should mean something to you.

Let's pull up Section 9 of the Profit Participation Agreement, Plaintiff's Exhibit 1, Section 9. Greg Mirmelli individually guaranteed Transpark's performance under this contract. If there was any doubt about abandonment under the

contract, if there was any doubt that Transpark wasn't around, FTP had recourse, they could have gone to Greg individually, they could have gone and said, "Greg, you put up your share of the money, you put up your 30 percent of the capital contribution, you operate the lot."

It didn't happen because FTP kept it all in its head until 2021 when they took all the money for themselves.

Let's pull up Day 3 transcript, page 116, line 23.

IT STAFF: What page?

MR. PARDO: 116. Line 23.

This is when I brought back Mr. Seidler on cross-examination the last day of trial. And I was asking him about his intent, his desire to send notice.

Keep on going. Keep on going, Patrick. Keep on going, please. Keep on going, please. Keep on going. Let's start at line 17 and go to the end.

"Did you ever send Transpark an email of the capital call?

"I don't recall.

"An email that the Profit Participation Agreement had been abandoned?

"I don't think I did.

"A belief that the Profit Participation Agreement had been abandoned?

"I don't believe I did."

12:01PM Keep on going.

12:01PM "How about you believe there was an assignment of rights?

12:01PM "I did not."

12:01PM And then when I pulled up the Profit Participation Agreement -- keep on going, please -- I pulled up Section 10 and I walked him through it, keep on going, keep on going.

12:01PM I asked him:

12:01PM "Did you even desire to send a notice?

12:02PM "I didn't send him a notice, I out of business."

12:02PM I pushed him, I said, "Not that he's out of notice, all the things we talked about. And here it is, top of page 120. Don't forget the first line. Don't forget the first line, please.

12:02PM "I did not send him a notice. I did not send him a notice."

12:02PM You'll recall during Mr. Seidler's first day of testimony, that's the second time he admitted it. I asked him, I said, "You're the one on behalf of FTP who gives notices?

12:02PM "Yes.

12:02PM "You didn't give any notices?

12:02PM "No I did not." He didn't even try. He kept all the money to himself.

12:02PM Defendant might argue equitable estoppel. That's a legal expression. They have to show that through Transpark's actions, they didn't want any involvement in the property and, most importantly, that FTP relied on that for their detriment.

12:03PM I want you to listen carefully to what Mr. Casabielle says about detrimental reliance, what change of position did FTP actually take? It sounds to me like they were consistent in their position they wanted all the money to themselves.

12:03PM When you go back in your deliberation room, I want you to weigh all the evidence, and recall the standard, preponderance of the evidence. If it's just more likely than not that FTP breached the contract, enter a verdict in our favor.

12:03PM We'll go through the jury verdict form when I come back after Mr. Casabielle presents his closing, and I'll walk you through the verdict form and how we believe you should answer it, because I don't want there to be any confusion about what we believe the evidence showed and what we believe your verdict should be.

12:04PM Thank you very much.

12:04PM Your Honor, at this time, I would reserve the remaining 17 minutes I have for rebuttal.

12:04PM THE COURT: Yes, sir.

12:04PM MR. CASABIELLE: May I proceed, Your Honor?

12:04PM THE COURT: You may.

12:04PM MR. CASABIELLE: May it please the Court, counsel.

12:04PM Good afternoon, ladies and gentlemen. We finally get to address each other.

12:05PM This is the closing statement, basically here we are for argument, basically here we're going to summarize what we believe

is important of the evidence and ask you to return in our favor.

Now, let's start out with a very unequivocal understanding. What I say the evidence is, is not the evidence. What Mr. Pardo says the evidence is not the evidence. What we say the jury instructions are, is not the jury instructions. The jury instructions come from the Court, the facts you decide.

Now, let me submit something to you. It seems to me, you decide, that the plaintiff is just trying to confuse you folks. He's trying to take a very complicated -- a very simple matter, a very simple case, and make it into this monster, throw out all these things. It's called respectfully lying or deflecting. And I made a few notes of what Mr. Pardo said during his closing argument, which are examples of this.

For example, he said that no notice was given, but then later on they talk about emails. He talked a lot about the disbursement of the funds after the property was sold, after Mr. Seidler sold the property to this entity. That's not part of this particular trial. He spoke a lot about that. He spoke about capital gains, 1031 forms for the IRS. He talks about us not calling a forensic accountant. Let me just say the reason we didn't call a forensic accountant is because they presented absolutely no evidence that they were damaged, which is one of the elements that the Court is going to instruct you that they have to do if they want to have any kind of a viable case, okay.

Now, they talked about FTP's tax returns. So what? FTP

can make a zillion dollars. That has nothing to do with this case. This case is simpler than that.

This case is pretty straightforward. It has to do with a contract between Greg Mirmelli and Bart Seidler. The contract calls for Mr. Mirmelli to assign to Mr. Seidler rights to a deal he had secured.

MR. PARDO: Objection, Your Honor.

THE COURT: Overruled.

MR. CASABIELLE: And it calls for Mr. Mirmelli to pretty much take over and run a parking lot and it calls for Mr. Seidler to pay $7 million, that's it.

Now, if we could -- hold on a minute. I want to try to follow this so you guys can follow me. So let's put up DX-1, please. All right, folks. This is the contract that was entered into. It's called a Profit Participation Agreement and Assignment. It was entered into between Mr. Mirmelli and Mr. Seidler. This is really what we're here to discuss.

Mr. Mirmelli claims we violated that contract. We claim there was no contract by the time that the property was sold, and I'm going to try to walk you through our train of thought here so you can understand our position.

Now, there are some key recitals of this contract that I have highlighted, perhaps we could start with the first paragraph, the top paragraph, if we could bring it up, please, Dan. All right.

12:09PM This talks about the date. This is just simply very straightforward, the date that the contract was entered into, May 22, 2006. This is about the time that Mr. Seidler came up with the money and bought the property, that's the date. That gives you -- it's important because some things work off of that date.

12:10PM Now, as part of the recitals, the first paragraph of the recitals it says that GM, that is Mr. Mirmelli, he agrees to take care of the property, pretty much supervise and maintain the lot. That's his part of the agreement. He also agrees to pay $30,000 a month and, interestingly, this recital also talks about -- now this is a contract, remember this is a contract that Mr. Mirmelli and Mr. Seidler entered into. It also calls for $100,000 to be paid to Stewart Mirmelli.

12:11PM Mr. Stewart Mirmelli took the stand and he was pretty much turning into a pretzel trying to explain why he was getting $100,000 in this deal. Now, he said that first Mr. Mirmelli lent the money, it was in his escrow account. And then it's unclear whether Mr. Stewart Mirmelli actually loaned the money to him or not, whether it was Mr. Mirmelli's money that went into that trust account. That's unclear. But it is important because, in addition to the other recitals here, Mr. Seidler agrees to pay $7 million -- approximately $7 million for the property.

12:11PM Now, I suggest to you, folks, that at this stage of the this deal, you have Mr. Mirmelli, who secures the loan, he talks

somebody into selling him a piece of property, but, in reality, he doesn't have the money to buy it. Okay. He gets $100,000 from his dad to secure the deal, secure the deal, and then he gets the rest -- the money to pay for the property from Mr. Seidler. He's in a deal where he hasn't put in a lick -- a penny. Of course, he did put in the $300,000 that we've talked about, but we will talk about that as well.

Interestingly, the deal takes place in 2006. By 2007, Mr. Mirmelli is asking Bart for $300,000, which, coincidentally, is the same amount of money that he borrowed from Mr. -- from Bart after the sale was consummated.

Clearly, clearly, Mr. Mirmelli has no skin in this game. He is applying his business rule, which is -- what was it? Other people's money, OPM. That's his business model. He has no risk in this deal at all. He can just walk away from it and suffer no losses, or at least no significant losses, and that's exactly what he did in this case. When things got bad, he walked away from the deal.

Now, to convince Bart to lend money to buy the lot, he had to make his own promises. Of course he broke them, but he made promises.

Now, I want to suggest to you that Mr. Mirmelli is a con man. He talks the talk but he doesn't walk the walk. He's a paper tiger, if you will. He talks about having a lot of money, being able to do all these things, when, in reality, he doesn't

have the money to buy this lot; and if he did, he doesn't want to use his money, he wants to use Bart's money in case something goes wrong, which it did, and then he can walk away, which he did, and then Bart has to take up the slack and take responsibility for the lot, which he did.

Okay, now the -- one of the promises that Mr. Mirmelli made was to run the lot. And we've talked about that. He violated that trust. That's clear, that's what the evidence has established.

The other promises that Mr. Mirmelli made to Bart to get him to buy the lot was he promised to pay $30,000 a month, he also took out a loan and promised Bart that he would repay the loan, the $300,000 loan. By 2008, ladies and gentlemen, Mr. Mirmelli had broken all the promises he made to get Bart to buy the property, okay. He stopped supervising, running the lot, he didn't make any payments, he didn't make the $30,000-a-month payment, which put him in automatic default which we're going to discuss in a minute, and he also had failed to pay the $300,000 loan.

These promises led Mr. Mirmelli to lose any right that he had to this property, so that by 2008, 2009, he is irrelevant in this deal, irrelevant, totally irrelevant. Why? Because he walked away from it, and he knew he was in automatic default. He didn't care. He knew he owed Bart, who he claimed to be a friend, $300,000, but he didn't repay it in full.

12:16PM This is consistent with his personality. This is consistent with his business model. Let me talk other people into using their money so I don't have any risk, but I can make a profit, maybe.

Now, let's go -- kind of go over the profit agreement, if we could. Let's see. This talks about the way to distribute or distribute responsibility, 70 percent versus 30 percent. Well, we've heard that. We all know that. I don't need to dispute that.

It also talks -- it has -- where is it? It talks, if we could focus on Section 3, please, Dan. Bring it up here. Allocation of net profits and lost.

Now, I say that Mr. Mirmelli has not proven damages, but it goes beyond that. The reason he hasn't presented any evidence of damages is because he cannot prove that he was damaged.

Now, Mr. Pardo accuses us of not calling our forensic accountant. The reason we didn't call them is because two reasons: One, we don't have the burden of proving anything. They have to prove that we violated the contract. That's where we start. That's the first question you ask yourselves, and the verdict form will kind of guide you through that process, okay.

He has the burden of proving damages, so if he had a forensic accountant, he would have called them. He would have told you guys: Oh, Mr. Seidler made a lot of money. Well, the truth of the matter is if there was a forensic accountant called,

he would have had to have followed what is written here in the contract to come up with the specific numbers.

In here what it talks about is a preferential return. Which pretty much is, let's say you have a gross of $17 million, for example. Before you get to profit, net profit, you have to deduct certain deductions, costs. I mean it's common sense. To reach net you have to take profit minus costs, correct. And then you have to define what those costs are.

The contract provides for that, accrued interest, et cetera et cetera, et cetera. I'm not going to get into that because, quite frankly, I'm trying to avoid getting into the weeds here. I don't want to mislead you on anything. I want you to focus on what is at stake here, what decisions you have to make.

So that's one of the clauses in the agreement. And there is another one that I do want to emphasize as well, Clause No. 9. Can we get to that, Dan, please.

9. This kind of went by the wayside for a little while, but it eventually came up during the trial. Mirmelli is the personal guarantee in this particular deal. So when Mr. Pardo talks about what Transpark did versus what Mr. Mirmelli did, that's -- that's nonsensical. Why?

Because when we're talking about Transpark, we are talking about Mirmelli. Don't be fooled, don't be misled, or misdirected by any argument that, well, that was Transpark's responsibility, not Mirmelli. Not the case. Mirmelli is

12:20PM Transpark, period.

12:20PM Now, as part of the agreement and part of the promises, Mr. Mirmelli signed a ground lease agreement. Can we put that up, please. That would be DX No. 2.

12:20PM This is what you folks have to focus on. I love the expression "where the rubber meets the road." Mr. Pardo wants you to focus on one paragraph of all these -- of these two documents and all of the other documents and all of the other papers that have been introduced in this case. The rubber doesn't meet the road in that one paragraph, which says Mr. Mirmelli is entitled to 30 percent.

12:21PM There's a lot more to this case than that. Don't be misled into believing that is the case. That is not the case. That's what I'm here to try to remind you folks of. Let's look at the lease.

12:21PM Well, it talks about the principal offices of Transpark. We can focus on that right there. The address is Suite 2650. Why do I bring that in even though that's a little bit kind of getting into the weeds? Because there was a lot of talk about receiving mail for 2610 at 2650 and that he would have received it if it had gone out. He didn't receive any notice because he, Mr. Seidler, could have sent it to his address by sending any notices to 2650 -- by sending it to 2610.

12:22PM That's, again, a nonsensical argument, one that's meant to mislead you. Fortunately during the trial, the truth comes

12:22PM out. He knew what was going on. Nathan was telling him: Bart wants his money; you owe money. And he disregarded that. But anyway, that's why I highlight that.

12:22PM The term of the lease, the first paragraph. The reason I highlight this is just to remind you folks that the testimony established that Mr. Mirmelli had a right to renew this lease but decided not to. He just said: I'm done with it. That's consistent with our theory of the case, he abandoned everything.

12:23PM Now, the lease agreement calls for a $30,000 a month payment that I've discussed. That's at paragraph 3. And we can -- and I'm skipping around. I'm not suggesting you should ignore the entire agreement. You have every right, and I recommend that you read everything that's been introduced into evidence.

12:23PM You don't have to. You can go back in there and say: I know exactly what happened here. I don't need to read anything. I know what my verdict is going to be. You can do that, or you can read everything. We spent four days here, introduced over 130 exhibits, so that's going to take a little while, but you choose. That's your choice. Okay.

12:24PM The reason I mention this is because I'm showing highlighted portions. I don't want you to just focus on that; I want you folks to be clear-headed when you make your decision, so you have a right to review all of this if you want to.

12:24PM Now here we go. We're talking about notices again,

paragraph 11. Here we go back to the 2650 versus 2610 evidence that we heard ad nauseam where Mr. Stewart Mirmelli is trying to convince you folks, turning himself into a pretzel, that, oh, yeah, Greg could receive notices by having things sent to his office at 2610, by having notices sent to Stewart's office when he moved to Flagler, by having notices sent to Stewart's office/apartment in Miami Beach when he moved.

He wants you folks to believe that by doing that, you could have gotten notice to Mr. Mirmelli; but he didn't receive anything. Well, he kind of hems and haws, well, maybe I did, maybe I didn't. Could you unequivocally say that you would have received any notices addressed to Mr. Mirmelli at the 2510 -- 2610 address, the Miami Beach address or the Flagler address, he said no.

Okay. So that really is a red herring, one of those things that is thrown at you to mislead. And in some sense, you're getting some less than honest statements from the witnesses. We're going to discuss what you can take into account when determining what -- how to evaluate a witness's testimony.

Now, let's not forget. Let's not lose sight that Gregory is Stewart's son. If you're a parent, you understand, you know, what that means. If you can bend the truth a little bit, you're going to help your son or daughter. If you have to lie to help your son or daughter, some people would do that as well, so keep that in mind.

Okay. Let's go to paragraph 14. This is really interesting and important. I've highlighted the portion I'd like you folks to focus on: If tenant fails to pay rent by the first of the month twice in one year, tenant shall no longer be granted a cure period and shall be in immediate default the third time rent is not paid on the first of the month.

What does that mean? Mr. Mirmelli is screaming: Oh, he didn't give me notice. I'm entitled to notice before any default. Which is a nonsensical argument because he is saying basically: Folks, I know I owe him the money; I paid it for two years. I know I owe rent for the remaining term of this lease, but I am not going to pay it. I'm going to stick my head in the sand, and I'm not going to pay it until somebody says I have to.

That's his argument to you folks. But guess what? He's not even entitled to be advised that he is in default. Why? Because of this particular section of the contract: If you default twice in one year, the third time you do it, you lose your right of -- shall be in immediate default and shall no longer be granted a cure period.

That's the letter of the agreement that Mr. Mirmelli signed. He says: Disregard what I signed; listen to what I say. And I submit to you that Mr. Mirmelli cannot be believed. He is a liar. I will be so bold as to accuse him of being that kind of a person.

Now, that is the ground lease agreement that kind of

governs your decision-making process in this case. Additionally, there is another document -- documents that Mr. Pardo doesn't want you to even look at. He doesn't want you to consider. Can we put up DX 78, please.

The promissory note. That says, in a nutshell -- we don't have to go through all of the fancy language -- it says: Bart is going to lend you -- me, Bart, I'm going to lend you $300,000. You, Greg, promise to pay me by January 1st, 2008. I, Greg, promise that if I don't pay the money, you can have whatever interest I had in the lot as collateral.

We all know what collateral is. You didn't leave your common sense when you walked into this room. An example of collateral is you borrow money to buy a car, you use the car as collateral. You don't pay the money, the loan, the bank gets to keep the car.

MR. PARDO: Objection, Your Honor.

THE COURT: Overruled.

MR. CASABIELLE: That's an example. In this case the agreement is crystal clear. We're going to lend you $300,000. You're going to pay me back by January 2008. If you don't pay me back, I get to have your share of the property. And that's exactly what happened in this case.

MR. PARDO: Objection, Your Honor.

THE COURT: It's argument. The jury is instructed and will be instructed again that the lawyers' comments are not

evidence, and it's not the law. Move on.

MR. CASABIELLE: Thank you, Your Honor.

If you look to Exhibit DX 79, please, that is the actual assignment of the collateral. Don't take my word for it; just read it for yourselves, okay. Section B of the recitals of the assignment: As security for the loan, and intending to be legally bound, borrower, being Mr. Mirmelli, hereby covenant, agree, warrant, represents, assigns, set over, and transfer to the lender all of the rights in and to that certain real estate property known as the central lot located at 130 Southeast 1st Street, Miami, Florida.

That's it. That's the assignment. That's what he gave up when he didn't repay the loan on January 1st, 2008.

Now, I've just given you basically pretty much an overview of what I believe this case is about. Again, as the judge has reminded you folks, this is only argument. What is important here is what you folks remember and how you evaluate the evidence that was presented to you. And there will be certain rules that the judge will read to you that you are to apply when making decisions in this case.

Now, let me qualify what I'm about to say by saying this. I'm going to tell you what the rules are; Mr. Pardo will tell you what the rules are. Those are not the rules. I know that sounds rather odd, counterintuitive, but I say that because the rules come from the bench. She is the one, Her Honor is the one that's

12:32PM going to tell you what the rules are.

12:32PM But I respectfully suggest I wouldn't be reading these to 12:32PM you out of the blue unless I had some kind of -- some kind of 12:32PM knowledge as to what the judge will be reading to you, so let's go 12:32PM over these rules together. Hopefully, my discussing them will aid 12:32PM you in using the rules that the Judge will give you.

12:32PM Okay. So if we can put up the jury instruction dealing 12:32PM with: To decide whether you believe any witness. I suggest that 12:32PM you ask yourself a few questions. Let's put that up there, 12:33PM please.

12:33PM This is a rule that you're going to get from the judge. 12:33PM It happens to be one of my favorite rules because it tells you 12:33PM look at the people that are testifying, look at these things, and 12:33PM you decide whether or not they're truthful. Okay. And some of 12:33PM the factors that the Court says or suggests you should ask 12:33PM yourselves include: Did the witness impress you as one who was 12:33PM telling the truth?

12:33PM Now, these instructions apply to all the witnesses, but 12:33PM basically we can break them into two camps. You have the -- Bart 12:33PM and Nathan camp, you have the Mirmelli clan. Those are the two 12:33PM groups of witnesses that these particular rules will apply to, 12:33PM okay.

12:33PM So the first one that the Court suggests you should ask 12:34PM yourself, did the witness impress you as one who was telling the 12:34PM truth? Did Mr. Mirmelli impress you folks as one who was telling

12:34PM the truth? I suggest, no, he did not. That's your decision. That's the beauty of being a juror. It's a lot of work, but it also gives you certain privileges and responsibilities. Okay.

12:34PM Another consideration is: Did the witness have any particular reason not to tell the truth? Well, Mr. Mirmelli is suing Bart for anywhere between, I don't know, 7 million, 18 million depending what numbers you want to listen to. Does he have an interest? Yeah. At a minimum he has 16 -- 6 million reasons why. That's money; that's what he wants.

12:34PM Did the witness have a personal interest in the outcome of the case? Well, that goes without saying. Obviously if he wins, he gets money. If he doesn't, he walks away empty-handed.

12:35PM Did the witness seem to have a good memory? Well, we kept being reminded that this happened a long time ago; it happened in 2006, 2008, 2009. We're in 2025 now. Well, did he have a good memory? You decide for yourselves. I submit that he did not, often. He would use it sort of as an excuse, which is: Well, I don't remember the answer to that question.

12:35PM I submit that even if he didn't remember the answer to some of these questions, he's still going to say that because he doesn't want to have to answer the question before you.

12:35PM Another question, another consideration, did the witness appear to understand the questions clearly and answer them directly? That's key. I don't think Mr. Mirmelli answered the question that I put to him. He may have answered a few, but

mostly he did not answer any of the questions I put to him directly.

He would try to circle around the question, give me answers that are not relevant or not responsive to the questions. Why? Because he is being consistent with who he is. He is a con man. He is trying to mislead you, and he is lying to you.

Now, this is really important, folks, because the plaintiff's case is pretty much dependent on whether or not you believe Mirmelli. If you believe Mirmelli is a liar, well, we're wasting our time here. Go back to the jury room and say: Leave us alone, you get nothing. Okay. It's very important that you evaluate whether you can believe this man. I submit you cannot.

And another suggestion, did the witness's testimony differ from other testimony or other evidence? Well, clearly it did. Mr. Mirmelli's recollection of events are in many instances different than what Mr. Seidler's memory of the events were, what Nathan Heber's revision of the facts are. They're inconsistent. Now, moving on, if we can go to the next jury instruction, please, Dan.

Okay. This goes to a rule, which is that the plaintiff has the burden of proof. Remember, we don't have to prove anything to you. They have to prove their case. So when they say we didn't call a forensic accountant, we didn't have to. If you're not convinced with what they presented, they haven't proven their case.

Now, the instructions also provide that if they do prove -- if they do meet their burden of proving that we violated the contract, then the judge is going to instruct you to look to other things because we have raised certain defenses. Now, keep in mind we don't have to prove any of these. Just because we raised them doesn't mean we have to prove them, but because we raised them, we can prove them, and we have. Okay.

The defenses we've raised are that Transpark abandoned the Profit Participation Agreement; Transpark anticipatorily breached the profit agreement; Transpark is estopped from bringing this breach of contract claims. Those are affirmative defenses.

The way it works is if they meet their burden, then it's on us to meet our burden by a preponderance of the evidence. The scales of justice in criminal cases are like this. Here, they're not. Preponderance of the evidence is just a little bit more weight of the evidence than what they have presented or lack or didn't present.

Now, one thing that is consistent with all of the allegations, all of the claims brought by Mr. Mirmelli is that he has to prove damages. I know I'm harping on this, but it's very important. We have been here discussing all the things that Bart did wrong, which we have disputed and proven that he did not. But at the end of the day, if he can't prove he was damaged, he has no case, none. You haven't heard a scintilla of evidence from Mr. Mirmelli's camp that he suffered any damages, none.

So what are you suing for? Why are we here? Why are you wasting our time? I don't know. But you can say we're not going to award you anything because you haven't proven what you have to prove. That's part of your responsibility and your privilege.

Now, for them to prove their claim, which is a breach of contract claim, they have to prove that Transpark and Bart or FTP entered into a contract. They have to prove that Transpark, Mr. Mirmelli, did all, or substantially all of the essential things that -- which the contract required him to do. And there are a couple of other elements, if you will, of the claim, four and five, I am not going to read to you, but you will have them in front of you. And then finally, No. 6, I harp on it, he has to prove he was damaged by his failure.

I submit ladies and gentlemen that Mr. Mirmelli has failed to prove his case. He has failed to prove that he did all or substantially all of the essential things that the contract required him to do. And he also failed to prove damages. That should be the end of the case. If you agree with me, you say, no, Mr. Mirmelli, go home. Leave us alone.

Now, we've claimed that they abandoned the contract. Now, for us to prevail on that affirmative defense, we have to prove that we acted -- I'm sorry.

They must prove that plaintiff acted inconsistent with the existence of the agreement in that we, FTP, accepted those inconsistent acts of the abandonment of the agreement.

Okay. Now, here is the way it's going to work: If they prove breach of contract, then you go and evaluate our three affirmative defenses. If you say, yes, we've proven any one of those three, again, they lose, we win. Those are the rules. You're going to get a further explanation by the Court.

And to establish anticipatory breach, we have to establish that Transpark breached the contract by clearly and positively indicating, by words or conduct, or both, that it would not or could not perform the contract.

I submit to you that it has been established, without any doubt or argument, that Transpark communicated clearly its intent, both in words and in conduct. The words were the words he spoke to Nathan, "I'm out of here, you take over, I'm no longer part of this."

The acts are -- we showed them to you, or just a couple of examples of acts that he did that are consistent with an anticipatory breach. He allowed the company, Transpark, to be dissolved, and he reported to the IRS that the company had been dissolved. That's what he sent to the IRS.

Now he wants you to disbelieve what he has told the U.S. government on his tax returns. I don't think that's a good idea.

And to prove equitable estoppel, the following has to be presented: Transpark, through statements, actions, or inaction, indicate that he did not want any involvement with the property anymore. I submit both his actions, inactions, clearly indicated

his desire to abandon the property, which he did around 2008, 2009, and that we, FTP, in good faith, relied on his actions and our reliance caused us to change our position. All those elements have been proven, and established.

So, again, if you find that we breached -- that they have met their burden and we breached the contract, if you find that this happened, we win and they lose.

Now, you've heard a lot of evidence regarding the futility of certain actions that Transpark supposedly was supposed to do, was supposed to accomplish, but they just couldn't because it was futile to even attempt to do so. And you've heard evidence about how we believe that Transpark has waived its right to have any notice. You've heard, I don't want to say ad nauseam, but you did hear evidence how it was futile to try to get any kind of notice to Mr. Mirmelli and, importantly, it was futile to try to get any money out of Mr. Mirmelli. He says, well, if they had called me and asked me for a capital -- made a capital call, which honestly was an expression I first heard during this trial, if they had made a personal capital call, we would have provided our capital contribution as required under the participation agreement. We would have provided our 30 percent as called for in the participation agreement.

It's futile to ask a man who is in the red, red, accountants understand what red means, not a good thing, they're negative $27 million, say, "Hey, Greg, I know your net worth is

12:47PM negative minus $27 million, but I'd like you to give me some money to help run this parking lot."

12:47PM It's futile to ask Greg, "Hey, Greg, pay your rent," when the man has not paid his rent after 2008 and he's negative $27 million in personal assets. That's futility.

12:47PM Now, those are some of the rules that the judge is going to read to you regarding how you decide some of the issues that have come up during the trial. Now, one thing we both agree on is that there are two very important documents in this case; one is the participation agreement, and the second is the lease agreement.

12:48PM Where we disagree is they don't want you folks to consider the promissory note, and the putting up as collateral his interest in the property. They don't want you to consider that. We're fine if we look at the -- if we look at the Profit Participation Agreement, it's clear that Mr. Mirmelli violated it. If we look at the lease, it's clear that he has violated this. He hasn't paid the rent, he didn't do it at least twice in one year, the third time he was in automatic default. And if we look further, where you must look, we look to the promissory note, and we look to the assignment, the collateral assignment, it's clear that he violated this as well, and that he lost his interest in the property.

12:49PM MR. PARDO: Objection, Your Honor.

12:49PM THE COURT: Overruled.

MR. CASABIELLE: I want to be a little bit more specific. Mr. Mirmelli violated the participation agreement by stopping his supervision of the park, by abandoning the property in around 2009, and let me just say on that topic, if we could put up Defense Exhibit 90, in particular, the one marked 90-46. If we could just -- there we go.

I want you folks to look at that. This is a representation that Mr. Mirmelli made to the IRS in 2011. I know you folks can read it for yourselves, but I'd like to emphasize it because it's important.

He told the IRS that this activity relating to Transpark, LLC, was entirely dissolved. That's what he is telling the IRS. That's when we talk about having abandoned the property, not only through his actions, but also through his words.

Also, let's put up 41, please, DX-41. These are the tax -- I'm sorry, the reports to Sunbiz or the Department of Corporations here in the State of Florida.

After 2010, there is no report by Transpark. In other words, they stopped filing reports with the Department of -- Division of Corporations here in the State of Florida. So these are two actions directly attributable to Mr. Mirmelli indicating that he abandoned the property.

In addition to that, it's not what he did but what he didn't do. He just walked away from the lot. He stopped managing and supervising the lot.

12:52PM Now, also I want to emphasize the participation agreement also calls for the automatic default, which I've already mentioned, so I'm not going to repeat it. I'm trying not to bore you folks, and I know the longer I speak, the longer the possibility of that happening becomes greater. But he also did something else.

12:52PM Again, I focus, I come back to it, is that by 2009, he had failed to pay the $300,000 loan as he had promised to do.

12:53PM Ladies and gentlemen, by the year 2010, Mirmelli is irrelevant, has nothing to do with this property by his own choosing, he has indicated it by his actions, and by his inactions.

12:53PM Now, 11 years later, 2021, Mr. Mirmelli smells money. He comes out of the woodwork and is trying to shake up Mr. -- Bart for money. He's trying to shake down Mr. Bart for money. At this time, ladies and gentlemen, Bart said no, he's not going to put up with it, and we are asking you to say the same thing. And you can do that -- you can say no by checking off no in the verdict form. That's the very first question. Say no to Mr. Mirmelli, we're not going to allow you to shake down Bart. We know you're a con man, Mr. Mirmelli, no, you cannot continue doing it.

12:54PM Ladies and gentlemen, by answering no, you say -- by checking off no, you say no to Mr. Mirmelli. And as a result of that, you are telling the judge that we should prevail, and I ask you to do that, and I thank you for your time, very much so. Have

58

a good day. And I think we'll see each other in a little while, maybe later, but not much longer.

Thank you for your attention and your time.

Thank you, Your Honor.

THE COURT: Counsel.

THE COURTROOM DEPUTY: Mr. Casabielle, please turn off your lapel mic, thank you.

MR. CASABIELLE: Thank you.

MR. PARDO: May it please the Court. That was a lot of mud being thrown right there, and I want to start where Mr. Casabielle ended, which was when he suggested to you that Greg Mirmelli came out of the woodwork in 2021. It's a good thing what attorneys say is not evidence to you because the evidence at trial that you heard was that FTP did not reach out to Transpark in 2021. They did not tell them the property was being sold. They did not tell them that they, on one hand, abandoned the property, on the other hand, believed that there were capital contributions in excess of the profits upon the sale. That did not happen.

Had FTP reached out, we might be in a very different posture here today. I would contend to you it might have been a shrewd business tactic had FTP sent a notice upon the closing saying, "Here is the capital contribution reconciliation. We believe there's no profits," so that there would have been an opportunity to address it. He didn't even do that. He didn't

even desire to do that. What FTP desired to do was sell the property and direct all of the profits for itself.

The IRS tax return that Mr. Casabielle showed you, you heard Greg's testimony where he explained in earnest his understanding that that form deals with the operations of the parking lot; not his contractual rights under the Profit Participation Agreement, which did not accrue, which didn't happen until the property was sold in 2021.

Mr. Casabielle showed you the Sunbiz filing forms, Defendant's Exhibit 40, and he suggested to you that after 2009, no more Sunbiz filing reports, no more annual reports were ever filed. Go back and look at Defendant's Exhibit 40, I think it was. Between 2017 and 2021, those annual reports are in there. They were filed. Transpark was reinstated in 2017, and was in existence every year from 2017, '18, '19, '20 and '21.

Mr. Casabielle went through his three defenses, they have three defenses, anticipatory breach, abandonment, and estoppel. You heard Mr. Casabielle say in conclusory fashion, "I contend to you there was no evidence, I contend to you we met this burden, I contend to you" -- fill in the blank.

What evidence were you shown to support his position? I ask you to listen carefully. How did Transpark -- excuse me, FTP detrimentally change its position? What's the evidence to prove it? Remember he said, "We don't have to prove

anything." He has to prove his defenses. Each of those three defenses, you have to hold him to the same preponderance of the evidence standard that you hold us to prove our claim.

If you didn't hear him tell you, suggest to you, point you to the evidence who the witness was, what the document was that supports his defenses, I contend to you it is not enough for him to say, in conclusory fashion the burden was met. That's not how it works.

You will be instructed as matter of law, futility is not a defense. Futility is not a defense. When you go through that verdict form, did Transpark breach the Profit Participation Agreement? We would ask you to write in the word "yes" or the foreman, the foreperson should write in the word "yes."

You will see three boxes for the defenses, anticipatory breach, abandonment, and equitable estoppel. I am asking you to write in the words "no" for each of those three defenses. Then you will go to breach of implied covenant of good faith and fair dealing, did FTP breach the implied covenant? I am asking you to write in the word "yes," and then you will see those same three defenses, anticipatory breach, abandonment, and estoppel, I am asking you to write in the words "no" for each of those three defenses.

Let me remind you, there can be a "no" for breach, meaning you can find that there was no breach of an express term of the contract, and then you can find that there was a breach of

01:01PM the implied covenant of good faith and fair dealing, and I will be candid with you, if you find that one of the three defenses was met, Transpark gets nothing. I tell you that in earnest and sincerity, because if you believe that Transpark is entitled to damages because of FTP's conduct, your verdict form should read "yes" for breach, "no" for each of the defenses, and then a damage figure for breach of contract; "yes" for breach of implied covenant, "no" for each of the defenses. And then a damage figure.

That's how I am asking you to fill out this verdict. That's how I'm asking you to make Transpark whole. We're asking you to be the trier of fact and we trust you.

THE COURT: All right. Ladies and gentlemen of the jury, I'm going to give you a break before I read you the jury instructions, so maybe get some coffee, take a stretch, they're not long, but, you know, it could be 30 minutes of me reading or more, so take a break, stretch, get something to drink, and we will be back.

(Jury out at 1:02 p.m.)

MR. PARDO: May we be seated, Your Honor?

THE COURT: Yes, I am going to go into chambers a minute. Get something to drink, look at the verdict form and jury instructions one last time, and let Donna know when you're ready.

(Recess at 1:03 p.m.)

(Back on the record at 1:22 p.m.)

THE COURT: So I have the joint stipulation of uncontested facts. You can just put those in with the exhibits.

MS. MACKIEWICZ: It's inside the first binder of exhibits that's going back to the jury. We just wanted Your Honor to have a copy, if you needed one.

THE COURT: All right. I appreciate that.

And then, Donna, I need a copy of the jury instructions. I thought you had given it to me.

THE COURTROOM DEPUTY: I gave you that and the verdict.

THE COURT: I might have left them in my office.

Any comments on the last set of jury instructions or the verdict form. Plaintiff?

MS. MACKIEWICZ: The last set of jury instruction and the verdict are acceptable to the plaintiff.

MR. PARDO: Hold on, wait. Sorry, Your Honor.

MS. MACKIEWICZ: Oh, I apologize.

MR. PARDO: We're requesting two curative instructions be added to the jury instructions.

THE COURT: Okay. What are they?

MR. PARDO: One is the offered instruction relating to suit on promissory note based on the objections that I made during Mr. Casabielle's closing.

And two, and I take this as a personal note, the ad hominem attacks on counsel calling me a liar and calling the whole Mirmelli camp liars and crooks, I believe warrants a curative

instruction.

THE COURT: The first is denied. First of all, the second time he suggested the issue with the car and not only did I sustain your objection, interrupted him, and I instructed the jury it was argument. You also had the opportunity, of course, in rebuttal to address it, which I think you did. So I don't think that merits a curative instruction, much less a jury instruction that had previously been proposed.

I don't think the second requires a curative instruction, either. I think counsel proceeds at their peril when they make those kinds of attacks.

With respect to making it with respect to the witnesses or the Mirmelli witnesses, he can make that argument. To the extent that can be interpreted as an attack on counsel, like I said, I think he proceeds at his own peril if that's the way the jury interprets it.

MR. PARDO: Your Honor, respectfully, and maybe the transcript will prove me otherwise, he called me a liar.

THE COURT: Mr. Casabielle, I will let you respond.

MR. CASABIELLE: Your Honor, I don't believe I called Mr. Pardo a liar. I did call Mr. Mirmelli a liar, but Mr. Pardo, no, I suggested to the jury that Mr. Pardo, through his arguments, tried to mislead and confuse the jury.

MR. PARDO: Let the record speak for itself. I will take a close look at that transcript when I see it, Your Honor.

THE COURT: I mean, even if he had said that, honestly, I am -- what kind of curative instruction would I give the jury now?

MR. PARDO: That personal attacks from counsel to opposing counsel are unbecoming of the Florida Bar, of a member of the Florida Bar of Mr. Casabielle's experience.

THE COURT: That might be true, but what benefit does that give this jury or this case, or what relevance does it have?

MR. PARDO: Because for Mr. Casabielle to so boldly go beyond the bounds of decency and arguably violate rules of professionalism warrants a curative instruction in the eyes of the jury, who might be prejudiced into believing that the words coming out of my mouth weren't truthful.

MR. CASABIELLE: Your Honor, I --

THE COURT: No, I don't need to hear anything else. There is no reason for me to give a curative instruction that, even if I were to accept your description of Mr. Casabielle's closing, would not be an appropriate curative instruction because it's got nothing to do with the evidence before them.

So let's bring the jury in.

I'm sorry, I didn't ask if the defense had an objection to the jury instruction and the verdict form?

MR. NIELSEN: No, Your Honor. We're ready to proceed.

THE COURT: Bring them in.

(Jury in at 1:26 p.m. )

THE COURT: All right. Everyone be seated.

Members of the jury, it is my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished, you will go to the jury room and you will begin your discussions, sometimes called deliberations.

Your decision must be based solely on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it -- even if you don't agree with the law -- and you must follow all my instructions as a whole. You must not single out or disregard any of the instructions on the law.

The fact that a corporation is involved as a party must not affect your decision in any way. A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.

As I said before, you consider only the evidence that I have admitted in this case. Evidence includes the testimony of witnesses and the exhibits admitted. But, anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I may have -- that I have any opinion about any factual issue in this

01:28PM case. Except for my instructions to you on the law, you should
01:28PM disregard anything I may have said during the trial in arriving at
01:29PM your own decision about the facts.

01:29PM Your own recollection and interpretation of the evidence
01:29PM is what matters.

01:29PM In consideration the evidence you may use reasoning and
01:29PM common sense to make deductions and reach conclusions. You
01:29PM shouldn't be concerned about whether the evidence is direct or
01:29PM circumstantial.

01:29PM "Direct evidence" is the testimony of a person who
01:29PM asserts that he or she has actual knowledge of a fact, such as an
01:29PM eyewitness.

01:29PM "Circumstantial evidence" is proof of a chain of facts
01:29PM and circumstances that tend to prove or disprove a fact. There's
01:29PM no legal difference in the weight you may give to either direct or
01:29PM circumstantial evidence.

01:29PM Now when I say you must consider all the evidence, I
01:29PM don't mean that you must accept all the evidence as true or
01:29PM accurate. You should decide whether you believe what each witness
01:29PM had to say, and how important that testimony was. In making that
01:30PM decision you may believe or disbelieve any witness, in whole or in
01:30PM part. The number of witnesses testifying concerning a particular
01:30PM point doesn't necessarily matter.

01:30PM To decide whether you believe any witness I suggest that
01:30PM you ask yourselves a few questions:

Did the witness impress you as one who was telling the truth?

Did the witness have any particular reason not to tell the truth?

Did the witness have a personal interest in the outcome of the case?

Did the witness seem to have a good memory?

Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

Did the witness appear to understand the questions clearly and answer them directly?

Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during the trial.

But please keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or

about an unimportant detail.

In this case it is the responsibility of the Plaintiff Transpark, to prove every essential part of its claim by a "preponderance of the evidence." This is sometimes called the "burden of proof."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that Plaintiff Transpark's claim is more likely true than not true.

If Plaintiff Transpark meets its burden of proof by a preponderance of the evidence, you should find in favor of Plaintiff Transpark on its claims.

If Plaintiff Transpark fails to meet its burden of proof by a preponderance of the evidence, you should find against Plaintiff Transpark on its claim.

When more than one claim is involved, you should consider each claim separately.

If deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of Plaintiff Transpark's claims by a preponderance of the evidence, you should find for Defendant FTP as to that claim.

In this case, the Defendant FTP asserts the affirmative

defenses of abandonment, anticipatory breach and repudiation, and equitable estoppel. If Plaintiff Transpark proves its claims by a preponderance of the evidence, Defendant FTP can prevail in this case if it proves an affirmative defense by a preponderance of the evidence.

When more than one affirmative defense is involved, you should consider each separately.

I caution you that Defendant FTP does not have to disprove Plaintiff Transpark's claims, but if Defendant FTP raises an affirmative defense, the only way it can prevail on the specific defense is if it proves that defense by the preponderance of the evidence.

The fact that I have given you instructions concerning the issue of Plaintiff Transpark's damages should not be interpreted in any way as an indication that I believe Plaintiff Transpark should, or should not, prevail in this case.

Your verdict must be unanimous -- in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for your yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you're discussing the case, don't hesitate to reexamine your opinion and change your mind if you become convinced that you were wrong. But don't give up your honest

beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges -- judges of the facts. Your only interest to seek the truth from the evidence in this case.

Plaintiff Transpark and Defendant FTP entered into a contract known as the Profit Participation Agreement to purchase real property, whereby the Plaintiff Transpark would be entitled to 30 percent of the profits from the eventual sale of the property assuming certain conditions were met.

Plaintiff Transpark claims that Defendant FTP breached the Profit Participation Agreement by not paying monies allegedly owed to plaintiff Transpark from the sale of the property in 2021 and that the breach resulted in damages to plaintiff Transpark.

Defendant FTP denies that it breached the Profit Participation Agreement or that it owes plaintiff Transpark any money from the sale of the property under the agreement. Defendant FTP further contends that plaintiff Transpark's breach of contract claim is barred by certain affirmative defenses which are: (1) Plaintiff Transpark abandoned the Profit Participation Agreement agreement; (2) Plaintiff Transpark anticipatorily breached the Profit Participation Agreement; and (3) Plaintiff Transpark is estopped from bringing his breach of contract claim.

To recover damages from defendant FTP for breach of contract, plaintiff Transpark must prove all of the following:

1. Plaintiff Transpark and defendant FTP entered into a contract;

2. Plaintiff Transpark did all, or substantially all, of the essential things which the contract required it to do;

3. All conditions required by the contract for defendant FTP's performance had occurred;

4. Defendant FTP failed to do something essential which the contract required it to do; and

5. Plaintiff Transpark was damaged by that failure.

Plaintiff Transpark claims that the original contract was modified changed. Defendant FTP denies that the contract was modified. Therefore, plaintiff Transpark must prove that the parties agreed to the modification.

The parties to a contract may agree to modify its terms. You must decide whether a reasonable person would conclude from the words and conduct of plaintiff Transpark and defendant FTP that they agreed to modify the contract. You cannot consider the parties' hidden intentions. A contract in writing may be modified by a contract in writing, by a subsequent oral agreement between the parties, or by the parties' subsequent conduct, if the modified agreement has been accepted and acted upon by the parties in such a manner as would work a fraud on either party to refuse to enforce it.

An implied covenant of good faith and fair dealing exists in all contracts. Plaintiff Transpark contends that defendant

violated the implied covenant of good faith and fair dealing in the contract in this case. To establish this claim, plaintiff Transpark must prove all of the following:

1. Plaintiff Transpark and defendant entered into a contract;

2. Plaintiff Transpark did all, or substantially all, of the significant things that the contract required it to do;

3. All conditions required for defendant's performance had occurred;

4. Defendant's conduct was not consistent with the parties' reasonable expectations under Sections 1, 3, 6, and 7 of the agreement; and

5. Plaintiff Transpark was damaged by defendant's conduct.

In deciding what the disputed term(s) of the contract mean, you should consider the whole contract, not just isolated parts. You should use each part to help you interpret the others, so that all the parts make sense when taken together.

The administrative dissolution of a Florida business does not extinguish contractual rights or obligations belonging to that business.

Defendant FTP claims that plaintiff Transpark abandoned the contract and, therefore, defendant FTP Investment Corporation was excused from its obligations.

To establish abandonment, defendant FTP must prove that

01:39PM plaintiff Transpark acted inconsistent with the existence of the agreement and FTP accepted these inconsistent acts as abandonment of the agreement.

01:39PM Defendant FTP claims that plaintiff Transpark anticipatorily breached the contract between the parties. To establish this claim, defendant FTP must prove both of the following:

01:39PM 1. Plaintiff Transpark breached the contract by clearly and positively indicating, by words or conduct, or both, that it would not or could not perform the contract; and

01:40PM 2. Defendant FTP was willing and able to perform the contract at the time plaintiff Transpark breached the contract.

01:40PM Defendant FTP has raised the defense of equitable estoppel. To establish this defense, defendant FTP must prove all of the following:

01:40PM 1. Plaintiff Transpark through statements, actions, and inaction, indicated it gave up its rights under the Profit Participation Agreement.

01:40PM 2. Defendant FTP relied in good faith upon plaintiff Transpark's words and inaction.

01:40PM 3. Defendant FTP's reliance on plaintiff Transpark's words, action or inaction caused defendant to change its position for the worse.

01:40PM If you find for plaintiff Transpark on either of its claims, you must consider the matter of damages. Generally, you

should award an amount of money for each claim that the preponderance of the evidence shows will fairly and adequately compensate Transpark for its damages arising from that claim.

The amount of money you find to be justified by a preponderance of the evidence as full, just and reasonable compensation for all of Transpark's damages caused by FTP. For example, in the case of damages for breach of contract, compensatory damages is that amount of money which will put Transpark in as good a position as it would have been if the defendant FTP had not breached the contract and which naturally result from the breach.

Now, when you go to the jury room, choose one of your members to act as the foreperson. The foreperson will direct your deliberations and speak for you in court.

I have prepared a verdict form. The verdict form asks you to consider Question 1: Did defendant FTP breach the Profit Participation Agreement? It says: Answer yes or no. There is a line there. You write yes or you write no.

If you write yes, you go to 1(a). If you write no, you go to Question 2. All right. If you go 1(a) and you, as to 1(a), which is: Did plaintiff Transpark abandon the Profit Participation Agreement? If you find yes, you're done. You will just have the foreperson sign.

If you answered no, you're going to proceed to 1(b). And the same thing, you go to 1(b), which is the affirmative defense

and anticipatory breach. If it's yes, you go to the end of the form. If you've answered no, you proceed to the next affirmative defense. If it's yes as to the affirmative defense, you're done, you sign the form, you don't have to do anything else. If you have no, then you move on to the amount of damages.

If you went to Question 2, then it's the same thing. Answer yes or no, and then you will go through the three affirmative defenses. And if none of the affirmative defenses applied after finding a yes, you go to the amount.

The verdict form just walks you through that, and there is language in there that tells you what to do if you do one or the other on each of those steps.

You will take this -- you're going to have a copy of the jury instructions. You're going to have a copy the verdict form. When you have all agreed on the verdict, your foreperson is going to sign it, date it, and let the marshal know that you're ready to come back and that you have a verdict. You will return then into the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the marshal. He will bring it to me, and I will respond as promptly as possible -- either in writing or by bringing you here into the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to a question or message, so be patient as you have been all along in waiting for a

response. But I caution you not to tell me how many jurors have voted one way or the other at any time. That type of information should remain in the jury room and not be shared with anyone, including me, in any note or question you send me.

Ladies and gentlemen, we appreciate your patience, your close attention. You will now go into the jury room. You can now talk about this case, but only with each other, okay. So you can't reach out to anybody during your deliberations, you can't look anything up during your deliberations.

Donna will bring a set of the jury instructions, the verdict form. You'll have a set of the exhibits, and I also think you'll have lunch. All right. Thank you very much.

(Jury out to deliberate at 1:44 p.m.)

THE COURT: All right. Actually, the verdict form is fine. I caught that issue on page 7. It still had "waiver and futility." I didn't read it, but let me go ahead, I will make that change. I will send that version into the jury room, and of course that's the one that will be filed. I will make sure everybody has a copy of it.

MR. PARDO: That's acceptable for the plaintiff, Your Honor.

THE COURT: The defense?

MR. NIELSEN: No objection, Your Honor.

THE COURT: I am going to ask -- it looks like we have exhibits, so that's good to go.

I am going to ask that you stay relatively close, that you stay in the courthouse. Do not go back to your respective offices. You're free to stay here in my courtroom. I don't have anything going on this afternoon. We have the two rooms in the back. There is the seventh floor. There is the jury room on the 14th -- I mean the lawyers' lounge on the 14 floor. Stay in the building. Make sure Donna has your cell phone, all right.

I know there are lots of people on both sides. If I get a question from the jury, as long as I have a lawyer from each side, I go. Okay. So letting you know that as well.

We're in recess.

(Recess at 1:46 p.m.) (It is 319 p.m. And we have a verdict. ) (Back on the record at 322 p.m. )

THE COURT: All right. We have a note just got the note from the jury signed by the jury foreperson Amanda Suarez that they have a verdict. Let's bring them in.

(Jury in at 3:22 p.m.)

THE COURT: All right. You may be seated. I understand you have a verdict, Madam Foreperson.

THE FOREPERSON: Yes.

THE COURT: All right. If you can hand your verdict to our marshal, and I'll read the verdict. Thank you.

Question 1. Did defendant FTP breach the Profit Participation Agreement?

Answer: No.

Question 2. Did FTP breach the implied covenant of good faith and fair dealing?

The answer is: No.

Would you like me to poll the jury?

MR. PARDO: Yes, Your Honor.

THE COURT: All right. It's customary, ladies and gentlemen of the jury, just as to ascertain that the verdict is unanimous.

I will go to each juror and ask if this is your verdict.

JUROR: Yes.

JUROR: Yes.

JUROR: Yes.

JUROR: Yes.

JUROR: Yes.

JUROR: Yes.

JUROR: Yes.

JUROR: Yes.

JUROR: Yes.

THE COURT: All right. We have an affirmation from all eight jurors.

Can I see the lawyers sidebar.

(Sidebar conference.)

THE COURT: Before I dismiss the jury, is there any issue with the verdict? I just wanted you to look at it. It appears in order.

03:25PM (Inaudible response.)

03:25PM THE COURT: All right. I usually go in and thank the jury. I don't know that there is any posttrial things I need to take care of with you all; but if I do, just give me ten minutes to thank them and give them back their phones.

03:25PM MR. CASABIELLE: Thank you, Your Honor.

03:25PM (End of sidebar conference.)

03:25PM THE COURT: All right. Ladies and gentlemen of the jury, on behalf of the lawyers, the parties, and our community, thank you for your service.

03:25PM Donna is going to give you back your phones. And if you'll just give me two minutes of your time, I'm also going to be in the jury room just to personally thank you for your time, and then you're excused.

03:26PM Now you can talk about the case. Now you can Google anything you want to Google; you just can't do it before then.

03:26PM But thank you very much for your time. You've been an incredibly attentive jury and, like I said, I will give you my personal thanks in just a minute. All right.

03:26PM (Jury out at 3:26 p.m.)

03:26PM THE COURT: All right. I'll be right back.

03:30PM (Back on the record at 3:30 p.m.)

03:30PM THE COURT: All right. Be seated. Is there anything else on behalf of the plaintiffs?

03:30PM MR. PARDO: Nothing for Your Honor at this time.

Obviously, we reserve any rights to file posttrial motions if necessary.

THE COURT: Sure. I just didn't know if you wanted more time for that or if you were prepared to address that now; but, obviously, you can file whatever motion you need to when you feel ready.

Anything else on behalf of the defendant?

MR. NIELSEN: Your Honor, we would like to move for entitlement to attorney's fees under the contract.

THE COURT: No, you're going to have to file a written motion for that.

MR. NIELSEN: Of course, Your Honor.

THE COURT: Let me just tell you how I generally do the attorney's fees because I don't want to see, you know, $50,000 worth of litigation over fees. I am not going to do that.

So I want you to confer with opposing counsel with respect to whether or not he is going to file a new trial motion or an appeal or what he is going to do, because there is no point in even briefing the fees issue until that's resolved. So I want to you to confer, discuss it, see where you are on that.

And then if you're going to pursue fees, if there is going to be a debate on entitlement, we will do entitlement first.

And then if there is no debate on entitlement and it's just a question of amount, then that can be done on a fairly, you know, more streamlined basis.

So why don't you all first let's get through the hoops of whether or not there is going to be any posttrial litigation; if there is, then you should file the motion to stay the consideration of the fees. Okay.

And then if there is going to be a consideration of fees and you're going to debate entitlement, we're just going to brief entitlement because I don't think that's going to be particularly complex; we will do that first.

And then when we get to amount, if we get to amount, I'm probably not going to need much more than you submitting just a fee petition. I don't need a 40-page brief that goes through the line items, right. I'm going to want to see the bills. I spend a lot of time in my life looking at legal bills, and then we will take it, you know, from there.

But I don't want us to embark now on another round of litigation that's going to six months over fees. So let's do it one thing at a time. You know, take a deep breath today. Don't talk about this with the plaintiffs today; give you a minute to take a breath, advise your client, look at what you need to look at, and try to confer next week and try to get something together. All right.

If you can't agree to a schedule or you're having an issue, then file a simple motion asking for me to give you some sort of schedule on how to do things. But I'm hoping that you'll work together in a collaborative fashion, not to come to a

03:33PM resolution necessarily, but to come to a process that will afford your clients a little breathing room from the fees.

03:33PM All right. Anything else on behalf of the plaintiff then?

03:33PM MR. PARDO: Not at this time, Your Honor. Thank you.

03:33PM THE COURT: On behalf of the defense?

03:33PM MR. NIELSEN: No, Your Honor. Thank you.

03:33PM MR. CASABIELLE: Thank you, Your Honor.

03:33PM THE COURT: Thank you, Your Honor.

03:33PM MS. MACKIEWICZ? Thank you, Your Honor. Have a good weekend.

03:33PM (Recess at 3:33 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 10/3/25

/s/Vernita Allen-Williams
VERNITA ALLEN-WILLIAMS, RMR, FCRR
Official Court Reporter
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
(305) 523-5938

## $

**$10,000** [1] - 9:3
**$100,000** [7] - 19:25, 20:2, 20:3, 37:13, 37:17, 38:2
**$17** [1] - 41:4
**$18** [3] - 17:15, 23:19, 30:5
**$200,000** [1] - 30:18
**$21** [2] - 20:20, 25:19
**$27** [3] - 54:25, 55:1, 55:5
**$30,000** [3] - 37:10, 39:11, 43:9
**$300,000** [15] - 17:7, 18:20, 20:7, 22:24, 30:12, 30:13, 30:17, 38:6, 38:9, 39:13, 39:18, 39:25, 46:8, 46:19, 57:8
**$50,000** [1] - 80:14
**$500,000** [1] - 24:24

## '

**'18** [1] - 59:15
**'19** [1] - 59:15
**'20** [1] - 59:15
**'21** [1] - 59:16

## /

**/s/Vernita** [1] - 82:18

## 1

**1** [20] - 1:7, 6:19, 9:4, 11:13, 11:14, 12:15, 15:12, 15:24, 19:15, 26:20, 31:23, 70:20, 71:1, 72:4, 72:11, 73:8, 73:16, 74:16, 77:23
**1(a** [2] - 74:20
**1(a)** [1] - 74:19
**1(b** [1] - 74:25
**1(b)** [1] - 74:24
**1-and-a-half** [1] - 17:17
**1.2** [1] - 20:6
**10** [3] - 21:16, 27:6, 33:5
**10/3/25** [1] - 82:18
**100** [3] - 1:18, 5:4, 17:16
**100,000** [1] - 30:19
**1031** [3] - 17:18, 23:22, 35:19
**11** [2] - 44:1, 57:13
**11.4** [2] - 17:21, 24:5
**111** [1] - 25:4
**112** [1] - 24:23
**116** [2] - 32:8, 32:10
**119** [2] - 25:1, 25:3
**11:03** [2] - 1:5, 2:1
**11:22** [1] - 15:15
**120** [1] - 33:11
**1205** [1] - 1:15
**122** [1] - 25:8
**123** [1] - 27:5
**129** [1] - 27:17
**13** [2] - 27:18, 31:9
**13-and-a-half** [1] - 17:17
**13-and-a-half-million** [1] - 23:22
**130** [2] - 43:18, 47:10
**136** [1] - 23:18
**14** [4] - 20:19, 31:9, 45:1, 77:6
**142** [1] - 24:4
**14th** [1] - 77:6
**15** [7] - 5:17, 18:18, 18:19, 18:20, 18:21, 22:25, 29:6
**151** [1] - 31:6
**153** [1] - 31:9
**16** [1] - 49:8
**17** [2] - 32:16, 34:17
**17-and-a-half** [1] - 17:19
**17-and-a-half-million** [1] - 23:25
**18** [2] - 6:18, 49:7
**1:02** [1] - 61:19
**1:03** [1] - 61:24
**1:22** [1] - 61:25
**1:26** [1] - 64:24
**1:44** [1] - 76:13
**1:46** [1] - 77:12
**1st** [3] - 46:8, 47:10, 47:13

## 2

**2** [16] - 6:3, 11:11, 11:13, 11:15, 15:12, 26:16, 42:4, 70:21, 71:3, 72:6, 73:11, 73:19, 74:20, 75:6, 78:1
**2-and-a-half** [1] - 17:19
**2-and-a-half-million-dollar** [1] - 23:25
**2001** [1] - 30:22
**2006** [4] - 16:1, 37:3, 38:8, 49:15
**2007** [1] - 38:8
**2008** [8] - 39:13, 39:21, 46:8, 46:20, 47:13, 49:15, 54:1, 55:4
**2009** [6] - 39:21, 49:15, 54:2, 56:4, 57:7, 59:11
**2010** [3] - 29:16, 56:18, 57:9
**2011** [2] - 29:9, 56:8
**2017** [6] - 24:22, 30:1, 30:3, 59:13, 59:15
**2018** [1] - 25:3
**2021** [20] - 17:15, 17:21, 20:8, 20:19, 24:4, 24:22, 25:5, 25:10, 25:15, 25:17, 25:19, 30:1, 30:3, 32:7, 57:13, 58:12, 58:15, 59:8, 59:13, 70:13
**2025** [2] - 1:4, 49:15
**211** [1] - 1:15
**214** [1] - 1:7
**22** [1] - 37:3
**23** [2] - 32:8, 32:10
**24-CV-20631-Becerra** [1] - 2:2
**24-CV-20631-JB** [1] - 1:2
**25** [1] - 31:6
**250,000** [1] - 16:3
**2510** [1] - 44:12
**2600** [1] - 1:19
**2610** [5] - 42:20, 42:23, 44:1, 44:5, 44:12
**2650** [5] - 18:23, 42:17, 42:20, 42:23, 44:1
**2nd** [1] - 1:18

## 3

**3** [13] - 1:4, 17:18, 22:18, 23:23, 26:20, 32:8, 40:11, 43:10, 70:22, 71:5, 72:8, 72:11, 73:21
**30** [12] - 9:10, 16:11, 18:1, 18:20, 19:21, 24:18, 32:4, 40:7, 42:11, 54:21, 61:16, 70:9
**30,000-a-month** [1] - 39:16
**305** [1] - 82:21
**319** [1] - 77:12
**322** [1] - 77:13
**33128** [2] - 1:25, 82:21
**33131** [1] - 1:19
**33139** [1] - 1:16
**3:22** [1] - 77:17
**3:26** [1] - 79:20
**3:30** [1] - 79:22
**3:33** [2] - 1:5, 82:12

## 4

**4** [4] - 1:6, 71:7, 72:10
**4-and-a-half** [1] - 20:4
**40** [2] - 59:10, 59:12
**40-page** [1] - 81:11
**400** [2] - 1:24, 82:20
**401** [1] - 23:19
**41** [1] - 56:15

## 5

**5** [2] - 71:9, 72:13
**5-and-a-half** [1] - 20:16
**5.8** [3] - 9:6, 9:9, 30:9
**515** [1] - 23:21
**523-5938** [1] - 82:21

## 6

**6** [8] - 18:8, 24:5, 24:10, 26:20, 27:18, 49:8, 52:12, 72:11
**601** [1] - 23:19

## 7

**7** [7] - 26:20, 36:11, 37:23, 49:6, 72:11, 76:15
**70** [1] - 40:7
**78** [1] - 46:4
**79** [1] - 47:3

## 8

**8** [1] - 21:14
**803** [1] - 23:24
**81** [2] - 30:16, 30:18

## 9

**9** [5] - 21:15, 31:22, 31:23, 41:15, 41:17
**90** [1] - 56:5
**90-46** [1] - 56:5

## A

**a.m** [3] - 1:5, 2:1, 15:15
**abandon** [2] - 54:1, 74:21
**abandoned** [12] - 13:24, 25:22, 32:21, 32:24, 43:8, 51:8, 52:20, 56:13, 56:22, 58:17, 70:20, 72:22
**abandoning** [2] - 7:5, 56:3
**abandonment** [14] - 4:10, 10:24, 14:21, 28:17, 29:8, 29:20, 31:25, 52:25, 59:18, 60:15, 60:20, 69:1, 72:25, 73:2
**ability** [1] - 67:8
**able** [5] - 3:3, 20:10, 27:3, 38:25, 73:11
**above-entitled** [1] - 82:15
**absolute** [2] - 8:6, 9:22
**absolutely** [7] - 4:11, 4:13, 4:21, 8:14, 9:18, 14:2, 35:22
**absolved** [1] - 8:8
**accept** [3] - 5:15, 64:16, 66:18
**acceptable** [2] - 62:14, 76:20
**accepted** [4] - 28:20, 52:24, 71:21, 73:2
**accepting** [1] - 27:14
**accomplish** [1] - 54:10
**accordance** [6] - 3:15, 16:12, 17:25, 19:21, 23:16, 26:23
**account** [4] - 24:19, 37:18, 37:21, 44:18
**accountant** [7] - 20:25, 35:20, 35:21, 40:17, 40:23, 40:25, 50:23
**accountants** [1] - 54:24
**accounting** [3] - 21:4, 24:11, 26:23
**accrue** [1] - 59:7
**accrued** [5] - 20:19, 21:6, 21:7, 23:14, 41:9
**accurate** [3] - 7:14, 66:19, 82:14
**accurately** [1] - 67:9
**accuse** [1] - 45:23
**accuses** [1] - 40:16
**acknowledge** [2] - 22:19, 29:9
**acknowledges** [2] - 17:6, 18:9

**act** [2] - 65:16, 74:13
**acted** [5] - 16:13, 52:22, 52:23, 71:21, 73:1
**action** [1] - 73:22
**actions** [10] - 7:12, 33:23, 53:23, 53:25, 54:2, 54:9, 56:14, 56:21, 57:11, 73:16
**active** [1] - 30:1
**activity** [1] - 56:11
**acts** [5] - 52:25, 53:15, 53:16, 65:17, 73:2
**actual** [3] - 29:21, 47:3, 66:11
**ad** [3] - 44:2, 54:13, 62:23
**added** [1] - 62:18
**addition** [4] - 26:8, 26:9, 37:22, 56:23
**additionally** [1] - 46:1
**address** [12] - 18:23, 18:25, 34:23, 42:17, 42:22, 44:13, 58:25, 63:6, 80:4
**addressed** [2] - 12:14, 44:12
**adequately** [1] - 74:2
**adhere** [1] - 6:7
**administrative** [3] - 29:20, 29:22, 72:19
**admitted** [3] - 33:16, 65:21, 65:22
**advances** [1] - 9:3
**advise** [1] - 81:19
**advised** [1] - 45:15
**advisement** [1] - 13:2
**affect** [1] - 65:13
**affidavit** [4] - 22:11, 27:17, 27:18, 27:21
**affirmation** [1] - 78:19
**afford** [1] - 82:1
**afternoon** [2] - 34:22, 77:4
**agent** [5] - 21:25, 22:12, 23:3, 27:19
**ago** [1] - 49:14
**agree** [9] - 6:6, 7:21, 47:7, 52:18, 55:8, 65:9, 69:18, 71:14, 81:22
**agreed** [4] - 19:5, 71:13, 71:17, 75:15
**Agreement** [38] - 7:13, 15:24, 16:25, 18:17, 19:10, 19:16, 21:8, 21:24, 23:6, 24:8, 24:20, 26:15, 26:21, 27:12, 27:20, 28:1, 29:5, 31:9, 31:11, 31:17, 31:23, 32:20, 32:23, 33:5, 36:15, 51:9, 55:16, 59:7, 60:12, 70:7, 70:12, 70:16, 70:21, 70:22, 73:18, 74:17, 74:22, 77:24
**agreement** [40] - 8:9, 8:10, 9:1, 9:2, 20:17, 21:19, 25:14, 27:6, 27:10, 27:14, 30:14, 31:12, 37:10, 40:5, 41:14, 42:2, 42:3, 43:9, 43:12, 45:20, 45:25, 46:19, 51:10, 52:24, 52:25, 54:21, 54:22, 55:10, 55:11, 56:2, 57:1, 69:23, 70:17, 70:21, 71:19, 71:21, 72:12, 73:2, 73:3
**agrees** [3] - 37:8, 37:10, 37:22
**ahead** [1] - 76:16
**ahold** [1] - 30:7
**AIA** [1] - 31:13
**aid** [1] - 48:5
**alive** [5] - 29:12, 29:15, 29:17, 30:6
**allegation** [1] - 13:7
**allegations** [1] - 51:19
**allege** [1] - 13:8
**allegedly** [1] - 70:12
**Allen** [1] - 82:18
**ALLEN** [2] - 1:22, 82:18
**Allen-Williams** [1] - 82:18
**ALLEN-WILLIAMS** [2] - 1:22, 82:18
**allocation** [1] - 40:12
**allow** [1] - 57:20
**allowed** [3] - 13:24, 19:24, 53:17
**almost** [1] - 10:17
**alone** [2] - 50:11, 52:19
**Amanda** [1] - 77:15
**amount** [11] - 23:17, 38:10, 68:6, 74:1, 74:4, 74:8, 75:5, 75:9, 80:24, 81:9
**annual** [3] - 29:18, 59:11, 59:13
**answer** [11] - 34:11, 49:18, 49:19, 49:21, 49:23, 50:1, 67:11, 74:17, 75:7, 77:25, 78:3
**answered** [5] - 11:14, 49:24, 49:25, 74:24, 75:2
**answering** [1] - 57:22
**answers** [1] - 50:4
**anticipatorily** [3] - 51:9, 70:21, 73:5
**anticipatory** [8] - 14:22, 53:6, 53:17, 59:18, 60:14, 60:20, 69:1, 75:1
**ANTONIO** [1] - 1:17
**anyway** [2] - 11:12, 43:3
**apologize** [2] - 25:5, 62:16
**appeal** [1] - 80:18
**appear** [2] - 49:23, 67:10
**APPEARANCES** [1] - 1:11
**appearances** [1] - 2:4
**applied** [1] - 75:9
**apply** [4] - 6:3, 47:19, 48:18, 48:21
**applying** [1] - 38:13
**appreciate** [2] - 62:6, 76:5
**appropriate** [1] - 64:17
**approximate** [1] - 20:5
**arguably** [1] - 64:9
**argue** [19] - 4:5, 4:7, 4:8, 4:10, 9:11, 9:12, 9:15, 10:3, 10:4, 12:25, 13:2, 13:3, 13:25, 14:2, 14:3, 17:2, 18:22, 29:8, 33:22
**argued** [1] - 10:22
**arguing** [4] - 3:7, 3:8, 5:3
**argument** [21] - 3:24, 5:6, 7:20, 7:22, 7:24, 13:21, 13:22, 13:23, 15:17, 30:11, 34:25, 35:13, 41:24, 42:24, 45:9, 45:14, 46:24, 47:16, 53:11, 63:5, 63:13
**arguments** [1] - 63:22
**arising** [3] - 21:19, 30:11, 74:3
**arriving** [1] - 66:2
**ascertain** [1] - 78:7
**aside** [1] - 5:20
**asserts** [2] - 66:11, 68:25
**assets** [1] - 55:5
**assign** [3] - 19:19, 19:20, 36:5
**assigned** [2] - 19:23, 20:2
**Assignment** [1] - 36:16
**assignment** [7] - 16:24, 33:2, 47:4, 47:6, 47:12, 55:21
**assigns** [1] - 47:8
**assume** [2] - 8:13, 65:24
**assuming** [1] - 70:10
**attached** [1] - 29:17
**attack** [1] - 63:14
**attacks** [3] - 62:24, 63:11, 64:3
**attempt** [1] - 54:11
**attention** [2] - 58:3, 76:6
**attentive** [1] - 79:18
**attorney's** [2] - 80:9, 80:14
**attorneys** [1] - 58:13
**attributable** [1] - 56:21
**attribute** [1] - 5:1
**automatic** [4] - 39:17, 39:23, 55:19, 57:2
**Avenue** [2] - 1:24, 82:20
**avoid** [2] - 6:7, 41:11
**Avrohom** [1] - 29:13
**award** [4] - 26:10, 27:3, 52:3, 74:1
**aware** [1] - 20:11

**B**

**bad** [1] - 38:17
**bank** [2] - 30:20, 46:14
**bar** [4] - 8:6, 9:22
**Bar** [2] - 64:4, 64:5
**bargain** [1] - 27:22
**barred** [2] - 8:11, 70:19
**Bart** [30] - 2:12, 19:1, 19:5, 19:8, 25:11, 27:18, 28:12, 30:13, 30:15, 31:1, 36:4, 38:9, 38:10, 38:19, 39:4, 39:10, 39:12, 39:14, 39:24, 43:1, 46:7, 48:19, 49:6, 51:21, 52:6, 57:14, 57:15, 57:16, 57:20
**Bart's** [1] - 39:2
**based** [3] - 26:25, 62:21, 65:5
**basis** [1] - 80:25
**Bauza** [1] - 2:13
**Beach** [3] - 1:16, 44:7, 44:13
**beauty** [1] - 49:2
**became** [1] - 18:12
**BECERRA** [1] - 1:9
**Becerra** [1] - 1:23
**become** [1] - 69:24
**becomes** [1] - 57:5
**BEFORE** [1] - 1:9
**begin** [1] - 65:4
**beginning** [1] - 16:15
**behalf** [10] - 2:12, 2:23, 6:6, 9:4, 33:17, 79:9, 79:24, 80:7, 82:3, 82:6
**behave** [1] - 11:18
**belief** [2] - 21:22, 32:23
**beliefs** [2] - 21:17, 70:1
**belonging** [3] - 29:22, 29:24, 72:20
**bench** [1] - 47:25
**bend** [1] - 44:22
**benefit** [4] - 7:7, 7:11, 27:22, 64:6
**best** [2] - 11:21, 22:10
**between** [8] - 30:3, 30:14, 36:4, 36:16, 49:6, 59:13, 71:19, 73:5
**beyond** [2] - 40:14, 64:9
**big** [1] - 2:16
**bills** [2] - 81:12, 81:13
**binder** [1] - 62:3
**binding** [1] - 65:23
**bit** [5] - 25:9, 42:18, 44:22, 51:15, 56:1
**blank** [1] - 59:21
**blue** [1] - 48:3
**bold** [1] - 45:23
**boldly** [1] - 64:8
**bookkeeper** [1] - 24:11
**boot** [2] - 17:19, 23:25
**boots** [2] - 18:15, 28:22
**boots-on-the-ground** [1] - 28:22
**bore** [1] - 57:3
**borrow** [1] - 46:13
**borrowed** [2] - 30:12, 38:10
**borrower** [1] - 47:7
**bought** [1] - 37:4
**bound** [1] - 47:7
**bounds** [1] - 64:9
**boxes** [1] - 60:14
**Boyd** [1] - 1:18

**breach** [53] - 3:9, 4:7, 4:19, 4:22, 5:8, 5:13, 5:14, 5:17, 5:21, 5:25, 6:2, 10:10, 11:9, 11:10, 12:21, 12:23, 14:22, 15:3, 19:12, 26:8, 26:10, 26:11, 26:14, 26:15, 27:3, 51:11, 52:5, 53:2, 53:6, 53:17, 59:18, 60:11, 60:15, 60:17, 60:18, 60:20, 60:23, 60:24, 60:25, 61:6, 61:7, 61:8, 69:1, 70:14, 70:18, 70:23, 70:24, 74:7, 74:11, 74:16, 75:1, 77:23, 78:1
**breached** [20] - 4:19, 5:24, 8:10, 12:22, 16:9, 25:23, 26:18, 28:4, 34:7, 51:10, 53:7, 54:5, 54:6, 70:11, 70:15, 70:22, 73:5, 73:8, 73:12, 74:10
**breaches** [1] - 8:8
**break** [4] - 13:19, 48:19, 61:14, 61:17
**breath** [4] - 20:14, 25:24, 81:17, 81:19
**breathing** [1] - 82:2
**brief** [3] - 5:16, 81:6, 81:11
**briefing** [2] - 6:9, 80:19
**bring** [12] - 2:22, 15:14, 16:23, 27:5, 36:24, 40:11, 42:18, 64:19, 64:23, 75:21, 76:10, 77:16
**bringing** [3] - 51:10, 70:23, 75:22
**broke** [1] - 38:20
**broken** [1] - 39:14
**brought** [3] - 19:23, 32:11, 51:19
**bucket** [2] - 18:20, 26:24
**build** [1] - 27:25
**building** [2] - 16:3, 77:7
**burden** [13] - 14:20, 40:18, 40:22, 50:21, 51:2, 51:12, 51:13, 54:6, 59:21, 60:7, 68:5, 68:9, 68:12
**business** [12] - 19:2, 29:20, 29:22, 29:23, 29:24, 33:9, 38:13, 38:14, 40:2, 58:22, 72:19, 72:21
**buy** [10] - 16:1, 21:14, 21:15, 23:23, 38:2, 38:19, 39:1, 39:11, 39:14, 46:13
**buyer** [3] - 16:2, 27:9, 27:24
**BY** [1] - 1:21

## C

**calculation** [1] - 23:13
**camp** [3] - 48:20, 51:25, 62:25
**camps** [1] - 48:19
**cancellation** [1] - 28:17
**candid** [1] - 61:2
**candidly** [1] - 30:19
**cannot** [7] - 5:21, 11:11, 40:15, 45:22, 50:12, 57:21, 71:17
**capital** [31] - 8:1, 8:19, 8:23, 9:4, 9:9, 17:9, 17:11, 17:13, 17:22, 20:5, 20:11, 20:12, 20:15, 20:18, 21:1, 21:5, 24:5, 24:14, 25:9, 25:18, 26:22, 32:4, 32:17, 35:19, 54:17, 54:19, 54:20, 58:18, 58:23
**car** [4] - 46:13, 46:15, 63:3
**care** [4] - 11:22, 37:9, 39:24, 79:4
**carefully** [2] - 34:1, 59:23
**Casabielle** [11] - 2:12, 34:1, 34:10, 58:6, 58:11, 59:3, 59:9, 59:17, 59:19, 63:19, 64:8
**CASABIELLE** [21] - 1:17, 2:14, 14:9, 14:13, 14:16, 14:23, 14:25, 15:7, 15:9, 15:13, 34:19, 34:21, 36:9, 46:18, 47:2, 56:1, 58:8, 63:20, 64:13, 79:6, 82:8
**Casabielle's** [3] - 62:22, 64:5, 64:16
**case** [51] - 5:11, 6:11, 6:13, 8:7, 12:17, 15:23, 18:13, 35:10, 35:24, 36:2, 36:3, 38:17, 39:2, 41:25, 42:9, 42:12, 42:13, 43:8, 46:1, 46:18, 46:22, 47:15, 47:20, 49:11, 50:8, 50:22, 50:25, 51:24, 52:15, 52:18, 55:9, 64:7, 65:2, 65:21, 66:1, 67:6, 68:2, 68:25, 69:4, 69:16, 69:20, 69:22, 69:23, 70:2, 70:5, 72:2, 74:7, 76:7, 79:15
**Case** [1] - 2:2
**CASE** [1] - 1:2
**cases** [1] - 51:14
**cash** [3] - 16:11, 17:24, 24:19
**caught** [1] - 76:15
**caused** [3] - 54:3, 73:22, 74:6
**causes** [1] - 11:20
**caution** [2] - 69:8, 76:1
**cell** [1] - 77:7
**central** [1] - 47:10
**certain** [8] - 41:6, 47:9, 47:18, 49:3, 51:4, 54:9, 70:10, 70:19
**certify** [1] - 82:14
**cetera** [3] - 41:10
**chain** [1] - 66:13
**chambers** [1] - 61:21
**change** [7] - 7:19, 34:2, 54:3, 59:24, 69:24, 73:22, 76:17
**changed** [2] - 11:16, 71:11
**changes** [1] - 13:21
**checked** [1] - 29:14
**checking** [2] - 57:18, 57:23
**choice** [1] - 43:20
**choose** [2] - 43:19, 74:12
**choosing** [1] - 57:11
**circle** [1] - 50:3
**circumstances** [1] - 66:14
**circumstantial** [3] - 66:9, 66:13, 66:16
**cites** [1] - 5:10
**City** [3] - 24:23, 24:25, 30:21
**claim** [20] - 22:4, 26:8, 26:10, 36:18, 52:5, 52:6, 52:10, 60:3, 68:3, 68:8, 68:14, 68:15, 68:16, 68:24, 70:19, 70:23, 72:2, 73:6, 74:1, 74:3
**claimed** [2] - 39:24, 52:20
**claims** [14] - 8:11, 22:13, 36:18, 51:11, 51:19, 68:11, 68:23, 69:2, 69:9, 70:11, 71:10, 72:22, 73:4, 73:25
**clan** [1] - 48:20
**clause** [1] - 9:3
**Clause** [1] - 41:15
**clauses** [1] - 41:14
**clear** [9] - 14:9, 14:25, 15:9, 39:8, 43:23, 46:19, 55:16, 55:17, 55:21
**clear-headed** [1] - 43:23
**cleared** [1] - 22:1
**clearly** [9] - 38:12, 49:23, 50:14, 53:7, 53:11, 53:25, 67:11, 73:8
**client** [4] - 2:9, 10:12, 10:15, 81:19
**clients** [1] - 82:2
**Clinton** [1] - 2:8
**close** [6] - 2:20, 11:6, 13:18, 63:25, 76:6, 77:1
**closed** [1] - 22:8
**closing** [25] - 3:1, 11:17, 11:18, 11:21, 14:10, 15:17, 21:20, 21:25, 22:13, 23:1, 23:3, 23:4, 23:18, 23:21, 24:2, 25:25, 26:1, 26:24, 27:19, 34:10, 34:24, 35:12, 58:22, 62:22, 64:17
**closings** [1] - 6:14
**cocounsel** [1] - 2:7
**coffee** [1] - 61:15
**coincidentally** [1] - 38:9
**collaborative** [1] - 81:25
**collateral** [7] - 46:10, 46:11, 46:13, 46:14, 47:4, 55:13, 55:21
**Colletti** [5] - 21:25, 22:1, 22:7, 22:9, 23:3
**Colletti's** [1] - 27:19
**colloquy** [1] - 20:1
**Colonnelli** [1] - 1:18
**comfortable** [1] - 11:17
**coming** [2] - 17:13, 64:11
**comments** [3] - 29:17, 46:25, 62:11
**commission** [1] - 16:6
**common** [3] - 41:6, 46:12, 66:7
**communicate** [2] - 21:19, 75:19
**communicated** [1] - 53:11
**communicating** [1] - 30:8
**community** [1] - 79:9
**companies** [4] - 29:10, 29:15, 29:17
**company** [10] - 22:10, 22:11, 29:9, 29:17, 29:25, 30:1, 30:6, 53:17, 53:18, 65:19
**compensate** [1] - 74:3
**compensation** [1] - 74:6
**compensatory** [1] - 74:8
**complained** [1] - 2:18
**complete** [3] - 4:12, 5:7, 31:18
**completely** [1] - 10:9
**complex** [1] - 81:8
**compliance** [1] - 13:7
**complicated** [1] - 35:9
**compounding** [1] - 20:19
**con** [3] - 38:22, 50:5, 57:20
**conceded** [1] - 17:3
**concern** [1] - 10:2
**concerned** [1] - 66:8
**concerning** [2] - 66:22, 69:13
**conclude** [1] - 71:15
**conclusions** [1] - 66:7
**conclusory** [2] - 59:19, 60:7
**condition** [2] - 9:22, 9:24
**conditions** [4] - 23:9, 70:10, 71:5, 72:8
**conduct** [8] - 53:8, 53:12, 61:5, 71:16, 71:20, 72:10, 72:14, 73:9
**confer** [3] - 80:16, 80:20, 81:20
**conference** [2] - 78:22, 79:7
**confidential** [2] - 20:17, 30:9
**conflict** [1] - 27:11
**conform** [1] - 13:6
**confronted** [2] - 21:3,

25:10
**confuse** [2] - 35:8, 63:23
**confusing** [5] - 6:24, 7:1, 7:8, 10:21, 12:20
**confusion** [2] - 10:2, 34:12
**consent** [1] - 27:9
**consider** [19] - 9:8, 20:6, 20:7, 21:17, 26:7, 31:17, 31:18, 46:3, 55:13, 55:14, 65:20, 66:17, 68:15, 68:18, 69:7, 71:17, 72:16, 73:25, 74:16
**consideration** [5] - 49:4, 49:22, 66:6, 81:4, 81:5
**considering** [1] - 69:21
**consistent** [9] - 26:6, 34:3, 40:1, 40:2, 43:8, 50:5, 51:18, 53:16, 72:10
**construction** [1] - 31:13
**consummated** [1] - 38:11
**contemplated** [2] - 28:2
**contemplates** [1] - 18:17
**contend** [7] - 17:24, 26:9, 58:21, 59:20, 59:21, 60:6
**contends** [2] - 70:18, 71:25
**content** [1] - 31:3
**continue** [2] - 6:14, 57:21
**contract** [133] - 3:9, 3:10, 3:13, 3:16, 4:7, 5:14, 5:22, 5:23, 5:25, 6:4, 6:5, 7:5, 7:16, 9:13, 9:25, 10:9, 10:10, 10:21, 12:22, 13:8, 13:9, 13:24, 14:6, 15:23, 16:9, 16:12, 16:14, 16:24, 17:1, 17:2, 17:3, 17:9, 17:11, 17:25, 18:5, 18:8, 18:17, 19:2, 19:4, 19:13, 19:14, 19:16, 19:18, 19:19, 19:22, 19:24, 20:2, 22:5, 22:8, 22:9, 22:16, 22:17, 22:18, 22:20, 22:23, 22:25, 23:1, 23:10, 23:16, 24:7, 24:10, 25:17, 25:20, 25:22, 26:8, 26:10, 26:14, 26:24, 27:8, 27:11, 27:13, 28:7, 29:6, 31:12, 31:13, 31:25, 32:1, 34:8, 36:4, 36:14, 36:18, 36:19, 36:22, 37:2, 37:12, 40:19, 41:2, 41:9, 45:16, 51:3, 51:11, 52:6, 52:7, 52:9, 52:16, 52:20, 53:2, 53:7, 53:9, 54:6, 60:25, 61:7, 70:7, 70:19, 70:23, 70:25, 71:2, 71:4, 71:5, 71:8, 71:10, 71:11, 71:14, 71:17, 71:18, 71:19, 72:2, 72:5, 72:7, 72:15, 72:16, 72:23, 73:5, 73:8, 73:10, 73:12, 74:7, 74:10, 80:9
**contracts** [1] - 71:25
**contractual** [4] - 29:21, 29:23, 59:6, 72:20
**contribute** [1] - 20:15
**contributed** [1] - 9:6
**contribution** [12] - 9:9, 17:9, 17:12, 17:14, 20:5, 20:11, 20:12, 24:14, 26:22, 32:4, 54:20, 58:23
**contributions** [12] - 8:1, 8:4, 8:20, 8:23, 9:5, 20:15, 20:18, 21:1, 21:5, 25:9, 25:18, 58:18
**control** [1] - 26:25
**controlled** [1] - 17:16
**convince** [3] - 7:21, 38:19, 44:3
**convinced** [2] - 50:24, 69:25
**copy** [7] - 5:12, 23:3, 62:5, 62:7, 75:13, 75:14, 76:19
**core** [1] - 19:19
**CORPORATION** [1] - 1:6
**Corporation** [3] - 2:3, 16:3, 72:23
**corporation** [4] - 65:12, 65:13, 65:15, 65:17
**Corporations** [2] - 56:17, 56:20
**correct** [11] - 3:11, 3:17, 3:22, 4:1, 4:4, 4:17, 4:21, 4:25, 9:18, 14:15, 41:7
**costs** [3] - 41:6, 41:7, 41:8
**counsel** [11] - 2:4, 7:10, 15:18, 34:21, 58:5, 62:24, 63:10, 63:14, 64:3, 64:4, 80:16
**Count** [3] - 15:12, 26:16
**count** [1] - 26:11
**counterintuitive** [1] - 47:24
**couple** [2] - 52:10, 53:15
**course** [6] - 38:5, 38:20, 63:5, 65:16, 76:18, 80:12
**court** [2] - 65:15, 74:14
**Court** [13] - 1:22, 1:23, 2:1, 15:19, 34:21, 35:6, 35:23, 48:15, 48:23, 53:5, 58:9, 82:19, 82:19
**COURT** [82] - 1:1, 2:15, 2:25, 3:12, 3:17, 3:19, 3:23, 4:2, 4:5, 4:12, 4:14, 4:18, 4:22, 5:1, 5:5, 6:10, 6:25, 7:18, 8:12, 8:16, 9:7, 9:11, 9:19, 10:3, 10:8, 11:4, 12:1, 12:4, 12:9, 12:11, 13:10, 13:12, 13:15, 13:18, 14:2, 14:12, 14:15, 14:18, 14:24, 15:6, 15:8, 15:11, 15:14, 15:16, 34:18, 34:20, 36:8, 46:17, 46:24, 55:25, 58:5, 61:13, 61:21, 62:1, 62:6, 62:10, 62:19, 63:2, 63:19, 64:1, 64:6, 64:14, 64:23, 64:25, 76:14, 76:22, 76:24, 77:14, 77:18, 77:21, 78:6, 78:19, 78:23, 79:2, 79:8, 79:21, 79:23, 80:3, 80:10, 80:13, 82:6, 82:9
**Court's** [1] - 19:3
**courthouse** [1] - 77:2
**COURTROOM** [3] - 2:2, 58:6, 62:9
**courtroom** [3] - 75:18, 75:23, 77:3
**covenant** [14] - 12:20, 12:24, 26:12, 26:17, 26:18, 28:4, 47:7, 60:17, 60:18, 61:1, 61:8, 71:24, 72:1, 78:1
**covenants** [1] - 27:4
**CPA** [1] - 29:13
**credit** [2] - 8:2, 8:4
**criminal** [1] - 51:14
**Crimson** [3] - 9:6, 9:8, 30:10
**crooks** [1] - 62:25
**cross** [1] - 32:12
**cross-examination** [1] - 32:12
**crystal** [1] - 46:19
**culpa** [1] - 29:18
**curative** [8] - 62:17, 62:25, 63:7, 63:9, 64:2, 64:10, 64:15, 64:17
**cure** [2] - 45:5, 45:19
**customary** [1] - 78:6

## D

**dad** [1] - 38:3
**damage** [2] - 61:7, 61:9
**damaged** [7] - 24:17, 35:22, 40:15, 51:23, 52:13, 71:9, 72:13
**damages** [28] - 5:8, 5:9, 5:25, 12:14, 12:15, 12:19, 12:21, 12:23, 12:25, 13:2, 26:9, 27:3, 40:13, 40:15, 40:22, 51:20, 51:25, 52:17, 61:5, 69:14, 70:14, 70:24, 73:25, 74:3, 74:6, 74:7, 74:8, 75:5
**Dan** [5] - 2:13, 36:24, 40:11, 41:16, 50:19
**DATE** [1] - 82:18
**date** [5] - 37:1, 37:2, 37:4, 37:6, 75:16
**daughter** [2] - 44:23, 44:24
**days** [2] - 17:13, 43:18
**days'** [2] - 18:18, 29:6
**dead** [1] - 28:18
**deal** [19] - 16:4, 16:5, 16:23, 19:23, 20:15, 20:20, 22:8, 28:18, 36:5, 37:17, 37:25, 38:3, 38:5, 38:8, 38:15, 38:18, 39:22, 41:19
**dealing** [10] - 4:20, 7:4, 26:12, 28:5, 48:7, 60:18, 61:1, 71:24, 72:1, 78:2
**dealmaker** [1] - 16:21
**deals** [1] - 59:5
**dealt** [1] - 65:14
**debate** [3] - 80:22, 80:23, 81:6
**decency** [1] - 64:9
**deception** [1] - 67:24
**decide** [14] - 15:22, 17:10, 23:17, 35:6, 35:8, 48:8, 48:14, 49:16, 55:7, 66:19, 66:24, 67:23, 69:20, 71:15
**decided** [2] - 16:6, 43:7
**deciding** [3] - 65:2, 68:17, 72:15
**decision** [9] - 12:12, 43:23, 46:1, 49:1, 65:5, 65:13, 66:3, 66:21, 67:24
**decision-making** [1] - 46:1
**decisions** [2] - 41:13, 47:20
**deduct** [1] - 41:6
**deductions** [2] - 41:6, 66:7
**deep** [1] - 81:17
**default** [13] - 18:18, 21:11, 29:4, 39:17, 39:23, 45:5, 45:8, 45:15, 45:17, 45:18, 55:19, 57:2
**defendant** [30] - 2:12, 8:1, 17:1, 18:22, 33:22, 70:15, 70:18, 70:24, 71:1, 71:5, 71:7, 71:11, 71:16, 71:25, 72:4, 72:22, 72:23, 72:25, 73:4, 73:6, 73:11, 73:13, 73:14, 73:19, 73:21, 73:22, 74:10, 74:16, 77:23, 80:7
**Defendant** [8] - 1:7, 68:24, 68:25, 69:3, 69:8, 69:9, 70:6, 70:11
**DEFENDANT** [1] - 1:17
**Defendant's** [8] - 25:1, 25:2, 25:4, 25:7, 30:16, 30:17, 59:10, 59:12
**defendant's** [6] - 7:11,

25:6, 25:7, 72:8, 72:10, 72:13
**defendants** [2] - 29:8, 30:11
**defense** [32] - 4:23, 6:4, 9:14, 9:16, 9:21, 10:8, 10:18, 10:19, 10:20, 11:11, 11:15, 12:5, 14:11, 14:17, 14:18, 14:20, 52:21, 60:10, 64:20, 69:4, 69:6, 69:10, 69:11, 73:13, 73:14, 74:25, 75:3, 76:22, 82:6
**Defense** [1] - 56:5
**defenses** [26] - 4:12, 5:7, 5:24, 6:3, 15:4, 15:5, 51:4, 51:8, 51:11, 53:3, 59:17, 59:18, 60:1, 60:2, 60:6, 60:14, 60:16, 60:20, 60:22, 61:3, 61:7, 61:9, 69:1, 70:19, 75:8
**define** [1] - 41:8
**deflecting** [1] - 35:11
**delegated** [1] - 29:12
**deliberate** [1] - 76:13
**deliberation** [1] - 34:5
**deliberations** [5] - 65:4, 69:18, 74:14, 76:8, 76:9
**denied** [1] - 63:2
**denies** [2] - 70:15, 71:11
**Department** [2] - 56:16, 56:19
**dependent** [1] - 50:8
**deposit** [5] - 19:25, 20:3, 23:20
**deprived** [2] - 24:17, 24:18
**DEPUTY** [3] - 2:2, 58:6, 62:9
**description** [1] - 64:16
**desire** [6] - 19:9, 28:16, 32:13, 33:8, 54:1, 59:1
**desired** [4] - 18:5, 18:6, 20:10, 59:1
**desires** [1] - 21:18
**detail** [1] - 68:1
**determine** [2] - 18:2, 27:13
**determines** [1] - 6:9
**determining** [1] - 44:19
**detriment** [1] - 33:25
**detrimental** [1] - 34:2
**detrimentally** [1] - 59:24
**develop** [1] - 27:25
**developing** [1] - 28:3
**development** [1] - 31:12
**differ** [2] - 50:14, 67:12
**difference** [2] - 5:20, 66:15
**different** [5] - 11:2, 18:14, 50:16, 58:20, 67:18
**differently** [1] - 70:1
**diluted** [2] - 18:19, 29:7
**direct** [5] - 59:2, 66:8, 66:10, 66:15, 74:13
**directed** [5] - 3:20, 13:1, 17:16, 24:1, 24:2
**directly** [4] - 49:24, 50:2, 56:21, 67:11
**disagree** [1] - 55:12
**disbelieve** [2] - 53:20, 66:21
**disbursement** [1] - 35:16
**discretion** [1] - 26:21
**discretional** [1] - 24:1
**discuss** [5] - 36:17, 39:18, 44:18, 69:22, 80:20
**discussed** [1] - 43:10
**discussing** [3] - 48:5, 51:21, 69:23
**discussions** [1] - 65:4
**dismiss** [1] - 78:23
**disprove** [2] - 66:14, 69:9
**dispute** [3] - 17:1, 19:16, 40:8
**disputed** [2] - 51:22, 72:15
**disregard** [3] - 45:21, 65:10, 66:2
**disregarded** [1] - 43:2
**dissolution** [4] - 29:20, 29:23, 30:5, 72:19
**dissolved** [4] - 29:9, 53:18, 53:19, 56:12
**distribute** [5] - 21:21, 23:16, 26:23, 40:6, 40:7
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [4] - 1:23, 1:24, 82:19, 82:20
**Division** [1] - 56:20
**document** [6] - 16:18, 17:4, 30:25, 31:15, 46:2, 60:5
**documents** [4] - 42:7, 42:8, 46:2, 55:9
**dollar** [4] - 17:19, 20:4, 20:16, 23:20
**dollars** [7] - 17:17, 17:18, 17:20, 23:22, 24:1, 30:4, 36:1
**done** [7] - 23:6, 23:7, 25:23, 43:7, 74:22, 75:3, 80:24
**Donna** [5] - 61:23, 62:7, 76:10, 77:7, 79:11
**doubt** [3] - 31:25, 32:1, 53:11
**down** [7] - 9:7, 10:15, 16:4, 25:9, 57:15, 57:20, 75:20
**Downtown** [2] - 16:2, 23:23
**dozens** [1] - 29:11
**drink** [2] - 61:17, 61:22
**due** [1] - 30:22
**DUFFY** [1] - 1:14
**Duffy** [1] - 2:8
**during** [14] - 11:18, 17:14, 18:13, 33:15, 35:12, 41:18, 42:25, 54:18, 55:8, 62:21, 66:2, 67:18, 76:8, 76:9
**duties** [1] - 65:19
**duty** [1] - 65:1
**DX** [3] - 42:4, 46:4, 47:3
**DX-1** [1] - 36:13
**DX-41** [1] - 56:15

## E

**earned** [1] - 25:19
**earnest** [2] - 59:4, 61:4
**eight** [1] - 78:20
**either** [6] - 63:10, 65:6, 66:15, 71:22, 73:24, 75:22
**element** [3] - 23:9, 24:6, 24:16
**elements** [4] - 19:11, 35:23, 52:10, 54:3
**Elijah** [1] - 2:8
**Elizabeth** [1] - 2:8
**eloquent** [1] - 26:5
**email** [4] - 19:6, 28:14, 32:17, 32:20
**emails** [2] - 30:7, 35:15
**embark** [1] - 81:15
**emphasize** [4] - 6:7, 41:15, 56:9, 57:1
**employees** [3] - 65:16, 65:18, 65:19
**empty** [1] - 49:12
**empty-handed** [1] - 49:12
**end** [9] - 8:22, 14:24, 16:6, 16:8, 32:16, 51:23, 52:18, 75:1, 79:7
**ended** [1] - 58:11
**enforce** [5] - 13:24, 25:15, 25:16, 25:20, 71:23
**England** [1] - 26:4
**enter** [1] - 34:8
**entered** [12] - 16:25, 21:10, 21:13, 27:7, 36:14, 36:16, 37:2, 37:13, 52:7, 70:6, 71:1, 72:4
**entire** [2] - 8:7, 43:12
**entirely** [1] - 56:12
**entitled** [8] - 10:1, 18:1, 42:10, 45:8, 45:15, 61:5, 70:8, 82:15
**entitlement** [6] - 80:9, 80:22, 80:23, 81:6, 81:7
**entity** [1] - 35:17
**enures** [1] - 7:10
**equal** [1] - 65:14
**equals** [1] - 65:15
**equitable** [8] - 4:10, 10:23, 14:21, 33:22, 53:22, 60:15, 69:2, 73:13
**escrow** [1] - 37:18
**ESQ** [5] - 1:13, 1:13, 1:14, 1:17, 1:17
**essential** [9] - 19:18, 24:7, 24:8, 52:8, 52:16, 68:3, 68:22, 71:4, 71:7
**establish** [7] - 53:6, 53:7, 68:22, 72:2, 72:25, 73:6, 73:14
**established** [4] - 39:9, 43:6, 53:10, 54:4
**estate** [1] - 47:9
**estopped** [2] - 51:10, 70:23
**estoppel** [10] - 4:10, 10:23, 14:22, 33:22, 53:22, 59:19, 60:15, 60:21, 69:2, 73:14
**et** [3] - 41:9, 41:10
**evaluate** [4] - 44:19, 47:17, 50:12, 53:2
**events** [2] - 50:15, 50:16
**eventual** [1] - 70:9
**eventually** [1] - 41:18
**evidence** [82] - 2:21, 6:22, 9:5, 13:6, 16:16, 16:17, 16:19, 17:6, 17:7, 17:24, 18:2, 18:4, 20:6, 22:14, 22:21, 22:23, 28:8, 29:25, 31:15, 31:18, 34:6, 34:7, 34:13, 35:1, 35:3, 35:4, 35:22, 39:8, 40:14, 43:14, 44:1, 47:1, 47:18, 50:14, 51:13, 51:15, 51:16, 51:24, 54:8, 54:11, 54:14, 58:13, 58:14, 59:20, 59:22, 59:24, 60:3, 60:5, 64:18, 65:5, 65:20, 65:21, 65:23, 66:4, 66:6, 66:8, 66:10, 66:13, 66:16, 66:17, 66:18, 67:13, 67:14, 67:16, 68:4, 68:6, 68:7, 68:10, 68:13, 68:18, 68:20, 68:23, 69:3, 69:5, 69:12, 69:21, 70:5, 74:2, 74:5
**exactly** [7] - 10:14, 16:20, 22:19, 27:25, 38:16, 43:16, 46:22
**examination** [1] - 32:12
**example** [5] - 35:14, 41:5, 46:12, 46:18, 74:7
**examples** [2] - 35:13, 53:16
**except** [1] - 66:1
**excerpt** [1] - 31:5
**excess** [1] - 58:18
**exchange** [3] - 17:18, 19:21, 23:22
**excuse** [5] - 24:24, 30:17, 31:19, 49:17, 59:23
**excused** [2] - 72:24, 79:14
**exercise** [2] - 24:18, 26:19
**exhibit** [6] - 2:19, 2:22, 3:2, 12:2, 12:6, 25:4
**Exhibit** [20] - 15:24,

18:8, 19:15, 23:18, 24:4, 24:23, 25:1, 25:3, 25:4, 25:8, 27:5, 27:17, 30:16, 30:18, 31:20, 31:23, 47:3, 56:5, 59:10, 59:12
**exhibits** [11] - 31:18, 31:19, 43:19, 62:2, 62:3, 65:22, 68:20, 76:11, 76:25
**exist** [2] - 10:2, 10:9
**existence** [6] - 6:5, 23:5, 27:19, 52:24, 59:15, 73:1
**exists** [1] - 71:24
**expectation** [1] - 27:1
**expectations** [2] - 16:14, 72:11
**expenses** [3] - 21:6, 24:19, 29:1
**experience** [1] - 64:5
**experienced** [1] - 20:21
**expired** [3] - 18:9, 18:10, 28:11
**explain** [5] - 25:11, 26:13, 37:16, 65:8, 69:19
**explained** [1] - 59:4
**explanation** [1] - 53:5
**express** [6] - 4:19, 5:8, 5:19, 26:14, 26:17, 60:24
**expression** [3] - 33:23, 42:6, 54:18
**extent** [1] - 63:14
**extinguish** [9] - 3:10, 3:13, 3:14, 8:19, 9:10, 10:14, 29:21, 29:23, 72:20
**eyes** [1] - 64:10
**eyewitness** [1] - 66:12

## F

**face** [1] - 27:20
**facilitated** [1] - 20:4
**fact** [17] - 5:16, 6:8, 12:6, 15:22, 17:10, 18:1, 21:20, 22:3, 23:17, 61:12, 65:12, 66:11, 66:14, 67:15, 67:25, 68:17, 69:13
**factors** [1] - 48:15
**facts** [7] - 4:9, 35:6, 50:17, 62:2, 66:3, 66:13, 70:4
**factual** [1] - 65:25
**failed** [12] - 16:10, 21:10, 24:6, 26:25, 27:2, 39:18, 52:15, 52:17, 57:8, 71:7
**fails** [3] - 45:3, 68:12, 68:22
**failure** [2] - 52:13, 71:9
**failures** [1] - 24:17
**fair** [8] - 4:20, 26:12, 28:5, 60:18, 61:1, 71:24, 72:1, 78:2
**fairly** [2] - 74:2, 80:24
**faith** [9] - 26:12, 28:5, 54:2, 60:17, 61:1, 71:24, 72:1, 73:19, 78:2
**falsely** [1] - 67:15
**fancy** [1] - 46:6
**fashion** [3] - 59:19, 60:7, 81:25
**favor** [3] - 34:8, 35:1, 68:10
**favorite** [1] - 48:12
**FCRR** [2] - 1:22, 82:18
**FedEx** [1] - 28:14
**fee** [2] - 16:6, 81:11
**fees** [9] - 80:9, 80:14, 80:15, 80:19, 80:21, 81:4, 81:5, 81:16, 82:2
**feet** [1] - 16:4
**few** [5] - 28:7, 35:12, 48:9, 49:25, 66:25
**fictitious** [1] - 20:21
**fifth** [2] - 10:19, 24:16
**figure** [2] - 61:7, 61:9
**figures** [1] - 18:2
**file** [6] - 80:1, 80:5, 80:10, 80:17, 81:3, 81:23
**filed** [4] - 29:18, 59:12, 59:14, 76:18
**filing** [3] - 56:19, 59:9, 59:11
**fill** [2] - 59:21, 61:10
**final** [2] - 21:10, 21:12
**finally** [2] - 34:22, 52:12
**finder's** [1] - 16:6
**fine** [2] - 55:15, 76:15
**finished** [2] - 11:24, 65:3
**first** [33] - 8:20, 8:24, 11:15, 16:10, 18:6, 18:7, 19:14, 22:2, 22:4, 22:16, 24:13, 24:18, 31:5, 31:6, 33:12, 33:15, 36:23, 37:7, 37:17, 40:20, 43:4, 45:3, 45:6, 48:23, 54:18, 57:19, 62:3, 63:2, 80:22, 81:1, 81:8
**five** [4] - 18:9, 18:10, 30:25, 52:11
**five-year** [1] - 18:9
**Flagler** [2] - 44:6, 44:13
**flies** [1] - 27:20
**floor** [2] - 77:5, 77:6
**FLORIDA** [1] - 1:1
**Florida** [15] - 1:3, 1:16, 1:19, 1:24, 1:25, 29:20, 29:23, 47:11, 56:17, 56:20, 64:4, 64:5, 72:19, 82:20, 82:21
**flow** [4] - 12:23, 16:11, 17:24, 24:19
**focus** [8] - 40:11, 41:13, 42:5, 42:7, 42:17, 43:22, 45:3, 57:7
**folks** [20] - 35:8, 36:14, 37:24, 42:5, 42:14, 43:5, 43:23, 44:3, 44:8, 45:3, 45:10, 45:14, 47:16, 47:17, 48:25, 50:7, 55:12, 56:7, 56:9, 57:4
**follow** [4] - 36:13, 65:8, 65:9
**followed** [1] - 41:1
**following** [5] - 53:22, 70:25, 72:3, 73:7, 73:15
**fooled** [1] - 41:23
**FOR** [2] - 1:13, 1:17
**foregoing** [1] - 82:14
**foreman** [1] - 60:13
**forensic** [7] - 20:25, 35:20, 35:21, 40:16, 40:23, 40:25, 50:23
**Foreperson** [1] - 77:19
**foreperson** [6] - 60:13, 74:13, 74:23, 75:15, 77:15
**FOREPERSON** [1] - 77:20
**forget** [6] - 22:24, 25:15, 33:12, 44:20, 67:21
**form** [29] - 2:17, 3:4, 4:16, 11:16, 12:10, 12:13, 12:17, 13:19, 14:4, 14:20, 26:11, 34:9, 34:11, 40:21, 57:18, 59:5, 60:11, 61:6, 61:22, 62:12, 64:21, 74:15, 75:2, 75:4, 75:10, 75:14, 76:11, 76:14
**forms** [2] - 35:19, 59:9
**fortunately** [1] - 42:25
**four** [2] - 43:18, 52:10
**fourth** [2] - 10:19, 24:6
**frankly** [3] - 7:10, 19:5, 41:11
**fraud** [1] - 71:22
**free** [1] - 77:3
**friend** [1] - 39:24
**front** [2] - 16:6, 52:12
**FTP** [96] - 1:6, 2:3, 9:3, 16:2, 16:9, 16:13, 16:24, 17:8, 17:12, 17:15, 17:20, 18:5, 18:6, 19:21, 19:23, 19:24, 20:2, 20:9, 20:18, 21:9, 21:17, 22:8, 22:9, 22:11, 22:20, 23:2, 23:21, 23:24, 24:1, 24:5, 24:6, 24:10, 24:24, 25:14, 25:21, 26:15, 26:18, 27:7, 28:4, 28:15, 28:20, 29:3, 30:1, 30:8, 30:14, 30:24, 31:2, 32:1, 32:6, 33:17, 33:25, 34:2, 34:7, 35:25, 52:6, 52:24, 54:2, 58:14, 58:20, 58:22, 59:1, 59:23, 60:18, 68:24, 68:25, 69:3, 69:8, 69:9, 70:6, 70:11, 70:15, 70:18, 70:24, 71:1, 71:7, 71:11, 71:16, 72:22, 72:23, 72:25, 73:2, 73:4, 73:6, 73:11, 73:13, 73:14, 73:19, 74:6, 74:10, 74:16, 77:23, 78:1
**FTP's** [9] - 20:5, 23:10, 24:17, 25:16, 28:23, 35:25, 61:5, 71:6, 73:21
**fulfill** [1] - 27:2
**full** [3] - 18:7, 39:25, 74:5
**fully** [2] - 9:1, 69:21
**fundamental** [1] - 24:8
**funds** [1] - 35:16
**futile** [19] - 3:12, 3:23, 3:24, 8:13, 8:14, 8:16, 9:13, 9:23, 10:4, 13:25, 14:3, 14:5, 14:13, 18:24, 54:11, 54:14, 54:15, 54:23, 55:3
**futility** [18] - 3:21, 4:6, 4:15, 5:6, 7:23, 7:25, 8:9, 10:9, 10:23, 11:1, 11:7, 13:22, 14:11, 54:9, 55:5, 60:9, 60:10, 76:16

## G

**gain** [2] - 17:22
**gains** [2] - 24:5, 35:19
**game** [1] - 38:12
**general** [4] - 21:3, 25:8, 25:10, 65:17
**generally** [2] - 73:25, 80:13
**gentlemen** [12] - 15:2, 15:20, 34:22, 39:13, 52:14, 57:9, 57:16, 57:22, 61:13, 76:5, 78:7, 79:8
**given** [6] - 17:13, 19:6, 35:14, 47:14, 62:8, 69:13
**GM** [1] - 37:8
**Google** [2] - 79:15, 79:16
**government** [1] - 53:21
**governs** [1] - 46:1
**grant** [1] - 10:20
**granted** [2] - 45:4, 45:19
**greater** [1] - 57:5
**Greg** [29] - 2:9, 6:22, 16:1, 16:22, 20:1, 20:11, 21:13, 26:4, 27:22, 28:12, 29:10, 29:14, 30:6, 30:12, 30:15, 30:18, 31:2, 31:23, 32:2, 32:3, 36:4, 44:4, 46:8, 46:9, 54:25, 55:3, 58:12
**Greg's** [4] - 16:21, 20:3, 30:23, 59:4
**Gregory** [1] - 44:20
**gross** [1] - 41:4
**ground** [4] - 18:16, 28:22, 42:3, 45:25
**groups** [1] - 48:21
**guarantee** [1] - 41:19
**guaranteed** [1] - 31:24
**guess** [1] - 45:14
**guide** [1] - 40:21
**guy** [2] - 22:1, 28:23
**guys** [2] - 36:13, 40:24

## H

**half** [2] - 23:20, 30:3
**half-a-million** [1] - 30:3
**hand** [3] - 58:17, 77:21
**handed** [1] - 49:12
**Hanzman** [2] - 5:10, 5:11
**hard** [1] - 23:20
**harp** [1] - 52:12
**harping** [1] - 51:20
**Harvey** [2] - 21:14, 21:15
**haws** [1] - 44:10
**head** [5] - 21:19, 21:22, 31:4, 32:6, 45:12
**headed** [1] - 43:23
**hear** [6] - 7:20, 17:1, 29:19, 54:14, 60:4, 64:14
**heard** [18] - 18:11, 19:1, 19:8, 24:21, 27:23, 28:24, 30:23, 40:8, 44:2, 51:24, 54:8, 54:11, 54:13, 54:18, 58:14, 59:3, 59:19
**Heber** [8] - 7:4, 18:11, 19:7, 28:17, 28:21, 28:22, 29:13, 29:16
**Heber's** [2] - 28:9, 50:17
**held** [1] - 26:21
**help** [4] - 44:23, 55:2, 72:17
**hems** [1] - 44:10
**hereby** [2] - 47:7, 82:14
**Hernandez** [2] - 21:14, 21:15
**herring** [1] - 44:15
**hesitate** [1] - 69:23
**hidden** [1] - 71:18
**highlight** [3] - 28:8, 43:3, 43:5
**highlighted** [3] - 36:23, 43:22, 45:2
**himself** [5] - 23:8, 24:3, 31:4, 33:21, 44:3
**hires** [1] - 7:4
**hold** [6] - 3:19, 6:25, 36:12, 60:2, 60:3, 62:15
**home** [1] - 52:19
**hominem** [1] - 62:24
**honest** [3] - 16:19, 44:17, 69:25
**honestly** [2] - 54:18, 64:1
**Honor** [53] - 2:6, 2:11, 2:14, 2:24, 3:11, 3:18, 3:22, 4:1, 4:4, 4:17, 4:21, 4:25, 5:4, 6:21, 7:17, 7:24, 9:2, 9:18, 9:20, 11:3, 12:7, 13:5, 14:9, 15:10, 34:16, 34:19, 36:7, 46:16, 46:23, 47:2, 47:25, 55:24, 58:4, 61:20, 62:4, 62:15, 63:17, 63:20, 63:25, 64:13, 64:22, 76:21, 76:23, 78:5, 79:6, 79:25, 80:8, 80:12, 82:5, 82:7, 82:8, 82:9, 82:10
**honor** [1] - 16:10
**HONORABLE** [1] - 1:9
**Honorable** [1] - 1:23
**hoops** [1] - 81:1
**hope** [1] - 15:20
**hopefully** [1] - 48:5
**hoping** [1] - 81:24
**hunt** [1] - 10:15
**hypothetical** [1] - 7:2

## I

**idea** [2] - 12:25, 53:21
**ideal** [1] - 16:2
**ignore** [1] - 43:12
**imagine** [1] - 6:12
**immediate** [2] - 45:5, 45:18
**implied** [18] - 4:24, 5:9, 5:17, 5:21, 12:20, 12:24, 26:11, 26:17, 26:18, 27:4, 28:4, 60:17, 60:18, 61:1, 61:8, 71:24, 72:1, 78:1
**important** [14] - 13:20, 35:1, 37:5, 37:21, 45:2, 47:17, 50:7, 50:11, 51:21, 55:9, 56:10, 66:20, 67:15, 67:25
**importantly** [2] - 33:25, 54:15
**impress** [4] - 48:16, 48:24, 48:25, 67:1
**inaccurately** [1] - 67:22
**inaction** [4] - 53:23, 73:17, 73:20, 73:22
**inactions** [3] - 7:12, 53:25, 57:12
**Inaudible** [1] - 79:1
**inclination** [1] - 5:15
**inclined** [1] - 2:19
**include** [1] - 48:16
**includes** [1] - 65:21
**including** [2] - 21:20, 76:4
**income** [1] - 17:23
**inconsistent** [6] - 27:16, 50:17, 52:23, 52:25, 73:1, 73:2
**incredible** [1] - 16:1
**incredibly** [1] - 79:18
**indicate** [1] - 53:24
**indicated** [4] - 7:12, 53:25, 57:11, 73:17
**indicating** [3] - 53:8, 56:21, 73:9
**indication** [1] - 69:15
**individually** [3] - 30:13, 31:24, 32:2
**influenced** [1] - 65:6
**inform** [1] - 17:12
**information** [1] - 76:2
**initial** [4] - 17:9, 20:1, 20:5, 28:10
**innocent** [1] - 67:23
**inside** [1] - 62:3
**instances** [1] - 50:15
**instruct** [6] - 19:3, 19:11, 28:6, 35:23, 51:3, 65:1
**instructed** [4] - 46:24, 46:25, 60:9, 63:4
**instruction** [15] - 9:23, 29:19, 48:7, 50:18, 62:13, 62:20, 63:1, 63:7, 63:9, 64:2, 64:10, 64:15, 64:17, 64:21
**instructions** [25] - 4:16, 6:15, 6:19, 11:7, 11:19, 13:20, 14:5, 14:19, 35:5, 35:6, 48:18, 51:1, 61:15, 61:23, 62:7, 62:11, 62:17, 62:18, 65:10, 65:11, 66:1, 69:13, 75:14, 76:10
**intended** [1] - 19:7
**intending** [1] - 47:6
**intent** [3] - 21:13, 32:13, 53:11
**intentional** [1] - 67:24
**intentions** [1] - 71:18
**interest** [13] - 16:7, 20:19, 21:7, 22:10, 23:14, 41:9, 46:10, 49:8, 49:10, 55:14, 55:22, 67:5, 70:4
**interested** [1] - 6:12
**interesting** [1] - 45:2
**interestingly** [2] - 37:11, 38:8
**interpret** [1] - 72:17
**interpretation** [1] - 66:4
**interpreted** [2] - 63:14, 69:15
**interprets** [1] - 63:16
**interrupted** [1] - 63:4
**introduced** [3] - 42:9, 43:13, 43:18
**INVESTMENT** [1] - 1:6
**Investment** [3] - 2:3, 16:3, 72:23
**involved** [6] - 7:6, 7:15, 65:12, 65:15, 68:15, 69:6
**involvement** [8] - 6:17, 6:19, 6:23, 7:3, 7:9, 33:24, 53:24
**irrelevant** [4] - 39:21, 39:22, 57:10
**IRS** [7] - 35:19, 53:18, 53:19, 56:8, 56:11, 56:12, 59:3
**ISAIAH** [1] - 1:13
**isolated** [1] - 72:16
**issue** [7] - 63:3, 65:25, 69:14, 76:15, 78:23, 80:19, 81:23
**issues** [1] - 55:7
**IT** [2] - 25:6, 32:9
**items** [1] - 81:12
**itself** [2] - 59:2, 63:24

## J

**JACQUELINE** [1] - 1:9
**Jacqueline** [1] - 1:23
**January** [4] - 30:22, 46:8, 46:20, 47:13
**Joe** [5] - 21:25, 22:1, 22:7, 22:8, 23:3
**joint** [1] - 62:1
**Jones** [1] - 21:11
**JOSEPH** [1] - 1:13
**Joseph** [1] - 2:6
**Judge** [1] - 48:6
**judge** [9] - 19:11, 28:6, 47:16, 47:19, 48:4, 48:11, 51:3, 55:6, 57:24
**JUDGE** [1] - 1:10
**judge's** [1] - 29:19
**judges** [2] - 70:3, 70:4
**judgment** [2] - 21:10, 21:13
**juror** [2] - 49:2, 78:9
**JUROR** [9] - 78:10, 78:11, 78:12, 78:13, 78:14, 78:15, 78:16, 78:17, 78:18
**jurors** [3] - 69:21, 76:1, 78:20
**jury** [77] - 2:17, 2:19, 4:8, 4:15, 4:18, 4:22, 5:16, 5:18, 5:22, 6:15, 6:19, 10:4, 11:1, 11:6, 11:19, 12:5, 13:15, 13:20, 14:5, 14:10, 14:19, 15:2, 15:15, 15:20, 15:21, 34:9, 35:5, 46:24, 48:7, 50:10, 50:18, 61:13, 61:14, 61:19, 61:22, 62:4, 62:7, 62:11, 62:13, 62:18, 63:4, 63:7, 63:16, 63:22, 63:23, 64:2, 64:7, 64:11, 64:19, 64:21, 64:24, 65:1, 65:3, 74:12, 75:14, 76:3, 76:6, 76:10, 76:13, 76:17, 77:5, 77:9, 77:15, 77:17, 78:4, 78:7, 78:23, 79:3, 79:8, 79:13, 79:18, 79:20
**JURY** [1] - 1:9
**Justesen** [1] - 2:9
**justice** [2] - 51:14, 65:15
**justified** [1] - 74:4

## K

**keep** [18] - 24:11, 26:22, 29:12, 29:14, 29:16, 32:14, 32:15, 33:1, 33:5, 33:6, 44:24, 46:15, 51:4, 67:19
**keeping** [2] - 16:19, 31:3
**kept** [9] - 21:17, 21:22, 23:7, 24:2, 24:14, 31:4, 32:6, 33:20, 49:14
**key** [2] - 36:22, 49:24
**kind** [12] - 35:24, 40:5, 40:21, 41:17, 42:18, 44:10, 45:23, 45:25, 48:3, 54:14, 64:2
**kinds** [1] - 63:11
**knowledge** [2] - 48:4, 66:11
**known** [3] - 22:7,

47:10, 70:7

## L

**label** [1] - 2:19
**lack** [1] - 51:16
**ladies** [12] - 15:2, 15:20, 34:22, 39:13, 52:14, 57:9, 57:16, 57:22, 61:13, 76:5, 78:6, 79:8
**lanes** [1] - 11:20
**language** [2] - 46:6, 75:11
**lapel** [1] - 58:7
**lapse** [1] - 67:23
**last** [7] - 5:2, 8:12, 19:8, 32:12, 61:23, 62:11, 62:13
**lasts** [1] - 17:4
**law** [13] - 5:13, 10:24, 19:3, 28:6, 47:1, 60:9, 65:2, 65:8, 65:9, 65:11, 65:14, 65:17, 66:1
**Law** [2] - 1:14, 2:7
**lawyer** [2] - 20:25, 77:9
**lawyers** [4] - 65:22, 75:24, 78:21, 79:9
**lawyers'** [2] - 46:25, 77:6
**LAZARO** [1] - 1:17
**LEA** [1] - 1:13
**leading** [1] - 24:22
**lease** [20] - 18:8, 18:9, 18:10, 18:18, 20:9, 24:24, 24:25, 28:10, 28:24, 29:4, 29:5, 42:3, 42:15, 43:4, 43:6, 43:9, 45:11, 45:25, 55:10, 55:17
**leased** [1] - 18:4
**leasing** [1] - 18:21
**least** [3] - 9:23, 38:16, 55:18
**leave** [3] - 46:11, 50:10, 52:19
**led** [1] - 39:20
**ledger** [3] - 21:3, 25:8, 25:10
**LEE** [1] - 1:14
**left** [2] - 8:5, 62:10
**legal** [3] - 33:22, 66:15, 81:13
**legally** [1] - 47:6
**lend** [4] - 38:19, 46:7, 46:19
**lender** [1] - 47:8
**lent** [1] - 37:17
**less** [3] - 29:1, 44:17, 63:7
**letter** [1] - 45:20
**letters** [2] - 21:11, 21:13
**letting** [2] - 12:5, 77:10
**liar** [6] - 45:23, 50:9, 62:24, 63:18, 63:21
**liars** [1] - 62:25
**lick** [1] - 38:5
**lie** [1] - 44:23
**life** [1] - 81:13
**likely** [2] - 34:7, 68:8
**limitations** [1] - 30:24
**Lincoln** [1] - 1:15
**line** [15] - 11:16, 12:18, 12:19, 23:19, 23:21, 23:24, 31:6, 32:8, 32:10, 32:16, 33:12, 74:18, 81:12
**lines** [1] - 31:9
**list** [2] - 29:10, 29:14
**listen** [4] - 34:1, 45:21, 49:7, 59:23
**literally** [1] - 22:18
**litigation** [3] - 80:15, 81:2, 81:16
**LLC** [3] - 1:3, 2:3, 56:12
**loan** [14] - 20:4, 30:12, 30:15, 30:22, 31:1, 37:25, 39:12, 39:13, 39:19, 46:14, 47:6, 47:13, 57:8
**loaned** [1] - 37:19
**located** [1] - 47:10
**look** [25] - 5:24, 18:2, 24:4, 27:13, 42:14, 46:3, 47:3, 48:13, 51:3, 55:15, 55:17, 55:19, 55:20, 55:21, 56:7, 59:12, 61:22, 63:25, 76:9, 78:24, 81:19
**looking** [1] - 81:13
**looks** [2] - 3:1, 76:24
**lose** [5] - 39:20, 44:20, 45:17, 53:4, 54:7
**loses** [1] - 9:4
**loss** [4] - 20:21, 25:1, 25:3, 25:5
**losses** [3] - 25:13, 38:16
**lost** [6] - 8:12, 20:14, 21:22, 26:1, 40:12, 55:22
**lounge** [1] - 77:6
**love** [1] - 42:5
**lunch** [1] - 76:12
**lying** [2] - 35:11, 50:6

## M

**Mackiewicz** [1] - 2:7
**MACKIEWICZ** [7] - 1:13, 11:24, 12:3, 62:3, 62:13, 62:16, 82:10
**Madam** [1] - 77:19
**mail** [2] - 28:22, 42:20
**maintain** [1] - 37:9
**maintained** [1] - 21:6
**man** [6] - 38:23, 50:6, 50:12, 54:23, 55:4, 57:20
**Management** [1] - 29:11
**managing** [1] - 56:24
**manner** [1] - 71:22
**Manny** [1] - 2:12
**MANUEL** [1] - 1:17
**Marcus** [1] - 2:11
**MARCUS** [1] - 1:17
**marked** [1] - 56:5
**marshal** [3] - 75:16, 75:20, 77:22
**math** [3] - 8:5, 10:6, 21:1
**matter** [8] - 19:3, 28:6, 35:9, 40:25, 60:9, 66:23, 73:25, 82:15
**mattered** [1] - 18:22
**matters** [2] - 10:24, 66:5
**mea** [1] - 29:18
**mean** [14] - 7:5, 7:7, 7:15, 7:21, 8:25, 31:20, 41:6, 45:7, 51:6, 64:1, 66:18, 67:20, 72:16, 77:6
**meaning** [1] - 60:23
**meaningful** [1] - 15:21
**means** [6] - 10:14, 16:22, 19:4, 44:22, 54:24, 68:6
**meant** [3] - 4:6, 4:7, 42:24
**meet** [9] - 9:24, 14:19, 23:11, 27:2, 42:9, 51:2, 51:12, 51:13, 68:12
**meeting** [1] - 9:22
**meets** [6] - 15:25, 17:5, 22:19, 24:12, 42:6, 68:9
**Melissa** [1] - 2:7
**MELISSA** [1] - 1:13
**member** [1] - 64:4
**members** [2] - 65:1, 74:13
**memorandum** [2] - 31:13, 31:16
**memory** [5] - 49:13, 49:16, 50:16, 67:7, 67:23
**mention** [2] - 14:16, 43:21
**mentioned** [1] - 57:3
**merits** [1] - 63:7
**message** [2] - 75:20, 75:24
**met** [5] - 54:6, 59:21, 60:7, 61:3, 70:10
**methodology** [1] - 6:7
**Miami** [13] - 1:3, 1:16, 1:19, 1:24, 1:25, 16:2, 23:23, 29:10, 44:7, 44:13, 47:11, 82:20, 82:21
**mic** [1] - 58:7
**Michael** [1] - 5:11
**might** [9] - 12:15, 12:20, 18:22, 33:22, 58:20, 58:21, 62:10, 64:6, 64:11
**million** [33] - 5:17, 9:6, 9:9, 17:15, 17:17, 17:18, 17:20, 17:21, 20:4, 20:6, 20:16, 20:20, 21:14, 21:15, 23:19, 23:20, 23:23, 24:5, 25:19, 30:3, 30:5, 30:9, 36:11, 37:23, 41:4, 49:6, 49:7, 49:8, 54:25, 55:1, 55:5
**million-and-a-half-dollar** [1] - 23:20
**mind** [6] - 5:1, 29:3, 44:25, 51:5, 67:19, 69:24
**minimum** [1] - 49:8
**minus** [2] - 41:7, 55:1
**minute** [5] - 36:12, 39:18, 61:21, 79:19, 81:18
**minutes** [4] - 34:17, 61:16, 79:4, 79:12
**Mirmelli** [69] - 2:9, 6:22, 16:21, 20:1, 26:4, 30:12, 30:15, 30:18, 31:23, 36:4, 36:5, 36:9, 36:16, 36:18, 37:8, 37:12, 37:14, 37:15, 37:17, 37:19, 37:25, 38:9, 38:12, 38:22, 39:6, 39:10, 39:13, 39:20, 40:13, 41:18, 41:20, 41:23, 41:25, 42:3, 42:10, 43:6, 44:2, 44:9, 44:12, 45:7, 45:20, 45:22, 47:7, 48:20, 48:25, 49:5, 49:24, 50:9, 51:19, 52:8, 52:14, 52:19, 54:15, 54:16, 55:16, 56:2, 56:8, 56:21, 57:9, 57:13, 57:19, 57:21, 57:23, 58:12, 62:25, 63:13, 63:21
**Mirmelli's** [3] - 37:20, 50:15, 51:25
**misdirected** [1] - 41:24
**mislead** [5] - 41:12, 42:25, 44:16, 50:6, 63:23
**misled** [2] - 41:23, 42:13
**missing** [1] - 31:19
**misstated** [1] - 67:22
**misstatement** [1] - 67:25
**mistake** [1] - 67:19
**mistakes** [1] - 15:1
**model** [2] - 38:14, 40:2
**modification** [5] - 11:8, 13:9, 19:4, 28:7, 71:13
**modifications** [1] - 28:8
**modified** [5] - 19:2, 71:11, 71:12, 71:18, 71:21
**modify** [2] - 71:14, 71:17
**moment** [1] - 26:3
**money** [48] - 17:8, 17:11, 20:14, 21:21, 21:22, 22:11, 23:7, 23:20, 24:14, 26:1, 26:23, 31:4, 32:4, 32:7, 33:21, 34:4, 37:4, 37:18, 37:19, 37:20, 38:2, 38:4, 38:10, 38:14, 38:19, 38:24, 39:1, 39:2, 40:3, 40:24, 43:2, 45:10, 46:9, 46:13, 46:14, 49:9, 49:12, 54:16, 55:1, 57:13, 57:15, 70:17, 74:1, 74:4, 74:8
**monies** [1] - 70:12
**monster** [1] - 35:10
**month** [9] - 18:12, 28:10, 37:11, 39:11,

43:9, 45:4, 45:6
**month-to-month** [2] - 18:12, 28:10
**months** [1] - 81:16
**morning** [5] - 2:6, 2:11, 2:14, 2:15, 15:16
**most** [2] - 26:5, 33:24
**mostly** [1] - 50:1
**motion** [8] - 10:20, 13:1, 13:6, 80:5, 80:11, 80:17, 81:3, 81:23
**motions** [1] - 80:1
**mouth** [1] - 64:12
**move** [4] - 6:8, 47:1, 75:5, 80:8
**moved** [3] - 28:21, 44:6, 44:7
**moving** [1] - 50:18
**MR** [79] - 2:6, 2:11, 2:14, 2:23, 2:24, 3:11, 3:14, 3:18, 3:22, 4:1, 4:4, 4:11, 4:13, 4:17, 4:21, 4:25, 5:4, 6:6, 6:21, 7:17, 7:24, 8:15, 9:2, 9:8, 9:18, 9:20, 10:7, 11:3, 12:7, 12:10, 13:5, 13:11, 13:14, 13:17, 13:25, 14:9, 14:13, 14:16, 14:23, 14:25, 15:7, 15:9, 15:13, 15:19, 25:7, 32:10, 34:19, 34:21, 36:7, 36:9, 46:16, 46:18, 46:23, 47:2, 55:24, 56:1, 58:8, 58:9, 61:20, 62:15, 62:17, 62:20, 63:17, 63:20, 63:24, 64:3, 64:8, 64:13, 64:22, 76:20, 76:23, 78:5, 79:6, 79:25, 80:8, 80:12, 82:5, 82:7, 82:8
**MS** [6] - 11:24, 12:3, 62:3, 62:13, 62:16, 82:10
**mud** [1] - 58:10
**must** [25] - 52:23, 55:20, 65:2, 65:5, 65:6, 65:8, 65:9, 65:10, 65:12, 65:14, 66:17, 66:18, 67:22, 69:17, 69:18, 69:20, 69:22, 70:25, 71:12, 71:15, 72:3, 72:25, 73:6, 73:14, 73:25

## N

**name** [1] - 11:2
**names** [1] - 10:24
**Nanette** [1] - 2:13
**Nathan** [14] - 18:11, 19:1, 19:7, 28:9, 28:12, 28:17, 28:21, 28:22, 29:12, 29:16, 43:1, 48:20, 50:17, 53:13
**National** [1] - 30:21
**naturally** [2] - 67:21, 74:10
**nauseam** [2] - 44:2, 54:13
**necessarily** [2] - 66:23, 82:1
**necessary** [4] - 13:8, 13:11, 13:16, 80:2
**need** [14] - 2:18, 13:10, 13:12, 13:23, 18:15, 40:8, 43:16, 62:7, 64:14, 79:3, 80:5, 81:10, 81:11, 81:19
**needed** [3] - 5:18, 10:2, 62:5
**needing** [1] - 8:10
**negative** [3] - 54:25, 55:1, 55:4
**net** [8] - 16:11, 17:24, 24:19, 40:12, 41:5, 41:7, 54:25
**never** [4] - 22:8, 31:1, 31:2, 69:18
**new** [2] - 13:20, 80:17
**next** [4] - 31:7, 50:18, 75:2, 81:20
**NIELSEN** [20] - 1:17, 2:11, 2:24, 6:21, 7:17, 7:24, 8:15, 9:2, 9:8, 9:20, 10:7, 11:3, 12:7, 12:10, 13:25, 64:22, 76:23, 80:8, 80:12, 82:7
**Nielsen** [1] - 20:24
**Nielson** [1] - 2:11
**night** [1] - 5:2
**NO** [1] - 1:2
**nobody** [1] - 2:17
**none** [4] - 11:9, 51:24, 51:25, 75:8
**nonsensical** [3] - 41:21, 42:24, 45:9
**North** [2] - 1:24, 82:20
**note** [11] - 30:13, 30:24, 30:25, 46:5, 55:13, 55:20, 62:21, 62:23, 76:4, 77:14
**notes** [1] - 35:12
**nothing** [7] - 20:23, 36:1, 50:11, 57:10, 61:3, 64:18, 79:25
**notice** [53] - 3:9, 3:10, 3:12, 3:23, 3:24, 4:2, 4:6, 8:1, 8:3, 8:4, 8:7, 8:9, 8:10, 8:14, 8:17, 8:21, 9:13, 9:24, 10:1, 10:13, 10:21, 10:23, 14:6, 17:12, 17:13, 18:18, 18:25, 19:7, 19:9, 24:13, 28:13, 28:15, 28:16, 28:17, 29:3, 29:6, 32:13, 33:8, 33:9, 33:10, 33:13, 33:14, 35:14, 42:21, 44:9, 45:8, 54:13, 54:15, 58:22
**noticed** [1] - 22:23
**notices** [8] - 33:17, 33:19, 42:22, 43:25, 44:4, 44:5, 44:6, 44:12
**notify** [2] - 3:24, 8:23
**number** [3] - 5:19, 18:3, 66:22
**numbers** [2] - 41:2, 49:7
**numerous** [1] - 8:1
**nutshell** [1] - 46:5

## O

**objection** [17] - 2:23, 2:24, 5:15, 6:18, 7:17, 11:20, 12:4, 12:8, 12:13, 15:1, 36:7, 46:16, 46:23, 55:24, 63:4, 64:20, 76:23
**objections** [3] - 3:5, 12:10, 62:21
**obligation** [2] - 26:19, 27:2
**obligations** [6] - 24:20, 26:19, 29:21, 29:24, 72:20, 72:24
**obliterated** [1] - 6:5
**observe** [1] - 67:9
**obviously** [4] - 11:19, 49:11, 80:1, 80:5
**occurred** [3] - 23:10, 71:6, 72:9
**October** [1] - 1:4
**odd** [1] - 47:24
**OF** [1] - 1:1
**offer** [1] - 27:15
**offered** [1] - 62:20
**office** [5] - 16:3, 18:24, 44:5, 62:10
**office/apartment** [1] - 44:7
**offices** [3] - 28:21, 42:16, 77:3
**Official** [2] - 1:22, 82:19
**often** [1] - 49:17
**once** [1] - 20:2
**one** [58] - 2:16, 2:25, 6:2, 6:10, 9:3, 12:18, 12:19, 14:24, 15:4, 15:11, 19:7, 19:8, 20:13, 22:12, 27:9, 28:9, 28:23, 29:15, 31:2, 33:17, 35:22, 39:6, 40:18, 41:14, 41:15, 42:7, 42:10, 42:24, 44:15, 45:4, 45:17, 47:25, 48:12, 48:16, 48:23, 48:24, 48:25, 51:18, 53:3, 55:8, 55:9, 55:18, 56:5, 58:16, 61:2, 61:23, 62:5, 62:20, 67:1, 68:15, 69:6, 69:22, 74:12, 75:11, 76:2, 76:18, 81:17
**ones** [1] - 25:19
**opening** [4] - 16:16, 16:18, 18:13, 20:24
**operate** [2] - 18:15, 32:5
**operating** [2] - 18:11, 28:2
**operation** [1] - 18:15
**operations** [4] - 18:14, 24:21, 25:4, 59:5
**opinion** [2] - 65:25, 69:24
**OPM** [1] - 38:14
**opportunities** [1] - 16:22
**opportunity** [7] - 16:1, 16:23, 24:17, 27:23, 58:25, 63:5, 67:8
**opposing** [2] - 64:4, 80:16
**opposite** [1] - 10:17
**oral** [4] - 13:9, 28:7, 71:19
**order** [3] - 2:1, 19:12, 78:25
**original** [1] - 71:10
**Osoria** [1] - 2:8
**otherwise** [3] - 6:9, 7:22, 63:18
**outcome** [2] - 49:10, 67:5
**outsourced** [1] - 7:3
**overruled** [3] - 36:8, 46:17, 55:25
**overview** [1] - 47:15
**owe** [3] - 43:2, 45:10, 45:11
**owed** [4] - 9:10, 22:15, 39:24, 70:13
**owes** [1] - 70:16
**own** [6] - 21:4, 38:20, 57:10, 63:15, 66:3, 66:4
**owned** [1] - 16:3
**ownership** [3] - 17:14, 17:22, 18:14
**owning** [1] - 28:3
**owns** [1] - 23:24

## P

**p.m** [13] - 1:5, 61:19, 61:24, 61:25, 64:24, 76:13, 77:12, 77:13, 77:17, 79:20, 79:22, 82:12
**page** [10] - 6:18, 24:5, 27:6, 31:6, 31:7, 31:9, 32:8, 32:9, 33:11, 76:15
**Pages** [1] - 1:7
**paid** [9] - 18:7, 28:24, 30:18, 30:19, 37:14, 45:6, 45:10, 55:4, 55:18
**paper** [1] - 38:24
**papers** [1] - 42:8
**paragraph** [10] - 6:19, 36:23, 36:24, 37:7, 42:7, 42:10, 43:4, 43:10, 44:1, 45:1
**paragraphs** [1] - 27:18
**paralegals** [2] - 2:8, 3:2
**PARDO** [41] - 1:13, 2:6, 2:23, 3:11, 3:14, 3:18, 3:22, 4:1, 4:4, 4:11, 4:13, 4:17, 4:21, 4:25, 5:4, 6:6, 9:18, 13:5, 13:11, 13:14, 13:17, 15:19, 25:7, 32:10, 36:7, 46:16, 46:23, 55:24, 58:9, 61:20, 62:15, 62:17, 62:20, 63:17, 63:24, 64:3, 64:8, 76:20, 78:5, 79:25, 82:5
**Pardo** [18] - 1:14, 2:6, 3:6, 6:16, 7:21, 9:17, 15:8, 35:4, 35:12,

40:16, 41:19, 42:6, 46:2, 47:22, 63:21, 63:22
**Pardo's** [1] - 5:5
**parent** [1] - 44:21
**Park** [1] - 29:11
**park** [1] - 56:3
**Parker** [1] - 1:18
**parking** [5] - 16:2, 25:3, 36:10, 55:2, 59:6
**Parking** [4] - 24:23, 24:25, 29:11
**part** [14] - 11:15, 15:21, 16:5, 35:17, 37:7, 37:10, 42:2, 52:4, 53:13, 66:22, 68:3, 68:22, 72:17
**participation** [8] - 16:7, 22:5, 22:15, 54:20, 54:22, 55:10, 56:2, 57:1
**Participation** [38] - 7:13, 15:24, 16:25, 18:17, 19:10, 19:15, 21:7, 21:24, 23:6, 24:8, 24:20, 26:15, 26:21, 27:12, 27:20, 28:1, 29:5, 31:8, 31:11, 31:17, 31:22, 32:20, 32:23, 33:4, 36:15, 51:9, 55:16, 59:7, 60:11, 70:7, 70:12, 70:16, 70:20, 70:22, 73:18, 74:17, 74:22, 77:24
**particular** [9] - 9:3, 35:18, 41:19, 45:16, 48:21, 49:5, 56:5, 66:22, 67:3
**particularly** [1] - 81:7
**parties** [11] - 13:8, 16:24, 27:1, 28:2, 71:13, 71:14, 71:20, 71:21, 73:5, 75:24, 79:9
**parties'** [3] - 71:18, 71:20, 72:11
**partner** [1] - 16:23
**partnership** [1] - 31:12
**parts** [2] - 72:17, 72:18
**party** [2] - 65:12, 71:22
**passion** [1] - 26:6
**patience** [1] - 76:5
**patient** [1] - 75:25
**Patrick** [2] - 2:9, 32:14
**pay** [21] - 3:25, 4:3, 4:6, 21:10, 29:1, 36:11, 37:10, 37:22, 38:4, 39:11, 39:18, 45:3, 45:12, 45:13, 46:8, 46:9, 46:14, 46:20, 55:3, 57:8
**paying** [1] - 70:12
**payment** [8] - 9:6, 9:8, 9:9, 20:16, 28:20, 30:9, 39:17, 43:10
**payments** [2] - 28:24, 39:16
**penalty** [1] - 22:12
**pending** [1] - 13:6
**penny** [2] - 24:2, 38:5
**people** [7] - 2:25, 40:2, 44:24, 48:13, 65:16, 67:21, 77:8
**people's** [1] - 38:14
**percent** [20] - 5:4, 9:4, 9:10, 16:11, 17:16, 18:1, 18:19, 18:20, 18:21, 19:21, 20:19, 22:25, 24:18, 32:4, 40:7, 42:11, 54:21, 70:9
**perfect** [1] - 12:1
**perfectly** [1] - 31:3
**perform** [4] - 27:3, 53:9, 73:10, 73:11
**performance** [4] - 23:10, 31:24, 71:6, 72:8
**perhaps** [1] - 36:23
**peril** [2] - 63:10, 63:15
**period** [3] - 42:1, 45:5, 45:19
**perjury** [1] - 22:12
**person** [4] - 29:16, 45:24, 66:10, 71:15
**personal** [12] - 7:3, 26:3, 30:12, 30:15, 41:19, 49:10, 54:19, 55:5, 62:23, 64:3, 67:5, 79:19
**personality** [1] - 40:1
**personally** [2] - 7:5, 79:13
**persons** [1] - 65:14
**persuade** [1] - 68:7
**petition** [1] - 81:11
**phone** [1] - 77:7
**phones** [2] - 79:5, 79:11
**phrase** [1] - 6:16
**piece** [1] - 38:1
**place** [1] - 38:8
**plaintiff** [39] - 2:5, 2:23, 6:6, 7:11, 9:10, 35:8, 50:20, 52:23, 62:12, 62:14, 70:6, 70:11, 70:13, 70:14, 70:16, 70:18, 70:25, 71:1, 71:3, 71:9, 71:10, 71:12, 71:16, 71:25, 72:2, 72:4, 72:6, 72:13, 72:22, 73:1, 73:4, 73:12, 73:16, 73:19, 73:21, 73:24, 74:21, 76:20, 82:3
**Plaintiff** [17] - 1:4, 68:2, 68:7, 68:9, 68:11, 68:12, 68:14, 68:23, 69:2, 69:9, 69:14, 69:15, 70:8, 70:20, 70:21, 70:22, 73:8
**PLAINTIFF** [1] - 1:13
**Plaintiff's** [10] - 15:23, 18:8, 19:15, 23:18, 24:4, 24:23, 25:6, 27:5, 27:17, 31:23
**plaintiff's** [2] - 8:2, 50:8
**plaintiffs** [2] - 79:24, 81:18
**play** [1] - 11:6
**Plaza** [1] - 30:10
**pleadings** [1] - 13:6
**PLLC** [2] - 1:14, 2:7
**point** [5] - 10:5, 12:15, 60:4, 66:23, 80:18
**poll** [1] - 78:4
**portfolio** [1] - 29:10
**portion** [1] - 45:2
**portions** [1] - 43:22
**position** [10] - 8:2, 8:9, 34:2, 34:4, 36:21, 54:3, 59:22, 59:24, 73:22, 74:9
**positively** [2] - 53:8, 73:9
**possibility** [1] - 57:5
**possible** [1] - 75:22
**posttrial** [4] - 6:8, 79:3, 80:1, 81:2
**posture** [1] - 58:20
**powerful** [1] - 10:12
**precedent** [2] - 9:22, 9:25
**preferential** [1] - 41:3
**preferred** [4] - 22:20, 22:21, 22:22, 23:13
**prejudice** [2] - 6:8, 65:7
**prejudiced** [1] - 64:11
**prepare** [1] - 3:1
**prepared** [2] - 74:15, 80:4
**preponderance** [15] - 34:6, 51:13, 51:15, 60:2, 68:4, 68:6, 68:10, 68:13, 68:18, 68:23, 69:3, 69:4, 69:11, 74:2, 74:5
**present** [1] - 51:17
**presented** [7] - 35:21, 40:14, 47:18, 50:24, 51:16, 53:23, 65:6
**presents** [1] - 34:10
**pretty** [7] - 36:3, 36:9, 37:9, 37:15, 41:4, 47:14, 50:8
**pretzel** [2] - 37:16, 44:3
**prevail** [5] - 52:21, 57:24, 69:3, 69:10, 69:16
**previewed** [1] - 16:16
**previously** [1] - 63:8
**price** [3] - 17:7, 17:8, 23:19
**principal** [2] - 26:4, 42:16
**printed** [1] - 11:25
**privilege** [1] - 52:4
**privileges** [1] - 49:3
**problem** [2] - 14:3, 19:8
**problematic** [1] - 12:18
**proceed** [4] - 34:19, 64:22, 74:24, 75:2
**proceedings** [1] - 82:15
**proceeds** [8] - 17:16, 17:20, 21:21, 23:15, 24:1, 63:10, 63:15
**process** [3] - 40:21, 46:1, 82:1
**procuring** [1] - 18:21
**produced** [1] - 68:21
**professionalism** [1] - 64:10
**proffered** [2] - 6:21, 9:5
**profit** [14] - 8:18, 16:7, 22:5, 22:15, 24:19, 25:1, 25:3, 25:5, 40:4, 40:5, 41:5, 41:7, 51:10
**Profit** [38] - 7:13, 15:24, 16:25, 18:17, 19:10, 19:15, 21:7, 21:24, 23:6, 24:8, 24:20, 26:15, 26:20, 27:12, 27:20, 28:1, 29:5, 31:8, 31:10, 31:16, 31:22, 32:20, 32:23, 33:4, 36:15, 51:9, 55:15, 59:6, 60:11, 70:7, 70:12, 70:15, 70:20, 70:22, 73:17, 74:16, 74:21, 77:23
**profitable** [1] - 24:22
**profits** [15] - 3:15, 8:5, 8:25, 16:11, 17:25, 18:14, 20:22, 23:16, 24:9, 40:12, 58:18, 58:24, 59:2, 70:9
**promise** [3] - 16:17, 46:8, 46:9
**promised** [3] - 39:11, 39:12, 57:8
**promises** [7] - 38:20, 38:21, 39:6, 39:10, 39:14, 39:20, 42:2
**promissory** [5] - 30:13, 46:5, 55:13, 55:20, 62:21
**promote** [4] - 16:7, 18:19, 23:1, 29:7
**promptly** [1] - 75:21
**proof** [6] - 50:21, 66:13, 68:5, 68:9, 68:12, 68:22
**properly** [1] - 22:23
**property** [63] - 6:17, 6:20, 6:23, 7:6, 7:7, 7:9, 7:15, 8:18, 17:4, 17:14, 17:15, 17:20, 17:22, 18:4, 18:21, 19:20, 20:8, 20:9, 20:22, 21:14, 21:15, 22:10, 23:11, 23:12, 24:9, 24:23, 27:10, 27:15, 27:24, 28:3, 28:5, 30:3, 30:4, 31:4, 33:24, 35:16, 35:17, 36:19, 37:4, 37:9, 37:23, 38:1, 38:4, 39:15, 39:21, 46:21, 47:9, 53:24, 54:1, 55:14, 55:23, 56:3, 56:13, 56:22, 57:10, 58:15, 58:17, 59:2, 59:8, 70:8, 70:10, 70:13, 70:17
**proposed** [1] - 63:8
**proposing** [1] - 4:14
**prove** [42] - 9:12, 10:8, 14:21, 19:12, 23:9, 24:6, 24:16, 40:15, 40:19, 50:21, 50:22, 51:2, 51:5, 51:6, 51:7, 51:20, 51:23, 52:4, 52:5, 52:6, 52:7, 52:13, 52:15,

52:17, 52:22, 52:23, 53:2, 53:22, 59:25, 60:1, 60:3, 63:18, 66:14, 68:3, 70:25, 71:12, 72:3, 72:25, 73:6, 73:14
**proved** [2] - 8:13, 68:17
**proven** [6] - 40:13, 50:24, 51:22, 52:3, 53:3, 54:4
**proves** [3] - 69:2, 69:4, 69:11
**provide** [1] - 51:1
**provided** [2] - 54:19, 54:21
**provides** [1] - 41:9
**proving** [3] - 40:18, 40:22, 51:2
**provision** [1] - 4:19
**pull** [9] - 19:14, 23:17, 24:23, 25:7, 27:12, 30:16, 31:5, 31:22, 32:8
**pulled** [2] - 33:4, 33:5
**purchase** [9] - 17:7, 17:8, 19:20, 19:24, 27:6, 27:8, 27:10, 27:14, 70:7
**purported** [1] - 25:12
**purportedly** [1] - 21:4
**purposes** [1] - 13:21
**pursuant** [1] - 20:16
**pursue** [1] - 80:21
**pushed** [1] - 33:10
**put** [22] - 2:17, 17:7, 17:8, 19:25, 20:1, 32:3, 32:4, 36:13, 38:5, 38:6, 39:17, 42:3, 46:3, 48:7, 48:9, 49:25, 50:1, 56:4, 56:15, 57:16, 62:2, 74:8
**putting** [1] - 55:13

## Q

**qualify** [1] - 47:21
**Queen** [1] - 26:4
**questions** [7] - 48:9, 49:20, 49:23, 50:1, 50:4, 66:25, 67:10
**quick** [1] - 31:7
**quite** [3] - 7:10, 19:4, 41:11

## R

**raised** [7] - 14:10, 30:11, 51:4, 51:6, 51:7, 51:8, 73:13
**raises** [1] - 69:9
**rank** [1] - 7:2
**rather** [2] - 16:5, 47:24
**reach** [6] - 30:2, 41:7, 58:14, 66:7, 69:22, 76:8
**reached** [1] - 58:20
**read** [14] - 2:21, 7:10, 43:13, 43:16, 43:18, 47:5, 47:19, 52:11, 55:7, 56:9, 61:6, 61:14, 76:16, 77:22
**reading** [3] - 48:2, 48:4, 61:16
**ready** [9] - 15:17, 20:10, 21:14, 21:15, 27:3, 61:23, 64:22, 75:16, 80:6
**real** [4] - 31:7, 47:9, 70:3, 70:8
**reality** [2] - 38:1, 38:25
**really** [7] - 6:11, 10:15, 13:21, 36:17, 44:15, 45:1, 50:7
**reason** [8] - 35:20, 40:14, 40:17, 43:4, 43:21, 49:5, 64:15, 67:3
**reasonable** [5] - 16:14, 26:25, 71:15, 72:11, 74:5
**reasoning** [1] - 66:6
**reasons** [4] - 6:12, 27:1, 40:18, 49:9
**rebuttal** [2] - 34:17, 63:6
**receive** [8] - 3:15, 7:25, 18:25, 20:12, 27:22, 42:21, 44:4, 44:9
**received** [3] - 42:20, 44:12, 68:20
**receiving** [1] - 42:19
**recess** [4] - 61:24, 77:11, 77:12, 82:12
**recital** [1] - 37:11
**recitals** [5] - 36:22, 37:7, 37:8, 37:22, 47:5
**recollection** [2] - 50:15, 66:4
**recommend** [1] - 43:13
**reconcile** [1] - 24:12
**reconciliation** [4] - 23:2, 23:12, 25:12, 58:23
**record** [7] - 2:4, 12:5, 12:7, 61:25, 63:24, 77:13, 79:22
**recorded** [1] - 22:2
**records** [3] - 21:4, 25:2, 26:23
**recourse** [1] - 32:2
**recover** [2] - 19:12, 70:24
**red** [4] - 44:15, 54:23, 54:24
**reexamine** [1] - 69:24
**reference** [2] - 28:1, 31:20
**refers** [1] - 31:15
**reflect** [1] - 30:14
**refusal** [6] - 16:10, 22:2, 22:4, 22:17, 24:13, 24:18
**refuse** [1] - 71:22
**regarding** [2] - 54:8, 55:7
**regardless** [2] - 68:19, 68:20
**reinstated** [2] - 30:1, 59:14
**relating** [3] - 30:25, 56:11, 62:20
**relatively** [1] - 77:1
**released** [1] - 23:21
**relevance** [1] - 64:7
**relevant** [1] - 50:4
**reliance** [3] - 34:2, 54:3, 73:21
**relied** [3] - 33:25, 54:2, 73:19
**remain** [2] - 6:23, 76:3
**remained** [1] - 20:7
**remaining** [2] - 34:16, 45:11
**remember** [10] - 12:9, 19:25, 37:12, 47:17, 49:18, 49:19, 50:21, 59:25, 67:21, 70:3
**remembers** [1] - 67:20
**remind** [3] - 42:14, 43:5, 60:23
**reminded** [2] - 47:16, 49:14
**remove** [2] - 13:6, 13:23
**removing** [1] - 6:18
**renew** [1] - 43:6
**rent** [12] - 18:6, 18:7, 21:10, 24:24, 28:20, 28:24, 45:3, 45:6, 45:11, 55:3, 55:4, 55:18
**repay** [3] - 39:12, 39:25, 47:13
**repeat** [2] - 8:12, 57:3
**replace** [1] - 19:24
**replaced** [1] - 20:2
**report** [2] - 29:18, 56:18
**REPORTED** [1] - 1:21
**reported** [3] - 17:21, 24:5, 53:18
**Reporter** [2] - 1:22, 82:19
**reports** [5] - 56:16, 56:19, 59:11, 59:13
**representation** [1] - 56:8
**representations** [3] - 27:6, 27:7, 27:16
**representative** [1] - 2:9
**represented** [1] - 27:8
**represents** [1] - 47:8
**repudiation** [1] - 69:1
**requesting** [1] - 62:17
**require** [1] - 15:1
**required** [12] - 19:18, 23:10, 24:7, 27:9, 52:9, 52:17, 54:20, 71:4, 71:5, 71:8, 72:7, 72:8
**requires** [1] - 63:9
**reserve** [2] - 34:16, 80:1
**resolution** [2] - 22:9, 82:1
**resolved** [2] - 22:3, 80:19
**respect** [3] - 63:12, 80:17
**respectfully** [3] - 35:11, 48:2, 63:17
**respective** [1] - 77:2
**respond** [3] - 63:19, 75:21, 75:24
**response** [2] - 76:1, 79:1
**responsibilities** [1] - 49:3
**responsibility** [6] - 29:12, 39:4, 40:7, 41:25, 52:4, 68:2
**responsible** [5] - 21:25, 22:2, 28:23, 29:16, 65:17
**responsive** [1] - 50:4
**rest** [1] - 38:4
**result** [2] - 57:23, 74:11
**resulted** [1] - 70:14
**retrial** [3] - 6:8, 6:11, 6:13
**retry** [1] - 12:17
**return** [8] - 22:20, 22:21, 22:22, 23:14, 35:1, 41:3, 59:3, 75:17
**returned** [1] - 20:3
**returns** [4] - 17:21, 24:4, 35:25, 53:21
**review** [1] - 43:24
**revision** [1] - 50:17
**Richards** [1] - 1:18
**rid** [1] - 9:1
**rights** [30] - 3:10, 3:13, 7:5, 7:12, 7:16, 7:25, 9:13, 9:25, 10:14, 10:21, 14:6, 18:16, 19:20, 22:2, 22:5, 22:17, 22:25, 23:1, 29:6, 29:7, 29:21, 29:24, 33:2, 36:5, 47:9, 59:6, 72:20, 73:17, 80:1
**risk** [2] - 38:14, 40:3
**RMR** [2] - 1:22, 82:18
**Road** [1] - 1:15
**road** [7] - 15:25, 17:5, 22:19, 23:11, 24:12, 42:6, 42:10
**room** [11] - 34:5, 46:12, 50:10, 65:3, 74:12, 76:3, 76:6, 76:17, 77:5, 79:13, 82:2
**rooms** [1] - 77:4
**Roth** [1] - 29:13
**round** [1] - 81:15
**RPR** [1] - 1:22
**rubber** [7] - 15:24, 17:5, 22:19, 23:11, 24:12, 42:6, 42:9
**rule** [3] - 38:13, 48:11, 50:20
**rules** [14] - 47:19, 47:22, 47:23, 47:24, 48:1, 48:5, 48:6, 48:12, 48:21, 53:4, 55:6, 64:9, 65:2
**run** [3] - 36:10, 39:7, 55:2
**running** [1] - 39:15

## S

**sale** [24] - 8:20, 8:24, 17:16, 17:20, 20:22, 21:21, 23:11, 23:12, 23:15, 23:19, 24:1, 24:9, 24:22, 27:6, 27:8, 27:10, 27:14, 38:11, 58:19, 70:9, 70:13, 70:17
**sand** [1] - 45:12
**Savannah** [1] - 2:7

**SAVANNAH** [1] - 1:14
**saw** [3] - 18:6, 29:9, 29:14
**scales** [1] - 51:14
**schedule** [2] - 81:22, 81:24
**scintilla** [1] - 51:24
**scope** [1] - 65:18
**screaming** [1] - 45:7
**screen** [1] - 19:15
**scroll** [1] - 25:8
**SE** [1] - 1:18
**seated** [5] - 2:16, 61:20, 64:25, 77:18, 79:23
**second** [8] - 5:19, 6:1, 26:11, 28:12, 33:16, 55:10, 63:3, 63:9
**secret** [1] - 69:18
**Section** [10] - 22:18, 24:10, 26:20, 31:22, 31:23, 33:5, 40:11
**section** [2] - 45:16, 47:5
**Sections** [1] - 72:11
**secure** [2] - 38:3
**secured** [1] - 36:6
**secures** [1] - 37:25
**security** [1] - 47:6
**see** [17] - 6:16, 13:19, 21:1, 26:10, 28:1, 29:17, 31:15, 31:19, 40:6, 58:1, 60:14, 60:19, 63:25, 78:21, 80:14, 80:20, 81:12
**seek** [1] - 70:4
**seem** [2] - 49:13, 67:7
**Seidler** [25] - 2:13, 17:3, 17:17, 20:12, 21:3, 21:23, 24:21, 25:11, 27:18, 30:13, 30:15, 31:8, 31:10, 32:11, 35:17, 36:4, 36:5, 36:10, 36:17, 37:3, 37:13, 37:22, 38:4, 40:24, 42:21
**Seidler's** [2] - 33:15, 50:16
**sell** [2] - 22:10, 59:1
**seller's** [4] - 17:19, 23:25, 27:7, 27:17
**selling** [2] - 27:15, 38:1
**send** [20] - 8:14, 8:17, 9:13, 16:11, 20:13, 28:15, 28:16, 28:18, 28:19, 28:22, 30:2, 32:13, 32:17, 33:8, 33:9, 33:13, 76:4, 76:17
**sending** [4] - 21:13, 30:9, 42:22, 42:23
**sense** [7] - 10:12, 12:16, 41:6, 44:16, 46:12, 66:7, 72:18
**sent** [10] - 19:6, 28:25, 29:3, 29:16, 42:22, 44:4, 44:5, 44:6, 53:19, 58:22
**separate** [2] - 18:8, 18:16
**separately** [2] - 68:16, 69:7
**series** [1] - 2:20
**service** [1] - 79:10
**set** [6] - 5:20, 47:8, 62:11, 62:13, 76:10, 76:11
**settlement** [3] - 20:16, 20:17, 30:9
**seven** [1] - 21:11
**seventh** [1] - 77:5
**shake** [3] - 57:14, 57:15, 57:20
**shall** [4] - 45:4, 45:5, 45:18
**share** [2] - 32:3, 46:21
**shared** [1] - 76:3
**shines** [1] - 26:6
**shortcut** [1] - 10:25
**show** [10] - 6:22, 16:17, 16:18, 19:4, 19:17, 21:4, 21:6, 21:7, 25:2, 33:23
**showed** [10] - 16:18, 16:20, 22:14, 22:21, 22:23, 28:8, 34:13, 53:15, 59:3, 59:9
**showing** [1] - 43:21
**shown** [2] - 11:1, 59:22
**shows** [2] - 17:24, 74:2
**shrewd** [1] - 58:22
**side** [1] - 77:10
**sidebar** [3] - 78:21, 78:22, 79:7
**sides** [1] - 77:8
**sight** [1] - 44:20
**sign** [3] - 74:23, 75:4, 75:16
**signed** [6] - 22:9, 22:11, 42:3, 45:21, 77:15
**significance** [1] - 67:24
**significant** [2] - 38:16, 72:7
**signing** [1] - 27:13
**simple** [4] - 35:9, 35:10, 67:19, 81:23
**simpler** [1] - 36:2
**simply** [3] - 37:1, 68:6, 70:2
**sincerely** [1] - 30:20
**sincerity** [1] - 61:4
**single** [2] - 19:9, 65:10
**sitting** [1] - 21:20
**six** [1] - 81:16
**skin** [1] - 38:12
**skipping** [1] - 43:11
**slack** [1] - 39:4
**slide** [1] - 13:22
**slow** [1] - 9:7
**small** [1] - 2:16
**smarter** [1] - 5:11
**smells** [1] - 57:13
**Smith** [1] - 2:13
**sold** [12] - 8:18, 17:4, 17:15, 17:20, 28:5, 30:4, 31:4, 35:16, 35:17, 36:19, 58:16, 59:8
**solely** [1] - 65:5
**sometimes** [2] - 65:4, 68:4
**son** [3] - 44:21, 44:23, 44:24
**sorry** [7] - 11:9, 12:9, 12:11, 52:22, 56:16, 62:15, 64:20
**sort** [4] - 7:3, 12:13, 49:17, 81:24
**sounds** [2] - 34:3, 47:23
**Southeast** [1] - 47:10
**Southern** [2] - 1:24, 82:20
**SOUTHERN** [1] - 1:1
**speaker** [1] - 26:5
**specific** [4] - 13:7, 41:2, 56:1, 69:11
**specifically** [1] - 3:14
**spend** [1] - 81:12
**spent** [1] - 43:18
**square** [1] - 16:3
**STAFF** [2] - 25:6, 32:9
**staff** [1] - 3:3
**stage** [1] - 37:24
**stake** [1] - 41:13
**stand** [6] - 4:23, 19:1, 19:2, 19:8, 37:15, 65:14
**standard** [2] - 34:6, 60:3
**standing** [1] - 6:3
**start** [6] - 7:22, 32:15, 35:2, 36:23, 40:20, 58:10
**starting** [1] - 2:5
**State** [2] - 56:17, 56:20
**state** [1] - 2:4
**statement** [7] - 16:16, 20:24, 22:13, 23:4, 23:18, 25:2, 34:24
**statements** [6] - 7:12, 30:20, 44:17, 53:23, 65:18, 73:16
**STATES** [2] - 1:1, 1:10
**States** [2] - 1:23, 82:19
**statute** [1] - 30:23
**stay** [6] - 11:20, 77:1, 77:2, 77:3, 77:6, 81:3
**STENOGRAPHICALLY** [1] - 1:21
**steps** [1] - 75:12
**Stewart** [7] - 16:21, 18:23, 20:1, 37:14, 37:15, 37:19, 44:2
**Stewart's** [3] - 44:5, 44:6, 44:21
**stick** [1] - 45:12
**still** [19] - 2:18, 3:25, 4:2, 4:10, 4:23, 5:9, 6:16, 11:10, 11:13, 13:1, 13:23, 13:25, 18:18, 23:24, 26:16, 29:5, 49:20, 76:15
**stipulation** [2] - 12:6, 62:1
**stipulations** [4] - 2:17, 2:18, 2:20, 11:22
**stop** [1] - 23:7
**stopped** [3] - 39:15, 56:19, 56:24
**stopping** [1] - 56:2
**story** [1] - 26:5
**straightforward** [2] - 36:3, 37:2
**streamlined** [1] - 80:25
**street** [1] - 16:4
**Street** [2] - 1:18, 47:10
**stretch** [2] - 61:15, 61:17
**strict** [1] - 13:7
**structured** [1] - 14:4
**Suarez** [1] - 77:15
**submit** [8] - 35:7, 45:22, 49:16, 49:19, 50:12, 52:14, 53:10, 53:25
**submitting** [1] - 81:10
**subsequent** [2] - 71:19, 71:20
**substantially** [5] - 19:17, 52:8, 52:16, 71:3, 72:6
**successful** [1] - 16:5
**sue** [2] - 30:24, 31:1
**sued** [3] - 31:1, 31:2
**suffer** [2] - 25:12, 38:15
**suffered** [1] - 51:25
**sufficient** [1] - 6:22
**suggest** [7] - 37:24, 38:22, 48:2, 48:8, 49:1, 60:4, 66:24
**suggested** [4] - 58:11, 59:10, 63:3, 63:22
**suggesting** [1] - 43:11
**suggestion** [2] - 13:7, 50:13
**suggests** [2] - 48:15, 48:23
**suing** [2] - 49:6, 52:1
**suit** [1] - 62:21
**Suite** [3] - 1:15, 1:19, 42:17
**summarize** [1] - 34:25
**Sunbiz** [3] - 56:16, 59:9, 59:11
**supervise** [1] - 37:9
**supervising** [2] - 39:15, 56:25
**supervision** [1] - 56:3
**support** [1] - 59:22
**supports** [1] - 60:6
**supposed** [2] - 54:9, 54:10
**supposedly** [1] - 54:9
**sustain** [2] - 11:20, 63:4
**swearing** [1] - 22:11
**sympathy** [1] - 65:7

## T

**table** [3] - 21:20, 25:25, 26:1
**tactic** [1] - 58:22
**talks** [12] - 35:19, 37:1, 37:11, 37:25, 38:23, 38:24, 40:6, 40:10, 41:3, 41:20, 42:16
**tax** [6] - 17:21, 24:4, 35:25, 53:21, 56:16, 59:3
**taxable** [1] - 17:23
**technician** [1] - 2:10
**ten** [2] - 17:13, 79:4
**tenancy** [1] - 28:10
**tenant** [3] - 18:12, 45:3, 45:4
**tend** [2] - 66:14, 67:21

**term** [10] - 5:8, 5:19, 17:3, 18:9, 26:14, 26:17, 28:10, 43:4, 45:11, 60:24
**term(s** [1] - 72:15
**terms** [3] - 9:25, 25:14, 71:14
**testified** [12] - 16:21, 16:22, 19:5, 20:11, 20:12, 21:23, 22:7, 28:15, 30:19, 67:9, 67:15
**testify** [2] - 18:11, 21:2
**testifying** [2] - 48:13, 66:22
**testimony** [23] - 24:21, 25:16, 26:6, 27:19, 27:23, 28:9, 28:12, 28:25, 30:23, 31:6, 33:16, 43:5, 44:19, 50:13, 50:14, 59:4, 65:21, 66:10, 66:20, 67:12, 67:18, 68:18
**THE** [88] - 1:9, 1:13, 1:17, 2:2, 2:15, 2:25, 3:12, 3:17, 3:19, 3:23, 4:2, 4:5, 4:12, 4:14, 4:18, 4:22, 5:1, 5:5, 6:10, 6:25, 7:18, 8:12, 8:16, 9:7, 9:11, 9:19, 10:3, 10:8, 11:4, 12:1, 12:4, 12:9, 12:11, 13:10, 13:12, 13:15, 13:18, 14:2, 14:12, 14:15, 14:18, 14:24, 15:6, 15:8, 15:11, 15:14, 15:16, 34:18, 34:20, 36:8, 46:17, 46:24, 55:25, 58:5, 58:6, 61:13, 61:21, 62:1, 62:6, 62:9, 62:10, 62:19, 63:2, 63:19, 64:1, 64:6, 64:14, 64:23, 64:25, 76:14, 76:22, 76:24, 77:14, 77:18, 77:20, 77:21, 78:6, 78:19, 78:23, 79:2, 79:8, 79:21, 79:23, 80:3, 80:10, 80:13, 82:6, 82:9
**themes** [1] - 18:13
**themselves** [3] - 24:15, 32:7, 34:4
**theory** [3] - 19:13, 27:4, 43:8
**therefore** [3] - 10:5, 71:12, 72:23
**third** [4] - 23:9, 45:5, 45:17, 55:19
**thoughts** [1] - 21:18
**three** [15] - 4:23, 6:3, 15:4, 15:11, 53:2, 53:4, 59:17, 59:18, 60:1, 60:14, 60:16, 60:20, 60:22, 61:2, 75:7
**throw** [1] - 35:10
**thrown** [2] - 44:16, 58:10
**tiger** [1] - 38:24
**tinker** [1] - 11:17
**title** [4] - 19:20, 21:25, 22:1, 22:12
**today** [5] - 15:24, 23:24, 58:21, 81:17, 81:18
**together** [5] - 19:2, 48:5, 72:18, 81:20, 81:25
**took** [6] - 16:24, 22:4, 22:5, 32:7, 37:15, 39:12
**top** [2] - 33:11, 36:24
**topic** [1] - 56:4
**totally** [1] - 39:22
**toward** [1] - 17:7
**train** [1] - 36:20
**transcript** [4] - 5:12, 32:8, 63:18, 63:25
**transcription** [1] - 82:15
**transfer** [1] - 47:8
**Transpark** [99] - 2:3, 7:11, 9:4, 16:7, 17:7, 17:12, 17:25, 18:4, 18:10, 18:12, 19:17, 19:19, 19:23, 19:24, 19:25, 20:4, 20:9, 20:10, 20:22, 21:9, 21:12, 21:19, 22:17, 22:24, 23:4, 24:2, 24:16, 28:4, 28:20, 29:15, 30:2, 30:14, 31:2, 32:1, 32:17, 41:20, 41:22, 42:1, 42:16, 51:8, 51:9, 51:10, 52:6, 52:7, 53:7, 53:11, 53:17, 53:23, 54:9, 54:12, 56:11, 56:18, 58:15, 59:14, 59:23, 60:11, 61:3, 61:4, 61:11, 68:3, 68:9, 68:11, 68:12, 68:14, 69:2, 69:16, 70:6, 70:8, 70:11, 70:13, 70:14, 70:16, 70:20, 70:21, 70:23, 70:25, 71:1, 71:3, 71:9, 71:10, 71:12, 71:16, 71:25, 72:3, 72:4, 72:6, 72:13, 72:22, 73:1, 73:4, 73:8, 73:12, 73:16, 73:24, 74:3, 74:9, 74:21
**TRANSPARK** [1] - 1:3
**Transpark's** [20] - 3:15, 16:14, 16:24, 18:16, 18:20, 20:7, 22:24, 22:25, 26:3, 31:24, 33:23, 41:24, 68:8, 68:23, 69:9, 69:14, 70:18, 73:20, 73:21, 74:6
**trial** [13] - 16:15, 19:9, 31:5, 32:12, 35:18, 41:18, 42:25, 54:18, 55:8, 58:14, 66:2, 67:18, 80:17
**Trial** [1] - 1:6
**TRIAL** [1] - 1:9
**tried** [1] - 63:23
**trier** [5] - 15:22, 17:10, 18:1, 23:17, 61:12
**true** [7] - 22:13, 22:14, 26:2, 64:6, 66:18, 68:8
**truly** [1] - 30:19
**trust** [3] - 37:20, 39:8, 61:12
**truth** [11] - 40:25, 42:25, 44:22, 48:17, 48:25, 49:1, 49:5, 67:2, 67:4, 67:20, 70:4
**truthful** [2] - 48:14, 64:12
**try** [11] - 28:19, 33:20, 36:12, 36:20, 42:14, 50:3, 54:14, 54:15, 69:22, 81:20
**trying** [14] - 6:13, 6:16, 25:14, 25:16, 25:19, 35:8, 35:9, 37:16, 41:11, 44:2, 50:6, 57:3, 57:14, 57:15
**turn** [1] - 58:6
**turning** [2] - 37:16, 44:3
**twice** [3] - 45:4, 45:17, 55:18
**two** [15] - 12:14, 18:6, 18:7, 26:1, 40:17, 42:7, 45:10, 48:19, 48:20, 55:9, 56:21, 62:17, 62:23, 77:4, 79:12
**type** [1] - 76:2

## U

**U.S** [1] - 53:20
**ultimate** [1] - 27:24
**ultimately** [1] - 17:23
**unanimous** [2] - 69:17, 78:8
**unbecoming** [1] - 64:4
**unclear** [2] - 37:18, 37:21
**uncontested** [1] - 62:2
**under** [37] - 4:10, 7:13, 13:2, 14:6, 16:14, 18:16, 18:18, 19:9, 21:7, 22:5, 22:12, 22:15, 22:17, 22:23, 22:25, 23:1, 24:10, 24:20, 25:13, 26:10, 26:20, 27:3, 28:5, 28:24, 29:4, 29:5, 29:10, 31:24, 31:25, 54:20, 59:6, 65:17, 70:17, 72:11, 73:17, 80:9
**understood** [2] - 11:3, 13:17
**underwater** [3] - 25:13, 25:17, 25:25
**unequivocal** [1] - 35:2
**unequivocally** [1] - 44:11
**unfairly** [1] - 16:13
**unimportant** [1] - 68:1
**UNITED** [2] - 1:1, 1:10
**United** [2] - 1:23, 82:19
**unless** [1] - 48:3
**unrefuted** [2] - 17:6, 17:8
**up** [43] - 7:12, 7:16, 16:15, 19:14, 19:25, 20:1, 21:16, 23:17, 24:22, 24:23, 25:7, 25:21, 27:5, 27:12, 30:16, 31:5, 31:22, 32:3, 32:4, 32:8, 33:4, 33:5, 36:13, 36:24, 37:3, 39:4, 40:11, 41:2, 41:18, 42:3, 46:4, 47:13, 48:7, 48:9, 55:8, 55:13, 56:4, 56:15, 57:14, 57:16, 69:25, 73:17, 76:9

## V

**vague** [2] - 6:18, 6:24
**valid** [1] - 17:2
**validity** [2] - 16:25, 19:16
**verbatim** [1] - 30:22
**verdict** [46] - 2:17, 3:4, 3:21, 4:16, 11:16, 12:10, 12:13, 12:16, 13:1, 13:19, 14:4, 14:20, 26:10, 34:8, 34:9, 34:11, 34:13, 40:21, 43:17, 57:18, 60:11, 61:5, 61:10, 61:22, 62:9, 62:12, 62:14, 64:21, 69:17, 69:19, 74:15, 75:10, 75:14, 75:15, 75:17, 76:11, 76:14, 77:13, 77:16, 77:19, 77:21, 77:22, 78:7, 78:9, 78:24
**VERNITA** [2] - 1:22, 82:18
**Vernita Allen** [1] - 1:25
**Vernita Allen-Williams@flsd.uscourts.gov** [1] - 1:25
**version** [1] - 76:17
**versus** [3] - 40:7, 41:20, 44:1
**viable** [1] - 35:24
**violate** [1] - 64:9
**violated** [9] - 36:18, 39:8, 40:19, 51:2, 55:16, 55:17, 55:22, 56:2, 72:1
**violation** [1] - 5:19
**voicemail** [1] - 28:15
**voted** [1] - 76:2
**vs** [2] - 1:5, 2:3

## W

**Wachovia** [1] - 30:21
**wait** [1] - 62:15
**waiting** [1] - 75:25
**waived** [8] - 3:10, 4:2, 7:25, 10:13, 14:3, 14:14, 18:25, 54:12
**waiver** [14] - 3:8, 3:21, 4:5, 4:15, 5:6, 7:23, 7:25, 10:11, 10:16, 11:2, 11:7, 13:23, 76:15
**waives** [1] - 10:13
**walk** [6] - 34:10, 36:20, 38:15, 38:23, 39:3
**walked** [5] - 33:6, 38:17, 39:23, 46:12, 56:24

**Walker** [1] - 21:11
**walks** [2] - 49:12, 75:10
**wants** [9] - 20:14, 20:18, 20:19, 39:2, 42:6, 43:2, 44:8, 49:9, 53:20
**warehouse** [2] - 17:18, 23:23
**warrant** [1] - 47:8
**warrants** [2] - 62:25, 64:10
**wasting** [2] - 50:10, 52:2
**wayside** [1] - 41:17
**weeds** [2] - 41:11, 42:19
**week** [1] - 81:20
**weekend** [1] - 82:11
**weigh** [4] - 18:2, 29:25, 31:17, 34:6
**weight** [2] - 51:16, 66:15
**welcome** [1] - 15:16
**West** [1] - 29:11
**whatsoever** [1] - 28:13
**whereby** [1] - 70:8
**whole** [5] - 61:11, 62:24, 65:10, 66:21, 72:16
**WILLIAMS** [2] - 1:22, 82:18
**Williams** [1] - 82:18
**Williams@flsd.uscourts.gov** [1] - 1:25
**willing** [3] - 7:16, 20:10, 73:11
**win** [2] - 53:4, 54:7
**wins** [1] - 49:12
**wish** [1] - 75:19
**withheld** [1] - 23:5
**witness** [22] - 48:8, 48:16, 48:24, 49:4, 49:10, 49:13, 49:22, 60:5, 66:19, 66:21, 66:24, 67:1, 67:3, 67:5, 67:7, 67:8, 67:10, 67:15, 67:16, 67:18, 67:20, 67:22
**witness's** [3] - 44:19, 50:13, 67:12
**witnesses** [8] - 44:18, 48:18, 48:21, 63:12, 63:13, 65:22, 66:22, 68:19
**woodwork** [2] - 57:14, 58:12
**word** [4] - 47:4, 60:12, 60:13, 60:19
**words** [15] - 7:9, 53:8, 53:12, 56:14, 56:19, 60:16, 60:21, 64:11, 69:17, 71:16, 73:9, 73:20, 73:22
**works** [2] - 51:12, 60:8
**world** [1] - 26:5
**worse** [1] - 73:23
**worth** [2] - 54:25, 80:15
**write** [10] - 60:12, 60:13, 60:16, 60:19, 60:21, 74:18, 74:19, 75:20
**writing** [3] - 71:18, 71:19, 75:22
**written** [5] - 9:21, 11:12, 11:14, 41:1, 80:10
**wrote** [1] - 5:2

**Y**

**year** [10] - 18:9, 24:24, 25:12, 25:13, 30:4, 45:4, 45:17, 55:18, 57:9, 59:15
**years** [6] - 18:6, 18:7, 18:10, 30:25, 45:10, 57:13
**yourself** [5] - 27:13, 48:9, 48:24, 67:14, 69:20
**yourselves** [6] - 40:20, 47:5, 48:16, 49:16, 56:9, 66:25

**Z**

**zero** [6] - 8:5, 14:21, 14:22, 14:23, 14:24
**zeroes** [1] - 5:17
**zillion** [1] - 36:1
**zoom** [3] - 25:8, 30:16, 31:7